**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| SKYSONG INNOVATIONS, LLC,<br>*Plaintiff*,<br>v.<br>FORTINET, INC.,<br>*Defendant*. | Civil Action No. 2:25-CV-00098-JRG |

# DEFENDANT FORTINET'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**


**I. INTRODUCTION** ........ 1

**II. '897 Patent** ........ 2

A. *"software vulnerabilities before disclosure based on the hacker communications from the [training data | plurality of datasets]" ('897 Patent, Claims 1, 14, 18)* ........ 2

B. *"likelihood of exploitation" ('897 Patent, Claims 1, 14, 18)* ........ 5

C. *"social connections [of users posting hacking-related content]" ('897 Patent, Claim 1)* ........ 6

**III. '831 Patent** ........ 8

A. *"full precision computation" ('831 Patent, Claim 1)* ........ 10

B. *"first set of most significant bits (MSBs)" ('831 Patent, Claim 1)* ........ 12

C. *"second set of most significant bits (MSB)s" ('831 Patent, Claim 2)* ........ 14

**IV. '721 Patent** ........ 14

A. *"data defining a first web content class and a second web content class" / "data defining rules for delegating web access associated with a first content class to a first browser type and delegating web access associated with a second content class to a second browser type" / "data associating a first web content class with a first browser type and a second web content class with a second browser type" ('721 Patent, Claims 1, 7, 12)* ........ 15

B. *"sensitive information presenting a security risk" / "sensitive information indicating that accessing the web content by the first browser instance presents a security risk" ('721 Patent, Claims 1, 16)* ........ 17

C. *"intercept a request" / "identifying a request" / "accessing a request" ('721 Patent, Claims 1, 7, 12)* ........ 19

D. *"browser instance type" / "first browser type" / "second browser type" ('721 Patent, Claims 1, 7, 12)* ........ 21

E. *"in order to manage according to the rules" ('721 Patent, Claim 12)* ........ 22

**V. '385 Patent** ........ 24

A. *"exploits on the computer system" / "exploits" ('385 Patent, Claims 1, 8, 15)* ........ 24

B. *"... set of vulnerabilities" ('385 Patent, Claims 1, 8, 15)* ........ 26

C. *"... minimum set of dependencies..." ('385 Patent, Claims 1, 8, 15)* ........ 28

**VI. CONCLUSION** ........ 30

# TABLE OF AUTHORITIES

**Cases**

*Akamai Techs., Inc. v. MediaPointe, Inc.*,
159 F.4th 1370 (Fed. Cir. 2025) .......... 19, 29

*Andersen Corp. v. Fiber Composites, LLC*,
474 F.3d 1361 (Fed. Cir. 2007).......... 16

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017).......... 1, 3, 5, 6, 20, 21, 25

*Barnhart v. Thomas*,
540 U.S. 20 (2003).......... 3

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*,
813 F. App'x 522 (Fed. Cir. 2020).......... 22, 23

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
435 F.3d 1366 (Fed. Cir. 2006).......... 23

*In re Taasera Licensing LLC, Patent Litig.*,
No. 2:22-MD-03042-JRG, 2023 WL 8628323 (E.D. Tex. Dec. 13, 2023) .......... 1

*Intell. Ventures I LLC v. T-Mobile USA, Inc.*,
902 F.3d 1372 (Fed. Cir. 2018).......... 17

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014).......... 18, 19, 29

*Liqwd, Inc. v. L'Oréal USA, Inc.*,
720 F. App'x 623 (Fed. Cir. 2018) .......... 19

*Sequoia Tech., LLC v. Dell, Inc.*,
66 F.4th 1317 (Fed. Cir. 2023) .......... 26

*Skysong Innovations, LLC v. Crowdstrike, Inc.*,
No. 7:25-cv-00040 (W.D. Tex. Mar. 12, 2026) .......... 2, 13, 19

*Wenger Mfg. v. Coating Machinery Systems*,
239 F.3d 1225 (Fed. Cir. 2001).......... 4

# TABLE OF ABBREVIATIONS

| Abbreviation | Full term |
|---|---|
| ’385 Patent | U.S. Patent No. 10,313,385 |
| ’721 Patent | U.S. Patent No. 10,574,721 |
| ’831 Patent | U.S. Patent No. 11,775,831 |
| ’897 Patent | U.S. Patent No. 11,892,897 |
| IPR | *Inter Partes* Review |
| PTO | U.S. Patent and Trademark Office |
| POSITA | Person Of Ordinary Skill In the Art |

## I. INTRODUCTION

It is a fundamental principle of patent law that claim language cannot be interpreted one way to preserve validity and another for infringement. Yet that is what Skysong appears to be attempting now. Skysong proposed constructions during IPR proceedings for six of the 14 terms-at-issue. Fortinet is proposing that this Court adopt those constructions. But Skysong has reversed course and now argues that the very constructions it proposed to the PTO are wrong. Although the PTO denied the IPRs on discretionary grounds without reaching claim construction, Skysong's positions at the PTO nevertheless defeat its positions here because "statements made by a patent owner during an IPR proceeding, whether before or after an institution decision, can be considered for claim construction and relied upon to support a finding of prosecution disclaimer." *Aylus Networks, Inc. v. Apple Inc*., 856 F.3d 1353, 1362 (Fed. Cir. 2017).

For five more terms, Fortinet's constructions are consistent with the plain and ordinary meaning to a POSITA in light of the intrinsic record. By contrast, although Skysong has proposed "plain and ordinary meaning," its apparent interpretations defy the intrinsic record and basic logic. Skysong's refusal to elucidate the meaning of these technical terms leaves their scope uncertain and serves only to preserve Skysong's ability to twist their meanings before a jury.

The remaining three terms are indefinite. None are terms of art, thus they have no plain and ordinary meaning. And even Skysong's own expert could not articulate the plain meaning. Instead, he admitted that one term is wholly dependent on a user's perspective; another term lacks antecedent basis; and the third term can be evaluated from any number of different levels of abstraction making it (in his words) "hard to define."

Skysong's reliance upon *In re Taasera Licensing LLC, Patent Litig*., No. 2:22-MD-03042-JRG, 2023 WL 8628323 (E.D. Tex. Dec. 13, 2023) is entirely misplaced. There, the Court

expressly gave guidance as to the scope of the terms "for clarity [by] expressly reject[ing]" arguments by the patentee in favor of Fortinet. *Id.*, 16.

## II. '897 Patent

The '897 patent recognizes that thousands of software vulnerabilities are publicly disclosed every year, but states that only a small percentage will actually be exploited by hackers. Dkt. 67-13, 1:32-64. The patent explains that vulnerabilities may be exploited hours after "the vulnerability [is] publicly disclosed." *Id.*, 1:51-57. The patent therefore purports to utilize existing machine learning algorithms (e.g., support vector machines) on hacker communications to identify the likelihood a vulnerability will be exploited "before disclosure" of a vulnerability. *Id.*, 5:30-32.

