# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

SKYSONG INNOVATIONS, LLC, )
)
Plaintiff, ) Case No.
) 2:25-CV-00098-JRG
v. )
)
FORTINET, INC., )
)
Defendant. )
------------------------------)

- - -
Tuesday, March 17, 2026
- - -

Remote Videotaped Deposition of NENAD MEDVIDOVIC, PH.D., beginning at 9:19 a.m., before Nancy J. Martin, a Registered Merit Reporter, Certified Shorthand Reporter. All parties appeared remotely.

REPORTED BY NANCY J. MARTIN
CSR. NO. 9504, RMR, RPR
PAGES 1 - 150

A P P E A R A N C E S :

CHRISTOPHER GERSON, ESQ.
GISH PLLC
41 Madison Avenue
Floor 31
New York, New York 10010
Chris.Gerson@gishpllc.com
Counsel for Fortinet, Inc.

JOHN D. ROEHRICK, ESQ.
CAHILL GORDON & REINDEL LLP
900 16th Street NW
Suite 500
Washington, D.C. 20006
jroehrick@cahill.com
(202) 862-8920
Counsel for Skysong Innovations, LLC

ALSO PRESENT:

BOB FENTON, LEGAL VIDEOGRAPHER



I N D E X


| EXAMINATION OF NENAD MEDVIDOVIC, PH.D. | PAGE |
|---|---|
| BY MR. GERSON | 6 |
| BY MR. ROEHRICK | 144 |


E X H I B I T S


| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 1 | DECLARATION OF NENAD MEDVIDOVIC, PH. D., REGARDING CLAIM CONSTRUCTION | 6 |
| Exhibit 2 | EXHIBIT A TO P.R. 4-3 JOINT CLAIM CONSTRUCTION AND PREHEARING STATEMENT1 | 35 |
| Exhibit 3 | Patent No.: US 10,574,721 B2 | 36 |
| Exhibit 4 | Patent No.: US 11,775,831 B2 | 76 |
| Exhibit 5 | Patent No.: US 10 , 313, 385 B2 | 104 |




MANHATTAN BEACH, CALIFORNIA, TUESDAY, MARCH 17, 2026;
9:19 A.M.
- - -

THE VIDEOGRAPHER: Good morning. We are on the record. The time is 9:19 a.m. Pacific Time. Today is March 17, 2026.

Please note that this deposition is being conducted virtually. The quality of recording depends on the quality of camera and Internet connection of participants. What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Dr. Nenad Medvidovic, taken by counsel for defendant in the matter of Skysong Innovations, LLC vs. Fortinet, Incorporated, filed in the United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2:25-CV-00098-JRG.

This deposition is being conducted remotely using virtual technology. My name is Robert Fenton, representing Veritext Legal Solutions, and I'm the videographer. The court reporter is Nancy Martin from the firm Veritext Legal Solutions.



I'm not related to any party in this action nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. GERSON: Good morning. This is Christopher Gerson from Gish, PLLC, and I'm here on behalf of defendant Fortinet, Inc.

MR. ROEHRICK: John Roehrick of Cahill Gordon & Reindel on behalf of plaintiff, Skysong Innovations, LLC and the defendant, Dr. Medvidovic. Excuse me. The witness. My correction.

THE VIDEOGRAPHER: Will the court reporter please introduce yourself and administer the oath to the witness, and then counsel may proceed.

REPORTER MARTIN: Good morning. My name is Nancy Martin. I'll be your reporter today. My CSR number is 9504.

NENAD MEDVIDOVIC, PH.D.,
was sworn/affirmed,
and testified as follows:

///

Page 6

EXAMINATION
BY MR. GERSON:
Q. Good morning. Could you please state your name for the record.
A. Yes. Nenad Medvidovic.
Q. And Dr. Medvidovic, where are you located today?
A. I'm in Manhattan Beach, California.
Q. Is there anyone else in the room with you?
A. No.
Q. Do you have any materials with you?
A. The only thing that I have with me is a printout of my declaration, the first 60 pages up to the signature page.
Q. Perfect. Are there any handwritten notes or anything else on that printout, or is it clean?
A. It's clean.
MR. GERSON: Okay. And if you could go to the Exhibit Share folder. We've marked as Exhibit 1 your declaration.
If could you just please confirm that is a correct copy of your declaration regarding claim construction in this matter.
(Deposition Exhibit 1 was marked for identification.)

Page 7

THE WITNESS: It's loading for me. I'm not allowed to download it. So I'm just viewing it inside the exhibit share window.
That looks to be my declaration.
BY MR. GERSON:
Q. All right. I'm fine if you use your printout or what's marked as Exhibit 1, but either way, we agree that both are your declaration regarding claim construction in this matter; correct?
A. That is correct, with the added caveat that what I'm seeing on the screen has the exhibits attached to it.
Q. Perfect.
And the first exhibit that's attached to Exhibit 1, that's your CV; is that right?
A. That appears to be the case. Sorry.
Again, since I'm viewing this inside of the portal window, it might take me a minute to get to it, but yes.
Q. That's fine, and thank you for working with us on the tech.
And the CV, I believe, is dated January of 2026; is that correct?
A. Correct.
Q. Is there an updated version of your CV, or is

Page 8

that your latest?
A. I have not updated it. There have been a couple of developments in the last couple of months, but I typically update my CV twice a year. So early in the year and midyear.
Q. When you say, "developments," what did you mean by that?
A. In the last couple of months I have been elected fellow of the International Academy of Artificial Intelligence Sciences. I have been named as an association of computing machinery distinguished speaker. I've had some number of papers accepted at various conferences and things of that nature.
So a handful of line items in the CV, if you will.
Q. Is the CV up-to-date with respect to the patent litigation matters you've worked on?
A. This CV generally -- this is my academic CV, and it does not contain -- oh. There we go. There is an addendum in Appendix B that is, I believe, generally up-to-date.
Q. Great.
And you understand you're under oath today; correct?
A. Yes.

Page 9

Q. And you've been deposed before?
A. I have.
Q. Approximately how many times?
A. Well over 100, but I couldn't tell you an exact number.
Q. Perfect.
Are the vast majority of those depositions in the context of patent litigation matters?
A. Yes.
Q. Given you've been deposed so many times, I'm sure you understand that you have an obligation to tell the truth under penalty of perjury; correct?
A. Correct.
Q. Any reason you cannot provide complete and truthful testimony today?
A. No reason.
Q. Thank you.
What did you do to prepare for the deposition today?
A. I read over the patents once again. I read my declaration, including the attachments, the exhibits that are included with it. And met with counsel for a couple of short meetings.
Q. When were those meetings?
A. One was yesterday. One was Friday, and one

Page 10

was either Wednesday or Thursday. I can't remember exactly. But there were a couple short meetings last week and one yesterday.
Q. Was there anyone present at these meetings aside from outside counsel for Skysong and yourself?
A. No.
Q. Did you do anything else to prepare for the deposition?
A. No, not really.
Q. And so turning to Exhibit 1, on Page 60, you see your signature; is that correct?
MR. ROEHRICK: I'm getting to the page, but eventually, let me know when you're on the page as well.
THE WITNESS: I am on Page 60.
That is my signature.
BY MR. GERSON:
Q. And you signed Exhibit 1 on February 17, 2026; is that right?
A. That is correct.
Q. And are there any changes that you would like to make to your declaration, Exhibit 1?
A. No substantive changes. I think I caught a small number of typos, but nothing that I would care to change right now in terms of my substantive

Page 11

opinions.
Q. Do you know offhand what those typos are? Do you have a list of them or...
A. I do not. I have not marked the copy that I have, as I already mentioned, and if they come up, I will highlight them.
Q. Great. But aside from typos, there's no substantive changes you'd like to make to the declaration; correct?
A. That is correct.
Q. And does the declaration marked as Exhibit 1 include all of your opinions in this case related to claim construction?
A. It does.
Q. In Paragraph 2 of your declaration you note that you're being compensated for your work at your customary rate.
Do you see that?
MR. ROEHRICK: I'm sorry. Is that Page 1 or --
MR. GERSON: Paragraph 2 of Exhibit 1.
THE WITNESS: Yes.
BY MR. GERSON:
Q. What is your customary rate?
A. It's $850 an hour.

Page 12

Q. So for the work you've done in this matter on behalf of Skysong, you have been compensated at $850 per hour; correct?
A. That is correct.
Q. And is that what you typically charge as a technical expert in patent litigation matters?
A. It would vary. So for some of the more recent cases it's gone up a little bit, but generally, within the last year, year and a half, that has been the rate.
Q. And how much time have you spent on this matter for Skysong?
A. Sorry. When you say, "this matter," are you specifically referring to providing a claim construction opinion for the -- with respect to the Fortinet case? The reason I'm asking is because I also provided a claim construction opinion in a related case and then worked on a handful of IPRs as well.
Q. Perfect, and thank you for that clarification. So yeah, let's take that one step at a time.
About how much time did you spent on the Skysong/Fortinet matter -- strike that. I'll try it again.

Page 13

How much time have you spent on the Skysong/Fortinet matter to date?
A. My guess would be over the past month, maybe longer, probably on the order of 50 or 60 hours, but that's -- that a guess. I haven't checked my notes.
Q. And would that cover both the drafting of Exhibit 1 and then your deposition prep as well?
A. That is generally correct. I haven't even thought about how much I've spent preparing for the deposition, to be honest with you. That's been mostly over the past week, ever since I received notice of the deposition.
Q. You are also representing or working with Skysong in the CrowdStrike litigation, and then you mentioned CrowdStrike IPRs as well; correct?
A. That is correct.
Q. And for those matters, you similarly were compensated or being compensated at $850 an hour; is that right?
A. That is correct.
Q. Do you know approximately how much time you spent on the CrowdStrike matters to date?
A. For my CrowdStrike declaration, probably it would be comparable to this, and then there were, if I remember, five different IPRs. For that, I honestly

Page 14

don't recall. That took place in 2025, and it was spread out over some number of weeks. So I don't remember exactly.
Q. Do you know approximately how many hours you've worked on Skysong matters in total to date?
A. Well, as I already estimated, for the two claim construction matters it was likely over 100, but beyond that, I would not want to speculate because I might be wildly off. I just don't know.
Q. With respect to your preparation of Exhibit 1, the declaration, did you write the entire declaration yourself?
A. The entire declaration, in terms of substantive opinions, is mine. I did get help with formatting. I got help with a lot of issues that pertained to how external references are cited. So whether it's the patents or extrinsic evidence, I was provided with the legal standards, and I think counsel reused my already existing description of my own background and qualifications from a previous declaration, and I, for the most part, I think that remained largely unchanged.
Q. So the help that you just referred to, that was help provided by counsel for Skysong; is that correct?

Page 15

A. That is correct.
Q. Did anybody else assist with you in the preparation of your declaration?
A. No.
Q. Did you -- in preparing your declaration, did you speak with anybody aside from counsel for Skysong?
A. I did not.
Q. In your declaration, you opine on certain Markman positions that Fortinet and Skysong have taken in this case; is that correct?
A. To the extent that I understand what you mean by "Markman positions," that sounds right. These are --
Q. The claim construction -- sorry. I didn't mean to interrupt.
A. Well, I was going to say these are claim construction terms that the two parties, as I understand it, have not been able to agree on.
Q. Thank you.
And did you at all formulate or help formulate Skysong's claim construction positions, or were those provided to you?
A. With respect to this particular matter, those already were part of kind of my mental bank. When they first came up and how they were drafted or

Page 16

whether it was suggested to me that Skysong had a particular position on one of these versus me suggesting it to them, I honestly don't remember, but certainly, by the time I wrote this declaration, my position on all those terms was already more or less formed because I had analyzed these patents in a lot of depth over some number of months.
Q. When were you first retained by Skysong?
A. If I recall correctly, sometime probably either in the first half or mid-2025.
Q. If you could please turn to Pages 6 and 7 of your declaration. You see there is a list of materials considered?
A. Yes. Starts on Page 6, and goes through about the middle of Page 7.
Q. Perfect.
And are there any additional materials that you considered besides what's listed on Pages 6 and 7?
MR. ROEHRICK: Objection. Form.
THE WITNESS: Well, in a sense by definition, the answer would be yes because I'm also including in the exhibits some additional materials not listed here, but this forms the -- the foundation of my opinion and what I used to prepare for it today.
BY MR. GERSON:

Page 17

Q. So on Page 7 and Subsection h, you know, "any other materials referenced herein," by that you mean the appendices that are attached to your declaration; is that correct?
A. Yes. And as we sit here, I don't remember if there was anything that was referenced that's not attached in the 400-plus pages of the declaration because there were some -- for example, Fortinet patents, as I remember it, and some CrowdStrike patents.
I think those are in there, but I'd have to go through and just double-check. But that should be the totality of it.
Q. Okay. You're not aware of anything that you've relied on that's missing from this exhibit list or the attachments to your declaration; correct?
A. That is fair. Obviously, when I say things like -- oh, yeah, never mind. It says explicitly when it's names of patent, like in C or D, it does specify that its file history is also considered.
So yes, that should be -- as we sit here, I think that should be a complete list.
Q. The list of patents that are in this list, the '721 patent, the '831 patent, the '897 patent, the '385 patent, you've listed here as well as the names

Page 18

of inventors on those patents.
Do you see that?
A. I do.
Q. And in your work on this matter, have you spoken to any of the named inventors?
A. I have not.
Q. More generally, are you -- do you know or have you met any of these named inventors?
A. I have not met any of them.
Q. Prior to this litigation and your work on this case, have you heard of any of these inventors?
A. A couple of the names --
MR. ROEHRICK: Objection. Calls for speculation.
THE WITNESS: A couple of the names sound vaguely familiar, but I have not done any research into them beyond what I know about these patents.
BY MR. GERSON:
Q. Which names sound vague -- or try that again.
Sorry.
Which names sounded vaguely familiar to you?
MR. ROEHRICK: Objection. Form.
THE WITNESS: The Paulo Shakarian, Minkyu Kim, Rida Bazzi. I mean these are names that I may have run across previously, but, again, I have not

Page 19

look into specifically what work they may have done beyond these patents or anything else pertaining to their background.
BY MR. GERSON:
Q. So fair to say going into this litigation, you weren't really aware of the work that these folks had done. You've only learned about that work as part of your work on this case?
A. Again, I was not aware of these patents because in my daily life, the kinds of publications that we tend to reference are publications in technical literature, in journals, conference proceedings, and so on, which is why some of these names may seem familiar because I've done work in relevant areas, but I would not have cited a patent in -- as part of a technical publication. So I would not have looked at this; the materials that are listed in Items A through D of Paragraph 16.
Q. Got it. Thank you.
And you don't recall citing, for example, literature from those folks in your research either?
A. Again, as I said, these names seem familiar. It's possible that we have cited it. I have over the years published close to 300 different peer-reviewed papers, book chapters, and/or books, and I just would

Page 20

not be able to recall off the top of my head without double-checking whether and for which publication my students and I may have cited one or more of these people.
Q. Perfect.
So when you started to work on this matter, you weren't, for example, particularly familiar with any of the named inventors on the patents, or weren't aware of any other work off the top your head. They were just sort of vaguely familiar; is that correct?
MR. ROEHRICK: Objection. Calls for a narrative. Mischaracterizes testifies.
THE WITNESS: Yes, as I said, these names are generally familiar. I do not possess detailed knowledge of any of the people on the list of patent inventors on Page 6.
BY MR. GERSON:
Q. And just to close this out, and we'll move on soon, but you went to ASU as an -- for your undergraduate degree; is that correct?
A. I did. Decades ago, I'm sorry to say.
Q. And while you were there, you understand that these patents, Skysong purports they came out of research that was done at ASU?
MR. ROEHRICK: Objection. Excuse me.

Page 21

Objection. Mischaracterizes evidence. Scope relevance.
THE WITNESS: My understanding is that the patents themselves did come out of either research that was conducted at ASU or that ASU is the assignee of these patents, but beyond that, I did not check kind of what the provenance of the patents was, how and when they may have been invented and so on.
BY MR. GERSON:
Q. And while you were at ASU, did you take any classes from any of the inventors listed or did you otherwise know any of the folks that are here -- that are named as patent inventors?
A. To be quite honest with you, ASU has changed a lot. I left in 1993. It's changed a great deal. For one, it has multiple campuses now, and it's highly likely that in the intervening 33 years the people for whom I took classes are already retired. So it was -- you know, as they say, it was a different time.
In this particular case, it really was a different time. So I doubt -- I haven't checked, but I doubt that any of these people were at ASU when I was there.
Q. I hate to think of the early '90s as over 30 years ago, but yes. Thanks for the clarification.

A. Yes. It's scary, but it's true.
Q. Just in case I missed it, you have not spoken with any of the named inventors that are on the patents-in-suit as part of your work on this case; right?
MR. ROEHRICK: Objection.
You can answer.
THE WITNESS: I have not spoken to any of the people who are listed in Paragraph 16 of my declaration in connection to these patents or otherwise, to the best of my knowledge.
BY MR. GERSON:
Q. Could you please turn to Paragraph 30 of your declaration. It's on Page 11.
A. I'm there.
Q. The first sentence you note that "The '721 patent is part of a broader ASU-originated cybersecurity portfolio managed by Skysong."
Do you see that?
A. Yes.
Q. Could you just please explain how you came to this understanding and what you mean by that statement.
A. This is something that was told to me by the counselor when I was initially approached about this



case. That these are patents that either came out of ASU and/or were somehow acquired by ASU -- I would not know one way or the other -- and that Skysong is an LLC that is partnered with ASU to work with this intellectual property, in this particular case to assert ASU's intellectual property rights.
That's -- that's about the extent of my understanding.
Q. So when you refer to a "cybersecurity portfolio," would you know, for example, which patents are part of that portfolio?
MR. ROEHRICK: Objection. Calls for speculation. Calls for a narrative.
THE WITNESS: I have been involved with providing an opinion regarding five different patents so far, and four of those are at issue in today's proceeding. And to the best of my recollection, that's about the extent of my familiarity with the portfolio. I would not be surprised if there are a variety of other patents. Universities tend to own broad patent portfolios.
BY MR. GERSON:
Q. So I guess -- strike that.
With respect to the work you've done on this matter for Skysong, have you been asked to or have you



formed an opinion as to whether any Fortinet products infringed the asserted patents?
MR. ROEHRICK: Objection. Scope.
Dr. Medvidovic, I'm going to instruct you to the extent you can answer that without divulging attorney-client information, please go ahead. Yeah. To the extent you can answer that without getting into attorney-client information, go ahead.
THE WITNESS: When I was first approached regarding this case, it was mentioned that this is a potential patent infringement matter. So that was my understanding, that there is an infringement element to this, but to date, my involvement with the case has spanned essentially the validity of related issues that an IPR is typically centered around, as well as claim construction.
BY MR. GERSON:
Q. Have you reviewed, for example, Skysong's infringement contentions against Fortinet as part of your work on this matter?
MR. ROEHRICK: Same objection and instruction.
THE WITNESS: It is possible that I've seen Skysong's infringement contentions early on. I can tell that you if I have, I have not looked at them in



months, and obviously, I don't recall for sure. It has not been something that was relevant in the work that I've done on the five IPRs and the two claim construction declarations so far.
BY MR. GERSON:
Q. Aside from the declarations that you provided as part of the IPR process, have you formed any other opinions related to the validity of the asserted patents-in-suit?
A. I'm not sure I understand your question.
My understanding, for a proceeding like this one, the assumption is that the patents are valid because they have been allowed by the USPTO. There's a process for, I guess, calling that into question through IPRs. So there, I additionally confirmed my opinion that they are valid.
And then, as part of the district court case there's going to be a validity part to the case as well. That hasn't happened yet, but, again, I've both gone into this with an understanding that the patents are valid because they've been allowed by the USPTO, but I've also provided an independent analysis as part of the IPRs that preceded this declaration that we're discussing today.
So by the time it got to this declaration, I

had, in a sense, two independent sources of evidence that the patents are valid. I don't know what it asked -- what your question was about, but I'm trying to give you the best possible answer based on what I think you might be asking.

Q. Sure. I'm just trying to understand the work you've done so far in this matter.

If you've reviewed, for example, Fortinet's invalidity contentions?

A. I do not believe that I have seen those. That doesn't ring a bell, and I certainly have not looked at them in connection to the -- in connection with this declaration or today's deposition.

Q. In connection with your work on this matter, including this declaration, have you analyzed any Fortinet products?

MR. ROEHRICK: Objection. Form. Vague. Ambiguous.

THE WITNESS: I have not done an analysis of Fortinet's technology offerings in the marketplace in connection to -- or in connection with my claim construction declaration.

MR. GERSON: Could you please turn to Page 5 of your declaration, Paragraph 14.

MR. ROEHRICK: Page 5; correct, Counsel?



MR. GERSON: I'm sorry, Counsel. I couldn't hear you.

MR. ROEHRICK: Page 5; is that correct?

MR. GERSON: Yes. That's correct.

Paragraph 14.

THE WITNESS: I'm there.

BY MR. GERSON:

Q. Great.

You reference in the first section of Paragraph 14 "deep neural networks" or DNNs.

Do you see that?

A. Yes.

Q. And it's just very complicated, but just at a very high level, could you please explain what a DNN is?

A. Sure.

MR. ROEHRICK: I'm sorry. Objection. Form. Vague. Ambiguous. Calls for a narrative. Scope.

MR. GERSON: Counsel --

Sorry, Dr. Medvidovic. Excuse me.

Just real quick, Counsel, I think in the eastern district of Texas objections are really supposed to be limited to form. So it's Local Rule 30, I believe.

Q. Anyway, I'm sorry. I didn't mean to



interrupt your answer.

A. Sorry. Yeah, I was just waiting for the two of you to figure out the procedural parts of it that I know nothing about.

One of the patents that are at issue in this case -- well, at least one of them, for example, talks about convolutional neural networks. Convolutional neural networks are an example of deep neural networks. These are neural networks that have multiple, different layers that engage in various kinds of processing of data that is fed on one side, and they make certain determinations on the -- kind of as their output.

Q. So are all convolutional neural networks or CNNs, are all of them considered deep neural networks?

MR. ROEHRICK: Objection. Form.

THE WITNESS: Of -- the ones that I have worked with are. I think that generally they're considered to be deep neural networks. It does not make a significant difference in this case, as we sit here, in my opinion, whether that answer is yes, always, or most of the time or sometimes.

I don't see how -- I don't think that it impacts any of my opinions, but as -- you know, if you drill more deeply, I'm happy to unpack that answer as



well.

BY MR. GERSON:

Q. There are artificial neural networks that are not convolutional neural networks; correct?

MR. ROEHRICK: Objection. Form.

THE WITNESS: Sorry. When you say, "artificial neural networks," what do you mean by that?

BY MR. GERSON:

Q. Sure.

So there are a variety of different types of neural networks; correct?

A. Yes. Other than, I guess, the -- you might have meant other than what we have in our brains, for example. All of the other ones are, in a sense, artificial, but yes, there are -- in the neural network area of research that has emerged over the last couple of decades in AI and that's kind of exploded over the last 10 years or so, there are a variety of types of neural networks.

And the CNNs that we just mentioned, the convolutional neural networks, are just one kind of neural network.

Q. Right.

And this might not be a fair question, but if

Page 30

you could give me an example of other types of neural networks that are not CNNs?

MR. ROEHRICK: Objection. Form.

THE WITNESS: Sure. So my own research has dived deeply into this area, and we have worked on -- beyond just what's described in Paragraph 14, we have work on a technique that will be presented next month at the -- at this years international conference in software engineering for modularizing CNNs, and then, since we solved that problem, we started looking at other types of neural networks.

So -- and then quickly realized that what works for CNNs does not work for those. So a different kind of technique or set of techniques would be required for recurrent neural networks, which are sometimes abbreviated as RNNs.

I have a Ph.D. student who is currently looking at graph neural networks and how they could be modularized. Those are very often referred to as GNNs.

Everybody who is jumping on are the large language model bandwagon, you know, if they read more about it, they will find out that it is underpinned by a transformer neural network architecture, which is yet another kind of neural network.

Page 31

So there are a variety out there. My work has intersected with four or five of them, but my research is primarily in software engineering rather than an artificial intelligence. So there are likely others, some of them probably esoteric, that I haven't run across yet.

BY MR. GERSON:

Q. So is it fair to say that if there's a product or a software solution that uses neural network technology, it's not necessarily CNNs; correct?

A. In a vacuum that may be the case. It might use -- or more likely than not would use a combination of CNN and something else. So, for example, I could tell you that in the quick case of graph neural networks, there are convolutional layers playing an important role, and in case of CNNs, fully connected layers, so convolutional layers also play a role. So it just -- we would have to look at the exact details of the kind of neural network and how it is built.

Generally, I would not -- as a researcher and as a scientist, I would not just take somebody's word for this neural network type X and assume that it's built purely or cleanly using whatever properties X may have. I would want to look under the hood.

Page 32

Q. So I guess maybe put another way, if there were information that suggested a product used neural networks, really to determine if those were CNNs or something else, you'd have to look under the hood?

A. At various levels of depth, that's true. You can determine certain things depending on the kinds of problems that are being solved. So, for example, are you dealing with binary classification. Are you trying to do some sort of processing of natural language or real world images or things like that.

So there are likely candidates, even without looking under the hood, but ultimately, for example, I'll give you a -- maybe something that will drive the point home in the world that you live in.

If I were asked, "Hey, what is the likelihood that Technology X may be infringing a patent that teaches a particular neural network based technique," there, if I knew that technology X uses a neural network and if I also knew that the way they're using the neural network is consistent with the way that specific class of neural networks typically is used to make its determinations, to kind of deliver its knowledge, if you will, then for the purpose of, let's say, a preliminary infringement contention, that type of information may be sufficient.

Page 33

But if you then said, "Is that enough to -- as an expert for you to deliver a complete infringement opinion," the answer to that would be no, I would want to look at the technical documentation and the source code and use cases, possibly also to use the product in practice and so on. So there are different thresholds there.

Some preliminary presentations could be made and determinations could be made based on relatively small amounts of detail, but confirming the -- kind of the details and the -- and that set of initial determinations to the level that as a scientist I would want to feel comfortable when making statements, that would require a more in-depth dive.

Q. So if a product or component claims to use a neural network-based solution, it's entirely possible that that solution does not use CNNs; right? CNNs are just one type of neural --

MR. ROEHRICK: Objection. Form. I'm sorry, Counsel. Are you asking an infringement question?

MR. GERSON: This is in Paragraph 14 of his report, refers to neural network-based solutions. I'm trying to just understand.

MR. ROEHRICK: And I'm just -- I'm not seeing anything in that paragraph about products or, you

Page 34

know, what they had or what would be infringing. I'm just saying I believe this declaration is for claim construction.

MR. GERSON: I don't want to go back and forth. I'm going to ask the question that one of the issues relates to CNN. So I'm just trying to understand the technology that he's opining on.

THE WITNESS: Well, I -- I have not seen the technology that we're discussing here. So I'm not sure what specifically you're referring to, but I'll give you a simple example.

If we're discussing ChatGPT, there's a high probability -- or a similar technology, there is a high probability that that would not use CNNs or it would not use only CNNs that some sort of transformer-based architecture would be present there.

So in a vacuum, it's really difficult to answer that question, but I think we already established that there are different types of neural networks out there. So what kind of neural network is being used for what purpose, that depends on a large number of factors that we have not nailed down, or at least you have not nailed down in your question.

MR. GERSON: I'm going to mark our next exhibit so just bear with me.

Page 35

(Deposition Exhibit 2 was marked for identification.)

MR. GERSON: So there should be an Exhibit 2 in the Exhibit Share folder. If you could let me know if you're able to view that.

(Pause.)

THE WITNESS: I see that.

BY MR. GERSON:

Q. Perfect.

And do you see that this is a joint claim -- Exhibit A to a joint claim construction and prehearing statement?

A. Yes.

Q. Perfect. And I just want to make sure that I understand the scope of which terms you've opined on as part of this case.

So you were not asked to, and you did not provide an opinion as to every claim construction issue that's disputed between the parties in this matter; correct?

MR. ROEHRICK: Objection to form.

THE WITNESS: The terms I opined on are, I believe, a subset of the terms in this -- in this document. I did not opine on all of these.

BY MR. GERSON:

Page 36

Q. Okay. And just to make sure we're on the same page, I think that subset would be Terms 3, 4, 8, 11, 13, and 15.

If you could just confirm that.

(The witness reviewed materials.)

THE WITNESS: That, I believe, is correct.

BY MR. GERSON:

Q. And you were not asked to provide any opinion with respect to any other terms; is that right?

A. I did not provide an opinion with respect to the other terms, and you're correct. I was not asked to.

MR. GERSON: I'm going to mark our next exhibit.

(Deposition Exhibit 3 was marked for identification.)

THE WITNESS: I'm not sure if I'm supposed to be seeing it yet. I've refreshed my browser a couple times, but it's not there.

MR. GERSON: Sorry. It's loading a little slow. So it should now be there.

THE WITNESS: Okay. I see now.

BY MR. GERSON:

Q. Perfect.

And do you recognize Exhibit 3 to be U.S.

Page 37

Patent No. 10,574,721?

A. I do.

Q. Perfect.

And this is one of the patents that you have opined on as to the meaning of certain claim terms; is that right?

A. That is correct.

(Pause.)

MR. GERSON: So could you please turn to Claim 1 of the '721 patent.

MR. ROEHRICK: Do you happen to know that page it starts on?

MR. GERSON: I think it's Page 18 of the patent.

THE WITNESS: I'm there. I can't see the entire claim in a readable format since it's split across two columns. So I'm looking at the top half of it. The initial half of it, which is in Column 13.

BY MR. GERSON:

Q. You can't see the rest on Column 14 the way it's displayed on your screen?

A. Right. Because there is quite a bit of the exhibit share cropped at the top, and I can Zoom out, but then I can't read it.

MR. GERSON: Sorry. Can we just go off the

Page 38

record for a minute. I want to see if we can resolve this tech issue and make it easier.
THE WITNESS: If it was possible just to --
THE VIDEOGRAPHER: We're going off the record at 10:11 a.m.
(A recess was taken from 10:11 a.m. to 10:29 a.m.)
THE VIDEOGRAPHER: We are back on the record at 10:29 a.m.
BY MR. GERSON:
Q. So, Dr. Medvidovic, we have put into the Exhibit Share, Exhibit 3, the '721 patent.
Are you able to download and open that patent?
A. Yes, I have it in front of me.
Q. Thank you.
And if you could please turn to Claim 1 of the '721 patent, which starts about two-thirds of the way down in Column 13.
A. I'm there.
Q. So after the preamble and after the processor limitation, you see that the first thing the processor is operable to do is "receive data defining a first web content class and a second web content class."
Do you see that?

