# Exhibit H

**UNITED STATES PATENT AND TRADEMARK OFFICE**

---

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

---

CROWDSTRIKE, INC.,
Petitioner,

v.

SKYSONG INNOVATIONS, LLC,
Patent Owner.

---

PTAB Case No. IPR2025-01397
U. S. Patent No. 10,313,385 B2

---

**DECLARATION OF NENAD MEDVIDOVIC, PH. D., IN SUPPORT OF PATENT OWNER'S PRELIMINARY RESPONSE**

I, Dr. Nenad Medvidovic, under the penalty of perjury under the laws of the United States, declare that the following is true and correct based on the best of my ability.

Date: 19 November 2025 Signed: ______________________
Nenad Medvidovic, Ph.D.

# TABLE OF CONTENTS

I. QUALIFICATIONS ....... 6

II. BASES OF OPINIONS ....... 17

III. A PERSON OF ORDINARY SKILL IN THE ART ....... 18

IV. LEGAL FRAMEWORK ....... 19

A. Claim Construction ....... 19

B. Validity ....... 20

1. Anticipation ....... 21

2. Obviousness ....... 22

V. THE ’385 PATENT (EX1001) ....... 30

A. Technical Background ....... 30

B. Challenged Claims ....... 32

1. Claim 1 ....... 32

2. Claim 2 ....... 33

3. Claim 3 ....... 33

4. Claim 4 ....... 34

5. Claim 5 ....... 34

6. Claim 6 ....... 34

7. Claim 7 ....... 34

8. Claim 8 ....... 34

9. Claim 9 ....... 35

10. Claim 10 ....... 35

11. Claim 11 ....................................................................................35

12. Claim 12 ....................................................................................35

13. Claim 13 ....................................................................................36

14. Claim 14 ....................................................................................36

15. Claim 15 ....................................................................................36

16. Claim 16 ....................................................................................36

17. Claim 17 ....................................................................................37

C. Priority Dates ....................................................................................37

D. Prosecution History ....................................................................................38

VI. THE ASSERTED PRIOR ART ....................................................................................39

A. Vallone (EX1004) ....................................................................................39

B. Oberheide (EX1005) ....................................................................................40

C. Patsos (EX1006) ....................................................................................42

D. Roytman (EX1007) ....................................................................................43

E. Juels (EX1008) ....................................................................................43

F. Wolff (EX1009) ....................................................................................45

VII. CLAIM CONSTRUCTIONS ....................................................................................46

VIII. VALIDITY ANALYSIS ....................................................................................46

A. Ground 1: Obviousness in Light of Vallone ....................................................................................46

1. Claim 1 ....................................................................................46

2. Claim 8 ....................................................................................56

3. Claim 14 ....59

4. Claim 15 ....59

B. Ground 2: Obviousness in Light of Oberheide, Patsos, and Roytman ....61

1. Claim 1 ....61

2. Claim 8 ....67

3. Claim 14 ....70

4. Claim 15 ....70

5. Motivation To Combine ....72

C. Ground 3: Obviousness in Light of Oberheide, Patsos, Roytman, and Juels ....73

1. Claim 2 ....73

2. Claim 3 ....74

3. Claim 4 ....75

4. Claim 5 ....75

5. Claim 6 ....77

6. Claim 9 ....77

7. Claim 10 ....78

8. Claim 11 ....78

9. Claim 12 ....78

10. Claim 16 ....79

11. Claim 17 ....79

12. Motivation to Combine ....80

D. Ground 4: Obviousness in Light of Oberheide, Patsos, Roytman, and Wolff....80

1. Claim 7....80

2. Claim 13....81

3. Motivation to Combine....81

IX. CONCLUSION....81

1. I have been retained by KKD Law PLLC, as an independent technical expert in the *Inter Partes* Review between CrowdStrike, Inc. ("CrowdStrike") and Skysong Innovations, LLC ("Skysong") PTAB Case No. IPR2025-01397 involving U. S. Patent No. 10,313,385 ("'385 patent").

2. I am being compensated for my work as a technical expert at my customary rate. My compensation does not in any way depend on the outcome of this review, and I have no personal interest in the outcome of this review. My declaration is a technical analysis of the subject patent and the art cited by Petitioner. Nothing in my declaration is intended to offer any legal conclusion.

## I. QUALIFICATIONS

3. My qualifications as an expert are detailed in my curriculum vitae, which is attached as **Appendix A** to this report. Appendix A includes a list of all publications authored or co-authored by me in the previous 10 years.

4. A list of all other cases in which, during the previous four years, I testified as an expert at trial or by deposition, is provided as **Appendix B** to this report.

5. I received a Bachelor of Science degree in Computer Science, summa cum laude, from Arizona State University's Computer Science and Engineering department.

6. I received a Master of Science degree in Information and Computer Science from the University of California at Irvine's Information and Computer Science department.

7. I received a Doctor of Philosophy degree from the University of California at Irvine's Information and Computer Science department. My dissertation was entitled "Architecture-Based Specification-Time Software Evolution."

8. For over thirty years, my research has focused on software systems; their design, development, maintenance, and evolution; their individual building blocks and overall architectures; mechanisms for their implementation and deployment; and their critical properties, including security, trust, robustness, reliability, maintainability, etc.

9. My Ph. D. dissertation yielded a new design style for the development and evolution of highly distributed software systems built out of independent components that exchange different types of data encoded in messages to accomplish specific goals. This research focused on the design principles behind those systems, the appropriate support for modeling the systems (both at the level of individual modules as well as their integrations into subsystems and entire systems), and the infrastructure for their implementation, deployment, optimization, and long-term evolution. The techniques I developed relied on the novel notion of software connectors as loci of interaction in a system. Connectors are first-class architectural

building blocks, equivalent to functional components, and manage all aspects of interaction, spanning communication, data compression, encryption, integrity, coordination, distribution, etc. This architectural style and the tools I developed to support it were applied across a wide range of domains, from traditional distributed systems, to mobile devices and applications, to embedded systems and autonomous robots.

10. My work has been funded by US government agencies (e.g., the National Science Foundation, National Institutes of Health, Defense Advanced Research Projects Agency, NASA, and Department of Homeland Security) and industrial organizations (e.g., Boeing, IBM, Northrop Grumman, Xerox, Google, and Bosch).

11. I am employed by the University of Southern California ("USC") as a faculty member in the Computer Science Department and have been since January 1999. I am a tenured professor. Since July 2022, I have served as my Department's Chair. Between January 2009 and January 2013, I served as the Director of USC's Center for Systems and Software Engineering (USC-CSSE), a large research center that involved the work of a number of USC faculty, students, and staff as well as several dozen industry partners. Under my direction, USC-CSSE was involved in a range of cutting-edge projects for our industry partners, ranging from the Aerospace Corporation to Xerox. Between July 2011 and July 2015, I served as my Department's Associate Chair for Ph.D. Affairs. Between July 2021 and June 2022,

I served as my Department's Vice Chair for Tenure Affairs. In July 2025, I was named TRW Professor in Engineering and granted an endowed chair for my contributions to my university and the academic community.

12. In the mid-2000s, I worked with colleagues from NASA's Jet Propulsion Laboratory on designing the architecture of their OODT data grid system that was intended to provide the massive amounts of NASA's available planetary science data efficiently and securely to arbitrary numbers of users around the country. This work was jointly published at the 2006 International Conference on Software Engineering. Subsequently, I spearheaded a project at my university that extended OODT to make the data grid accessible to mobile devices.

13. Based on my experience and expertise in the area of software system architectures, and the success of the above project, in 2007 I was offered the position of Chief Software Engineer of the Transformational Satellite Communications System (TSAT) program. This was a $4 billion U.S. Department of Defense (DOD) program, sponsored by the U.S. Air Force. The program's charge was to build the satellite grid of the future. With my university's agreement, I was prepared to go on a multi-year leave-of-absence assignment until the TSAT project was operational. Unfortunately, the program's funding was cut before my involvement could begin.

14. I have created and/or taught undergraduate-, Master's-, and PhD-level courses in software engineering, software requirements, software architecture, and

embedded systems for many years. As part of these courses, I have developed and taught modules, and created and guided projects that exposed students to the interplay between software and traditional computing devices on one hand, and a wide range of physical equipment on the other hand, including sensors, RFID systems and their integration into item tagging applications, cameras, mobile robots, and wearable computing devices.

15. I co-authored "*Software Architecture: Foundations, Theory, and Practice*," a widely used textbook on software systems architecture initially published in 2009. The issues of security and trust are discussed throughout the book as guiding principles behind the design of modern software systems. Additionally, an entire chapter of the book is explicitly dedicated to this topic.

16. A critical aspect of all systems I have researched over the past three decades is system security. I have taught existing and developed new techniques for ensuring system security in distributed, mobile, and embedded settings. These techniques have spanned static program code analysis; dynamic monitoring, logging, simulation, emulation, and testing; and statistical analysis and algorithmic prediction based on historical data gathered both at the architectural/design and implementation levels.

17. In the early 2000s, I secured a grant from Intel Corp. which I used to equip a teaching laboratory with a variety of embeddable computing equipment. These are

non-traditional computing platforms, such as those listed above, that can be a part of devices used in everyday activities (e.g., "smart" cards, cameras, phones, clothing accessories, etc.). This laboratory was used as the foundation of a graduate-level course, Software Engineering for Embedded Systems, that I introduced soon thereafter and taught a number of times. This course covered a range of topics relevant to embedded systems, including efficient, reliable, and secure communication in networks of varying sizes and the challenges inherent therein. Every semester, my students had to complete a course project they selected from a range of real-world scenarios. These projects included real-time image tracking and recognition; incremental automated scene discovery and rendering; efficient and secure off-board data compression, storage, and access; and so on. Several of these projects grew into peer-reviewed publications and doctoral dissertations. Subsequent extensions of the projects from this course have been used externally, at NASA's Jet Propulsion Laboratory and Bosch Research and Technology Center.

18. In 2007, I published a technique that was subsequently patented, in which I showed how software computation can be accomplished in a highly distributed manner on a public network such that mathematically provable guarantees are provided that no compromised nodes can discover the involved algorithm or the data (beyond the jumble of the binary bits involved).

19. Some of my earliest work relating to artificial intelligence (AI) pertained to determining the optimal deployment of a software-intensive system on a set of hardware devices. This project took started around 2000, was initially published in 2002, and culminated in two highly cited publications in the IEEE Transactions on Software Engineering journal, in 2005 and 2011. Initial attempts at solving the problem by taking into account large numbers of competing system requirements and device capabilities involved traditional (e.g., greedy) and linear programming algorithms. Those proved adequate, but had limitations. My students and I quickly turned to AI and adopted a genetic algorithm, which we further tailored in a number of innovative ways to outperform state-of-the-art techniques in this area.

20. In the context of this work, my students and I explored a range of possible game-theoretic approaches for solving a version of the deployment problem where *decentralized* agents need to coordinate and cooperate on updating a system's deployment across a network of distributed hosts as network conditions change, but without the availability of a single entity that is aware of the entire network. To this end, we considered a range of game-theoretic strategies, including voting, market-based, and auctioning algorithms. For the purpose of our specific problem, we developed a novel auctioning algorithm that outperformed its competitors. This work was initially published in the International Working Conference on Component Deployment in 2005. We made several subsequent improvements to the algorithm,

including in a system described in a paper co-authored with an engineering team from Bosch Research and Technology Centers in the International Conference on Software Engineering in 2007. The culmination of this work was the comprehensive treatment of deployment optimization in the above mentioned 2011 publication in the IEEE Transactions on Software Engineering journal.

