**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| SKYSONG INNOVATIONS, LLC, *Plaintiff* v. FORTINET, INC. *Defendant* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 2:25-cv-98-JRG |

# CLAIM CONSTRUCTION ORDER

On May 29, 2026, the Court held a hearing to determine the proper construction of disputed terms in United States Patents No. 10,313,385, 10,574,721, 11,775,831, and 11,892,897.[1]

Before the Court are the Opening Claim Construction Brief (Dkt. No. 67) filed by Skysong Innovations, LLC, the Responsive Claim Construction Brief (Dkt. No. 78) filed by Defendant Fortinet, Inc., and Plaintiff's Reply (Dkt. No. 80). Also before the Court are the parties' February 17, 2026 P.R. 4-3 Joint Claim Construction and Prehearing Statement (Dkt. No. 46) and the parties' May 19, 2026 P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 92).

Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

[1] The parties present no claim construction disputes as to U.S. Patent No. 11,275,900, asserted by Plaintiff

Table of Contents

**I. BACKGROUND** ........ **2**
**II. LEGAL PRINCIPLES** ........ **5**
**III. AGREED TERMS** ........ **8**
**IV. DISPUTED TERMS** ........ **9**
1. "software vulnerabilities before disclosure based on the hacker communications from the [training data / plurality of datasets]" ........ 9
2. "likelihood of exploitation" ........ 13
3. "social connections" ........ 17
4. "full precision computation" ........ 22
5. "first set of most significant bits (MSBs)" ........ 26
6. "second set of MSBs" ........ 29
7. "data defining a first web content class and a second web content class" / "data defining rules for delegating web access associated with a first content class to a first browser type and delegating web access associated with a second content class to a second browser type" / "data associating a first web content class with a first browser type and a second web content class with a second browser type" ........ 31
8. "sensitive information presenting a security risk" / "sensitive information indicating that accessing the web content by the first browser instance presents a security risk" ........ 35
9. "intercept a request" / "identifying a request" / "accessing a request" ........ 38
10. "browser instance type" / "first browser type" / "second browser type" ........ 44
11. "in order to manage according to the rules" ........ 47
12. "exploits on the computer system" / "exploits" ........ 50
13. ". . . set of vulnerabilities" ........ 53
14. ". . . minimum set of dependencies . . ." ........ 56
**V. CONCLUSION** ........ **59**
**APPENDIX A** ........ **1**

## I. BACKGROUND

Plaintiff alleges infringement of United States Patents No. 10,313,385 ("the '385 Patent"), 10,574,721 ("the '721 Patent"), 11,275,900 ("the '900 Patent"), 11,775,831 ("the '831 Patent"), and 11,892,897 ("the '897 Patent") ("the Asserted Patents"). Dkt. No. 67, Exs. 9–13. Plaintiff submits that "[t]he Asserted Patents were developed by Arizona State University faculty and

researchers focusing on novel methods and techniques in the computer and cybersecurity arts." Dkt. No. 67 at 2.

The '385 Patent, titled "Systems and Methods for Data Driven Game Theoretic Cyber Threat Mitigation," issued on June 4, 2019, and bears an earliest priority date of November 30, 2015. Plaintiff submits that "[t]he '385 patent presents a game-theory framework for cyber-defense that uses real-world exploit-market information to inform penetration testing and hardening decisions." Dkt. No. 67 at 2. The Abstract of the '385 Patent states:

> System and methods for a data-driven security game framework that models an attacker based on exploit market data actively mined from the darknet to develop strategies for the defender are disclosed.

The '721 Patent, titled "Systems and Methods for an Automatic Fresh Browser Instance for Accessing Internet Content," issued on February 25, 2020, and bears an earliest priority date of December 6, 2013. Plaintiff submits that "[t]he '721 patent addresses secure browsing by intercepting requests associated with sensitive content and automatically launching a fresh browser instance with appropriate policies and isolation." Dkt. No. 67 at 3 (citations omitted). The Abstract of the '721 Patent states:

> A system and method for securing access to sensitive content on the web is disclosed. The approach automates compartmentalization practices for accessing different kinds of content with different browser instances. The automation is transparent to the user and does not require any modification of how non-sensitive content is accessed. For sensitive content, a Fresh Browser Instance (FBI) is automatically created to access the content. In addition, the automatic FBI system may provide support for novice users with predefined sensitive content sites as well as for more experienced users who can define conflict of interest (COI) classes which allows content from sites in the same user-defined class to coexist in a browser instance.

The '831 Patent, titled "Cascaded Computing for Convolutional Neural Networks," issued on October 3, 2023, and bears an earliest priority date of September 26, 2016. Plaintiff submits that "[t]he '831 patent teaches a computationally efficient convolutional neural network (CNN)

technique that first performs low-precision computations using a 'first set of most significant bits (MSBs)' to approximate outputs across data sets, identifies the candidate producing the maximum, and then performs a 'full precision computation' for the selected data set." Dkt. No. 67 at 3 (citation omitted). The Abstract of the '831 Patent states:

> Techniques are described for efficiently reducing the amount of total computation in convolutional neural networks (CNNs) without affecting the output result or classification accuracy. Computation redundancy in CNNs is reduced by exploiting the computing nature of the convolution and subsequent pooling (e.g., sub-sampling) operations. In some implementations, the input features may be divided into a group of precision values and the operation(s) may be cascaded. A maximum may be identified (e.g., by 90% probability) using a small number of bits in the input features, and the full-precision convolution may then be performed on the maximum input. Accordingly, the total number of bits used to perform the convolution is reduced without affecting the output features or the final classification accuracy.

The '897 Patent, titled "Systems and Methods for Predicting Which Software Vulnerabilities Will Be Exploited by Malicious Hackers to Prioritize for Patching," issued on February 6, 2024, and bears an earliest priority date of November 3, 2017. Plaintiff submits that "[t]he '897 Patent claims exploit prediction models that integrate sources of information and dark/deep web forum features—including measures derived from users' social relationships—to predict actual exploitation of software vulnerabilities before public disclosure." Dkt. No. 67 at 3. The Abstract of the '897 Patent states:

> Various embodiments for predicting which software vulnerabilities will be exploited by malicious hackers and hence prioritized by patching are disclosed.

The Western District of Texas has construed disputed terms in the asserted patents in *Skysong Innovations, LLC v. CrowdStrike, Inc.*, No. 7:25-cv-00040-DC-DTG, Dkt. No. 122 (W.D. Tex. Mar. 12, 2026) (Gilliland, J.) ("*CrowdStrike*") (attached to Plaintiff's Opening Claim Construction Brief as Exhibit 1).

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion. Those preliminary constructions are noted below within the discussion for each term.

## II. LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841 (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent

claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

"[P]rior orders in related cases do not bar the Court from conducting additional construction in order to refine earlier claim constructions." *TQP Dev., LLC v. Intuit Inc.*, No. 2:12-CV-180-WCB, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) (Bryson, J., sitting by designation).

In general, however, prior claim construction proceedings involving the same patents-in-suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*." *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779, at *4 (E.D. Tex. June 21, 2006) (Davis, J.); *see TQP*, 2014 WL 2810016, at *6 ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."); *see also Teva*, 135 S. Ct. at 839–40 ("prior cases will sometimes be binding because of issue preclusion and sometimes will serve as persuasive authority") (citation omitted); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting "the importance of uniformity in the treatment of a given patent") (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996)).

## III. AGREED TERMS

In their February 17, 2026 P.R. 4-3 Joint Claim Construction Statement, the parties did not submit any agreed-upon constructions. *See* Dkt. No. 46. During the course of briefing, the parties

reached agreement for one group of disputed terms, and that agreement is set forth in Appendix A of this Claim Construction Order.

## IV. DISPUTED TERMS

In their claim construction briefing, the parties have organized the disputed terms differently. Rather than attempt to divine an ideal ordering, the Court adopts the ordering set forth in Plaintiff's opening brief.

### 1. "software vulnerabilities before disclosure based on the hacker communications from the [training data / plurality of datasets]"

| **"software vulnerabilities before disclosure based on the hacker communications from the [training data / plurality of datasets]"**<br>('897 Patent, Claims 1, 14, 18) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning<br><br>Alternatively:<br>"prior to disclosure to a public database" | "vulnerabilities not yet assigned a vulnerability number by NIST"<br><br>Alternatively:<br>"prior to disclosure to a public database" |

Dkt. No. 46 at A-1; Dkt. No. 78 at 4; Dkt. No. 92, Ex. A at A-1.

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "wherein the likelihood of exploitation predicts an actual exploitation of the respective software vulnerabilities before disclosure based on the hacker communications from the training data" means "wherein, based on the hacker communications from the training data, the likelihood of exploitation predicts the likelihood of an actual exploitation of the respective software vulnerabilities prior to such vulnerabilities being disclosed in a public database."

(a) The Parties' Positions

Plaintiff argues that "Fortinet's construction should be rejected because it modifies the wrong noun and reads out embodiments expressly recited in the specification." Dkt. No. 67 at 4. Plaintiff argues that "'before disclosure' in this claim term refers to disclosure of an '*actual exploitation*,' not (as Fortinet would have it) the disclosure of a *vulnerability*." Dkt. No. 67 at 4. "Moreover," Plaintiff argues, "each component of the disputed phrase is readily understandable to a person of ordinary skill and to a lay jury, and no further construction is warranted." *Id.* at 5 (citations omitted). Further, Plaintiff argues that "[t]he claims do not mention NIST, vulnerability numbers, or any particular disclosure channel." *Id.*

Defendant responds that "Fortinet's position is consistent with the claim language, the specification, Skysong's statements to the PTO, and the construction of this term in the '*Crowdstrike* case.'" Dkt. No. 78 at 2 (citation omitted). For example, Defendant argues that "the patent and Skysong consistently refer to the disclosure of vulnerabilities, not 'actual exploits.'" *Id.* at 4. Also, Defendant revises its proposal so as to no longer refer to "NIST" and to instead propose that "before disclosure" means "prior to disclosure to a public database," which is the construction of the Western District of Texas in *CrowdStrike*. *CrowdStrike* at 4.

Plaintiff replies that "Skysong agrees with Fortinet's alternative construction in its Response, that the phrase 'before disclosure' means 'prior to disclosure to a public database.'" Dkt. No. 80 at 2. As to Defendant's primary proposal, Plaintiff replies that "[t]he phrase closest to 'before disclosure,' and thus the noun being modified by it, is '*actual exploitation of* the respective *software vulnerabilities*,' not 'software vulnerabilities' alone." *Id.* at 3.

At the May 29, 2026 hearing, the parties presented oral arguments.