### A. *"software vulnerabilities before disclosure based on the hacker communications from the [training data | plurality of datasets]" ('897 Patent, Claims 1, 14, 18)*

| Fortinet's Proposed Construction | Skysong's Proposed Construction |
|---|---|
| "vulnerabilities not yet assigned a vulnerability number by NIST" **OR** "prior to disclosure to a public database" | Plain and ordinary meaning |

The core dispute here is whether "before disclosure" refers to computation of a likelihood of exploitation of a vulnerability (i) before the vulnerability's ***disclosure*** to a public database (e.g., the National Institute of Standards and Technology ("NIST")) (Fortinet's position); or (ii) before an "***actual exploitation***" of the vulnerability is disclosed (Skysong's apparent position). Fortinet's position is consistent with the claim language, the specification, Skysong's statements to the PTO, and the construction of this term in the "*Crowdstrike* case." *See Skysong Innovations, LLC v. Crowdstrike, Inc.*, No. 7:25-cv-00040 (W.D. Tex. Mar. 12, 2026), Dkt. 122. Skysong's position, on the other hand, has no intrinsic support and was recently rejected in the *Crowdstrike* case.

***(1) The disclosure must be of a vulnerability, not an actual exploitation***. The claim language—"wherein the likelihood of exploitation predicts an actual exploitation of the respective ***software vulnerabilities before disclosure*** based on the hacker communications from the training

data"—supports Fortinet's position, not Skysong's, for two reasons. First, the "before disclosure" language is proximate to "software vulnerabilities," indicating that disclosure refers to vulnerabilities. *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) ("[A] limiting clause or phrase ... should ordinarily be read as modifying only the noun or phrase that it immediately follows."). Skysong's argument that Fortinet's construction is reading "actual exploitation" out of the claims is a strawman. The claims make clear that the "actual exploitation" is "of the respective software vulnerability." Second, claim 12, which depends from claim 1, recites explains that it is the "disclosure of the ***vulnerability*** to the public ***vulnerability*** database." Skysong's claim differentiation argument for claim 12 is that the disclosure in claim 12 further limits the disclosure in claim 1, which is discussed later. But this position contradicts Skysong's position that the disclosure in claim 1 relates to "actual exploitations" because claim 12 confirms that the disclosure is of a vulnerability to a vulnerability database, not of an "actual exploit" to an exploit database. Fortinet's position is also consistent with the specification, which only describes disclosure of vulnerabilities, not exploits. Dkt. 67-13, 4:31-53 (discussing "publicly disclosed vulnerabilities" and "detecting real-world exploits"); 4:35-36 ("publicly disclosed vulnerabilities in its National Vulnerability Database (NVD)"); *see id*., 7:46-56, 12:35-44.

Furthermore, Fortinet's position is consistent with Skysong's own arguments before the PTO. In response to an IPR petition, Skysong argued that a prior art reference did not disclose this limitation because the prior art did not detect zero-day attacks, "which exploit ***vulnerabilities before their public disclosure***," and instead the prior art focused "on detecting the use of exploits against known vulnerabilitie***s***." Ex. A, 29. In other words, Skysong acknowledged that it what matters for the claims is the disclosure of vulnerabilities, not actual exploits. *See Aylus*, 856 F.3d at 1362 (statements during an IPR are binding).

In sum, the patent and Skysong consistently refer to the disclosure of vulnerabilities, not "actual exploits." Indeed, Skysong does not identify anything in the intrinsic record for support.

***(2) The disclosure must be made to a public database, like NIST***. Fortinet's construction is based upon Skysong's own statements to the PTO, defining the "disclosure date" as "the day [NIST] officially releases the ***vulnerability number***." Ex. A, 46. Fortinet's construction is also supported by the specification, which explains that NIST's NVD is "a comprehensive list of vulnerabilities disclosed." Dkt. 67-13, 1:61-62. Skysong raises two arguments in response. First, Skysong argues that the claims do not recite NIST, and the specification also refers to public data sources like NVD (which is the NIST vulnerability database), EDB, and ZDI. Dkt. 67, 5-6. To moot this argument, Fortinet proposes that the Court adopt the construction from the Western District of Texas. There, on March 12, 2026, the Court found that "before disclosure" means "prior to disclosure to a public database." Ex. B, 4.

Second, contrary to Skysong's argument, the doctrine of claim differentiation does not support its position. As a factual matter, dependent claim 12 does not recite "a time associated with discussion of a vulnerability by users posting hacking-related content at a web forum prior to disclosure to a public vulnerability database" to limit claim 1's disclosure to a public vulnerability database. Rather, claim 12 adds ***temporal*** connections to the analysis by looking at the intervals between different times. As a legal matter, claim differentiation does not apply here where the limitation in question is not "the only meaningful difference between the two claims." *Wenger Mfg. v. Coating Machinery Systems*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (limiting when claim differentiation typically applies).

Fortinet therefore asks the Court to construe "before disclosure" as "prior to disclosure to a public database." Ex. B, 4.

B. *"likelihood of exploitation" ('897 Patent, Claims 1, 14, 18)*

| **Fortinet's Proposed Construction** | **Skysong's Proposed Construction** |
|---|---|
| "requiring a gradient in order to facilitate 'ranking vulnerabilities' that are likely to be exploited, not a binary determination like 'exploited' or 'not exploited'" | Plain and ordinary meaning |

Fortinet's construction is not only the plain and ordinary meaning, but it comes directly from Skysong's own statements to the PTO about the meaning of this term. Skysong stated that:

> "likelihood of exploitation" in the '897 patent refers to a likelihood gradient in order to facilitate "ranking vulnerabilities" that are likely to be exploited. This would be impossible in a binary classification model consisting only of "exploited" and "not exploited."

Ex. A, 26 (citation omitted). Skysong's claim construction expert endorsed this construction. Ex. C, ¶ 179 (opining "that term requires a gradient"). This is a clear and unmistakable disavowal of any broader constructions of this term. And, contrary to Skysong's arguments to the contrary, its statements to the PTO during an IPR are part of the intrinsic record and can form the basis for prosecution disavowal. *See Aylus*, 856 F.3d at 1362. Skysong's failure to mention its own statements to the PTO is telling.

Fortinet's construction is also consistent with the plain and ordinary meaning of the word "likelihood," including as it is used in the patent. The ordinary meaning of likelihood refers to a likelihood gradient, e.g., percentage chance, of something happening. For example, the likelihood that it will rain tomorrow is typically expressed as a percentage chance of that happening. Indeed, the patent refers to "the likelihood of being exploited" as different percentages (9%, 12%, 14%, 2.4%). Dkt. 67-13, 4:1-9; 12:1-18. The patent also explains that a likelihood can "increase," which would not be possible for a binary determination. *Id.*

The intrinsic support Skysong relies upon is largely from a single sentence in the specification that states: "Computing the Likelihood of Exploitation (206): In all embodiments

presented in this disclosure, the problem is viewed as a binary classification problem, and several standard supervised machine learning approaches were evaluated and may be implemented." Dkt. 67-13, 7:8-12. That statement, however, is not defining the likelihood of exploitation as a binary determination. Instead, it is referring to the "supervised machine learning approaches" that can make binary determinations—e.g., a picture is a "cat" or a "dog"—but compute a likelihood gradient—e.g., decimal scale from 1 (cat) to 0 (dog)–to make that determination. Indeed, the very next sentence discloses that "[d]ifferent algorithms can be used to present the results of the likelihood of exploitation," including "rescaling the results, ranking vulnerabilities, categorizing vulnerabilities under pre-determine [sic] categories," which would not be possible with a binary output. *See id.*, 7:10-18. Even if Skysong's interpretation were true, this statement is squarely contradicted by the plain meaning, the specification, and Skysong's own statements to the PTO detailed above.