Page 39

A. Yes.
Q. What is a first -- strike that.
What is a content class or a web content class?
MR. ROEHRICK: Objection. Form.
(The witness reviewed materials.)
THE WITNESS: Content class, also referred in the specification using the term "category," describes the types of content that can be downloaded onto a browser, and in the context of this patent they are grouped according to what the specification terms "conflict of interest" classes. So if things are in the same class, they can coexist within a browser instance, and if they're not, then different browser instances need to be created or run to render whatever that content is within a browser.
THE VIDEOGRAPHER: Excuse me, Counsel. I think we lost our court reporter. Would you like to go off the record?
MR. GERSON: Sure. Let's go off the record.
THE VIDEOGRAPHER: Going off the record at 10:33 a.m.
(A recess was taken from 10:33 a.m. to 10:36 a.m.)
THE VIDEOGRAPHER: We are back on the record

Page 40

at 10:36 a.m.
BY MR. GERSON:
Q. Continuing on with Claim 1 of the '721 patent, you see the first web content class is "defining a first plurality of Uniform Resource Lease indicators" or "(URLs)"?
MR. ROEHRICK: Objection. Form.
I'm sorry. I believe Dr. Medvidovic is muted.
THE WITNESS: My apologies.
I see that same language in the same claim limitation we were discussing a minute ago.
BY MR. GERSON:
Q. Perfect. Thank you.
So what does it mean for the web content class to define a plurality of URLs?
MR. ROEHRICK: Objection. Form.
THE WITNESS: I would answer that question just by maybe most simply by drawing your attention to Figure 3 of the patent where, for example, the content class banking has a plurality of URLs that are part of that content class. So things like AMERICANEXPRESS.COM, USBANK.COM, and so on.
BY MR. GERSON:
Q. So the content class has like a list of URLs.

Page 41

Is that a shorthand way to describe it?
MR. ROEHRICK: Objection. Form.
THE WITNESS: The -- that's one example, and possibly embodiment. There could be other ways of defining the plurality of URLs. The patent would not be restricted just to the exemplary embodiment in Figure 3.
BY MR. GERSON:
Q. But each content class, I guess, has certain URLs that are associated with that class; is that correct?
MR. ROEHRICK: Objection. Form.
THE WITNESS: Well, in this particular case, we're just talking about the first content class. So I'm not sure what you mean by "each content class."
BY MR. GERSON:
Q. Sure. I'll try that again.
So there's a first content class that defines or otherwise has associated with it a first plurality of URLs; is that right?
MR. ROEHRICK: Objection. Form.
THE WITNESS: Well, there's a first content class defining a first plurality of URLs. I wouldn't want to introduce another term such as associated with it, because that's not in the claim language. So we

Page 42

would have to maybe discuss that separately. But defining a first plurality of URLs using the claim language, and that part is accurate.
BY MR. GERSON:
Q. Perfect. And thanks for the clarification.
And then there's a second web content class defined in a second plurality of URLs in Claim 1; correct?
A. Yes, with the added limitation that the second of URLs is different than the first plurality of URLs.
Q. Right. And then the second web content class is further being associated with sensitive information presenting a security risk; is that right?
MR. ROEHRICK: Objection to form.
THE WITNESS: That is right.
Sorry, John.
The remainder of that claim element is the second web content class further being associated with sensitive information presenting.
BY MR. GERSON:
Q. Okay. So then is it fair that each of the second plurality of URLs -- so those of the URLs in the second web content class -- each of those URLs are associated with sensitive information presenting a

Page 43

security risk?
A. One possible read of this is that each of those URLs is associated with sensitive information presenting a security risk, but the way the language of the claim is written allows for read where it need not be each of them because it says that the content class is associated with sensitive information presenting a security risk.
Again, how that is manifested is taught or, rather, illustrated by the embodiments disclosed in the patent, but there are possible reads here where at least as we sit here, without any additional context, where not every individual member of the class is associated with specific sensitive information presenting a security risk.
It just says that the second content class itself is associated with sensitive information.
BY MR. GERSON:
Q. So then your read of the claim is that there could be URLs not associated with sensitive information presenting a security risk that are a part of the second web content class, and that would still meet the limitation?
MR. ROEHRICK: Objection. Form.
THE WITNESS: That would depend on the

Page 44

specific scenario. Again, we have not -- we have not specified the scenario. So I would have to look at the details of what the content of such a second content class are, meaning what URLs are there and what is the sensitive information that presents a security risk. In a vacuum, I don't think it's possible to answer that question.
BY MR. GERSON:
Q. So if a content class included a URL that was not associated with sensitive information presenting a security risk, that content class still could satisfy the second web content class limitation?
MR. ROEHRICK: Objection. Form.
Counsel, I'm not seeing how this is connected to the document where he reaches his opinions.
MR. GERSON: He has opined on claim terms that are part of this claim, including the terms that we're discussing.
MR. ROEHRICK: The terms being "sensitive information presenting a security risk"?
(Indiscernible cross-talk.)
MR. ROEHRICK: -- I believe Fortinet, that is indefinite.
MR. GERSON: Again, I don't want to get into it, but obviously, claims have to be read in the

Page 45

context of the surrounding language and the specification, part of the intrinsic record, one of the claim terms at issue.
MR. ROEHRICK: Again, same objection. Form. This is getting outside of the document and his opinions.
THE WITNESS: So I do appreciate the clarification, Counsel, that claims have to be read in context. I think that your question also has to be formed in context. So it is unclear from your question what URL you had in mind, what the plurality of URLs is, what the second class is, and what the sensitive information is.
So if you have a specific example, I'm happy to consider it, but the way you asked that question I cannot answer it because it's -- there are too many missing pieces.
BY MR. GERSON:
Q. Does the patent specification provide an example of a second web content class that would meet the claim limitation that we've been discussing? In other words, where that second web content class is further being associated with sensitive information presenting a security risk?
MR. ROEHRICK: Same objection. Form.

Outside the scope of the opinion.
(The witness reviewed materials.)
THE WITNESS: So the patent is actually clear about the fact that it supports the ability to identify sensitive content for both inexperienced and experienced users, meaning that the notion of sensitive content is supported broadly, and it discusses, in the context of Figure 3, how things like AMERICANEXPRESS.COM and AMAZON.COM would be part of two different COI classes.
So sensitive content can be associated with banking information, such as AMERICANEXPRESS.COM, but sensitive content increasingly nowadays is also associated with E-commerce sites because they contain payment information like credit cards.
So you really have to read the patent in context. There are examples that a person of ordinary skill in the art would understand are part of sensitive content, but there is no specific disclosure in the patent that fits exactly the parameters of your question.
So I would again ask if you could provide a more flushed out use case so that I can answer the question in a meaningful way.
BY MR. GERSON:



Q. Yeah. I think my question was: Can you point to, for me, an example in the patent of a second web content class further being associated with sensitive information presenting a security risk?
A. Again, as I mentioned, Figure 3 identifies, for example, banking, which is 302, that may be designated as sensitive content, and that sensitive content may, under the correct circumstances and in a properly constructed scenario, be -- let me go back to the language of the claim.
That sensitive content may be the second web content class further being associated with sensitive information presenting a security risk.
So a POSITA would look at this and understand that if you are going to BANKOFAMERICA.COM, for example, there is going to be a lot of sensitive content that may be part of any of your interactions with that site because you have to log in. It may contain things, sensitive information like your social security number, the current balances of your accounts, a whole bunch of other stuff that you -- that one would consider sensitive.
So there are examples in there that describe or present embodiments for what that claim element states. For now, I'll just leave it at that.



Q. So if we look at Figure 3 in the example you're referring to, this banking, banking is a -- strike that. Let me try that again.
Turning to Figure 3, there's "Banking." Is banking an example of a web content class?
Is that right?
MR. ROEHRICK: Objection. Form. Again, outside the scope of the declaration.
THE WITNESS: I think technically, banking is in the context of the specification. It would be a COI class. So it's a content class that, in the context of the patent, is described as a conflict of interest class where different conflict of interest classes are governed by different rules as far as, for example, the browser instance that should be used, whether that browser instance should be different from a previously used browser instance and so on. So it is a content class, but it's described in more depth and characterized in a more nuanced way in the patent specification.
BY MR. GERSON:
Q. So how would you determine if that content class -- the banking one, for example, how would you determine if that is associated with sensitive information presenting a security risk?



MR. ROEHRICK: Objection. Form. Calls for speculation.
THE WITNESS: Again, that depends on the -- on the example itself. So if we want to build out the banking example, since that is explicitly provided in the patent, there is a reason why somebody who uses this technique would -- give me just a second.
The experienced user, for example, maybe in this case, maybe even the novice user identified in the patent, would classify these URLs as being part of the same COI class and would designate them as having -- or containing sensitive information.
I think that it's not very controversial to assume that many people would consider banking, especially online banking, as involving sensitive information. But again, that would depend on the specific context that we're discussing.
BY MR. GERSON:
Q. So then is it up to the user to decide what he or she believes to be sensitive versus not sensitive information?
MR. ROEHRICK: Objection. Form. Mischaracterizes.
(The witness reviewed materials.)
THE WITNESS: The term "sensitive

Page 50

information" has a well understood meaning. What the patent teaches is how novice versus experienced users can leverage the concept of COI in web browser instances, which is what the patent discusses, to determine whether, for example, a URL from a given class, COI class, can be opened in the same browser or whether it requires its own browser.

So this notion of FBI that is discussed in the patent.

BY MR. GERSON:

Q. So is the patent flexible enough that one user could view a given URL as sensitive and another could view it as not sensitive and the patent sort of allows for that flexibility?

MR. ROEHRICK: Objection. Form.

THE WITNESS: That is not what the patent is talking about. The patent is talking about one user allowing content from more than one domain to coexist within a browser and another user not having those kinds of privileges. So that's the distinction between a novice and an experienced user.

The sensitive content is sensitive content, and that's a well-known term. How an experienced user may work with sensitive content versus a novice user, those things could be different. There are highly

Page 51

experienced users who understand how information can be misused, how it can be surreptitiously obtained, et cetera, and then there are always going to be novice users who do not have that level of understanding.

So what the patent teaches is the extent to which novice users are not given the privilege of, for example, determining whether two different kinds of URLs can be opened within the same browser instance while an experienced user can't do that.

So the experienced user, in a sense, has the -- you can think of it as them having the authority, potentially, to decide whether certain kinds of sensitive content can be accessed within the same browser instance or whether those kinds of sensitive content require launching a new browser instance.

But the notion of what is sensitive is very much going to be well understood provided the knowledge of the context and the domain.

BY MR. GERSON:

Q. Could you give me an example of a URL that is not associated with sensitive information presenting a security risk?

MR. ROEHRICK: Objection. Form.

Page 52

THE WITNESS: Sure. WWW.USC.EDU. I don't believe that at least on the home page of my university there is anything especially sensitive. In fact, I think it, by definition, will contain information that my university wants to share with the outside world.

BY MR. GERSON:

Q. Okay. So the USC home page is a URL that is not associated with sensitive information presenting a security risk; right?

MR. ROEHRICK: Objection. Form. Outside the scope.

THE WITNESS: All things being equal, without kind of considering any sort of added aspects of this scenario, it should not -- it is a publicly accessible website. It should not allow -- sorry. It should not require you to authenticate yourself in any way. It is not going to require any information from you other than specifying the URL that you want to access, which is the home page of the university.

So in that sense again, divorced of any additional context, I would, as we sit here, consider that not to contain sensitive information.

BY MR. GERSON:

Q. When you say, "divorced of any additional

Page 53

context," what do you mean by that?

A. Again, it's -- there are places on that web page -- or there may be places I haven't been in for a while on that web page that provide text boxes for a certain kind of input, or there may be a log-in part of that page that allows for employees to access the Intranet. It's been a while since I've been there.

So, again, divorced of those kinds of things, if it's just something that kind of presents the outward facing kind of content that the university wants to share, like a beautiful photograph and the smiling face and a short message by the university president and some students who are sharing their amazing experiences, et cetera, that generally would not comprise sensitive information, assuming that all of those parties have been -- have given their consent, essentially, to have their images and their statements displayed on the university web page.

Q. Is it possible that two users could disagree with respect to whether a given URL is associated with sensitive information presenting a security risk?

A. Well, I could give you a simple scenario where that would be the case. If you have a medical professional -- that was one of the first things that came to mind when you started this line of

questioning. I realized that I may know about the sensitivity of banking data because I'm a bank customer. But I don't really understand like HIPAA regulations, for example.

So if you have a medical professional who is well-versed in that and a layperson who's not, it is possible that the layperson may not perceive something as being sensitive information. So in a sense, that would be a disagreement. It would be a disagreement out of -- in a sense, out of ignorance or not being informed.

Q. In Claim 1 can the second web content class have URLs in it that are not associated with sensitive information presenting a security risk?

MR. ROEHRICK: Objection. Form.

(Pause.)

THE WITNESS: Given that the patent even explicitly provides scenarios and says things like for the experienced user a nonjudicious choice of classes can pose a security risk, it is my opinion that if every single URL in the second web content class presents a security risk that clearly reads to the claim limitation but the claim limitation is construed more broadly and it says the second web content class further being associated with sensitive information



presenting a security risk, again, I haven't done this analysis. So I'm just answering your question right here on the spot, but it sounds to me that saying that web content class further being associated with sensitive information does allow for the possibility of this being read more broadly because of the way it is expressed, and it seems to be consistent with the specification.

Having said that, that's not analysis that I've done in preparation for today. So I'm just answering to the best of my ability right now on the spot.

BY MR. GERSON:

Q. So how would a person of ordinary skill, looking at a second web content class, know whether it's associated with sensitive information presenting a security risk?

A. Again, it sounds to me like you're asking me to form, essentially, an infringement opinion. It is -- I would give this its plain and ordinary meaning.

Associated with sensitive information means that it has an association with sensitive information, and a person of ordinary skill in the art would understand that a given web content class, such as



banking information, is generally associated with sensitive information, which is bank account numbers, log-in and password, possibly Social Security number, possibly further authentication via pin and things like that.

So at the same time, a person of ordinary skill in the art would know that AMERICANEXPRESS.COM may use additional authentication by sending you a pin code to a secondary device, but USBANK.COM may not. So that pin being sensitive information is associated with the class, but it -- the same, exact content is not identical across all of them, and that would still be consistent, completely consistent with this patent.

There is a scenario that all things being equal without further context and further analysis, that's a scenario where I could completely see this still being -- complying with the language, the second web content class, further being associated with sensitive information presenting a security risk where in this content class, let's say four out of these five also use a pin, but USBANK.COM only uses user ID, password, and maybe, you know, your facial recognition, for example, on a mobile app.

All of this is sensitive information. It's just not identical sensitive information for all of



it. So there's a totality of sensitive information across the class, which is user ID, password, account number, secondary pin, and then, you know, facial recognition or fingerprint reader or whatever, but it doesn't mean that every single one of those URLs is associated -- in my scenario that I provided, every single one of those URLs doesn't have to have all of that information associated with it.

So USBANK.COM could just have user ID pass and facial recognition. AMERICANEXPRESS.COM could have user ID pass, facial recognition, and secondary authentication through some kind of two-factor authentication utility.

BANKOFAMERICA.COM could have user ID pass and secondary authentication through a pin texted to your phone, for example. So that seems to me -- again, as we sit here, it seems like a perfectly reasonable read of that specific language in the -- at the end of that claim limitation.

Q. Could you please turn to Figure 5 of the '721 patent.

A. That's on Page 8.

(Pause.)

THE WITNESS: I'm there, by the way.

BY MR. GERSON:

Page 58

Q. Thank you.
Can you see a list of URLs in the first column of Figure 5?
A. I do.
Q. Which of those are associated with sensitive information presenting a security risk?
MR. ROEHRICK: Objection. Form.
THE WITNESS: Well, for starters, this figure seems to be doing some sort of performance evaluation for the tracer with caching enabled and caching disabled. So I do not believe that this figure was intended -- or these URLs are intended to represent things specifically associated with sensitive information. Let me also go to the listing of the...
Right. Table 1 is showing a performance evaluation for a tracer. So these -- these particular URLs are things that whoever did this analysis used to measure the speed of these particular parameters. I can go to the spec and look at what those parameters are, but this figure has nothing to do with trying to classify these things across -- across different conflict of interest classes, as far as I understand.
BY MR. GERSON:
Q. So then this figure doesn't indicate one way or the another whether these URLs are associated with

Page 59

sensitive information presenting a security risk?
A. Again, I'm happy to look at the spec, but as this figure -- this figure's caption says, it's a "Performance evaluation for the tracer, times are in milliseconds."
And then in the description -- the brief description of drawings in Column 2 it says, "Figure 5 is TABLE 1 showing a performance evaluation for a tracer."
THE WITNESS: And let me look at in the spec itself where it is discussed.
(The witness reviewed materials.)
THE WITNESS: Right. So the purpose of this -- of the tracer that produced -- the exemplary tracer that produced the values in Table 5 is that once conflict of interest classes are defined -- and we saw some examples in Figure 3 -- at that point that tracer can be used to intercept system calls and figure out whether those conflict of interest classes involve the kinds of things that -- the kinds of attempted accesses to the kernel on the given computing device that should not be allowed, and it would then redirect those calls.
So it would intercept the calls and potentially launch a new fresh instance of a browser

Page 60

to make sure that the information is handled in a separate browse instance. So if we go to the discussion that is in Column 5 at the end there are various rules for which browser instance you should use.
So if a call is intercepted by the tracer, and, for example, you're currently using Mozilla Firefox but that particular call is tagged for that COI class to use Google Chrome, then the tracer will initiate the process whereby the system that is taught by this patent, the '721 patent, will spin off or launch a Google Chrome instance and access the information that is specified by that URL inside of Google Chrome.
And what this table in Figure 5 was specifically doing was demonstrating that you can use such a tracer without paying a significant performance penalty.
BY MR. GERSON:
Q. So is there any indication in the patent specification as to whether the URLs listed in Figure 5 are each associated with sensitive information presented in a secure (inaudible)?
MR. ROEHRICK: Objection to form.
THE WITNESS: Most of these URLs are not

Page 61

discussed, as far as I recall, in the patent specification. Again, this is done for a very specific purpose, which is to specify or denote the performance for the tracer to show that the technique taught in the patent would not be -- would not essentially allow you to deal with sensitive information in an effective way as taught by the patent, but at the same time, it would be practically not feasible because of the performance penalty that he would pay.
So this was just the inventors doing their due diligence and showing that if the other teachings of the patent are implementing -- implemented properly, the benefits you get there are not going to be rendered prohibitively expensive by using the tracer that is too slow. That's literally the only purpose of this table in Figure 5.
BY MR. GERSON:
Q. So can you tell, looking at the table in Figure 5, which of these URLs are associated with sensitive information presenting a security risk?
A. I can tell you that in my opinion, just as we sit here, I don't know -- I haven't been to some number of these. For example, I don't think I have ever accessed -- where is it? I saw it a second ago.

Page 62

Like SOSO.COM. I don't think I've ever accessed BAIDU.COM.

On the other hand, I do know that it's an online marketplace. So it may contain sensitive information.

I know that, for example, Facebook would contain potentially sensitive information because it requires a user to log in using their credentials, and it also may have restrictions on the kind of content that different Facebook users may see from that user. So that would be potentially sensitive.

On the other hand, something like, let's say, WIKIPEDIA.ORG, generally that's an online encyclopedia. So I would not consider that as being sensitive. But again, the specifics of each one of these would depend on some amount of domain knowledge, domain understanding, and potentially expertise.

As I already said, I don't have expertise on SOSO.COM. As we sit here, I don't actually know what it is.

I feel like I know enough about Wikipedia to provide a reasonably confident answer, and I know enough about Facebook to be able to say something about it.

For some of these others, I would need more

Page 63

information, meaning that I would essentially be what the patent calls a "novice user."

Q. According to the patent, if we look at -- strike that.

(Pause.)

BY MR. GERSON:

Q. Does Claim 1 of the patent prevent the first web content class from having URLs being associated with sensitive information presenting a security risk?

MR. ROEHRICK: Objection. Form. Scope.

(The witness reviewed materials.)

THE WITNESS: I haven't done the complete analysis of this. Again, because that's not what I was asked to do in connection with today. But the way this claim is written, and the way this particular claim element is written, all that it requires is that the first plurality of URLs be different than the second plurality of URLs, and that the second web content class is associated with sensitive information presenting a security risk.

This does not preclude -- at least as I read it right now, it doesn't preclude other scenarios where the first web content class is associated with other kind of sensitive information presenting other kinds of security risk, but it also allows for the

Page 64

first content class being something like WIKIPEDIA.ORG where, again, generally, it would be assumed not to contain a security risk.

So I think both those reads seem possible, as we sit here, the way this is written. I would have to sift through the specification to make sure that there is nothing in the specification that precludes that, but, again, the language of this is very straightforward.

The only thing that it requires is that the two pluralities of URLs be different from one another and that the second web content class that reflects the second plurality of URLs is associated with sensitive information presenting a security risk.

BY MR. GERSON:

Q. Did you provide, in your declaration, a plain and ordinary meaning for the term "sensitive information presenting a security risk"?

MR. ROEHRICK: Objection. Form.

THE WITNESS: If I understand your question correctly, you're asking me if I provide a definition for sensitive information that, in my view, would be the plain and ordinary meaning of sensitive information?

Did I understand that correctly?

Page 65

BY MR. GERSON:

Q. I think so, yeah.

Did you explain what the plain and ordinary meaning of sensitive information is? If you want to call that a definition, that's fine.

A. Well, I don't think those two are the same because I definitely explained what it is over -- let's see. This is Pages 14 through 28. So that's 15 -- almost 15 pages of text. There is a lot of explanation there.

But as far as the meaning of the term, I state in Paragraph 62, "In fact, this term is so simple and self-explanatory even to a lay jury, that there is no need to unduly complicate it with a construction. It should simply retain its plain and ordinary meaning."

So sensitive information is information that is sensitive.

Q. And can reasonable minds differ as to what information is sensitive versus not?

A. Well, maybe you can give me an example. I gave you an example where reasonable minds would potentially differ, but that's because one of the people is not familiar with the context, with the domain in that particular case.

Page 66

So in the case of, let's say, patient confidentiality and various laws and regulations, somebody might be, you know, prepared to disclose some information that a person knowledgeable in that domain would consider sensitive.

So there is a discrepancy there drawn by a level of experience, if you will. I would be -- I believe that a person of ordinary skill in the art would understand within a given context whether information is sensitive or not, but if you have specific examples, I'm happy to consider them and I can, to the best of my ability, try to give you an answer as to whether that information would be sensitive or not.

Q. Would my weight be sensitive?

A. That depends on the context. It is your private information, and you could be discussing it freely with your family or your partner, but you may not want it to be known more broadly than that. So depending on context, again, that could be sensitive information.

You would not, for example, want your doctor to publicly state what your weight is in front of other patients. So I think in that context, it's a clear example of where reasonable people would all

Page 67

agree that for that context, that is information is sensitive.

Q. My eye color, just as another example, is that sensitive information?

A. Divorced of context, that's not possible to say. Generally, it's less -- I think it could be potentially considered less sensitive or less potentially sensitive than your weight, but I could imagine scenarios where, you know, eye color could be code for race, for example, and that would be highly inappropriate to include as part of a discussion.

So it would depend on context, but I think, again, reasonable people familiar with the context in the domain would have no problem distinguishing something that's sensitive from something that's not, even when it pertains to a person's eye color.

(Pause.)

BY MR. GERSON:

Q. On -- if we go to your declaration, on Page 26, Paragraph 59. It's Exhibit 1.

MR. ROEHRICK: I'm sorry. What was the page of that again?

MR. GERSON: Page 26, Paragraph 59.

THE WITNESS: I'm there.

BY MR. GERSON:

Page 68

Q. Great.

You write that "the National Institute of Standards and Technology defines 'sensitive information' as the below."

Do you see that?

A. Yes.

Q. Is this the definition of sensitive information that you believe applies to the claim term of the '721 patent?

(The witness reviewed materials.)

THE WITNESS: Again, that's one scope of sensitive information that pertains to the national interest or the conduct of federal programs in the interest of national defense or foreign policy. So a person of ordinary skill in the art would definitely understand in that context what sensitive information is.

So without, you know, casting any aspersions, but I doubt that your body weight or mine would be a matter of national security, all other things being equal. So that is an aspect of sensitive information for a particular context, and you can think of it almost like a domain of discourse.

MR. GERSON: We've been going for a while, I think. Can we perhaps go off the record and take a

Page 69

brief break?

THE WITNESS: Sure.

THE VIDEOGRAPHER: Going off the record at 11:32 a.m.

(A recess was taken from 11:32 a.m. to 11:44 a.m.)

THE VIDEOGRAPHER: We are back on the record at 11:44 a.m.

MR. GERSON: Thanks so much.

Q. Sticking with the '721 patent, which I believe is Exhibit 3, if you could please turn to Claim 12, which is on last page of the patent.

A. I'm there.

Q. And so one of the at-issue claim terms opined on your declaration is "to manage by the rules"; is that right?

(The Reporter requested clarification.)

MR. GERSON: Well, it says "to manage by the rules."

And I'm looking at Paragraph 69 of your declaration.

MR. ROEHRICK: Objection. Form.

THE WITNESS: 69. Oh, I see. Yeah. It starts on -- in Paragraph -- right about Paragraph 63, and the term technically -- at least the way I opined

Page 70

on it is "in order to manage according to the rules."
MR. GERSON: Right. Perfect. Okay. We're on the same page.
Q. So the claim term is "in order to manage according to the claim rules." Do you see that? It starts on -- like you said, just before Paragraph 63 of your declaration, and we see that claim term in Claim 12 of the '721 patent as well; right?
(The witness reviewed materials.)
THE WITNESS: Yes, it is at the top of Page -- sorry, rather, Column 16, the part of the claim limitation that reads, "and launches a new browser instance in order to manage according to the rules."
BY MR. GERSON:
Q. Perfect.
And the claim -- that same claim term -- and I apologize. I'm bouncing around a little bit.
That same claim term is also found in Claim 7 of the '721 patent, which is at the bottom of Column 14; is that correct?
A. Yes. That one is at about Line 59 and 60.
Q. Perfect. Now -- okay.
So starting with Claim 7, Claim 7 has a -- is a method claim; correct?

Page 71

A. Yes.
Q. And the method comprises "utilizing a processor in communication with a non-transitory tangible storage medium storing instructions."
Based on those two things in tangent are going to perform a number of steps. The first step is "accessing data defining rules for delegating web access."
Do you see that?
A. Yes.
Q. And the limitation goes on from there, but in Claim 7, there's "data defining rules for delegating web access associated with a first content class to a first browser type and delegating web access associated with a second content class to a second browser type."
Is that correct?
A. Yes, that is the second claim element after the preamble.
Q. Right. So later, when Claim 7 -- when Claim 7 includes the language at issue, "in order to manage according to go the rules," is it your opinion that the antecedent basis for the rules is the data defining rules that we spoke of earlier?
MR. ROEHRICK: Objection. Form.

Page 72

BY MR. GERSON:
Q. Maybe I should ask a better question. Sorry.
What is the antecedent basis for the rules in Claim 7, part of the claim term, in order to manage according to the rules?
A. The antecedent is rules for delegating web access associated with a first web content class to a first web browser type, and delegating web access associated with a second content class to a second content -- sorry, to a second browser type.
Q. Okay. Great.
And then if we go to Claim 12, as you mentioned, Claim 12 also has the language "in order to manage according to the rules." It's the top of column 16.
Could you just tell me the antecedent basis for the rules in the context of Claim 12?
MR. ROEHRICK: Objection. Form.
(The witness reviewed materials.)
THE WITNESS: The rules in this case would be associated with the data that associates a first web content class with a first browser type and a second web content class with a second browser type.
So that's the -- that is the reference in this claim element to something that determines which

Page 73

content class is associated with which browser type.
BY MR. GERSON:
Q. The element you're referring to, though, doesn't use the word "rule" or "rules"; correct?
A. That word itself is not used, but from context, it is clear what is meant by that claim element.
Q. If you could turn to Paragraph 69 of your declaration, which is on Page 31?
A. Okay.
Q. Just to make sure I understand, you write, "Thus, in summary, 'to manage by the rules' simply means," and then you go on to provide.
Is that the meaning of the term "to manage by the rules" as you provided in Paragraph 69?
MR. ROEHRICK: Objection. Form. Mischaracterizes.
(The witness reviewed materials.)
THE WITNESS: That is the meaning that I'm ascribing to "to manage by the rules" based on the disclosure of the patent, and as a way of explaining or summarizing why to manage by the rules is not indefinite as claimed by Fortinet.
BY MR. GERSON:
Q. I'm just jumping around a little bit. Go

Page 74

back to Page 63 of your declaration.
A. Okay.
Q. The second to the last sentence there, that paragraph you note, "This is one of the fundamental concepts of the invention, which utilizes a set of rules for segregating 'sensitive' user information of known safe sources." Then there's a parenthetical, then "from everything else."
My question is: What does "known safe sources" mean?
A. In this context, a known safe source could be your bank, like BANKOFAMERICA.COM.
Q. When you say, "known" -- I'm just trying to understand this a little better.
Known to whom as being a safe source?
MR. ROEHRICK: Objection. Form.
THE WITNESS: Well, in -- in the context of really the, let's say, Internet literate public in the U.S. at least would know that BANKOFAMERICA.COM is a legitimate banking institution, or rather, the website of a legitimate banking institution. So in that case, it's a very broad cross-section of -- of the public.
I don't think that there would be any dispute among people like probably everybody on -- present, right now on this Zoom call, that BANKOFAMERICA.COM

Page 75

would be a safe source, meaning that if it prompts you, for example, for your user ID and password, that it's okay to provide those so you can authenticate yourself and access your financial information, which is another piece of sensitive information that, again, is stored in that safe source.
So you're entrusting as a customer -- or rather, one is entrusting some of that sensitive information to this known safe source.
(Pause.)
BY MR. GERSON:
Q. Sorry, but turning back to Paragraph 69, which is -- again, it starts on Page 31 of your declaration and goes to Page 32.
A. Okay.
Q. On -- I guess on the last sentence, which is on Page 32, you make a reference to a "claimed daemon program." I'm not sure of the correct pronunciation.
A. Generally, it's pronounced daemon. Sorry to jump in.
Q. That's okay. So I'll start again.
You reference a "daemon program" on the last sentence of Paragraph 69 on Page 32.
Can you just explain what a daemon program is?