21. In the mid 2010s, my research further explored the emerging AI and machine learning (ML) algorithms as vehicles for predicting various aspects of a software system. Initially, my lab developed algorithms that were applied to the predicting appropriate architectural design decisions that can resolve the implementation problems reported about a system. Subsequently, my students and I developed a pair of techniques, published in 2017 and 2018 and patented soon thereafter, where we analyze communications on a mobile device, identify potentially vulnerable interactions, and use a combination of static code analysis, dynamic/runtime analysis, and AI/ML algorithms to predict likely upcoming user interactions with their device as a way of anticipating and blocking those interactions that may compromise the device's security.

22. My most recent work has focused on building a framework for evaluating AI/ML techniques—especially those relying on deep neural networks (DNNs)—that purport to pinpoint the sources of security vulnerabilities in software systems. My team's most recent publication on this topic, at the 2025 International Conference

on Software Engineering, presents a framework called VIPer, which identified key shortcomings in existing DNN-based vulnerability detectors by showing how they learn from spurious system features and can be "fooled" by amplifying such features in their training datasets. VIPer provides an alternative neural network-based solution that significantly outperforms the current state-of-the-art in detecting vulnerabilities in previously unseen software systems.

23. A significant portion of my professional activity centers on conducting research through advising Ph.D. students. I have graduated 21 Ph.D. students to date, and I advise seven students currently pursuing their Ph.D. My students have gone on to successful careers in top software companies (e.g., Google, NVIDIA, Intel, Snap), research institutes (e.g., NASA's Jet Propulsion Laboratory, Information Sciences Institute, Quandary Peak Research), and universities (e.g., University of Massachusetts, University of California, University of Edinburgh in the UK).

24. I served as Program Co-Chair for the flagship conference in my field—International Conference on Software Engineering ("ICSE")—held in May 2011. I have served as Chair or Co-Chair for various other conferences in the Software Engineering field, including: the Fifth Working Institute of Electrical and Electronics Engineers ("IEEE")/IFIP Conference on Software Architecture, the Third IEEE International Conference on Self-Adaptive and Self-Organizing Systems, the Fifteenth International Association for Computing Machinery's

("ACM") Special Interest Group on Software Engineering ("SIGSOFT") Symposium on Component Based Software Engineering, the IEEE/CSSE/ISE Workshop on Software Architecture Challenges for the 21st Century, and the Doctoral Symposia at the Sixteenth ACM SIGSOFT International Symposium on the Foundations of Software Engineering and at the 44th International Conference on Software Engineering.

25. I have served as an editor of several peer-reviewed journals, including IEEE Transactions on Software Engineering, ACM Transactions on Software Engineering and Methodology, Journal of Software Engineering for Robotics, Elsevier Information and Software Technology Journal, Journal of Systems and Software, Journal of Software Engineering Research and Development, and Springer Computing Journal. I have also served as a guest editor of several special issues for other journals. Between January 2018 and December 2022, I served as Editor-in-Chief of IEEE Transactions on Software Engineering ("TSE"), the flagship software engineering research journal.

26. Between September 2013 and September 2015, I served as Chair of the ICSE Steering Committee. Both before that (2008-2013) and subsequent to that (2015-present) I have been a member of the ICSE Steering committee. I am currently a member of the Steering Committee of the joint European Conference on Software Engineering and the Symposium on the Foundations of Software Engineering

("ESEC/FSE"). From July 2015 to September 2017, I chaired the Steering Committee of FSE, while it was a standalone symposium. I have served as a member of the Steering Committees of the Working IEEE/IFIP Conference on Software Architecture on two separate occasions, including presently.

27. Between July 2015 and June 2018, I served as Chair of the ACM SIGSOFT, the largest professional organization in my field. During the past year, I have chaired the committee in charge of ACM's Software System Award, one of the most important technical awards in my field.

28. I have served as editor of various books in the Software Engineering field, including Proceedings of the 3rd International Conference on Self-Adaptive and Self-Organizing Systems, Proceedings of the Warm-Up Workshop for the 32nd International Conference on Software Engineering, Proceedings of the 5th Working IEEE/IFIP Conference on Software Architecture, and 40 Editions of ICSE—the Ruby Anniversary Celebration.

29. I have authored or co-authored nearly 300 papers in the Software Engineering field. My work has been cited over 21,000 times. My most cited paper alone has been cited nearly 3,200 times; that paper recently received a Most Influential Paper Award from IEEE TSE. A paper I co-authored in the 1998 ICSE, my field's flagship conference, was given ten years later, in 2008, that conference's Most Influential Paper Award. Another of my publications received a Most

Influential Paper Award in 2020. Several of my other publications have received "best paper" or "most cited" awards.

30. My research frequently results in the development of software tools that accompany and demonstrate the published ideas. The above-mentioned paper describing a security-vulnerability detection and remediation tool for mobile (e.g., Android phone) devices built in my lab, won the Best Tool Paper award at the 2017 Automated Software Engineering Conference. That idea was subsequently awarded a US patent. I am a co-inventor on two additional issued patents in distributed systems design, implementation, deployment, and computer security.

31. I have been named a Distinguished Scientist of the ACM. I have been elected a Fellow of the IEEE. Fellow of the IEEE is IEEE's highest grade; less than 0.1% of its membership earns this grade each year.

## II. BASES OF OPINIONS

32. The basis and reasoning of my opinions include my education, training, and experience as an engineer, including my decades of experience in computer science. In conducting my analysis and forming my opinions, I have considered the materials listed below:

a. U.S. Patent No. 10,313,385 to Paulo Shakarian, *et al.*, filed Nov. 28, 2016, and issued on June 4, 2019 (EX1002), its provisional application No. 62/261,200, and its file history (EX1002);

b. CrowdStrike's petition (Paper 1, "Pet.") and any materials referenced therein relevant to my analysis; specifically including the declaration of Dr. Erez Zadok (EX1003, "Zadok");

c. U.S. Patent Application Publication No. 2016/0134653 to Vallone et al. (EX1004, "*Vallone*")

d. U.S. Patent Application Publication No. 2014/0245450 to Oberheide et al. (EX1005, "*Oberheide*")

e. Dimitrios Patsos et al., *Expanding Topological Vulnerability Analysis To Intrusion Detection Through The Incident Response Intelligence System, Information Management & Computer Security*, Vol. 18, No. 4, 291-309 (2010) (EX1006, "*Patsos*")

f. U.S. Patent Application Publication No. 2015/0237065 to Roytman et al. (EX1007, "*Roytman*")

g. U.S. Patent No. 9,471,777 to Juels et al. (EX1008, "*Juels*")

h. U.S. Patent Publication No. 2013/0198848 to Wolff (EX1009, "*Wolff*")

i. and any other materials referenced herein.

## III. A PERSON OF ORDINARY SKILL IN THE ART

33. My opinions in this declaration are based on the understanding of a Person of Ordinary Skill in the Art ("POSITA") at the time of the invention of the claims in the '385 patent.

34. In assessing the level of skill of a POSITA, I have considered the type of problems encountered in the art, the prior solutions to those problems found in the prior art references, the rapidity with which innovations are made, the sophistication of the technology, the level of education of active workers in the field, and my own experience working with those of skill in the art at the time of the invention.

35. In my opinion, a person of ordinary skill in the art at the time of the filing of the '385 patent would have at least a Bachelor's degree in CS, computer engineering, or cybersecurity, and 2–4 years of experience working in the field of software development, distributed systems, and cybersecurity. A graduate degree in CS, computer engineering, AI, cybersecurity, or software engineering may be substituted wholly or in part for work experience.

36. I am very familiar with this level of skill. Over my decades of experience, I have supervised and worked with engineers in this field having at least the level of skill identified above.

## IV. LEGAL FRAMEWORK

### *A. Claim Construction*

37. I understand that the words of a claim are generally given their ordinary and customary meaning, that is, the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.

38. I understand that a claim term that does not use the word "means" is presumed not to be a means-plus-function term. I understand that a term that does not use the word "means" would be construed as a means-plus-function term if it does not describe structure to a POSITA. Conversely, I understand that if a term describes structure to a POSITA, it is not a means-plus-function term.

39. I understand that a patent has several components, including an abstract, drawings, a written description detailing different embodiments of the invention (*i.e.*, the specification), and numbered claims at the end of the patent. It is the numbered claims that define metes and bounds of the properties that the patentee has the right to exclude other from infringing.

### *B. Validity*

40. I understand that a patent, once issued or granted, is entitled to a presumption of validity. However, this presumption can be overcome by clear and convincing evidence to the contrary. Validity is routinely challenged post-issuance, and courts often invalidate the patent, on the ground that the patent fails to meet one or more statutory requirements, *e.g.*, by claiming a non-patentable subject matter, such as an abstract idea, in violation of 35 U.S.C. § 101; by being not novel and anticipated by prior art under § 102; by being obvious in view of prior art under § 103; and/or lacking sufficient disclosures or being indefinite, in violation of § 112.

41. I understand that the presumption of validity does not apply before the PTAB.

### 1. Anticipation

42. I understand that section 102 first defines "prior art" that would anticipate and, thus, invalidate the patent. The term "prior art" is a patent term of art for the technology that was known or used before the priority date of the patent, which is the filing date of the patent application. However, I understand that, to the extent a provisional patent application properly discloses and supports the claimed subject matter, the priority date of the claims is the filing date of the provisional application, which is considered the invention date. Thus, if the subject matter of the invention was already patented or described in a printed publication anywhere in the world before the invention claimed in the patent, such prior art would invalidate the patent.

43. Anticipation is a technical defense. A patent claim is anticipated and therefore invalid under 35 U.S.C. §102, only if: a single prior art reference discloses, either expressly or inherently, each and every element of the claimed invention arranged exactly as they are arranged in the claim. If even a single element or step recited by the claim is not disclosed in exactly the same way, arranged as in the claim, there is no anticipation. In addition, the reference must enable one of skill in the art to practice an embodiment of the claimed invention without undue experimentation.

44. For an element to be present in a reference through inherency, the evidence must be clear and convincing that the missing element is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill. That means that inherency cannot be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient. If, however, the disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, that disclosure could be inherent.

45. I understand that CrowdStrike does not argue that any prior art anticipates the '385 patent.

**2. Obviousness**

46. I understand that § 103 is broader than § 102 in a sense that § 103 forbids issuance of a patent even if the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

47. I understand that to measure obviousness under § 103, a court determines the scope and content of the prior art, ascertains differences between the prior art and the claims at issue, and resolves the level of ordinary skill in the pertinent art. I

understand that secondary considerations such as commercial success, long felt but unsolved needs, failure of others might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

48. It is my understanding that the information that is used to evaluate whether an invention is new and not obvious is generally referred to as "prior art." Prior art generally includes U.S. and foreign patents and U.S. and foreign printed publications (*e.g.*, published patent applications (before issued as a patent), books, journal publications, presentation files, posters, articles on websites, product manuals, etc.) that existed before the earliest filing date (the "effective filing date") of the claims in the patent. A patent will be prior art if it was filed before the effective filing date of the claimed invention, while a printed publication will be prior art if it was publicly available before that date.

49. I understand that, in addition to the patents and printed publications, a product used in public or on sale in the U.S. more than one year prior to the effective filing date of a patent can be prior art to that patent. I understand that a product is considered "on sale" when (i) the product embodying the invention is offered for commercial sale, and (ii) the invention was ready for patenting. An invention is shown to be "ready for patenting" when there is proof of a reduction to practice or proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled

in the art to practice the invention. I understand that CrowdStrike does not assert a product as prior art.

50. It is my understanding that a claimed invention is not patentable if it would have been obvious to a person of ordinary skill in the field of the invention at the time the invention was made, and that the burden of establishing obviousness rests with the challenger and must be supported by clear and convincing evidence.

51. It is my understanding that the following standards govern the determination of whether a claim in a patent is obvious. I have applied these standards in my evaluation, recognizing that obviousness determinations must be based on a careful evidence-based analysis rather than general assertions or hindsight reasoning.