(b) Analysis

Claim 1 of the '897 Patent, for example, recites (emphasis added):

1. A method for assessing a likelihood of exploitation of software vulnerabilities, comprising:

utilizing a processor in operable communication with at least one memory for storing instructions that are executed by the processor to perform operations, including:

accessing a plurality of datasets associated with a predetermined set of data sources, the plurality of datasets including training data comprising hacker communications;

accessing features from the plurality of datasets that include measures computed from social connections of users posting hacking-related content

applying learning algorithms to the training data to generate classification models that are configured to predict class labels defining a likelihood of exploitation of respective software vulnerabilities;

accessing one or more features associated with a software vulnerability; and

computing, by applying the one or more features to the classification model, a class label defining one or more values defining a likelihood of exploitation associated with the software vulnerability, *wherein the likelihood of exploitation predicts an actual exploitation of the respective software vulnerabilities before disclosure based on the hacker communications from the training data.*

In its reply brief, Plaintiff "agrees with Fortinet's alternative construction in its Response, that the phrase 'before disclosure' means 'prior to disclosure to a public database.'" Dkt. No. 80 at 2.

The recital of "before disclosure" appears immediately after the noun "vulnerabilities" and therefore is presumed to modify "vulnerabilities." *See DeGeorge v. Bernier*, 768 F.2d 1318, 1323 (Fed. Cir. 1985) ("Modifiers of a term are usually in proximity to such term."); *see also Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (noting "the grammatical 'rule of the last antecedent,' according to which a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows"). Plaintiff argues that "before disclosure" modifies the entire "noun

phrase" "an actual exploitation of the respective software vulnerabilities," but this would be an unnatural reading, particularly when considering that the limitation recites "predict[ing]" actual exploitation. This is also consistent with the specification, which discusses "publicly disclosed vulnerabilities." *See* '897 Patent at 4:31–53.

Plaintiff also cites dependent Claim 12 of the '897 Patent, which recites:

> 12. The method of claim 1, further comprising:
> accessing one or more features indicative of temporal connections between at least two of:
> a time associated with discussion of a vulnerability by users posting hacking-related content at a web forum prior to disclosure to a public vulnerability database;
> a time associated with disclosure of the vulnerability to the public vulnerability database; and
> a time associated with exploitation of the vulnerability as obtained through exploits data associated with real-world exploitation of the vulnerability.

Plaintiff argues that "[t]he phrase 'before disclosure' in claim 1, which has a broader scope than claim 12, cannot therefore be limited to *only* concern itself with merely *one of three* times, i.e., the time of a vulnerability's discussion before its disclosure to a database." Dkt. No. 80 at 3. To the extent, if any, that these dependent limitations are probative, Plaintiff does not demonstrate that this dependent claim limits the recital of the "likelihood of exploitation" limitation in independent Claim 1.

Finally, the parties dispute whether Plaintiff's statements in a Patent Owner's Preliminary Response (POPR) in *Inter Partes* Review ("IPR") proceedings support Plaintiff or support Defendant, but the cited statements do not significantly affect the claim construction analysis as to the present disputed term. *See* Dkt. No. 78 at 3; *see also* Dkt. No. 80 at 3; Dkt. No. 78, Ex. A, Nov. 10, 2024 Patent Owner's Preliminary Response at 29 (discussing "Sabottke" reference). For example, at the May 29, 2026 hearing, Plaintiff cited a section titled "No Predicting 'An Actual

Exploitation . . . Before Disclosure" and argued that the section title, which refers to an actual exploitation, undercuts any reading of this IPR evidence as referring to something being prior to disclosure of a vulnerability. *Id.* Plaintiff's argument is unpersuasive because the ellipsis in this section title represents claim language that includes "vulnerabilities."

The Court therefore hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| "wherein the likelihood of exploitation predicts an actual exploitation of the respective software vulnerabilities before disclosure based on the hacker communications from the training data" | **"wherein, based on the hacker communications from the training data, the likelihood of exploitation predicts the likelihood of an actual exploitation of the respective software vulnerabilities prior to such vulnerabilities being disclosed in a public database"** |
| "wherein the likelihood of exploitation predicts an actual exploitation of the software vulnerability before disclosure based on hacker communications from the plurality of datasets" | **"wherein, based on hacker communications from the plurality of data sets, the likelihood of exploitation predicts the likelihood of an actual exploitation of the software vulnerability prior to such vulnerability being disclosed in a public database"** |

**2. "likelihood of exploitation"**

| **"likelihood of exploitation"**<br>('897 Patent, Claims 1, 14, 18) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "requiring a gradient in order to facilitate 'ranking vulnerabilities' that are likely to be exploited, not a binary determination like 'exploited' or 'not exploited'" |

Dkt. No. 46 at A-1; Dkt. No. 92, Ex. A at A-4.

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "a gradient of three or more likelihood levels that facilitate ranking a likelihood that particular vulnerabilities will be exploited."

(a) The Parties' Positions

Plaintiff argues that "[t]he Court should reject Fortinet's attempt to replace the straightforward three-word phrase 'likelihood of exploitation' with an unwieldy 24-word construction that appears nowhere within the specification or the file history." Dkt. No. 67 at 6 (emphasis omitted).

Defendant responds that "Fortinet's construction is not only the plain and ordinary meaning, but it comes directly from Skysong's own statements to the PTO about the meaning of this term." Dkt. No. 78 at 5.

Plaintiff replies that there has been no disclaimer and that "Fortinet's argument misunderstands the distinction Skysong drew with regard to the prior art Sabottke in the IPR." Dkt. No. 80 at 3. Plaintiff also argues that "Fortinet's interpretation of Skysong's statements in the POPR, which excludes binary determinations altogether, contradicts what the specification says is true about all its embodiments, and thus cannot constitute a clear and unmistakable disavowal." *Id.* at 4 (citation omitted).

At the May 29, 2026 hearing, the parties presented no oral arguments and instead rested on their briefing.

(b) Analysis

Claim 1 of the '897 Patent, for example, recites in relevant part (emphasis added):

> 1. A method for assessing a likelihood of exploitation of software vulnerabilities, comprising:
>
> * * *

> computing, by applying the one or more features to the classification model, a class label defining one or more values defining a likelihood of exploitation associated with the software vulnerability, *wherein the likelihood of exploitation predicts an actual exploitation of the respective software vulnerabilities before disclosure based on the hacker communications from the training data.*

Defendant argues that, because the specification discloses that a likelihood of exploitation can "increase[]" (*see, e.g.,* '897 Patent at 1:36–38), the likelihood must be numerical. The specification also discloses several specific percentages:

> Using vulnerability mentions on EDB, ZDI, and DW, the present disclosure further describes the increase in the *vulnerability exploitation likelihood* over vulnerabilities only disclosed on NVD. In addition, the present disclosure provides results that demonstrate the *likelihood of being exploited* given vulnerability mention on EDB is *9%*, ZDI is *12%* and DW is *14%* as compared to NVD, which is *2.4%*, and explains the availability of such information relative to the time an exploit is found in the wild.

'897 Patent at 4:1–9 (emphasis added); *see id.* at 12:1–18 ("around 2.4% of the vulnerabilities disclosed in NVD are exploited in the wild").

Plaintiff persuasively counters, however, that the disclosure of percentages pertains to specific embodiments and that classifications could instead "increase" through a series of qualitative levels, such as not likely, somewhat likely, and highly likely.

The specification further discloses:

> Computing the Likelihood of Exploitation (206): In all embodiments presented in this disclosure, the problem is viewed as a binary classification problem, and several standard supervised machine learning approaches were evaluated and may be implemented.

'897 Patent at 7:8–13.

This disclosure that "all embodiments" can involve "binary classification" weighs against Defendant's proposal of expressly excluding "a binary determination." *Id.*

Defendant cites statements by Plaintiff in IPR proceedings in a section that Plaintiff titled "PATENT OWNER'S CLAIM CONSTRUCTIONS" as well as in discussion regarding the "Sabottke" reference:

> A POSITA would understand the term "likelihood of exploitation" as requiring a *gradient* in order to facilitate "ranking vulnerabilities" that are likely to be exploited, which would be impossible in a binary classification model consisting only of "exploited" and "not exploited."
>
> * * *
>
> As set forth above, "likelihood of exploitation" in the '897 patent refers to a likelihood *gradient* in order to facilitate "ranking vulnerabilities" that are likely to be exploited. *See* sec. VII.D. above (construction of "likelihood of exploitation"). This would be impossible in a binary classification model consisting only of "exploited" and "not exploited." EX2008 at ¶113 (citing '897 patent at 7:15–17).

Dkt. No. 78, Ex. A, Nov. 10, 2024 Patent Owner's Preliminary Response at 16 & 26 (emphasis added; citations omitted). Plaintiff's reliance on a "gradient" did not necessarily require a numerical percentage, particularly when considering that Plaintiff distinguished a classification model that had only two options: "exploited" and "not exploited." *Id.* Also, in this IPR Plaintiff distinguished Sabottke as being backward-looking ("exploit*ed*" or "not exploit*ed*") rather than forward-looking, not based on numerical percentages. *Id.*

Still, Plaintiff in the IPR expressly construed this term as referring to a "gradient" (*id.*), which supports Defendant's proposal of requiring a gradient. Although the "likelihood" need not necessarily be a numerical percentage, giving effect to Plaintiff's use of the word "gradient" requires more than merely two levels.

The Court therefore hereby construes "likelihood of exploitation" to mean **"a gradient of three or more likelihood levels that facilitate ranking a likelihood that particular vulnerabilities will be exploited."**

**3. "social connections"**

| "social connections"<br>('897 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| "connections of a user to other users in a social network"<br><br>Alternatively:<br>"measures computed from the social connections of users posting hacking-related content, which include but are not limited to the in-degree and out-degree a given user has to other active users in the social network" | "the in-degree and out-degree a given user has to other active users in the social network"<br><br>Alternatively:<br>"connections of a user to other users in a graph representing a social network" |

Dkt. No. 46 at A-2; Dkt. No. 78 at 6 & 7; Dkt. No. 80 at 5; Dkt. No. 92, Ex. A at A-6–A-7.

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "the in-degree and out-degree a given user has to other active users in the social network."

(a) The Parties' Positions

Plaintiff argues that Defendant's proposed construction "improperly imports technical graph-theory terminology from a particular embodiment described in the specification into the claims." Dkt. No. 67 at 8. Plaintiff argues that "Fortinet's construction collapses the broader term 'social connections' into just one of multiple metrics the specification describes, thereby excluding from claim 1 the very centrality and importance measures the patent also discloses as social graph features." *Id.*

Defendant responds that "Fortinet's proposed construction comes directly from Skysong's own clear and unmistakable disavowal of any broader constructions of this term in arguments to the PTO." Dkt. No. 78 at 6 (citation omitted).