Skysong also refers to Table 2, which uses the word "binary"; but Table 2 describes "features used" in calculating the likelihood of exploitation, not the likelihood. *Id.*, 10:64-11:15.

C. *"social connections [of users posting hacking-related content]" ('897 Patent, Claim 1)*

| Fortinet's Proposed Construction | Skysong's Proposed Construction |
|---|---|
| "the in-degree and out-degree a given user has to other active users in the social network" OR "connections of a user to other users in a graph representing a social network" | Plain and ordinary meaning |

Again, Fortinet's proposed construction comes directly from Skysong's own clear and unmistakable disavowal of any broader constructions of this term in arguments to the PTO. *See Aylus*, 856 F.3d at 1362. There, Skysong stated: "'social connections' refers to the in-degree and out-degree a given user has other active users in the social network." Ex. A, 23 (citation omitted). Again, Skysong's failure to mention its statements to the PTO is telling.

Fortinet's construction is also supported by the specification, which explains that the Social Network Features "contain[] measures computed from the social connections of users posting hacking-related content. The basic social network features (e.g., in-degree, out-degree) indicates how active a user is in the social graph." Dkt. 67-13, 11:29-33. Indeed, Skysong's own expert agrees that Fortinet's proposed construction is "synonymous with" the plain and ordinary meaning of the term. Dkt. 67-3, ¶ 101. In other words, Skysong's argument that the plain and ordinary meaning does not include "technical graph-theory terminology" is contradicted both by its own statements to the PTO and its expert. As another option, Skysong's expert proposed: "connections of a user to other users in a ***graph*** representing a social network." *Id.* Although Fortinet's construction is consistent with the clear statements Skysong made to the PTO, Fortinet submits that Skysong's expert's graph definition could be an alternative if more helpful for a jury. Notably, this is the construction Skysong itself supported in the *Crowdstrike* case, but ultimately withdrew that construction. *CrowdStrike*, Dkt. 122, 4 (Crowdstrike's position was "Plain and ordinary meaning, where plain and ordinary meaning means connections of a user to other users in a graph representing a social network"). There, the Court ultimately did not enter a construction since Crowdstrike withdrew it. Given that the parties agree as to the plain and ordinary meaning here, the Court should adopt the construction to aid the jury.

Skysong's only other argument is that dependent claim 11 mandates a different construction under claim differentiation. Dkt. 67, 8-9. This is wrong. Claim 11 adds "accessing features from the plurality of datasets that measure a centrality of the users in a social graph." The specification explains the concept of a social network, with in-degree and out-degree features consistent with Fortinet's construction, and adds that "***[m]ore advanced features*** measure the ***centrality of users*** in the social graph." Dkt. 67-13,11:33-34. Thus, the specification reveals a

normal independent/dependent claim relationship: independent claim 1 recites social connections, with in-degree and out-degree features that may be represented in a graph, and claim 11 adds the "more advanced feature[]" of measuring the centrality of users within the graph.

## III. '831 Patent

The '831 patent acknowledges that convolutional neural networks ("CNNs"), including CNNs that use max pooling, were already known in the art. Dkt. 67-12, 1:22-29, 3:25-37. According to the patent, CNNs are compute- and memory-intensive. The conventional process is show in Figure 2:




***FIG. 2***

Step **208** is the ***convolution*** of the ***convolutional*** neural network. This step is the computationally expensive step because it involves matrix multiplication ("9 multipliers and adders"). In this example, step **208** takes as input a 3x3 matrix where each entry has 8 bits. This same matrix multiplication is repeated many times for a single dataset, compounding the computational requirement. *See id.*, Fig. 3, 6:35-50. After the convolutions are performed, the results from that step are put through a max pooling step **212**. This step will look at the combined results as 2x2 matrices and pass on ***only*** the highest number in each matrix.

The patent thus recognizes that "[o]ne of the largest redundancies in conventional CNNs is that a large amount of data is thrown away at each pooling layer, because only the maximum value is conveyed to the next layer." *Id.*, 3:25-28. The patent explains that "in 2×2 max-pooling, 75% of convolution computation data is thrown away at each pooling layer" and, "[i]n 3×3 max-pooling, 89% of convolution computing data is thrown away at each pooling layer." *Id.*, 3:28-32. According to Skysong's expert, "[t]his is the key insight of the '831 patent." Ex. D, ¶ 116. The patent therefore describes and claims a very specific purported improvement to conventional CNNs to avoid these redundancies: "***performing convolution first with a small number of most significant bits (MSBs)***" and doing a full precision convolution on only the maximum value since the system throws away the rest of the data. Dkt. 67-12, 3:33-37. This is shown in Figure 4:




Step **408** is the first convolution. The claimed system performs this convolution with only "a small number of" MSBs (2 bits in this example). *Id.* Because the matrix multiplications here are performed on only 2 MSBs, instead of all 8 bits, the computation and memory requirements are reduced. The results are stored in registers in step **410**. Then, at step **412**, the system will try to identify the maximum value and "[i]f a maximum is found, the 3×3 convolution may be performed and full precision convolution may be performed on the maximum-exhibiting data set (**414**)." *Id.*,

7:4-20. In short, the patent uses a small number of MSBs to try to identify the maximum value, which is the only value kept after max pooling. If it can identify the maximum, it will perform the full precision convolution for only that maximum value.

If the maximum value is not identified using those MSBs, however, the patent discloses that the system can repeat the process using a larger number of MSBs to try to identify the maximum value again. *Id.*, 1:51-2:11.

A. *"full precision computation" ('831 Patent, Claim 1)*

| Fortinet's Proposed Construction | Skysong's Proposed Construction |
|---|---|
| "performing a full convolution for a data set identified using the value calculated from a [first/second] set of most significant bits for a data set" | Plain and ordinary meaning |

Fortinet's construction is the plain and ordinary meaning of the term as it would have been understood by a POSITA, which is supported by the claim language and the alleged improvement over conventional CNNs detailed in the specification and explained above. Claim 1 recites:

> **[MSB step]** in one or more layers of a convolutional neural network (CNN), performing a first iteration that includes ***computing*** a value based on a first set of most significant bits (MSBs) for each of a plurality of data sets; [Step 408 above]
>
> **[max value step]** examining a first set of values computed for the plurality of data sets in the first iteration to determine whether a maximum value is present among the first set of values; [Step 412 above]
>
> **[full-precision step]** responsive to identifying the maximum value, ***performing a full precision computation*** of the value for a data set, of the plurality of data sets, that exhibited the maximum value. [Step 414 above]

Given the disclosure in the specification detailed above, a POSITA would have understood that the MSB step corresponds to **408** in Figure 4 because that step computes values using the MSBs; the max value step refers to **412** because that step determines the maximum value; and the full-precision step refers to **414** because the full-precision convolution is performed on only the identified maximum value.