Page 76

MR. ROEHRICK: Objection. Form. Outside the scope.
You have a document that does not give an opinion defining what a daemon is.
(The witness reviewed materials.)
THE WITNESS: The daemon is explained in the claim element that says that the daemon -- it's implementing a daemon or -- yeah, "the daemon comprising a multi-threaded program executed outside the first browser instance that tracks active browser instances and launches a new browser instance in order to manage according to the rules."
So that -- I read that from Claim 12. So that would be an appropriate characterization of a daemon program. It's multi-threaded. It runs outside of the browser instance, which is, in this case, the software in question, if you will, or the capability in question.
It tracks what's happening with the browser instances. So the active browser instances, and it can launch a new one based on the rules.
(Pause.)
MR. GERSON: We'll mark our next exhibit -- so bear with me for one second, please.
(Deposition Exhibit 4 was marked for

Page 77

identification.)
MR. GERSON: Exhibit 4 should be in the Exhibit Share. Let me know if you're able to open and download it, please.
THE WITNESS: It is the '831 patent, and I was able to open and download it. Let me just open it in a bigger window here.
(Pause.)
THE WITNESS: Okay.
BY MR. GERSON:
Q. And the '831 patent, again, is one of the at-issue patents in this litigation that has disputed claim construction issues; correct?
A. That is correct. I believe there is one issue that -- rather, one term that I opined on.
(Pause.)
BY MR. GERSON:
Q. If you could please turn to Page 19 of the '831 patent, which has Claim 1 on it on Column 14.
A. Okay.
Q. The at-issue claim that you've opined on is "performing a full precision computation of the value for a data set"; is that correct?
MR. ROEHRICK: Objection. Form. Mischaracterizes.

Page 78

(The witness reviewed materials.)
THE WITNESS: That is the term I opined on in my declaration on Page 35. I'm just trying to find it in the -- specifically where it is in the claim element.
I found it now. Yeah, it's on Line 44.
BY MR. GERSON:
Q. Okay. And so far as I understand the dispute, you disagree with Fortinet's construction because Fortinet's construction, essentially in your view, replaces the word "computation" with "convolution"; is that correct?
MR. ROEHRICK: Objection. Form. Mischaracterizes.
THE WITNESS: That's definitely one of the reasons or the, I guess, in some way the key reason. That one alone I think renders Fortinet's construction incorrect because it reads out embodiments from the patent.
I did not, as I recall, spend time analyzing other aspects of the definition.
BY MR. GERSON:
Q. So just to help me kind of understand the dispute a bit better, is it your view that the computation word in the at-issue phrase requires a

Page 79

convolution and other things, or that it could be just other computations alone, if that makes sense?
MR. ROEHRICK: Objection. Form. Foundation.
MR. GERSON: In other words -- let me try at that again.
Q. Does the word "computation" in the disputed phrase require as part of that computation, convolution?
MR. ROEHRICK: Objection. Form. Compound.
THE WITNESS: Well, the patent says the computation in Column -- at the bottom of Column 1, it says the computation "employs a convolution and a pooling."
So the patent itself explains that even in that one embodiment, there are two different types of computation of which one is explicitly excluded by Fortinet's proposed construction. But then a person of ordinary skill in the article would know that when you're talking about CNNs or convolutional and neural networks, there are other types of computation, and I list several of those in Paragraph 82 of my declaration.
So at the least, Fortinet's construction explicitly excludes an embodiment disclosed in the patent and that, as far as I understand, is

Page 80

inappropriate.
BY MR. GERSON:
Q. Is -- let me try it this way: Does the claim limitation at issue performing a full precision computation of the value for a data set, does that require, as part of that computation, a convolution?
(The witness reviewed materials.)
THE WITNESS: According to this, it may because it says, "in one or more layers of" the -- rather, "of a CNN, performing a first iteration that includes computing a value base on a first set of most significant bits."
BY MR. GERSON:
Q. Sorry. You said, "it may." I'm just trying to understand. So maybe I'll just ask it again.
Does the claim limitation at issue require, as part of the computation, convolution?
A. It includes it. To a person of ordinary skill in the art, they would understand that an iteration through a CNN would include a convolution, but they would also understand that it would include operations -- or computations, rather, beyond just convolution.
But that explicitly discloses an embodiment where it says the computing in each of the first

Page 81

iteration and the second iteration employs a convolution and a pooling. And in patent lingo, if you will, a convolution and a pooling is one or more convolution computations and one or more pooling computations.
Q. So convolution is a computation that is used in CNNs; correct?
MR. ROEHRICK: Objection. Form. Mischaracterizes.
THE WITNESS: It is one type of computation that is used in CNNs, but it's not, by any means, the only type of computation, and it cannot be substituted for computation when defining a term such as performing a full precision computation of the value for a data set. That is inappropriate, and it's wrong.
BY MR. GERSON:
Q. So in Paragraph 82 of your declaration, as you mentioned, you go on to list things that include "activation, normalization, flattening, backpropigation, and" then "pooling or padding."
Do you see that?
A. Yes.
Q. Perfect.
So just to help me understand, taking them

Page 82

one by one, what is "activation"?
A. Activation is essentially the process by which different neurons in a deep neural network are either fired or not.
Q. All right. And what is "normalization"?
A. Normalization is a process where you end up essentially ensuring that the output of one layer matches, in terms of dimensionality, the input of the next layer.
Q. Continuing on, what is "flattening"?
A. Flattening is a process whereby you can take a multi-dimensional vector of data and reduce its dimensions to a single vector. So this has an applicability in convolutional neural networks where typically, at the tail-end of a CNN, you end up having fully-connected layers, and for those layers, they will require one-dimensional input rather than multi-dimensional input that might -- like a 3D feature map that might be used in a convolutional neural network.
Q. What is "backpropigation"?
A. Backpropigation essentially is the process of updating the weights associated with various neurons. So -- right. To ensure that you're minimizing prediction error as you're making progress through the

Page 83

network.
Q. And what is "pooling"?
A. Pooling is essentially a process of down sampling, where you reduce the width and the height of the feature maps that are generated by convolutional layers so that you can essentially reduce the number of parameters that need to be computed, and thereby, avoid, at least in theory, overfitting, meaning that you get better results with identifying objects, for example, that may move over time.
So if you're looking at images in subsequent video frames and things of that nature.
Q. Is pooling different than max pooling?
MR. ROEHRICK: Objection. Form.
THE WITNESS: Max pooling is a kind of pooling. So --
(Indiscernible cross-talk.)
BY MR. GERSON:
Q. I'm sorry. I interrupted. I'm sorry. Go ahead.
A. No worries.
So one example -- one type of pooling would be max pooling, and in the case of max pooling, what you end up doing is you select the maximum value from the region that you're essentially considering. So

Page 84

that's kind of what your filter is looking at. And thereby, you're accentuating the most prominent features.
Another example of pooling could be average pooling. In the case of average pooling, you end up computing the average value of the region, and that allows you to -- at the potential cost of not recognizing the most important features of a particular class, it does allow you for a more -- if you're going to achieve a more general or smoother representation.
So both of those work well in certain -- or each of those works well in certain -- under certain circumstances.
Q. And then "padding"?
A. Well, adding is already explained in my declaration. It's adding zeros or other values to the actual input data so that the size of the output matrix remains the same as the input matrix.
Essentially, what you're ensuring is that in a way that will, presumably for whatever problem you're studying, not impact your ability to detect whatever features you're interested in, you're ensuring that you can continue the computation unimpeded with -- through layers that otherwise might

Page 85

be mismatched in terms of the number of dimensions.
Q. So can you -- strike that. Let me try that again.
Is it possible to meet the requirements of Claim 1 without performing convolution?
MR. ROEHRICK: Objection. Form. Outside the scope.
THE WITNESS: Well, the patent itself discloses that the first iteration, as well as the second iteration, employs a convolution and a pooling. So the disclosure in the patents states that that's what has to happen.
I think you're asking me are there other possible embodiments where that would not be the case. I have not conducted that analysis. I would have to think through that and see whether it's possible to infringe this claim element in a CNN that does not do any kind of convolution.
Again, if we're dealing with fully connected layers inside of a CNN, it is possible that you would still infringe without doing convolution for those particular layers, but that -- that would also depend on what the scope of the iteration is and what the network looks like, and so on, and I just haven't done that analysis.

BY MR. GERSON:
Q. So the patents -- sorry. If you could please turn to Column 3 of the patent, of the '831 patent. Around Line 32.
A. Okay.
Q. And if my line numbers are correct, then there's a sentence, "Implementations avoid such redundancies does by performing convolution first with a small number of most significant bits" or "(MSBs)."
Do you see that?
A. Yes.
Q. Great.
And does the patent disclose using a small number of most significant bits to perform any other types of computations besides convolutions?
MR. ROEHRICK: Objection. Form. Scope.
THE WITNESS: Are you asking me to look through the whole patent? Because, again, there's quite a bit. There's -- there are 13-1/3 columns of spec there.
This is not -- again, this is not something that I analyzed in the context of preparing for today, but I'm happy to look through it and see if there's any explicit disclosure there for other operations.
In the very next sentence it talks about



computing the pooling. So that computing the pooling is clearly also done in the context of the previous clause in that same sentence, which is "performing convolutional with the most number of significant bits." So that would suggest to a POSITA that the pooling also references what happens after -- or with the information involving the small number of MSBs.
But for other disclosures, I would just have to look through the specification.
BY MR. GERSON:
Q. Going back to the list of techniques that we've been talking about in Paragraph 82, activation, normalization, flattening, et cetera, you know what I'm referring to?
A. Yes.
Q. Are these different -- which of these different, what you call computations, are disclosed and discussed in the specification of the '831 patent?
MR. ROEHRICK: Objection. Form.
THE WITNESS: In a way, they're all disclosed because a person of ordinary skill in the art would understand the moment you mentioned "CNNs," all of these are inherently included.
BY MR. GERSON:
Q. So the inventors of the '831 patent, they



didn't invent any of these techniques like activation, normalization, flattening, backpropigation, pooling, and adding; correct? They were all known?
A. Again, this is all done in the context of CNNs, and the first sentence in the background of the patent says CNNs have gained popularity in many computer vision applications.
So the -- in this particular case, the inventors are Jae-sun Seo and Minkyu Kim, and as we sit here, I honestly couldn't tell you. There is a remote possibility that one of them didn't, or both of them did participate in inventing CNNs, but that's not the invention claimed by '831 either way.
Q. And by the time the '831 patent was filed, techniques like max pooling were also known in the art and the '831 patent doesn't purport to invent that; correct?
MR. ROEHRICK: Objection. Form. Outside the scope.
(The Reporter requested clarification.)
(Record read.)
MR. GERSON: Let me strike all that.
Q. By the time that the '831 patent's filing, techniques like max pooling were known in the art; correct?



MR. ROEHRICK: Objection. Form. Scope.
THE WITNESS: In my understanding, max pooling was introduced at least two or three decades ago when original CNNs were -- before -- essentially, in a sense, when they were introduced well before they gained the amount of popularity they have within the past decade or so, maybe 15 years or so.
So yes, I would say that max pooling is not something that there's any suggestion that the '831 patent has invented. They talk about it, for example, in Column 3.
They say, "For example, in 2x2 max-pooling 75 percent of convolution computation data is thrown away at each pooling layer," et cetera, et cetera.
This is not presented as the invented capability of this patent. This is discussed as a known fact.
BY MR. GERSON:
Q. If you could turn to Paragraph 73 of your declaration. It's on Page 33.
A. Okay.
Q. Here, you quote -- or you start the paragraph, you write, "The '831 patent teaches techniques," and then you quote the abstract.
Do you see that?

A. Yes.
Q. And the second line that you quote in the abstract reads, "Computation redundancy and CNNs is reduced by exploiting the computing nature of the convolution and subsequent pooling."
Do you see that?
A. Yes.
Q. Does that sentence in the abstract relate to this use of a small number of most significant bits that we're speaking about earlier, or is this something to ditch?
MR. ROEHRICK: Objection. Form. Outside the scope.
(The witness reviewed materials.)
THE WITNESS: Well, the subsequent language -- let me just zoom in a little bit here in the abstract says -- so the sentence that I quote that you just read says, "Computation redundancy in CNNs is reduced by exploiting the computing nature of the convolutional and subsequent pooling (e.g., sub-sampling) operations. In some implementations, the input features may be divided into a group of precision values and the operation(s) may be cascaded. A maximum may be identified using a small number of bits in the input features, and the full-precision



convolution may then be performed on the maximum input. Accordingly, the total number of bits used to perform the convolution is reduced without affecting the output features of the final classification accuracy."
So this is describing what may happen in some convolution site. Obviously, that sentence is in the abstract. So all I can comment on, with respect to the specific intent of the patent's authors is what else they say specifically in the abstract with respect to that one sentence in isolation.
BY MR. GERSON:
Q. So the term at issue we've been speaking about is performing a full precision computation of the value for a data set.
Could you just explain what "full precision"; means.
MR. ROEHRICK: Objection. Form. Outside the scope.
(The witness reviewed materials.)
THE WITNESS: I think that without belaboring this too much, there are multiple places in the patent that discuss this, but I will point to Paragraph 84 in my declaration that I think summarizes this. At the bottom of Page 37 it says the quoted language from the



'831 patent, Column 3, Line 65 to 69, say, "implementations perform approximate computations of neural networks (e.g., based on the MSBs)," and then later on it says, "And then perform the more fine-grain, full precision, (e.g., more accurate) computations on the narrowed-down set of data that exhibited the maximum."
So using the MSBs, you would get, in essence, approximate values or you'd be able to perform approximate computations using all of the data available or the narrowed down set of data that exhibited the maximum. There, you would end up computing the -- or performing the full computation, or full precision computation.
There are other disclosures there as well, but for starters, let's go with that.
BY MR. GERSON:
Q. So the full precision computation, then, is in contrast to using only a certain number of MSBs? You would not limit the computation to some number of most significant bits; is that correct?
MR. ROEHRICK: Objection. Form. Compound. Mischaracterizes. Also scope.
THE WITNESS: Full precision computation, specifically in the context of '831, at least in the



embodiments that I include in Paragraph 84, talks about it in terms of the plurality of the data sets and the value for a data set -- sorry.
The value for a data set of the plurality of data sets that exhibited the maximum value. That would be the full precision computation.
So even the patent itself, in Column 3, for example, says if the maximum value is not known based on the small number of MSBs, the process may proceed with lower bits of convolution for multiple entries."
So this explicitly suggests that just by focusing on MSBs, you may, in fact, be sacrificing your ability to perform the full-precision computation.
BY MR. GERSON:
Q. The -- speaking of the full precision computation, the last limitation of Claim 1 is "propagating the full precision computation of the value to a subsequent layer of the CNN."
Do you see that?
A. Yes, I do.
Q. So does this mean that this full-precision computation, in the context of Claim 1, it's not being performed on the last layer of the CNNs since it has to be propagated to a subsequent one; correct?

Page 94

MR. ROEHRICK: Objection. Form. Mischaracterizes. Scope.
THE WITNESS: Why would that be the case? I mean all this says is that you're just propagating the value to a subsequent layer of the CNN. It doesn't say which layer it is. It could be the last layer of the CNN. That could be -- if you're in the penultimate layer, your subsequent layer would be the last layer.
BY MR. GERSON:
Q. Right. So the -- sorry. Maybe I misphrased the question.
The full-precision computation of the value, that computation could be the penultimate layer, but it wouldn't be the last layer -- right? -- because it has to be propagated to a subsequent; correct?
MR. ROEHRICK: Objection. Form. Mischaracterizes. Scope. Also compound.
THE WITNESS: I think that your question, if I understand it correctly, is implying that somehow Claim 1 does not allow for the computation ever to conclude, meaning that somehow you would have almost like an infinite CNN based on -- if I'm understanding your question correctly.
BY MR. GERSON:

Page 95

Q. No. I might be misphrasing it, then.
I guess what I'm trying to say is that what's being referred to in Claim 1, this full-precision computation, that that computation is being performed on some other layer other than the last layer given the last limitation.
MR. ROEHRICK: Objection. Form.
THE WITNESS: Yeah. Sorry. I'm struggling in understanding the question.
So this is specifically referring in the antecedent claim element right after the -- right after the beginning of the claim. It says, "in one or more layers of a convolutional neural network," doing all of this and then propagating to subsequent layer.
So any convolutional neural network that operates in this manner where in one or more layers this happens and it gets propagated to the subsequent layer, even if it happens in one layer, that would still satisfy the language of this claim.
This does not preclude a variety of CNN as being potentially compliant with this -- yeah, with this claim.
BY MR. GERSON:
Q. Yeah. I guess -- I'm sorry. I'll try to ask again.

Page 96

The one or more layers -- strike that.
The -- to your point, Claim 1 references operations that are performed in one or more layers of the CNN; correct?
MR. ROEHRICK: Objection. Form. Mischaracterizes.
THE WITNESS: I mean in one or more layers of a CNN that perform a first iteration that includes computing a value based on a first set of MSBs for each of a plurality of data sets. That's what the claim element discloses.
BY MR. GERSON:
Q. Right.
And those one or more layers can't only be the last layer of the CNN because then that propagating step, propagating the full-precision computation of the value to a subsequent layer wouldn't make sense; correct?
MR. ROEHRICK: Objection. Form. Mischaracterizes. Scope.
THE WITNESS: Well, if it's the last layer, then the subsequent layer of the CNN would essentially be outputting the results. So I think that, again, I have not provided an analysis of this, but the way I read this, there's nothing here that precludes this

Page 97

from being the last layer of the CNN. So I do feel like I -- sorry. I didn't understand your question initially.
This -- depending on the context of this, as we sit here, I'm not comfortable excluding the last layer of the CNN being included in this, but having said that, that's not the analysis that I did in preparation for today.
BY MR. GERSON:
Q. In your dec- -- strike that.
In your declaration, have you identified any other computations, aside from convolution, as MSB driven?
MR. ROEHRICK: Objection. Form.
THE WITNESS: Can you point me to where in my declaration I'm identifying convolution as MSB driven?
BY MR. GERSON:
Q. So --
A. Let me just -- maybe I can help you because in Paragraph 84 I explicitly quote the language from the patent that says, "performing a first iteration that includes computing a value based on a first set of most significant bits." And I already pointed to the language that computing in the iteration -- in each of the iterations involves -- or rather, employs

Page 98

a convolution and a pooling.
So that, to me, directly points to two different times of computation being explicitly disclosed in '831 with respect to MSBs.
Q. And do you identify any other computations as being -- MSB driven is a term used in the patent. Any other computations besides convolution and pooling as being MSB driven?
A. Going from memory, I don't want to -- you know, I know that you have a limited amount of time. So I don't want to take up too much of that time.
Going from memory, I do believe that convolution and pooling are two computations that are explicitly disclosed.
It is possible that some of these other types of computation are explicitly disclosed, but as I already mentioned, ultimately it would not matter because a POSITA would understand that they would be disclosed.
Now, I don't see the term "MSB driven" in the claim that we just discussed a minute ago. I don't think that it's in the other claims either. So maybe I have some concerns with that question on more than one level.
But computation definitely discloses -- or is

Page 99

disclosed as being convolution and pooling in the patent. It's possible that these other operations are disclosed as well, and on top of that, MSB driven is not a term that's used in the claim elements. So that's -- all those things give me pause when I hear a question the way you phrased it.
Q. With respect to these computations that you reference in Paragraph 82, activation, normalization, flattening, et cetera, you don't provide a cite to the patent specification where these are expressly disclosed; correct?
MR. ROEHRICK: Objection. Form. Mischaracterizes.
THE WITNESS: As I pointed out, at the least, a POSITA, somebody who is familiar with CNNs would readily know that these are the kinds of computations present in CNNs. But if you're saying beyond just the POSITA knowing that they're there, are there other -- are there other disclosures, I would have to look through the patent spec.
There is no citation specifically in Paragraph 82, but the point here is that Fortinet asserts that computation should be rendered equivalent to convolution, and there is evidence in the patent that I cited explicitly that that's simply not the

Page 100

case.
BY MR. GERSON:
Q. So if you could turn to Paragraph 77 of your declaration, which is on Page 34.
A. Okay.
Q. You write, "In summary, the '831 patent teaches that a highly innovative 'MSB-driven convolution may produce similar results given that the lower precision bits in the data set would not have altered the maximum determination computation even if they had been included in the original computation."
Do you see that?
A. I see that.
Q. Okay. And you're citing to the '831 patent, starting at Column 5, Line 24; correct?
A. That is the citation at the end of the paragraph.
Q. And so you'd agree, then, that the patent expressly discloses "MSB-driven convolution"; correct?
MR. ROEHRICK: Objection. Form. Mischaracterizes.
THE WITNESS: That term appears in the patent --
(Indiscernible cross-talk.)
BY MR. GERSON:

Page 101

Q. Sorry. I didn't mean to interrupt. I'm sorry.
A. That much I cannot deny because I cited it in my declaration.
Q. And you describe that term "MSB-driven convolution" and what it does is highly innovative; is that correct?
MR. ROEHRICK: Object to the form. Mischaracterizes.
THE WITNESS: Yeah. I say that in that paragraph. Again, you read that at the beginning of the paragraph.
BY MR. GERSON:
Q. And you know where say that the patent discloses MSB driven activation content; correct?
A. You broke up for me there for a second. I heard MSB-driven activation, but I didn't hear the whole question.
Q. I'm sorry. Let me try that again.
You don't allege in your declaration that the patent expressly discloses MSB-driven activation; correct?
MR. ROEHRICK: Form. Mischaracterizes.
(The Reporter requested clarification.)
MR. GERSON: MSB.

THE WITNESS: I do not. That, I do not.
BY MR. GERSON:
Q. And similarly, you don't allege in your declaration that the patent expressly discloses MSB-driven normalization?
MR. ROEHRICK: Objection. Form. Mischaracterizes. Scope.
THE WITNESS: Again, it -- it is not a term that appears in the specification, but just like with activation, a person of ordinary skill in the art would understand that those are the types of operations that exist in -- in a CNN.
BY MR. GERSON:
Q. You don't point to any disclosure, in the patent specification, that expressly refers to "MSB-driven flattening"; correct?
A. Same answer. A POSITA would understand --
MR. ROEHRICK: Objection. Same objections.
THE WITNESS: A POSITA would understand that flattening is an operation or a computation that takes place in the context of -- in the context of CNNs.
BY MR. GERSON:
Q. Right. I just -- to be clear, you don't expressly state or identify any disclosure of MSB-driven flattening in the '831 patent; correct?



MR. ROEHRICK: Objection. Mischaracterizes the scope.
THE WITNESS: I do not -- I have not written about it in my declaration. It's possible that that particular combination of words does not exist in the patent. I would just have to look.
BY MR. GERSON:
Q. And you don't identify any disclosure in the patent, express disclosure of MSB-driven backpropigation; correct?
MR. ROEHRICK: Same objections.
THE WITNESS: It's the same answer. It's possible that those words do not appear in the patent in that combination, but just like everything else, including -- that I've discussed so far, including the language of Paragraph 77, that is immaterial to this particular claim construction issue.
It's basically cherry picking terms to indicate that this term may mean something other than what it actually means and what is actually disclosed in the patent. So same answer.
MR. GERSON: Let's take a two-minute break.
THE WITNESS: Sure. I was just going to ask if we could do a five-minute break. So perfect timing.



MR. ROEHRICK: Actually, it's about 1:00 o'clock Pacific Time. I'm assuming Dr. Medvidovic has not eaten lunch. Is it possible that we can take a longer break for that?
MR. GERSON: Let's go off the record to discuss that, but happy to do whatever is best for the witness.
THE VIDEOGRAPHER: Going off the record at 12:52 p.m.
(A recess was taken from 12:52 p.m. to 1:23 p.m.)
THE VIDEOGRAPHER: We are back on the record at 1:23 p.m.
MR. GERSON: Thanks so much.
I put into the Exhibit Share our next exhibit. I believe it's Exhibit 5.
(Deposition Exhibit 5 was marked for identification.)
THE WITNESS: Okay. I have it.
It's the '385 patent; correct?
BY MR. GERSON:
Q. Correct. Yeah.
The '385 patent is one of the at-issue patents for which there are Markman disputes that you've opined on; is that correct?



A. That is correct.
Q. And according to your declaration, your discussion of the '385 patent begins on Page 47 at Paragraph 109; is that right?
A. That is correct.
Q. If you could please turn to Page 49, Paragraph 114.
A. Okay.
Q. Here you quote the '385 patent. You refer to the term "software dependencies" on the third line down.
Do you see that?
A. Yes.
Q. What is a software dependency?
A. It's just a dependency of one software module, entity, application, depending on context, on another such module or entity or application.
Q. So basically, one module can't run without the other.
Is that kind of the concept?
MR. ROEHRICK: Objection. Form. Mischaracterizes.
THE WITNESS: Or it may depend on the other to provide -- depending on context, it may provide certain features or capabilities that make the running

Page 106

of one -- the first module in some ways more successful or more performant, more secure, more reliable. It just depends.

So it need not be strictly that without it you can't run it divorced of the context of this patent. When we talk about software dependencies, there are -- well, let's just put it this way, there's a whole science behind it, and in some cases it's enhancement, and in other cases it is, as you pointed out, the ability to have a running system in the first place.

BY MR. GERSON:

Q. What do you mean by "a running system in the first place"?

A. I think you might not have heard me correctly. So I'll just repeat what I said, and I'll explain.

The ability to have a running system in the first place. So meaning -- yeah, essentially the same thing that you said, I think, which is that if you have a dependency that has not been satisfied, so to speak, so A depends on B and B is not there, A is not capable of running.

Q. Understood. Thank you.

And so for any given Software A, it might

Page 107

have multiple dependencies; is that correct?

A. In modern software systems -- sorry, John, did you --

MR. ROEHRICK: Yes.

Objection. Form.

THE WITNESS: In modern software systems, it is not unusual for a software program to depend on multiple other programs.

BY MR. GERSON:

Q. Just so we are kind of on the same page, you said "software program." Is that kind of what we're talking about with dependencies? One program might rely on the other, or is it done at a different level, or do people tend to look at it in the context of software programs?

A. It really spans all levels. So you could have function or method level dependencies all the way up to entire system level dependencies where the systems themselves could be complex entities that have multiple, different parts to them.

So a method level dependency could be -- for example, since we talked about banking before, a method that computes compound interest, for example, for a savings account, that might depend on several other things in a system.

Page 108

At the other end of the spectrum, a system that contains multiple other systems, in a sense, would be, for example, the Microsoft Office Suite, which itself has Word and Excel and et cetera, and the Office Suite has certain dependencies at the level of the whole suite, but then internally, Word might have a set of dependencies that are different from the dependencies that PowerPoint has, and those are different from the dependencies that Outlook has and so forth.

Q. You said there's, I think, kind of a whole science to this issue of identifying dependencies; is that right?

MR. ROEHRICK: Objection. Form. Mischaracterizes.

THE WITNESS: In software engineering, people who work in the area of software analysis and testing spent -- or have historically spent a fairly bit of time trying to figure out what the best way is of taking some piece of software, regardless of what its scale is, and typically, the problem is harder the larger the scale.

In trying to understand what all of the overt and for various reasons and in various ways conceal dependencies may exist there, people in the area of

Page 109

system deployment have to worry about that in significant ways. People in the area of operating systems have had to historically worry about that in critical ways, and it's still the case.

And we are all aware of many examples of where, as end users, by not respecting those dependencies or not dealing with them properly, updates or operating systems end up introducing problems.

People in the area of highly distributed and cloud systems have to deal with that in very, I would say, pronounced ways where the impact of not providing proper support for the different system dependencies, or system level dependencies could be catastrophic.

And more and more it's -- well, the other one that's very common is in the area of web-based applications where just a very simple, trivial example is a broken web link; right? You have a website, and it worked fine and then at some point you tried to click on the link and it's no longer there. So that's another example of a dependency at that level.

And then what I was going to kind of end with is in the context of the emerging Internet of things, kinds of applications, these issues crop up all the time. So I'll just give you a very annoying example.

Page 110

For my car, I drive a car for which it is a known bug that Apple car play will introduce about a two-second voice communication delay. So you can't properly use your phone and make a phone call from the car.

So something in the operating system of the car, something in the Apple operating system, and whatever the surrounding functionalities they have built just is not playing well together and, you know, for somebody like me, who doesn't have insight into the IOS, because it's a closed platform, I could just tear my hair out, and I'll never be able to figure out exactly what the problem is. But it is a dependency-related issue.

BY MR. GERSON:

Q. So is it fair to say that identifying for any given thing, like Apple car play, potentially the set of software dependencies, it's not an easy problem? It could be a very hard problem to solve?

MR. ROEHRICK: Objection. Form. Vague. Ambiguous. Compound. Mischaracterizes.

THE WITNESS: It is a hard problem to solve for somebody who doesn't have access to those systems. So I drive an Italian made car and own an iPhone, and I don't really have access to either one of those two;

Page 111

right? The two companies could get together, although this is actually a known problem for some other auto makers as well. So it's probably a problem with Apple car play.

Whoever is working on that system should be able to figure out where the problem is. For you or me, that would be, essentially, an impossible thing because we just -- we're -- even though I consider myself skilled in the art, I'm just a consumer when it comes to the iPhone. I have no sort of penetrative ability to figure out what's happening within its guts any more than any other random person who owns an iPhone.

But figuring out what the dependencies are within your system that you're working on, and in the context in which it's supposed to be running, that problem is -- it's not a trivial problem, but it's far from being unsolvable.

BY MR. GERSON:

Q. Why -- so looking back to Paragraph 114, I guess just moving on to make sure I understand the rest of the sentence.

You also reference "legacy systems."

If you could just describe what those are.

A. For the purpose of this, I think this is

Page 112

quoted from the patent. So let me just go there to make sure that I don't misquote it -- or that I don't misrepresent it rather.

(Pause.)

THE WITNESS: I think generally, use of legacy systems, these are any -- this is any system that -- you can think of it as any system that predates the system you're currently working on. So this is kind of older software.

Typically, in the vernacular when you say, "legacy systems," it is sometimes implied also that this is a system that might use an outdated technology. So it's something that, for example, might be written in a cobalt programming language or might run on like a DOS-based operating system, for example, that's not supported actively, and that very often creates problems, but in the context of this discussion, I think even systems that would be more modern than that that are in existence, those systems could still create issues.

It's a well-known phenomenon, and I think that's what '385 is dealing with, this issue of emergent behaviors where something -- a behavior manifests itself even though it wasn't anticipated by the developer of whatever the current system is, the

Page 113

current software is, or the developers of the pieces that already existed with which this current software is supposed to interface.

BY MR. GERSON:

Q. If we could go to the next paragraph. That's Paragraph 115 of your declaration.

You're referencing a "constraint set."

Do you see that?

A. Yes.

Q. And you write, in the second sentence, "This constraint set is the set of vulnerabilities that cannot be avoided, because avoiding these vulnerabilities would limit the functionality of the computer network below acceptable levels."

Do you see that?

A. Yes.

Q. And what do you mean by limiting the computer network below acceptable levels?

(The witness reviewed materials.)

THE WITNESS: Essentially, these are the vulnerabilities with which, in a sense, you have to -- you have to live, the vulnerabilities that they have to tolerate because if you eliminate the pieces of your overall system, whatever that may be -- so in this case some kind of a network system.