52. It is my understanding that, to find a claim in a patent obvious, one must make certain findings regarding the claimed invention and the prior art. Specifically, the obviousness question requires consideration of four factors (although not necessarily in order):

a. the scope and content of the prior art;

b. the differences between the prior art and the claims at issue;

c. the knowledge of a person of ordinary skill in the pertinent art; and

d. objective factors that may indicate non-obviousness, which must be given meaningful weight rather than treated as secondary or optional considerations.

53. It is my understanding that the obviousness inquiry should not be done in hindsight, but must be done using the perspective of a person of ordinary skill in the relevant art as of the effective filing date of the patent claim. This includes avoiding reconstruction of the invention with knowledge of the patent in hand, and avoiding attributing to the prior art recognition of the very problem solved by the invention.

54. It is my understanding that the obviousness inquiry may also consider certain objective indicia of non-obviousness, which serve as a critical safeguard against hindsight. Such objective factors indicating non-obviousness may include: commercial success of products covered by the patent claims; a long-felt need for the invention; failed attempts by others to make the invention; copying of the invention by others in the field; unexpected results achieved by the invention; praise of the invention by the infringer or others in the field; the taking of licenses under the patent by others; expressions of surprise by experts and those skilled in the art at the making of the invention; and the patentee proceeded contrary to the accepted wisdom of the prior art. These considerations are not merely supplemental, but can be dispositive.

55. It is my understanding that the fact finder must determine whether potential evidence of such objective considerations is relevant. With respect to evidence offered for each objective consideration, the fact finders must ascertain whether there is a nexus between the claimed invention and the evidence establishing the objective consideration and determine its probative value. Where such a nexus is present, the evidence must be given substantial weight in favor of non-obviousness.

56. I understand that the obviousness analysis requires a comparison of the properly construed claim language to the prior art on a limitation-by-limitation basis. The analysis may not rely on broad generalizations or assumptions about what a person of ordinary skill might have done. Only if a person of ordinary skill in the art can implement the claimed invention as a predictable variation of a known invention without undue experimentation and with a clear motivation grounded in the prior art may a claim be considered obvious. Also, "hindsight" reconstruction cannot be used to combine references together to reach a conclusion of obviousness.

57. It is my understanding that exemplary rationales that may support a conclusion of obviousness include:

a. combining prior art elements according to known methods to yield predictable results;

b. simple substitution of one known element for another to obtain predictable results;

c. use of known techniques to improve similar devices (methods or products) in the same way;

d. applying a known technique to a known device (method or product) ready for improvement to yield predictable results;

e. "obvious to try," *i.e.*, choosing from a finite number of identified, predictable solutions but only where there is a demonstrable and reasonable expectation of success at the time;

f. known work in one field may prompt variations for use in another field only where such variations would have been reasonably predictable and supported by the record; and

g. some teaching, suggestion, or motivation in the prior art that is contemporaneous and specific rather than assumed through hindsight.

58. Thus, I understand that a reference may be relied upon for all that it teaches, including uses beyond its primary purpose. However, where a reference teaches away, i.e., discourages or criticizes the path taken by the invention, such teachings must be given meaningful weight. The mere disclosure of alternative designs does not teach away, but explicit indications that a path would be undesirable, inferior, or impractical strongly weigh against obviousness.

59. I understand that a claim might be obvious over a single reference; however, such an argument requires that the reference clearly and fully provide the

missing teachings or that such teachings would have been immediately apparent to a person of ordinary skill without inventive insight, not based on generalized knowledge or hindsight interpretation.

60. An obviousness evaluation can also be based on a combination of multiple prior art references. However, a specific and articulated rationale must exist to justify such a combination, and the motivation must be grounded in the prior art itself, not reconstructed from the claim. I further understand that, although market demand may influence innovation, it cannot substitute for a teaching, suggestion, or motivation in the prior art.

61. I understand that a proper obviousness analysis must recognize that innovation often results from insight that was neither expected nor recognizable from merely assembling known pieces in the prior art. A person of ordinary skill in the art must be considered without the benefit of hindsight, and thus cannot be assumed to have known the solution or outcome in advance. Therefore, any alleged combination of prior art must be shown to have been clearly supported and reasonably suggested by the prior art itself at the relevant time, and not inferred only after knowledge of the invention's success.

62. I understand that the concept of "obvious to try" applies only in rare circumstances, and only where the possible options were finite, predictable, and accompanied by a reasonable expectation of success. If experimentation, insight, or

creativity were required to arrive at the claimed invention, the invention is not obvious.

63. It is my understanding that combining familiar elements using known methods does not render a claim obvious where the result yields new, unexpected, or improved properties or solves a previously unrecognized problem. Obviousness requires predictability, and the absence of such predictability strongly indicates non-obviousness.

64. I understand that when a patent arranges known elements, the question is whether the arrangement yields more than predictable results and reflects inventive judgment. The analysis focuses on what was known or knowable to a person of ordinary skill at the time, and whether the problem addressed was recognized and appreciated in the prior art, not merely whether solutions appear straightforward after the fact.

65. In sum, it is my understanding that prior art teachings may be combined only where the record demonstrates that a person of ordinary skill, without hindsight and based on contemporaneous knowledge, would have been motivated to do so with a reasonable expectation of success. Where such evidence is lacking, or where hindsight reconstruction is required, obviousness may not be found.

## V. THE '385 PATENT (EX1001)

### *A. Technical Background*

66. My below discussion pertains to the state of the art at the time of the invention of the '385 patent unless specifically indicated otherwise.

67. The '385 patent teaches various system and methods for a data-driven security game framework that models an attacker based on exploit market data actively mined from the darknet to develop strategies for the defender. '385 patent at abstract.

68. Generally, the '385 patent notes that "given a system configuration (or a distribution of system configurations within an organization), the present disclosure models an attacker who, given a budget, will purchase exploits to maximize his level of access to the target system." '385 patent at 2:63–66. "Likewise, a defender will look to adjust system configurations in an effort to minimize the effectiveness of an attacker while ensuring that necessary software dependencies are satisfied." '385 patent at 2:67–3:3.

69. Based on this intuitive insight, the '385 patent addresses what exploits an attacker will likely use and what software in the organization poses the biggest threat. '385 patent at 1:45–49. To achieve these objectives, the '385 patent discloses a "game theoretic approach to host-based defense where the activities of the attacker are informed from an 'un-conventional' source (information not directly related to

the defender's system)—specifically, information from darknet markets. '385 patent at 2:26–31 and 3:6–7.

70. To accomplish this objective, the '385 patent discloses " a security game where the attacker **102** is a malicious hacker with access to a darknet exploit markets **104** and the defender **106** is tasked with host-based defense." *Id.* at 3:16–19. In this framework, "the notation V is used [] to represent the entire set of vulnerabilities within a given computer system." *Id*. at 3:20–22.

71. The '385 patent further teaches that "in a real-world organization, system administrators are not able to patch all vulnerabilities for a variety of reasons. Software dependencies, use of legacy systems, and non-availability of patches are some examples." *Id.* at 3:25–29.

72. To model this, a 'constraint set' (denoted C) is defined as a subset of V." *Id.* at 3:29–30. This constraint set is the set of vulnerabilities that cannot be avoided, because avoiding these vulnerabilities would limit the functionality of the computer network below acceptable levels. *Id.* at 3:30–32 ("The vulnerabilities in a constraint set represent the vulnerabilities required for some system functionality.").

73. The '385 patent then defines "C" as the "set of all possible constraint sets." *Id.* at 3:36–37. "Each constraint set in $C_i$, represents a set of vulnerabilities that together will provide complete functionality of application i." *id.* at 3:39–41. If "at least one constraint set in $C_i$ is satisfied, application i will properly operate on the

system." *Id.* at 3:43–45. Therefore, since "C is the set of all application constraint sets for a given system configuration", it "represents all of the applications to be run on the system." *Id*. at 3:45–47. "In this framework, for a given system, a system administrator selects which vulnerabilities may be present in order to allow each application i to function." *Id.* at 3:47–50. The '385 patent teaches how the system administrator can then choose the proper constraint set that minimizes the vulnerabilities that are most likely to be attacked, by comparing the possible vulnerability constraint sets to the vulnerabilities associated with the set of exploits determined to be most likely used in an attack.

74. In summary, the '385 patent teaches a highly innovative method of allowing a computer administrator to configure a computer system to be protected in such a way that the set of vulnerabilities exposed by the computer system has the least possible overlap with the set of vulnerabilities that an attacker is most likely to exploit.

### *B. Challenged Claims*

75. CrowdStrike's Petition challenges all claims (1–17) of the of the '385 patent. Of these, claims 1, 8, and 15 are independent.

#### 1. Claim 1

**Claim 1.** A system for protecting a computer system from attack, the system comprising:

**a.** a network connection;

**b.** a processing device; and

**c.** a non-transitory computer-readable medium connected to the processing device configured to store instructions that, when executed by the processing device, performs the operations of:

**d.** accessing data through the network connection, the data comprising dark net information associated with exploits of a computer system, comprising:

**e.** obtaining a set of exploits from the dark net information, the set of exploits configured to penetrate the computer system;

**f.** applying an exploit function which takes the set of exploits as input and returns a set of vulnerabilities;

**g.** creating a constraint set of the computer system from the set of vulnerabilities, the constraint set comprising a minimum set of dependencies to operate the computer system;

**h.** applying the set of exploits to the constraint set of the computer system;

**i.** analyzing the application of the set of exploits on the computer system to detect a particular vulnerability of the computer system; and

**j.** altering a configuration of the computer system in response to the analysis of the application of the set of exploits to reduce potential damage of a cyberattack.

**2. Claim 2**

**Claim 2**. The system of claim 1, wherein analyzing the application of the set of exploits on the computer system comprises quantifying a risk level posed to the computer system related to a cost to obtain the set of exploits.

**3. Claim 3**

**Claim 3**. The system of claim 2, wherein the processing device further performs the operation of:

aligning internet data with the constraint set of vulnerabilities based on information obtained about the set of exploits.

### 4. Claim 4

**Claim 4**. The system of claim 3, wherein obtaining a set of exploits through the network connection comprises:

applying one or more algorithms to obtain the set of exploits.

### 5. Claim 5

**Claim 5**. The system of claim 4, wherein the one or more algorithms determine the cost to obtain the set of exploits to create a budget and obtains the set of exploits constrained by the determined cost to obtain the set of exploits.

### 6. Claim 6

**Claim 6**. The system of claim 5, wherein obtaining the set of exploits is based on maximizing the quantifying of the risk level posed to the computer system related to the cost to obtain the set of exploits.

### 7. Claim 7

**Claim 7**. The system of claim 1, wherein altering the configuration of the computer system comprises removing a software component of the computer system that is utilized by the set of exploits to attack the computer system.

### 8. Claim 8

**Claim 8**. A method for improving a computing device, the method comprising:

**a.** accessing data comprising dark net information associated with a computer system;

**b.** obtaining a set of exploits from the dark net information, the set of exploits configured to bypass a security feature of the computer system;

**c.** applying an exploit function which takes the set of exploits as input and returns a set of vulnerabilities;

**d.** creating a constraint set of vulnerabilities of the computer system from the set of vulnerabilities comprising a minimum set of dependencies to operate the computer system, wherein application of the set of exploits on the

computer system comprises determining the effect of the set of exploits on the constraint set of vulnerabilities of the computer system;

**e.** analyzing an application associated with the set of exploits on the computer system to detect a particular vulnerability of the constraint set of vulnerabilities of the computer system; and

**f.** altering a configuration of the computer system in response to the analysis of the application of the set of exploits to reduce potential damage of a cyberattack.

**9. Claim 9**

**Claim 9**. The method of claim 8, wherein analyzing the application of the set of exploits on the computer system comprises quantifying a risk level posed to the computer system related to a cost to obtain the set of exploits.