Plaintiff replies that "'[s]ocial connections' should carry its plain and ordinary meaning because the intrinsic record does not require a graph until dependent claim 11." Dkt. No. 80 at 4. "Moreover," Plaintiff argues, "the specification discusses 'in-degree and out-degree' as examples of features that 'contain measures computed from the social connections of users posting hacking-related content,' not as a *definition* narrowing claim 1." *Id.* (citations omitted).

At the May 29, 2026 hearing, the parties presented no oral arguments and instead rested on their briefing.

(b) Analysis

Claim 1 of the '897 Patent, for example, recites (emphasis added):

> 1. A method for assessing a likelihood of exploitation of software vulnerabilities, comprising:
>
> utilizing a processor in operable communication with at least one memory for storing instructions that are executed by the processor to perform operations, including:
>
> accessing a plurality of datasets associated with a predetermined set of data sources, the plurality of datasets including training data comprising hacker communications;
>
> accessing features from the plurality of datasets that include measures computed from *social connections of users posting hacking-related content*
>
> applying learning algorithms to the training data to generate classification models that are configured to predict class labels defining a likelihood of exploitation of respective software vulnerabilities;
>
> accessing one or more features associated with a software vulnerability; and
>
> computing, by applying the one or more features to the classification model, a class label defining one or more values defining a likelihood of exploitation associated with the software vulnerability, wherein the likelihood of exploitation predicts an actual exploitation of the respective software vulnerabilities before disclosure based on the hacker communications from the training data.

Nothing in the claim language specifies a "graph," and Defendant does not identify any definition or disclaimer in the specification. The remaining dispute is whether Plaintiff's

statements in IPR proceedings support Defendant's proposal of requiring "in-degree and out-degree" or a social "graph."

In IPR proceedings, Plaintiff stated as follows in a section titled "PATENT OWNER'S CLAIM CONSTRUCTIONS" and in a subsection titled "Social Connections":

> A POSITA would understand the term "social connections" in the '897 patent as including "the in-degree and out-degree a given user has to other active users in the social network."
>
> * * *
>
> The "centrality of users" is determined using the users' in-degree and out-degree, which the '897 patent defines as the number of edges pointing to the user (in-degree) and the number of edges originated from the user (out-degree).

Dkt. No. 78, Ex. A, Nov. 10, 2024 Patent Owner's Preliminary Response at 14 & 15 (citing declaration of Plaintiff's expert; citing '897 Patent at 21:12–14). The patentee further stated as follows when arguing that the "Sabottke" reference does not disclose a limitation of Claim 1 of the '897 Patent:

> As set forth above, "social connections" *refers to* the in-degree and out-degree a given user has [*sic*, has to] other active users in the social network.

*Id.* at 23 (emphasis added).

Plaintiff emphasizes its use of the phrase "as including" in the claim construction section of this IPR document (*id.* at 14), but, when later referring back to that statement, Plaintiff used the word "refers" without any suggestion that in-degree and out-degree are non-limiting. *Id.* at 23. Plaintiff's reliance on in-degree and out-degree in its own construction of "social connections" is part of the intrinsic record and should be given effect in the present claim construction proceedings. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017) ("[S]tatements made by a patent owner during an IPR proceeding, whether before or after an institution decision, can

be considered for claim construction and relied upon to support a finding of prosecution disclaimer.”).

Plaintiff’s proposed construction—“connections of a user to other users in a social network”—does not give appropriate effect to Plaintiff’s statements in the IPR proceedings. *Id.* Plaintiff’s alternative proposed construction—“measures computed from the social connections of users posting hacking-related content, which *include but are not limited to* the in-degree and out-degree a given user has to other active users in the social network”—is likewise inconsistent with Plaintiff’s statements in the IPR proceedings. Instead, Plaintiff’s reliance on in-degree and out-degree should be reflected in the construction of “social connections.”

Plaintiff argues that such a construction would render Claim 11 superfluous. Claim 11 of the ’897 Patent recites (emphasis added):

> 11. The method of claim 1, further comprising:
> accessing features from the plurality of datasets that measure a *centrality* of the users in a social graph.

Plaintiff does not demonstrate, however, that “centrality” is coextensive with in-degree and out-degree, so Claim 11 is not inconsistent with interpreting “social connections” as requiring in-degree and out-degree. Indeed, the specification refers to “centrality” as a “[m]ore advanced feature[].” ’897 Patent at 11:33–34. Moreover, even if Claim 11 were deemed to be superfluous, this would not be a sufficient basis to set aside Plaintiff’s definitive statement in the IPR proceeding requiring in-degree and out-degree. *See Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1360 (Fed. Cir. 2016) (“The dependent claim tail cannot wag the independent claim dog.”); *see also N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993) (same).

Also, the specification reinforces this interpretation by listing in-degree and out-degree as "basic social network features":

> DW [(darkweb/deepweb)] Social Network Features. This set of features contains measures computed from the *social connections* of users posting hacking-related content. The *basic social network features (e.g., in-degree, out-degree)* indicates how active a user is in the social graph. More advanced features measure the centrality of users in the social graph. Highly central users are more important; thus the vulnerability mentions should take more consideration. The features were computed for the set of users who explicitly mentioned one or more CVE-IDs in their posts.

'897 Patent at 11:29–38 (emphasis added). Additional disclosure in the specification as to a particular embodiment further reinforces this understanding by describing in-degree and out-degree:

> Social Network Measures (Embodiment B)
>
> After creating the social network, measures are computed derived from the network structure. In this disclosure, three categories of social network measures are considered:
>
> Network Structure Measures: the measures under this category are: (1) In-degree: the number of edges pointing to the user, (2) Out-degree: the number of edges originated from the user, (3) Sum of In-degree weights: the sum of the weights for all edges pointing to the user, (4) Sum of out-degree weights: the sum of the weights for all edges pointing away from the user. These measures describe the type of activities in which the user engages. For example, higher in-degree than out-degree may indicate the user tendency towards creating new topics or posting under topics short time after they are created.
>
> Centrality Measures: three measures are computed: (1) In-degree centrality: it measures the popularity of a user $v_i$ by normalizing $v_i$'s in-degree by the maximum possible in-degree, (2) Out-degree centrality: measures how actively a user $v_i$ replies to others by normalizing $v_i$'s out-degree measure by the maximum possible out-degree, (3) Betweenness centrality: for a user $v_i$, Betweenness centrality measures the importance of $v_i$ by computing the fraction of shortest paths between all pairs of users that pass through vi.
>
> Importance Measures: the number of connections user $v_i$ has with other users, by itself, may not be indicative of importance; rather, $v_i$ is important if his/her posts make other important users reply. * * *

*Id.* at 21:6–46.

The Court therefore hereby construes "social connections" to mean **"the in-degree and out-degree a given user has to other active users in the social network."**

**4. "full precision computation"**

| **"full precision computation"**<br>('831 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "performing a full convolution for a data set identified using the value calculated from a [first/second] set of most significant bits for a data set"<br><br>Alternatively:<br>"performing a full computation, comprising a convolution for a data set identified using the value calculated from a [first/second] set of most significant bits for a data set" |

Dkt. No. 46 at A-2; Dkt. No. 78 at 12; Dkt. No. 92, Ex. A at A-8.

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "Plain and ordinary meaning."

(a) The Parties' Positions

Plaintiff argues, for example, that "[s]ubstituting 'convolution' for 'computation,' as Fortinet proposes, would exclude other types of computation expressly disclosed, such as pooling." Dkt. No. 67 at 10 (citation omitted). Plaintiff also argues that "Fortinet's further limitation—that the full-precision step must be 'for a data set identified using the value calculated from' the MSB iterations—needlessly rewrites the claim, is superfluous, and risks confusing the jury." *Id.*

Defendant responds that "Fortinet's construction is the plain and ordinary meaning of the term as it would have been understood by a POSITA, which is supported by the claim language and the alleged improvement over conventional CNNs detailed in the specification . . . ." Dkt. No. 78 at 10. Defendant also argues that "Skysong's argument that Fortinet's construction would read out embodiments is likewise wrong." *Id.* at 11.

Plaintiff replies that "Fortinet's attempt to equate 'computation' with 'convolution' fails for three reasons: 1) Claim 4, which depends from claim 1, discloses that a 'computation' may include 'convolution *and* pooling,' and thus that the term cannot be limited merely to 'convolution'; 2) Fortinet itself concedes that its construction 'does not preclude other calculations' (Resp. at 11 ); and 3) Fortinet's reliance on embodiments depicting convolution cannot override the claim language." Dkt. No. 80 at 5 (citation omitted).

At the May 29, 2026 hearing, the parties presented no oral arguments and instead rested on their briefing.

(b) Analysis

Claims 1, 2, and 4 of the '831 Patent recite (emphasis added):

> 1. One or more non-transitory computer-readable storage media storing instructions which, when executed by at least one processor, cause the at least one processor to perform operations comprising:
>
> *in one or more layers of a convolutional neural network (CNN)*, performing a first iteration that includes *computing* a value based on a first set of most significant bits (MSBs) for each of a plurality of data sets;
>
> examining a first set of values computed for the plurality of data sets in the first iteration to determine whether a maximum value is present among the first set of values;
>
> responsive to identifying the maximum value, performing a *full precision computation* of the value for a data set, of the plurality of data sets, that exhibited the maximum value; and
>
> propagating the *full precision computation* of the value to a subsequent layer of the CNN.

> 2. The one or more non-transitory computer-readable storage media of claim 1, further comprising:
>
> responsive to determining that the first set of values are the same, performing, by the at least one processor, a second iteration that includes *computing* the value based on a second set of MSBs for each of the plurality of data sets, the second set of MSBs being larger than the first set of MSBs.
>
> * * *
>
> 4. The one or more non-transitory computer-readable storage media of claim 2, wherein *the computing* in each of the first iteration and the second iteration *employs a convolution and a pooling.*

On one hand, dependent Claim 4 recites not only "convolution" but also "pooling," so any inference based on the doctrine of claim differentiation is of limited weight. *Wenger Mfg. v. Coating Mach. Sys.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Claim differentiation, while often argued to be controlling when it does not apply, is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and that limitation is *the only meaningful difference between the two claims*.") (emphasis added).

On the other hand, dependent Claim 4 expressly recites "convolution," which, apart from the doctrine of claim differentiation, implies to at least some degree that "computing" or "computation" is broader than "convolution." *See Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.") (citation omitted).