Skysong's position and the order in the *Crowdstrike* case (which provides no reasoning) failed to account for all of this intrinsic support. First, Skysong argues that "full precision computation" should not be limited to "full precision convolution" because of claim differentiation compared to claim 4 and because it reads out disclosed embodiments. Dkt. 67, 9-10. But Skysong's claim differentiation position relies upon the premise that the "computing" in claim 4 refers to the "full precision computation" in claim 1. It does not. Claim 4 depends from claim 2:

> 2. The one or more non-transitory computer-readable storage media of claim 1, further comprising: responsive to determining that the first set of values are the same, performing, by the at least one processor, ***a second iteration that includes computing the value based on a second set of MSBs*** for each of the plurality of data sets, the second set of MSBs being larger than the first set of MSBs.
>
> 4. The one or more non-transitory computer-readable storage media of claim 2, ***wherein the computing in each of the first iteration and the second iteration employs a convolution and a pooling***.

Claim 4 refers to "the computing" in each of the first ***and*** second iterations. The ***only*** "computing" recited in the claimed ***second*** iteration is the MSB step. In other words, the limitations of claim 4 limit the "the computing" of the MSB step and therefore have no bearing on the full-precision step.

Skysong's argument that Fortinet's construction would read out embodiments is likewise wrong. Every embodiment in the patent performs a convolution for the full-precision step. *E.g.*, Dkt. 67-12, Fig. 4-5, 7:15-20, 7:58-8:7. Skysong has not and cannot point to a single embodiment in the specification that uses a calculation other than convolution for the full-precision step. There are none. Instead, Skysong is reduced to arguing that the specification uses "permissive language" and that "operation-type is an implementation detail." Dkt. 67, 10. This argument, however, belies the fact that the claims recite that the calculation must be "in one or more layers of a ***convolutional*** neural network (CNN)," which necessarily involves a ***convolution***. Even Skysong's expert agreed that the full-precision step must include a convolution as part of it. Ex. E, 80:16-81:5. Plus, Fortinet's construction does not preclude other calculations from also being part of the full-

precision step. Fortinet would also support a construction that recognized this more explicitly: "performing a full computation, comprising a convolution…."

Second, Skysong argues that insofar as Fortinet's construction requires that the full-precision step be "for a data set identified using the value calculated from" the MSB determination is "superfluous" and "risks confusing the jury." Dkt. 67, 10. In doing so, Skysong argues that the limitation is "already capture[d]" in the claims. *Id*. Fortinet's construction is meant to clarify for the jury that the full-precision step is performed on the data previously determined to have the maximum value as part of the MSB and max value steps.

B. *"first set of most significant bits (MSBs)" ('831 Patent, Claim 1)*

| Fortinet's Proposed Construction | Skysong's Proposed Construction |
| --- | --- |
| "first set of bits containing at least the two highest-order contiguous bits, but less than all the bits, in a data set" | "a first set of bits containing two or more high order bits, but less than all the bits, in a data set" |

The sole difference in the parties' proposals centers around whether "***most*** significant" in fact means "***most*** significant," or whether, as Skysong contends, it can instead mean fairly or somewhat significant. Consistent with the plain meaning of the word "most," Fortinet's construction informs a jury that the "***most*** significant bits" refer to the "***highest***-order contiguous bits" in a number. As an initial matter, this is consistent with the plain and well-understood meaning of the word "most." This plain meaning is confirmed by the specification. Figure 1B depicts three subsets of bits: "most significant bits (MSB) **102**," "least significant bits (LSB) **104**," and "bits **106** in between the MSB and LSB ."




FIG. 1B

As shown, the MSBs are just that: the ***most*** significant (highest order) bits. The LSBs are the ***least*** significant (lowest order) bits, and the remaining bits are in between the MSB and LSB.

Skysong insists that, because the highest order bits are sometimes the same, the system can instead determine the maximum by using lower order bits or non-contiguous bits. Dkt. 67, 12. Not true. The highest order bits are always the MSBs, whether or not they happen to match. Tellingly, the '831 patent accounts for the fact that the MSBs of numbers may match. In those circumstances, the patent discloses using "second set of MSBs being ***larger*** than the first set of MSBs." Dkt. 67-12, 1:56-57. Skysong cherry-picks the numbers "1934" and "1925" to illustrate its argument. In this example, using a larger set of MSBs means that, if a system determines that "19" both match, it would use a larger set of digits and compare "193" with "192." The '831 does not disclose using a ***different*** set of bits because that would likely yield the incorrect result.

Yet this is what Skysong proposes. Skysong argues that, because the thousands and hundreds places happen to match for these two particular numbers, the ***most*** significant bits for these four-digit numbers can actually be the ***least*** significant bits (19**34** and 19**25**) since those happen to be the digits that distinguish the numbers. This position completely undermines the plain meaning of "most." The thousands and hundreds places are ***always*** the most significant places of a four-digit number. Using any other places would yield the incorrect result. For example, a system using Skysong's logic would determine that 19**34** and 19**25** are both higher than 99**01** and 80**03**. The same is true for using non-contiguous bits—e.g., "**1**9**3**4" and "**1**9**2**5" would be determined to be lower than "**1**0**9**9." Using Skysong's logic, a person could delude himself into believing he had more money than Elon Musk if his bank account ended in "$9.99." No rational person would do that. The order in the *Crowdstrike* case is wrong for the same reasons.

C. *"second set of most significant bits (MSB)s" ('831 Patent, Claim 2)*

| Fortinet's Proposed Construction | Skysong's Proposed Construction |
|---|---|
| "second set of bits containing at least one more highest-order contiguous bit than the first set of most significant bits (MSBs) in a data set" | Plain and ordinary meaning |

There are two issues to address for this term. The first is the same as a previous term: whether "***most*** significant bits" is consistent with the plain meaning of "most" (Fortinet's proposal) or whether it can encompass implementations where the ***least*** significant bits can instead be used (Skysong's proposal). Skysong's position fails for the same reasons set forth in the previous term.

Skysong additionally argues that "the added bits [for the second set] need not be the next contiguous MSB and that the bit growth can encompass intermediary bits adjacent to the MSBs." Dkt. 67, 13-14 (citing Dkt. 67-12, 5:40-49). That passage of the patent, however, simply states that the second set of bits can encompass "the MSB **102** and the intermediary bits **106**" in Fig. 1B above. ***These bits are contiguous***. And, as detailed above, using non-contiguous bits is technically (and mathematically) incorrect and inconsistent with the plain meaning of the word "most."

The second issue is Skysong's misinterpretation of Fortinet's construction. Skysong argues that Fortinet's construction requires "fixed one-bit increment," such that the second set is a fixed one bit larger than the first set. Not true. Fortinet's construction recites that the second set of MSBs needs to have "***at least*** one more" bit to make sure the jury understands what it means for the second set to be "larger" than the first set, as required by the claims.