Page 114

The reason why it's important that these are network systems is because this talks about the dark web and being able to access the system over a network by a malicious hacker. So in those kinds of settings, you can start blocking the potential vulnerabilities one by one by excluding those parts of your system.

At some point you'll get to a situation where if you exclude anything else from the system, it is no longer going to perform the functionality you need it to perform.

So let's say you're using the online version of Word, and there, you could lock one set of vulnerabilities by eliminating the spell checker, for example. And another set of vulnerabilities by eliminating the facility that allows you to insert figures into your document, et cetera, et cetera.

But at some point, if what you care about is at least the ability to produce text documents, at some point you're going to have to live with some number of vulnerabilities because eliminating other features to remove those vulnerabilities would mean that you no longer have even a basic text editor. So that would be one example.

BY MR. GERSON:

Q. And how is that line drawn, in your opinion?

Page 115

What is below or above an acceptable level, as you've used the term?

MR. ROEHRICK: Objection. Form. Mischaracterizes. Scope.

THE WITNESS: The patent itself -- and I quote that language, it says the vulnerabilities in a constraint set represent the vulnerabilities required for subsystem functionality. So if you decide that the system functionality that you need is "X" -- so let's say the system functionality in my hypothetical example is I want to at least have a base text editor, then I can decide which aspects of Microsoft Word are additional adornments, if you will, that go beyond just the text editor so I can start eliminating those.

And eventually, I'll get to the point where for my specific needs, the baseline text editor features are the only thing that's left, and that is this Constraint Set C.

BY MR. GERSON:

Q. So in that previous answer that you gave, how are you using or defining the term "vulnerability"? What is a vulnerability as you've used there?

MR. ROEHRICK: Objection. Form. Also scope.

(The witness reviewed materials.)

THE WITNESS: So if you look at the discussion in Column 3 of the patent, which I'm not going to read, it points to vulnerability basically being a weak spot in a system, or in this case, could be a network -- a network is also a system for that matter -- that could be exploited by some set of malicious exploits.

Page 116

BY MR. GERSON:

Q. And so what's the difference between a vulnerability and a dependency?

MR. ROEHRICK: Objection. Form.

THE WITNESS: Generally, a vulnerability is a weak spot in your system. A dependency is what your system depends on or what it relies on in order to be able to function.

So the relationship is that if you want to eliminate the vulnerability, one way of doing that -- it's not the only way, but one way of doing that is by eliminating the part of the system that contains that weak spot. So in some way blocking it or, you know, building an executable that doesn't include that. However you end up strategically approaching that.

By doing that, you may compromise the dependencies needed for the system to perform certain kinds of functionality. Those dependencies could be internal or it could -- they could be external. So,

Page 117

for example, you could break a dependency between your, let's say, text editor or text editing functionality and your spell checking functionality. Those would be presumably internal to Microsoft Word.

Or you could break the dependency between your Microsoft Word text editor and the photo browser on your computer, let's say. So either way, you could break -- those would be broken dependencies.

BY MR. GERSON:

Q. And so a dependency is not necessarily a vulnerability; is that correct? A vulnerability is a weak spot?

MR. ROEHRICK: Objection. Form. Mischaracterizes.

THE WITNESS: I mean these two are not -- they're kind of orthogonal terms in a sense. I mean there is a point of connection, but...

(The witness reviewed materials.)

THE WITNESS: The way the patent and the claims -- for example, Claim 1 or Claim 8 or Claim 15 used the notion of dependencies, they -- the patent relates them to vulnerabilities in a very specific way, and that's, in essence, a part of what this patent teaches, what its inventive contribution is, if you will.



Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 118

But in a vacuum, the notion of dependency and the notion of vulnerability can be considered separate from one another. The place where they end up overlapping is one where a dependency, for example, either relates to or sometimes even induces a vulnerability, or where a vulnerability ends up impacting the parts of a software system that boiled down to one of these dependencies as discussed in '385.

So the two do relate. They kind of touch in a sense, but in a way, the concept of vulnerability and the concept of dependency can be also discussed independently of one another. They're not in any way supposed to be synonyms.

BY MR. GERSON:

Q. All right. Let's say you have a number of dependencies, but none of those were weak spots. You might have no vulnerabilities despite these systems of dependencies; right? That's what you sort of meant by orthogonal. They're not necessarily the same thing. They're kind of different things; right?

A. Well, it's possible --

MR. ROEHRICK: Objection. Form.

THE WITNESS: Sorry, John. I spoke over you.

MR. ROEHRICK: Objection. Form.

Page 119

Mischaracterizes. (Inaudible.)

THE WITNESS: In practice, quite frankly, I don't think they can have a network system that is -- that doesn't have vulnerabilities. It's not realistic in this day and age, as they say. There used to be kind of a quip that was considered true that the only way to render a system secure is to unplug the network and/or disable the network and put it behind lock and key.

It actually turns out that even that is not necessarily enough because people have shown that you can engage in certain types of site channel attacks by studying the -- the characteristics of the electrical usage of those systems. So really sort of seemingly far-fetched techniques to figure out what a system might be doing to be able to infiltrate it.

But in theory, it is imaginable that you could build a system with various dependencies that is not vulnerable.

Again, in practice, I'm a little bit dubious about that.

You could also build a system that, at least theoretically, doesn't have dependencies to other things. So sort of what we call a big ball of mud type of architecture where the system is just one big

Page 120

lump of things that are just really tightly intertwined together, but that could be, for example, infectible by a virus or some such thing.

So, you know, as an intellectual exercise, both of those seem like the kinds of things one might consider possible, but in practice, you know, I'd be hard pressed to argue that these are realistic scenarios.

BY MR. GERSON:

Q. So if we can look at Claim 1 of the '385 patent. It's on Column 13.

MR. ROEHRICK: What page is that?

MR. GERSON: I have a hard copy. It's the second to the last page.

MR. ROEHRICK: Okay. Thank you.

THE WITNESS: Okay.

BY MR. GERSON:

Q. A little more than halfway down the claim, I think it starts at around Line 44, there's the limitation "creating a constraint set of the computer system from the set of vulnerabilities, the constraint set comprising a minimum set of dependencies to operate the computer system."

Do you see that?

A. Yes.

Page 121

Q. And this limitation that I just read includes the at-issue term, which is "minimum set of dependencies"; correct?

A. Yes.

Q. So the constraint set is going to comprise that minimum set of dependencies; is that right?

A. That is what the claim limitation says.

Q. And what is a constraint set in this claim limitation?

MR. ROEHRICK: Objection. Form. Scope.

THE WITNESS: The constraint set is -- sorry. I just lost this for a second.

The constraint set is constructed from the set of vulnerabilities, and it is a subset of all the vulnerabilities in the system. That's what the specification explains in Column 3.

BY MR. GERSON:

Q. Sorry. Where in Column 3, just to make sure we got this.

A. 20 -- I mean I quoted in my declaration as well, which is -- so I -- in Column 3, Lines 20 through 22, Paragraph 113, I quote the language, "The notation V is used to represent the entire set of vulnerabilities within a given computer system."

And then in Paragraph 114 I say -- sorry. In



Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 122

Paragraph 115 I say, "a 'constraint set' (denoted C) is defined as a subset of V," where V is the entire set of vulnerabilities within the system.

And then I explain that, "This constraint set of vulnerabilities cannot be avoided, because avoiding these vulnerabilities will limit the functionality of the computer network below acceptable levels."

In fact, that's the language you read a few minutes ago.

Q. So and then in the next paragraph, in Paragraph 116 you reference "'C' as the 'set of all possible constraint sets,'" and then that "Each constraint set in Ci, represents a set of vulnerabilities that together will provide complete functionality of application i."

Do you see that?

A. Yes.

Q. So the constraint set in this at-issue claim, is that referring to C, the set of all possible constraint sets, or is that something else?

MR. ROEHRICK: Objection. Form. Scope.

(The witness reviewed materials.)

THE WITNESS: Well, the patent says that -- in Column 3, Lines 35 to 47, I excerpt from there. The patent says that "C is the set of all application

Page 123

constraint sets for a given system configuration and represents all of the applications to be run on the system."

And to the extent that this -- since C is a set of sets, whatever is true of C is also true of Ci, but to the extent that you're trying to nail this down for the purpose of the question you asked, the language of the claim says creating a constrained set of the computer system from the set of vulnerabilities, that would be the set C.

Now, that C may have Element Ci, which are subsets of C. Elements of a subset of a set could be a single element. So mathematically, ultimately the characterization in Column 3 allows for any one of the possibilities where the entire system is essentially a single constraint set that has individual elements or the system is multiple applications where each one of the applications has a constraint set Ci, and those constraint sets need to be satisfied according to the language in Column 3, and especially in Claim 1.

Both of those are taught by this claim or encompassed by the claim. But strictly speaking, this is talking about the computer system and -- in the claim language, and the computer system is represented by C without the subscript in the discussion in

Page 124

Column 3.

BY MR. GERSON:

Q. So if there's more than one application necessary to operate the computer system, then this set of constraint sets might have -- would have multiple C sub I's within; correct?

MR. ROEHRICK: Objection. Form. Compound. Mischaracterizes.

THE WITNESS: In Column 3, the patent states, on Line 47, "So in this framework, for a given system, a system administrator selects which vulnerabilities may be present in order to allow each application i to function."

So if there is more than one application and if the system administrator determines that those -- that those functions need to be rendered functional -- sorry, that those applications need to be rendered functional, then different Ci sets would be -- would be relevant in that context.

BY MR. GERSON:

Q. If you could turn to -- it's Paragraph 123 of your declaration, which is on Page 51, but then goes to Page 52.

A. Okay.

Q. So on the last sentence of that paragraph,

Page 125

which is towards the bottom of Page 52 you write, "Thus, a POSITA would understand that the term 'minimum set of dependencies' relates to the claimed 'constraint set' and refers to the set of vulnerabilities that cannot be avoided in a computer system with the necessary minimal functionality."

Do you see that?

A. Yes, I do.

Q. So are you stating that the plain and ordinary meaning of the term "minimum set of dependencies," as a POSITA would understand it, is the set of vulnerabilities that cannot be avoided in a computer system with the necessary minimal functionality? Is that your definition of the term?

MR. ROEHRICK: Objection. Form. Mischaracterizes.

THE WITNESS: No. That is just a characterization of what the minimum set of dependencies relates to as a summarization of the first of the three arguments I offer to rebut Fortinet's claim that or assertion that the -- that this claim term is indefinite.

There are two other arguments that come -- that follow this one. One of them, I believe, if I remember correctly, explicitly cites the patent



Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 126

examiner.
BY MR. GERSON:
Q. I'm sorry. I don't want to interrupt.
A. No. That's okay. Please go ahead.
Q. In your declaration, did you provide a definition of the term "minimum set of dependencies"?
(The witness reviewed materials.)
THE WITNESS: I did not provide a definition as such. I provided an explanation of how a person of ordinary skill in the art would not only be able to understand or why they would be able to understand the term, but also, how they would understand that term.
So there is no sentence in that Section C, starting on Page 51, that says, "The definition of minimum set of dependencies is," and then a definition. Such a sentence does not exist.
BY MR. GERSON:
Q. I guess similarly, is there, in your declaration, a sentence that says, "The plain and ordinary meaning of minimum set of dependencies is," and did you provide such a meaning?
MR. ROEHRICK: Objection. Form.
THE WITNESS: There is no such a sentence. I think that from the context of the patent, the -- a person of ordinary skill in the art would be able to

Page 127

understand that the minimum set of dependencies relates to that constraint set as explained in Paragraph 123, and as the patent examiner said, also in Paragraph 125, it's a constraint set of vulnerabilities that is a subset of the vulnerabilities comprising a minimum set of dependencies to operate the computer system.
(Pause.)
BY MR. GERSON:
Q. So the term is minimum set of dependencies. With respect to the word "minimum," does that mean that there can't be any smaller set of dependencies to operate the computer system?
MR. ROEHRICK: Objection. Form. Mischaracterizes.
(The witness reviewed materials.)
THE WITNESS: The minimum set of dependencies is described in the patent specification, starting towards bottom of Column 2, is that those are the necessary dependencies that need to remain satisfied in the system that would, on the one hand, minimize the effectiveness of an attacker, and on the other hand, allow the required parts of the system to continue functioning.
And I state that slightly differently, but

Page 128

semantically identically in Paragraph 124 at the top of Page -- after I cite that very language or quote that very language, at the top of Page 53 where I say, "A POSITA would understand that the referenced 'necessary software dependencies' are the 'minimum set of dependencies' required for minimal necessary functionality of the computer system."
So if it is deemed that those are the dependencies required to run the functionality, additional dependencies would render the system more vulnerable than necessary because those additional dependencies are not necessary for the system, and fewer dependencies would potentially remove vulnerabilities, but they would also reduce the functionality of the system below the necessary minimum that is taught by the patent.
BY MR. GERSON:
Q. If you have a Software Module A and then, let's say, you know, as we talked about before, it might have a Dependency B. I think you mentioned A and B earlier.
A. Sorry. Just to clarify, dependency to a Module B?
Q. Yeah. I want to try to keep this simple and use your language and see if you can help me out with

Page 129

something.
So let's say you have a Module A and it depends on Module B.
With me so far?
A. Got it. Yeah. Just to make it clear, I was clarifying that you were not referring to the dependency itself as B but it's the other module that is B?
Q. Right. I think we're on the same page.
Is it possible in this -- you know, you said it's a science that A could sort of have a choice of relying on B, or, in the alternative, relying on C? In other words, there might be two different ways that A could function, rely on B or rely on C.
MR. ROEHRICK: Objection. Form. Compound. Scope.
THE WITNESS: I'll give you are a simple example of where that -- in general, that's possible.
You could have a, let's say, a text editor, since I used that example a couple of times, that in order to print could either produce PDF or it could directly produce postscript, and those -- so it needs to have a print functionality and that -- and allowed to the system administrator, let's say, and allowed variant of that functionality could be either to print

to postscript files or to print to PDF files.
So sure, in that kind of context you could have the minimal functionality -- allowed functionality of the system being satisfied by A having a dependency on B or A having a dependency on C but not necessarily both.
BY MR. GERSON:
Q. And so I could imagine that in a real world system that's more complicated than my A, B, or C, there might be all sorts of different ways to arrive at a set of dependencies for some given software module; correct?
MR. ROEHRICK: Objection. Form.
THE WITNESS: Well, I think that -- I think what you're asking is whether in a large system with -- and instead of only three modules, it's possible to have different subsets of "N" provide the -- provide some functionality that you might be interested in where the number of subsets could be -- or the -- rather, the number of components involved in those subsets could vary from one to another.
I suppose that in some sort of hypothetical scenario you could construct such systems, but in reality, that strikes me as a very risky strategy because then it seems like you might be duplicating



functionality, introducing inefficiencies into your system. So kind of having lots of bloat so you can have these redundant types of modules. And on top of that, you might, in fact, be exacerbating the software -- or the system vulnerability problem.
So I would be very leery of saying that such a scenario is a viable one because it, in fact, flies directly in the face of what the '385 patent is trying to address in the first place.
BY MR. GERSON:
Q. You could have, like you said, network access that could be using either capabilities or Wi-Fi capabilities; right? There could be a variety of different implementations to allow for a given functionality; right?
A. Some amount of redundancy may be possible, or may be desirable for certain types of functionalities so that you can have, let's say, I don't know, failover capabilities or things like that. So depending on the application, you may have a certain amount of redundancy.
But in that case, the dependencies are very carefully curated, if you will, or controlled because to take your scenario, whether you have wired versus wireless network capability, it would be the same



parts of the system that would be engaged with managing that.
So that would be very carefully modularized and isolated from other parts of the system. That's, in fact, what my own research has focused on for 30-plus years, how to do those kinds of things carefully and responsibly enough so that you can have the appropriate benefits without incurring all the drawbacks that I alluded to a minute ago.
So just to close the loop on this, again, while I agree with the premise of your question, the implied technical aspects of how that would be realized, I feel like you're assuming certain things that would not actually be true in practice.
Q. The term "minimum set of dependencies," how do you define the scope of dependencies? Is it a module, is it a program, what is it?
MR. ROEHRICK: Objection. Mischaracterizes.
THE WITNESS: I mean in this particular case --
(The witness reviewed materials.)
THE WITNESS: It could be a module. It could be -- again, this is -- it's a hard question to answer because, in general, unless we agree on what the definition of a module is versus of an application,



for example, the answer is yes, simply because these terms, it's not like -- you know, in some other domains where you may have a very, you know, like we kind of know what the difference is between a sedan and an SUV; right? And then, of course, in between they put those crossover vehicles, which made things a little bit trickier. So that's kind of an in-between category.
In the case of software modules, a module could be something as small as a single method in a system, or it could be an entire system in its own right. So the -- you know, entire field of software engineering is based on being able to leverage the most appropriate abstractions for the task at hand, and if the appropriate abstractions for you are at the level of what we'll sometimes refer to as systems of systems, where you're trying to compose multiple systems together to get even more impressive and powerful capabilities, in that case, what is a module to you could be a system to me. So, you know, that question in a vacuum is not possible to answer.
The relevant part of this that I should highlight here is none of the inventive capabilities of '385 depend on a particular strict characterization of what a module may be where you could say, "Well,

Page 134

this falls within '385's purview and this other thing doesn't."

'385 is completely consistent with kind of the larger world's understanding that somebody's module is somebody else's subsystem, and somebody's subsystem is somebody else's component, and somebody's application is somebody else's system and so forth.

You know, the only things that we can rely on are the things that are explicitly disclosed, and those are terms like "functionality," "application," and "system." And as long as something adheres to those terms where we can identify a functionality, we can identify an application, we can identify a system, then the '385 system captures that -- that universe, if you will.

BY MR. GERSON:

Q. So in the context of the claim, a dependency could be, for example, an application; is that correct?

MR. ROEHRICK: Objection. Form.

THE WITNESS: "In the context of the claim," what do you mean specifically?

First, a dependency is not an application. A dependency would be a dependency between applications, or it would be a dependency of different parts within

Page 135

an application; right? You can almost think of it -- if you think of systems as having a bunch of boxes, visually, which are the different parts of that system, and lines, which are the dependencies between those parts. An application would be a box in such a setting.

BY MR. GERSON:

Q. Right.

And I guess the box could also be something smaller than an application or something bigger than an application as well; correct?

MR. ROEHRICK: Objection. Form.

THE WITNESS: That, we have to be very careful because we have to adhere to the language used in -- in the patent. So in the context of the patent it says that a computer system comprises at the least applications as constituent elements.

So if you're using your terminology in a way that is mapable but not identical with the patent, then I would have to sit down and just kind of explain that Mr. Gerson's, you know, application is really what I refer to in -- or what the patent refers to as "X," and his module is what the patent refers to as, I don't know, application, and his functionality is what the patent refers to -- or his let's say method or

Page 136

function is what the patent refers to as functionality and so on.

So in your nomenclature, you don't have to use the same terminology as the patent, but the moment we start talking about the patent claims, there, we have to adhere to the patent's nomenclature.

BY MR. GERSON:

Q. So within the context of Claim 1, without minimum set of dependencies, what is a dependency in the context of that claim?

(The witness reviewed materials.)

THE WITNESS: We would go with the plain and ordinary meaning of dependency because the patent itself specifies that these are software dependencies, and a person of ordinary skill in the art would know that software dependencies are dependencies between one piece of software and another piece of software where that piece could be at different levels of abstraction and/or complexity.

BY MR. GERSON:

Q. I mean how would I know which level of abstraction to analyze the software at to know if the claim limitation is met?

MR. ROEHRICK: Objection. Form. Assumes facts.

Page 137

THE WITNESS: I am not sure. As long as you're adhering to software dependencies, you are meeting the claim limitation. So if you're looking for a system -- let's say you have a system like what's disclosed in Column 3 that has multiple applications in it. You have different constraint sets for each application.

Those -- within those applications you have different parts. How you term those parts is not something that the patent places constraints on. So let's say that within your applications you have packages or you have components or you have modules. The notion of what software dependencies are within at that level is well understood by one of ordinary skill in the art.

So whichever one of those subapplication, if you will, notions you adopt, there's a well-defined understanding of what a dependency is, and all that the patent requires is that for that application you maintain the necessary set of dependencies to run the application, while at the same time eliminating as many vulnerabilities as you can where the necessary set of dependencies is one that does not contain any bloat on the one side and is not too small to eliminate the functionality that you deem necessary

Page 138

for the system.
BY MR. GERSON:
Q. When you say "you deem necessary for this system," who is the "you" in that context?
A. It's what the patent is referring to as a "defender." So it is an individual or a group of individuals who are looking to defend the system that somebody is trying to exploit.
(Pause.)
BY MR. GERSON:
Q. In your declaration in Paragraph 124, it's on -- I'm on Page 53.
A. Okay. So it's the latter part of the paragraph?
Q. Yes. Thank you. A few sentences from the bottom you write, "The system administrator is thus able to choose the configuration that (1) includes the least number of vulnerabilities and (2) aims to avoid the vulnerabilities that are most likely to be exploited."
How do you count the number of vulnerabilities such that you have the least number of them?
MR. ROEHRICK: Objection. Form. Mischaracterizes.

Page 139

THE WITNESS: Well, I think that reading that sentence in isolation is not appropriate because I am explaining what a POSITA would understand the landscape of this patent to be, and then I conclude with the actual concluding statement subsequently that talks about what the patent actually teaches.
So if you look at the whole set -- the whole discussion that starts about three lines in on that page, it says, "In other words, the invention determines the minimal set of dependencies to identify which vulnerabilities cannot be avoided. Generally" -- so this is beyond just this patent -- "a POSITA would understand that for every computer system, there are competing possible configuration to provide minimal desired functionality. Each possible configuration would necessarily include certain vulnerabilities. The system administrator is thus able to choose the configuration that includes the least number of vulnerabilities and aims to avoid the vulnerabilities that are most likely to be exploited. That is the purpose of creating the constraint set of the computer system which comprises a 'minimum set of dependencies to operate the computer system.'"
So the minimum set of dependencies to operate the system is something that a defender, who is a

Page 140

system administrator, it could be a team of them, as I already mentioned. So reading that term more broadly. They choose a configuration that maintains the necessary functionality for the system, because that's the prerequisite, in a sense, baked into this particular invention.
And so that necessary functionality contains the minimum set of dependencies, and then everything that's outside of that are those where they deem the functionality dispensable, in a sense, because either the number or the likelihood or the severity of the vulnerabilities would compromise the system too much, in their estimation.
So obviously, this would be the system administrator's decision because they understand the system, and they're familiar with, I guess, the context within which they're making these decisions.
So the point here is not for a random person to walk in and say, "We're going to keep these parts of the system and eliminate these other ones. So let's just reconfigure." This is actually somebody who is highly knowledgeable about the system. The defender is somebody who is in that position because, in a sense, they earned it.
BY MR. GERSON:

Page 141

Q. And so it would be up to that administrator or administrators to decide what the minimal functionality is for a computer system; is that correct?
MR. ROEHRICK: Objection. Form. Mischaracterizes. Assumes facts.
THE WITNESS: So the -- the patent says the defender will look to adjust system configurations in an effort to minimize the effectiveness of an attacker while ensuring that necessary dependencies are satisfied. So it goes kind of from both directions. You're trying to ensure that necessary software dependencies are satisfied, which means that you have to expose some part of the system.
At the same time, you're ensuring that you're minimizing the effectiveness of the attacker, which means that you're whittling down or whittling away those parts of the system that you're willing to, in a way, sacrifice. That you're willing to live without.
BY MR. GERSON:
Q. I'm going to switch gears and talk about the term "exploits" or "exploits of a computer system" starting on Page 54 of your declaration.
A. Okay.
Q. And if you could go to the last paragraph of

Page 142

this section of your report, which is Paragraph 135.
A. Okay.
Q. And then the -- sorry to have you keep jumping around, but on Page 59, at the top, you write, "The plain and ordinary meaning of the term 'exploit,' which generally speaking would be a method, tool, data, or code fragment designed to take advantage of a vulnerability in a computer system, is sufficient to understand the context of these claims."
Do you see that?
A. Yes.
Q. Okay. So is it your opinion that the plain and ordinary meaning of the term "exploit" is a method, tool, data, or code fragment designed to take advantage of a vulnerability in a computer system?
(Indiscernible cross-talk.)
MR. ROEHRICK: Objection. Form.
THE WITNESS: Sorry, John. I spoke over you again.
MR. ROEHRICK: No problem. Objection. Form. Go ahead, Dr. Medvidovic.
THE WITNESS: That's what that sentence states, that the plain and ordinary meaning of the term "exploits," generally speaking, is a method, tool, data, or code fragment designed to take

Page 143

advantage of a vulnerability in a computer system.
(Pause.)
MR. GERSON: I think I'm almost done. Let's take a break for 10 minutes. Then we can wrap this up really soon.
MR. ROEHRICK: I just want to reserve the right to read and sign just before I forget.
MR. GERSON: Sure.
THE VIDEOGRAPHER: Going off the record. 2:35 p.m.
(A recess was taken from 2:35 p.m. to 2:46 p.m.)
THE VIDEOGRAPHER: We're back on the record at 2:46 p.m.
MR. GERSON: Thank you for your time today. I don't have any other questions at this point.
THE WITNESS: Thank you.
THE VIDEOGRAPHER: Can we conclude the video record?
MR. ROEHRICK: No. Counsel for Skysong will do a quick redirect. We can begin now if that's okay.
MR. GERSON: That's fine.
///
///
///

Page 144

EXAMINATION
BY MR. ROEHRICK:
Q. Dr. Medvidovic, do you recall that counsel asked you about graph neural networks earlier in this deposition?
A. I remember graph neural networks coming up. I don't remember the exact question that might have -- I think I mentioned them, but I don't remember what -- how counsel might have -- what follow-up questions he might have asked.
Q. Do you recall testifying that graph neural networks used convolutional layers?
(Indiscernible cross-talk.)
MR. GERSON: Objection. Vague.
THE WITNESS: Sorry. I spoke over you, Counsel.
Yes, graph neural networks, in fact, use convolutional layers. Something that we're dealing with directly in my own lab's research. One of my Ph.D. students is working with that literally as we speak.
BY MR. ROEHRICK:
Q. What other neural networks use convolutional layers?
A. A variety of neural network can use

Page 145

convolutional layers. So it's not just CNNs.
Q. Can deep neural networks use convolutional layers?
MR. GERSON: Objection. Form.
THE WITNESS: There is a variety of deep neural networks, and they do use -- sorry, convolutional layers.
BY MR. ROEHRICK:
Q. Can artificial neural networks use convolutional layers?
MR. GERSON: Objection to form.
THE WITNESS: To the extent that I understand what -- that was also an issue I had with counsel's question earlier today. To the extent that I understand what you mean by "artificial neural networks," then the answer is yes.
BY MR. ROEHRICK:
Q. So just to wrap this up, so just because a neural network is labeled a deep neural network does not mean it doesn't include convolutional layers; correct?
MR. GERSON: Objection. Leading.
THE WITNESS: That is absolutely correct. Convolutional neural networks are a kind of deep neural network.

Graph neural networks are a kind of deep neural network. Both of them include convolutional neural layers. ResNets, or residual networks, include -- they're a type of CNN architecture.

Dense net is another one. So there are a variety of artificial/deep neural networks that use convolutional layers and that are kinds of -- at times, also kinds of convolutional neural networks.

MR. ROEHRICK: Thank you. No further questions.

And just to restate it, I believe I did earlier, but I'm reserving the right to read and sign.

MR. GERSON: No further questions from me. Thank you for your time.

THE WITNESS: Thank you, everybody.

THE VIDEOGRAPHER: Okay to conclude the video record?

We are off the record at 2:49 p.m., and this concludes today's testimony given by Dr. Medvidovic. The total number of media used was one and will be retained by Veritext Legal Solutions.

(Witness excused.)

(Deposition concluded at 2:49 p.m.)



C E R T I F I C A T E

I do hereby certify that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.



Nancy J. Martin, RMR, CSR

Dated: March 20, 2026

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)



JOHN D. ROEHRICK, ESQ.
jroehrick@cahill.com

March 20, 2026

RE: Skysong Innovations, Inc. v. Fortinet, Inc.

3/17/2026, Nenad Medvidovic , Ph.D. (#7964777)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions



\- - - - - - - -

E R R A T A

\- - - - - - - -

| PAGE | LINE | CHANGE |
|---|---|---|
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |
| ____ | ____ | ________________ |

ACKNOWLEDGMENT OF DEPONENT

I, NENAD MEDVIDOVIC, PH.D., do hereby certify that I have read the foregoing pages, ________ to ________, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_______________________________________________

DATE SIGNATURE

Subscribed and sworn to before me this _________ day of __________________, 20__.

My commission expires: _______________________.