**10. Claim 10**

**Claim 10**. The method of claim 9, wherein obtaining a set of exploits comprises:

applying one or more algorithms to obtain the set of exploits based on the constraint set of vulnerabilities of the computer system from one or more darknet marketplaces on the Internet.

**11. Claim 11**

**Claim 11**. The method of claim 10, wherein the one or more algorithms determine the cost to obtain the set of exploits to create a budget and obtains the set of exploits constrained by the determined cost to obtain the set of exploits.

**12. Claim 12**

**Claim 12**. The method of claim 11, wherein obtaining the set of exploits is based on maximizing the quantifying of the risk level posed to the computer system related to the cost to obtain the set of exploits.

**13. Claim 13**

**Claim 13**. The method of claim 8, wherein altering the configuration of the computer system comprises removing a software component of the computer system that is utilized by the set of exploits to attack the computer system.

**14. Claim 14**

**Claim 14.** The method of claim 8, wherein altering the configuration of the computer system comprises installing a patch to a software component of the computer system that is exposed by the set of exploits to attack the computer system.

**15. Claim 15**

**Claim 15**. One or more non-transitory tangible computer-readable storage media storing computer-executable instructions for performing a computer process on a machine, the computer process comprising:

**a.** obtaining a set of exploits from dark net information, the set of exploits configured to bypass a security feature of a computer system;

**b.** applying an exploit function which takes the set of exploits as input and returns a set of vulnerabilities;

**c.** creating a constraint set of vulnerabilities of the computer system from the set of vulnerabilities comprising a minimum set of dependencies to operate the computer system;

**d.** applying the set of exploits to the constraint set of vulnerabilities of the computer system;

**e.** analyzing the application of the set of exploits on the computer system to detect a particular vulnerability of the computer system; and

**f.** altering a configuration of the computer system in response to the analysis of the application of the set of exploits to reduce potential damage of a cyberattack.

**16. Claim 16**

**Claim 16**. The one or more non-transitory computer-readable storage media of claim 15, wherein analyzing the application of the set of exploits on the

computer system comprises quantifying a risk level posed to the computer system related to a cost to obtain the set of exploits.

**17. Claim 17**

**Claim 17**. The one or more non-transitory computer-readable storage media of claim 15, wherein obtaining a set of exploits comprises applying one or more algorithms to obtain the set of exploits from one or more darknet marketplaces on the Internet.

***C. Priority Dates***

76. The '385 patent derives priority from provisional application No. 62/261,200, filed on Nov. 30, 2015. I have specifically reviewed the provisional application to confirm that the subject matter claimed in the '385 patent is disclosed therein. Although it is my opinion that the claimed subject matter is in fact disclosed in the original provisional patent applications, I understand that Petitioner alleges the following priority dates for the asserted prior art, which predate the provisional application:

a. *Vallone* (EX1004): November 11, 2014 (Pet. at 5)

b. *Oberheide* (EX1005): February 24, 2014 (Pet. at 7)

c. *Patsos* (EX1006): October 2010 (Pet. at 9)

d. *Roytman* (EX1007): March 9, 2015 (Pet. at 10)

e. *Juels* (EX1008): February 24, 2012 (Pet. at 12)

f. *Wolff* (EX1009): October 17, 2011 (Pet. at 13)

77. For my analysis in this declaration only, and without forming an opinion as to their accuracy, I have accepted these priority dates. My technical analysis

therefore relies on citations to the specification of the ’385 patent. However, I reserve the right to update my analysis with citations to the relevant provisional application in the event that I am informed later that the priority dates asserted by Petitioner are not accurate and in fact post-date the provisional patent application.

### *D. Prosecution History*

78. The ’385 patent was filed on Nov. 28, 2016, and the provisional application from which it derives priority on Nov. 30, 2015.

79. On October 15, 2018, a non-final rejection issued. All claims were rejected in part under 35 U.S.C. § 101, and in part as obvious under 35 U.S.C. § 103 based on Norman et al. (US2004/0088565), in view of *Wolff* and Martinez et al. (US2014/0137257). EX1002 at 85.

80. On February 15, 2019, an amendment / request for reconsideration was filed. EX1002 at 118. This amendment specifically added claim limitations including “accessing data through the network connection, the data comprising dark net information associated with exploits of a computer system;” and “applying an exploit function which takes the set of exploits as input and returns a set of vulnerabilities.” *Id.*

81. On March 26, 2019, a notice of allowance issued including an examiner’s amendment “creating a constraint set of vulnerabilities of the computer system from the set of vulnerabilities comprising a minimum set of dependencies to operate the

computer system, wherein application of the set of exploits on the computer system comprises determining the effect of the set of exploits on the constraint set of vulnerabilities of the computer system." EX1002 at 138. The examiner specifically noted that "neither prior art cited in its entirety, nor based on the prior art, found any motivation to combine any of said prior art that teaches" the amended claims. *Id*. at 139.

## VI. THE ASSERTED PRIOR ART

82. Petitioner asserts the following six prior art references in four grounds, and supplements this proffer with the *Declaration Of Erez Zadok, Ph.D.* (EX1003).

### *A. Vallone (EX1004)*

83. *Vallone* refers to U.S. Patent Application Publication No. 2016/0134653 to Vallone et al.

84. *Vallone* teaches a "device…for assessing a target network's vulnerability to a real cyberthreat [using] synthetic tests configured to model the behavior of the cyberthreat." *Vallone*, Abstract. *Vallone* accesses cyberthreat intelligence including from the darknet to determine cyberthreat characteristics. This includes, for example "generating a file, creating a network communication, accessing a user account/directory/database/registry, [or] a sequence of actions performed by the threat." *Vallone* at [0016]. *Vallone* does not retrieve or execute the actual exploit on its network. Instead, *Vallone* performs a "synthetic penetration test" using

"agents" to simulate "the threat's characteristics in[] the target environment," and then "monitors target network 300 activity during [the] synthetic test" and provides "feedback data" to "increase the efficiency at which [the] target network 300 can heal any vulnerabilities to one or more cyberthreats." *Vallone* at Abstract, [0016], [0019], [0039], [0040], and Fig. 6.

85. Because *Vallone* only performs a simulation, it ensures "that the ultimate objective of the cyberthreat…is not committed, while still providing an administrator with knowledge…regarding the depth of vulnerability of the target network 300 to an actual attack." *Id*. at [0038].

### *B. Oberheide (EX1005)*

86. *Oberheide* refers to U.S. Patent Application Publication No. 2014/0245450 to Oberheide et al.

87. *Oberheide* teaches a "system and method that includes identifying a vulnerability in a computing device; accessing a vulnerability exploitation mapped to the identified vulnerability; at the computing device, executing the vulnerability exploitation and…updating the system with a vulnerability resolution." *Oberheide* at Abstract, [0013], [0019], and Fig. 6.

88. *Oberheide* teaches use (i.e., exploitation) of an identified vulnerability to effectively "hack" the system to "enter[] an operating mode of escalated privileges through the identified vulnerability." *Oberheide* at Fig. 2. For this purpose,

*Oberheide* discloses an "exploit engine" to "execute an exploitation process" which "preferably uses at least one of the vulnerabilities identified by the VAC to grant the vulnerability tool heightened permissions within the operating system." *Oberheide* at [0017]. *Oberheide* further teaches that it "may systematically attempt various exploits and test if the exploit succeeded, which would circumvent the process of analyzing and predicting vulnerabilities." *Oberheide* at [0017].

89. Once in that escalated privileged mode, *Oberheide* teaches patching known vulnerabilities, including the specific exploited vulnerability. *Id.* and [0019] ("*Oberheide* teaches exploiting a vulnerability in order to resolve or mitigate the vulnerability"); [0024] ("Step S120, which includes entering an operating mode of escalated privileges through the identified vulnerability, functions to benevolently leverage the vulnerability to enable necessary capabilities to fix or lessen the threat."); [0025] ("The exploit preferably grants the vulnerability tool the necessary privileges to patch the vulnerability. The privileges are preferably escalated privileges such as those for a superuser, root account, system administrator, kernel level account, higher privileged services/drivers, privileges of another user/application/service, and/or other suitable modes of increased permissions within the device. Often these are system privileges that are reserved for carriers").

### *C. Patsos (EX1006)*

90. *Patsos* refers to Dimitrios Patsos et al., *Expanding Topological Vulnerability Analysis To Intrusion Detection Through The Incident Response Intelligence System*, Information Management & Computer Security, Vol. 18, No. 4, 291-309 (2010).

91. *Patsos* aims to automate the incident response (IR) process through collection, normalization, and correlation of security data, i.e. vulnerability, exploit, and intrusion detection information. *Patsos* at 291. To that end, *Patsos* "models the context of discovered vulnerabilities, calculates their significance, finds and analyzes potential exploit code and defines the necessary intrusion detection signatures that combat possible attacks, using standardized techniques." *Id*.

92. Specifically, *Patsos* introduces the "incident response intelligence system (IRIS) that works towards the elimination of the gap between automatic vulnerability identification; exploit verification; and intrusion detection." *Id*. at 293. "The system collects security information related to vulnerabilities, exploits and IDP [Intrusion Detection and Prevention] signatures from a large number of sources and stores them in a number of local databases." *Id*. at 295–296 (parenthetical omitted). "This vulnerability information is then normalized (i.e. redundant data are de-duplicated) and correlated with relative exploit code and IDP signatures." *Id*. "When IRIS parses a report from a VA [Vulnerability Analysis] tool, it can construct the attack

and response paths for the identified vulnerabilities . . ., score every identified vulnerability . . ., and provide the IDP signature(s) required to combat this particular attack." *Id.*

### *D. Roytman (EX1007)*

93. *Roytman* refers to U.S. Patent Application Publication No. 2015/0237065 to Roytman et al.

94. *Roytman* teaches techniques for "ranking a set of vulnerabilities of a computing asset and set of remediations for a computing asset" *Roytman* at abstract. Specifically, *Roytman* receives vulnerabilities "at a vulnerability intelligence platform," and further "breach data indicating set of breaches that occurred." *Id.*

95. *Roytman* uses this information to identify a "subset of the set of vulnerabilities that are most vulnerable to a breach" based on the breach data; a risk for the computing asset based on its vulnerabilities;" or "multiple remediations associated with a risk score and multiple vulnerabilities," which are ordered based on the remediations that would reduce the risk score the most. *Id.*

### *E. Juels (EX1008)*

96. *Juels* refers to U.S. Patent No. 9,471,777 to Juels et al.

97. *Juels* discloses "identifying a plurality of defensive security actions to be taken to address a persistent security threat to a [computer system]," and "to determine a schedule for performance of the defensive security actions based at least

in part on a selected distribution derived from a game-theoretic model." *Juels* at abstract. "The system subject to the persistent security threat is configured to perform the defensive security actions in accordance with the sched ule in order to deter the persistent security threat." *Id.* *Juels* disclosing "optimiz[ing] defender benefit in the context of the game-theoretic model." *Id.*

98. *Juels'* model is based on a hypothetical "game"—called FlipIt, which is a "stealthy takeover game," in which attacker and defender entities can each take control of a specified resource at any time by taking an action having a particular cost, but cannot determine current game state without taking the action." *Juels* at 5:32–36. Specific details of this attacker-defender game are disclosed in *Juels* starting at 9:36.

99. In one example, *Juels* discloses that "the attacker might choose between two types of move: (1) Use of a published exploit or (2) Use of a zero-day exploit, while the defender chooses either to: (1) Patch a machine or (2) Reinstall its software." *Juels* at 13:25–29. "For both players, (1) is the less expensive, but (2) the more effective." *Id.* at 13:28–29. "Action (2) results in takeover for either player, while action (1) will only work if the opponent's most recent move was action (1)." *Id.* at 13:30–32. "For instance, patching a machine won't recover control from a zero-day exploit, but software reinstallation will." *Id.* at 13:32–34.