Further, even if accepting Defendant's assertion that "[e]very embodiment in the patent performs a convolution for the full-precision step" (Dkt. No. 78 at 11 (citing '831 Patent at 7:15–20, 7:58–8:7 & Figs. 4–5)), the Federal Circuit has cautioned that "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips*, 415 F.3d at 1323. The opinions of Plaintiff's expert cited by Defendant do not show otherwise. *See* Dkt. No. 78, Ex. E, Medvidovic dep. at 80:18–23 ("To a person of

ordinary skill in the art, they would understand that an iteration through a CNN would include a convolution, but they would also understand that it would include operations -- or computations, rather, beyond just convolution."); *see also id.* at 78:8–81:16.

Finally, as for Defendant's proposal of "using the value calculated from a [first/second] set of most significant bits for a data set," Plaintiff persuasively argues that Claim 1 (reproduced above) already recites "performing a full precision computation of the value for a data set, of the plurality of data sets, that exhibited the maximum value." Defendant's proposal in this regard would thus tend to confuse rather than clarify the scope of the claims.

The Court therefore hereby expressly rejects Defendant's proposed constructions, and no further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 977–79 (Fed. Cir. 2021).

The Court accordingly hereby construes "full precision computation" to have its **plain meaning**.

**5. "first set of most significant bits (MSBs)"**

| **"first set of most significant bits (MSBs)"**<br>('831 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| "a first set of bits containing two or more high order bits, but less than all the bits, in a data set"[2] | "first set of bits containing at least the two highest-order contiguous bits, but less than all the bits, in a data set" |

Dkt. No. 46 at A-3; Dkt. No. 92, Ex. A at A-9.

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "a first set of bits containing two or more high-order bits, but less than all the bits, in a data set."

(a) The Parties' Positions

Plaintiff argues that Defendant's proposed construction "improperly imports a contiguity requirement and rigid numerical constraints that appear nowhere in the claims or specification." Dkt. No. 67 at 11.

Defendant responds: "The sole difference in the parties' proposals centers around whether '*most* significant' in fact means '*most* significant,' or whether, as Skysong contends, it can instead mean fairly or somewhat significant. Consistent with the plain meaning of the word 'most,' Fortinet's construction informs a jury that the '*most* significant bits' refer to the '*highest*-order contiguous bits' in a number." Dkt. No. 78 at 12.

Plaintiff replies: "Fortinet's argument focuses entirely on '*most* significant' but ignores the critical qualifier: the '*first* set of most significant bits.' The word 'first' necessarily implies possible additional sets." Dkt. No. 80 at 5. Plaintiff argues that "*nothing* in the specification

---

[2] Plaintiff previously proposed: "Plain and ordinary meaning." Dkt. No. 46 at A-3.

precludes the first set of most significant bits from not using the first two highest order bits or using *non-contiguous bits*, for example when the first two highest order bits are exactly the same, as with the numbers '1925' and '1934.'" *Id.* at 6.

At the May 29, 2026 hearing, the parties presented oral arguments.

(b) Analysis

Claim 1 of the '831 Patent recites (emphasis added):

> 1. One or more non-transitory computer-readable storage media storing instructions which, when executed by at least one processor, cause the at least one processor to perform operations comprising:
>
> in one or more layers of a convolutional neural network (CNN), performing a first iteration that includes computing a value based on a *first set of most significant bits (MSBs)* for each of a plurality of data sets;
>
> examining a first set of values computed for the plurality of data sets in the first iteration to determine whether a maximum value is present among the first set of values;
>
> responsive to identifying the maximum value, performing a full precision computation of the value for a data set, of the plurality of data sets, that exhibited the maximum value; and
>
> propagating the full precision computation of the value to a subsequent layer of the CNN.

Plaintiff submits that the Western District of Texas in *CrowdStrike* rejected the proposed construction that Defendant proposes here and, instead, construed "first set of most significant bits (MSBs)" in Claim 1 of the '831 Patent to mean "a first set of bits containing two or more high order bits, but less than all the bits, in a data set." *CrowdStrike* at 3.

The specification discloses:

> In some implementations, the data may include one or more *most significant bits (MSB) 102*, one or more least significant bits (LSB) 104, and one or more bits 106 in between the MSB and LSB. MSB may include the coarser level of data and LSB may include the more fine-grained data. In some implementations, convolution may be performed on the MSB initially. Based on the results of the MSB-driven convolution(s), a maximum may be determined. If one of the data sets exhibits a maximum, with a high confidence, over the other data sets based on the MSB-driven convolution(s), the algorithm may proceed to the next layers using that data set maximum and discarding the others. Compared to conventional methods, this

> MSB-driven convolution may produce similar results given that the lower precision bits in the data set would not have altered the maximum determination computation even if they had been included in the original computation. Accordingly, implementations initially perform a minimal amount of computation to determine and compare maximums among the data sets, and avoid the initial full convolution performed by conventional CNNs. In some implementations, after determining the maximum based on the low precision MSB-based computations, the full precision (e.g., all bits) computation may be performed on the data set for which the maximum was identified.
>
> In some instances, two data sets may exhibit the same value or a similar value following the initial low precision convolution, such that a clear maximum may not be determined among the data sets. In some implementations, if the difference between the initial results is less than a predetermined threshold then a cascaded convolution may be performed by repeating the convolution *using a large set of the bits of the data, e.g., the MSB 102 and the intermediary bits 106.* A maximum may then be determined from among the results of this computation for each data set. If a clear maximum is not determined based on this slightly higher precision computation, the process may cascade further and *perform another iteration with yet more bits*, and so forth. The algorithm may perform any suitable number of iterations, up to the full precision (e.g., full data set) convolution, until a maximum is determined from among the data sets. In some implementations, each iteration may include an additional two bits in the computation, compared to the previous iteration. In some implementations, the additional iterations may be performed on those data sets that are candidates to exhibit the eventual maximum, e.g., those data sets for which the result value is close to the result(s) of other data set(s). Accordingly, each iteration may reduce the number of candidate data sets for the eventual maximum value, until only one such data set remains to proceed to the next layer of analysis. This iterative algorithm provided by implementations is also described as a cascading algorithm.

’831 Patent at 5:11–63.

The plain meaning of “most” requires that a “first set of most significant bits (MSBs)” uses high-order bits. *See Phillips*, 415 F.3d at 1314 (“In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.”) (citation omitted). This is also consistent with the disclosed illustration of “MSB 102” in Figure 1B. ’831 Patent at 5:12, 5:44 & Fig. 1B; *see id.* at 5:11–63 (reproduced above).

As Plaintiff argues, "[t]he word 'first' necessarily implies possible additional sets." Dkt. No. 80 at 5. The claim does not restrict the number of bits other than requiring at least two (because the claim recites "bits," plural). The claim does not restrict the bits to being contiguous and does not otherwise restrict the positions of the bits other than by implicitly requiring that the "first set of most significant bits (MSBs)" at least does not include the least significant bit. This is reflected in the *CrowdStrike* construction (which Plaintiff now proposes) requiring "two or more high order bits."

The Court therefore hereby construes "first set of most significant bits (MSBs)" to mean **"a first set of bits containing two or more high-order bits, but less than all the bits, in a data set."**

**6. "second set of MSBs"**

| **"second set of MSBs"**<br>('831 Patent, Claim 2) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "second set of bits containing at least one more highest-order contiguous bit than the first set of most significant bits (MSBs) in a data set" |

Dkt. No. 46 at A-3; Dkt. No. 92, Ex. A at A-10.

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "Plain and ordinary meaning."

<u>(a) The Parties' Positions</u>

Plaintiff argues that Defendant's proposed construction "imports a contiguity requirement and a fixed one-bit increment that appear nowhere in the claim language." Dkt. No. 67 at 13.

Defendant responds by incorporating its argument as to "first set of most significant bits (MSBs)" and by further arguing that "Skysong argues that Fortinet's construction requires 'fixed one-bit increment,' such that the second set is a fixed one bit larger than the first set. Not true. Fortinet's construction recites that the second set of MSBs needs to have 'at least one more' bit to make sure the jury understands what it means for the second set to be 'larger' than the first set, as required by the claims." Dkt. No. 78 at 14.

Plaintiff replies that "Claim 2 requires only that the second set be larger than the first," "[i]t does not mandate contiguity or limitation to the next highest-order bits," and "[t]he specification's permissive language confirms flexibility." Dkt. No. 80 at 7.

At the May 29, 2026 hearing, the parties presented no oral arguments as to this term apart from their arguments as to "first set of most significant bits (MSBs)."

(b) Analysis

Claim 2 of the '831 Patent depends from Claim 1 (reproduced above), and Claim 2 recites (emphasis added):

> 2. The one or more non-transitory computer-readable storage media of claim 1, further comprising:
>
> responsive to determining that the first set of values are the same, performing, by the at least one processor, a second iteration that includes computing the value based on a *second set of MSBs* for each of the plurality of data sets, the *second set of MSBs* being larger than the first set of MSBs.

As for whether the additional bit (or bits) must be "contiguous" with the bits of the first set, this mirrors the parties' dispute regarding the meaning of "first set of most significant bits (MSBs)," which is addressed above. *CrowdStrike* construed "second set of MSBs" as "[p]lain and ordinary meaning," *CrowdStrike* at 3, and this Court reaches the same conclusion that no construction is necessary beyond the construction of "first set of most significant bits (MSBs)."

The Court therefore hereby construes "second set of MSBs" to have its **plain meaning**.

**7. "data defining a first web content class and a second web content class" / "data defining rules for delegating web access associated with a first content class to a first browser type and delegating web access associated with a second content class to a second browser type" / "data associating a first web content class with a first browser type and a second web content class with a second browser type"**

<table>
<tr><td colspan="2" align="center">"data defining a first web content class and a second web content class"<br><br>"data defining rules for delegating web access associated with a first content class to a first browser type and delegating web access associated with a second content class to a second browser type"<br><br>"data associating a first web content class with a first browser type and a second web content class with a second browser type"<br><br>('721 Patent, Claims 1, 7, 12)</td></tr>
<tr><td>Plaintiff's Proposed Construction</td><td>Defendant's Proposed Construction</td></tr>
<tr><td>Plain and ordinary meaning<br><br>Alternatively:<br>"data defining a first web content class and a second web content class, wherein the data must consist of more than, but may include, a single collection of pre-defined non-trusted sites"<br>"data defining rules for delegating web access associated with a first content class to a first browser type and delegating web access associated with a second content class to a second browser type, wherein the data must consist of more than, but may include, a single collection of pre-defined non-trusted sites"<br>"data associating a first web content class with a first browser type and a second web content class with a second browser type, wherein the data must consist of more than, but may include, a single collection of pre-defined non-trusted sites"</td><td>"data defining a first web content class and a second web content class, not simply storing a collection of pre-defined nontrusted sites"<br><br>"data defining rules for delegating web access associated with a first content class to a first browser type and delegating web access associated with a second content class to a second browser type, not simply storing a collection of pre-defined nontrusted sites"<br><br>"data associating a first web content class with a first browser type and a second web content class with a second browser type, not simply storing a collection of predefined non-trusted sites"</td></tr>
</table>

Dkt. No. 46 at A-4; Dkt. No. 92, Ex. A at A-10–A-11.