## IV. '721 Patent

The '721 patent purports to improve the security of web browsing by automatically compartmentalizing different categories of web content into different browser types. In particular, the patent describes associating different "classes" of web content—e.g., "sensitive content"—with different types of browsers. The patent describes an "automatic fresh browser instance"

system that launches a separate fresh browser to handle so-called "sensitive content," rather than allowing it to be accessed through an existing browser session. The patent explains that the system uses an enforcer and an enabler/daemon to monitor requests, manage active browser instances, and maintain isolation for sensitive content.[1]

A. *"data defining a first web content class and a second web content class" / "data defining rules for delegating web access associated with a first content class to a first browser type and delegating web access associated with a second content class to a second browser type" / "data associating a first web content class with a first browser type and a second web content class with a second browser type" ('721 Patent, Claims 1, 7, 12)*

| Fortinet's Proposed Construction | Skysong's Proposed Construction |
|---|---|
| "data defining a first web content class and a second web content class, not simply storing a collection of pre-defined non- trusted sites" / "data defining rules for delegating web access associated with a first content class to a first browser type and delegating web access associated with a second content class to a second browser type, not simply storing a collection of pre- defined non-trusted sites" / "data associating a first web content class with a first browser type and a second web content class with a second browser type, not simply storing a collection of pre-defined non-trusted sites" | Plain and ordinary meaning |

The parties agree that the plain language of the claims requires "***two*** distinct content classes—a 'first web content class' and a 'second web content class'—each linked to a respective browser type." Dkt. 67, 15 (Skysong's emphasis). Fortinet's construction makes clear that the "***data***" defining each class cannot simply comprise a ***single*** list such that the two distinct classes consist of: (Class 1) all URLs in the list and (Class 2) all other URLs not in the list. This

[1] Skysong's opening brief fails to address the parties' dispute regarding the '721 patent term "browser" / "browser instance." (*See* Dkt. 46-1 at A-9 (dispute No. 12).) Fortinet's construction is consistent with the plain meaning of the term, the specification's use of the term (*see, e.g.*, Dkt. 67-11, 1:24-45, 1:59-2:3, Figs. 1-2) and the *CrowdStrike* court's construction (Ex. B at 3.). It should be adopted. Skysong apparently concedes as much, given its failure to brief the issue.

clarification is required by the applicant's statements during prosecution. In distinguishing the prior art (the Loesch reference), the applicants argued that Loesch discloses the use of a single list of non-trusted websites and that this is different than the claimed invention. *See* Dkt. 67-7, ASU_FN0000354 ("Loesch describes a web site database 44 ***storing a collection of pre-defined non-trusted sites***. Loesch does not describe breaking down URL access according to content classes as described in detail throughout the specification."). The claims, therefore, cannot encompass a single list of non-trusted sites because Skysong cannot recapture what was surrendered during prosecution. *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007) ("an applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope…."). Fortinet's construction incorporates the exact language used by the applicants during prosecution to confirm that a single list is not enough.

Contrary to Skysong's allegation's Fortinet's construction does not preclude the use of "lists," (Dkt. 67, 15-16) but instead only makes clear that a single list is insufficient. This is consistent with the specification. For example, as in Fig. 3, there are separate lists for each class:




Skysong concedes as much in its brief, agreeing that "a ***single*** blacklist, which was all that Loesch had disclosed, lacked the ***two-class*** structure the claims require." Dkt. 67, 16-17 (Skysong's emphasis). Given that the parties agree, the question is what construction should be adopted to inform the jury. Fortinet's construction adopts the language straight from the prosecution history, but Fortinet alternatively proposes: "data

defining a first web content class and separate data defining a second web content class" to avoid any implication that separate lists for each separate class would not meet the claims. *See id.*, 16.

Skysong's proposal, "wherein the data must consist of more than, but may include, a single collection of pre-defined non-trusted sites" (*id.*, 17) is inconsistent with the file history because the applicants confirmed that the claims require "breaking down URL access according to content classes," Dkt. 67-7, ASU_FN0000354. That is not captured by Skysong's proposal it would encompass two lists of the ***for the same class***, when there should be separate lists for each class. The claims require two ***different*** classes of web content, including one for non-sensitive information and one for sensitive information.

B. *"sensitive information presenting a security risk" / "sensitive information indicating that accessing the web content by the first browser instance presents a security risk" ('721 Patent, Claims 1, 16)*

| Fortinet's Proposed Construction | Skysong's Proposed Construction |
|---|---|
| Indefinite | Not indefinite; Plain and ordinary meaning |

This term is indefinite because, as Skysong readily admits, the term is subjective and the '721 patent never provides an ***objective*** boundary for what qualifies as "sensitive information," or how a POSITA would determine when information is "presenting a security risk." *Intell. Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018). (finding claim term with "different meanings for different users" indefinite).

First, the intrinsic record does not define the term "sensitive information," let alone "sensitive information presenting a security risk." The claims only require that the second web content class be "associated" with sensitive information presenting a security risk, but do not define the term. The specification likewise does not define the term and confirms that it is subjective. For example, the specification explains that an "experienced user" may define conflict-of-interest classes and that "a non-judicious choice of classes can pose a security risk." Dkt. 67-

11, 5:27-35, 8:56-57. It gives a banking website as an example. *Id.*, 4:54-64, 6:11-17. But this example is not a definition, *see Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1373-74 (Fed. Cir. 2014) (finding the specification's single example did not supply objective boundaries for the phrase's full scope), and the patent never states what makes information "sensitive" in a way that permits a POSITA to determine the metes and bounds of the claim.

The same is true of the prosecution history. According to Skysong, during prosecution, the applicants explained that "content classes" are defined by security criteria and the Examiner likewise analyzed the term in the context of class-based handling. Dkt. 67, 20. But this does not define what it means for information to be "sensitive" or to "present a security risk"; it merely confirms that an aspect of the invention is to use a separate type of browser for this information. In sum, the patent intrinsic record repeatedly confirms that the term is a subjective one—what it means for information to be "sensitive" is entirely up to the user.

Skysong's own expert, Dr. Medvidovic, repeatedly confirmed the subjective nature of the term. When asked for the plain and ordinary meaning of "sensitive information," he repeatedly refused and instead stated that "sensitive information is information that is sensitive." Ex. E, 65:11-18. And when asked whether specific examples of information were sensitive, he repeatedly confirmed that context matters, noting that in some instances information such as a user's "weight" or even "eye color" "***could be*** sensitive information," "depending on context." *Id.*, 66:15-67:16. He also testified that different users (*e.g.*, a medical professional and a lay person) may view the sensitivity of information differently. *Id.*, 53:22-54:11. In short, Dr. Medvidovic's conclusion is that what constitutes "sensitive information presenting a security risk" is completely up to the user. Dkt. 67-3, ¶ 42 ("What specific information a particular user considers 'sensitive' is irrelevant in the context of the '721 patent.").