__________________________________

Notary Public

**&**

**&** 2:8 5:12

**0**

**00098** 1:6 4:20

**1**

**1** 1:25 3:8 4:14 6:19,24 7:7,15 10:10,18,22 11:11,19,21 13:7 14:11 37:10 38:17 40:3 42:7 54:12 58:15 59:8 63:7 67:20 77:19 79:11 85:5 93:17,23 94:21 95:3 96:2 117:20 120:10 123:20 136:8 138:17
**10** 3:15 29:19 143:4
**10,574,721** 3:12 37:1
**100** 9:4 14:7
**10010** 2:4
**104** 3:15
**109** 105:4
**10:11** 38:5,6
**10:29** 38:7,9
**10:33** 39:22,23
**10:36** 39:24 40:1
**11** 22:14 36:3
**11,775,831** 3:14
**113** 121:22
**114** 105:7 111:20 121:25
**115** 113:6 122:1
**116** 122:11
**11:32** 69:4,5
**11:44** 69:6,8
**12** 69:12 70:8 72:12,13,17 76:13
**123** 124:21 127:3
**124** 128:1 138:11
**125** 127:4
**12:52** 104:9,10
**13** 36:3 37:18 38:19 120:11
**13-1/3** 86:19
**135** 142:1
**14** 26:24 27:5 27:10 30:6 33:21 37:20 65:8 70:21 77:19
**144** 3:4
**15** 36:3 65:9,9 89:7 117:20
**150** 1:25
**16** 19:18 22:9 70:11 72:15
**16th** 2:9
**17** 1:13 4:1,6 10:18
**18** 37:13
**19** 77:18
**1993** 21:15
**1:00** 104:2
**1:23** 104:11,13

**2**

**2** 3:10 11:15,21 35:1,3 59:7 127:19 138:18
**20** 121:20,21 147:17 148:3 150:17
**20006** 2:10
**202** 2:11
**2025** 14:1 16:10
**2026** 1:13 4:1,6 7:23 10:19 147:17 148:3
**22** 121:22
**24** 100:15
**26** 67:20,23
**28** 65:8
**2:25** 1:6 4:20
**2:35** 143:10,11
**2:46** 143:12,14
**2:49** 146:18,23
**2x2** 89:12

**3**

**3** 3:12 36:2,15 36:25 38:12 40:20 41:7 46:8 47:5 48:1 48:4 59:17 69:11 86:3 89:11 92:1 93:7 116:1 121:16,18,21 122:24 123:14 123:20 124:1,9 137:5
**3/17/2026** 148:5
**30** 21:25 22:13 27:24 132:6 148:16
**300** 19:24
**302** 47:6
**31** 2:4 73:9 75:13
**313** 3:15
**32** 75:14,17,23 86:4
**33** 21:17 89:20
**34** 100:4
**35** 3:10 78:3 122:24
**36** 3:12

**37** 91:25
**385** 3:16 17:25 104:20,23 105:3,9 112:22 118:9 120:10 131:8 133:24 134:3,14
**385's** 134:1
**3d** 82:18

**4**

**4** 3:14 36:2 76:25 77:2
**4-3** 3:10
**400** 17:7
**41** 2:3
**44** 78:6 120:19
**47** 105:3 122:24 124:10
**49** 105:6

**5**

**5** 3:15 26:23,25 27:3 57:20 58:3 59:7,15 60:3,15,22 61:17,20 100:15 104:16 104:17
**50** 13:4
**500** 2:9
**51** 124:22 126:14
**52** 124:23 125:1
**53** 128:3 138:12
**54** 141:23
**59** 67:20,23 70:22 142:4

**6**

**6** 3:3,8 16:11 16:14,18 20:16
**60** 6:13 10:10 10:15 13:4 70:22
**62** 65:12
**63** 69:24 70:6 74:1
**65** 92:1
**69** 69:20,23 73:8,15 75:12 75:23 92:1

**7**

**7** 16:11,15,18 17:1 70:19,24 70:24 71:12,20 71:21 72:4
**721** 17:24 22:17 37:10 38:12,18 40:4 57:20 60:11 68:9 69:10 70:8,20
**73** 89:19
**75** 89:13
**76** 3:14
**77** 100:3 103:16
**7964777** 148:5

**8**

**8** 36:2 57:22 117:20
**82** 79:21 81:18 87:12 99:8,22
**831** 17:24 77:5 77:11,19 86:3 87:18,25 88:13 88:14,16,23 89:10,23 92:1 92:25 98:4 100:6,14 102:25
**84** 91:23 93:1 97:20
**850** 11:25 12:2 13:18
**862-8920** 2:11
**897** 17:24

**9**

**900** 2:9
**90s** 21:24
**9504** 1:24 5:20
**975** 147:14
**9:19** 1:18 4:2,5

**a**

**a.m.** 1:18 4:2,5 38:5,6,7,9 39:22,23,24 40:1 69:4,5,6,8
**abbreviated** 30:16
**ability** 46:4 55:11 66:12 84:22 93:13 106:10,18 111:11 114:18
**able** 15:18 20:1 35:5 38:13 62:23 77:3,6 92:9 110:12 111:6 114:3 116:14 119:16 126:10,11,25 133:13 138:17 139:18
**above** 115:1 148:6
**absolutely** 145:23
**abstract** 89:24 90:3,8,17 91:8 91:10
**abstraction** 136:19,22
**abstractions** 133:14,15
**academic** 8:18
**academy** 8:9
**accentuating** 84:2
**acceptable** 113:14,18

115:1 122:7
**accepted** 8:12
**access** 52:19 53:6 60:12 71:8,13,14 72:7,8 75:4 110:23,25 114:3 131:11
**accessed** 51:14 61:25 62:1
**accesses** 59:21
**accessible** 52:15
**accessing** 71:7
**account** 56:2 57:2 107:24
**accounts** 47:21
**accuracy** 91:5 148:9
**accurate** 42:3 92:5
**achieve** 84:10
**acknowledg...** 148:12 150:1
**acquired** 23:2
**action** 5:1 147:12
**activation** 81:20 82:1,2 87:12 88:1 99:8 101:15,17 101:21 102:10
**active** 76:10,20
**actively** 112:16
**actual** 84:18 139:5
**actually** 46:3 62:19 103:20 103:20 104:1 111:2 119:10 132:14 139:6 140:21
**added** 7:10 42:9 52:14
**addendum** 8:20
**adding** 84:16 84:17 88:3
**additional** 16:17,22 43:12 52:22,25 56:8 115:13 128:10 128:11
**additionally** 25:15
**address** 131:9
**adhere** 135:14 136:6
**adheres** 134:11
**adhering** 137:2
**adjust** 141:8
**administer** 5:16
**administrator** 124:11,15 129:24 138:16 139:17 140:1 141:1
**administrator's** 140:15
**administrators** 141:2
**adopt** 137:17
**adornments** 115:13
**advantage** 142:7,15 143:1
**affecting** 91:3
**affiliations** 5:6
**affirmed** 5:23
**aforesaid** 147:2
**age** 119:5
**ago** 20:21 21:25 40:12 61:25 89:4 98:21 122:9 132:9
**agree** 4:13 7:8 15:18 67:1 100:18 132:11 132:24
**ahead** 24:6,8 83:20 126:4 142:21
**ai** 29:18
**aided** 147:9
**aims** 138:18 139:19
**allege** 101:20 102:3
**allotted** 148:19
**allow** 52:16 55:5 61:6 84:9 94:21 124:12 127:23 131:14
**allowed** 7:2 25:13,21 59:22 129:23,24 130:3
**allowing** 50:18
**allows** 43:5 50:14 53:6 63:25 84:7 114:15 123:14
**alluded** 132:9
**altered** 100:10
**alternative** 129:12
**amazing** 53:14
**amazon.com** 46:9
**ambiguous** 26:18 27:18 110:21
**americanexpr...** 40:23 46:9,12 56:7 57:10
**amount** 62:16 89:6 98:10 131:16,21
**amounts** 33:10
**analysis** 25:22 26:19 55:2,9 56:15 58:17

63:13 85:15,25 96:24 97:7 108:17
**analyze** 136:22
**analyzed** 16:6 26:15 86:22
**analyzing** 78:20
**annoying** 109:25
**answer** 16:21 22:7 24:5,7 26:4 28:1,21 28:25 33:3 34:18 40:18 44:7 45:16 46:23 62:22 66:13 102:17 103:12,21 115:20 132:23 133:1,21 145:16
**answering** 55:2 55:11
**answers** 150:6
**antecedent** 71:23 72:3,6 72:16 95:11
**anticipated** 112:24
**anybody** 15:2,6
**anyway** 27:25
**apologies** 40:10
**apologize** 70:18
**app** 56:23
**appear** 103:13
**appearance** 5:4
**appearances** 5:6
**appeared** 1:20
**appears** 7:16 100:22 102:9
**appendices** 17:3
**appendix** 8:20
**apple** 110:2,7 110:17 111:3
**applicability** 82:14
**applicable** 148:8
**application** 105:16,17 122:15,25 124:3,12,14 131:20 132:25 134:7,10,13,18 134:23 135:1,5 135:10,11,21 135:24 137:7 137:19,21
**applications** 88:7 109:17,24 123:2,17,18 124:17 134:24 135:17 137:6,8 137:11
**applies** 68:8
**apply** 147:22
**appreciate** 45:7
**approached** 22:25 24:9
**approaching** 116:21
**appropriate** 76:14 132:8 133:14,15 139:2
**approximate** 92:2,9,10
**approximately** 9:3 13:21 14:4
**architecture** 30:24 34:16 119:25 146:4
**area** 29:17 30:5 108:17,25 109:2,10,16
**areas** 19:15
**argue** 120:7
**arguments** 125:20,23
**arrive** 130:10
**art** 46:18 55:24 56:7 66:8 68:15 80:19 87:21 88:15,24 102:10 111:9 126:10,25 136:15 137:15
**article** 79:18
**artificial** 8:10 29:3,7,16 31:4 145:9,15 146:6
**ascribing** 73:20
**aside** 10:5 11:7 15:6 25:6 97:12
**asked** 23:25 26:3 32:15 35:17 36:8,11 45:15 63:14 123:7 144:4,10
**asking** 12:16 26:5 33:20 55:18 64:21 85:13 86:17 130:15
**aspect** 68:21
**aspects** 52:14 78:21 115:12 132:12
**aspersions** 68:18
**assert** 23:6
**asserted** 24:2 25:8
**assertion** 125:21
**asserts** 99:23
**assignee** 21:5
**assist** 15:2
**associated** 41:10,19,24

42:13,19,25 43:3,7,14,17,20 44:10 45:23 46:11,14 47:3 47:12 48:24 51:23 52:9 53:20 54:13,25 55:4,16,22 56:1,10,18 57:6,8 58:5,13 58:25 60:22 61:20 63:8,19 63:23 64:13 71:13,15 72:7 72:9,21 73:1 82:23
**associates** 72:21
**association** 8:11 55:23
**assume** 31:23 49:14
**assumed** 64:2
**assumes** 136:24 141:6
**assuming** 53:15 104:2 132:13
**assumption** 25:12
**asu** 20:19,24 21:5,5,10,14,22 22:17 23:2,2,4
**asu's** 23:6
**attached** 7:12 7:14 17:3,7 148:11 150:8
**attachments** 9:21 17:16
**attacker** 127:22 141:9 141:16
**attacks** 119:12
**attempted** 59:21
**attention** 40:19
**attorney** 5:7 24:6,8 148:13
**audio** 4:11
**authenticate** 52:17 75:3
**authentication** 56:4,8 57:12 57:13,15
**authority** 51:13
**authors** 91:9
**auto** 111:2
**available** 92:11 148:6
**avenue** 2:3
**average** 84:4,5 84:6
**avoid** 83:8 86:7 138:18 139:19
**avoided** 113:12 122:5 125:5,12 139:11
**avoiding** 113:12 122:5
**aware** 17:14 19:6,9 20:9 109:5

**b**

**b** 3:6 8:20 106:22,22 128:20,21,23 129:3,7,8,12,14 130:5,9
**b2** 3:13,14,16
**back** 34:4 38:8 39:25 47:9 69:7 74:1 75:12 87:11 104:12 111:20 143:13
**background** 14:20 19:3 88:5
**backpropigat...** 81:21 82:21,22 88:2 103:10
**baidu.com.** 62:2
**baked** 140:5
**balances** 47:20
**ball** 119:24
**bandwagon** 30:22
**bank** 15:24 54:2 56:2 74:12
**banking** 40:21 46:12 47:6 48:2,2,4,5,9,23 49:5,14,15 54:2 56:1 74:20,21 107:22
**bankofameri...** 47:15 57:14 74:19,25
**bankofameri...** 74:12
**base** 80:11 115:11
**based** 26:4 32:17 33:9,16 33:22 34:16 71:5 73:20 76:21 92:3 93:8 94:23 96:9 97:22 109:16 112:15 133:13
**baseline** 115:16
**basic** 114:22
**basically** 103:18 105:18 116:2
**basis** 71:23 72:3,16
**bazzi** 18:24
**beach** 4:1 6:8

**bear** 34:25 76:24
**beautiful** 53:11
**beginning** 1:18 5:7 95:12 101:11
**begins** 105:3
**behalf** 5:10,12 12:2
**behavior** 112:23
**behaviors** 112:23
**belaboring** 91:21
**believe** 7:22 8:20 26:10 27:24 34:2 35:23 36:6 40:8 44:22 52:2 58:11 66:8 68:8 69:11 77:14 98:12 104:16 125:24 146:11
**believes** 49:20
**bell** 26:11
**benefits** 61:14 132:8
**best** 22:11 23:17 26:4 55:11 66:12 104:6 108:19
**better** 72:2 74:14 78:24 83:9
**beyond** 14:8 18:17 19:2 21:6 30:6 80:22 99:17 115:13 139:12
**big** 119:24,25
**bigger** 77:7 135:10
**binary** 32:8
**bit** 12:8 37:22 70:18 73:25 78:24 86:19 90:16 108:18 119:20 133:7
**bits** 80:12 86:9 86:14 87:5 90:9,25 91:2 92:21 93:10 97:23 100:9
**bloat** 131:2 137:24
**blocking** 114:5 116:19
**bob** 2:15
**body** 68:19
**boiled** 118:7
**book** 19:25
**books** 19:25
**bottom** 70:20 79:11 91:25 125:1 127:19 138:16
**bouncing** 70:18
**box** 135:5,9
**boxes** 53:4 135:2
**brains** 29:14
**break** 69:1 103:22,24 104:4 117:1,5 117:8 143:4
**brief** 59:6 69:1
**broad** 23:21 74:22
**broader** 22:17
**broadly** 46:7 54:24 55:6 66:19 140:2
**broke** 101:16
**broken** 109:18 117:8
**browse** 60:2
**browser** 36:18 39:10,13,14,16 48:15,16,17 50:3,6,7,19 51:9,15,16 59:25 60:4 70:13 71:14,16 72:8,10,22,23 73:1 76:10,10 76:11,16,19,20 117:6
**bug** 110:2
**build** 49:4 119:18,22
**building** 116:20
**built** 31:20,24 110:9
**bunch** 47:21 135:2

**c**

**c** 2:1 17:19 115:18 122:1 122:11,19,25 123:4,5,10,11 123:12,25 124:6 126:13 129:12,14 130:5,9 147:1 147:1
**caching** 58:10 58:10
**cahill** 2:8 5:11
**cahill.com** 2:10 148:2
**california** 4:1 6:8
**call** 60:6,8 65:5 74:25 87:17 110:4 119:24
**calling** 25:14
**calls** 18:13 20:11 23:12,13 27:18 49:1 59:18,23,24

63:2
**camera** 4:9
**campuses** 21:16
**candidates** 32:11
**capabilities** 105:25 131:12 131:13,19 133:19,23
**capability** 76:17 89:16 131:25
**capable** 106:23
**caption** 59:3
**captures** 134:14
**car** 110:1,1,2,5 110:7,17,24 111:4
**cards** 46:15
**care** 10:24 114:17
**careful** 135:14
**carefully** 131:23 132:3,7
**cascaded** 90:23
**case** 1:5 4:19 7:16 11:12 12:16,18 15:10 18:11 19:8 21:20 22:2,4 23:1,5 24:10 24:13 25:17,18 28:6,20 31:12 31:15,17 35:16 41:13 46:23 49:9 53:23 65:25 66:1 72:20 74:21 76:16 83:23 84:5 85:14 88:8 94:3 100:1 109:4 113:25 116:3 131:22 132:20 133:9,19
**cases** 12:8 33:5 106:8,9
**casting** 68:18
**catastrophic** 109:14
**category** 39:8 133:8
**caught** 10:23
**caveat** 7:10
**centered** 24:15
**certain** 15:8 28:12 32:6 37:5 41:9 51:13 53:5 84:12,13,13 92:19 105:25 108:5 116:23 119:12 131:17 131:20 132:13 139:16
**certainly** 16:4 26:11
**certification** 147:21
**certified** 1:19
**certify** 147:2 150:3
**certifying** 147:24
**cetera** 51:3 53:14 87:13 89:14,14 99:9 108:4 114:16 114:16
**change** 10:25 149:4
**changed** 21:14 21:15
**changes** 10:21 10:23 11:8 148:10 150:7
**channel** 119:12
**chapters** 19:25
**characteristics** 119:13
**characterizati...** 76:14 123:14 125:18 133:24
**characterized** 48:19
**charge** 12:5
**chatgpt** 34:12
**check** 17:12 21:6
**checked** 13:5 21:21
**checker** 114:13
**checking** 20:2 117:3
**cherry** 103:18
**choice** 54:19 129:11
**choose** 138:17 139:18 140:3
**chris.gerson** 2:5
**christopher** 2:2 5:9
**chrome** 60:9,12 60:14
**ci** 122:13 123:5 123:11,18 124:18
**circumstances** 47:8 84:14
**citation** 99:21 100:16
**cite** 99:9 128:2
**cited** 14:16 19:15,23 20:3 99:25 101:3
**cites** 125:25
**citing** 19:20 100:14
**claim** 3:9,11 6:22 7:8 11:13 12:14,17 14:7 15:14,16,21

24:16 25:3 26:21 34:2 35:10,11,18 37:5,10,16 38:17 40:3,11 41:25 42:2,7 42:18 43:5,19 44:16,17 45:3 45:21 47:10,24 54:12,23,23 57:19 63:7,15 63:16 68:8 69:12,14 70:4 70:5,7,8,12,17 70:17,19,19,24 70:24,25 71:12 71:18,20,21 72:4,4,12,13,17 72:25 73:6 76:7,13 77:13 77:19,21 78:4 80:3,16 85:5 85:17 93:17,23 94:21 95:3,11 95:12,19,22 96:2,11 98:21 99:4 103:17 117:20,20,20 120:10,18 121:7,8 122:18 123:8,20,21,22 123:24 125:21 125:22 134:17 134:21 136:8 136:10,23 137:3

**claimed** 73:23 75:17 88:13 125:3

**claims** 33:15 44:25 45:8 98:22 117:20 136:5 142:9

**clarification** 12:21 21:25 42:5 45:8 69:17 88:20 101:24

**clarify** 128:22

**clarifying** 129:6

**class** 32:21 38:24,24 39:3 39:4,7,13 40:4 40:16,21,22,25 41:9,10,14,15 41:18,23 42:6 42:12,19,24 43:7,13,16,22 44:4,9,11,12 45:12,20,22 47:3,12 48:5 48:11,11,13,18 48:23 49:11 50:6,6 54:12 54:21,24 55:4 55:15,25 56:11 56:18,20 57:2 60:9 63:8,19 63:23 64:1,12 71:13,15 72:7 72:9,22,23 73:1 84:9

**classes** 21:11 21:18 39:12 46:10 48:14 54:19 58:22 59:16,19

**classification** 32:8 91:4

**classify** 49:10 58:21

**clause** 87:3

**clean** 6:16,17

**cleanly** 31:24

**clear** 46:3 66:25 73:6 102:23 129:5

**clearly** 54:22 87:2

**click** 109:20

**client** 24:6,8

**close** 19:24 20:18 132:10

**closed** 110:11

**cloud** 109:11

**cnn** 31:14 34:6 80:10,20 82:15 85:17,20 93:19 94:5,7,23 95:20 96:4,8 96:15,22 97:1 97:6 102:12 146:4

**cnns** 28:15 29:21 30:2,9 30:13 31:10,17 32:3 33:17,17 34:14,15 79:19 81:7,11 87:22 88:5,6,12 89:4 90:3,18 93:24 99:15,17 102:21 145:1

**cobalt** 112:14

**code** 33:5 56:9 67:10 142:7,14 142:25

**coexist** 39:13 50:18

**coi** 46:10 48:11 49:11 50:3,6 60:9

**color** 67:3,9,16

**column** 37:18 37:20 38:19 58:3 59:7 60:3 70:11,21 72:15 77:19 79:11,11 86:3 89:11 92:1 93:7 100:15 116:1 120:11 121:16 121:18,21 122:24 123:14 123:20 124:1,9

127:19 137:5
**columns** 37:17 86:19
**combination** 31:13 103:5,14
**come** 11:5 21:4 125:23
**comes** 111:10
**comfortable** 33:13 97:5
**coming** 144:6
**comment** 91:8
**commerce** 46:14
**commission** 150:20
**common** 109:16
**communication** 71:3 110:3
**companies** 111:1
**comparable** 13:24
**compensated** 11:16 12:2 13:18,18
**competing** 139:14
**complete** 9:14 17:22 33:2 63:12 122:14
**completed** 148:16
**completely** 56:13,16 134:3
**complex** 107:19
**complexity** 136:19
**compliant** 95:21
**complicate** 65:14
**complicated** 27:13 130:9
**complying** 56:17
**component** 33:15 134:6
**components** 130:20 137:12
**compose** 133:17
**compound** 79:9 92:22 94:18 107:23 110:21 124:7 129:15
**comprise** 53:15 121:5
**comprises** 71:2 135:16 139:22
**comprising** 76:9 120:22 127:6
**compromise** 116:22 140:12
**computation** 77:22 78:11,25 79:6,7,11,12,16 79:20 80:5,6 80:17 81:6,10 81:12,13,14 84:24 89:13 90:3,18 91:14 92:13,14,18,20 92:24 93:6,14 93:17,18,23 94:13,14,21 95:4,4 96:17 98:3,16,25 99:23 100:10 100:11 102:20
**computations** 79:2 80:22 81:4,5 86:15 87:17 92:2,6 92:10 97:12 98:5,7,13 99:7 99:16
**computed** 83:7
**computer** 88:7 113:14,17 117:7 120:20 120:23 121:24 122:7 123:9,23 123:24 124:4 125:5,13 127:7 127:13 128:7 135:16 139:13 139:22,23 141:3,22 142:8 142:15 143:1 147:9
**computes** 107:23
**computing** 8:11 59:22 80:11,25 84:6 87:1,1 90:4,19 92:13 96:9 97:22,24
**conceal** 108:24
**concept** 50:3 105:20 118:11 118:12
**concepts** 74:5
**concerns** 98:23
**conclude** 94:22 139:4 143:18 146:16
**concluded** 146:23
**concludes** 146:19
**concluding** 139:5
**conduct** 68:13
**conducted** 4:8 4:21 21:5 85:15
**conference** 19:12 30:8
**conferences** 8:13

**confident** 62:22
**confidentiality** 66:2
**configuration** 123:1 138:17 139:14,16,18 140:3
**configurations** 141:8
**confirm** 6:21 36:4
**confirmed** 25:15
**confirming** 33:10
**conflict** 39:12 48:12,13 58:22 59:16,19
**connected** 31:17 44:14 82:16 85:19
**connection** 4:9 22:10 26:12,12 26:14,21,21 63:14 117:17
**consent** 53:17
**consider** 45:15 47:22 49:14 52:22 62:14 66:5,11 111:8 120:6
**considered** 16:13,18 17:20 28:15,19 67:7 118:2 119:6
**considering** 52:14 83:25
**consistent** 32:20 55:7 56:13,13 134:3
**constituent** 135:17
**constrained** 123:8
**constraint** 113:7,11 115:7 115:18 120:20 120:21 121:5,8 121:11,13 122:1,4,12,13 122:18,20 123:1,16,18,19 124:5 125:4 127:2,4 137:6 139:21
**constraints** 137:10
**construct** 130:23
**constructed** 47:9 121:13
**construction** 3:9,11 6:23 7:9 11:13 12:15,17 14:7 15:14,17 15:21 24:16 25:4 26:22 34:3 35:11,18 65:15 77:13 78:9,10,17 79:17,23 103:17
**construed** 54:23
**consumer** 111:9
**contain** 8:19 46:14 47:19 52:4,23 62:4,7 64:3 137:23
**containing** 49:12
**contains** 108:2 116:18 140:7
**content** 38:24 38:24 39:3,3,7 39:9,16 40:4 40:15,20,22,25 41:9,14,15,18 41:22 42:6,12 42:19,24 43:6 43:16,22 44:3 44:4,9,11,12 45:20,22 46:5 46:7,11,13,19 47:3,7,8,11,12 47:17 48:5,11 48:18,22 50:18 50:22,22,24 51:14,16 53:10 54:12,21,24 55:4,15,25 56:11,18,20 62:9 63:8,19 63:23 64:1,12 71:13,15 72:7 72:9,10,22,23 73:1 101:15
**contention** 32:24
**contentions** 24:19,24 26:9
**context** 9:8 39:10 43:12 45:1,9,10 46:8 46:17 48:10,12 49:17 51:20 52:22 53:1 56:15 65:24 66:9,16,20,24 67:1,5,12,13 68:16,22 72:17 73:6 74:11,17 86:22 87:2 88:4 92:25 93:23 97:4 102:21,21 105:16,24 106:5 107:14 109:23 111:16 112:17 124:19 126:24 130:2 134:17,21 135:15 136:8 136:10 138:4 140:17 142:9

**continue** 4:12 84:24 127:24
**continuing** 40:3 82:10
**contrast** 92:19
**contribution** 117:24
**control** 147:23
**controlled** 131:23
**controversial** 49:13
**convolution** 78:12 79:1,8 79:12 80:6,17 80:20,23 81:2 81:3,4,6 85:5 85:10,18,21 86:8 89:13 90:5 91:1,3,7 93:10 97:12,16 98:1,7,13 99:1 99:24 100:8,19 101:6
**convolutional** 28:7,7,14 29:4 29:22 31:16,18 79:19 82:14,19 83:5 87:4 90:20 95:13,15 144:12,18,23 145:1,2,7,10,20 145:24 146:2,7 146:8
**convolutions** 86:15
**copies** 148:14
**copy** 6:22 11:4 120:13
**correct** 6:22 7:9,10,23,24 8:24 9:12,13 10:11,20 11:9 11:10 12:3,4 13:8,15,16,20 14:25 15:1,10 17:4,16 20:10 20:20 26:25 27:3,4 29:4,12 31:11 35:20 36:6,11 37:7 41:11 42:8 47:8 70:21,25 71:17 73:4 75:18 77:13,14 77:23 78:12 81:7 86:6 88:3 88:17,25 92:21 93:25 94:16 96:4,18 99:11 100:15,19 101:7,15,22 102:16,25 103:10 104:20 104:22,25 105:1,5 107:1 117:11 121:3 124:6 130:12 134:19 135:11 141:4 145:21 145:23 147:10 150:5
**correction** 5:14
**corrections** 150:7
**correctly** 16:9 64:21,25 94:20 94:24 106:16 125:25 147:7
**cost** 84:7
**counsel** 2:5,11 4:15 5:5,17 9:23 10:5 14:18,24 15:6 26:25 27:1,19 27:21 33:20 39:17 44:14 45:8 143:20 144:3,9,16 147:11 148:14
**counsel's** 145:13
**counselor** 22:25
**count** 138:21
**couple** 8:3,3,8 9:23 10:2 18:12,15 29:18 36:18 129:20
**course** 133:5
**court** 1:1 4:18 4:24 5:15 25:17 39:18
**cover** 13:6
**create** 112:20
**created** 39:15
**creates** 112:17
**creating** 120:20 123:8 139:21
**credentials** 62:8
**credit** 46:15
**critical** 109:4
**crop** 109:24
**cropped** 37:23
**cross** 44:21 74:22 83:17 100:24 142:16 144:13
**crossover** 133:6
**crowdstrike** 13:14,15,22,23 17:9
**cs** 148:15
**csr** 1:24 5:19 147:15
**curated** 131:23
**current** 47:20 112:25 113:1,2
**currently** 30:17 60:7 112:8
**customary** 11:17,24
**customer** 54:3 75:7

**cv** 1:6 4:20 7:15 7:22,25 8:4,14 8:16,18,18
**cybersecurity** 22:18 23:9

**d**

**d** 2:8 3:1,8 17:19 19:18 148:1
**d.c.** 2:10
**daemon** 75:17 75:19,22,24 76:4,6,7,8,8,15
**daily** 19:10
**dark** 114:2
**data** 28:11 38:23 54:2 71:7,12,23 72:21 77:23 80:5 81:15 82:12 84:18 89:13 91:15 92:6,10,11 93:2,3,4,5 96:10 100:9 142:7,14,25
**date** 8:16,21 13:2,22 14:5 24:13 150:12
**dated** 7:22 147:17
**day** 119:5 150:16
**days** 148:16
**deal** 21:15 61:6 109:11
**dealing** 32:8 85:19 109:7 112:22 144:18
**dec** 97:10
**decade** 89:7
**decades** 20:21 29:18 89:3
**decide** 49:19 51:13 115:8,12 141:2
**decision** 140:15
**decisions** 140:17
**declaration** 3:8 6:13,20,22 7:4 7:8 9:21 10:22 11:9,11,15 13:23 14:11,12 14:13,21 15:3 15:5,8 16:4,12 17:3,7,16 22:10,14 25:23 25:25 26:13,15 26:22,24 34:2 48:8 64:16 67:19 69:15,21 70:7 73:9 74:1 75:14 78:3 79:22 81:18 84:17 89:20 91:24 97:11,16 100:4 101:4,20 102:4 103:4 105:2 113:6 121:20 124:22 126:5,19 138:11 141:23
**declarations** 25:4,6
**deem** 137:25 138:3 140:9
**deemed** 128:8
**deep** 27:10 28:8 28:15,19 82:3 145:2,5,19,24 146:1,6
**deeply** 28:25 30:5
**defend** 138:7
**defendant** 1:8 4:16 5:10,13
**defender** 138:6 139:25 140:23 141:8
**defense** 68:14
**define** 40:16 132:16
**defined** 42:7 59:16 122:2 137:17
**defines** 41:18 68:3
**defining** 38:23 40:5 41:5,23 42:2 71:7,12 71:24 76:4 81:13 115:21
**definitely** 65:7 68:15 78:15 98:25
**definition** 16:20 52:4 64:21 65:5 68:7 78:21 125:14 126:6,8 126:14,16 132:25
**degree** 20:20
**delay** 110:3
**delegating** 71:7 71:12,14 72:6 72:8
**deliver** 32:22 33:2
**demonstrating** 60:16
**denote** 61:3
**denoted** 122:1
**dense** 146:5
**deny** 101:3
**depend** 43:25 49:16 62:16 67:12 85:22 105:23 107:7 107:24 133:24
**dependencies** 105:10 106:6 107:1,12,17,18 108:5,7,8,9,12

108:25 109:7 109:13,14 110:18 111:14 116:23,24 117:8,21 118:8 118:17,19 119:18,23 120:22 121:3,6 125:3,11,19 126:6,15,20 127:1,7,10,12 127:17,20 128:5,6,9,10,12 128:13 130:11 131:22 132:15 132:16 135:4 136:9,14,16,16 137:2,13,20,23 139:10,23,24 140:8 141:10 141:13
**dependency** 105:14,15 106:21 107:21 109:21 110:14 116:9,12 117:1 117:5,10 118:1 118:4,12 128:20,22 129:7 130:5,5 134:17,23,24 134:24,25 136:9,13 137:18
**depending** 32:6 66:20 97:4 105:16,24 131:20
**depends** 4:8 34:21 49:3 66:16 106:3,22 116:13 129:3
**deployment** 109:1
**deponent** 147:4 147:6 148:13 150:1
**deposed** 9:1,10
**deposing** 148:13
**deposition** 1:17 4:7,15,21 6:24 9:18 10:8 13:7 13:10,12 26:13 35:1 36:15 76:25 104:17 144:5 146:23 147:9
**depositions** 9:7
**depth** 16:7 32:5 33:14 48:18
**describe** 41:1 47:23 101:5 111:24
**described** 30:6 48:12,18 127:18
**describes** 39:8
**describing** 91:6
**description** 3:7 14:19 59:6,7
**designate** 49:11
**designated** 47:7
**designed** 142:7 142:14,25
**desirable** 131:17
**desired** 139:15
**despite** 118:18
**detail** 33:10
**detailed** 20:14
**details** 31:19 33:11 44:3
**detect** 84:22
**determination** 100:10
**determinations** 28:12 32:22 33:9,12
**determine** 32:3 32:6 48:22,24 50:5
**determines** 72:25 124:15 139:10
**determining** 51:8
**developer** 112:25
**developers** 113:1
**developments** 8:3,6
**device** 56:9 59:22
**differ** 65:19,23
**difference** 28:20 116:8 133:4
**different** 13:25 19:24 21:19,21 23:15 28:10 29:11 30:14 33:7 34:19 39:14 42:10 46:10 48:13,14 48:16 50:25 51:8 58:21 62:10 63:17 64:11 79:15 82:3 83:13 87:16,17 98:3 107:13,20 108:7,9 109:13 118:21 124:18 129:13 130:10 130:17 131:14 134:25 135:3 136:18 137:6,9
**differently** 127:25
**difficult** 34:17