100. Based on this game-theoretic approach, *Juels* discloses and analyzes various attacker and defender strategies.

### *F. Wolff (EX1009)*

101. *Wolff* refers to Exhibit 1009 U.S. Patent Publication No. 2013/0198848 to Wolff. *Wolff* was specifically considered by the examiner. EX1002 at 89–90.

102. *Wolff* discloses a computer security vulnerability remediation system (CSVRS), including a CSVRS client and a remediation server. "A RSP [Remediation Service Provider] receives information about the exploit and vulnerability from a team of remediation experts." *Wolff* at 1. "The RSP may prepare a remedial exploit, which carries a self-healing pay load." *Id.* "The remedial exploit may be delivered either through the vulnerability itself, or through credentials granted by the CSVRS client to the RSP." *Id.* "The self-healing pay-load takes appropriate action, such as closing ports or disabling scripts, to prevent the vulnerability from being further exploited." *Id.* "The self-healing payload may take actions on client 120, such as disabling certain types of scripting, modifying firewall rules, disabling services, modifying registry settings, downloading programs, executing programs, downloading software updates, installing patches, removing software, modifying privileges, adjusting file attributes, modifying configuration files, downloading antivirus or malware updates, placing selected applications in a sandbox, and upgrading system level components." *Wolff* at 2.

## VII. CLAIM CONSTRUCTIONS

103. I understand that CrowdStrike purports to rely on the plain and ordinary meaning of all claim terms. Pet. at 5. In my analysis, I have applied the plain and ordinary meaning as a POSITA would have understood it at the time of the invention.

## VIII. VALIDITY ANALYSIS

104. I understand that CrowdStrike argues the following obviousness grounds:

| Ground | Allegation of Invalidity | Claims |
|---|---|---|
| 1 | Obviousness in light of *Vallone* | 1, 8, 14, and 15 |
| 2 | Obviousness in light of *Oberheide* in view of *Patsos* and *Roytman* | 1, 8, 14, and 15 |
| 3 | Obviousness in light of *Oberheide* in view of *Patsos*, *Roytman*, and *Juels* | 2–6, 9–12, 16, and 17 |
| 4 | Obviousness in light of *Oberheide* in view of *Patsos*, *Roytman*, and *Wolff* | 7 and 13 |

105. Below is my analysis of the asserted prior art references and my opinion as to what they do and do not disclose relative to the challenged claims.

### *A. Ground 1: Obviousness in Light of Vallone*

106. Petitioner asserts that claims 1, 8, 14, and 15 are obvious in light of *Vallone*.

#### 1. Claim 1

**Claim 1**. A system for protecting a computer system from attack, the system comprising:

***a) Claim 1.e: obtaining a set of exploits from the dark net information, the set of exploits configured to penetrate the computer system***

107. Petitioner construes "obtaining a set of exploits" as "crawling the net for exploit code." Pet. at 19. In my opinion, *Vallone* does not teach or suggest this limitation.

108. Petitioner argues that "*Vallone* teaches 'obtain[ing]' 'a threat characteristic,' which 'is a threat's signature, action, sequence of actions or other consequence of the real threat being executed.'" Pet. at 19 (citing *Vallone* at [0016]). This disclosure does not refer to "exploit code," and *Vallone's* discussion of "threat characteristics" shows that it is referring not to the exploit itself (i.e., the source code of the exploit), but to knowledge of the "characteristics" of the exploit, including for example "a threat's signature, action, sequence of actions or other consequence." Other examples of "threat characteristics" are "events (collectively referred to herein as 'characteristics'), such as generating a file, creating a network communication, accessing a user account/directory/database/registry, a sequence of actions performed by the threat etc." *Vallone* at [0016].

109. Instead, *Vallone* clarifies that "threat characteristics" are the behavior of the threat—not the threat itself. For example, *Vallone* discloses a sensor environment 212 that contains "monitoring technology that is configured to monitor at least host 208 activity for the occurrence of characteristics of the cyberthreat."

*Vallone* at [0036]. There is no disclosure in *Vallone* whatsoever of executing the threat directly in order to see if the monitoring system catches it. This is reinforced by the petition's statements that *Vallone* is looking to achieve "an objective of the cyberthreat" (Pet. at 19), which could be merely an approximation of the cyberthreat. *See Vallone* at [0017] (reference to "approximately achieve").

110. *Vallone* further teaches a feedback mechanism designed to learn more about the characteristics of the threat it is analyzing. Specifically, "feedback allows synthetic testing for cyberthreat vulnerabilities to be specified at higher levels of aggregation when details are not known, and allows for the progressive incorporation of higher-level detailed knowledge to allow improved resolution of modeling synthetic tests <u>as more information is gained on the cyberthreat's objectives and characteristics</u>, target network vulnerabilities, and other pertinent details." *Vallone* at [0036] (emphasis added). This would serve no purpose if *Vallone* presumed possession of the source code of the exploit, which could simply be analyzed directly to determine the threat characteristic.

111. *Vallone* further teaches that these characteristics are "mapped to instructions via logic…that when executed by an agent would achieve…an objective of the cyberthreat." *Vallone* at [0017] ("synthetic characteristics" are "intended to exhibit, via an agent, the real threat's characteristics"). As explicitly disclosed, *Vallone* does not obtain these instructions by "crawling the net for exploit code."

Instead, *Vallone* creates these instructions in order to emulate the characteristics of the threat it is analyzing. This is explicitly confirmed by *Vallone*:

> The technology, in various embodiments, defines a sequence of one or more synthetic characteristics and/or events ('instructions') intended to exhibit, via an agent, the real threat's characteristics. Characteristics are mapped to instructions via logic (e.g., logical steps in a programming language, script, program, text file, or database) that when executed by an agent would achieve or approximately achieve an objective of the cyberthreat.

*Vallone* at [0017]. *Vallone* thus discloses using its own instructions to exhibit threat characteristic that achieve or approximate the actual characteristic of the threat.

112. Other portions of *Vallone* confirm that *Vallone* only seeks to simulate the exploit's instructions to exhibit the same characteristic, in order to determine if the computer network that is being protected is vulnerable to that threat. *Vallone* at [0038] ("Agents 350 are configurable by the technology to execute instructions on a host 320 for performing characteristics of a cyberthreat as a means for determining whether the target network 300 would be vulnerable to the actual cyberthreat.") *See also*, *Vallone* at [0017] ("The agent can *simulate characteristics* of the cyberthreat to exercise a target network's sensor environment's capabilities at detecting cyberthreats within an organization's network(s )." (emphasis added)); *Vallone* at

[0019] (referring to "synthetically generated characteristics" and that "additional instructions can be initiated to carry out additional characteristics"); *Vallone* at [0038] (referring to agents that can be "configured with instructions can synthesize the characteristics of the cyberthreat.).

113. Petitioner argues that "*Vallone* receives threat intelligence from, e.g., the dark net, 'defin[ing] a series of instructions (e.g., **a script or program**) that, when carried out by one or more agents, will exhibit the malware's threat characteristics.'" Pet. at 20. Petitioner mischaracterizes this excerpt. When considered in context, *Vallone* refers to a script or program created internally to simulate the characteristics of the threat:

> In an example scenario, threat intelligence is received that there is a class of malware that has the following characteristics: it creates a binary called c:/temp/malware.exe, creates a registry entry called HKLM/malware/installed, and periodically attempts to communicate to a malware.com website via TCP port 443. <u>*The technology, in one or more embodiments, defines a series of instructions ( e.g., a script or program) that, when carried out by one or more agents, will exhibit the malware's threat characteristics.*</u>

*Vallone* at [0019] (emphasis added). *Vallone* explicitly discloses that its technology "defines a series of instructions . . . to exhibit the malware's threat

characteristics. *Id.* *Vallone* does not "receive this "series of instructions" from the dark net.

114. Petitioner further argues that the exploits obtained by *Vallone* are "configured to penetrate the computer system." Pet at 20 (*citing* EX1003 at ¶¶111–112). However, as already explained, *Vallone* does not disclose obtaining either executable or source code of any exploit. Therefore, *Vallone* cannot configure the exploit itself to "penetrate the computer system." Instead, as admitted by Petitioner, "*Vallone's* threat simulation technology includes a *synthetic test generator* that 'determines, for at least a portion of a cyberthreat's objective, one or more steps of an instruction for emulating that…objective." Pet. at 20 (citing *Vallone* at [0040] (emphasis added)). *Vallone's* threat simulation technology is a benign testing tool that cannot be considered to "penetrate the computer system" as claimed. Indeed, *Vallone* explicitly discloses that its simulation stops short of actually penetrating the network being protected. *Vallone* at [0038] ("The technology has the advantage of being able to synthesize the cyberthreat (e.g., harvest.pl) as executable instructions that can be limited so that the ultimate objective of the cyberthreat (e.g., posting stolen credit card numbers for sale on the Internet) is not committed.")

115. For these reasons, in my opinion, *Vallone* does not teach or suggest this limitation.

***b) Claim 1.f: applying an exploit function which takes the set of exploits as input and returns a set of vulnerabilities***

116. Petitioner argues that *Vallone* teaches this claim element "by determining the 'sequence of actions' an exploit takes to penetrate the computer system." Pet. at 20. This action however, pertains only to simulating some of the exploit characteristics. *Vallone* does not disclose creating an "exploit function" that "takes a set of exploits as input and returns a set of vulnerabilities." '385 patent at 3:59–64 and claim 1. At most, *Vallone* discloses emulating characteristics of exploits. Even if that information could be used to disclose the vulnerability targeted by that particular exploit, this would have to be done one at a time for each exploit *Vallone* analyzes. This does not teach or suggest an "exploit function" which takes an entire set of exploits and return the corresponding set of vulnerabilities.

117. Further, *Vallone* does not disclose a reason for using an exploit function to determining a set of vulnerabilities. A POSITA implementing *Vallone* would not have been motivated to implement such an exploit function, because *Vallone* does not teach or suggest a use for such a function.

***c) Claim 1.g: creating a constraint set of the computer system from the set of vulnerabilities, the constraint set comprising a minimum set of dependencies to operate the computer system***

118. Petitioner construes "creating a constraint set" where "the constraint set comprises a minimum set of dependencies to operate the computer system" as "an

environment with enough resources to test the malicious code while preventing wider damage." Pet at 23. Given that construction, in my opinion, *Vallone* does not teach or suggest this limitation.

119. Petitioner identifies *Vallone's* disclosure of "synthesiz[ing] the cyberthreat (e.g., harvest.pl) as executable instructions that can be limited so that the ultimate objective of the cyberthreat…is not committed[.]" Pet. at 23. But this disclosure does not relate to creating a "constraint set" of a computer system with a minimum set of dependencies. *Vallone's* cited disclosure refers to synthesizing characteristics of the *threat* used to attack the computer system, not the system itself.

120. Petitioner argues that "*Vallone's* threat simulation technology's server 510 instantiates agents on host computers and instructs the agents to 'executes steps of the instructions as if the agent 350 were the actual cyberthreat (e.g., a malware agent will mimic the characteristics/actions of real malware).'" Pet. 24 (citing *Vallone* at [0038]). This disclosure also does not teach or suggest this claim element, because it refers to a simulated version of the exploit that operates *in the actual computer system to be protected*. This computer environment is not restrained to an environment with only "enough resources to test the malicious code while preventing wider damage." To the contrary, this is the actual environment to be tested, such that release of the actual exploit would by likely to cause actual damage.

121. In summary, *Vallone* discloses, in a way, the opposite approach of the '385 patent. Instead of operating the actual exploit in a limited and safe environment, it operates a limited and safe simulation of the exploit in the actual environment. Contrary to Petitioner's statement, *Vallone* in no way "forms a controlled and isolated environment with the agents on the host computer." Pet. at 24. Instead, every aspect of *Vallone* teaches use of its agents on the live computer system to be protected.