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with the following preliminary constructions: "data defining a first web content class and a second web

content class, wherein for each web content class the data includes at least one distinct collection of predefined non-trusted sites"; "data defining rules for delegating web access associated with a first content class to a first browser type and delegating web access associated with a second content class to a second browser type, wherein for each content class the data includes at least one distinct collection of predefined non-trusted sites"; and "data associating a first web content class with a first browser type and a second web content class with a second browser type, wherein for each web content class the data includes at least one distinct collection of predefined non-trusted sites."

(a) The Parties' Positions

Plaintiff argues that "[t]he Court should reject Fortinet's attempt to append a negative limitation—'not simply storing a collection of pre-defined non-trusted sites'—to otherwise straightforward claim language." Dkt. No. 67 at 15. Plaintiff also argues that "[a]ny attempt to remove lists of websites from the classes would improperly exclude preferred embodiments from the specification." *Id.* at 16. Alternatively, Plaintiff argues that "to the extent that the Court believes that some clarification of claim scope is required, these limitations should instead be construed affirmatively rather than with negative limitations in order to avoid jury confusion." *Id.*

Defendant responds that clarification is appropriate that "[t]he claims . . . cannot encompass a single list of non-trusted sites because Skysong cannot recapture what was surrendered during prosecution." Dkt. No. 78 at 16 (citation omitted). Defendant submits that "Fortinet's construction does not preclude the use of 'lists,' . . . but instead only makes clear that a single list is insufficient," and Defendant argues that "[t]his is consistent with the specification." *Id.* (citation omitted).

Plaintiff replies that "Fortinet's proposed negative limitation, 'not simply storing a collection of pre-defined nontrusted sites,' adds no clarity because the claim language already requires two distinct content classes, each linked to a respective browser type." Dkt. No. 80 at 7.

At the May 29, 2026 hearing, the parties presented no oral arguments and instead rested on their briefing.

(b) Analysis

Claim 1 of the '721 Patent, for example, recites (emphasis added):

> 1. A system, comprising:
> a processor, operable to:
> receive *data defining a first web content class and a second web content class*, the first web content class defining a first plurality of Uniform Resource Locators (URLs), and the second web content class defining a second plurality of URLs different than the first plurality of URLs, the second web content class further being associated with sensitive information presenting a security risk;
> generate a first browser instance, the first browser instance defining a browser instance type predetermined to be associated with the first web content class;
> intercept a request to access web content from the first browser instance, the request defining a URL of the second plurality of URLs such that the web content is associated with the second web content class;
> confirm that the URL is not being accessed by another separate already-running browser instance associated with the second web content class, by
> implementing a daemon outside the first browser instance that tracks active browser instances and launches a new browser in order to manage web access according to the *data defining the first web content class and the second web content class,*
> receiving the request via a browser extension associated with the first browser instance,
> forwarding the request from the browser extension to the daemon using a native application,
> confirming, via the daemon that the web content is not associated with the first web content class and that another browser instance is not already launched and available to access the web content; and

> launch a new browser for accessing the web content associated with the second web content class to provide access to the URL of the second plurality of URLs via the new browser.

During prosecution of the ’721 Patent, the patentee distinguished the “Loesch” reference, arguing:

> Independent claims 7 and 13 (and independent claim 1) recite the utilization of content classes (first content class and second content class) for more secure authentication. For example, independent claim 7 recites “accessing data defining rules for delegating web access associated with a first content class to a first browser type and delegating web access associated with a second content class to a second browser type,” and independent claim 13 recites “accessing data associating a first web content class with a first browser type and a second web content class with a second browser type.”
>
> It is respectfully submitted that the Loesch reference is devoid of such features. Loesch describes a web site database 44 storing a *collection of predefined non-trusted sites*. Loesch does not describe *breaking down URL access according to content classes* as described in detail throughout the specification.

*See* Dkt. No. 67, Ex. 6, Aug. 14, 2018 Supplemental Amendment & Response Under 37 C.F.R. §1.111 and MPEP 714.03(a) (ASU_FN0000354) (emphasis added).

Defendant argues that the disputed terms therefore do not encompass a mere “collection of predefined non-trusted sites” (*id.*), and Plaintiff essentially agrees, as reflected by Plaintiff’s alternative proposal of construing the disputed terms by clarifying that “the data must consist of more than, but may include, a single collection of pre-defined non-trusted sites.” Dkt. No. 67 at 17 (emphasis omitted). That is, for each content class there must be a distinct collection of predefined non-trusted sites.

The Court hereby construes these disputed terms as set forth in the following chart:

| <u>Term</u> | <u>Construction</u> |
|---|---|
| “data defining a first web content class and a second web content class” | **“data defining a first web content class and a second web content class, wherein for each web content class the data includes at least** |

| | |
|---|---|
| | **one distinct collection of predefined non-trusted sites”** |
| “data defining rules for delegating web access associated with a first content class to a first browser type and delegating web access associated with a second content class to a second browser type” | **“data defining rules for delegating web access associated with a first content class to a first browser type and delegating web access associated with a second content class to a second browser type, wherein for each content class the data includes at least one distinct collection of predefined non-trusted sites”** |
| “data associating a first web content class with a first browser type and a second web content class with a second browser type” | **“data associating a first web content class with a first browser type and a second web content class with a second browser type, wherein for each web content class the data includes at least one distinct collection of predefined non-trusted sites”** |

**8. “sensitive information presenting a security risk” / “sensitive information indicating that accessing the web content by the first browser instance presents a security risk”**

| **“sensitive information presenting a security risk”**<br>**“sensitive information indicating that accessing the web content by the first browser instance presents a security risk”**<br>(’721 Patent, Claims 1, 16) | |
|---|---|
| **Plaintiff’s Proposed Construction** | **Defendant’s Proposed Construction** |
| Not indefinite; plain and ordinary meaning | Indefinite |

Dkt. No. 46 at A-5; Dkt. No. 92, Ex. A at A-15.

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with the following preliminary construction: “Plain and ordinary meaning.”

(a) The Parties’ Positions

Plaintiff argues that “Fortinet’s own patents and public materials use ‘sensitive information’ the same way the industry does: data that requires protection from unauthorized

access or exfiltration, including financial/banking information, PII/PHI, IP, and trade secrets." Dkt. No. 67 at 17 (citations omitted); *see id.* at 17–19.

Defendant responds that "[t]his term is indefinite because, as Skysong readily admits, the term is subjective and the '721 patent never provides an *objective* boundary for what qualifies as 'sensitive information,' or how a POSITA would determine when information is 'presenting a security risk.'" Dkt. No. 78 at 17 (citation omitted). Defendant argues that "the intrinsic record does not define the term 'sensitive information,' let alone 'sensitive information presenting a security risk,'" and "that Fortinet uses the term 'sensitive information' in its documents does not change the result." *Id.* at 17 & 19 (citation omitted).

Plaintiff replies that "Fortinet's indefiniteness argument fails because the intrinsic record provides objective boundaries and an implementable test." Dkt. No. 80 at 7.

At the May 29, 2026 hearing, the parties presented oral arguments.

<u>(b) Analysis</u>

Claim 1 of the '721 Patent, for example, recites in part (emphasis added):

> 1. A system, comprising:
> a processor, operable to:
> receive data defining a first web content class and a second web content class, the first web content class defining a first plurality of Uniform Resource Locators (URLs), and the second web content class defining a second plurality of URLs different than the first plurality of URLs, the second web content class further being associated with *sensitive information presenting a security risk*;
> * * *

As a threshold matter, Defendant argued at the May 29, 2026 hearing that the "sensitive information" must be significant because it is not recited in Claim 7 or Claim 12. Plaintiff does not dispute, however, that this term has meaning. The issue is whether Defendant has persuasively demonstrated that this claim term lacks reasonably clear meaning in the context of the '721 Patent.

In some cases, subjective claim language can lack reasonably clear meaning and can thereby be indefinite. *See, e.g., Akamai Techs., Inc. v. MediaPointe, Inc.*, 159 F.4th 1370, 1378 (Fed. Cir. 2025) ("the patents here do not give the required objective boundaries for determining what is 'optimal' or 'best'"); *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) (regarding "QOS Requirements," noting disclosure in specification that this is "a relative term, finding different meanings for different users"). Defendant argues that "the patent intrinsic record repeatedly confirms that the term is a subjective one—what it means for information to be 'sensitive' is entirely up to the user." Dkt. No. 78 at 18.

In the present context, however, the recital of "sensitive information presenting a security risk" pertains more to how the claimed system is *utilized* rather than to what the claimed system *is*. *See, e.g.,* '721 Patent at 4:54–5:4 (discussing operations "when a URL is sensitive" and "[i]f the URL is determined not to be sensitive"); *id.* at 7:8–14, 8:38–57 & 10:33–50; *id.* at Fig. 3. Plaintiff persuasively argues that "once administrators configure policy classes, the claim operates on that objective condition, not individual judgment." Dkt. No. 80 at 8 (citation omitted). Defendant's citation of testimony of Plaintiff's expert, such as that "sensitive information is information that is sensitive" (Dkt. No. 78, Ex. E, Mar. 17, 2026 Medvidovic dep. at 65:11–18; *see id.* at 53:22–54:11 & 66:15–67:16), is therefore unpersuasive. The opinion of Plaintiff's expert is also persuasive in this regard. Dkt. No. 67, Ex. 2, Feb. 17, 2026 Medvidovic Decl. ¶ 42. Further, an extrinsic technical definition of "computer security," cited by Plaintiff, reinforces that "sensitive information" is a phrase known in the relevant art. Dkt. No. 67, Ex. 3, *Microsoft Computer Dictionary* 121 (5th ed. 2002) ("On a computer that many people have access to, security can be maintained by requiring personnel to use passwords and by granting only approved users access to sensitive information.").

Finally, at the May 29, 2026 hearing, Defendant cited deposition testimony of Rida A. Bazzi, one of the named inventors of the '721 Patent (*see* Dkt. 94-1, Def. Slide #62), but this testimony is not an exhibit to the briefing in these claim construction proceedings and, even if considered, this testimony does not significantly affect the Court's analysis. *See Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346–47 (Fed. Cir. 2008) (inventor testimony is "limited by the fact that an inventor understands the invention but may not understand the claims, which are typically drafted by the attorney prosecuting the patent application").