The Federal Circuit has confirmed that subjective claim terms, which depend on user viewpoint, are indefinite. *Interval Licensing*, 766 F.3d at 1373; *Akamai Techs., Inc. v. MediaPointe, Inc.*, 159 F.4th 1370, 1378 (Fed. Cir. 2025). Such is the case here, as confirmed by the totality of the intrinsic record and by Skysong's own expert.[2]

Lastly, that Fortinet uses the term "sensitive information" in its documents does not change the result. Dkt. 67, 18-19. First, Skysong ignores that the full term at issue is "sensitive information presenting a security risk." Regardless, Skysong has not argued (and cannot argue) that any of the extrinsic evidence confirms that the term has ***objective*** metes and bounds. For this reason, Skysong's reliance on *Liqwd, Inc. v. L'Oréal USA, Inc.*, 720 F. App'x 623, 628–29 (Fed. Cir. 2018), is misplaced. There, the Federal Circuit rejected indefiniteness because a term that required visual inspection was tied to an objective, testable standard as confirmed by that defendant's own documents. *Id.*, 629. Here, by contrast, Skysong identifies no comparable objective standard or evidence (including from Fortinet) showing that "sensitive information presenting a security risk" has consistent, ***objective*** boundaries. Instead, all of the evidence, including the evidence that Skysong itself marshalled, confirms what is covered by this term depends on the user's view, not a fixed standard that would give a POSITA reasonable certainty as to claim scope.

C. *"intercept a request" / "identifying a request" / "accessing a request" ('721 Patent, Claims 1, 7, 12)*

| Fortinet's Proposed Construction | Skysong's Proposed Construction |
|---|---|
| "intercept a system call" / "identify a system call" / "access a system call" | Plain and ordinary meaning |

Fortinet's construction comes directly from Skysong's own statements to the PTO:

[2] Skysong notes that in the *CrowdStrike* litigation, the Magistrate Judge issued an order finding the term not indefinite. Dkt. 67, 17-18. But that order includes no explanation for any of its constructions, it has yet to be adopted by the District Court Judge in that case, and is not binding.

> "[T]he plain and ordinary meaning of the term 'intercept a request' [to access web content from the first browser instance] as understood by a POSITA at the relevant time is to 'intercept a system call' issued by the browser."

Ex. F, 16 (citation omitted). Skysong's claim construction expert, Dr. Medvidovic, also endorsed this construction. Dkt. 67-3, ¶ 117. But again, despite offering this exact construction to the PTO during IPR proceedings, Skysong now argues that it is incorrect. Dkt. 67, 21-22. As explained above, Skysong cannot simply ignore its statements to the PTO, which the Federal Circuit has confirmed are part of the intrinsic record. *See Aylus*, 856 F.3d at 1362.

Fortinet's construction is also consistent with the plain meaning based upon the remainder of the intrinsic record. Fortinet's construction properly translates the claimed "request" limitations into the technical mechanism the patent discloses for making and intercepting those requests. In the '721 patent, a browser "request" to access a website is implemented through low-level communications that the system monitors and intercepts, *i.e.*, system calls such as "connect," "rcvfrom," and "read." Dkt. 67-11, 7:15-8:11, 9:1-40. A POSITA would therefore understand the claimed interception, identification, and accessing of a request to refer to interception, identification, and accessing of the corresponding system call.

Skysong argues that the specification also discloses a browser-extension embodiment and therefore "request" must be broader than "system call." Dkt. 67, 20-22. But this directly contradicts Skysong's description of the patent specification in its own statements to the PTO. *See* Ex. F, 14-16 (Skysong describing how the patent explicitly discloses an enforcer that implements the limitation by intercepting system calls). As Skysong admits, the "intercepting aspect" of the enforcer "is described in the section 'Intercepting System Calls.'" *Id.* (citing Dkt. 67-11, 7:16-44), which further confirms that Fortinet's construction is correct.

In sum, Fortinet's construction is what Skysong advocated to the PTAB during IPR and it is supported by entirety of the intrinsic record. It should therefore be adopted.

D. *"browser instance type" / "first browser type" / "second browser type" ('721 Patent, Claims 1, 7, 12)*

| Fortinet's Proposed Construction | Skysong's Proposed Construction |
|---|---|
| "the type of internet browser (e.g., Google Chrome or Mozilla Firefox) used for the instance" / "first type of internet browser (e.g., Google Chrome or Mozilla Firefox) used for the instance" / "second type of internet browser (e.g., Google Chrome or Mozilla Firefox) used for the instance" | Plain and ordinary meaning |

Again, Fortinet's construction is consistent with Skysong's statements to the PTO:

> "The term 'browser instance type' is properly construed as 'the type of internet browser used for the instance'"

Ex. F, 16 (citation omitted). Skysong's claim construction expert endorsed this construction as well. Dkt. 67-3, ¶ 122. Skysong's failure to mention its own statements to the PTO is both telling and improper. *See Aylus*, 856 F.3d at 1362.

Fortinet's construction is also consistent with the remainder of the intrinsic record. The patent describes browser-type rules that specify whether a class should be opened in (a) Mozilla Firefox, (b) Google Chrome, (c) the same type as the launcher, (d) a different type than the launcher, or (e) with no restriction on browser type. Dkt. 67-11, 5:51-6:2. In other words, "browser instance type" is about the type of browser for a given instance. Fortinet's construction thus naturally aligns with the patent's description of the invention—using one type of internet browser for one content class, a second type of internet browser for the second content class.

Contrary to Skysong's contention, Fortinet's construction ***does not limit*** the claims to Chrome or Firefox. The parenthetical examples are just that—examples. They are also drawn directly from the patent, which identifies "F" as Firefox and "C" as Chrome, as examples of internet browsers. *Id.* Fortinet's construction therefore simply adds well-known examples of types of internet browsers for the jury using examples provided by the specification.

Skysong attempts to resist construction by arguing that the patent contemplates "any type of internet browser." Dkt. 67, 22-24. Fortinet agrees. But that does not eliminate the need to explain to a jury that "browser instance type" means ***different types*** of browsers, not two windows or tabs of the same type of browser. Fortinet's construction faithfully captures Skysong's definition to the PTO and is fully consistent with the patent's specification.

E. *"in order to manage according to the rules" ('721 Patent, Claim 12)*

| **Fortinet's Proposed Construction** | **Skysong's Proposed Construction** |
| --- | --- |
| Indefinite | Not indefinite; Plain and ordinary meaning |

The phrase "in order to manage according to the rules" is indefinite because claim 12 never tells a POSITA what "the rules" are. Claim 12 omits ***any*** antecedent reference to rules, reciting only "data associating a first web content class with a first browser type and a second web content class with a second browser type." Dkt. 67-11, cl. 12. Claim 12 then later refers to a daemon that launches a new browser instance "in order to manage according to the rules." *Id.* That missing antecedent basis creates uncertainty, which renders the term indefinite. *Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x 522, 526 (Fed. Cir. 2020).

Here, the '721 patent's specification discloses ***five*** exemplary, and ***different*** types of rules:


that instance. To allow for using different browsers for different classes, e.g. using Google Chrome for e-commerce and Mozilla Firefox for banking, we specify the browser type rule that should be followed for each class with a type descriptor (that comes immediately after a in the sample file):

'F': Mozilla Firefox instance should be used
'C': Google Chrome instance should be used
'=': the launched browser instance should be the same type as the launcher
'!': the launched browser instance type should be different from that of the launcher
'_': places no restriction on the type of the browser



Dkt. 67-11, 5:51-63 (depicting rules 'F', 'C', '=', '!', and '_').