**diligence** 61:12
**dimensional** 82:12,17,18
**dimensionality** 82:8
**dimensions** 82:13 85:1
**direct** 147:23
**directions** 141:11
**directly** 98:2 129:22 131:8 144:19
**disable** 119:8
**disabled** 58:11
**disagree** 53:19 78:9
**disagreement** 54:9,9
**disclose** 66:3 86:13
**disclosed** 43:10 79:24 87:17,20 98:4,14,16,19 99:1,3,11 103:20 134:9 137:5
**discloses** 80:24 85:9 96:11 98:25 100:19 101:15,21 102:4
**disclosure** 46:19 73:21 85:11 86:24 102:14,24 103:8,9
**disclosures** 87:8 92:15 99:19
**discourse** 68:23
**discrepancy** 66:6
**discuss** 42:1 91:23 104:6
**discussed** 50:8 59:11 61:1 87:18 89:16 98:21 103:15 118:8,12
**discusses** 46:8 50:4
**discussing** 25:24 34:9,12 40:12 44:18 45:21 49:17 66:17
**discussion** 60:3 67:11 105:3 112:18 116:1 123:25 139:8
**dispensable** 140:10
**displayed** 37:21 53:18
**dispute** 74:23 78:9,24
**disputed** 35:19 77:12 79:6
**disputes** 104:24
**distinction** 50:20
**distinguished** 8:11
**distinguishing** 67:14
**distributed** 109:10
**district** 1:1,2 4:18,18 25:17 27:22
**ditch** 90:11
**dive** 33:14
**dived** 30:5
**divided** 90:22
**division** 1:3 4:19
**divorced** 52:21 52:25 53:8 67:5 106:5
**divulging** 24:5
**dnn** 27:14
**dnns** 27:10
**doctor** 66:22
**document** 35:24 44:15 45:5 76:3 114:16
**documentation** 33:4
**documents** 114:18
**doing** 58:9 60:16 61:11 83:24 85:21 95:13 116:16 116:17,22 119:16
**domain** 50:18 51:20 62:16,17 65:25 66:4 67:14 68:23
**domains** 133:3
**dos** 112:15
**double** 17:12 20:2
**doubt** 21:21,22 68:19
**download** 7:2 38:13 77:4,6
**downloaded** 39:9
**dr** 4:15 5:13 6:6 24:4 27:20 38:11 40:8 104:3 142:21 144:3 146:19
**drafted** 15:25
**drafting** 13:6
**drawbacks** 132:9
**drawing** 40:19
**drawings** 59:7

**drawn** 66:6 114:25
**drill** 28:25
**drive** 32:13 110:1,24
**driven** 97:13,16 98:6,8,20 99:3 100:7,19 101:5 101:15,17,21 102:5,16,25 103:9
**dubious** 119:20
**due** 61:12
**duly** 147:4
**duplicating** 130:25

**e**

**e** 2:1,1 3:1,6 46:14 147:1,1 149:2
**e.g.** 90:20 92:3 92:5
**earlier** 71:24 90:10 128:21 144:4 145:14 146:12
**early** 8:4 21:24 24:24
**earned** 140:24
**easier** 38:2
**eastern** 1:2 4:18 27:22
**easy** 110:18
**eaten** 104:3
**editing** 117:2
**editor** 114:22 115:11,14,16 117:2,6 129:19
**effective** 61:7
**effectiveness** 127:22 141:9 141:16
**effort** 141:9
**either** 7:7 10:1 16:10 19:21 21:4 23:1 82:4 88:13 98:22 110:25 117:7 118:5 129:21 129:25 131:12 140:10
**elected** 8:9
**electrical** 119:13
**element** 24:12 42:18 47:24 63:16 71:18 72:25 73:3,7 76:7 78:5 85:17 95:11 96:11 123:11 123:13
**elements** 99:4 123:12,16 135:17
**eliminate** 113:23 116:16 137:25 140:20
**eliminating** 114:13,15,20 115:14 116:18 137:21
**else's** 134:5,6,7
**embodiment** 41:4,6 79:15 79:24 80:24
**embodiments** 43:10 47:24 78:18 85:14 93:1
**emerged** 29:17
**emergent** 112:23
**emerging** 109:23
**employees** 53:6
**employs** 79:12 81:1 85:10 97:25
**enabled** 58:10
**encompassed** 123:22
**encyclopedia** 62:14
**ends** 118:6
**engage** 28:10 119:12
**engaged** 132:1
**engineering** 30:9 31:3 108:16 133:13
**enhancement** 106:9
**ensure** 82:24 141:12
**ensuring** 82:7 84:20,24 141:10,15
**entire** 14:11,13 37:16 107:18 121:23 122:2 123:15 133:11 133:12
**entirely** 33:16
**entities** 107:19
**entity** 105:16 105:17
**entries** 93:10
**entrusting** 75:7 75:8
**equal** 52:13 56:15 68:21
**equivalent** 99:23
**errata** 148:11 148:13,16 150:9
**error** 82:25
**esoteric** 31:5
**especially** 49:15 52:3 123:20

**esq** 2:2,8 148:1
**essence** 92:8 117:23
**essentially** 24:14 53:17 55:19 61:6 63:1 78:10 82:2,7,22 83:3 83:6,25 84:20 89:4 96:22 106:19 111:7 113:20 123:15
**established** 34:19
**estimated** 14:6
**estimation** 140:13
**et** 51:3 53:14 87:13 89:14,14 99:9 108:4 114:16,16
**evaluation** 58:9 58:16 59:4,8
**eventually** 10:13 115:15
**everybody** 30:21 74:24 146:15
**evidence** 14:17 21:1 26:1 99:24
**exacerbating** 131:4
**exact** 9:5 31:19 56:11 144:7
**exactly** 10:2 14:3 46:20 110:13
**examination** 3:2 6:1 144:1
**examiner** 126:1 127:3
**example** 17:8 19:20 20:7 23:10 24:18 26:8 28:6,8 29:15 30:1 31:14 32:7,12 34:11 40:20 41:3 45:14,20 47:2,6,16 48:1 48:5,15,23 49:4,5,8 50:5 51:8,22 54:4 56:23 57:16 60:7 61:24 62:6 65:21,22 66:22,25 67:3 67:10 75:2 83:10,22 84:4 89:11,12 93:8 107:22,23 108:3 109:17 109:21,25 112:13,16 114:14,23 115:11 117:1 117:20 118:4 120:2 129:18 129:20 133:1 134:18
**examples** 46:17 47:23 59:17 66:11 109:5
**excel** 108:4
**except** 150:7
**excerpt** 122:24
**exclude** 114:8
**excluded** 79:16
**excludes** 79:24
**excluding** 97:5 114:6
**excuse** 5:13 20:25 27:20 39:17
**excused** 146:22
**executable** 116:20
**executed** 76:9
**exemplary** 41:6 59:14
**exercise** 120:4
**exhibit** 3:8,10 3:10,12,14,15 6:19,19,24 7:3 7:7,14,15 10:10,18,22 11:11,21 13:7 14:11 17:15 34:25 35:1,3,4 35:11 36:14,15 36:25 37:23 38:12,12 67:20 69:11 76:23,25 77:2,3 104:15 104:16,16,17
**exhibited** 92:7 92:12 93:5
**exhibits** 7:11 9:22 16:22
**exist** 102:12 103:5 108:25 126:16
**existed** 113:2
**existence** 112:19
**existing** 14:19
**expensive** 61:15
**experience** 66:7
**experienced** 46:6 49:8 50:2 50:21,23 51:1 51:10,11 54:19
**experiences** 53:14
**expert** 12:6 33:2
**expertise** 62:17 62:18
**expires** 150:20
**explain** 22:21 27:14 65:3 75:24 91:16 106:17 122:4

135:20
**explained** 65:7 76:6 84:16 127:2
**explaining** 73:21 139:3
**explains** 79:14 121:16
**explanation** 65:10 126:9
**explanatory** 65:13
**explicit** 86:24
**explicitly** 17:18 49:5 54:18 79:16,24 80:24 93:11 97:20 98:3,14,16 99:25 125:25 134:9
**exploded** 29:19
**exploit** 138:8 142:5,13
**exploited** 116:5 138:20 139:20
**exploiting** 90:4 90:19
**exploits** 116:6 141:22,22 142:24
**expose** 141:14
**express** 103:9
**expressed** 55:7
**expressly** 99:10 100:19 101:21 102:4,15,24
**extent** 15:11 23:7,18 24:5,7 51:6 123:4,6 145:12,14
**external** 14:16 116:25
**extrinsic** 14:17
**eye** 67:3,9,16

**f**

**f** 147:1
**face** 53:12 131:8
**facebook** 62:6 62:10,23
**facial** 56:22 57:3,10,11
**facility** 114:15
**facing** 53:10
**fact** 46:4 52:4 65:12 89:17 93:12 122:8 131:4,7 132:5 144:17
**factor** 57:12
**factors** 34:22
**facts** 136:25 141:6
**failover** 131:19
**fails** 148:18
**fair** 17:17 19:5 29:25 31:8 42:22 110:16
**fairly** 108:18
**falls** 134:1
**familiar** 18:16 18:21 19:14,22 20:7,10,14 65:24 67:13 99:15 140:16
**familiarity** 23:18
**family** 66:18
**far** 23:16 25:4 26:7 48:14 58:22 61:1 65:11 78:8 79:25 103:15 111:17 119:15 129:4
**fbi** 50:8
**feasible** 61:9
**feature** 82:19 83:5
**features** 84:3,8 84:23 90:22,25 91:4 105:25 114:21 115:17
**february** 10:18
**fed** 28:11
**federal** 68:13
**feel** 33:13 62:21 97:1 132:13
**fellow** 8:9
**fenton** 2:15 4:22
**fetched** 119:15
**fewer** 128:13
**fi** 131:12
**field** 133:12
**figure** 28:3 40:20 41:7 46:8 47:5 48:1 48:4 57:20 58:3,8,11,20,24 59:3,7,17,19 60:15,22 61:17 61:20 108:19 110:12 111:6 111:11 119:15
**figure's** 59:3
**figures** 114:16
**figuring** 111:14
**file** 17:20
**filed** 4:17 88:14
**files** 130:1,1
**filing** 88:23
**filter** 84:1
**final** 91:4
**financial** 75:4
**financially** 5:2
**find** 30:23 78:3
**fine** 7:6,20 65:5 92:5 109:19 143:22
**fingerprint** 57:4

**fired** 82:4
**firefox** 60:8
**firm** 4:25
**first** 6:13 7:14 15:25 16:8,10 22:16 24:9 27:9 38:22,23 39:2 40:4,5 41:14,18,19,22 41:23 42:2,10 53:24 58:2 63:7,17,23 64:1 71:6,13 71:14 72:7,8 72:21,22 76:10 80:10,11,25 85:9 86:8 88:5 96:8,9 97:21 97:22 106:1,10 106:14,19 125:20 131:9 134:23
**fits** 46:20
**five** 13:25 23:15 25:3 31:2 56:21 103:24
**flattening** 81:20 82:10,11 87:13 88:2 99:9 102:16,20 102:25
**flexibility** 50:14
**flexible** 50:11
**flies** 131:7
**floor** 2:4
**flushed** 46:23
**focused** 132:5
**focusing** 93:12
**folder** 6:19 35:4
**folks** 19:6,21 21:12
**follow** 125:24 144:9
**follows** 5:24
**foregoing** 147:21 150:4
**foreign** 68:14
**forget** 143:7
**form** 16:19 18:22 26:17 27:17,23 28:16 29:5 30:3 33:19 35:21 39:5 40:7,17 41:2,12,21 42:15 43:24 44:13 45:4,25 48:7 49:1,22 50:15 51:25 52:11 54:15 55:19 58:7 60:24 63:10 64:19 69:22 71:25 72:18 73:16 74:16 76:1 77:24 78:13 79:3,9 81:8 83:14 85:6 86:16 87:19 88:18 89:1 90:12 91:18 92:22 94:1,17 95:7 96:5,19 97:14 99:12 100:20 101:8,23 102:6 105:21 107:5 108:14 110:20 115:3,23 116:10 117:13 118:23,25 121:10 122:21 124:7 125:15 126:22 127:14 129:15 130:13 134:20 135:12 136:24 138:24 141:5 142:17 142:20 145:4 145:11 150:8
**format** 37:16
**formatting** 14:15
**formed** 16:6 24:1 25:7 45:10
**forms** 16:23
**formulate** 15:20,21
**forth** 34:5 108:10 134:7
**fortinet** 1:7 2:5 4:17 5:10 12:16,24 13:2 15:9 17:8 24:1 24:19 26:16 44:22 73:23 99:22 148:4
**fortinet's** 26:8 26:20 78:9,10 78:17 79:17,23 125:21
**found** 70:19 78:6
**foundation** 16:23 79:3
**four** 23:16 31:2 56:20
**fragment** 142:7 142:14,25
**frames** 83:12
**framework** 124:10
**frankly** 119:2
**freely** 66:18
**fresh** 59:25
**friday** 9:25
**front** 38:15 66:23
**full** 77:22 80:4 81:14 90:25 91:14,16 92:5 92:13,14,18,24

93:6,13,16,18 93:22 94:13 95:3 96:16
**fully** 31:17 82:16 85:19
**function** 107:17 116:14 124:13 129:14 136:1
**functional** 124:16,18
**functionalities** 110:8 131:17
**functionality** 113:13 114:9 115:8,9,10 116:24 117:3,3 122:6,15 125:6 125:14 128:7,9 128:15 129:23 129:25 130:3,4 130:18 131:1 131:15 134:10 134:12 135:24 136:1 137:25 139:15 140:4,7 140:10 141:3
**functioning** 127:24
**functions** 124:16
**fundamental** 74:4
**further** 42:13 42:19 45:23 47:3,12 54:25 55:4 56:4,15 56:15,18 146:9 146:13

**g**

**gained** 88:6 89:6
**gears** 141:21
**general** 84:10 129:18 132:24
**generally** 8:18 8:21 12:8 13:8 18:7 20:14 28:18 31:21 53:14 56:1 62:13 64:2 67:6 75:19 112:5 116:11 139:12 142:6 142:24
**generated** 83:5
**gerson** 2:2 3:3 5:8,9 6:2,18 7:5 10:17 11:21,23 16:25 18:18 19:4 20:17 21:9 22:12 23:22 24:17 25:5 26:23 27:1,4,7 27:19 29:2,9 31:7 33:21 34:4,24 35:3,8 35:25 36:7,13 36:20,23 37:9 37:13,19,25 38:10 39:20 40:2,13,24 41:8,16 42:4 42:21 43:18 44:8,16,24 45:18 46:25 48:21 49:18 50:10 51:21 52:7,24 55:13 57:25 58:23 60:19 61:18 63:6 64:15 65:1 67:18,23 67:25 68:24 69:9,18 70:2 70:15 72:1 73:2,24 75:11 76:23 77:2,10 77:17 78:7,22 79:4 80:2,13 81:17 83:18 86:1 87:10,24 88:22 89:18 91:12 92:17 93:15 94:10,25 95:23 96:12 97:9,17 100:2 100:25 101:13 101:25 102:2 102:13,22 103:7,22 104:5 104:14,21 106:12 107:9 110:15 111:19 113:4 114:24 115:19 116:7 117:9 118:15 120:9,13,17 121:17 124:2 124:20 126:2 126:17 127:9 128:17 130:7 131:10 134:16 135:7 136:7,20 138:2,10 140:25 141:20 143:3,8,15,22 144:14 145:4 145:11,22 146:13
**gerson's** 135:21
**getting** 10:12 24:7 45:5
**gish** 2:3 5:9
**gishpllc.com** 2:5
**give** 26:4 30:1 32:13 34:11 49:7 51:22 53:22 55:20 65:21 66:12 76:3 99:5 109:25 129:17

**given** 9:10 50:5 50:12 51:7 53:16,20 54:17 55:25 59:21 66:9 95:5 100:8 106:25 110:17 121:24 123:1 124:10 130:11 131:14 146:19 147:10 150:6
**gnns** 30:20
**go** 4:13 6:18 8:19 17:12 24:6,8 34:4 37:25 39:19,20 47:9 58:14,19 60:2 67:19 68:25 71:22 72:12 73:13,25 81:19 83:19 92:16 104:5 112:1 113:5 115:13 126:4 136:12 141:25 142:21
**goes** 16:14 71:11 75:14 124:22 141:11
**going** 15:16 19:5 24:4 25:18 34:5,24 36:13 38:4 39:21 47:15,16 51:3,19 52:18 61:14 68:24 69:3 71:6 84:10 87:11 98:9,12 103:23 104:8 109:22 114:9,19 116:2 121:5 140:19 141:21 143:9
**good** 4:4 5:8,18 6:3
**google** 60:9,12 60:14
**gordon** 2:8 5:11
**governed** 48:14
**grain** 92:5
**graph** 30:18 31:15 144:4,6 144:11,17 146:1
**great** 8:22 11:7 21:15 27:8 68:1 72:11 86:12
**group** 90:22 138:6
**grouped** 39:11
**guess** 13:3,5 23:23 25:14 29:13 32:1 41:9 75:16 78:16 95:2,24 111:21 126:18 135:9 140:16
**guts** 111:11

**h**

**h** 3:6 17:1
**hacker** 114:4
**hair** 110:12
**half** 12:9 16:10 37:17,18
**halfway** 120:18
**hand** 62:3,12 127:21,23 133:14
**handful** 8:14 12:18
**handled** 60:1
**handwritten** 6:15
**happen** 37:11 85:12 91:6
**happened** 25:19
**happening** 76:19 111:11
**happens** 87:6 95:17,18
**happy** 28:25 45:14 59:2 66:11 86:23 104:6
**hard** 110:19,22 120:7,13 132:23
**harder** 108:21
**hate** 21:24
**head** 20:1,9
**hear** 27:2 99:5 101:17
**heard** 4:10 18:11 101:17 106:15
**height** 83:4
**help** 14:14,15 14:23,24 15:20 78:23 81:25 97:19 128:25
**hey** 32:15
**high** 27:14 34:12,14
**highlight** 11:6 133:23
**highly** 21:16 50:25 67:10 100:7 101:6 109:10 140:22
**hipaa** 54:3
**historically** 108:18 109:3
**history** 17:20
**home** 32:14 52:2,8,20
**honest** 13:10 21:14
**honestly** 13:25 16:3 88:10
**hood** 31:25 32:4,12

**hour** 11:25 12:3 13:18
**hours** 13:4 14:4
**hypothetical** 115:10 130:22

**i**

**identical** 56:12 56:25 135:19
**identically** 128:1
**identification** 6:25 35:2 36:16 77:1 104:18
**identified** 49:9 90:24 97:11
**identifies** 47:5
**identify** 46:5 98:5 102:24 103:8 134:12 134:13,13 139:10
**identifying** 83:9 97:16 108:12 110:16
**ignorance** 54:10
**illustrated** 43:10
**images** 32:10 53:17 83:11
**imaginable** 119:17
**imagine** 67:9 130:8
**immaterial** 103:16
**impact** 84:22 109:12
**impacting** 118:7
**impacts** 28:24
**implementati...** 86:7 90:21 92:2 131:14
**implemented** 61:13
**implementing** 61:13 76:8
**implied** 112:11 132:12
**implying** 94:20
**important** 31:17 84:8 114:1
**impossible** 111:7
**impressive** 133:18
**inappropriate** 67:11 80:1 81:15
**inaudible** 60:23 119:1
**include** 11:12 67:11 80:20,21 81:19 93:1 116:20 139:16 145:20 146:2,4
**included** 9:22 44:9 87:23 97:6 100:11
**includes** 71:21 80:11,18 96:8 97:22 121:1 138:17 139:18
**including** 5:5 9:21 16:21 26:15 44:17 103:15,15
**incorporated** 4:17
**incorrect** 78:18
**increasingly** 46:13
**incurring** 132:8
**indefinite** 44:23 73:23 125:22
**independent** 25:22 26:1
**independently** 118:13
**indicate** 58:24 103:19
**indicated** 147:4
**indication** 60:20
**indicators** 40:6
**indiscernible** 44:21 83:17 100:24 142:16 144:13
**individual** 43:13 123:16 138:6
**individuals** 138:7
**induces** 118:5
**inefficiencies** 131:1
**inexperienced** 46:5
**infectible** 120:3
**infiltrate** 119:16
**infinite** 94:23
**information** 24:6,8 32:2,25 42:13,20,25 43:3,7,14,17,21 44:5,10,20 45:13,23 46:12 46:15 47:4,13 47:19 48:25 49:12,16,21 50:1 51:1,23 52:5,9,18,23 53:15,21 54:8 54:14,25 55:5 55:16,22,23 56:1,2,10,19,24 56:25 57:1,8

58:6,14 59:1 60:1,13,23 61:7,21 62:5,7 63:1,9,19,24 64:14,18,22,24 65:4,17,17,20 66:4,10,13,17 66:21 67:1,4 68:4,8,12,16,21 74:6 75:4,5,9 87:7
**informed** 54:11
**infringe** 85:17 85:21
**infringed** 24:2
**infringement** 24:11,12,19,24 32:24 33:3,20 55:19
**infringing** 32:16 34:1
**inherently** 87:23
**initial** 33:11 37:18
**initially** 22:25 97:3
**initiate** 60:10
**innovations** 1:4 2:11 4:16 5:12 148:4
**innovative** 100:7 101:6
**input** 53:5 82:8 82:17,18 84:18 84:19 90:22,25 91:2
**insert** 114:15
**inside** 7:2,17 60:13 85:20
**insight** 110:10
**instance** 39:14 48:15,16,17 51:9,15,17 59:25 60:2,4 60:12 70:13 76:10,11,16
**instances** 39:15 50:4 76:11,20 76:20
**institute** 68:2
**institution** 74:20,21
**instruct** 24:4
**instruction** 24:22
**instructions** 71:4
**intellectual** 23:5,6 120:4
**intelligence** 8:10 31:4
**intended** 58:12 58:12
**intent** 91:9
**interactions** 47:17
**intercept** 59:18 59:24
**intercepted** 60:6
**interest** 39:12 48:13,13 58:22 59:16,19 68:13 68:14 107:23
**interested** 5:2 84:23 130:19 147:12
**interface** 113:3
**internal** 116:25 117:4
**internally** 108:6
**international** 8:9 30:8
**internet** 4:9 74:18 109:23
**interrupt** 15:15 28:1 101:1 126:3
**interrupted** 83:19
**intersected** 31:2
**intertwined** 120:2
**intervening** 21:17
**intranet** 53:7
**intrinsic** 45:2
**introduce** 5:16 41:24 110:2
**introduced** 89:3,5
**introducing** 109:8 131:1
**invalidity** 26:9
**invent** 88:1,16
**invented** 21:8 89:10,15
**inventing** 88:12
**invention** 74:5 88:13 139:9 140:6
**inventive** 117:24 133:23
**inventors** 18:1 18:5,8,11 20:8 20:16 21:11,13 22:3 61:11 87:25 88:9
**involve** 59:20
**involved** 23:14 130:20
**involvement** 24:13
**involves** 97:25
**involving** 49:15 87:7
**ios** 110:11
**iphone** 110:24 111:10,13
**ipr** 24:15 25:7

**iprs** 12:18 13:15,25 25:3 25:15,23
**isolated** 132:4
**isolation** 91:11 139:2
**issue** 23:16 28:5 35:19 38:2 45:3 69:14 71:21 77:12,15,21 78:25 80:4,16 91:13 103:17 104:23 108:12 110:14 112:22 121:2 122:18 145:13
**issues** 14:15 24:14 34:6 77:13 109:24 112:20
**italian** 110:24
**items** 8:14 19:18
**iteration** 80:10 80:20 81:1,1 85:9,10,23 96:8 97:21,24
**iterations** 97:25

**j**

**j** 1:18,23 147:15
**jae** 88:9
**january** 7:22
**john** 2:8 5:11 42:17 107:2 118:24 142:18 148:1
**joint** 3:11 35:10,11
**journals** 19:12
**jrg** 1:6 4:20
**jroehrick** 2:10 148:2
**jump** 75:20
**jumping** 30:21 73:25 142:4
**jury** 65:13

**k**

**keep** 128:24 140:19 142:3
**kernel** 59:21
**key** 78:16 119:9
**kim** 18:24 88:9
**kin** 147:11
**kind** 15:24 21:7 28:12 29:18,22 30:14,25 31:20 32:22 33:10 34:20 52:14 53:5,9,10 57:12 62:9 63:24 78:23 83:15 84:1 85:18 105:20 107:10,11 108:11 109:22 112:9 113:25 117:16 118:10 118:21 119:6 130:2 131:2 133:4,7 134:3 135:20 141:11 145:24 146:1
**kinds** 19:10 28:11 32:6 50:20 51:8,14 51:15 53:8 59:20,20 63:25 99:16 109:24 114:4 116:24 120:5 132:6 146:7,8
**knew** 32:18,19
**know** 10:13 11:2 13:21 14:4,9 17:1 18:7,17 21:12 21:19 23:3,10 26:2 28:4,24 30:22 34:1 35:4 37:11 54:1 55:15 56:7,22 57:3 61:23 62:3,6 62:19,21,22 66:3 67:9 68:18 74:19 77:3 79:18 87:13 98:10,10 99:16 101:14 110:9 116:19 120:4,6 128:19 129:10 131:18 133:2,3,4,12,20 134:8 135:21 135:24 136:15 136:21,22
**knowing** 99:18
**knowledge** 20:15 22:11 32:23 51:20 62:16
**knowledgeable** 66:4 140:22
**known** 50:23 66:19 74:7,9 74:11,13,15 75:9 88:3,15 88:24 89:17 93:8 110:2 111:2 112:21

**l**

**lab's** 144:19
**labeled** 145:19
**landscape** 139:4
**language** 30:22 32:10 40:11 41:25 42:3 43:4 45:1 47:10 56:17

57:18 64:8 71:21 72:13 90:16 91:25 95:19 97:20,24 103:16 112:14 115:6 121:22 122:8 123:8,20 123:24 128:2,3 128:25 135:14
**large** 30:21 34:21 130:15
**largely** 14:22
**larger** 108:22 134:4
**latest** 8:1
**launch** 59:25 60:12 76:21
**launches** 70:12 76:11
**launching** 51:16
**laws** 66:2
**lay** 65:13
**layer** 82:7,9 89:14 93:19,24 94:5,6,6,8,8,9 94:14,15 95:5 95:5,14,18,18 96:15,17,21,22 97:1,6
**layers** 28:10 31:16,18,18 80:9 82:16,16 83:6 84:25
85:20,22 95:13 95:16 96:1,3,7 96:14 144:12 144:18,24 145:1,3,7,10,20 146:3,7
**layperson** 54:6 54:7
**leading** 145:22
**learned** 19:7
**lease** 40:5
**leave** 47:25
**leery** 131:6
**left** 21:15 115:17
**legacy** 111:23 112:6,11
**legal** 2:15 4:23 4:25 14:18 146:21 148:23
**legitimate** 74:20,21
**level** 27:14 33:12 51:4 66:7 98:24 107:13,17,18 107:21 108:5 109:14,21 115:1 133:16 136:21 137:14
**levels** 32:5 107:16 113:14 113:18 122:7 136:18
**leverage** 50:3 133:13
**life** 19:10
**likelihood** 32:15 140:11
**likely** 14:7 21:17 31:4,13 32:11 138:19 139:20
**limit** 92:20 113:13 122:6
**limitation** 38:22 40:12 42:9 43:23 44:12 45:21 54:23,23 57:19 70:12 71:11 80:4,16 93:17 95:6 120:20 121:1,7,9 136:23 137:3
**limited** 27:23 98:10
**limiting** 113:17
**line** 8:14 53:25 70:22 78:6 86:4,6 90:2 92:1 100:15 105:10 114:25 120:19 124:10 149:4
**lines** 121:21 122:24 135:4 139:8
**lingo** 81:2
**link** 109:18,20
**list** 11:3 16:12 17:15,22,23,23 20:15 40:25 58:2 79:21 81:19 87:11
**listed** 16:18,22 17:25 19:17 21:11 22:9 60:21
**listing** 58:14
**literally** 61:16 144:20
**literate** 74:18
**literature** 19:12,21
**litigation** 8:17 9:8 12:6 13:14 18:10 19:5 77:12
**little** 12:8 36:20 70:18 73:25 74:14 90:16 119:20 120:18 133:7
**live** 32:14 113:22 114:19 141:19
**llc** 1:4 2:11 4:17 5:13 23:4
**llp** 2:8
**loading** 7:1 36:20

**local** 27:23
**located** 6:6
**lock** 114:12 119:8
**log** 47:18 53:5 56:3 62:8
**long** 134:11 137:1
**longer** 13:4 104:4 109:20 114:9,22
**look** 19:1 31:19 31:25 32:4 33:4 44:2 47:14 48:1 58:19 59:2,10 63:3 86:17,23 87:9 99:19 103:6 107:14 115:25 120:10 139:7 141:8
**looked** 19:17 24:25 26:12
**looking** 30:10 30:18 32:12 37:17 55:15 61:19 69:20 83:11 84:1 111:20 137:3 138:7
**looks** 7:4 85:24
**loop** 132:10
**lost** 39:18 121:12
**lot** 14:15 16:6 21:15 47:16 65:9
**lots** 131:2
**lower** 93:10 100:9
**lump** 120:1
**lunch** 104:3