#### ***d) Claim 1.h: applying the set of exploits to the constraint set of the computer system;***

122. Petitioner argues that this claim element is met because "once the instructions are compiled for simulating the exploit, the synthetic test is executed." Pet. at 25. I disagree for multiple reasons.

123. First, *Vallone* discloses simulating and analyzing a single exploit at a time. Petitioner provides no support that *Vallone* creates or applies a "set of exploits." Each "synthetic test" tests for exactly one exploit. *See*, *e.g.*, *Vallone* at [0020] ("if analysis indicates that the target is vulnerable to a cyberattack (i.e., based on the synthetic test using the cyber-attack's characteristics)").

124. Second, *Vallone* does not disclose a "constraint set of the computer system." As noted, Petitioner construes this term as "an environment with enough resources to test the malicious code while preventing wider damage." Pet at 23. However, *Vallone* does not test the malicious code itself. Instead, *Vallone* only runs

a "synthetic test," that is, it "synthesize[s] the cyberthreat (e.g., harvest.pl) as executable instructions that can be limited so that the ultimate objective of the cyberthreat . . . is not committed, while still providing an administrator with knowledge . . . regarding the depth of vulnerability of the target network 300 to an actual attack." *Vallone* at [0038]. Further, *Vallone* does not run this simulation in a constraint set, i.e., a limited test environment. Instead, *Vallone* runs its simulation on the actual network to be protected.

***e) Claim 1.i: analyzing the application of the set of exploits on the computer system to detect a particular vulnerability of the computer system; and***

125. As explained above, *Vallone* does not disclose an "application of the set of exploits on the computer system." *See* claim element 1.h. At most, *Vallone* only analyzes the application of a *simulation of a single exploit*.

126. The purpose of this claim element is to take advantage of the "set of all possible constraint sets." '385 patent at 3:36–37. By applying the set of exploits on the computer system, and then "determining the effect of the set of exploits on the constraint set of vulnerabilities of the computer system," the invention enables the system administrator to reconfigure the target computer system to utilize a different constraint set, preferably one that exhibits a lesser effect from application of the set of exploits as claimed in element 1.j. *See also* '385 patent at 3:48–50 (given "the set of all application constraint sets for a given system configuration," "a system

administrator selects which vulnerabilities may be present in order to allow each application i to function.”). *See also* ’385 patent at 4:53–64 (discussion of the set of exploits and how they map to the vulnerabilities). This is not disclosed.

#### *f) Claim 1.j: altering a configuration of the computer system in response to the analysis of the application of the set of exploits to reduce potential damage of a cyberattack.*

127. As explained above, *Vallone* does not disclose an “application of the set of exploits.” *See* claim element 1.h. At most, *Vallone* only analyzes the application of a *simulation of a single exploit*. Further, as explained above, “altering a configuration of the computer system” refers to enabling the system administrator to select a different constraint set of vulnerabilities to minimize the impact of the set of exploits. *See* element 1.i; *see also*, *e.g.*, ’385 patent at 3:48–50 (“a system administrator selects which vulnerabilities may be present in order to allow each application i to function”). This is also different from the kinds of updates *Vallone* teaches (e.g., updates to network monitoring, firmware, etc.). *Vallone* at [0020].

### 2. Claim 8

**Claim 8**. A method for improving a computing device, the method comprising:

***a) Claim 8.b: obtaining a set of exploits from the dark net information, the set of exploits configured to bypass a security feature of the computer system***

128. Petitioner references its analysis of claim element 1.e for this claim element. I therefore incorporate my analysis of that claim element here. For the reasons stated there, *Vallone* does not disclose "obtaining a set of exploits."

***b) Claim 8.c: applying an exploit function which takes the set of exploits as input and returns a set of vulnerabilities***

129. Petitioner references its analysis of claim element 1.f for this claim element. I therefore incorporate my analysis of that claim element here. For the reasons stated there, *Vallone* does not disclose this claim element.

***c) Claim 8.d: creating a constraint set of vulnerabilities of the computer system from the set of vulnerabilities comprising a minimum set of dependencies to operate the computer system, wherein application of the set of exploits on the computer system comprises determining the effect of the set of exploits on the constraint set of vulnerabilities of the computer system***

130. Petitioner references its analysis of claim elements 1.g and 1.h for this claim element. I therefore incorporate my analysis of those claim elements here. For the reasons stated there, *Vallone* does not disclose this claim element.

131. Notably, this claim element differs from claim elements 1.g and 1.f in its reference to specifically "determining the effect of the set of exploits on the constraint set of vulnerabilities." The purpose of this claim element is to take advantage of the "set of all possible constraint sets." '385 patent at 3:36–37. By

applying the set of exploits on the computer system, and then "determining the effect of the set of exploits on the constraint set of vulnerabilities of the computer system," the invention enables the system administrator to reconfigure the target computer system to utilize a different constraint set, preferably one that exhibits a lesser effect from application of the set of exploits. '385 patent at 3:48–50 (given "the set of all application constraint sets for a given system configuration," "a system administrator selects which vulnerabilities may be present in order to allow each application i to function."). *See also* '385 patent at 4:53–64 (discussion of the set of exploits and how they map to the vulnerabilities).

#### ***d) Claim 8.e: analyzing an application associated with the set of exploits on the computer system to detect a particular vulnerability of the constraint set of vulnerabilities of the computer system***

132. Petitioner references its analysis of claim element 1.i for this claim element. I therefore incorporate my analysis of that claim element here. For the reasons stated there, *Vallone* does not disclose this claim element.

133. Petitioner identifies *Vallone's* analysis of the simulation of a single exploit as disclosing this claim element. Pet. at 30. The cited portion of *Vallone* does not disclose "analyzing an application associated with the set of exploits on the computer system." The claimed application of a set of exploits in this claim element is not aimed at evaluating the effect of a single exploit. Instead, it is aimed evaluating a given constraint set of vulnerabilities of the computer system. The purpose of this

evaluation is to enable the system administrator to reconfigure the target computer system to utilize a different constraint set, preferably one that exhibits a lesser effect from application of the set of exploits, as specifically claimed in claim element 8.f. ’385 patent at 3:48–50 (given “the set of all application constraint sets for a given system configuration,” “a system administrator selects which vulnerabilities may be present in order to allow each application i to function.”). *See also* ’385 patent at 4:53–64 (discussion of the set of exploits and how they map to the vulnerabilities).

##### ***e) Claim 8.f: altering a configuration of the computer system in response to the analysis of the application of the set of exploits to reduce potential damage of a cyberattack***

134. Petitioner references its analysis of claim element 1.j for this claim element. I therefore incorporate my analysis of that claim element here. For the reasons stated there, *Vallone* does not disclose this claim element.

#### 3. Claim 14

> **Claim 14:** The method of claim 8, wherein altering the configuration of the computer system comprises installing a patch to a software component of the computer system that is exposed by the set of exploits to attack the computer system.

135. Claim 14 depends on Claim 8 and is not disclosed by *Vallone* for the same reasons as stated in regard to Claim 8.

#### 4. Claim 15

> **Claim 15**. One or more non-transitory tangible computer-readable storage media storing computer-executable instructions for performing a computer process on a machine, the computer process comprising:

***a) Claim 15.a: obtaining a set of exploits from dark net information, the set of exploits configured to bypass a security feature of a computer system***

136. Petitioner references its analysis of claim elements 1.e and 8.b for this claim element. Pet. at 32. I therefore incorporate my analysis of those claim elements here. For the reasons stated there, *Vallone* does not disclose "obtaining a set of exploits."

***b) Claim 15.b: applying an exploit function which takes the set of exploits as input and returns a set of vulnerabilities***

137. Petitioner references its analysis of claim elements 1.f and 8.c for this claim element. Pet. at 32. I therefore incorporate my analysis of those claim elements here. For the reasons stated there, *Vallone* does not disclose this claim element.

***c) Claim 15.c: creating a constraint set of vulnerabilities of the computer system from the set of vulnerabilities comprising a minimum set of dependencies to operate the computer system;***

138. Petitioner references its analysis of claim elements 1.g and 8.d for this claim element. Pet. at 33. I therefore incorporate my analysis of those claim elements here. For the reasons stated there, *Vallone* does not disclose this claim element.

***d) Claim 15.d: applying the set of exploits to the constraint set of vulnerabilities of the computer system;***

139. Petitioner references its analysis of claim element 1.h for this claim element. Pet. at 33. I therefore incorporate my analysis of that claim element here. For the reasons stated there, *Vallone* does not disclose this claim element.

***e) Claim 15.e: analyzing the application of the set of exploits on the computer system to detect a particular vulnerability of the computer system; and***

140. Petitioner references its analysis of claim elements 1.i and 8.e for this claim element. Pet. at 33. I therefore incorporate my analysis of those claim elements here. For the reasons stated there, *Vallone* does not disclose this claim element.

***f) Claim 15.f: altering a configuration of the computer system in response to the analysis of the application of the set of exploits to reduce potential damage of a cyberattack.***

141. Petitioner references its analysis of claim elements 1.j and 8.f for this claim element. Pet. at 33. I therefore incorporate my analysis of those claim elements here. For the reasons stated there, *Vallone* does not disclose this claim element.

***B. Ground 2: Obviousness in Light of Oberheide, Patsos, and Roytman***

142. Petitioner asserts that claims 1, 8, 14, and 15 are obvious in light of *Oberheide*, *Patsos*, and *Roytman*.

**1. Claim 1**

**Claim 1**. A system for protecting a computer system from attack, the system comprising:

***a) Claim 1.g: creating a constraint set of the computer system from the set of vulnerabilities, the constraint set comprising a minimum set of dependencies to operate the computer system***

143. Petitioner defines a "constraint set of vulnerabilities" as constraining a "vulnerability analysis to specific vulnerabilities based on: (1) vulnerabilities associated with a specific component of the system; or (2) system capabilities after exploitation of vulnerability." Pet. at 41. This is based on—but not supported by—*Oberheide's* disclosure. *Id*. *Oberheide* does not use any variation of the word stem "constrain."

144. Using this construction, Petitioner notes that "while *Oberheide* does not expressly discuss how it constrains its analysis to these specific vulnerabilities, *Roytman* teaches a ranking technique to identify a subset of vulnerabilities most vulnerable to exploitation." Pet. at 41. Further, Petitioner notes that "*Oberheide* constrains its vulnerability analysis to vulnerabilities associated with a particular computer component or vulnerabilities that significantly alter the computer's capabilities after exploitation." Pet. at 42. Petitioner then concludes that "*Oberheide* therefore teaches or suggests creating a constraint set comprising "a minimum set of dependencies to operate the computer system" because its "vulnerability analysis may be constrained to vulnerabilities that shut down the computer system through successful exploitation and/or to vulnerabilities that render facets of the computer system inoperable." I disagree for multiple reasons.

145. First, neither *Oberheide* nor *Patsos* disclose a "minimum set of dependencies to operate the computer system" for the following reasons.

146. The '385 patent recognizes that "in a real-world organization, system administrators are not able to patch all vulnerabilities for a variety of reasons. Software dependencies, use of legacy systems, and non-availability of patches are some examples." *Id.* at 3:25–29. To model these dependencies, the '385 patent first introduces the notation "V" "to represent the entire set of vulnerabilities within a given computer system." '385 patent at 3:20–22. Then, a "'constraint set' (denoted C) is defined as a subset of V." *Id.* at 3:29–30. "The vulnerabilities in a constraint set represent the vulnerabilities required for some system functionality." *Id.* at 3:30–32. Thus, the claimed "constraint set" comprising the "minimum set of dependencies to operate the computer system" is the set of vulnerabilities that cannot be avoided, because avoiding these vulnerabilities would limit the functionality of the computer network below acceptable levels. This is useful to prioritize the exploits of those particular vulnerabilities (that cannot be avoided) against which a system administrator will most need to guard.