Defendant therefore has not met its burden to show indefiniteness. Defendant presents no alternative proposed construction, and no further construction is necessary.

The Court accordingly hereby construes "sensitive information presenting a security risk" and "sensitive information indicating that accessing the web content by the first browser instance presents a security risk" to have their **plain meaning**.

**9. "intercept a request" / "identifying a request" / "accessing a request"**

| **"intercept a request"**<br>**"identifying a request"**<br>**"accessing a request"**<br>('721 Patent, Claims 1, 7, 12) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "intercept a system call" /<br>"identify a system call" /<br>"access a system call" |

Dkt. No. 46 at A-7; Dkt. No. 92, Ex. A at A-17.

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with the following preliminary constructions: "intercept a system call"; "identifying a system call"; and "accessing a system call."

(a) The Parties' Positions

Plaintiff argues: "The Court should reject Fortinet's attempt to replace 'request' with 'system call' in each of these terms because the [*sic*] impermissibly read out embodiments in which requests are intercepted, identified, and accessed *without* invoking a 'system call' at all. Indeed, the specification *separately discusses* 'Intercepting *System Calls*' from 'Intercepting *IP Communication*,' thereby confirming that the word 'requests' is broader than merely 'System Calls.'" Dkt. No. 67 at 21 (citing '721 Patent at 7:15–8:36). Plaintiff argues that "Fortinet's narrowing of 'request' to 'system call' improperly imports a single implementation detail from the specification into the claims." *Id.* at 21.

Defendant responds that "despite offering this exact construction [(Fortinet's proposal)] to the PTO during IPR proceedings, Skysong now argues that it is incorrect." Dkt. No. 78 at 20.

Plaintiff replies that "[t]he ambiguity of Skysong's statements in the POPR and the contradiction between Fortinet's interpretation of those statements and the clear structural difference between claim 1 and its dependent, cannot and does not rise to a clear and unmistakable disavowal." Dkt. No. 80 at 8–9 (citation omitted).

At the May 29, 2026 hearing, the parties presented oral arguments.

(b) Analysis

Claim 1 of the '721 Patent, for example, recites (emphasis added):

> 1. A system, comprising:
>
> a processor, operable to:
>
> receive data defining a first web content class and a second web content class, the first web content class defining a first plurality of Uniform Resource Locators (URLs), and the second web content class defining a second plurality of URLs different than the first plurality of URLs, the second web content class further being associated with sensitive information presenting a security risk;

> generate a first browser instance, the first browser instance defining a browser instance type predetermined to be associated with the first web content class;
>
> *intercept a request* to access web content from the first browser instance, the request defining a URL of the second plurality of URLs such that the web content is associated with the second web content class; * * *
>
> launch a new browser for accessing the web content associated with the second web content class to provide access to the URL of the second plurality of URLs via the new browser.

2. The system of claim 1, wherein the new browser instance is launched automatically for display, and the web content is associated with a web server.

3. The system of claim 2, wherein the processor is operable to execute an API call configured to *intercept a system call* to the web server, the *system call* to the web server intended to provide access of the URL to the first browser instance.

In IPR proceedings, Plaintiff stated the following in a section titled "PATENT OWNER'S CLAIM CONSTRUCTIONS" and a subsection titled "intercept a request (claim 1)":

> The term "intercept a request" is properly construed as "intercept a system call." In context, claim 1 includes the limitation "intercept a request to access web content from the first browser instance." As Dr. Medvidovic explains, "the '721 patent identifies three different aspects of its enforcement mechanism: (1) enforcement inside the browser, (2) enforcement in a browser extension, and (3) enforcement outside the browser." The first two approaches are internal to the browser, and therefore have no need to "intercept a request" to access web content. "Only the third approach—enforcement outside the browser—requires intercepting a request because it is external to the browser." EX2008 at ¶118.
>
> * * *
>
> [T]he plain and ordinary meaning of the term "intercept a request" [to access web content from the first browser instance] as understood by a POSITA at the relevant time is to "intercept a system call" issued by the browser.

Dkt. No. 78, Ex. F, Dec. 23, 2025 Patent Owner's Preliminary Response at 14 & 16 (citations omitted; square brackets in original).

Plaintiff argues that these statements, if deemed to constitute a definition or disclaimer, apply to only Claim 1 because Plaintiff made these statements as to only Claim 1. Dkt. No. 80 at 8.

Because claim terms are presumed to have the same meaning throughout all of the claims of a particular patent, however, this intrinsic evidence regarding the meaning of "request" can be considered as to all of the claims in this patent. *See Aylus*, 856 F.3d at 1362 ("[S]tatements made by a patent owner during an IPR proceeding, whether before or after an institution decision, can be considered for claim construction and relied upon to support a finding of prosecution disclaimer."); *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("The patentee made a clear and unmistakable disclaimer of claim scope in its prosecution of the parent . . . patent, and we presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.") (citation omitted).

Plaintiff argues that no clear and unmistakable disclaimer occurred because Plaintiff "distinguished between interceptions of requests which occur inside the browser, which do not require interception of a system call, and interceptions of such requests outside the browser, which do require such interceptions . . . ." Dkt. No. 80 at 8 (emphasis added); *see* Dkt. No. 78, Ex. F, Dec. 23, 2025 Patent Owner's Preliminary Response at 14.

The context in which "request" is used in all three claims at issue, however, is similar. Specifically, Claims 7 and 12 of the '721 Patent recite "identifying a request to access an IP address by a first browser instance, the first browser instance being of the first browser type" and "accessing a request to access web content via a first browser instance, the first browser instance being of the first browser type," respectively. These recitals, together with surrounding claim language wherein the request is received "via a browser extension associated with the first browser

instance," are consistent with the context in which Plaintiff affirmatively interpreted "request" as meaning "system call" in the IPR proceedings. *See* Dkt. No. 78, Ex. F, Dec. 23, 2025 Patent Owner's Preliminary Response at 14 & 16.

Dependent Claim 3 (reproduced above) introduces a limitation of "intercept[ing] a system call," which could be read as weighing at least somewhat against Defendant's proposal of interpreting "request" to mean "system call." *See Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.") (citation omitted).

Any such inference from this dependent claim, however, is heavily outweighed by Plaintiff's definitive statements in the IPR proceedings, which should be given effect in the claim constructions here. *See Aylus*, 856 F.3d at 1362; *see also Omega Eng'g*, 334 F.3d at 1334 ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution.") (citation omitted); *Multilayer Stretch*, 831 F.3d at 1360 ("The dependent claim tail cannot wag the independent claim dog."); *N. Am. Vaccine*, 7 F.3d at 1577 (same).

At the May 29, 2026 hearing, Plaintiff argued that its above-cited claim construction in IPR proceedings was erroneous, and Plaintiff cited authority that "[a]n error in the prosecution record must be viewed as are errors in documents in general; that is, would it have been apparent to the interested reader that an error was made, such that it would be unfair to enforce the error." *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1348 (Fed. Cir. 2001). Even assuming for the sake of argument that Plaintiff is correct that the specification discloses requests that are not system calls, Plaintiff does not persuasively demonstrate that its affirmative statement in a section titled "PATENT OWNER'S CLAIM

CONSTRUCTIONS" can be fairly characterized as an "error," let alone one that would have been "apparent to the interested reader." *Id.*; Dkt. No. 78, Ex. F, Dec. 23, 2025 Patent Owner's Preliminary Response at 14.

Finally, also at the May 29, 2026 hearing, Plaintiff emphasized authority purportedly holding that, because the IPR was dismissed without any decision on the merits, Plaintiff's statements in the IPR cannot be given any limiting effect in the present litigation. *Power Integrations, Inc. v. ON Semiconductor Corp.*, 396 F. Supp. 3d 851, 866 (N.D. Cal. 2019). That decision, however, found that the PTAB in that case expressly rejected the interpretation that was at issue (in addition to the court also finding, "most importantly," that the prosecution disclaimer argument had not been timely raised). *Id.* at 863–64. The court also noted:

> . . . [T]his case is unique for the additional reason that the PTAB's decision was vacated and remanded for dismissal because the IPR was time-barred and never should have occurred. It is not clear that the record in a procedurally improper, vacated IPR can or should bind the patentee in future litigation. *Cf. Camreta v. Greene*, 563 U.S. 692, 131 S.Ct. 2020, 2025, 179 L.Ed.2d 1118 (2011) ("Vacatur then rightly strips the decision below of its binding effect, and clears the path for future relitigation." (citations omitted)).

*Id.* at 866. The court's statement regarding what "is not clear" does not compel this Court to adopt the wide-ranging legal principle that Plaintiff here proposes.

The Court accordingly hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| "intercept a request" | **"intercept a system call"** |
| "identifying a request" | **"identifying a system call"** |
| "accessing a request" | **"accessing a system call"** |

**10. "browser instance type" / "first browser type" / "second browser type"**

| **"browser instance type"**<br>**"first browser type"**<br>**"second browser type"**<br>('721 Patent, Claims 1, 7, 12) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning. | "the type of internet browser (e.g., Google Chrome or Mozilla Firefox) used for the instance"<br><br>"first type of internet browser (e.g., Google Chrome or Mozilla Firefox) used for the instance"<br><br>"second type of internet browser (e.g., Google Chrome or Mozilla Firefox) used for the instance" |

Dkt. No. 46 at A-8; Dkt. No. 92, Ex. A at A-21.

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with the following preliminary constructions: "the type of internet browser used for the instance," "the type of internet browser, different from the 'second browser type,'" "the type of internet browser, different from the 'first browser type.'"

(a) The Parties' Positions

Plaintiff argues that "[a] skilled artisan would readily understand the 'browser [instance] type' terms without further construction, and certainly without Fortinet's restrictive gloss limiting them to commercially-branded browsers." Dkt. No. 67 at 22. Plaintiff also argues that "[t]he patent . . . explicitly envisions browser types beyond commercial brands—including privacy-based browsers, onion-based browsers, branded browsers with modified settings (e.g., disabling cookies), and any other browser a user may access." *Id.* at 23.

Defendant responds that "Fortinet's construction is consistent with Skysong's statements to the PTO," and "Fortinet's construction is also consistent with the remainder of the intrinsic record." Dkt. No. 78 at 21 (citation omitted). Defendant also submits: "Contrary to Skysong's contention, Fortinet's construction *does not limit* the claims to Chrome or Firefox. The parenthetical examples are just that—examples." *Id.*

Plaintiff replies that "Fortinet's brand-name examples would narrow the term beyond what the patent teaches, would confuse the jury by excluding browsers such as Tor, which browse the dark web, and is irreconcilable with the patent's discussion that Chrome or Firefox are 'just that—examples.'" Dkt. No. 80 at 9 (quoting Dkt. No. 78 at 21).