Skysong alleges that "the rules" refers to rules "expressly described elsewhere in the claims and specification." Dkt. 67 at 24-25. The problem for Skysong, however, is that a POSITA reading claim 12 would not know which of the five rules in the specification, if any, are the claimed "the rules" or if other unlisted rules are encompassed. The claim does not specify what "rules" are meant by the claim – should the same browser be used? A different browser? Is there any restriction? The specification provides different examples of different ***possible*** rules (using Firefox, Chrome, the same type as the launcher, a different type from that of the launcher, or placing no restriction on the type of browser). A POSITA would have to guess as to which "rules" claim 12 is meant to cover. And notably, neither Skysong's brief, nor its "plain meaning" construction, nor its expert's declaration provides any additional clarity. This ambiguity—what "rules" are within the scope of the claim?—renders the term indefinite. *Bushnell*, 813 F. App'x at 526 (Fed. Cir. 2020) (holding "said different IP Address" indefinite because the claim contained three possible IP address referents and the claim context and the specification did not clarify).

The term's ambiguity also distinguishes the facts here from those in the cases Skysong relies on. Dkt 67, 24-25. For example, in *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366 (Fed. Cir. 2006), the missing antecedent basis was not fatal because the claim still had a single obvious implied referent—"anode gel" for "said zinc anode"—so a POSITA could readily understand the claim's scope. *Id.*, 1370–71. Here, by contrast, claim 12 never identifies what "the rules" are, and the specification discloses multiple different rule types, leaving a POSITA to guess which set of rules the daemon must follow. This ambiguity affects the substantive scope of the claim and renders the phrase indefinite.

Skysong's alternative argument, that "rules" refers to "instructions" from the preamble only further underscores the ambiguity of the term. Dkt. 67, 25. The structure of claim 12 is such

that ***all*** steps of the claim are implemented by "the set of instructions," and so if "the rules" just means the instructions, the term is effectively rendered meaningless.

This is therefore not a case of minor drafting imperfection with an obvious referent. The claim uses the definite article—"the rules"—without ever introducing rules in claim 12. Because a POSITA is left to guess which rules are meant by the term, the phrase is indefinite.

## V. '385 Patent

The '385 Patent is directed to a data-driven, game-theoretic framework for cyber threat mitigation. The patent describes a system that models an attacker and defender based on exploit-market data mined from the darknet, corresponding vulnerabilities, and functional constraints of the target system. Using those inputs, the framework evaluates which exploits an attacker is likely to obtain within a given budget and which vulnerabilities a defender must continue to tolerate in order to preserve necessary system functionality, including through the use of "constraint sets" representing the "minimum dependencies needed to operate the system." The patent thus seeks to guide penetration testing, hardening, and mitigation decisions by identifying how to reduce attacker payoff and narrow avenues of attack while maintaining required system operation.

### A. *"exploits on the computer system" / "exploits" ('385 Patent, Claims 1, 8, 15)*

| Fortinet's Proposed Construction | Skysong's Proposed Construction |
|---|---|
| "source code or executable software designed to leverage a vulnerability in a computer system" | Plain and ordinary meaning |

The dispute with "exploits" is whether the claims refer to actual code or software that exploits a vulnerability and penetrates a computer system (Fortinet's construction) or if performing the method using a mere description of how to penetrate a computer system suffices (Skysong's apparent interpretation). *See, e.g.*, Dkt. 67, 26-27 (Skysong arguing "exploit" encompasses any

"technique or method" including "social engineering techniques"). Fortinet's position is backed up by Skysong's IPR arguments, the claims, and the specification.

First, Skysong again contradicts its IPR position. There, it and its expert argued the prior art did not refer to or otherwise obtain "exploit code," but only to exploit "characteristics," such as a threat's signature, action, sequence of actions, or consequence, and thus did "not [refer] to the exploit itself." Ex. G, 17-19; Ex. H, ¶¶ 108, 111, 114. Those statements reflect the ordinary technical distinction Fortinet is asking the Court to adopt here: an exploit is the exploit itself, not merely information describing how to take advantage of a vulnerability. Skysong cannot run from its IPR positions. *See Aylus*, 856 F.3d at 1362.

Second, the entirety of the intrinsic record confirms Fortinet's position. The claims themselves require that the "exploit" is "configured to penetrate the computer system." Dkt. 67-10, cl. 1. Because a mere description of an exploit (e.g., a method or data about an exploit) is not itself "configure[able]" to penetrate anything, Skysong's understanding of the term must be wrong.

The specification also supports Fortinet's construction. The purported invention of the '385 patent is the application of conventional "game theoretic approach[es]…where the activities of the attacker are informed from…information from darknet markets. " Dkt. 67-10, 2:26-31. In other words, the purpose of the invention is to model an attack based on actual exploits that attackers and defenders can obtain on a darknet marketplace, and can budget for, apply, and/or reverse-engineer. The '385 specification's explanation of the "express purpose of the invention 'informs the proper construction of claim terms,'" and the Court should therefore adopt Fortinet's proposal. *Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1326 (Fed. Cir. 2023). The '385 specification further discusses darknet markets "specializing in zero-day exploit kits—exploits designed to leverage previously undiscovered vulnerabilities," and explains that such exploit kits

are sold at premium prices. Dkt. 67-10, 1:26-45. Table 1 then lists example products offered on darknet markets, including code-signing certificates, remote shells, botnets, and specific software exploits. *Id.*, Table 1. The patent likewise describes obtaining a "set of exploits" within a budget, applying those exploits to the system, and reverse-engineering one or more of the exploits to patch the exposed vulnerability. *Id.*, Fig. 7, 12:66-13:18. And the specification specifically refers to these products—including the botnets relied on by Skysong—as "hacking tools," confirming that the claimed invention is directed towards the software/code itself and not mere descriptions about potential attacks. *Id.*, 7:45-51; Dkt. 67, 26. The patent thus confirms that the term "exploit" is referring to software or an executable tool, not merely information about attack consequences.

In sum, Fortinet's construction should be adopted consistent with Skysong's own statements to the PTO and the intrinsic record.

B. *"… set of vulnerabilities" ('385 Patent, Claims 1, 8, 15)*

| Fortinet's Proposed Construction | Skysong's Proposed Construction |
|---|---|
| "the set of vulnerabilities that are exploited by the set of exploits" | Plain and ordinary meaning |

The term "set of vulnerabilities" refers to and should be construed as "the set of vulnerabilities that are exploited by the set of exploits." That construction is consistent with the entirety of the intrinsic record, including the plain language of the claim and the specification's definition of exploit function. All of the independent claims refer to the "set of vulnerabilities" as the output from the "exploit function." The claims recite "applying an exploit function which takes the set of exploits as input and returns a set of vulnerabilities." Dkt. 67-10, cls. 1, 8, 15. The specification then explains exactly what that means: "The set of vulnerabilities produced by ExF(A), for a given set of exploits A, represents ***the vulnerabilities that are exploited by the exploits in A***." *Id.*, 3:61-64. This confirms that Fortinet's construction is correct.

Skysong attempts to circumvent this straightforward definition by isolating the word "represents" in the '385 specification and arguing that the returned set could constitute some unspecified "representative" subset—a construction that finds no support in the '385 patent. Dkt. 67, 27-29. Short of its overreliance on the word "represents," Skysong has identified no disclosures suggesting that the exploit function could or would return any vulnerabilities beyond those exploited by the set of exploits. (*Id.*) Because no such embodiments are disclosed, no such embodiments are purportedly "read out" of the claims. (Dkt. 67, 28.)