**m**

**machine** 147:7
**machinery** 8:11
**made** 33:8,9 110:24 133:6
**madison** 2:3
**maintain** 137:20
**maintains** 140:3
**majority** 9:7
**make** 10:22 11:8 28:12,20 32:22 35:14 36:1 38:2 60:1 64:6 73:11 75:17 96:18 105:25 110:4 111:21 112:2 121:18 129:5
**makers** 111:3
**makes** 79:2
**making** 33:13 82:25 140:17
**malicious** 114:4 116:6
**manage** 69:15 69:18 70:1,4 70:13 71:22 72:4,14 73:12 73:14,20,22 76:12
**managed** 22:18
**managing** 132:2
**manhattan** 4:1 6:8
**manifested** 43:9
**manifests** 112:24
**manner** 95:16
**map** 82:19
**mapable** 135:19
**maps** 83:5
**march** 1:13 4:1 4:6 147:17 148:3
**mark** 34:24 36:13 76:23
**marked** 3:7 6:19,24 7:7 11:4,11 35:1 36:15 76:25 104:17
**marketplace** 26:20 62:4
**markman** 15:9 15:12 104:24
**marshall** 1:3 4:19
**martin** 1:18,23 4:24 5:18,19 147:15
**matches** 82:8
**materials** 6:11 16:13,17,22 17:2 19:17 36:5 39:6 46:2 49:24 59:12 63:11 68:10 70:9 72:19 73:18 76:5 78:1 80:7 90:14 91:20 113:19 115:24 117:18 122:22 126:7 127:16 132:21 136:11
**mathematically** 123:13
**matrix** 84:19 84:19
**matter** 4:16 6:23 7:9 12:1 12:12,13,24 13:2 15:23 18:4 20:6 23:25 24:11,20 26:7,14 35:20 68:20 98:17

116:5
**matters** 8:17 9:8 12:6 13:17 13:22 14:5,7
**max** 83:13,15 83:23,23 88:15 88:24 89:2,8 89:12
**maximum** 83:24 90:24 91:1 92:7,12 93:5,8 100:10
**mean** 8:7 15:11 15:15 17:2 18:24 22:22 27:25 29:7 40:15 41:15 53:1 57:5 74:10 93:22 94:4 96:7 101:1 103:19 106:13 113:17 114:21 117:15 117:16 121:20 127:11 132:19 134:22 136:21 145:15,20
**meaning** 37:5 44:4 46:6 50:1 55:21 63:1 64:17,23 65:4 65:11,16 73:14 73:19 75:1 83:8 94:22 106:19 125:10 126:20,21 136:13 142:5 142:13,23
**meaningful** 46:24
**means** 55:22 73:13 81:11 91:17 103:20 141:13,17 147:23
**meant** 29:14 73:6 118:19
**measure** 58:18
**media** 4:14 146:20
**medical** 53:23 54:5
**medium** 71:4
**medvidovic** 1:17 3:2,8 4:15 5:13,22 6:5,6 24:4 27:20 38:11 40:8 104:3 142:21 144:3 146:19 148:5 150:3
**meet** 43:23 45:20 85:4
**meeting** 137:3
**meetings** 9:23 9:24 10:2,4
**member** 43:13
**memory** 98:9 98:12
**mental** 15:24
**mentioned** 11:5 13:15 24:10 29:21 47:5 72:13 81:19 87:22 98:17 128:20 140:2 144:8
**merit** 1:19
**message** 53:12
**met** 9:22 18:8,9 136:23
**method** 70:25 71:2 107:17,21 107:23 133:10 135:25 142:6 142:14,24
**microsoft** 108:3 115:12 117:4,6
**mid** 16:10
**middle** 16:15
**midyear** 8:5
**milliseconds** 59:5
**mind** 17:18 45:11 53:25
**minds** 65:19,22
**mine** 14:14 68:19
**minimal** 125:6 125:13 128:6 130:3 139:10 139:15 141:2
**minimize** 127:21 141:9
**minimizing** 82:24 141:16
**minimum** 120:22 121:2,6 125:3,10,18 126:6,15,20 127:1,6,10,11 127:17 128:5 128:16 132:15 136:9 139:22 139:24 140:8
**minkyu** 18:23 88:9
**minute** 7:18 38:1 40:12 98:21 103:22 103:24 132:9
**minutes** 122:9 143:4
**mischaracteri...** 20:12 21:1 49:23 73:17 77:25 78:14 81:9 92:23 94:2,18 96:6 96:20 99:13 100:21 101:9 101:23 102:7 103:1 105:22 108:15 110:21

115:4 117:14 119:1 124:8 125:16 127:15 132:18 138:25 141:6
**mismatched** 85:1
**misphrased** 94:11
**misphrasing** 95:1
**misquote** 112:2
**misrepresent** 112:3
**missed** 22:2
**missing** 17:15 45:17
**misused** 51:2
**mobile** 56:23
**model** 30:22
**modern** 107:2 107:6 112:19
**modularized** 30:19 132:3
**modularizing** 30:9
**module** 105:16 105:17,18 106:1 128:18 128:23 129:2,3 129:7 130:12 132:17,22,25 133:9,19,25 134:5 135:23
**modules** 130:16 131:3 133:9 137:12
**moment** 87:22 136:4
**month** 13:3 30:7
**months** 8:3,8 16:7 25:1
**morning** 4:4 5:8,18 6:3
**move** 20:18 83:10
**moving** 111:21
**mozilla** 60:7
**msb** 97:12,16 98:6,8,20 99:3 100:7,19 101:5 101:15,17,21 101:25 102:5 102:16,25 103:9
**msbs** 86:9 87:7 92:3,8,19 93:9 93:12 96:9 98:4
**mud** 119:24
**multi** 76:9,15 82:12,18
**multiple** 21:16 28:10 91:22 93:10 107:1,8 107:20 108:2 123:17 124:6 133:17 137:5
**muted** 40:9

**n**

**n** 2:1 3:1 130:17
**nail** 123:6
**nailed** 34:22,23
**name** 4:22 5:18 6:4
**named** 8:10 18:5,8 20:8 21:13 22:3
**names** 17:19,25 18:12,15,19,21 18:24 19:14,22 20:13
**nancy** 1:18,23 4:24 5:19 147:15
**narrative** 20:12 23:13 27:18
**narrowed** 92:6 92:11
**national** 68:2 68:12,14,20
**natural** 32:9
**nature** 8:13 83:12 90:4,19
**necessarily** 31:10 117:10 118:20 119:11 130:6 139:16
**necessary** 124:4 125:6,13 127:20 128:5,6 128:11,12,15 137:20,22,25 138:3 140:4,7 141:10,12
**need** 39:15 43:5 62:25 65:14 83:7 106:4 114:9 115:9 123:19 124:16 124:17 127:20
**needed** 116:23
**needs** 115:16 129:22
**neither** 147:11
**nenad** 1:17 3:2 3:8 4:15 5:22 6:5 148:5 150:3
**net** 146:5
**network** 29:17 29:23 30:24,25 31:10,20,23 32:17,19,20 33:16,22 34:20 82:3,20 83:1 85:24 95:13,15 113:14,18,25 114:2,3 116:4 116:4 119:3,7 119:8 122:7 131:11,25

144:25 145:19
145:19,25
146:2
**networks** 27:10
28:7,8,9,9,14
28:15,19 29:3
29:4,7,12,20,22
30:2,11,15,18
31:16 32:3,21
34:20 79:20
82:14 92:3
144:4,6,12,17
144:23 145:2,6
145:9,16,24
146:1,3,6,8
**neural** 27:10
28:7,8,8,9,14
28:15,19 29:3
29:4,7,12,16,20
29:22,23 30:1
30:11,15,18,24
30:25 31:9,15
31:20,23 32:2
32:17,18,20,21
33:16,18,22
34:19,20 79:19
82:3,14,20
92:3 95:13,15
144:4,6,11,17
144:23,25
145:2,6,9,15,19
145:19,24,25
146:1,2,3,6,8
**neurons** 82:3
82:23
**never** 17:18
110:12
**new** 2:4,4 51:16
59:25 70:12
76:11,21
**nomenclature**
136:3,6
**non** 71:3
**nonjudicious**
54:19
**normalization**
81:20 82:5,6
87:13 88:2
99:8 102:5
**notary** 150:23
**notation**
121:23
**note** 4:7 11:15
22:16 74:4
148:10
**noted** 150:8
**notes** 6:15 13:5
**notice** 13:11
147:3
**noticing** 5:7
**notion** 46:6
50:8 51:18
117:21 118:1,2
137:13
**notions** 137:17
**novice** 49:9
50:2,21,24
51:4,7 63:2
**nowadays**
46:13
**nuanced** 48:19
**number** 3:7
5:20 8:12 9:5
10:24 14:2
16:7 34:22
47:20 56:3
57:3 61:24
71:6 83:6 85:1
86:9,14 87:4,7
90:9,24 91:2
92:19,20 93:9
114:20 118:16
130:19,20
138:18,21,22
139:19 140:11
146:20
**numbers** 56:2
86:6
**nw** 2:9
**ny** 148:15

**o**

**o'clock** 104:2
**oath** 5:16 8:23
**object** 101:8
**objection** 16:19
18:13,22 20:11
20:25 21:1
22:6 23:12
24:3,21 26:17
27:17 28:16
29:5 30:3
33:19 35:21
39:5 40:7,17
41:2,12,21
42:15 43:24
44:13 45:4,25
48:7 49:1,22
50:15 51:25
52:11 54:15
58:7 60:24
63:10 64:19
69:22 71:25
72:18 73:16
74:16 76:1
77:24 78:13
79:3,9 81:8
83:14 85:6
86:16 87:19
88:18 89:1
90:12 91:18
92:22 94:1,17
95:7 96:5,19
97:14 99:12
100:20 102:6
102:18 103:1
105:21 107:5
108:14 110:20
115:3,23
116:10 117:13
118:23,25
121:10 122:21
124:7 125:15
126:22 127:14
129:15 130:13

132:18 134:20 135:12 136:24 138:24 141:5 142:17,20 144:14 145:4 145:11,22
**objections** 5:3 27:22 102:18 103:11
**objects** 83:9
**obligation** 9:11
**obtained** 51:2
**obviously** 17:17 25:1 44:25 91:7 140:14
**offer** 125:20
**offerings** 26:20
**offhand** 11:2
**office** 108:3,5
**oh** 8:19 17:18 69:23
**okay** 6:18 17:14 36:1,22 42:22 52:8 70:2,23 72:11 73:10 74:2 75:3,15,21 77:9,20 78:8 86:5 89:21 100:5,14 104:19 105:8 120:15,16 124:24 126:4 138:13 141:24 142:2,12 143:21 146:16
**older** 112:9
**once** 9:20 59:16
**ones** 28:17 29:15 140:20
**online** 49:15 62:4,13 114:11
**open** 38:13 77:3,6,6
**opened** 50:6 51:9
**operable** 38:23
**operate** 120:23 124:4 127:7,13 139:23,24
**operates** 95:16
**operating** 109:2,8 110:6 110:7 112:15
**operation** 90:23 102:20
**operations** 80:22 86:24 90:21 96:3 99:2 102:12
**opine** 15:8 35:24
**opined** 35:15 35:22 37:5 44:16 69:14,25 77:15,21 78:2 104:25
**opining** 34:7
**opinion** 12:15 12:17 16:24 23:15 24:1 25:16 28:21 33:3 35:18 36:8,10 46:1 54:20 55:19 61:22 71:22 76:4 114:25 142:12
**opinions** 11:1 11:12 14:14 25:8 28:24 44:15 45:6
**order** 13:4 70:1 70:4,13 71:21 72:4,13 76:11 116:13 124:12 129:21
**ordinary** 46:17 55:14,20,24 56:6 64:17,23 65:3,16 66:8 68:15 79:18 80:18 87:21 102:10 125:10 126:10,20,25 136:13,15 137:14 142:5 142:13,23
**original** 89:4 100:11
**originated** 22:17
**orthogonal** 117:16 118:20
**outcome** 5:2 147:13
**outdated** 112:12
**outlook** 108:9
**output** 28:13 82:7 84:18 91:4
**outputting** 96:23
**outside** 10:5 45:5 46:1 48:8 52:6,11 76:1,9 76:15 85:6 88:18 90:12 91:18 140:9
**outward** 53:10
**overall** 113:24
**overfitting** 83:8
**overlapping** 118:4
**overt** 108:23
**own** 14:19 23:20 30:4 50:7 110:24 132:5 133:11 144:19
**owns** 111:12

**p**

**p** 2:1,1
**p.m.** 104:9,10 104:11,13 143:10,11,12 143:14 146:18 146:23
**p.r.** 3:10
**pacific** 4:5 104:2
**packages** 137:12
**padding** 81:21 84:15
**page** 3:2 6:14 10:10,12,13,15 11:19 16:14,15 17:1 20:16 22:14 26:23,25 27:3 36:2 37:12,13 52:2 52:8,20 53:3,4 53:6,18 57:22 67:20,21,23 69:12 70:3,11 73:9 74:1 75:13,14,17,23 77:18 78:3 89:20 91:25 100:4 105:3,6 107:10 120:12 120:14 124:22 124:23 125:1 126:14 128:2,3 129:9 138:12 139:9 141:23 142:4 149:4
**pages** 1:25 6:13 16:11,18 17:7 65:8,9 150:4
**papers** 8:12 19:25
**paragraph** 11:15,21 19:18 22:9,13 26:24 27:5,10 30:6 33:21,25 65:12 67:20,23 69:20 69:24,24 70:6 73:8,15 74:4 75:12,23 79:21 81:18 87:12 89:19,23 91:23 93:1 97:20 99:8,22 100:3 100:17 101:11 101:12 103:16 105:4,7 111:20 113:5,6 121:22 121:25 122:1 122:10,11 124:21,25 127:3,4 128:1 138:11,14 141:25 142:1
**parameters** 46:20 58:18,19 83:7
**parenthetical** 74:7
**part** 14:21 15:24 19:7,16 22:4,17 23:11 24:19 25:7,17 25:18,22 35:16 40:21 42:3 43:21 44:17 45:2 46:9,18 47:17 49:10 53:5 67:11 70:11 72:4 79:7 80:6,17 116:18 117:23 133:22 138:13 141:14
**participants** 4:10
**participate** 88:12
**particular** 15:23 16:2 21:20 23:5 32:17 41:13 58:16,18 60:8 63:15 65:25 68:22 84:9 85:22 88:8 103:5,17 132:19 133:24 140:6
**particularly** 20:7
**parties** 1:20 4:13 15:17 35:19 53:16
**partner** 66:18
**partnered** 23:4
**parts** 28:3 107:20 114:6 118:7 127:23 132:1,4 134:25 135:3,5 137:9 137:9 140:19 141:18
**party** 5:1 147:12
**pass** 57:9,11,14
**password** 56:3 56:22 57:2 75:2
**past** 13:3,11 89:7
**patent** 3:12,14 3:15 8:17 9:8 12:6 17:19,24 17:24,24,25 19:15 20:15 21:13 22:17 23:21 24:11 32:16 37:1,10 37:14 38:12,14 38:18 39:10 40:4,20 41:5 43:11 45:19

46:3,16,20 47:2 48:12,19 49:6,10 50:2,4 50:9,11,13,16 50:17 51:6 54:17 56:13 57:21 60:11,11 60:20 61:1,5,8 61:13 63:2,3,7 68:9 69:10,12 70:8,20 73:21 77:5,11,19 78:19 79:10,14 79:25 81:2 85:8 86:3,3,13 86:18 87:18,25 88:6,14,16 89:10,16,23 91:22 92:1 93:7 97:21 98:6 99:2,10 99:20,24 100:6 100:14,18,23 101:14,21 102:4,15,25 103:6,9,13,21 104:20,23 105:3,9 106:6 112:1 115:5 116:1 117:19 117:21,24 120:11 122:23 122:25 124:9 125:25 126:24 127:3,18 128:16 131:8 135:15,15,19 135:22,23,25 136:1,4,5,13 137:10,19 138:5 139:4,6 139:12 141:7

**patent's** 88:23 91:9 136:6

**patents** 9:20 14:17 16:6 17:9,10,23 18:1,17 19:2,9 20:8,23 21:4,6 21:7 22:4,10 23:1,10,15,20 24:2 25:9,12 25:20 26:2 28:5 37:4 77:12 85:11 86:2 104:24

**patient** 66:1

**patients** 66:24

**paulo** 18:23

**pause** 35:6 37:8 54:16 57:23 63:5 67:17 75:10 76:22 77:8,16 99:5 112:4 127:8 138:9 143:2

**pay** 61:10

**paying** 60:17

**payment** 46:15

**pdf** 129:21 130:1

**peer** 19:24

**penalty** 9:12 60:18 61:9

**penetrative** 111:10

**penultimate** 94:8,14

**people** 20:4,15 21:17,22 22:9 49:14 65:24 66:25 67:13 74:24 107:14 108:16,25 109:2,10 119:11

**perceive** 54:7

**percent** 89:13

**perfect** 6:15 7:13 9:6 12:20 16:16 20:5 35:9,14 36:24 37:3 40:14 42:5 70:2,16 70:23 81:24 103:24

**perfectly** 57:17

**perform** 71:6 86:14 91:3 92:2,4,9 93:13 96:8 114:9,10 116:23

**performance** 58:9,15 59:4,8 60:17 61:4,9

**performant** 106:2

**performed** 91:1 93:24 95:4 96:3

**performing** 77:22 80:4,10 81:14 85:5 86:8 87:3 91:14 92:13 97:21

**perjury** 9:12

**person** 46:17 55:14,24 56:6 66:4,8 68:15 79:17 80:18 87:21 102:10 111:12 126:9 126:25 136:15 140:18

**person's** 67:16

**pertained** 14:16

**pertaining** 19:2

**pertains** 67:16 68:12

**ph** 3:8

**ph.d.** 1:18 3:2 5:22 30:17 144:20 148:5

150:3
**phenomenon** 112:21
**phone** 57:16 110:4,4
**photo** 117:6
**photograph** 53:11
**phrase** 78:25 79:7
**phrased** 99:6
**picking** 103:18
**piece** 75:5 108:20 136:17 136:17,18
**pieces** 45:17 113:1,23
**pin** 56:4,8,10 56:21 57:3,15
**place** 4:12 14:1 102:21 106:11 106:14,19 118:3 131:9 147:4
**places** 53:2,3 91:22 137:10
**plain** 55:20 64:16,23 65:3 65:15 125:9 126:19 136:12 142:5,12,23
**plaintiff** 1:5 5:12
**platform** 110:11
**play** 31:18 110:2,17 111:4
**playing** 31:16 110:9
**please** 4:7 5:4 5:16 6:3,21 16:11 22:13,21 24:6 26:23 27:14 37:9 38:17 57:20 69:11 76:24 77:4,18 86:2 105:6 126:4
**pllc** 2:3 5:9
**pluralities** 64:11
**plurality** 40:5 40:16,21 41:5 41:19,23 42:2 42:7,10,23 45:11 63:17,18 64:13 93:2,4 96:10
**plus** 17:7 132:6
**point** 32:14 47:2 59:17 91:23 96:2 97:15 99:22 102:14 109:19 114:7,17,19 115:15 117:17 140:18 143:16
**pointed** 97:23 99:14 106:9
**points** 98:2 116:2
**policy** 68:14
**pooling** 79:13 81:2,3,4,21 83:2,3,13,13,15 83:16,22,23,23 84:4,5,5 85:10 87:1,1,6 88:2 88:15,24 89:3 89:8,12,14 90:5,20 98:1,7 98:13 99:1
**popularity** 88:6 89:6
**portal** 7:18
**portfolio** 22:18 23:10,11,19
**portfolios** 23:21
**pose** 54:20
**posita** 47:14 87:5 98:18 99:15,18 102:17,19 125:2,11 128:4 139:3,13
**position** 16:2,5 140:23
**positions** 15:9 15:12,21
**possess** 20:14
**possibilities** 123:15
**possibility** 55:5 88:11
**possible** 19:23 24:23 26:4 33:16 38:3 43:2,11 44:7 53:19 54:7 64:4 67:5 85:4 85:14,16,20 98:15 99:2 103:4,13 104:3 118:22 120:6 122:12,19 129:10,18 130:17 131:16 133:21 139:14 139:15
**possibly** 33:5 41:4 56:3,4
**postscript** 129:22 130:1
**potential** 24:11 84:7 114:5
**potentially** 51:13 59:25 62:7,11,17 65:23 67:7,8 95:21 110:17 128:13
**powerful** 133:19

**powerpoint** 108:8
**practically** 61:8
**practice** 33:6 119:2,20 120:6 132:14
**preamble** 38:21 71:19
**preceded** 25:23
**precision** 77:22 80:4 81:14 90:23,25 91:14 91:16 92:5,14 92:18,24 93:6 93:13,16,18,22 94:13 95:3 96:16 100:9
**preclude** 63:21 63:22 95:20
**precludes** 64:7 96:25
**predates** 112:8
**prediction** 82:25
**prehearing** 3:11 35:11
**preliminary** 32:24 33:8
**premise** 132:11
**prep** 13:7
**preparation** 14:10 15:3 55:10 97:8
**prepare** 9:18 10:7 16:24
**prepared** 66:3
**preparing** 13:9 15:5 86:22
**prerequisite** 140:5
**present** 2:14 5:5 10:4 34:16 47:24 74:24 99:17 124:12
**presentations** 33:8
**presented** 30:7 60:23 89:15
**presenting** 42:14,20,25 43:4,8,15,21 44:10,20 45:24 47:4,13 48:25 51:23 52:9 53:21 54:14 55:1,16 56:19 58:6 59:1 61:21 63:9,20 63:24 64:14,18
**presents** 44:5 53:9 54:22
**president** 53:13
**pressed** 120:7
**presumably** 84:21 117:4
**prevent** 63:7
**previous** 14:20 87:2 115:20
**previously** 18:25 48:17
**primarily** 31:3
**print** 129:21,23 129:25 130:1
**printout** 6:13 6:16 7:6
**prior** 18:10
**private** 66:17
**privilege** 51:7
**privileges** 50:20
**probability** 34:13,14
**probably** 13:4 13:23 16:9 31:5 74:24 111:3
**problem** 30:10 67:14 84:21 108:21 110:13 110:18,19,22 111:2,3,6,17,17 131:5 142:20
**problems** 32:7 109:9 112:17
**procedural** 28:3
**proceed** 5:17 93:9
**proceeding** 5:3 23:17 25:11
**proceedings** 19:13
**process** 25:7,14 60:10 82:2,6 82:11,22 83:3 93:9
**processing** 28:11 32:9
**processor** 38:21,22 71:3
**produce** 100:8 114:18 129:21 129:22
**produced** 59:14,15
**product** 31:9 32:2 33:6,15
**products** 24:1 26:16 33:25
**professional** 53:24 54:5
**program** 75:18 75:22,24 76:9 76:15 107:7,11 107:12 132:17
**programming** 112:14
**programs** 68:13 107:8,15
**progress** 82:25
**prohibitively** 61:15
**prominent** 84:2

**prompts** 75:1
**pronounced** 75:19 109:12
**pronunciation** 75:18
**propagated** 93:25 94:16 95:17
**propagating** 93:18 94:4 95:14 96:16,16
**proper** 109:13
**properly** 47:9 61:14 109:7 110:4
**properties** 31:24
**property** 23:5,6
**proposed** 79:17
**propounded** 150:7
**provenance** 21:7
**provide** 9:14 35:18 36:8,10 45:19 46:22 53:4 62:22 64:16,21 73:13 75:3 99:9 105:24,24 122:14 126:5,8 126:21 130:17 130:18 139:15
**provided** 12:17 14:18,24 15:22 25:6,22 49:5 51:19 57:6 73:15 96:24 126:9
**provides** 54:18
**providing** 12:14 23:15 109:12
**public** 74:18,22 150:23
**publication** 19:16 20:2
**publications** 19:10,11
**publicly** 52:15 66:23
**published** 19:24
**purely** 31:24
**purport** 88:16
**purports** 20:23
**purpose** 32:23 34:21 59:13 61:3,17 111:25 123:7 139:21
**pursuant** 147:3
**purview** 134:1
**put** 32:1 38:11 104:15 106:7 119:8 133:6

**q**

**qualifications** 14:20
**quality** 4:8,9
**question** 25:10 25:14 26:3 29:25 33:20 34:5,18,23 40:18 44:7 45:9,11,15 46:21,24 47:1 55:2 64:20 72:2 74:9 76:17,18 94:12 94:19,24 95:9 97:2 98:23 99:6 101:18 123:7 132:11 132:23 133:21 144:7 145:14
**questioning** 54:1
**questions** 143:16 144:9 146:10,13 150:6
**quick** 27:21 31:15 143:21
**quickly** 30:12
**quip** 119:6
**quite** 21:14 37:22 86:19 119:2
**quote** 89:22,24 90:2,17 97:20 105:9 115:6 121:22 128:2
**quoted** 91:25 112:1 121:20

**r**

**r** 2:1 147:1 149:2,2
**race** 67:10
**random** 111:12 140:18
**rate** 11:17,24 12:10
**rather** 31:3 43:10 70:11 74:20 75:8 77:15 80:10,22 82:17 97:25 112:3 130:20
**reaches** 44:15
**read** 9:20,20 30:22 37:24 43:2,5,19 44:25 45:8 46:16 55:6 57:17 63:21 76:13 88:21 90:18 96:25 101:11 116:2 121:1 122:8 143:7 146:12 148:9 150:4

**readable** 37:16
**reader** 57:4
**readily** 99:16
**reading** 139:1 140:2
**reads** 43:11 54:22 64:4 70:12 78:18 90:3
**real** 27:21 32:10 130:8
**realistic** 119:4 120:7
**reality** 130:24
**realized** 30:12 54:1 132:13
**really** 10:9 19:6 21:20 27:22 32:3 34:17 46:16 54:3 74:18 107:16 110:25 119:14 120:1 135:21 143:5
**reason** 9:14,16 12:16 49:6 78:16 114:1 148:11
**reasonable** 57:17 65:19,22 66:25 67:13
**reasonably** 62:22
**reasons** 78:16 108:24
**rebut** 125:20
**recall** 14:1 16:9 19:20 20:1 25:1 61:1 78:20 144:3,11
**receipt** 148:17
**receive** 38:23
**received** 13:11
**recent** 12:8
**recess** 38:6 39:23 69:5 104:10 143:11
**recognition** 56:23 57:4,10 57:11
**recognize** 36:25
**recognizing** 84:8
**recollection** 23:17
**reconfigure** 140:21
**record** 4:5,13 5:7 6:4 38:1,4 38:8 39:19,20 39:21,25 45:2 68:25 69:3,7 88:21 104:5,8 104:12 143:9 143:13,19 146:17,18 147:10
**recorded** 4:11 4:14 147:7
**recording** 4:8 4:12
**recurrent** 30:15
**redirect** 59:23 143:21
**reduce** 82:12 83:4,6 128:14
**reduced** 90:4 90:19 91:3
**redundancies** 86:8
**redundancy** 90:3,18 131:16 131:21
**redundant** 131:3
**refer** 23:9 105:9 133:16 135:22
**reference** 19:11 27:9 72:24 75:17,22 99:8 111:23 122:11
**referenced** 17:2 17:6 128:4 148:6
**references** 14:16 87:6 96:2
**referencing** 113:7
**referred** 14:23 30:19 39:7 95:3
**referring** 12:14 34:10 48:2 73:3 87:14 95:10 122:19 129:6 138:5
**refers** 33:22 102:15 125:4 135:22,23,25 136:1
**reflects** 64:12
**refreshed** 36:18
**regarding** 3:9 6:22 7:8 23:15 24:10
**regardless** 108:20
**region** 83:25 84:6
**registered** 1:19
**regulations** 54:4 66:2
**reindel** 2:8 5:12
**relate** 90:8 118:10
**related** 5:1 11:12 12:18 24:14 25:8 110:14

**relates** 34:6 117:22 118:5 125:3,19 127:2
**relationship** 116:15
**relatively** 33:9
**relevance** 21:2
**relevant** 19:15 25:2 124:19 133:22
**reliable** 106:3
**relied** 17:15
**relies** 116:13
**rely** 107:13 129:14,14 134:8
**relying** 129:12 129:12
**remain** 127:20
**remainder** 42:18
**remained** 14:22
**remains** 84:19
**remember** 10:1 13:25 14:3 16:3 17:5,9 125:25 144:6,7 144:8
**remote** 1:17 88:11
**remotely** 1:20 4:21 5:5
**remove** 114:21 128:13
**render** 39:15 119:7 128:10
**rendered** 61:15 99:23 124:16 124:17
**renders** 78:17
**repeat** 106:16
**replaces** 78:11
**report** 33:22 142:1
**reported** 1:23
**reporter** 1:19 1:20 4:24 5:15 5:18,19 39:18 69:17 88:20 101:24 147:24
**represent** 58:12 115:7 121:23
**representation** 84:11
**represented** 123:24
**representing** 4:23 13:13
**represents** 122:13 123:2
**reproduction** 147:22
**requested** 69:17 88:20 101:24
**require** 33:14 51:16 52:17,18 79:7 80:6,16 82:17
**required** 30:15 115:7 127:23 128:6,9
**requirements** 85:4
**requires** 50:7 62:8 63:16 64:10 78:25 137:19
**research** 18:16 19:21 20:24 21:4 29:17 30:4 31:3 132:5 144:19
**researcher** 31:21
**reserve** 143:6
**reserving** 146:12
**residual** 146:3
**resnets** 146:3
**resolve** 38:1
**resource** 40:5
**respect** 8:16 12:15 14:10 15:23 23:24 36:9,10 53:20 91:8,11 98:4 99:7 127:11
**respecting** 109:6
**responsibly** 132:7
**rest** 37:20 111:22
**restate** 146:11
**restricted** 41:6
**restrictions** 62:9
**results** 83:9 96:23 100:8
**retain** 65:15
**retained** 16:8 146:21
**retired** 21:18
**return** 148:13 148:16
**reused** 14:19
**review** 148:7
**reviewed** 19:24 24:18 26:8 36:5 39:6 46:2 49:24 59:12 63:11 68:10 70:9 72:19 73:18 76:5 78:1 80:7 90:14 91:20 113:19 115:24 117:18 122:22 126:7 127:16 132:21 136:11
**rida** 18:24
**right** 7:6,15 10:19,25 13:19