147. Petitioner identifies no disclosure in *Oberheide* or *Patsos* that discloses the claimed "constraint set." Petitioner's citation to *Oberheide*'s disclosure of constraining a "vulnerability analysis to specific vulnerabilities based on: (1) vulnerabilities associated with a specific component of the system; or (2) system

capabilities after exploitation of vulnerability" (Pet. at 41) does not disclose this claim element. Neither *Oberheide* nor *Patsos* determine the minimum set of dependencies to operate the computer system it seeks to protect, nor disclose creating a set of vulnerabilities based thereon as claimed.

148. Petitioner's citation to *Roytman* as disclosing ranking vulnerabilities (Pet. at 42) is irrelevant to this claim element. The claimed constraint set is not based on a ranking of vulnerabilities, but on the minimal set of dependencies to operate the computer system. *Roytman* does not determine this minimal set of dependencies.

#### ***b) Claim 1.h: applying the set of exploits to the constraint set of the computer system;***

149. Petitioner argues that this claim element is met because "*Oberheide's* system applies exploits to the identified subset of vulnerabilities to determine which exploit will provide the necessary privileges for patching." Pet. at 46. I disagree for multiple reasons.

150. First, *Oberheide* does not disclose a "set of exploits" at all. While *Oberheide* discusses various exploits, it does not disclose any metrics for grouping these into a set. The '385 patent, on the other hand, discloses determining a set of exploits as a subset of all available exploits based on the attacker's budget. '385 patent at 4:7–8 ("An attacker 102 will use a set of exploits to attempt to gain access to a system, and will do so within a budget.").

151. Second, the combination of *Oberheide*, *Patsos*, and *Roytman* does not "apply" a set of exploits to a constraint set of vulnerabilities. As noted, in this ground, Petitioner defines a "constraint set of vulnerabilities" as constraining a "vulnerability analysis to specific vulnerabilities based on: (1) vulnerabilities associated with a specific component of the system; or (2) system capabilities after exploitation of vulnerability." Pet. at 41. However, the combination of *Oberheide*, *Patsos*, and *Roytman* does not "apply" a set of exploits to Petitioner's "constraint set of vulnerabilities." In the '385 patent, this operation is defined as comparing the vulnerabilities associated with the set of exploits to the vulnerabilities in the constraint set of vulnerabilities. *See*, *e.g.*, '385 patent at 4:53–55 ("if the vulnerabilities generated by an attack strategy's exploits and the vulnerabilities in a defense strategy are disjoint sets, the payoff function must return 0"). This is not disclosed.

152. Based on the information gathered from "applying the set of exploits to the constraint set of the computer system," the '385 patent teaches that the system administrator can then choose the proper constraint set that minimizes the vulnerabilities that are most likely to be attacked, by comparing the possible vulnerability constraint sets to the vulnerabilities associated with the set of exploits determined to be most likely used in an attack, as shown in claim elements 1.i and

1.j. This functionality is not disclosed in *Oberheide*, *Patsos*, or *Roytman*, and is not taught or suggested by any combination thereof.

#### *c) Claim 1.i: analyzing the application of the set of exploits on the computer system to detect a particular vulnerability of the computer system; and*

153. The purpose of this claim element is to take advantage of the "set of all possible constraint sets." '385 patent at 3:36–37. By applying the set of exploits on the computer system, and then "determining the effect of the set of exploits on the constraint set of vulnerabilities of the computer system," the invention enables the system administrator to reconfigure the target computer system to utilize a different constraint set, preferably one that exhibits a lesser effect from application of the set of exploits as claimed in element 1.j. *See also* '385 patent at 3:48–50 (given "the set of all application constraint sets for a given system configuration," "a system administrator selects which vulnerabilities may be present in order to allow each application i to function."). *See also* '385 patent at 4:53–64 (discussion of the set of exploits and how they map to the vulnerabilities). This is not disclosed in any of *Oberheide*, *Patsos*, or *Roytman*, or by their combination.

154. Petitioner argues that this claim element is disclosed because "*Oberheide* exploits the vulnerabilities in its constraint set to gain access to privileges necessary to patch those vulnerabilities." Pet. at 48. Specifically, Petitioner states that the combination system would "identify the highest ranked vulnerability to patch." *Id.*

That does not disclose this claim element. Instead, the ’385 patent teaches that the purpose of the claimed analysis is to determine the overlap between the vulnerabilities associated with the set of exploits to the constraint set of vulnerabilities. This information then allows the system administrator to choose the proper constraint set that minimizes the overlap of vulnerabilities.

#### *d) Claim 1.j: altering a configuration of the computer system in response to the analysis of the application of the set of exploits to reduce potential damage of a cyberattack.*

155. Petitioner identifies the “’update component’ that applies ‘a patch or system update to resolve or reduce an existing vulnerability’” as disclosing this claim element because that operation “alters a configuration of the computer system.” Pet. at 49. I disagree.

156. The ’385 patent identifies “altering a configuration of the computer system” as the system administrator selecting a different constraint set of vulnerabilities to minimize the impact of the most likely set of exploits.

### 2. Claim 8

**Claim 8**. A method for improving a computing device, the method comprising:

#### *a) Claim 8.b: obtaining a set of exploits from the dark net information, the set of exploits configured to bypass a security feature of the computer system*

157. Petitioner references its analysis of claim element 1.e for this claim element. I therefore incorporate my analysis of that claim element here.

#### ***b) Claim 8.c: applying an exploit function which takes the set of exploits as input and returns a set of vulnerabilities***

158. Petitioner references its analysis of claim element 1.f for this claim element. I therefore incorporate my analysis of that claim element here. For the reasons stated there, the combination of *Oberheide*, *Patsos*, and *Roytman* does not disclose this claim element.

#### ***c) Claim 8.d: creating a constraint set of vulnerabilities of the computer system from the set of vulnerabilities comprising a minimum set of dependencies to operate the computer system, wherein application of the set of exploits on the computer system comprises determining the effect of the set of exploits on the constraint set of vulnerabilities of the computer system***

159. Petitioner references its analysis of claim elements 1.g and 1.h for this claim element. I therefore incorporate my analysis of those claim elements here. For the reasons stated there, the combination of *Oberheide*, *Patsos*, and *Roytman* does not disclose this claim element.

160. Notably, this claim element includes the limitation "determining the effect of the set of exploits on the constraint set of vulnerabilities." The combination of *Oberheide*, *Patsos*, and *Roytman* does not disclose applying a "set of exploits" to determine its effect on the "constraint set of vulnerabilities."

161. The purpose of this claim element is to take advantage of the "set of all possible constraint sets." '385 patent at 3:36–37. By applying the set of exploits on the computer system, and then "determining the effect of the set of exploits on the

constraint set of vulnerabilities of the computer system," the invention enables the system administrator to reconfigure the target computer system to utilize a different constraint set, preferably one that exhibits a lesser effect from application of the set of exploits. '385 patent at 3:48–50 (given "the set of all application constraint sets for a given system configuration," "a system administrator selects which vulnerabilities may be present in order to allow each application i to function."). *See also* '385 patent at 4:53–64 (discussion of the set of exploits and how they map to the vulnerabilities).

#### ***d) Claim 8.e: analyzing an application associated with the set of exploits on the computer system to detect a particular vulnerability of the constraint set of vulnerabilities of the computer system***

162. Petitioner references its analysis of claim element 1.i for this claim element. I therefore incorporate my analysis of that claim element here. For the reasons stated there, the combination of *Oberheide*, *Patsos*, and *Roytman* does not disclose this claim element.

#### ***e) Claim 8.f: altering a configuration of the computer system in response to the analysis of the application of the set of exploits to reduce potential damage of a cyberattack***

163. Petitioner references its analysis of claim element 1.j for this claim element. I therefore incorporate my analysis of that claim element here. For the reasons stated there, the combination of *Oberheide*, *Patsos*, and *Roytman* does not disclose this claim element. Further the combination of *Oberheide*, *Patsos*, and

*Roytman* does not disclose "altering a configuration of the computer system," i.e., enabling the system administrator to select a different constraint set of vulnerabilities to minimize the impact of the set of exploits. *See* element 1.i.

#### 3. Claim 14

> **Claim 14:** The method of claim 8, wherein altering the configuration of the computer system comprises installing a patch to a software component of the computer system that is exposed by the set of exploits to attack the computer system.

164. Claim 14 depends on Claim 8 and is not disclosed by the combination of *Oberheide*, *Patsos*, and *Roytman* for the same reasons as stated in regard to Claim 8.

#### 4. Claim 15

> **Claim 15**. One or more non-transitory tangible computer-readable storage media storing computer-executable instructions for performing a computer process on a machine, the computer process comprising:

##### ***a) Claim 15.a: obtaining a set of exploits from dark net information, the set of exploits configured to bypass a security feature of a computer system***

165. Petitioner references its analysis of claim elements 1.e and 8.b for this claim element. Pet. at 53. I therefore incorporate my analysis of those claim elements here. For the reasons stated there, the combination of *Oberheide*, *Patsos*, and *Roytman* does not disclose "obtaining a set of exploits."

***b) Claim 15.b: applying an exploit function which takes the set of exploits as input and returns a set of vulnerabilities***

166. Petitioner references its analysis of claim elements 1.f and 8.c for this claim element. Pet. at 53. I therefore incorporate my analysis of those claim elements here. For the reasons stated there, the combination of *Oberheide*, *Patsos*, and *Roytman* does not disclose this claim element.

***c) Claim 15.c: creating a constraint set of vulnerabilities of the computer system from the set of vulnerabilities comprising a minimum set of dependencies to operate the computer system;***

167. Petitioner references its analysis of claim elements 1.g and 8.d for this claim element. Pet. at 53. I therefore incorporate my analysis of those claim elements here. For the reasons stated there, the combination of *Oberheide*, *Patsos*, and *Roytman* does not disclose this claim element.

***d) Claim 15.d: applying the set of exploits to the constraint set of vulnerabilities of the computer system;***

168. Petitioner references its analysis of claim element 1.h for this claim element. Pet. at 53. I therefore incorporate my analysis of that claim element here. For the reasons stated there, the combination of *Oberheide*, *Patsos*, and *Roytman* does not disclose this claim element.

#### *e) Claim 15.e: analyzing the application of the set of exploits on the computer system to detect a particular vulnerability of the computer system; and*

169. Petitioner references its analysis of claim elements 1.i and 8.e for this claim element. Pet. at 54. I therefore incorporate my analysis of those claim elements here. For the reasons stated there, the combination of *Oberheide*, *Patsos*, and *Roytman* does not disclose this claim element.

#### *f) Claim 15.f: altering a configuration of the computer system in response to the analysis of the application of the set of exploits to reduce potential damage of a cyberattack.*

170. Petitioner references its analysis of claim elements 1.j and 8.f for this claim element. Pet. at 54. I therefore incorporate my analysis of those claim elements here. For the reasons stated there, the combination of *Oberheide*, *Patsos*, and *Roytman* does not disclose this claim element.

### 5. Motivation To Combine

171. A POSITA would not be motivated to combine *Oberheide* with *Roytman*. *Oberheide* focuses on identifying and exploiting vulnerabilities that will give it elevated access privileges in order to alter the system configuration to apply its own patches. A ranking of vulnerabilities is not necessary to achieve this goal. In fact, *Oberheide* explicitly references vulnerability <u>*set*</u>s (i.e., unordered collections) rather than ranked lists as it allows system users or administrators to explore, visualize, and decide on remedying them based on their preference. *Oberheide* at [0020], [0022],

and [0029]. A POSITA would not be motivated to incur the extra expense and complexity of implementing *Roytman* since it would provide no benefit to *Oberheide's* system.