At the May 29, 2026 hearing, the parties presented no oral arguments and instead rested on their briefing.

<u>(b) Analysis</u>

Claim 1 of the '721 Patent, for example, recites, in part (emphasis added):

> 1. A system, comprising:
>     a processor, operable to:
>         receive data defining a first web content class and a second web content class, the first web content class defining a first plurality of Uniform Resource Locators (URLs), and the second web content class defining a second plurality of URLs different than the first plurality of URLs, the second web content class further being associated with sensitive information presenting a security risk;
>         generate a first browser instance, the first browser instance defining a *browser instance type* predetermined to be associated with the first web content class;
>         * * *

The specification discloses:

> When a browser is launched by the user, it is associated with the general class. If the user attempts to access a site from a domain in a class other than the general class, then, if there is no active browser instance associated with that class, a new browser instance for that class is created to process and display the site. If there is

> an active browser instance for the class of the requested site, then the request is processed and displayed in that instance. To allow for *using different browsers for different classes*, e.g. using Google Chrome for e-commerce and Mozilla Firefox for banking, we specify the *browser type* rule that should be followed for each class with a type descriptor (that comes immediately after a in the sample file):
>
> 'F': Mozilla Firefox instance should be used
>
> 'C': Google Chrome instance should be used
>
> '=': the launched browser instance should be the same type as the launcher
>
> '!': the launched browser instance type should be different from that of the launcher
>
> '_': places no restriction on the type of the browser
>
> The implicit general class has the implicit type descriptor '_', so both Google Chrome and Mozilla Firefox can be used to browse websites from the general class. While Google Chrome and Firefox have been provided as examples, it is contemplated that *any type of internet browser, or any browser accessible by a user, may be used.*

'721 Patent at 5:43–6:2 (emphasis added).

Defendant agrees that the '721 Patent "contemplates 'any type of internet browser.'" Dkt. No. 78 at 22 (citing Dkt. No. 67 at 22–24).

Although Plaintiff replies that Defendant's proposal "would confuse the jury by excluding browsers such as Tor, which browse the dark web" (Dkt. No. 80 at 9), Defendant's proposal would not exclude any particular browser. Defendant persuasively argues that a construction is appropriate to clarify that the disputed terms require "*different types* of browsers, not two windows or tabs of the same type of browser." (Dkt. No. 78 at 22.)

The Court therefore hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| "browser instance type" | **"the type of internet browser used for the instance"** |
| "first browser type" | **"the type of internet browser, different from the 'second browser type'"** |
| "second browser type" | **"the type of internet browser, different from the 'first browser type'"** |

### 11. "in order to manage according to the rules"

| **"in order to manage according to the rules"**<br>('721 Patent, Claim 12) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Not indefinite; plain and ordinary meaning | Indefinite |

Dkt. No. 46 at A-9; Dkt. No. 92, Ex. A at A-26.

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "Indefinite."

(a) The Parties' Positions

Plaintiff argues that "when read in light of the intrinsic record, a POSITA would have no difficulty understanding what 'the rules' refers to," and "[t]he specification . . . provides detailed, objective guidance for implementation." Dkt. No. 67 at 24 & 25.

Defendant responds that "[t]he phrase 'in order to manage according to the rules' is indefinite because claim 12 never tells a POSITA what 'the rules' are." Dkt. No. 78 at 22.

Plaintiff replies that "Fortinet's indefiniteness challenge fails because the intrinsic record makes clear what 'the rules' are." Dkt. No. 80 at 9.

At the May 29, 2026 hearing, the parties presented oral arguments.

(b) Analysis

Claim 12 of the ’721 Patent recites (emphasis added):

> 12. A non-transitory computer readable medium encoded with a set of instructions for facilitating different categories of content to be displayed in different independent browser instances, the set of instructions, executable by a processor, comprising:
>
> accessing data associating a first web content class with a first browser type and a second web content class with a second browser type;
>
> accessing a request to access web content via a first browser instance, the first browser instance being of the first browser type; and
>
> comparing the web content to the first web content class and the second web content class to determine whether the web content is accessible to the first browser instance, by
>
> implementing a daemon, the daemon comprising a multi-threaded program executed outside the first browser instance that tracks active browser instances and launches a new browser instance *in order to manage according to the rules,*
>
> receiving the request via a browser extension associated with the first browser instance,
>
> forwarding the request from the browser extension to the daemon using domain sockets.

The recital of “the rules” has no explicit antecedent basis. In some cases, antecedent basis can be implicit. *See, e.g., Energizer Holdings, Inc. v. Int’l Trade Comm’n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006) (holding that “an anode gel comprised of zinc as the active anode component” provided implicit antecedent basis for “said zinc anode”). The specification discloses:

> To allow for using different browsers for different classes, e.g. using Google Chrome for e-commerce and Mozilla Firefox for banking, we specify the *browser type rule* that should be followed for each class with a type descriptor (that comes immediately after a in the sample file):
>
> ‘F’: Mozilla Firefox instance should be used
>
> ‘C’: Google Chrome instance should be used
>
> ‘=’: the launched browser instance should be the same type as the launcher
>
> ‘!’: the launched browser instance type should be different from that of the launcher

'_': places no restriction on the type of the browser

'721 Patent at 5:51–63 (emphasis added); *see id.* at 7:12–14 ("an enabler determines when sensitive content is requested and, if needed, launches a new fresh instance of the browser to access the content").

On balance, neither the surrounding claim language nor the specification provide reasonable clarity regarding the meaning of, or antecedent basis for, "the rules" in Claim 12 of the '721 Patent. Plaintiff does not persuasively demonstrate any implicit antecedent basis for "the rules." Plaintiff cites the recital of "data defining rules" in Claim 7 of the '721 Patent (Dkt. No. 67 at 24–25), but Plaintiff's argument that these two claims recite the same "rule-based framework" is unpersuasive because Claims 7 and 12 are separate independent claims. Plaintiff reiterated this argument at the May 29, 2026 hearing but could not cite any authority for relying on a different independent claim to provide antecedent basis.

Plaintiff alternatively suggests that "a POSITA would understand 'rules' in claim 12 as interchangeable with the 'instructions' recited in the claim's preamble." *Id.* at 25. This is not reasonably clear, particularly when considering that the word "instructions" appears in a so-called "*Beauregard*" preamble, which is part of "a claim to a computer readable medium (e.g., a disk, hard drive, or other data storage device) containing program instructions for a computer to perform a particular process." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011) (discussing *In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995)). The word "instructions" referred to by Plaintiff thus refers to the entirety of the body of the claim, including the limitation that recites "the rules," which would be a confusing self-referential interpretation. Plaintiff's arguments are therefore unpersuasive.

Finally, to whatever extent Plaintiff has suggested that no antecedent basis is required (by, in essence, interpreting "according to the rules" as simply "according to rules"), the scope of such "rules" would not be reasonably clear in the context of this claim.

Lack of antecedent basis as to "the rules" thus creates a lack of reasonable certainty and is indefinite. *See, e.g., Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, No. 2019-2191, 813 F. App'x 522, 526 (Fed. Cir. May 14, 2020).

The Court accordingly hereby finds that "in order to manage according to the rules" is **indefinite**.

**12. "exploits on the computer system" / "exploits"**

| **"exploits on the computer system"**<br>**"exploits"**<br>('385 Patent, Claims 1, 8, 15) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "source code or executable software designed to leverage a vulnerability in a computer system" |

Dkt. No. 46 at A-10; Dkt. No. 92, Ex. A at A-31.

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "exploit" means "source code, executable software, or hardware, or a combination thereof, designed to take advantage of a vulnerability in a computer system."

<u>(a) The Parties' Positions</u>

Plaintiff argues that "[t]hese are well-understood terms in the cybersecurity field," and "[t]he specification of the '385 Patent confirms the ordinary, broad meaning." Dkt. No. 67 at 26.

Plaintiff argues that "exploits" can be hardware-based, such as using "bots," or can "include inputs, data payloads, or sequences of commands that leverage vulnerabilities." *Id.* at 26–27 (citation omitted).

Defendant responds that its proposed construction "is backed up by Skysong's IPR arguments, the claims, and the specification." Dkt. No. 78 at 25.

Plaintiff replies that "[t]he specification defines exploits more broadly as techniques used to 'take advantage of a given vulnerability,' including tools, server hardware and data obtained on darknet markets used for exploit campaigns." Dkt. No. 80 at 9–10 (citation omitted).

At the May 29, 2026 hearing, the parties presented no oral arguments and instead rested on their briefing.

(b) Analysis

As a threshold matter, in the IPR proceedings cited by Defendant, Plaintiff did not propose a construction for "exploit" but rather merely applied the petitioner's construction. *See* Dkt. No. 78, Ex. G, Nov. 19, 2025 Patent Owner's Preliminary Response at 17 ("*Petitioner construes* 'obtaining a set of exploits' as 'crawling the net for exploit code.'") (emphasis added); *see also id.*, Ex. H, Nov. 19, 2025 Medvidovic Decl. ¶ 107.

Turning to the specification, the specification discloses, for example:

> The present system introduces a rigorous and thoroughly analyzed framework for addressing penetration testing that is fed with real-world *exploit* market data, mined from the darknet. FIG. 1 provides a schematic diagram 100 of our framework. In one embodiment, a new security game framework 100 is designed to model an attacker with access to *exploit* markets and a defender of information technology infrastructure; theoretical analysis of the framework leading to the development of algorithms to find near-optimal strategies for both players; and an implementation of the system and the results of a thorough suite of experiments on real-world data.
>
> In some embodiments, the framework 100 includes a security game where the attacker 102 is a malicious hacker with access to a darknet *exploit* markets 104 and

> the defender 106 is tasked with host-based defense of either a single or group of systems.

'385 Patent at 3:4–20 (emphasis added). The specification thus provides context for understanding how exploits can be obtained but does not illuminate whether the term "exploits" should be limited to source code and executable software.

Turning to the context in which the claims use the disputed term, Claim 1 of the '385 Patent, for example, recites (emphasis added):

> 1. A system for protecting a computer system from attack, the system comprising:
> a network connection;
> a processing device; and
> a non-transitory computer-readable medium connected to the processing device configured to store instructions that, when executed by the processing device, performs the operations of:
> accessing data through the network connection, the data comprising dark net information associated with *exploits* of a computer system, comprising:
> obtaining a set of *exploits* from the dark net information, the set of *exploits configured to penetrate the computer system*;
> applying an exploit function which takes the set of *exploits* as input and returns a set of vulnerabilities;
> creating a constraint set of the computer system from the set of vulnerabilities, the constraint set comprising a minimum set of dependencies to operate the computer system;
> applying the set of *exploits* to the constraint set of the computer system;
> analyzing the application of the set of *exploits on the computer system* to detect a particular vulnerability of the computer system; and
> altering a configuration of the computer system in response to the analysis of the application of the set of *exploits* to reduce potential damage of a cyberattack.