Skysong mischaracterizes the disputed passage to suggest that the extension from "singletons" to "a set of exploits" somehow means that the exploit function can return vulnerabilities untethered to the inputted exploits. Not so. The correct understanding of that passage is more straightforward and supported by Skysong's own PTAB arguments: whereas the prior art may have analyzed a single exploit at a time, the '385 Patent purports to look at "a set of exploits" at once. Thus, the "straightforward definition" extends the exploit function from a single exploit to "sets of exploits: $ExF(A)=\cup_{a\in A}{}^{ExF}(\{a\})$." Dkt. 67-10, 3:64-4:2. This simple explanation is confirmed by Skysong's own IPR arguments, where it repeatedly relied on this distinction in distinguishing the prior art *Vallone* reference: "*Vallone* discloses simulating and analyzing ***a single exploit at a time***,…[and not] a 'set of exploits.'" Ex. G, 25-28.

Fortinet's construction thus does not read in an extraneous limitation nor read out disclosed embodiments. It simply states the input-output relationship that the patent itself defines. Without that, Skysong's plain-meaning position risks untethering the returned "set of vulnerabilities" from the "set of exploits" supplied to the exploit function, even though the patent expressly links the two (both in the claims and in the specification). Nowhere does the specification suggest that the "set of vulnerabilities" output by the exploit function need not be tied to a specific set of exploits

(A), but instead can be arbitrarily selected from the full universe of potential vulnerabilities, and Skysong cites no evidence to argue otherwise. The Court should adopt Fortinet's construction.

C. *"… minimum set of dependencies…" ('385 Patent, Claims 1, 8, 15)*

| Fortinet's Proposed Construction | Skysong's Proposed Construction |
|---|---|
| Indefinite | Not indefinite; Plain and ordinary meaning |

"Minimum set of dependencies" is indefinite because the patent never defines what counts as a "dependency," at what level of abstraction dependencies are to be assessed, or how a POSITA would determine when a set is the "minimum." The specification uses the term "software dependencies" only twice: "defender will look to adjust system configurations in an effort to minimize the effectiveness of an attacker while ensuring that necessary software ***dependencies*** are satisfied"; "[s]oftware ***dependencies***, use of legacy systems, and non-availability of patches are some examples" of why administrators may be unable to patch all vulnerabilities. Dkt. 67-10, 2:67-3:3, 3:27-29. While these passages describe problems in the art, they do not clarify what a dependency is or provide an objective understanding for a minimum set of such dependencies.

The uncertainty is substantial. As an initial matter, "minimum set of dependencies" is ***not*** a term of art, and Skysong has presented no evidence to the contrary. There is thus no "plain and ordinary meaning" because the term is not used outside the context of this alleged invention. And because it is neither a term of art nor a term guided by specification support, it is unsurprising that Dr. Medvidovic admitted that he did not provide a definition in his declaration or otherwise provide any statement explaining that "The definition of minimum set of dependencies is ___" or "The plain and ordinary meaning of minimum set of dependencies is ____." Ex. E, 126:5-23.

Indeed, Dr. Medvidovic admitted that defining a "dependency" is a "hard question to answer" because a "dependency" could be analyzed at different levels of abstraction—"a module," an application, or some other software component. *Id.*, 132:15-25; 136:12-19. This testimony

gets to the heart of the indefiniteness problem: the patent provides no definition or objective rule for identifying the relevant unit of dependency. Skysong argues that "a minimum set of dependencies" is not indefinite, but Skysong's own expert confirms that it is hard to know what counts as a "dependency." Without understanding what a dependency is in this context, how can anyone know whether they've identified the "***minimum*** set of dependencies?" As Dr. Medvidovic explained, the '385 patent "is completely consistent with kind of the larger world's understanding that somebody's module is somebody else's subsystem, and somebody's subsystem is somebody else's component, and somebody's application is somebody else's system and so forth." *Id.*, 134:3-7.) When a claim term's scope depends on a user's subjective understanding, as Dr. Medvidovic confirmed here, it is indefinite. *Interval*, 766 F.3d at 1373; *Akamai*, 159 F.4th at 1378.

The term "minimum" does not cure the ambiguity, but instead compounds it. Skysong and its expert have equated "minimum" to "necessary," but even if that were correct, the patent leaves it to the defender or system administrator to decide what functionality is "necessary" and what can be dispensed with. *See id.*, 139:9-23; 140:3-16. Two different administrators could therefore identify different "necessary" functionality, analyze dependencies at different abstraction levels, and arrive at different "minimum" sets. Again, a claim whose scope turns on that kind of subjective, implementation-specific judgment does not provide reasonable certainty.

Skysong points to the surrounding discussion of "constraint set[s]" and argues that the concept is bounded by the vulnerabilities needed to preserve functionality. Dkt. 67, 29-30. But that is simply a re-wording of "necessary," without providing any additional guidance. The patent never tells a POSITA how to determine which software relationships count as dependencies, how to measure minimality, or when an alternative configuration no longer provides the claimed

"necessary" functionality. Because the term leaves those critical questions unanswered, it is indefinite.

## VI. CONCLUSION

For the foregoing reasons, Fortinet respectfully requests the Court to adopt its proposed constructions.

Dated: April 14, 2026

Respectfully submitted,

*/s/ Melissa R. Smith*

Melissa R. Smith
TX Bar No. 24001351
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, TX 75670
melissa@gillamsmithlaw.com
Telephone: (903) 934-8450
Facsimile: (903) 934-9257

John M. Neukom (CA Bar No. 23176)
(admitted in the Eastern District of Texas)
**DAVIS & POLK LLP**
900 Middlefield Road, Suite 200
Redwood City, CA 94603
Telephone: (650) 752-2000

Lindsay Cooper Hayman (CA Bar No. 287125)
(*pro hac vice*)
**DEBEVOISE & PLIMPTON LLP**
650 California Street, 31st Floor
San Francisco, CA 94108
jneukom@debevoise.com
lchayman@debevoise.com
Telephone: (415) 738-5700
Facsimile: (415) 644-5328

Andrew Gish (NY Bar No. 4918454)

(admitted in the Eastern District of Texas)
Josef B. Schenker (NY Bar No. 4935185)
(admitted in the Eastern District of Texas)
**GISH PLLC**
41 Madison Avenue, Floor 31,
New York, NY 10010
andrew@gishpllc.com
Josef.schenker@gishpllc.com
Telephone: (212) 518-2000

Ryan Iwashahi (CA Bar No. 284766)
(admitted in the Eastern District of Texas)
**GISH PLLC**
50 California Street, Suite 1500
San Francisco, CA 94111
ryan@gishpllc.com
Telephone: (415) 630-8960

*Attorneys for Defendant Fortinet, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was filed electronically in compliance with Local Rule CV-5 on April 14, 2026. As of this date, all counsel of record had consented to electronic service and are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3)(A) and by email.

*/s/ Melissa R. Smith*

Melissa R. Smith