15:12 22:5 29:24 33:17 36:9 37:6,22 41:20 42:12,14 42:16 48:6 52:10 55:2,11 58:15 59:13 63:22 69:16,24 70:2,8 71:20 74:25 82:5,24 94:11,15 95:11 95:11 96:13 102:23 105:4 108:13 109:18 111:1 118:16 118:19,21 121:6 129:9 131:13,15 133:5,12 135:1 135:8 143:7 146:12
**rights** 23:6
**ring** 26:11
**risk** 42:14 43:1 43:4,8,15,21 44:6,11,20 45:24 47:4,13 48:25 51:24 52:10 53:21 54:14,20,22 55:1,17 56:19 58:6 59:1 61:21 63:9,20 63:25 64:3,14 64:18
**risky** 130:24
**rmr** 1:24 147:15
**rnns** 30:16
**robert** 4:22
**roehrick** 2:8 3:4 5:11,11 10:12 11:19 16:19 18:13,22 20:11,25 22:6 23:12 24:3,21 26:17,25 27:3 27:17 28:16 29:5 30:3 33:19,24 35:21 37:11 39:5 40:7,17 41:2 41:12,21 42:15 43:24 44:13,19 44:22 45:4,25 48:7 49:1,22 50:15 51:25 52:11 54:15 58:7 60:24 63:10 64:19 67:21 69:22 71:25 72:18 73:16 74:16 76:1 77:24 78:13 79:3,9 81:8 83:14 85:6 86:16 87:19 88:18 89:1 90:12 91:18 92:22 94:1,17 95:7 96:5,19 97:14 99:12 100:20 101:8,23 102:6 102:18 103:1 103:11 104:1 105:21 107:4 108:14 110:20 115:3,23 116:10 117:13 118:23,25 120:12,15 121:10 122:21 124:7 125:15 126:22 127:14 129:15 130:13 132:18 134:20 135:12 136:24 138:24 141:5 142:17,20 143:6,20 144:2 144:22 145:8 145:17 146:9 148:1
**role** 31:17,18
**room** 6:9
**rpr** 1:24
**rule** 27:24 73:4
**rules** 48:14 60:4 69:15,19 70:1,5,14 71:7 71:12,22,23,24 72:3,5,6,14,17 72:20 73:4,12 73:15,20,22 74:6 76:12,21
**run** 18:25 31:6 39:15 105:18 106:5 112:15 123:2 128:9 137:20
**running** 105:25 106:10,13,18 106:23 111:16
**runs** 76:15

**s**

**s** 2:1 3:6 90:23
**sacrifice** 141:19
**sacrificing** 93:12
**safe** 74:7,9,11 74:15 75:1,6,9
**sampling** 83:4 90:21
**satisfied** 106:21 123:19 127:20 130:4 141:11 141:13
**satisfy** 44:11 95:19
**savings** 107:24
**saw** 59:17 61:25

**saying** 34:2 55:3 99:17 131:6
**says** 17:18 43:6 43:16 54:18,24 59:3,7 69:18 76:7 79:10,12 80:9,25 88:6 90:17,18 91:25 92:4 93:8 94:4 95:12 97:21 115:6 121:7 122:23,25 123:8 126:14 126:19 135:16 139:9 141:7
**scale** 108:21,22
**scary** 22:1
**scenario** 44:1,2 47:9 52:15 53:22 56:14,16 57:6 130:23 131:7,24
**scenarios** 54:18 63:22 67:9 120:8
**science** 106:8 108:12 129:11
**sciences** 8:10
**scientist** 31:22 33:12
**scope** 21:1 24:3 27:18 35:15 46:1 48:8 52:12 63:10 68:11 76:2 85:7,23 86:16 88:19 89:1 90:13 91:19 92:23 94:2,18 96:20 102:7 103:2 115:4,23 121:10 122:21 129:16 132:16
**screen** 4:11 7:11 37:21
**second** 38:24 42:6,7,10,12,19 42:23,24 43:16 43:22 44:3,12 45:12,20,22 47:2,11 49:7 54:12,21,24 55:15 56:17 61:25 63:18,18 64:12,13 71:15 71:15,18 72:9 72:9,10,22,23 74:3 76:24 81:1 85:10 90:2 101:16 110:3 113:10 120:14 121:12
**secondary** 56:9 57:3,11,15
**section** 27:9 74:22 126:13 142:1
**secure** 60:23 106:2 119:7
**security** 42:14 43:1,4,8,15,21 44:6,11,20 45:24 47:4,13 47:20 48:25 51:24 52:10 53:21 54:14,20 54:22 55:1,17 56:3,19 58:6 59:1 61:21 63:9,20,25 64:3,14,18 68:20
**sedan** 133:4
**see** 10:11 11:18 16:12 18:2 22:19 27:11 28:23 35:7,10 36:22 37:15,20 38:1,22,25 40:4,11 56:16 58:2 62:10 65:8 68:5 69:23 70:5,7 71:9 81:22 85:16 86:10,23 89:25 90:6 93:20 98:20 100:12,13 105:12 113:8 113:15 120:24 122:16 125:7 128:25 142:10
**seeing** 7:11 33:24 36:18 44:14
**seem** 19:14,22 64:4 120:5
**seemingly** 119:14
**seems** 55:7 57:16,17 58:9 130:25
**seen** 4:10 24:23 26:10 34:8
**segregating** 74:6
**select** 83:24
**selects** 124:11
**self** 65:13
**semantically** 128:1
**sending** 56:8
**sense** 16:20 26:1 29:15 51:11 52:21 54:8,10 79:2 89:5 96:18 108:2 113:21 117:16 118:11 140:5,10,24
**sensitive** 42:13 42:20,25 43:3 43:7,14,17,20 44:5,10,19 45:13,23 46:5

46:7,11,13,19
47:4,7,7,11,12
47:16,19,22
48:24 49:12,15
49:20,21,25
50:12,13,22,22
50:24 51:14,16
51:18,23 52:3
52:9,23 53:15
53:21 54:8,13
54:25 55:5,16
55:22,23 56:2
56:10,19,24,25
57:1 58:5,13
59:1 60:22
61:6,21 62:4,7
62:11,15 63:9
63:19,24 64:14
64:17,22,23
65:4,17,18,20
66:5,10,14,15
66:20 67:2,4,7
67:8,15 68:3,7
68:12,16,21
74:6 75:5,8
**sensitivity** 54:2
**sent** 148:14
**sentence** 22:16
74:3 75:16,23
86:7,25 87:3
88:5 90:8,17
91:7,11 111:22
113:10 124:25
126:13,16,19
126:23 139:2
142:22
**sentences**
138:15
**seo** 88:9
**separate** 60:2
118:2
**separately** 42:1
**set** 30:14 33:11
74:5 77:23
80:5,11 81:15
91:15 92:6,11
93:3,4 96:9
97:22 100:9
108:7 110:17
113:7,11,11
114:12,14
115:7,18 116:5
120:20,21,22
120:22 121:2,5
121:6,8,11,13
121:14,23
122:1,3,4,11,13
122:13,18,19
122:25 123:5,8
123:9,10,12,16
123:18 124:5
125:3,4,4,10,12
125:18 126:6
126:15,20
127:1,2,4,6,10
127:12,17
128:5 130:11
132:15 136:9
137:20,23
139:7,10,21,22
139:24 140:8
**sets** 93:2,5
96:10 122:12
122:20 123:1,5
123:19 124:5
124:18 137:7
**setting** 135:6
**settings** 114:4
**several** 79:21
107:24
**severity** 140:11
**shakarian**
18:23
**share** 6:19 7:3
35:4 37:23
38:12 52:5
53:11 77:3
104:15
**sharing** 53:13
**sheet** 148:11
150:9
**short** 9:23 10:2
53:12
**shorthand** 1:19
41:1 147:7,24
**show** 61:4
**showing** 58:15
59:8 61:12
**shown** 119:11
**side** 28:11
137:24
**sift** 64:6
**sign** 143:7
146:12 148:12
**signature** 6:14
10:11,16
147:14 150:12
**signed** 10:18
148:19
**significant**
28:20 60:17
80:12 86:9,14
87:4 90:9
92:21 97:23
109:2
**similar** 34:13
100:8
**similarly** 13:17
102:3 126:18
**simple** 34:11
53:22 65:13
109:17 128:24
129:17
**simply** 40:19
65:15 73:12
99:25 133:1
**single** 54:21
57:5,7 82:13
123:13,16
133:10
**sit** 17:5,21
28:20 43:12
52:22 57:17
61:23 62:19
64:5 88:10

97:5 135:20
**site** 47:18 91:7 119:12
**sites** 46:14
**situation** 114:7
**size** 84:18
**skill** 46:18 55:14,24 56:7 66:8 68:15 79:18 80:19 87:21 102:10 126:10,25 136:15 137:14
**skilled** 111:9
**skysong** 1:4 2:11 4:16 5:12 10:5 12:2,12 12:24 13:2,14 14:5,24 15:6,9 16:1,8 20:23 22:18 23:3,25 143:20 148:4
**skysong's** 15:21 24:18,24
**slightly** 127:25
**slow** 36:21 61:16
**small** 10:24 33:10 86:9,13 87:7 90:9,24 93:9 133:10 137:24
**smaller** 127:12 135:10
**smiling** 53:12
**smoother** 84:10
**social** 47:19 56:3
**software** 30:9 31:3,9 76:17 105:10,14,15 106:6,25 107:2 107:6,7,11,15 108:16,17,20 110:18 112:9 113:1,2 118:7 128:5,18 130:11 131:5 133:9,12 136:14,16,17 136:17,22 137:2,13 141:12
**solution** 31:9 33:16,17
**solutions** 4:23 4:25 33:22 146:21 148:23
**solve** 110:19,22
**solved** 30:10 32:7
**somebody** 49:6 66:3 99:15 110:10,23 134:5,6,7 138:8 140:21 140:23
**somebody's** 31:22 134:4,5 134:6
**soon** 20:19 143:5
**sorry** 7:16 11:19 12:13 15:14 18:20 20:21 27:1,17 27:20,25 28:2 29:6 33:19 36:20 37:25 40:8 42:17 52:16 67:21 70:11 72:2,10 75:12,19 80:14 83:19,19 86:2 93:3 94:11 95:8,24 97:2 101:1,2,19 107:2 118:24 121:11,18,25 124:17 126:3 128:22 142:3 142:18 144:15 145:6
**sort** 20:10 32:9 34:15 50:13 52:14 58:9 111:10 118:19 119:14,24 129:11 130:22
**sorts** 130:10
**soso.com.** 62:1 62:19
**sound** 18:15,19
**sounded** 18:21
**sounds** 15:12 55:3,18
**source** 33:5 74:11,15 75:1 75:6,9
**sources** 26:1 74:7,10
**spanned** 24:14
**spans** 107:16
**speak** 15:6 106:22 144:21
**speaker** 8:12
**speaking** 90:10 91:13 93:16 123:22 142:6 142:24
**spec** 58:19 59:2 59:10 86:20 99:20
**specific** 32:21 43:14 44:1 45:14 46:19 49:17 57:18 61:3 66:11 91:9 115:16 117:22
**specifically** 12:14 19:1 34:10 58:13 60:16 78:4

91:10 92:25 95:10 99:21 134:22
**specification** 39:8,11 45:2 45:19 48:10,20 55:8 60:21 61:2 64:6,7 87:9,18 99:10 102:9,15 121:16 127:18
**specifics** 62:15
**specified** 44:2 60:13
**specifies** 136:14
**specify** 17:19 61:3
**specifying** 52:19
**spectrum** 108:1
**speculate** 14:8
**speculation** 18:14 23:13 49:2
**speed** 58:18
**spell** 114:13 117:3
**spend** 78:20
**spent** 12:11,23 13:1,9,22 108:18,18
**spin** 60:11
**split** 37:16
**spoke** 71:24 118:24 142:18 144:15
**spoken** 18:5 22:2,8
**spot** 55:3,12 116:3,12,19 117:12
**spots** 118:17
**spread** 14:2
**standards** 14:18 68:3
**start** 75:21 89:22 114:5 115:14 136:5
**started** 20:6 30:10 53:25
**starters** 58:8 92:16
**starting** 70:24 100:15 126:14 127:18 141:23
**starts** 16:14 37:12 38:18 69:24 70:6 75:13 120:19 139:8
**state** 5:4,6 6:3 65:12 66:23 102:24 127:25
**statement** 22:23 35:12 139:5
**statement1** 3:11
**statements** 33:13 53:18
**states** 1:1 4:18 47:25 85:11 124:9 142:23
**stating** 125:9
**step** 12:21 71:6 96:16
**steps** 71:6
**sticking** 69:10
**storage** 71:4
**stored** 75:6
**storing** 71:4
**straightforward** 64:9
**strategically** 116:21
**strategy** 130:24
**street** 2:9
**strict** 133:24
**strictly** 106:4 123:22
**strike** 12:24 23:23 39:2 48:3 63:4 85:2 88:22 96:1 97:10
**strikes** 130:24
**struggling** 95:8
**student** 30:17
**students** 20:3 53:13 144:20
**studying** 84:22 119:13
**stuff** 47:21
**sub** 90:21 124:6
**subapplication** 137:16
**subscribed** 150:16
**subscript** 123:25
**subsection** 17:1
**subsequent** 83:11 90:5,15 90:20 93:19,25 94:5,8,16 95:14,17 96:17 96:22
**subsequently** 139:5
**subset** 35:23 36:2 121:14 122:2 123:12 127:5
**subsets** 123:12 130:17,19,21
**substance** 150:8
**substantive** 10:23,25 11:8 14:14
**substituted** 81:12

**subsystem** 115:8 134:5,6
**successful** 106:2
**sufficient** 32:25 142:8
**suggest** 87:5
**suggested** 16:1 32:2
**suggesting** 16:3
**suggestion** 89:9
**suggests** 93:11
**suit** 22:4 25:9
**suite** 2:9 108:3 108:5,6
**summarization** 125:19
**summarizes** 91:24
**summarizing** 73:22
**summary** 73:12 100:6
**sun** 88:9
**supervision** 147:8,24
**support** 109:13
**supported** 46:7 112:16
**supports** 46:4
**suppose** 130:22
**supposed** 27:23 36:17 111:16 113:3 118:14
**sure** 9:11 25:1 25:10 26:6 27:16 29:10 30:4 34:10 35:14 36:1,17 39:20 41:15,17 52:1 60:1 64:6 69:2 73:11 75:18 103:23 111:21 112:2 121:18 130:2 137:1 143:8
**surprised** 23:19
**surreptitiously** 51:2
**surrounding** 45:1 110:8
**suv** 133:5
**switch** 141:21
**sworn** 5:23 147:5 150:16
**synonyms** 118:14
**system** 59:18 60:10 106:10 106:13,18 107:18,25 108:1 109:1,13 109:14 110:6,7 111:5,15 112:6 112:7,8,12,15 112:25 113:24 113:25 114:3,6 114:8 115:9,10 116:3,4,12,13 116:18,23 118:7 119:3,7 119:15,18,22 119:25 120:21 120:23 121:15 121:24 122:3 123:1,3,9,15,17 123:23,24 124:4,10,11,15 125:6,13 127:7 127:13,21,23 128:7,10,12,15 129:24 130:4,9 130:15 131:2,5 132:1,4 133:11 133:11,20 134:7,11,13,14 135:4,16 137:4 137:4 138:1,4 138:7,16 139:14,17,22 139:23,25 140:1,4,12,14 140:16,20,22 141:3,8,14,18 141:22 142:8 142:15 143:1
**systems** 107:2,6 107:19 108:2 109:3,8,11 110:23 111:23 112:6,11,18,19 114:2 118:18 119:14 130:23 133:16,17,18 135:2

**t**

**t** 3:6 147:1,1 149:2
**table** 58:15 59:8,15 60:15 61:17,19
**tagged** 60:8
**tail** 82:15
**take** 4:12 7:18 12:21 21:10 31:22 68:25 82:11 98:11 103:22 104:4 131:24 142:7 142:14,25 143:4
**taken** 4:15 15:9 38:6 39:23 69:5 104:10 143:11 147:3
**takes** 102:20
**talk** 44:21 83:17 89:10 100:24 106:6 141:21 142:16 144:13
**talked** 107:22 128:19

**talking** 41:14 50:17,17 79:19 87:12 107:12 123:23 136:5
**talks** 28:6 86:25 93:1 114:2 139:6
**tangent** 71:5
**tangible** 71:4
**task** 133:14
**taught** 43:9 60:10 61:5,7 123:21 128:16
**teaches** 32:17 50:2 51:6 89:23 100:7 117:24 139:6
**teachings** 61:12
**team** 140:1
**tear** 110:12
**tech** 7:21 38:2
**technical** 12:6 19:12,16 33:4 132:12
**technically** 48:9 69:25
**technique** 30:7 30:14 32:17 49:7 61:4
**techniques** 30:14 87:11 88:1,15,24 89:24 119:15
**technology** 4:22 26:20 31:10 32:16,18 34:7,9,13 68:3 112:13
**tell** 9:4,12 24:25 31:15 61:19,22 72:16 88:10 147:5
**tend** 19:11 23:20 107:14
**term** 39:8 41:24 49:25 50:23 64:17 65:11,12 68:8 69:25 70:4,7 70:17,19 72:4 73:14 77:15 78:2 81:13 91:13 98:6,20 99:4 100:22 101:5 102:8 103:19 105:10 115:2,21 121:2 125:2,10,14,22 126:6,12,12 127:10 132:15 137:9 140:2 141:22 142:5 142:13,24
**terminology** 135:18 136:4
**terms** 10:25 14:13 15:17 16:5 35:15,22 35:23 36:2,9 36:11 37:5 39:11 44:16,17 44:19 45:3 69:14 82:8 85:1 93:2 103:18 117:16 133:2 134:10 134:12
**testified** 5:24
**testifies** 20:12
**testifying** 144:11
**testimony** 9:15 146:19 147:2,6 147:10 148:9 148:17
**testing** 108:17
**texas** 1:2 4:19 27:22
**text** 53:4 65:9 114:18,22 115:11,14,16 117:2,2,6 129:19
**texted** 57:15
**thank** 7:20 9:17 12:20 15:19 19:19 38:16 40:14 58:1 106:24 120:15 138:15 143:15 143:17 146:9 146:14,15
**thanks** 21:25 42:5 69:9 104:14
**theoretically** 119:23
**theory** 83:8 119:17
**thereof** 147:13
**thing** 6:12 38:22 64:10 106:20 110:17 111:7 115:17 118:20 120:3 134:1
**things** 8:13 17:17 32:6,10 39:12 40:22 46:8 47:19 50:25 52:13 53:8,24 54:18 56:4,14 58:13 58:17,21 59:20 68:20 71:5 79:1 81:19 83:12 99:5 107:25 109:23 118:21 119:24 120:1,5 131:19 132:6,13 133:6 134:8,9
**think** 10:23 14:18,21 17:11 17:22 21:24

26:5 27:21 28:18,23 34:18 36:2 37:13 39:18 44:6 45:9 47:1 48:9 49:13 51:12 52:4 61:24 62:1 64:4 65:2 65:6 66:24 67:6,12 68:22 68:25 74:23 78:17 85:13,16 91:21,24 94:19 96:23 98:22 106:15,20 108:11 111:25 112:5,7,18,21 119:3 120:19 126:24 128:20 129:9 130:14 130:14 135:1,2 139:1 143:3 144:8
**third** 105:10
**thirds** 38:18
**thought** 13:9
**threaded** 76:9 76:15
**three** 89:3 125:20 130:16 139:8
**thresholds** 33:7
**thrown** 89:13
**thursday** 10:1
**tightly** 120:1
**time** 4:5,5 5:4 12:11,22,23 13:1,21 16:4 21:19,21 25:25 28:22 56:6 61:8 78:20 83:10 88:14,23 98:10,11 104:2 108:19 109:25 137:21 141:15 143:15 146:14 147:3 148:18
**timeframe** 148:8
**times** 9:3,10 36:19 59:4 98:3 129:20 146:8
**timing** 103:25
**today** 4:6 5:19 6:7 8:23 9:15 9:19 16:24 25:24 55:10 63:14 86:22 97:8 143:15 145:14
**today's** 23:16 26:13 146:19
**together** 110:9 111:1 120:2 122:14 133:18
**told** 22:24
**tolerate** 113:23
**took** 14:1 21:18
**tool** 142:6,14 142:25
**top** 20:1,9 37:17,23 70:10 72:14 99:3 128:1,3 131:3 142:4
**total** 14:5 91:2 146:20
**totality** 17:13 57:1
**touch** 118:10
**towards** 125:1 127:19
**tracer** 58:10,16 59:4,9,14,15,18 60:6,9,17 61:4 61:16
**tracks** 76:10,19
**transcribed** 147:8
**transcript** 147:21 148:6 148:19
**transcription** 147:9 150:5
**transformer** 30:24 34:16
**transitory** 71:3
**trickier** 133:7
**tried** 109:19
**trivial** 109:17 111:17
**true** 22:1 32:5 119:6 123:5,5 132:14 147:10
**truth** 9:12 147:5,5,6
**truthful** 9:15
**try** 12:24 18:19 41:17 48:3 66:12 79:4 80:3 85:2 95:24 101:19 128:24
**trying** 26:3,6 32:9 33:23 34:6 58:20 74:13 78:3 80:14 95:2 108:19,23 123:6 131:8 133:17 138:8 141:12
**tuesday** 1:13 4:1
**turn** 16:11 22:13 26:23 37:9 38:17 57:20 69:11 73:8 77:18 86:3 89:19 100:3 105:6 124:21

**turning** 10:10 48:4 75:12
**turns** 119:10
**twice** 8:4
**two** 14:6 15:17 25:3 26:1 28:2 37:17 38:18 46:10 51:8 53:19 57:12 64:11 65:6 71:5 79:15 89:3 98:2,13 103:22 110:3 110:25 111:1 117:15 118:10 125:23 129:13
**type** 31:23 32:24 33:18 71:14,16 72:8 72:10,22,23 73:1 81:10,12 83:22 119:25 146:4
**types** 29:11,20 30:1,11 34:19 39:9 79:15,20 86:15 98:15 102:11 119:12 131:3,17
**typically** 8:4 12:5 24:15 32:21 82:15 108:21 112:10
**typos** 10:24 11:2,7

**u**

**u.s.** 36:25 74:19
**ultimately** 32:12 98:17 123:13
**unchanged** 14:22
**unclear** 45:10
**under** 8:23 9:12 31:25 32:4,12 47:8 84:13 147:8,23
**undergraduate** 20:20
**underpinned** 30:23
**understand** 8:23 9:11 15:11,18 20:22 25:10 26:6 33:23 34:7 35:15 46:18 47:14 51:1 54:3 55:25 58:22 64:20,25 66:9 68:16 73:11 74:14 78:8,23 79:25 80:15,19,21 81:25 87:22 94:20 97:2 98:18 102:11 102:17,19 108:23 111:21 125:2,11 126:11,11,12 127:1 128:4 139:3,13 140:15 142:9 145:12,15
**understanding** 21:3 22:22 23:8 24:12 25:11,20 51:5 62:17 89:2 94:23 95:9 134:4 137:18
**understood** 50:1 51:19 106:24 137:14
**unduly** 65:14
**uniform** 40:5
**unimpeded** 84:25
**unit** 4:14
**united** 1:1 4:18
**universe** 134:14
**universities** 23:20
**university** 52:3 52:5,20 53:10 53:12,18
**unpack** 28:25
**unplug** 119:7
**unsolvable** 111:18
**unusual** 107:7
**update** 8:4
**updated** 7:25 8:2
**updates** 109:8
**updating** 82:23
**url** 44:9 45:11 50:5,12 51:22 52:8,19 53:20 54:21 60:13
**urls** 40:6,16,21 40:25 41:5,10 41:20,23 42:2 42:7,10,11,23 42:23,24 43:3 43:20 44:4 45:12 49:10 51:9 54:13 57:5,7 58:2,12 58:17,25 60:21 60:25 61:20 63:8,17,18 64:11,13
**usage** 119:14
**usbank.com** 40:23 56:9,21 57:9
**usc** 52:8
**use** 7:6 31:13 31:13 33:5,6 33:15,17 34:14

34:15 46:23 56:8,21 60:5,9 60:16 73:4 90:9 110:4 112:5,12 128:25 136:4 144:17,23,25 145:2,6,9 146:6
**used** 16:24 32:2 32:21 34:21 48:15,17 58:17 59:18 73:5 81:6,11 82:19 91:2 98:6 99:4 115:2,22 117:21 119:5 121:23 129:20 135:14 144:12 146:20 148:19
**user** 49:8,9,19 50:12,17,19,21 50:23,24 51:10 51:11 54:19 56:21 57:2,9 57:11,14 62:8 62:10 63:2 74:6 75:2
**users** 46:6 50:2 51:1,4,7 53:19 62:10 109:6
**uses** 31:9 32:18 49:6 56:21
**using** 4:22 31:24 32:19 39:8 42:2 60:7 61:15 62:8 86:13 90:24 92:8,10,19 114:11 115:21 131:12 135:18
**uspto** 25:13,21
**utility** 57:13
**utilizes** 74:5
**utilizing** 71:2

**v**

**v** 1:6 121:23 122:2,2 148:4
**vacuum** 31:12 34:17 44:6 118:1 133:21
**vague** 18:19 26:17 27:18 110:20 144:14
**vaguely** 18:16 18:21 20:10
**valid** 25:12,16 25:21 26:2
**validity** 24:14 25:8,18
**value** 77:22 80:5,11 81:14 83:24 84:6 91:15 93:3,4,5 93:8,19 94:5 94:13 96:9,17 97:22
**values** 59:15 84:17 90:23 92:9
**variant** 129:25
**variety** 23:20 29:11,20 31:1 95:20 131:13 144:25 145:5 146:6
**various** 8:13 28:10 32:5 60:4 66:2 82:23 108:24 108:24 119:18
**vary** 12:7 130:21
**vast** 9:7
**vector** 82:12,13
**vehicles** 133:6
**verify** 148:9
**veritext** 4:23,25 146:21 148:14 148:23
**veritext.com.** 148:15
**vernacular** 112:10
**versed** 54:6
**version** 7:25 114:11
**versus** 16:2 49:20 50:2,24 65:20 131:24 132:25
**viable** 131:7
**video** 4:11,14 83:12 143:18 146:16
**videographer** 2:15 4:4,24 5:15 38:4,8 39:17,21,25 69:3,7 104:8 104:12 143:9 143:13,18 146:16
**videotaped** 1:17
**view** 35:5 50:12 50:13 64:22 78:11,24
**viewing** 7:2,17
**virtual** 4:22
**virtually** 4:8
**virus** 120:3
**vision** 88:7
**visually** 135:3
**voice** 110:3
**vs** 4:17
**vulnerabilities** 113:11,13,21 113:22 114:5 114:13,14,20 114:21 115:6,7 117:22 118:18 119:4 120:21 121:14,15,24

122:3,5,6,14 123:10 124:11 125:5,12 127:5 127:6 128:14 137:22 138:18 138:19,22 139:11,17,19 139:20 140:12
**vulnerability** 115:21,22 116:2,9,11,16 117:11,11 118:2,6,6,11 131:5 142:8,15 143:1
**vulnerable** 119:19 128:11

**w**

**waiting** 28:2
**walk** 140:19
**want** 14:8 31:25 33:4,13 34:4 35:14 38:1 41:24 44:24 49:4 52:19 65:4 66:19,22 98:9 98:11 115:11 116:15 126:3 128:24 143:6
**wants** 52:5 53:11
**washington** 2:10
**way** 7:7 23:3 32:1,19,20 37:20 38:19 41:1 43:4 45:15 46:24 48:19 52:17 55:6 57:24 58:24 61:7 63:14,15 64:5 69:25 73:21 78:16 80:3 84:21 87:20 88:13 96:24 99:6 106:7 107:17 108:19 116:16,17,17 116:19 117:7 117:19,23 118:11,13 119:7 135:18 141:19
**ways** 41:4 106:1 108:24 109:2,4,12 129:13 130:10
**we've** 6:19 45:21 68:24 87:12 91:13
**weak** 116:3,12 116:19 117:12 118:17
**web** 38:24,24 39:3 40:4,15 42:6,12,19,24 43:22 44:12 45:20,22 47:3 47:11 48:5 50:3 53:2,4,18 54:12,21,24 55:4,15,25 56:18 63:8,18 63:23 64:12 71:7,13,14 72:6,7,8,8,21 72:23 109:16 109:18 114:3
**website** 52:16 74:20 109:18
**wednesday** 10:1
**week** 10:3 13:11
**weeks** 14:2
**weight** 66:15 66:23 67:8 68:19
**weights** 82:23
**went** 20:19
**whichever** 137:16
**whittling** 141:17,17
**wi** 131:12
**width** 83:4
**wikipedia** 62:21
**wikipedia.org** 62:13 64:1
**wildly** 14:9
**willing** 141:18 141:19
**window** 7:3,18 77:7
**wired** 131:24
**wireless** 131:25
**witness** 4:10 5:14,17 7:1 10:15 11:22 16:20 18:15,23 20:13 21:3 22:8 23:14 24:9,23 26:19 27:6 28:17 29:6 30:4 34:8 35:7,22 36:5,6 36:17,22 37:15 38:3 39:6,7 40:10,18 41:3 41:13,22 42:16 43:25 45:7 46:2,3 48:9 49:3,24,25 50:16 52:1,13 54:17 57:24 58:8 59:10,12 59:13 60:25 63:11,12 64:20 67:24 68:10,11

69:2,23 70:9 70:10 72:19,20 73:18,19 74:17 76:5,6 77:5,9 78:1,2,15 79:10 80:7,8 81:10 83:15 85:8 86:17 87:20 89:2 90:14,15 91:20 91:21 92:24 94:3,19 95:8 96:7,21 97:15 99:14 100:22 101:10 102:1,8 102:19 103:3 103:12,23 104:7,19 105:23 107:6 108:16 110:22 112:5 113:19 113:20 115:5 115:24,25 116:11 117:15 117:18,19 118:24 119:2 120:16 121:11 122:22,23 124:9 125:17 126:7,8,23 127:16,17 129:17 130:14 132:19,21,22 134:21 135:13 136:11,12 137:1 139:1 141:7 142:18 142:22 143:17 144:15 145:5 145:12,23 146:15,22 147:11 148:8 148:10,12,18

**word** 31:22 73:4,5 78:11 78:25 79:6 108:4,6 114:12 115:12 117:4,6 127:11

**words** 45:22 79:4 103:5,13 129:13 139:9

**work** 11:16 12:1 18:4,10 19:1,6,7,8,14 20:6,9 22:4 23:4,24 24:20 25:2 26:6,14 30:7,13 31:1 50:24 84:12 108:17

**worked** 8:17 12:18 14:5 28:18 30:5 109:19

**working** 7:20 13:13 111:5,15 112:8 144:20

**works** 30:13 84:13

**world** 32:10,14 52:6 130:8

**world's** 134:4

**worries** 83:21

**worry** 109:1,3

**wrap** 143:4 145:18

**write** 14:11 68:2 73:11 89:23 100:6 113:10 125:1 138:16 142:4

**written** 43:5 63:15,16 64:5 103:3 112:14

**wrong** 81:16

**wrote** 16:4

**www.usc.edu.** 52:1

**x**

**x** 3:1,6 31:23 31:24 32:16,18 115:9 135:23

**y**

**yeah** 12:21 17:18 24:6 28:2 47:1 65:2 69:23 76:8 78:6 95:8,21 95:24 101:10 104:22 106:19 128:24 129:5

**year** 8:4,5 12:9 12:9

**years** 19:24 21:17,25 29:19 30:8 89:7 132:6

**yesterday** 9:25 10:3

**york** 2:4,4

**z**

**zeros** 84:17

**zoom** 37:23 74:25 90:16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.