### *C. Ground 3: Obviousness in Light of Oberheide, Patsos, Roytman*, and *Juels*

172. Petitioner asserts that claims 2–6, 9–12, 16, and 17 are obvious in light of *Oberheide*, *Patsos*, *Roytman*, and *Juels*.

#### 1. Claim 2

> **Claim 2**. The system of claim 1, wherein analyzing the application of the set of exploits on the computer system comprises quantifying a risk level posed to the computer system related to a cost to obtain the set of exploits.

173. Claim 2 depends on claim 1 and is not disclosed for the same reasons as stated in regard to claim 1.

174. In my opinion, *Juels* does not disclose this claim element. *Juels* consideration of costs is limited to a single "move" in its game. *Juels* at 13:25–29. *Juels* provides nothing that would motivate a POSITA to expand this analysis to "a set of exploits." To the contrary, *Juels* discloses that players "choose among a set of actions with varying costs and effectiveness." This disclosure would not encourage the consideration of the cost of a whole set of exploits, because *Juels* system teaches making a single "move" at a time. *Juels* at 1:20–22 ("attackers orchestrating an APT typically introduce periods of delay among different stages of the attack"); 12:3–5 (*Juels* discourages sets of "moves" because "there is always a

cost to pushing the button [i.e., making a "move]. In this example, pushing the button costs the equivalent of one second of ownership.").

### 2. Claim 3

> **Claim 3**. The system of claim 2, wherein the processing device further performs the operation of:
>
> aligning internet data with the constraint set of vulnerabilities based on information obtained about the set of exploits.

175. Claim 3 depends on Claim 2 and is not disclosed for the same reasons as stated in regard to Claim 2.

176. Petitioner argues that the combination *Oberheide*, *Patsos*, and *Roytman* teaches creating a "constraint set" by constraining its vulnerability analysis to specific vulnerabilities, including by ranking vulnerabilities, as taught by Roytman, to identify a subset of vulnerabilities most vulnerable to exploitation." Pet. at 56. I disagree. The '385 patent discloses the constraint set as the set of vulnerabilities that cannot be avoided, because avoiding these vulnerabilities would limit the functionality of the computer network below acceptable levels. '385 patent at 3:30–32 ("The vulnerabilities in a constraint set represent the vulnerabilities required for some system functionality."); '385 patent at 3:45–50 ("C is the set of all application constraint sets for a given system configuration and represents all of the applications to be run on the system. So, in this framework, for a given system, a system

administrator selects which vulnerabilities may be present in order to allow each application i to function.")

#### 3. Claim 4

> **Claim 4**. The system of claim 3, wherein obtaining a set of exploits through the network connection comprises:
>
> applying one or more algorithms to obtain the set of exploits.

177. Claim 4 depends on Claim 3 and is not disclosed for the same reasons as stated in regard to Claim 3.

#### 4. Claim 5

> **Claim 5**. The system of claim 4, wherein the one or more algorithms determine the cost to obtain the set of exploits to create a budget and obtains the set of exploits constrained by the determined cost to obtain the set of exploits.

178. Claim 5 depends on Claim 4 and is not disclosed for the same reasons as stated in regard to Claim 4.

179. Petitioner argues that "*Oberheide* would have similarly benefitted from buying exploits based on collected cost information to update its repository and creating a budget to regulate this system." Pet. at 58. This conclusion is not supported by *Oberheide*. *Oberheide* aims to exploit a vulnerability to gain escalated privilege access to a system, including for example by "systematically attempt[ing] various exploits and test[ing] if the exploit succeeded." *Oberheide* at [0017]. Once it found an exploit that succeeded, *Oberheide* would have established the desired

access to the system, and would have no need to consider a "budget" for additional exploits.

180. In fact, *Oberheide* explicitly allows sets of vulnerabilities to be detected and potentially patched in a variety of scenarios involving different temporal relationships between the vulnerabilities:

> For example, a first vulnerability is detected at time t1; the first vulnerability is patched and a reference monitor is set up; a second vulnerability is detected at time t2, where t2 comes after t1; the established reference monitor is used to invoke heightened privileges without executing an exploit; and the second vulnerability is patched. The detection of the second vulnerability can happen for a vulnerability of a set of vulnerabilities detected with the first vulnerability, during a second local scan of new data objects of the device, scanning for latent vulnerability in data object records using new vulnerability information, or in response to any patching prompt.

*Oberheide* at [0029]. Thus, *Oberheide* teaches addressing and patching vulnerabilities one at a time as they are detected, and does not disclose or suggest the cost for a set of exploits.

### 5. Claim 6

> **Claim 6**. The system of claim 5, wherein obtaining the set of exploits is based on maximizing the quantifying of the risk level posed to the computer system related to the cost to obtain the set of exploits.

181. Claim 6 depends on claim 5 and is not disclosed for the same reasons as stated in regard to claim 5.

182. Petitioner relies on a combination of *Roytman's* risk assessment with *Juels'* cost of exploits for this claim element. Pet. at 60. In my opinion, this claim element is not disclosed by this combination (further combined with *Oberheide* and *Patsos*).

183. As detailed regarding claim 2, *Juels* consideration of costs is limited to a single "move" in its game. *Juels* at 13:25–29. *Juels* provides nothing that would motivate that it expands this analysis to "a set of exploits." To the contrary, *Juels* discloses that players "choose among a set of actions with varying costs and effectiveness." This disclosure would not encourage the consideration of the cost of a whole set of exploits, because *Juels* system teaches making a single "move" at a time. *See*, *e.g.*, *Juels* at 1:20–22 and 12:3–5.

### 6. Claim 9

> **Claim 9**. The method of claim 8, wherein analyzing the application of the set of exploits on the computer system comprises quantifying a risk level posed to the computer system related to a cost to obtain the set of exploits.

184. Claim 9 depends on claim 8 and is not disclosed for the same reasons as stated in regard to claim 8.

185. Petitioner references its analysis of claim 2 for this claim. I therefore incorporate my response thereto here.

### 7. Claim 10

> **Claim 10**. The method of claim 9, wherein obtaining a set of exploits comprises:
>
> applying one or more algorithms to obtain the set of exploits based on the constraint set of vulnerabilities of the computer system from one or more darknet marketplaces on the Internet.

186. Claim 10 depends on Claim 9 and is not disclosed for the same reasons as stated in regard to Claim 9.

187. Petitioner references its analysis of claim 4 for this claim. I therefore incorporate my response thereto here.

### 8. Claim 11

> **Claim 11**. The method of claim 10, wherein the one or more algorithms determine the cost to obtain the set of exploits to create a budget and obtains the set of exploits constrained by the determined cost to obtain the set of exploits.

188. Claim 11 depends on claim 10 and is not disclosed for the same reasons as stated in regard to claim 10.

189. Petitioner references its analysis of claim 5 for this claim. I therefore incorporate my response thereto here.

### 9. Claim 12

> **Claim 12**. The method of claim 11, wherein obtaining the set of exploits is based on maximizing the quantifying of the risk level posed to the computer system related to the cost to obtain the set of exploits.

190. Claim 12 depends on claim 11 and is not disclosed for the same reasons as stated in regard to claim 11.

191. Petitioner references its analysis of claim 6 for this claim. I therefore incorporate my response thereto here.

### 10. Claim 16

> **Claim 16**. The one or more non-transitory computer-readable storage media of claim 15, wherein analyzing the application of the set of exploits on the computer system comprises quantifying a risk level posed to the computer system related to a cost to obtain the set of exploits.

192. Claim 16 depends on claim 15 and is not disclosed for the same reasons as stated in regard to claim 15.

193. Petitioner references its analysis of claim 2 for this claim. I therefore incorporate my response thereto here, as well as to related claim 12.

### 11. Claim 17

> **Claim 17**. The one or more non-transitory computer-readable storage media of claim 15, wherein obtaining a set of exploits comprises applying one or more algorithms to obtain the set of exploits from one or more darknet marketplaces on the Internet.

194. Claim 17 depends on claim 15 and is not disclosed for the same reasons as stated in regard to claim 15.

195. Petitioner references its analysis of claims 1.e, 4, and 10 for this claim. I therefore incorporate my responses thereto here.

### 12. Motivation to Combine

196. A POSITA would have had no motivation to combine *Oberheide* with *Juels*. *Oberheide* focuses on identifying and exploiting vulnerabilities that will give it elevated access privileges in order to alter the system configuration to apply its own patches. A determination of the cost of exploits is not relevant to this analysis. A POSITA would not be motivated to incur the extra expense and complexity of implementing *Juels* since it would provide no benefit to *Oberheide's* system. *Juels'* game-theoretic approach (called FlipIt) may actually conflict with the desired result of *Oberheide*, since *Juels* considers the cost of a single exploit based on acquisition (*Juels* at 13:25–29) and does not consider *Oberheide's* requirement that the exploit allow escalated privileges. *See*, *e.g.*, *Oberheide* at Fig. 2 and [0025].

## *D. Ground 4: Obviousness in Light of Oberheide, Patsos, Roytman, and Wolff*

197. Petitioner asserts that claims 7 and 13 are obvious in light of *Oberheide*, *Patsos*, *Roytman*, and *Wolff*.

### 1. Claim 7

> **Claim 7**. The system of claim 1, wherein altering the configuration of the computer system comprises removing a software component of the computer system that is utilized by the set of exploits to attack the computer system.

198. Claim 7 depends on claim 1 and is not disclosed for the same reasons as stated in regard to Claim 1.

### 2. Claim 13

> **Claim 13**. The method of claim 8, wherein altering the configuration of the computer system comprises removing a software component of the computer system that is utilized by the set of exploits to attack the computer system.

199. Claim 13 depends on claim 8 and is not disclosed for the same reasons as stated in regard to claim 8.

### 3. Motivation to Combine

200. A POSITA would have had no motivation to combine *Oberheide* with *Roytman* as detailed above in ground 2. Similarly, a POSITA would have had no motivation to combine *Oberheide* with *Wolff*. *Oberheide* focuses on identifying and exploiting vulnerabilities that will give it elevated access privileges in order to alter the system configuration to apply its own patches. The removal of software exhibiting certain vulnerabilities would be contrary to *Oberheide's* goal of using the vulnerability to enter an operating mode of escalated privileges through the identified vulnerability. *Oberheide* at Fig. 2. *Oberheide* would exclude its own escalated system access by removing the vulnerability it used to access the system. A POSITA would not be motivated to incur the extra expense and complexity of implementing *Wolff* since it would provide no benefit to *Oberheide's* system.

## IX. CONCLUSION

201. My opinions are subject to change or revision. I may acquire additional opinions regarding arguments Petitioner, or its expert, may present, information I

may receive in the future, or additional work I may perform. Based on the analysis I have conducted and for the reasons set forth herein, I have preliminarily reached the conclusions and opinions in this declaration.

202. In the event of a hearing or trial in this matter, I may create and/or use various exhibits for the purposes of demonstrating my testimony as discussed in this declaration. I have not yet created, directed the creation of, or selected any demonstrative exhibits for this purpose.

203. For at least the reasons stated herein, it is my expert opinion that Petitioner's references do not disclose or suggest all elements of any claim of the '385 patent. Thus, I understand that Defendant's expert witness fails to establish a *prima facie* case of obviousness. My review of the references, the combinations of references, and the materials I have considered leave me with the opinion that the patent claims are valid over the prior art. In reaching my opinions, and in stating the basis of my opinions, I have provided representative reasons why the asserted claims are not disclosed by the cited references. I may not have provided every reason why the asserted claims are not invalid over the references (including combinations) as many are self-evidently trivial and make-weight. I therefore reserve the right to supplement my opinion and provide additional bases for my opinions, as necessary, particularly if Petitioner raises new arguments or interpretations, or if any other new information becomes available to me during this proceeding.