The patentee thus used the term "exploits" to refer to something that can be "configured to penetrate the computer system." In the context of this usage of "configured," and in the context of being "of a computer system," the term "exploit" refers not to an action but rather to a software or hardware structure.

On one hand, the specification discloses:

> The term ex is used to denote a particular exploit—a *technique* used to take advantage of a given vulnerability.

'385 Patent at 3:53–54 (emphasis added). On the other hand, the specification also discloses:

> Eight marketplaces located on the Tor network were scraped and parsed during the month of May 2015. Each of these markets host vendors offering *"hacking tools"*, including malware, botnets, *exploits* and other means serving to breach, steal and otherwise manipulate virtual targets. The product list is comprised of 235 such hacking tools, 167 of which were distinct.

*Id.* at 7:45–51 (emphasis added). Particularly when read in the context of the above-discussed claim language, the specification confirms that the term "exploits" refers not to *any* "means serving to breach, steal and otherwise manipulate virtual targets" but rather to a type of "tool." *Id.*

The Court therefore hereby construes "exploits" to mean **"source code, executable software, or hardware, or a combination thereof, designed to take advantage of a vulnerability in a computer system."**

**13. ". . . set of vulnerabilities"**

| **". . . set of vulnerabilities"**<br>('385 Patent, Claims 1, 8, 15) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | "the set of vulnerabilities that are exploited by the set of exploits" |

Dkt. No. 46 at A-10; Dkt. No. 92, Ex. A at A-35.

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "a set of vulnerabilities that can be exploited by the set of exploits."

(a) The Parties' Positions

Plaintiff argues that Defendant's proposed construction "is unsupported by the intrinsic record and would improperly read out preferred embodiments from the specification." Dkt. No. 67 at 27.

Defendant responds that its proposal "is consistent with the entirety of the intrinsic record, including the plain language of the claim and the specification's definition of exploit function," and "simply states the input-output relationship that the patent itself defines." Dkt. No. 78 at 26 & 27.

Plaintiff replies: "Fortinet restricts the 'set of vulnerabilities' to only those 'exploited by the set of exploits.' But the specification states the set 'represents the vulnerabilities that are exploited by the exploits in A.' The word 'represents' indicates the set need not be coextensive." Dkt. No. 80 at 10 (citing '385 Patent at 3:61–64).

At the May 29, 2026 hearing, the parties presented no oral arguments and instead rested on their briefing.

(b) Analysis

Claim 1 of the '385 Patent, for example, recites (emphasis added):

> 1. A system for protecting a computer system from attack, the system comprising:
> a network connection;
> a processing device; and
> a non-transitory computer-readable medium connected to the processing device configured to store instructions that, when executed by the processing device, performs the operations of:
> accessing data through the network connection, the data comprising dark net information associated with exploits of a computer system, comprising:
> obtaining a set of exploits from the dark net information, the set of exploits configured to penetrate the computer system;
> *applying an exploit function which takes the set of exploits as input and returns a set of vulnerabilities;*

> creating a constraint set of the computer system from the *set of vulnerabilities*, the constraint set comprising a minimum set of dependencies to operate the computer system;
> applying the set of exploits to the constraint set of the computer system;
> analyzing the application of the set of exploits on the computer system to detect a particular vulnerability of the computer system; and
> altering a configuration of the computer system in response to the analysis of the application of the set of exploits to reduce potential damage of a cyberattack.

The specification discloses:

> The *set of vulnerabilities* produced by ExF(A), for a given *set of exploits* A, represents *the vulnerabilities that are exploited by the exploits* in A. While many possible variations of an exploit function are possible, in this paper, we will use a straightforward definition that extends the exploit function from singletons (whose associated vulnerabilities can be taken directly from the online marketplaces) to sets of exploits.

’385 Patent at 3:61–4:2 (emphasis added).

Plaintiff argues that this disclosure of “represent[ing] the vulnerabilities” demonstrates that “the representative vulnerabilities returned by the exploit function may constitute far fewer than the full set of vulnerabilities exploited by the inputted exploits.” Dkt. No. 67 at 28 (emphasis omitted). Plaintiff’s interpretation is appropriate, especially in light of the claim limitation here at issue reciting an exploit function that “returns *a* set of vulnerabilities,” because the indefinite article “a” in patent parlance “carries the meaning of ‘one or more’ in open-ended claims containing the transitional phrase ‘comprising.’” *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000); *accord Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (“That ‘a’ or ‘an’ can mean ‘one or more’ is best described as a rule, rather than merely as a presumption or even a convention.”). Finally, as for Defendant’s argument that Plaintiff is improperly interpreting the specification as disclosing that the exploit function can

return vulnerabilities "untethered to the inputted exploits" (Dkt. No. 78 at 27), any dispute regarding application of this language has not been presented as a claim construction dispute.

The Court therefore hereby construes "a set of vulnerabilities" to mean **"a set of vulnerabilities that can be exploited by the set of exploits."**

**14. ". . . minimum set of dependencies . . ."**

| **". . . minimum set of dependencies . . ."**<br>('385 Patent, Claims 1, 8, 15) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Not indefinite; plain and ordinary meaning | Indefinite |

Dkt. No. 46 at A-11; Dkt. No. 92, Ex. A at A-38.

Shortly before the start of the May 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "Plain and ordinary meaning."

(a) The Parties' Positions

Plaintiff argues that "the '385 Patent provides a detailed explanation of this concept and supplies an objective lower boundary for the claimed 'minimum,'" and "[t]he specification establishes that the claimed 'minimum set of dependencies' is not an abstract or unbounded concept." Dkt. No. 67 at 29 & 30.

Defendant responds that "'[m]inimum set of dependencies' is indefinite because the patent never defines what counts as a 'dependency,' at what level of abstraction dependencies are to be assessed, or how a POSITA would determine when a set is the 'minimum.'" Dkt. No. 78 at 28.

Plaintiff replies that "Fortinet's indefiniteness challenge fails because the patent provides an objective framework." Dkt. No. 80 at 10.

At the May 29, 2026 hearing, the parties presented oral arguments.

(b) Analysis

Claim 1 of the '385 Patent, for example, recites (emphasis added):

> 1. A system for protecting a computer system from attack, the system comprising:
>
> a network connection;
>
> a processing device; and
>
> a non-transitory computer-readable medium connected to the processing device configured to store instructions that, when executed by the processing device, performs the operations of:
>
> accessing data through the network connection, the data comprising dark net information associated with exploits of a computer system, comprising:
>
> obtaining a set of exploits from the dark net information, the set of exploits configured to penetrate the computer system;
>
> applying an exploit function which takes the set of exploits as input and returns a set of vulnerabilities;
>
> creating a constraint set of the computer system from the set of vulnerabilities, the constraint set comprising a *minimum set of dependencies* to operate the computer system;
>
> applying the set of exploits to the constraint set of the computer system;
>
> analyzing the application of the set of exploits on the computer system to detect a particular vulnerability of the computer system; and
>
> altering a configuration of the computer system in response to the analysis of the application of the set of exploits to reduce potential damage of a cyberattack.

Defendant argues that "dependencies" is unclear and also that "minimum" is a term of degree that lacks objective boundaries. *See, e.g., Akamai Techs., Inc. v. MediaPointe, Inc.*, 159 F.4th 1370, 1378 (Fed. Cir. 2025) ("the patents here do not give the required objective boundaries for determining what is 'optimal' or 'best'"). As a general matter, however, "[c]laim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014). Here the specification provides context, both as to the meaning of "dependencies" and as to "minimum":

> Given a system configuration (or a distribution of system configurations within an organization), the present disclosure models an attacker who, given a budget, will purchase exploits to maximize his level of access to the target system. Likewise, a defender will look to adjust system configurations in an effort to *minimize the effectiveness of an attacker while ensuring that necessary software dependencies are satisfied.*
>
> * * * In a real-world organization, system administrators are not able to patch all vulnerabilities for a variety of reasons. *Software dependencies,* use of legacy systems, and non-availability of patches are some examples. To model this, a "constraint set" (denoted C) is defined as a subset of V. The vulnerabilities in a constraint set represent *the vulnerabilities required for some system functionality.* When each vulnerability in a constraint set C is in the presented attack surface (i.e. externally accessible), C is then said to be satisfied and the system supports the functionality modeled by C.

'385 Patent at 2:63–3:35 (emphasis added). This disclosure in the specification provides context for understanding the claim language reciting "the constraint set comprising a minimum set of dependencies *to operate the computer system,*" together with the constraint set being created "from the set of *vulnerabilities*," as using the word "dependencies" to refer to vulnerabilities that are necessary for operation.

Defendant argues that "a claim whose scope turns on . . . subjective, implementation-specific judgment does not provide reasonable certainty." Dkt. No. 78 at 29. The claim recites what is minimum "to operate the computer system," which is inherently implementation-specific, but not subjective. Defendant's arguments—such as that "[t]wo different administrators could . . . identify different 'necessary' functionality, analyze dependencies at different abstraction levels, and arrive at different 'minimum' sets (*id.*)—is unpersuasive because what is minimum "to operate the computer system" pertains more to how the claimed system is *utilized* rather than to what the claimed system *is*. The fact that two administrators might implement the claimed system differently does not render it indefinite. This is reinforced by claim language reciting analyzing the application of the set of exploits and altering a configuration of the computer system in

response to the analysis (to reduce potential damage). The deposition testimony of Plaintiff's expert cited by Defendant does not show otherwise. *See* Dkt. No. 78, Ex. E, Mar. 17, 2026 Medvidovic dep. 126:5–23, 132:15–25, 134:3–7, 136:12–19, 137:1–138:1, 139:9–23 & 140:3–16.

Defendant therefore has not met its burden to show indefiniteness. Defendant presents no alternative proposed construction, and no further construction is necessary.

The Court accordingly hereby construes "minimum set of dependencies" to have its **plain meaning**.

## V. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 8th day of June, 2026.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

**APPENDIX A**

| <u>Term</u> | <u>Agreed Construction</u> |
|---|---|
| "browser" / "browser instance"<br>('721 Patent, Claims 1, 7, 12) | "web browser" / "web browser instance" |

Dkt. No. 92, Ex. A at A-27.